**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Kelvin Alexander on 01/07/2022**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 20-CV-25271-BECERRA


JENNIFER PELL, A Citizen and
Resident of California,

        Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES LTD.,
a Liberian Corporation,

        Defendant.
_____/



REMOTE VIDEOTAPED DEPOSITION
OF
KELVIN ALEXANDER



Friday, January 7th, 2022
11:22 A.M. – 2:19 P.M.




LOCATION: Via Zoom Videoconference




       - - -


Stenographically Reported By:
Paula Bekker-Murphy, Court Reporter

**Page 2**

APPEARANCES:
(All appearances via Zoom Videoconference)

On behalf of the Plaintiff:
     NICHOLAS I. GERSON, ESQUIRE
     GERSON & SCHWARTZ, PA
     1980 Coral Way
     Miami, Florida 33145
     E-mail: Ngerson@gslawusa.com


On behalf of the Defendant:
     W. COOPER JARNAGIN, ESQUIRE
     GRAY ROBINSON, PA
     515 N. Flagler Drive, Suite 650
     West Palm Beach, Florida 33401
     E-mail: Cooper.jarnagin@gray-robinson.com

ALSO PRESENT:
ROOSEVELT HARRISON, VIDEOGRAPHER

**Page 3**

- - -
I N D E X
- - -

WITNESS:            DIRECT  CROSS  REDIRECT  RECROSS
KELVIN ALEXANDER
BY: MR. GERSON         5

- - -
E X H I B I T S
- - -

MARKED BY PLAINTIFF

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1A | Photograph | 67 |
| Exhibit 2 | E-mail chain | 39 |
| Exhibit 3 | Public area attendant schedule | 51 |
| Exhibit 4 | Photograph | 25 |
| Exhibit 5 | Photograph | 88 |
| Exhibit 6 | Video | 91 |
| Exhibit 7 | Video | 109 |

*Exhibits Retained

**Page 4**

P R O C E E D I N G S
- - -
This deposition was taken stenographically before Paula Bekker-Murphy, Court Reporter and Notary Public in and for the State of Florida at Large, in the above cause.
- - -
THE VIDEOGRAPHER:  All right.  This is the beginning of Media No. 1 in the deposition -- video-recorded deposition of Mr. Kelvin Alexander in the matter of Jennifer Pell versus Royal Caribbean Cruises, LTD.  Today's date is January 7th, 2022.  The time on the monitor is 11:22 A.M.

Counsel, please introduce yourselves, after which the court reporter will swear in the witness.

MR. GERSON:  Nick Gerson on behalf of the plaintiff.

MR. JARNAGIN:  Cooper Jarnagin on behalf of defendant.

///
///
///

**Page 5**

Thereupon,

KELVIN ALEXANDER,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GERSON:

Q.    All right.  Good morning.  Please state your name for the record.

A.    Kelvin Alexander.

Q.    Okay.  Mr. Alexander, you understand you're here for purposes of giving a lawsuit [sic] that's been filed against Royal Caribbean by Jennifer Pell?

A.    Yes.

Q.    Have you ever given your deposition before?

A.    No.

Q.    All right.  Where are you -- where are you right now?

A.    Presently we are -- I'm on the Adventure of the Seas.  We are in our home port today in Galveston, Texas.

Q.    Adventure of the Seas in Galveston, Texas?

A.    Correct.

Q.    All right.  Let me just explain to you a

**Page 6**

couple of the ground rules, Mr. Alexander.  I'll be asking you a series of questions, and you're required to answer all my questions truthfully.

You just swore your right hand which means that you've declared under penalty of perjury that if you don't tell the truth, there can be consequences including fines, even incarceration if it's determined that you've lied or not been candid, okay?  I'm not trying to threaten you; I'm just trying to explain to you what the rules are for today, okay?

A.    Okay.

Q.    Every question that I ask you requires a verbal response.  And it's important that you try not to speak over me and I'll try not to speak over you.

If you don't understand a question, you can tell me that.  If you do -- if you answer, I will assume that you understood it.

Okay.  So -- all right.  So with that said, what is your -- what is your occupation, Kelvin?

A.    I presently work with Royal Caribbean Group as the executive housekeeper on board the Adventure of the Seas.

THE REPORTER:  So sorry.  Can --

BY MR. GERSON:

Q.    All right, Mr. Alexander.  Let me just

**Page 7**

tell you right now.  It's important that you speak slowly and clearly, okay?

A.    Okay.

Q.    So please do your best to do so.

A.    All right.

Q.    That way the court reporter can take down my questions and your answers so there can be a record of all this.

A.    Okay.

Q.    All right.  It's also being videoed, so everything that you say is going to be seen by a jury or a judge if needed, okay?

A.    Okay.  Gotcha.

Q.    Okay.  So you mentioned that your position was executive housekeeper; is that correct?

A.    That is correct.

Q.    And what is an executive housekeeper?

A.    I'm in charge of the housekeeping operation, accommodation, public area, and the laundry operation.

Q.    You're in charge of housekeeping, public areas, and what was the third?

A.    The second one is public areas accommodation, and the laundry operation.

Q.    Can you say that last one?  I didn't

**Page 8**

understand what you said.  Laundry, is that it?

A.    Laundry, that is correct.  Laundry operations.

Q.    Okay.  How long have you been an executive housekeeper for Royal Caribbean?

A.    Royal Caribbean, I've been an executive housekeeper for 11 years.

Q.    And if you don't mind me asking, where are you from originally?

A.    I'm from Trinidad and Tobago, the Caribbean.

Q.    Trinidad and Tobago?

A.    That's correct.

Q.    And you've worked for Royal Caribbean for the last 11 years; is that correct?  Or just as an executive housekeeper for 11 years?

A.    As an executive housekeeper.  I work for Royal Caribbean for 30 years.

Q.    Wow.  So 30 years you've been employed by Royal Caribbean?

A.    That is correct.

Q.    And tell me, when did you rejoin the Adventure of the Seas?

A.    I rejoined the Adventure of the Seas on November the 12th.

**Page 9**

Q.    November the 12th?

A.    That's correct.

Q.    And you've been on the Adventure of the Seas for the last almost two months?

A.    That is correct, yes.

Q.    Okay.  Can you walk me through -- you mentioned that in the last 11 years that you've worked as an executive housekeeper.

Tell me how -- walk me through your educational background up until your current job as an executive housekeeper on the Adventure of the Seas the best you can.

A.    For the company or before I joined the company?

Q.    Well, what is your educational background?  Tell me that.

A.    Well, actually, I went to elementary school, I went to high school, I went to Trinidad and Tobago UE, and after that I applied for the cruise ship job in 1991.

Q.    Okay.

A.    I started out on -- I started out in the food and beverages as a utility, and then I work my way up to the company from utility to crew mess attendant and stockkeepers, and then housekeeping

Page 10

admin, then housekeeping supervisor, then assistant executive housekeeper, then --

THE REPORTER:  I'm sorry, Mr. Alexander. Can you just speak just a little bit slower again.

THE WITNESS:  Okay.

A.    I started off as a utility in 1991 with the company, and I work my way through -- up -- through the provision stockkeeper, hotel stockkeeper, housekeeping admin, deck supervisor, first housekeeper, and now I'm executive housekeeper.

BY MR. GERSON:

Q.    Okay.  And you were the executive housekeeper on the Adventure of the Seas or -- strike that.

You were the executive housekeeper on the Enchantment of the Seas back on January the 16th, 2020?

A.    Yes.

Q.    And how long had you been working on the Adventure -- excuse me -- on the Enchantment of the Seas as of January the 16th, 2020?

A.    I -- I work, I think, about three to four contracts there.  We have a four months' contract.

Q.    So a typical employment arrangement is

Page 11

that you sign a contract for a period of months; is that correct?

A.    That is correct, yes.

Q.    And you mentioned that you -- you mentioned that this was your third or fourth contract on the Enchantment of the Seas; is that correct?

A.    That is correct.

Q.    So can you just tell me generally how many months you estimate you had been working continuously on the Enchantment of the Seas prior to January the 16th, 2020?

A.    Continuously we work four months and then we get two months off for vacation.  So within that -- January 16th -- I think I signed on the Enchantment sometime in October, and I sign off on February 3rd.  That was two weeks before [sic] the incident on January the 16th.

Q.    So you signed off two weeks later from the date of the incident involving Ms. Pell?

A.    That is correct.

Q.    And you had been working for approximately 16 consecutive months?

A.    No.  I work for four months -- four months consecutive, then two months' vacation.

Q.    Okay.

Page 12

A.    So we do --

Q.    You worked approximately -- so over what time span -- how many years did you work on the Adventure of the Seas?  For almost two years?

A.    The Adventure or the Enchantment?

Q.    On the Enchantment.

A.    Okay.  If you put it -- almost 16 months you could say, but not consecutive.  It's on a four-month -- after four months, yes, so it's around 16 months.

Q.    Okay.  And prior to working for the 16 months on the Enchantment of the Seas before January 16th, 2020, what other vessels did you work on?

A.    I was on the Quantum in Asia for over three or four years.  And I worked on --

Q.    Quantum?

A.    Quantum of the Seas, yeah.

Q.    Okay.  The Quantum of the Seas, that's a class of ship for Royal Caribbean, right?

A.    Correct.  That is correct, yes.

Q.    That would be a different class from, say, the Enchantment of the Seas, correct?

A.    Yes, that is correct.

Q.    The Enchantment of the Seas would be part of which class of Royal Caribbean vessels?

Page 13

A.    Enchantment of the Seas would be the vision class.

THE REPORTER:  I'm sorry.  Can you repeat that?

BY MR. GERSON:

Q.    Vision class?

A.    Yeah, vision class.

THE REPORTER:  Vision class?

THE WITNESS:  Vision class, yeah.

BY MR. GERSON:

Q.    Do you know how many vessels consist of the vision class?

A.    Five.

Q.    Do you know what those vessels are?

A.    Yeah.  Vision of the Seas, Enchantment of the Seas, Brilliance of the Seas, Rhapsody of the Seas, and I can't remember the other one, but there's another one.  Five of them, there's five of them.

Q.    Is it safe to say that you've worked on all the different vision-class vessels in your 30-year tenure working for Royal Caribbean?

A.    Yeah.  I worked on a few classes, and -- not all of them, but a few classes, like two or three of them.  Overall I work maybe around 15 ships for the past 30 years.

Page 14

Q.   Okay.  Who do you report -- who do you report to, Mr. Alexander?

A.   I report directly to the hotel director.

Q.   And who is the hotel director?

MR. JARNAGIN:  Objection.  Form.

A.   On the Adventure or the Enchantment?

BY MR. GERSON:

Q.   Yes.  Well, let's start with the vessel you're currently stationed at.  Who do you -- who is the hotel director from the -- let me ask the question, sir, please.  Otherwise it's going to be a very long afternoon, okay?

So my question for you was:  Who is the hotel director that you currently report to today?

A.   That's Sanjey.

Q.   Sanjey?

A.   Sanjey, S-A-N-J-E-Y.

Q.   Okay.  And who did you report to when you were working for the Enchantment of the Seas?

A.   Francois.

Q.   Francois Cavalier?

A.   That is correct, yeah.

Q.   So when you working on the Enchantment of the -- strike that.

You were working on the Enchantment of the

Page 15

Seas when Ms. Pell was injured, correct?

A.   Yeah, that's correct.

Q.   Okay.  And when you were -- and at the time, your direct report was to the hotel director, and that person was Francois Cavalier, correct?

A.   Correct.

Q.   And have you spoken to Mr. Cavalier at any time since being notified about your deposition testimony?

A.   No.

Q.   When was -- when was the last time you spoke to Francois?

A.   The -- the morning before I signed off on February the 3rd.

Q.   Okay.  And tell me, in preparation for today's deposition, did you review any documents?

A.   Yes, that e-mail -- the e-mail which was sent from Francois.

Q.   So you reviewed an e-mail that was sent from Francois?

A.   Yes.

Q.   Do you have a copy of that e-mail with you?

A.   No.

Q.   Where do -- you have a laptop in front of

Page 16

you, correct?

A.   No.

Q.   You have a laptop in front of you, correct?

A.   Pardon?  I'm sorry.

Q.   You have a laptop --

A.   No.  A desktop.

Q.   -- in front of you, correct?

Okay.  Can you -- can you access the e-mail that Francois sent you?

A.   No, I don't have it at my -- on my -- my desktop, no.

Q.   What was the e-mail about that you reviewed?  What do you recall?

A.   There was an accident.  There was a slip and -- slip by the pool, and the guest got injured, and then for us to -- to make sure that the -- we -- we remind the guys to keep the pool area dry at all times.

That's the normal training that we give whenever there's an incident by the pool.  We get the team together and give them a briefing.  So the e-mail was just about the incident with the guest.

Q.   Okay.  Did you review the video footage of the incident?

Page 17

A.   No.

Q.   Other than the e-mail, did you review any of the photographs that were taken in connection with the incident?

A.   No.

Q.   When did you review the e-mail that you referred to from Francois?

A.   Pardon?  Sorry.  You break up a little. When?

Q.   When -- when did you review the e-mail that you were just referring to from Francois?

A.   The e-mail?

Q.   Yes.

A.   I got it -- a couple months ago I got the e-mail.

Q.   Okay.  Did you -- strike that.

So do you have -- are you familiar with the policies and procedures that apply to maintaining the pool deck in a dry condition?

A.   Yes.

Q.   What are -- what are the procedures?

A.   To maintain -- the procedures for the pool, like, in a dry environment.  We have continuous pool attendants on both port and starboard side actually walking around with the equipment, which is

Page 18

the dustpan and the broom and the mop and the bucket to make sure that the pool is being kept clean at all times, that's in the dry condition. We also have -- yes.

Q. I'm listening. Keep going.

A. Right. So -- and we also have -- just in case there's any spill, they have the mop and the bucket ready to attend to it immediately.

Q. Are the policies and procedures for the ship personnel that are supposed to maintain the pool deck and monitor it for any wet areas, is that a written policy?

A. Yes.

Q. What is that policy called?

A. It's -- I cannot recall it offhand.

Q. You don't know what the name of the policy is that applies to maintaining the pool deck in a dry condition?

MR. JARNAGIN: Objection. Form.

A. It's -- yeah. It's the -- to my recollection, it's the -- to maintain the pool and the outer deck and pool safety.

BY MR. GERSON:

Q. What is that -- what is that policy called? Does it have a title?

Page 19

A. I cannot remember the -- the number itself, you know. There's a -- 4-point-something-something-something. I cannot remember the number offhand. But yes, there's a policy marked pool safety and -- pool safety and -- pool safety environment and how to maintain the safety and cleanliness of the pool.

Q. Who is responsible for overseeing the personnel from Royal Caribbean to ensure that they are actually on the pool deck monitoring the area, the floors on the pool deck, for any wet or other slippery conditions?

A. We have the head pool attendant.

Q. How many head pool attendants are there assigned to the pool deck on the Enchantment of the Seas?

A. We have one head pool attendant. And we have one FCS, that's facility cleaning specialist as well.

Q. What is the total number of ship personnel that are assigned to the pool deck on the Enchantment of the Seas to make sure that the walkway and surfaces are maintained in a dry condition?

A. We have eight of them on the day, and four of them on the night shift. So on the day shift we

Page 20

have eight of them available.

Q. Okay. And so it's your testimony as the executive housekeeper for the Enchantment of the Seas that there's supposed to be roughly -- or you said eight personnel assigned to the pool deck; is that correct?

MR. JARNAGIN: Objection.

A. That's correct.

BY MR. GERSON:

Q. Are the eight personnel assigned to the pool deck supposed to be assigned -- are they all working on the pool deck at the same time?

A. We have one of them on the open decks, one of them -- two of them in the solarium, we have four of them around the pool area, and we have one of them up on deck number 12 as well.

Q. Okay. You are familiar with deck 9, are you not, of the Enchantment of the Seas?

A. Deck 9, yes.

Q. Deck 9 would be the pool area and also where the jacuzzi is located, correct?

A. Yeah, that's correct.

Q. And if I understood you correctly, you told me of the eight personnel that are assigned to monitor the pool decks, that -- and correct me if I'm

Page 21

wrong, that there are a total of four personnel that are supposed to be assigned to the pool deck located on deck 9. Is that a correct statement?

A. That is correct.

Q. And what are the positions of the personnel -- of the four persons that are supposed to be assigned to deck 9 as you've stated?

A. We have two on port side and two on starboard side. And they make continuous walk checking for all -- any cups and plates where guests leave on the floor, leave on the table, clean up the area, and they constantly walk to see if there's any -- any cleanliness needs to be done or any -- anything needs to be done down by the pool.

Q. So two on the port side and two on the which side?

A. Starboard side.

Q. Two on the port side and two on the starboard side, so that would be left and right, correct?

A. That is correct.

Q. And the -- the personnel that you've referred to, what are their positions for the four people that are supposed to be stationed, two on the port side and two on the starboard side?

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Kelvin Alexander on 01/07/2022**                    **Pages 22..25**

Page 22

A.   Yeah, that's the head pool attendant.  He oversees the pool operation when it coming to the cleanliness and the maintenance of the pool.  He actually is monitoring them as well, constantly walking around them, checking, greeting the guest, talking to the guest, you know, with any issues, you know.

So he may connect to the guest, and making sure that the guys are actually doing what they're supposed to be doing.

Q.   I don't -- okay.  I'm not sure you understood me.

What I was asking you, Kelvin, was: What is the job title of the two -- of the four people that are stationed on the -- on deck 9 to monitor it for wet and other hazard-like cups and spills like you just mentioned?

MR. JARNAGIN:  Objection.  Form.

A.   That's the -- that's the pool attendants.

BY MR. GERSON:

Q.   The pool attendants.

And how do the pool attendants get their assignments?

A.   Every morning they have the briefing at 6:00 with the head pool attendant, and they give out

Page 23

all the assignment that need to be done throughout the day.

Q.   Are you familiar with something called a PAA schedule?

A.   Yeah, PAA, that's the public area attendant.  It's the same -- pool attendant, same position.

Q.   So there's an actual document that is used on a daily basis that tells the cruise ship personnel who is supposed to be stationed where.  Is that an accurate statement?

A.   No.

Q.   Okay.  You were telling me the PAA schedule is -- you're familiar with the PAA schedule, correct?

A.   Yes.  They work -- yeah.

Q.   Who -- tell the members of the jury what a PAA schedule is.

A.   Public attendant schedule is a schedule that lay out for -- the pool -- the public area attendant to the time they begin work, the time they go for break, the time they start back, and the time they finish their duty.  That's our daily working schedule.

Q.   And would the four crew members that you

Page 24

referred to that should have -- that were assigned to the pool deck on the Enchantment of the Seas, would they have been provided with a copy of the PAA schedule when -- on January the 16th, 2020?

A.   Yes.  The -- actually, the schedule is posted on the --

THE REPORTER:  I'm sorry.  The schedule is posted on the?

THE WITNESS:  On the notice board.

BY MR. GERSON:

Q.   Who creates the PAA schedule?

A.   The facility cleaning specialist in conjunction with the head pool attendant.

Q.   So the PAA schedule is created by the facility cleaning specialist and the head pool attendant?

A.   Correct.

Q.   And what is your role with respect to the public area attendant schedule or the PAA schedule as I've been referring to?

A.   My role is to ensure that the schedule covers the -- the working hours for the day and the areas need to be covered for the day.

So after they -- they finalize the schedule, they bring it to me for approval.  And as

Page 25

long as it fits in the operation, definitely we go ahead and approve it, and then it is post and explained to all the pool attendants and the PAA attendants that this is the schedule for the cruise, that this is the schedule for the day.

Q.   So let me show you what we are going to mark as an exhibit to the deposition.  This will be Plaintiff's Exhibit 1 [sic].  I'd like you to take a look at what is on the screen.

Do you see this?

A.   I just -- okay.

(Plaintiff's Exhibit 4 was marked for identification.)

BY MR. GERSON:

Q.   Do you see what's on the screen?  Sorry.  It's Exhibit 4, Plaintiff's Exhibit 4.

Do you recognize Exhibit 4?

A.   Yeah, I see it.

Q.   I'll represent to you that Exhibit 4 is a photograph taken of the Enchantment of the Seas.

Do you recognize Exhibit 4 as a photograph of deck 9 of the Enchantment of the Seas?

A.   Yeah.

Q.   Does this fairly and accurately depict generally what the configuration is of the Enchantment

Page 26

of the Seas when the ship is in port?

A.  Yeah, I can see it.

Q.  Do you see the numbers 1 and then the numbers 2 on the screen?

A.  Yes.  Yeah.

Q.  Are the personnel that you referred to, the four ship personnel, are any of those ship personnel supposed to monitor the area from 1, and if you go to my cursor, to 2, this walkway area?

A.  Yes.

Q.  Tell me about that.

A.  Do I see any of the personnel?  Is that the question?

Q.  No.  My question for you was -- I asked you if cruise ship personnel are supposed to monitor the area, the walkway area between 1 and 2 as depicted in this photograph.

You see that?

A.  Yeah, I can see it.  I can see the 1 and 2, yes.

Q.  Okay.  You mentioned earlier that the cruise ship personnel that you referred to, that there were two on the port side and two on the starboard side, that they're supposed to be monitoring the walkways continuously, correct?

Page 27

A.  Correct.

Q.  Is that important for the safety of the pool deck?

A.  Yes.  Monitoring -- monitoring the pool area, yes, that's -- that is part of their daily assignment.  That's part of their duties, yes.

Q.  Is the area between 1 and 2 as depicted in this photograph an area where the pool attendants are supposed to be monitoring for potential safety hazards?

A.  I'm sorry.  I lost your audio.  I cannot hear you.  I lost your audio.

Q.  I was just saying, sir, you would agree that the area between 1 and the number 2 is an area where the pool attendants are supposed to be monitoring for any wet or risk-creating hazards, correct?

MR. JARNAGIN:  Objection.  Form.

A.  Yes.

BY MR. GERSON:

Q.  And what would you describe the area depicted in this photograph between 1 and 2?

A.  I'm sorry.  You break up.

Q.  What would you refer to the area depicted between 1 and 2?  What do you call this area?

Page 28

A.  This is -- this is the port side forward -- forward pool deck.  It's just opposite the kids pool.

Q.  Okay.  And this is an area -- this area, port side, say that again.  Port side, what did you call it?

A.  Port side forward.

Q.  Yep.

A.  And just opposite the kids pool.

Q.  Port side forward just opposite the kids pool?

A.  Yeah.

Q.  And so there's supposed to be two -- at least two cruise ship personnel stationed on the port side area monitoring the walkways and the deck surfaces to keep an eye out for any wet areas or anything else that can cause a hazard to a passenger, correct?

MR. JARNAGIN:  Objection.  Form.

A.  That is correct.  You will not find them stationed or standing at one place.  They will be continuously moving.

BY MR. GERSON:

Q.  Okay.  And how often -- the two public area attendants, would you agree that the positions

Page 29

that you're referring to, they're public area attendants?  Is that an accurate statement?

A.  That is correct.

Q.  So on the morning of January -- on the day of January the 16th, 2020, there's supposed to be two personnel continuously monitoring the port -- starboard side area walkway continuously, correct?

A.  Yes.

Q.  And what are your -- what are the -- as the executive housekeeper, what if a wet area is identified by a public area attendant, what are they supposed to do?

A.  They clean it up immediately.

Q.  Do the public area attendants have any -- I think you mentioned they have a mop with them; is that correct?

A.  They have a mop, they have a bucket, sometime -- and they have a dustpan and they have the scoopers.

Q.  Is the mop supposed to be with them at the time that they're doing the inspections?

A.  No.  The mop is in a station in another area, but the dustpan and the broom supposed to be with them, yes.  If there's a spill --

Q.  Okay.  And if we go back to the -- the

Page 30

photograph that I was just showing you, Exhibit 4 here, of the two pool attendants that are supposed to be assigned to the port side aft by the kids pool, they're supposed to be -- are they supposed to be stationed in the same place?

A.    No.  They stationed -- like I said, they continuously walk all over the place on port side. They move from point A to point B, point A to point B. They move --

Q.    So they're --

(Simultaneous speakers.)

BY MR. GERSON:

Q.    Okay.  I'm trying not to talk over you, and I'd appreciate if you tried not to talk over me. I understand that it's difficult because you're on a cruise ship and I'm on land, okay?  So let's try this again.

Tell me again what your understanding is as the executive housekeeper about what the two personnel -- two of the four crew members are supposed to be doing on the port side by the kids pool as depicted in Exhibit 4.

A.    They supposed to be walking.  They have the broom and dustpan with them.  They walking to see if there's any garbage on the floor.  They clean up

Page 31

any -- if there's any spill, they attend to it immediately.  So they're --

Q.    Do they --

A.    -- maintaining cleanliness of the area.

Q.    Okay.  And you said that they're supposed to be walking continuously, correct?

A.    Yeah, that is correct.  Yes.

Q.    The purpose of the public area attendants that are assigned to the pool deck, their primary purpose is to make sure that the deck is dry and free from any hazards, correct?

MR. JARNAGIN:  Objection.  Form.

A.    That is -- that is part of it.  They also maintain the cleanliness as well.

BY MR. GERSON:

Q.    Okay.  Is -- now, if we look at Exhibit 4, the pool deck located on deck 9, that is -- more or less, that's the top deck of the ship, correct?

A.    Yes.  That's the top, main deck of the ship, yes.

Q.    And the pool deck on deck -- the deck -- the pool that's located on deck 9 is -- that's probably the largest open deck on the entire vessel. Would you agree with that?

A.    Agree.

Page 32

Q.    All right.  And that's also a place where there's the most number of slip-and-fall accidents, isn't it?

MR. JARNAGIN:  Objection.  Form.

A.    No.  No, I wouldn't say that.

BY MR. GERSON:

Q.    Where -- okay.  Well, are slip-and-fall accidents something that do occur on the pool deck?

A.    No.  It's not a common --

Q.    In your --

A.    It could happen, but it's not a common thing that we encounter.

Q.    Tell me about that.  How do you know that?

A.    Because whenever there's any slip and fall, there's obviously -- it -- it will be reported, and then we get to know.

Q.    Where else on a Royal Caribbean ship are there more accidents -- more slip and falls or more falls on deck -- as opposed to deck 9 --

MR. JARNAGIN:  Objection.

BY MR. GERSON:

Q.    -- on the pool deck?

A.    Actually, there's nowhere else, to my recollection.

Q.    You're not aware of anywhere else where

Page 33

there's as many slip and falls other than the pool deck, are you?

MR. JARNAGIN:  Objection.  Form.

A.    No.  There is -- actually, there are not -- there is no other -- where -- on the ship that's -- you know, people could slip and fall.

BY MR. GERSON:

Q.    I don't -- say that again.

A.    No, there's nowhere around the ship other people can slip and fall unless it's human error, you know.

Q.    So as the executive housekeeper for Royal Caribbean, the only way someone can slip and fall is due to human error?

A.    No.

MR. JARNAGIN:  Objection.  Form.

BY MR. GERSON:

Q.    Well, you just told me that the only way someone can slip and fall is due to human error.

What did you -- what did you mean by that?

A.    Well, meaning that slip and fall is something common, right?  Around the pool area, let's say, for example, is an area where, you know, there's continuous activities, continuous running, you know.

So eventually human error -- they could

Page 34

make mistakes and fall, you know. But if you actually walking and just slip and fall because of a trip over a chair, then it's impossible because everything is visual.

Q. Can crew members commit human error?

A. Can crew members?

Q. Yes.

A. Excuse me. Can you repeat?

Q. Can crew members commit human error?

A. Yes, they can commit human error. Yeah. We all entitled to make human errors.

Q. Okay. Would it be a violation of Royal Caribbean's policies and procedures for public area attendants if crew members were not monitoring the walkway on deck 9 as they should do in Exhibit 4?

MR. JARNAGIN: Objection. Form.

A. Yeah. If the crew member is -- based on the supervision there, we have constant supervision. And if the crew member do violate the area, yes, there could be consequences based on the nature of the violation.

BY MR. GERSON:

Q. If there was a violation of the monitoring policies and procedures and inspection of the pool deck, what would you do as the executive housekeeper

Page 35

if you learned of such a violation?

A. If it's brought to my attention, first I do investigation and find out what was the root cause, why did this happen, yeah.

Based on the investigation -- based on the investigation conducted, sometime the employee might be going to the bathroom, they might be going somewhere, go take a break without informing their supervisor.

So based on the nature of the violation of not being present, yes, I take it into consideration, and we could exercise certain action on my part.

Q. Would that -- would you perhaps have a meeting as a result of your investigation into a violation of a policy and procedure like the inspection policy that you were referring to that's applicable to the pool deck?

MR. JARNAGIN: Objection. Form.

A. Yes, we -- we could have a meeting with the team and explain to them that this is what was observed and let's try to avoid it in the future.

BY MR. GERSON:

Q. Now, you actually had a meeting with the pool attendants in connection with Ms. Pell's fall, didn't you?

Page 36

A. Yeah, we had a meeting, to my recollection, I think the day after.

Q. And in that meeting, it's my understanding that you -- what do you recall about that meeting?

A. We stressed that there -- there was an accident yesterday, and we must make sure that, you know, we maintain the pool area cleanliness, and whatever need to be done around by the pool, just make sure that we try our best to avoid any -- any accident or any slip from our guest.

Q. Do you recall reviewing the report arrangement for the pool area attendants in connection with Ms. Pell's fall?

A. No.

Q. Do you know what a report arrangement is?

A. Can you --

THE REPORTER: I'm sorry?

BY MR. GERSON:

Q. Well --

THE REPORTER: Can you repeat your answer?

BY MR. GERSON:

Q. Do you know -- Kelvin, as you sit here today in front of a federal jury, are you telling the members of the jury that you're not familiar with

Page 37

something called a report arrangement?

MR. JARNAGIN: Objection.

A. Can you -- can you ask the question, please?

BY MR. GERSON:

Q. Sure. Are you telling the members of the jury that you're not familiar with something called a report arrangement?

MR. JARNAGIN: Objection. Form.

A. Is that specific to the job -- the job specifics?

BY MR. GERSON:

Q. I'm asking you, Mr. Alexander, as the executive housekeeper for Royal Caribbean for the last 11 years, I believe, are you telling me that you don't know what a report arrangement is for public area attendants?

MR. JARNAGIN: Objection. Form.

A. No. Of course. Yes. The report arrangement, yes.

BY MR. GERSON:

Q. Okay. Would you please tell me what a report arrangement is?

A. The report arrangement is the -- whatever issues you have by the pool, all reports go to the

Page 38

head pool attendant, then it comes to the facility cleaning specialist, and then it have been addressed.

Q.   Is the report arrangement the assignments for the people that are supposed to be stationed on the pool deck?

A.   Yes.

Q.   Is the report arrangement the same thing as the PAA schedule?

A.   It fits in the schedule, yes.

Q.   Okay.  So let me show you what we're going to mark as an exhibit, the next exhibit to the deposition, and I would like you to take a look at what is marked as Plaintiff's Exhibit 2.

Do you see this?

A.   Yeah, Exhibit 2.

Q.   I asked you earlier --

MR. JARNAGIN:  Nick, there's several different files on the screen.

MR. GERSON:  I'm sorry?

MR. JARNAGIN:  There's several different files on the screen.

MR. GERSON:  Okay.

THE WITNESS:  Yeah.

MR. GERSON:  All right.  Hold on a second.

Page 39

(Plaintiff's Exhibit 2 was marked for identification.)

BY MR. GERSON:

Q.   Okay.  Take a look at what now we've got marked as Exhibit 4 -- excuse me -- Exhibit 2.

Do you see Exhibit 2?

A.   Yeah, I can see it.

Q.   Exhibit 2 -- and I'll represent to you, this was produced by Royal Caribbean's lawyers in connection with the lawsuit involving Ms. Pell.

Do you see it?

A.   I can see it.

Q.   When I asked you earlier about what documents you reviewed in preparation of your deposition, you made reference to an e-mail.

Would you please tell me if this refreshes your recollection as to the e-mail that you reviewed?

A.   Correct.

Q.   Okay.  If we look at Exhibit 2, Exhibit 2 is an e-mail from the executive hotel director.  That would be you, correct?

MR. JARNAGIN:  Objection.  Form.

A.   No.  I'm the executive housekeeper.

BY MR. GERSON:

Q.   Excuse me.  It's from the executive --

Page 40

well, if we take a look at Exhibit 2, do you see that you wrote an e-mail to Francois, and it appears to be on January the 16th, 2020?  Do you see that?

A.   I can see it, yes.  I recall this e-mail.

Q.   Okay.  And in this e-mail -- this would have been the same day that Ms. Pell was injured on the pool deck, correct?

A.   January the 16th, yes, correct.

Q.   Would you read into the record what the e-mail says as you wrote to Francois, the executive hotel director?

A.   Hello, Francois.  Absolutely, as soon as I saw the report arrangement, already I meet with all -- I already to meet with all the pool PAs at the pool at 17:00 tomorrow evening to set the tone and expectation to everyone working -- oh, thank you -- working on the pool deck.  Also, this will be highlighted every morning during the briefing.  In additional, this will be address to the rest of the PA this voyage ensuring all are in the same vision for our upcoming rotation at the end of next month.  Thank you, Francois, and indeed I am on top of this.

Q.   Okay.  So this is an -- do you recognize this e-mail as being sent to Francois following your review of the pool -- of the report arrangement for

Page 41

the Enchantment of the Seas on January the 16th?  Correct?

MR. JARNAGIN:  Objection.  Form.

A.   I saw the -- I recall this e-mail, yeah.

BY MR. GERSON:

Q.   I'm sorry?

A.   I recall this e-mail, yes.

Q.   Why did you send this e-mail to the -- to the hotel director?

A.   I reply back on -- based on what he sent to me.

Q.   A little below it, it says, "Hi Kelvin, would you please stress to the PA team the importance to squeegee regularly and keep the" -- and then it's cut -- "the deck dry."

Do you see that?

A.   Yeah, I see that.  Yeah.

Q.   What is your understanding of why the hotel director was telling you to stress the importance to the PA team to squeegee and regularly keep the deck dry?

A.   Based on the e-mail that he sent, the guest slipped.  It's something that we -- it's a common thing that we normally do.

If it do happen, he send an e-mail and we

Page 42

have a meeting, make sure that, you know, everyone is aware of what happened, and just for us to be on top of the ball to ensure that we maintain the pool area as much as possible.

Q.    Did you have a meeting with the pool attendants and stress the importance of making sure that the pool was kept dry?

A.    Yes, the next day after, we did.

Q.    Had you had any meetings prior to Ms. Pell's fall with the pool deck attendants to stress the importance of keeping the deck dry?

A.    The pool -- the pool -- we do keep that in our morning briefing, and a lot of -- many other safety aspect with the pool operation.

So safety and reminders, yes, are being addressed to them on a daily basis during our morning briefing.  If there's an incident like this, we'll focus more on it and make sure that the message goes on each shift, morning shift and night shift, and also whenever we have a location.

Q.    Who did you meet with on the pool area attendant side to stress the importance of keeping the pool deck dry following Ms. Pell's fall?

A.    Yeah.  We have eight pool attendants.  We met the eight pool attendants.

Page 43

Q.    Who were the eight pool attendants that you had this meeting with?

A.    I cannot recall their name.  Sorry.

Q.    Do you know -- when you say you don't recall their names, do you specifically recall having a meeting with the pool deck attendants in connection with this e-mail that you sent to Francois on January the 16th --

A.    Yes.

Q.    Yes?

A.    I recall -- I recall that I had a meeting with them in conjunction with the facility cleaning specialist and the head pool attendant.  But the head -- the pool attendant for them, it's a long time.  I cannot remember their name or their face.

Q.    Did you review the video footage in connection with Ms. Pell's fall?

A.    No.

Q.    If you were to watch the video of Ms. Pell's fall, how -- would you expect to see the pool area attendants walking through the area where Ms. Pell fell to inspect it on a periodic basis?

MR. JARNAGIN:  Objection.  Form.

A.    I don't see the video so I cannot really, you know, predict that somebody would be there

Page 44

or someone --

BY MR. GERSON:

Q.    Have you ever -- okay.  Would you expect over a period of a two-minute span to see at least a pool deck area attendant go through the walkway area that I just showed you to monitor it and to make sure that it was in a dry condition?

MR. JARNAGIN:  Objection.  Form.

A.    There is a possibility yes.  There's a possibility no.

BY MR. GERSON:

Q.    How much time would you expect to go by for there to be a pool area attendant walking through the area that I showed you in Exhibit 4 between 1 and 2?  And I could put that back up on the screen if you need.

A.    Should take him approximately about maybe couple minutes; two, three, four minutes.  Because if they're on the way and they're picking up cups and glass and stuff like that as well, they have to go to the pantry and drop it off and then come back, so it should be a couple of minutes.

Q.    So you wouldn't expect more than a couple minutes to go by before a pool area attendant walks through the area that I just showed you in the first

Page 45

exhibit to the deposition, correct?

MR. JARNAGIN:  Objection.  Form.

A.    It would not -- it would not be specific, but it could be lesser, it could be more.  But at that time, I couldn't say exactly how long it would take.

BY MR. GERSON:

Q.    Now, going back to the e-mail that we were looking at, according to this e-mail, it says here that you read the report arrangement, correct?

MR. JARNAGIN:  Objection.

A.    Yeah, that is the e-mail that -- that is the e-mail that Francois sent.

BY MR. GERSON:

Q.    Okay.  The report arrangement that you're referring to is the public area attendant schedule, correct?

A.    Yes.

Q.    And you actually reviewed that -- why did you review the public area attendant schedule in connection with Ms. Pell's fall?

A.    No.  The report which I read was the report that -- the e-mail Francois sent where the guest slipped and fell.  That is the report that I'm talking about.  The schedule, no, I didn't -- the schedule -- we never look at the schedule --

**Page 46**

THE REPORTER: Mr. Alexander, can you -- can you slow down a little bit? I didn't understand your answer.

THE WITNESS: Sorry.

A.    Yeah, the report arrangement which I was to -- was to my mind was the report that Francois sent from the e-mail.

BY MR. GERSON:

Q.    What is the report that -- well, let me show you what we're --

A.    From what I understand.

Q.    I'm not sure I understand you.

So you -- your e-mail that we were just looking at makes reference to a report arrangement. What is the report arrangement?

A.    The e-mail that Francois sent where the guest slip and fall, and he tell us, Kelvin, please make sure that you stress that to the guys, and the areas are being kept dry at all times.

Q.    That e-mail that you're referring to, is that part of this -- what I -- the e-mail that I just showed you, or is that a different e-mail?

A.    That's the same one. It's --

Q.    Okay. In the -- in the e-mail, you make specific reference -- if we look at Exhibit 4, it

**Page 47**

says, I saw the report arrangement already to meet with all pool attendant at the pool at 17:00 tomorrow evening and set the tone and expectation to everyone working in the pool deck, also this will be highlight every morning during the brief additional -- briefing.

In additional, this will be addressed to the rest of the PAA this voyage ensuring all are in the same vision for our upcoming rotation at the end of next month.

You see that, correct?

A.    Yeah, I see it. Yeah.

Q.    So were you disappointed with the fact that the pool deck attendants did not appear to be monitoring the pool deck in connection with Ms. Pell's incident?

MR. JARNAGIN: Objection. Form.

A.    No. No.

BY MR. GERSON:

Q.    Did you ever do anything to review the video footage in connection with Ms. Pell's incident to determine whether or not you see any pool deck attendant monitoring the area where Ms. Pell fell?

A.    To review the video, that's not my job. That's the job of the chief officer safety [sic] and security.

**Page 48**

Q.    Okay. What was the expectation that you were trying to set with the pool deck as you're referring to here on the evening of January the 16th, 2020 following Ms. Pell's fall?

A.    The expectation is that based on the incident, to raise the awareness with the PAA attendants that we had an accident yesterday, and please ensure that we make sure that we keep the area clean and dry at all times, always maintain it.

Q.    How did you find out that Ms. Pell was injured?

A.    Because of the e-mail from Francois, the communication.

Q.    What did you do when you found out -- so are you telling me that you found out on the evening of January 6th, 2020 [sic] that Ms. Pell was injured in a fall?

A.    I found out the night after I read the e-mail. I cannot recall the time that the e-mail was sent, but I reply back to the e-mail that same night, if I'm not mistaken.

Q.    Okay.

A.    At the time of the incident -- I was unaware at the time of the incident.

Q.    Do you recall having a meeting at the pool

**Page 49**

at 17:00 hours the next day on January the 21st [sic]?

MR. JARNAGIN: Objection. Form.

A.    Yes.

BY MR. GERSON:

Q.    Who was at the meeting?

A.    The eight pool attendants plus the facility cleaning specialist and the head pool attendant.

Q.    How would you go about figuring out who the eight cleaning attendants were that would have been at your meeting following Ms. Pell's incident?

A.    It's a long time. I can't -- I don't know the name. I cannot remember their faces.

Q.    Well, as someone who's the executive housekeeper for Royal Caribbean and someone who has worked for the company for over 30 years, who would you go and talk to to try and find out who was working on the pool deck at the time?

MR. JARNAGIN: Objection.

A.    The only way we can do that is to get back to the ship for information.

BY MR. GERSON:

Q.    The lifeguard is not someone who's supposed to be monitoring the pool deck for spills, are they?

Page 50

A. No.

MR. JARNAGIN: Objection. Form.

BY MR. GERSON:

Q. The lifeguard is supposed to be there to make sure that there are no issues with people in the pool and that there are no drownings and other potential issues that can go on in the pool itself, correct?

MR. JARNAGIN: Objection. Form.

A. Yeah. They focus on their -- on their duties.

BY MR. GERSON:

Q. Okay. And the actual personnel that are supposed to be assigned to the pool deck, are those the facility cleaning specialists or is there some other job title?

A. There's the -- assigned to the pool deck is the head pool attendant and the -- the PAAs under the direct supervision of the facility cleaning specialist.

Q. If you wanted to find out today who the PAAs were assigned to the pool deck, could you go and access the PAA schedule?

A. No. Not from where I am, no.

Q. Are you familiar with the PAA schedule,

Page 51

Kelvin?

A. Yes.

MR. JARNAGIN: Objection. Form. Asked and answered.

BY MR. GERSON:

Q. You know -- you know what the PAA schedule is, correct?

A. Yes, I know the PAA schedule.

Q. Okay. Let me show you -- just for the benefit of the jurors that are watching this, let me show you what's been marked as Exhibit 3.

Do you see Exhibit 3?

A. I'm not seeing anything yet. Okay. Yeah. (Plaintiff's Exhibit 3 was marked for identification.)

BY MR. GERSON:

Q. I just took it off. I'll put it back on.

A. Yeah, came on and came off. Yeah.

Q. You see Exhibit 3?

A. Yeah, I see it.

Q. Exhibit 3 is -- what is -- take a look at Exhibit 3 and tell me what -- your understanding of what this document is.

A. This is for the voyage. This is for October the 26th.

Page 52

Q. All right. And this would be the documentation that's used by -- by Royal Caribbean for the -- to assign the various personnel where they're supposed to be working and what they're supposed to be doing including deck 9 for the Enchantment of the Seas, correct?

MR. JARNAGIN: Objection. Form.

A. This is our -- this is our on board schedule where it change -- every cruise -- every two weeks it changes.

BY MR. GERSON:

Q. Okay. Now, you've seen this document many times before, haven't you?

MR. JARNAGIN: Objection. Form.

A. Yeah, I -- yeah, I review this document sometimes.

BY MR. GERSON:

Q. Okay. This document that we're referring to in Exhibit 3, there would be the same public area attendant schedule for the Enchantment, correct?

MR. JARNAGIN: Objection. Form. Calls for speculation.

BY MR. GERSON:

Q. You can answer.

A. Each ship have different schedule. Yes,

Page 53

this look like one of the schedule.

Q. Okay. Each ship has a schedule like the one we're looking at in Exhibit 3, correct?

A. They have a schedule, different format, different style, but the schedule is the same, yes.

Q. And this public area attendant schedule is something that's used by the Enchantment of the Seas and all other Royal Caribbean ships in some form, correct?

A. Yeah, that's correct.

Q. And this would be the governing document that would dictate to the ship personnel who is supposed to be inspecting deck 9 and who is supposed to be monitoring other decks during particular shifts, correct?

A. This is the voyage schedule, yes.

Q. Okay. Did you ever pull the voyage schedule for the day that Ms. Pell was injured?

A. Pardon? Can you repeat the question?

Q. Did you ever review the PAA schedule for the day on which Ms. Pell fell and was injured?

A. We review the schedule during the meeting as well, but the schedule already set for the cruise.

Q. I'm not sure I understand what you meant. Could you please explain?

Page 54

A. During the briefing I had, we -- we confirm with the team that make sure everybody is in place and is actually doing the right -- monitoring the right area. That's in order to make sure everybody cover --

Q. How -- okay. So how were you able to make sure that the people that were assigned to the pool on the day that Ms. Pell fell were in attendance at your meeting?

A. I'm sorry. Can you repeat the question?

Q. How were you able to determine who needed to be present from Royal Caribbean for your meeting in response to Francois's e-mail that we just referred to?

A. Based on the schedule we have there. We have people assigned to different areas.

Q. So you were able to access the PAA schedule and figure out who was supposed to be stationed on the pool deck, on deck 9 on January the 16th, correct?

MR. JARNAGIN: Objection. Form.

A. Correct. At that time, yes. At that time on board, yes, we would be able to access that.

BY MR. GERSON:

Q. How did you access the document?

Page 55

A. On board the Enchantment, we access it through the facility cleaning specialist; they have the file, and we have access to the file with all the schedules and all the public data.

Q. The files are electronically maintained, correct?

A. That is correct.

Q. The format that we just looked at of the PAA schedule in the previous exhibit was in an Excel spreadsheet or a format that was generated on a computer. You would agree with that, correct?

MR. JARNAGIN: Objection. Form.

A. Yes.

BY MR. GERSON:

Q. And it was just a matter of you accessing the electronic schedule and you were able to determine who needed to be present to attend your meeting?

A. No. Whoever is on the schedule, those are the pool attendants that need to be there for the meeting.

Q. How did you communicate with the attendants that you had a meeting that they needed to be present for?

A. I set up the -- the meeting with the facility cleaning specialist, and he is the one who

Page 56

arrange the meeting with the head pool attendant and the pool attendants.

Q. Who was the head facility cleaning specialist, do you recall?

A. I cannot recall his name, but I can recall -- I know that he was -- I can recall his face but not his name.

Q. You could recall his what?

A. His face. His face, like, you know, how he looks. But his name, I can't recall his name.

Q. So did he send out an e-mail to the public area attendants telling them they had to be present for a meeting which you held the following day to stress the expectation and tone about everyone on the pool deck to ensure that they had the same vision for the upcoming rotation?

A. He communicate with the head pool attendant, and the head pool attendant verbally tell all the pool attendants available that the meeting will be held at this date and at this time.

Q. Kelvin, the reason why you had the meeting with the pool attendants in connection with Ms. Pell's incident was because not everyone was positioned and monitoring the pool deck the way they were supposed to, were they?

Page 57

MR. JARNAGIN: Objection. Form.

A. No. No. The meeting -- the reason why we have the meeting is to raise the awareness more that we had an incident yesterday, and for us to be more vigilant and be more proactive and make sure that we maintain the area.

BY MR. GERSON:

Q. Are there supposed to be spills on the pool deck that aren't timely cleaned up?

A. Spills is unpredictable. Yes, it's an area where you will find spills. And that's where we have the 19 [sic] available to make sure that they clean up the spill whenever possible and as soon as possible.

Q. Who determines the number of people that are supposed to be assigned to the pool deck?

A. The facility cleaning specialist in conjunction with myself.

Q. And how do you go about making the determination about what -- the number of people that should be assigned to such a large area like the pool deck on deck 9?

A. Based on our -- based on the power we have. Let's say we have eight --

THE REPORTER: I'm sorry. I didn't

Page 58

understand the answer there. Let's say we have eight?

BY MR. GERSON:

Q. Well, Kelvin, you told me before that there are only four people assigned to the pool deck to monitor the -- to monitor deck 9 on January the 16th, and you referred to two people on the port side and two people on the starboard side, correct?

MR. JARNAGIN: Objection. Form.

A. That's correct.

BY MR. GERSON:

Q. There were no other people other than those four individuals that would -- that could have been or would -- or were assigned to deck 9 on the day that Ms. Pell was injured, correct?

MR. JARNAGIN: Objection. Form.

A. Within that specific walking area, yes.

BY MR. GERSON:

Q. Have you ever -- what have -- you mentioned before that it's your job and also the head cleaning specialist, you guys ultimately make the decision as to how many people are supposed to be assigned to deck 9, correct, the pool deck?

A. Yes, based on our power level report for the head pool attendants by the pool.

Page 59

Q. As part of your -- the determination, have you ever reviewed the number of slip and falls that have required medical attention in the one year prior to Ms. Pell's fall?

A. Actually, since I'm on the Enchantment, I think that was the only case we have. It's not a common thing we have, slip and fall. It's not common.

Q. So it's your testimony as the executive housekeeper for roughly 16 --

A. Months, yes.

Q. -- months that you were only aware of one fall on the pool deck on deck 9?

MR. JARNAGIN: Objection. Form. Mischaracterizes earlier testimony.

BY MR. GERSON:

Q. You can answer.

MR. GERSON: Please don't object to anything other than the form.

A. Yes, for the past 16 months aboard the Enchantment, this was the only fall, to my recollection.

BY MR. GERSON:

Q. Had you been made aware that there had been a history of falls on the pool deck of deck 9 on the Enchantment of the Seas, would you have asked

Page 60

there to be potentially more personnel assigned to the pool deck to monitor it more continuously or more regularly to ensure that it was maintained in a dry condition?

MR. JARNAGIN: Objection. Form.

A. The power everybody have and the manpower you have by the pool based on the -- the guest capacity. We have sufficient manpower to monitor that area.

BY MR. GERSON:

Q. Are you telling me that four -- two people on the starboard side and two people on the port side of the entire pool deck on deck 9 is enough to monitor the walkway areas and the deck surface to ensure that they are kept in a dry condition?

A. Yes, that's sufficient manpower. And if I need additional manpower, I can always source it from the internal public area attendant.

Q. What would it take for you to request more manpower from the public area attendants to monitor deck 9 if it was necessary?

A. Based on the guest demographic. If we have, you know, full capacity, obviously the pool would be busy, so I normally source the additional resources from the internal PAA that works internally

Page 61

on the ship.

Q. How do you know that there were four people assigned to the pool deck on this particular day?

A. Based on the schedule.

Q. Where is the schedule?

A. That's the standard schedule that we have.

Q. When did you review the schedule that makes you believe that there were four people assigned to the pool deck, monitoring it on the day that Ms. Pell was injured?

A. That's the -- that's the -- during the morning briefing, we have the eight pool attendant, like I told -- like I mentioned before.

We have two of them in the solarium that's on the same deck number 9, one of them in the aft, we have one of them down on deck number 5, and we have one on deck number 12 as well, and we have four cover the main area which is around the pool area, deck number 9. That is our high focus there.

Q. Why is it a high focused area?

A. Because it's a busy area where we find guest coming in and out, in and out, you know. It's a busy area.

Q. The area where Ms. Pell fell is a busy

Page 62

area, isn't it?

MR. JARNAGIN: Objection. Form.

A.    It's a traffic area.

BY MR. GERSON:

Q.    The area where Ms. Pell fell is an area where people are coming in and out of the water, correct?

A.    No.  People actually -- the area where -- where I visual [sic] is the area where they walk from the mid-ship to the windjammer.  I think the windjammer is a little forward.

Q.    Now, what do you know about what happened -- what do you know -- you mentioned before that if you wanted to increase the manpower on deck 9, that it would be a relatively easy process in the sense you would just ask for more public area attendants, correct?

A.    Yeah, that's correct.

Q.    And at any point in time prior to January 16th, 2020, did you ever evaluate the need to increase the manpower based on the number of reported slip and falls that had occurred in any previous year prior to January the 16th on this particular vessel?

MR. JARNAGIN: Objection. Form.

A.    No.  No.  There was -- to my recollection,

Page 63

there wasn't any, so I don't see the need for additional manpower.

BY MR. GERSON:

Q.    If it were the case that there had been a series of slip and falls on the pool deck, would that be grounds for you to potentially increase the manpower?

A.    Possibility, yes.  Yes, we can do that. If we have increase of slip and trip by the pool, obviously we will put out more manpower.

And if we see guests actually running or kids running, we actually physically stop them and politely tell them, please be careful, do not run. And yes, we normally put out more manpower if there's a need for an increase.

Q.    What would be an example of a increase that would warrant your involvement and a potential request for more personnel assigned to the pool deck on the day that Ms. Pell fell?

MR. JARNAGIN: Objection. Form.

A.    If there's an increase of slip.

BY MR. GERSON:

Q.    What would you consider an increase of slips that would warrant additional manpower on the pool deck?

Page 64

A.    We have like -- we will have like five, six, seven to the cruise.

Q.    Do you have any background or training with respect to how to actually manage a pool deck?

A.    Yes.

Q.    Tell me about that.

A.    It's part of our description.

(Simultaneous speakers.)

A.    Yeah, we maintain the cleanliness and safety of the pool deck, ensuring the schedule is set in place, ensuring everyone know their area of responsibility, what to do if any additional help needed, they always reach out to us for additional help or assistance.

But the main drive is to ensure that the safety and comfort of our guests at the pool area is maintained at all time.  Any -- any maintenance issue, they always report it and always make sure all maintenance is rectified.

We actually make sure that when we setting up all the pool chairs and everything, make sure that there's no trip hazard.  And mainly to maintain the integrity of the pool, and we keep it clean and -- and spotless and dry at all times.

///

Page 65

BY MR. GERSON:

Q.    What specific training do you have with respect to managing a pool deck like the one on the Enchantment of the Seas?

A.    The training is just to make sure that the pool operation runs smoothly without any issues. Also, equipments -- the equipments that we use to maintain the cleanliness and the safety of the pool area as well.

Q.    So the only person that can make the decision to increase the manpower on the pool deck would either be yourself and the head cleaning facility specialist for deck -- for the Enchantment, correct?

A.    Yeah, that's correct.  And if the head pool attendant as well would like to add -- if they need it, we take it into consideration as well.

Q.    Okay.  And as you sit here today, prior to January 16th, you never did anything to evaluate the need for additional manpower on the pool deck of a vessel like the Enchantment of the Seas, did you?

MR. JARNAGIN: Objection. Form.

A.    Correct.

BY MR. GERSON:

Q.    Why didn't you -- why didn't you ever do

Page 66

anything to evaluate whether or not there was a need to increase the manpower and possibly set the correct tone and expectation for the pool deck prior to January the 16th, 2020?

MR. JARNAGIN: Objection. Form.

A.    Because there was -- because there was -- there's -- actually no incident took place.

BY MR. GERSON:

Q.    Had you been -- but if there were incidents, you just didn't know about them, right?

A.    I can't say.

Q.    Well, you told me that there were no prior slip-and-fall incidents that you had been aware of on the Enchantment of the Seas other than Ms. Pell's fall for the 16 months prior, correct?

MR. JARNAGIN: Objection. Form.

A.    That is correct.

BY MR. GERSON:

Q.    You're not aware of any other slip-and-fall incidents that occurred on the Enchantment of the Seas other than Ms. Pell's fall for the entire three to four contracts that you had been working for the Enchantment. Isn't that a correct statement?

A.    That's correct.

Page 67

(Plaintiff's Exhibit 1A was marked for identification.)

BY MR. GERSON:

Q.    Now I'd like you to take a look at Exhibit 1A.

Do you see Exhibit 1A?

A.    Yeah, I can see it.

Q.    Tell me, what is your understanding of what Exhibit 1A is?

A.    There's some pool chairs around the area, and there's one of them actually under the staircase -- two of them under the staircase.

Q.    Two of them under what?

A.    Under the staircase.

Q.    Two of them under the staircase, okay.

Do you recognize that this is also a photograph of the -- of deck 9 of the Enchantment of the Seas? Correct?

A.    I cannot say if it's exactly the Enchantment of the Seas.

Q.    Well, I'd like you to -- I'll represent to you, Mr. Alexander, that this is a photograph that was produced by Royal Caribbean in connection with the investigation of Ms. Pell's fall, okay?

A.    Okay.

Page 68

Q.    So I want you to accept my representation to you that this, in fact, is the deck 9 of the pool deck on the Enchantment of the Seas on January the 16th, 2020.

A.    Okay.

Q.    You see that?

A.    Yes, I see it.

Q.    Now, do you see that I have a 1 with a circle -- kind of like a semicircle around it and it goes around three chairs? Do you see that?

A.    I see it.

Q.    Have you ever seen this photograph before?

A.    No.

Q.    Do you see the number 1 within the semicircle?

A.    Yes.

Q.    And do you see what appears to be something spilled underneath part of the chair that extends into a portion of the walkway?

MR. JARNAGIN: Objection. Form.

A.    I can see something white on the floor, but I cannot -- I don't know. I cannot identify exactly what it is, but it's something -- it's a different color, yeah.

///

Page 69

BY MR. GERSON:

Q.    Okay. Do you see also in the photograph we have a glass with a circle around it, and there's a number 2 below the circle? Do you see that?

MR. JARNAGIN: Objection. Form.

A.    I cannot -- I cannot make out the glass and I can see the 2.

BY MR. GERSON:

Q.    Do you see what -- do you see that there's an object in the circle that's been -- below number 2 -- or above number 2?

A.    I can see the white object, yeah. A little white thing there, yeah.

Q.    It's not a little white thing. That's actually a glass, isn't it?

MR. JARNAGIN: Objection. Form.

A.    I cannot see the photo clearly from my vision here.

BY MR. GERSON:

Q.    Okay. Well, I want you to assume for purposes of this question, Mr. Alexander, that this, in fact, number 1, was a spill -- something spilled in the walkway. Would you expect the public area attendants to identify this spill and -- and dry it within a reasonable amount of time?

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Kelvin Alexander on 01/07/2022**                    **Pages 70..73**

Page 70

MR. JARNAGIN: Objection. Form.

A.    Yes.

BY MR. GERSON:

Q.    Yes?

A.    Yes.  Yes.

Q.    Would you expect your public area attendants, if they identified that there was a glass on the floor in the high traffic area on deck 9, for them to have identified it and cleaned up whatever was there?

MR. JARNAGIN: Objection. Form.

A.    The location of the glass, yes, they could see it. And based on the location, again, they could bypass it based on where the glass is situated.

BY MR. GERSON:

Q.    Based on the photograph that we're looking at in Exhibit 4 -- excuse me -- 1A, based on this photograph, these are the exact types of things and risk-creating conditions that your public area attendants are supposed to be monitoring to make sure that they're not creating a risk to passengers like Ms. Pell, correct?

MR. JARNAGIN: Objection. Form.

A.    Yes, they pass -- they do their rounds and they make sure that whatever spill like this have been

Page 71

cleaned up, yeah.

Can you zoom back the picture out a little?

BY MR. GERSON:

Q.    Sure.

A.    The photo, zoom out.

Okay.  This area here is not really the main walkway.  The main walkway is more on the right-hand side.  That's where the high traffic is.

Q.    Do you see the drain --

A.    Yeah, I see the drain.

Q.    Okay.  Have you ever been made aware of any issues with the drain cover causing people to fall?

A.    No.  Not to my knowledge, no.

Q.    Have you ever attended any safety meetings in connection with the Enchantment of the Seas?

A.    Can you repeat the question?

Q.    Have you ever attended any safety meetings on the Enchantment of the Seas?

A.    Yes, we have our safety meeting with our hotel director.  I also have my divisional safety meeting with the -- (audiovisual interruption.)

Q.    At any of the safety meetings that you attend -- how many safety meetings would you say

Page 72

you've attended on the Enchantment of the Seas for your 16 months that you worked for -- worked on the vessel?

A.    16 months.  64.  Four every month.

Q.    Four every month.

And in any of the safety meetings that you were present for, do you have any recollection of any slip and falls on the pool deck?

A.    No.

Q.    Are slip and falls preventable?

A.    Yes.

Q.    How can slip and falls be prevented?

A.    Proceed with caution.  Take your time. When you coming out -- when you're walking, look -- always look straight ahead and make sure you not gazing, left, right, and center.

If you walking like you just come out of the pool, you take your time and you walk slowly and not run.  So it could be avoided, yes.

Q.    What -- what can Royal Caribbean do to reduce the number of slip and falls that occur on its decks like deck 9 on the Enchantment of the Seas?

MR. JARNAGIN: Objection. Form.

A.    With the company, what we do, continuous reminding our guests about the pool safety for

Page 73

themselves and the kids.

BY MR. GERSON:

Q.    What does Royal Caribbean do to make sure that their employees can prevent slip and falls?

A.    By continuing education of employee during our safety meeting and our daily briefing.  If we see any guests with, like, wild behavior, we actually politely stop them and tell them, please be careful when you walking by the pool, please look for any objects in front of you, you know, like pool chair or anything like that sitting in front of them.

Q.    Now, is there a particular setup and configuration that's supposed to be followed for the deck chairs in any -- in any way?

A.    Yes, there is --

THE REPORTER:  I'm sorry?  Can you repeat that?  I didn't understand the answer.

I'm sorry.

A.    Yes, there is a standard setup where we -- where we -- where we place all the chairs on it.

BY MR. GERSON:

Q.    What is the standard setup for the way the deck chairs are supposed to be placed on the pool deck?

A.    They placed in a line around by the pool

**Page 74**

with a sufficient walkway that the guest can actually enjoy the lounge chairs; at the same time, we do not block any pathway going through to the pool.

Q.    So what would be an example of the improper setup of deck chairs on the -- on the pool deck?

MR. JARNAGIN:  Objection.  Form.

A.    Improper setup, it's if a guest decide to move their party to another location, maybe out of the sun or maybe in the sun, that is one -- could be one of the possibilities.

But after they remove it, we -- and they finish enjoy the -- their convenience, we actually put it back into the original space.

BY MR. GERSON:

Q.    I'd like you to take a look at what we've marked first -- I showed you this photograph, Exhibit 1A.

You see this, correct?

A.    Yeah, that's correct.

Q.    Exhibit 1A, as I mentioned before, this is the -- a photograph that was taken in connection with Ms. Pell's fall, right?

A.    Yeah.

Q.    Do you see any caution signs in the area?

**Page 75**

A.    Caution sign in the area?  No.

Q.    Do you see any warning cones of any sort in the area where Ms. Pell fell?

A.    No.

Q.    Are you aware of any caution or warning signs that were placed in the area at the time that Ms. Pell fell?

A.    At the time I was not on the scene, no.

Q.    Well, I believe in the photograph that you're taking a look at, you don't see any caution signs or cones in the area alerting anyone that there was anything spilled in the walkway surface, do you?

MR. JARNAGIN:  Objection.  Form.

A.    No.  Can you zoom the photo to the upper right-hand side?  I see there's a blue -- like a trolley there.  Can you zoom that -- on the right-hand side, upper right-hand side?

BY MR. GERSON:

Q.    Sure.

A.    Go in some more.  Yeah.  Zoom in there a little more.  I want to see that blue bag there. There's something blue in the corner of the photo. Okay.  Go to your right.

No, I can't make it out.  I cannot make it out, no.  Thank you.

**Page 76**

Q.    Sure.

Now, if we take a look at -- I'd like to take a look at another exhibit that we were looking at earlier.  I'd like you to take a look at Exhibit 4.

Do you see Exhibit 4?

A.    Nothing yet.  Okay.  I can see it now.

Q.    Now, in Exhibit 4, I'll represent to you that this is a photograph of the Enchantment of the Seas that was recently taken just this past weekend.

Do you see it?

A.    Yeah, I can see it.

Q.    Do you see the number 1 and then you see a drain to the right of the number 1?

A.    I can see it, yeah.

Q.    Can you explain to me why the chair setup and configuration appears different in Exhibit 4 than it was on the date that Ms. Pell fell?

MR. JARNAGIN:  Objection.  Form.  Calls for speculation.

BY MR. GERSON:

Q.    You can answer.

A.    (No verbal response.)

Q.    Mr. Alexander?

A.    The one that you showed before, it was kind of under -- close to the staircase.

**Page 77**

Q.    You would agree, Mr. Alexander, that the setup of the deck chairs in Exhibit 4 is much different than the way that they were set up in the photograph taken in connection with Ms. Pell's incident, correct?

A.    How this is set up, yes.  It's totally different, yes.  There's a different setup on that side and a different setup on the walkway side, the main walkway side.

Q.    In the photograph taken in connection with Ms. Pell's fall that we looked at, there's a deck chair that is actually covering a portion of the drain.

Do you remember seeing that?

A.    Right.  Correct.  Close to the glass.

Q.    Right.  And here it is again, Exhibit 1A. We have a deck chair that is -- looks like it's partially over a portion of the drain with a line of deck chairs ahead of it, and then on the opposite side of the deck chairs are other deck chairs which have what appears to be a spill.

You see that?

MR. JARNAGIN:  Objection.  Form.

A.    Yeah.  This is a different -- this is a different drain.  That's not the same drain in the

Page 78

other -- in the other photo, to my understanding.

BY MR. GERSON:

Q.   Are you sure about that?

A.   Yeah.  This drain is like -- as I said before, it's almost close to the staircase.  The one that's between -- Exhibit 4, between 1 and 2, that drain is almost in the middle of the walkway.

Q.   Here's Exhibit 4 again.

Do you see the -- right here on the left you've got the jacuzzi, correct?

A.   No.  Incorrect.  That is the kids pool.

Q.   The kids pool.  Excuse me.

Are you telling me that this drain right here in Exhibit 4 is a different drain from the drain that we looked at in connection with Ms. Pell's fall?

A.   I think -- to my knowledge, I think -- I think so.

Q.   Do you know for -- with any certainty?

A.   Based on how the photo was taken from the height on deck number 10, and the other photo which was taken on -- close to the staircase, it looks to me like it's two different drain.

Q.   Do you know -- do you know as you sit here today -- well, I'd like -- for purposes of this question, Mr. Alexander, I'd like you to assume that

Page 79

this drain in Exhibit 4 is the same drain that we were looking at in the previous photograph taken in connection with Ms. Pell's fall, okay?

MR. JARNAGIN: Objection.  Form.

A.   I don't want to assume.  I want to make sure, yeah.  I --

BY MR. GERSON:

Q.   Well, I'm asking you for purposes -- I'm asking you for purposes of this question to assume that what I'm telling you is correct, okay?

MR. JARNAGIN: Objection.  Form.

BY MR. GERSON:

Q.   So --

A.   Okay.

Q.   -- with the assumption that this photograph in Exhibit 4 with the drain is the same drain that we looked at on the day that Ms. Pell's fall occurred, what is your explanation, as the executive housekeeper responsible for ensuring that the pool deck is maintained in a safe condition, why the drain and the setup of the deck chairs is much different in this photograph as opposed to on the day when Ms. Pell fell?

MR. JARNAGIN: Objection.  Form.

A.   Well, based on what I see from the other

Page 80

photo -- if you can go back to A.

BY MR. GERSON:

Q.   Sure.  Go ahead.

A.   Okay.  Can you zoom it in a little closer for me?  I want to see the white spot on the ground by the -- by the 1.  Can you come in a little closer?  Okay.  Okay.  Can you go -- all right.  Okay.  Stay right there.  Okay.

What I understand from here, right, I believe there's a spill there.  I can see it.  I can see the glass.  I can see the drain.

However, what catch me is that the -- it's a spill where it look like some kind of food or something, like a food or something -- something -- it's not to say -- it's a liquid spill, so there's some particles in it.

And based on how the chairs and them are roped off, the area was blocked off because -- based on that, I see here it was blocked off.  So there's some kind of spill that happened that need attention.  That's why they blocked off the area.

Q.   So it's your understanding in looking at this photograph that the reason why these chairs are in -- pulled off underneath the -- the staircase is to block off the area where the spill is located?

Page 81

A.   Yes, correct.  And if it's a spill that is -- actually, it would cause an immediate hazard, it would have been cleaned immediately.  If -- to my recollection, I don't know.  This could be either food or vomit or something.  That's why they rope it off and they --

THE REPORTER:  I'm sorry.  I didn't understand the answer.  I'm not understanding, Mr. Alexander.

A.   Yes.  The reason why I see the area kind of blocked off, so that no one would enter the area there.  If it was like a normal spill, it would have been cleaned up immediately, but this spill look like either food debris or either vomit or something.  Look something similar to that where it do need special attention, special care.

BY MR. GERSON:

Q.   Mr. Alexander, this isn't vomit that's on the floor.  This is a -- this is a part of the spill.

MR. JARNAGIN: Objection.  Form.

A.   I'm defining what I see, you know, what I think it looks like.

BY MR. GERSON:

Q.   What you're referring to -- what you're referring to, do you see that a chair has been pulled

Page 82

over a large portion of the -- of the area marked with the number 1 with the circle around it?  Do you see that?

A.    Yeah, I see it.

Q.    Okay.  So if it's -- if what you're telling me is that you believe that this was actually vomit, how would someone vomit under a chair?

A.    No, I did not say this is vomit.  I say it's a possibility it can be food debris.  It could be some kind of vomit based on how they secure the area.

Q.    It could also be a spill, couldn't it?

MR. JARNAGIN:  Objection.  Form.

A.    If it was a spill -- if it is a spill, it would have been cleaned up immediately.

BY MR. GERSON:

Q.    So you would agree that if this -- you would agree, Mr. Alexander, that if what was marked in this circle is, in fact, a spill, it should have been cleaned up immediately, correct?

MR. JARNAGIN:  Objection.  Form.

A.    Yes.  But this -- this spill that I'm seeing -- and I'll mention it again -- based how they block off the area, it -- maybe it's food debris or something, you know.  It could be -- it could be.  I don't know.  I'm just presuming it could be food or

Page 83

something that need special care.

BY MR. GERSON:

Q.    If it was, in fact, a spill, is there a policy within Royal Caribbean that deals with spills?

A.    If it's a spill, they clean it up immediately.

Q.    Is there a policy within the organization that deals with spills?

A.    Yeah.  Any spill encounter throughout the ship, yes, we have a policy on it, that we -- we approach it immediately.

Q.    What is the policy called?

A.    This is -- they call it the own a spill kit.  We have --

Q.    Okay.

A.    -- them situated all over the cruise ship.

Q.    Is everyone -- to the best of your knowledge as the executive housekeeper for Royal Caribbean and someone who has worked on a ship for Royal Caribbean for the last 30 years, is everyone responsible for understanding what to do in the event that they identify a spill on an open deck like deck 9?

A.    Yes.  This is --

Q.    All --

Page 84

(Simultaneous speakers.)

A.    -- all crew members, yes.

BY MR. GERSON:

Q.    All crew members are supposed to be familiar with the own the spill policy, correct?

A.    That is correct.  That's why we call it the own the spill kit.  And they're situated in many different location throughout the ships.

Q.    It doesn't make a difference whether or not a spill is identified by a public area attendant or a lifeguard, does it?

MR. JARNAGIN:  Objection.

A.    To a identify from a lifeguard, it's -- he can identify it, but he may not have the time to attend it, but he can call on assistance to get it -- to get it cleaned up.

BY MR. GERSON:

Q.    How long would it take to clean up a spill like the one that we just saw if Royal Caribbean personnel or Royal Caribbean's crew members were notified or made aware of, in fact, that there was a spill in -- in the area where we were just looking at on deck 9?

MR. JARNAGIN:  Objection.  Form.

A.    That spill -- that spill could be -- if

Page 85

it's food debris, that spill could be cleaned up within five minutes' time or less.  But --

BY MR. GERSON:

Q.    What if it's just a matter of something spilled on the surface like a glass of water or a glass of some -- some other -- of wine?

A.    Within minutes.  Within less than two minutes, I would say.

Q.    If your personnel had been monitoring this area and had noticed that there was a spill in the area where we were just looking at in Exhibit 1A, it would take them a matter of seconds for them to clean it up, correct?

MR. JARNAGIN:  Objection.  Form.

A.    As soon as they identify it, yes, they will.

BY MR. GERSON:

Q.    And in the event that they didn't have the tools to mop it up handy, what is a crew member supposed to do in the event that they identify a spill that needs to be cleaned up because it is in a high traffic area like the one that we were just looking at on deck 9, referencing Exhibit 1?

A.    Normally they will actually block off the area like what was shown in the photo a while ago.

# JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
## Kelvin Alexander on 01/07/2022
**Pages 86..89**

Page 86

Q.    Could they put a warning cone out?

A.    They could put a warning cone.  They could put a chair over it.  They could put anything just to avoid the guest from actually stepping into that spill.

Q.    So your crew members are trained to do a number of things in the event that they identify a spill or a wet area on an open deck, correct?

A.    Yes, they are.  But the main priority is to make sure that they clean it up as soon as possible.

Q.    One of the things that they can do when they identify a spill is they can mop it up, correct?

A.    They can mop it up immediately.

Q.    And if they don't have a mop available, they can pull a chair over it to make sure that no one else steps on it, correct?

A.    They could put a chair, they could put a cone, or they could ask a fellow employee, can you please stand by here and let me go to the spill kit and then come back, which shouldn't take two minutes.

Q.    So if your ship personnel were actively monitoring the area that we were just looking at in Exhibit 1A, there were a number of procedures available to ship personnel to mitigate the risk posed

Page 87

by a potential spill in the area that we were just looking at in Exhibit 1A, correct?

MR. JARNAGIN:  Objection.  Form.

A.    Yeah, they -- they would be able to monitor.  They would be able to identify.

BY MR. GERSON:

Q.    Are you aware of anyone that put -- are you aware of any action by Royal Caribbean to do any of the things that you just referred to, whether placing a cone or mopping up the area prior to Ms. Pell falling?

A.    No.

Q.    Now, you made reference before that in your -- based on your background, training, and experience, it appeared that the area had been closed off to preserve the scene.  Is that an accurate statement?

MR. JARNAGIN:  Objection.  Form.

A.    No.  Actually, the area been closed off because, to me, I presume that that's a spill that needs special treatment.

If it's debris, they need a scoop and everything to take it up to make sure it's disposed properly.  They need chemical to clean that spill.  So there are quite a few factors that contribute to that

Page 88

closed area where the spill is.

If it's a vomit -- if it's a vomit, which I'm not too sure about, it definitely need special attention, special equipment, special sanitizing process where we carry it on.

BY MR. GERSON:

Q.    Let me show -- I'd like you to take a look at another version of the photograph that I was just referring to.  And this is a little clearer, okay?

Do you see what we are going to mark as Exhibit 5 to the deposition?

A.    I can see the photo, yeah.

(Plaintiff's Exhibit 5 was marked for identification.)

BY MR. GERSON:

Q.    Now that you're able to see Exhibit 5, this is a little clearer of a picture which shows the spill with the chair pulled over it, and the two chairs that are blocking off the walkway from where Ms. Pell was coming from, correct?

MR. JARNAGIN:  Objection.  Form.

A.    Well, I wasn't at the scene where she was coming from.  I didn't see anything.  But all I can see is the photo, the area blocked off, and the spill. ///

Page 89

BY MR. GERSON:

Q.    You see the spill?  The spill goes from -- how many planks of the walkway do you see the spill covering?

MR. JARNAGIN:  Objection.  Form.

A.    Five.

BY MR. GERSON:

Q.    Five planks.

And then opposite the spill on the other side of the planks underneath the chair is also a glass, correct?

MR. JARNAGIN:  Objection.  Form.

A.    Correct.

BY MR. GERSON:

Q.    So someone pulled the chairs over the glass and pulled the chairs over the spill in connection with the investigation with Ms. Pell's fall, correct?

MR. JARNAGIN:  Objection.  Form.  Calls for speculation.

A.    I cannot --

BY MR. GERSON:

Q.    You can answer.

A.    I cannot say if that is exactly the scenario because I wasn't on the scene, yeah?  I can

Page 90

just --

Q.    Well --

A.    -- address or voice what I can see from the photo.

Q.    Well, you don't dispute that there are chairs pulled over the glass and there's a chair pulled over the spill, correct?

MR. JARNAGIN: Objection. Form.

A.    I can see that there's a chair pulled over the spill, but I cannot see -- I don't know if these chairs was lay out there as part of the layout as well.

BY MR. GERSON:

Q.    Well, you see that these chairs at the top here are blocking the walkway from where Ms. Pell would have been coming from, correct?

MR. JARNAGIN: Objection. Form. Calls for speculation.

BY MR. GERSON:

Q.    You can answer.

MR. GERSON: And please don't do that again.

A.    I don't know -- I don't know which side the guest was coming from.

I'm sorry, but I don't know if I lost

Page 91

audio.

BY MR. GERSON:

Q.    No.  I'm just locating something for you. Since you said that you weren't aware, I'm going to show you.  I'd like you to take a look.  I'm going to share my screen in a second.

For purposes of this question, Mr. Alexander, I'd like you to assume that the chairs that were blocking off the area where the spill was located is, in fact, the area where Ms. Pell was walking from, okay?

MR. JARNAGIN: Objection. Form.

A.    Okay.

BY MR. GERSON:

Q.    Based on that assumption, my understanding is that the deck chairs were -- may have been pulled out to block off the area.

A.    (No verbal response.)

Q.    Can you hear me?

A.    Okay.  I can hear you.

Q.    Okay.  I'd like you to take a look at what's on the screen.  This is Exhibit 6, okay?

A.    All right.

(Plaintiff's Exhibit 6 was marked for identification.)

Page 92

BY MR. GERSON:

Q.    Can you see Exhibit 6?

A.    I can see photo of the video.

Q.    Okay.  I'm going to run the video.

Have you ever seen this video before?

A.    No.  First time I'm seeing this.

(Video recording played.)

BY MR. GERSON:

Q.    As the executive housekeeper and the person responsible for ensuring that the pool deck is maintained in a safe manner or a safe condition, you never reviewed video footage in connection with Ms. Pell's incident?

MR. JARNAGIN: Objection. Form.

A.    No.  We have no access to that and that's not under my responsibility.  It's under the chief officer safety and security responsibility.

BY MR. GERSON:

Q.    Okay.  In the video that you're looking at, do you see where my cursor is?

A.    Yeah, I can see it.  Yeah.

Q.    In the video that you're looking at, do you see any cruise ship personnel in the video footage?

A.    It's --

Page 93

Q.    Answer my question, please.

A.    That's what I'm doing.  I can see --

Q.    Okay.  In the video footage that you've been shown so far -- I'll ask the question, okay?

In the video footage that you've seen thus far, have you seen any cruise ship personnel in any of the footage so far?

A.    Based on the clarity, I cannot -- I cannot make out who is there.

Q.    Do you see any -- now, we have a crew member walking through with what looks like a handful of something in his hand, correct?

MR. JARNAGIN: Objection. Form.

A.    That's a crew member -- that's a bartender, yes.  I can make out the one very close.

BY MR. GERSON:

Q.    So at 7:46:30, you see a bartender walking through the walkway with a tray waved in the area, correct?

A.    I can see something like that, yes.

Q.    Have you seen, so far, any of the public area attendants monitoring the area that that crew member, the bartender, just walked through?

A.    No, I didn't see anyone on this side.  No.

(Recording playing.)

Page 94

BY MR. GERSON:

Q.   I'd like you to continue watching the video.

Do you see -- so far up until 7:47:20 -- we looked at the video starting at 7:44:58 to 7:47:20. You haven't seen anyone other than the one bartender with the tray of drinks walk through the area, correct?

A.   From the close vision, yes. From the far vision, I cannot make out.

Q.   So far you haven't seen anyone -- any public area attendant monitoring the area that you referred to as the port side at forward -- across from the kids pool, have you?

MR. JARNAGIN:  Objection. Form.

A.   Like I said before, I cannot make out the faces and the -- from close range I could make it, but from far, by way of cursor-wise, I can only see the body move, but I cannot make out who it is.

BY MR. GERSON:

Q.   Well, you can see -- Mr. Alexander, you're not trying to be cute with me, are you?  In the sense that you do see that there's a man here in a green shirt, don't you?

A.   Yes.

Page 95

Q.   You see that there's a passenger with a white hat in this video footage, correct?

A.   Yes.

Q.   You see that there's a passenger seated on a deck chair in this video footage, correct?

A.   Yes.

Q.   There's nothing ambiguous about what I just indicated to you was depicted in the video footage, is there?

A.   I -- like I told you before, the visual up close, I can see it.  I can see the movements and the color of the clothes and everything from the far distance.  To make out the individual person, no, I can't see.  You --

(Simultaneous speakers.)

A.   You asked me to speak the truth, and I am speaking the truth.  If I cannot make them out, I cannot make them out.

BY MR. GERSON:

Q.   Okay.  So far based on the evidence that you've seen in this case, you haven't seen one single public area attendant walk through the area monitoring this walkway to see if there was anything spilled or anything else that could cause a risk of harm to someone like Ms. Pell, have you?

Page 96

MR. JARNAGIN:  Objection. Form.

A.   I have -- based on my visual, I cannot see within the three and a half to four minutes, no.

BY MR. GERSON:

Q.   Should someone have gone through this area for this interval of time from Royal Caribbean?

A.   I'm sorry.  You break up a little.  Can you repeat?

Q.   Sure.  Wouldn't -- shouldn't there have been a public area attendant walk through this area in the interval of time of the video footage that we've seen leading up to her fall?

A.   The video footage is from when?  7:40:44 to 47, right?  It's around three and a half minutes. Possibility -- possibility you cannot see because maybe he aft, maybe he's forward, maybe he actually roped off the area and went for assistance to clean up the spill.

So there -- possibly you -- you would not be able to see that if the attendant do something else or would be seeking more assistance to clean up the spill.

Q.   Not too sure I have any idea of what you just said, and I apologize for that.

But what I've asked you so far,

Page 97

Mr. Alexander, is:  Based on the video footage that you've seen, don't you -- wouldn't you expect that if your public area attendants were doing their job the way that they were trained and the way that the expectation is set by you, that you would -- you should have seen a public area attendant at least walk through this area where my cursor is going within the interval of time beginning from 7:44 up until 7:47:42?

A.   That's roughly about three or four minutes, right?  Possibility no, possibility yes based on if there's any -- anything he attending to within the visual of the camera or the footage.

Q.   But you -- you would expect at least someone to come walking through this area in a few minutes, wouldn't you?

A.   Yes.  Somebody, yeah.  Yeah, they -- they could walk through, yeah.

Q.   The public area attendant is the person who is supposed to be -- there's supposed to be two public area attendants monitoring the area where Ms. Pell fell; isn't that correct?

A.   Well, not -- it's part of the area where they monitor.  They have to walk from forward to aft to mid-ship and then to aft and then come back again, you know.

**Page 98**

So maybe possibility you could see them within the three and a half minutes.  If you don't see them, which mean either possibility they're attending to some spill -- not spill, but something spill or some glass or something they may be doing that you would not be able to see them within the three to four minutes, exact time for the footage.

Q.    So in the event that what you're just telling me is true and the public area attendant had to go and do something else, to maybe tend to another spill, what is the procedure that's in place for when someone has to leave their assigned area to tend to a particular incident or event?

A.    Well, actually, it's within the area. They're not out of the area.  They are by the pool, and there's a port side and there's a starboard side.

Just that maybe they -- they have a little more maybe cups to pick up or glasses to pick up, then they have to go to take it to the pantry.  So they do not leave their working area.

So maybe it's just that maybe the time the footage camera was there, it's just that time maybe there wasn't someone in that spot at that time.

But on a normal routine, yes, they do -- they do pass, they do make periodic -- they do

**Page 99**

constant work on port and starboard side and make sure that all the spills or whatever spills -- cleanliness need to be taken care of.

Q.    Since you're partly responsible for the assignment of the number of public area attendants for the pool deck, would it have been unreasonable to have more public area attendants assigned to such a large area of the ship where Ms. Pell fell?

MR. JARNAGIN:  Objection.  Form.

A.    It would have been -- obviously the more manpower you have, the more better for us.  But however, like I mentioned before, the schedule based on the power we have, which based on the size of the pool, it's -- it's a good range to cover based on the manpower.

I do not see any additional manpower needed here unless, like I mentioned before, if we have a full capacity of guests and the area is very busy, then we can source additional manpower from within internal of the ship.

MR. GERSON:  Let's take a five-minute break, okay?

THE VIDEOGRAPHER:  The time on the monitor is 1:31 P.M., and we're going off the record.

**Page 100**

(Whereupon, at 1:31 P.M., a recess was taken.)

(Whereupon, at 1:46 P.M., the deposition continued.)

THE VIDEOGRAPHER:  The time on the monitor is 1:46 P.M., and we're back on the record.

BY MR. GERSON:

Q.    Mr. Alexander, can you hear me?

A.    I can hear you.

Q.    Okay.  Once you were notified about -- well, tell me, what were you notified by Francois about what happened to Ms. Pell?

A.    Based on the e-mail, that there was an accident yesterday -- today, which is January 16th, and just make sure that you -- you reach out to all the pool attendants and carry out a briefing with them and explain them the importance of, you know, maintaining the -- maintaining the pool area.

Q.    And it's important to maintain the pool area for what purpose, for what reasons?

A.    To avoid any potential accident, slip, trips, and fall.

Q.    And if the pool area is maintained properly, would you agree that slip and falls can be

**Page 101**

reduced, if not mitigated in their entirety?

MR. JARNAGIN:  Objection.  Form.

A.    Well, it all been maintained properly because, to my recollection for the past 16 months, we never had -- to my understanding, we never had any slip by the pool area.  So based on this incident, it can raise the awareness, so we put more focus on it.

BY MR. GERSON:

Q.    If you had been made aware that there were five slip and falls on the pool deck within the two years, would that warrant, in your opinion, increasing the manpower on the pool deck?

A.    Within two years' period, if you looking at the long-term, we could take it into consideration. But within two years' time, I think yes, we could -- we could increase the manpower.

Q.    Have you ever made any request to anyone -- strike that.

What would it -- do you -- to increase the manpower on the pool deck -- how many public area attendants are actually available to you on this particular -- on this particular ship?

A.    Overall internal and by the pool area?

Q.    Yes.

A.    Overall of 43.  Overall of 43.

Page 102

Q.    43 public area attendants?

A.    Yes.  The numbers may not be specific, but it's around that figure.  I cannot recall the specific figure.  Each class of ship have different figures.

Q.    So if there are four public area attendants assigned to the pool deck on deck 9 on this particular day, you would have potentially had available to you another 39 public area attendants that could have been monitoring the deck area?

A.    No, because it's a big ship, so we have -- they are covering all over the ship, yeah.  They cover internal public area, the crew areas as well, the pool area, the solarium, and the outer deck on deck number 5.

Q.    Are there any other areas of the ship that have more than four public area attendants assigned to a particular deck?

A.    Well, for a particular area, no.  That is -- that is the most amount there, in that particular area.  If you mention -- you mention particular deck, yes, there almost around six, seven people assigned to one deck.

And deck is very big, it's very long, it's almost around almost 6-, 700 feet, you know.  So if you go by deck, yes, there's amount of PAA attendants

Page 103

inside of the ship.  If you go by areas, by the pool area, that is -- we have four.  There's where we have the most manpower there.

Q.    Did -- were you ever interviewed as part of the investigation into Ms. Pell's fall?

A.    No.

Q.    Were you ever asked to provide a statement?

A.    I think sometime last year, my recollection, yeah.

Q.    Tell me about that.

A.    Sometime last year, I think.  Not to provide a statement, but just to give a clear picture of what happened, information needed.  I reach out to the ship.  And whatever information they can, we provide it for them.

Q.    Who did you provide the information to?

A.    I cannot recall.  I cannot recall.  Yeah, I cannot recall.

Q.    What were you asked?

A.    About schedule, which, as I mentioned, schedule and manpower, who was there actually on the scene, which was the pool attendants and the head pool attendant, and to provide information on the working schedule, who were the individually -- individuals who

Page 104

were there.

Q.    And what were you -- what did you do to figure out who was -- who was assigned to the area at the time?

A.    Well, they reach out to the ship who -- which is the Enchantment, and they can provide the information, because we don't travel with information.

Q.    Were you sent a copy of the -- the schedule of the personnel that were assigned to the area or supposed to be assigned to the area?

A.    I don't know what information they got from them.

Q.    I didn't hear you.  Can you repeat that?

A.    Yeah.  They also reach out -- they ask to reach out -- find information pertaining to who was the FCS there and who was the head pool attendant, so I think they reach out to them as well.

Q.    Right.  But when you were asked to figure out what the schedule was and who was supposed to be assigned to the area, how did you get that information over to the person that was asking?

MR. JARNAGIN:  Objection.  Form.

A.    That information was sent from the ship itself, from the Enchantment, not from me.

///

Page 105

BY MR. GERSON:

Q.    What information was sent?

A.    I don't know.  I was not communicated on that.

Q.    Well, you did -- at some point in time when you were asked to figure out who was assigned to the area and what public area attendants were actually supposed be to be working in that area on that particular day, you would have accessed the public area attendant schedule, correct?

MR. JARNAGIN:  Objection.  Form.

A.    Yeah, that is the -- that is the schedule that will show you exactly who is working there.

BY MR. GERSON:

Q.    And that was how you were able to determine who was supposed to be working there at the time that Ms. Pell fell, correct?

MR. JARNAGIN:  Objection.  Form.

A.    Yes.  And that -- that information would be on the Enchantment.

BY MR. GERSON:

Q.    Do you recall being provided the information?

A.    No, I was not.  No, I don't -- I don't recall that.  No.

Page 106

Q.    Well, how did you go -- how did you cooperate with the inquiry that was made of you to figure out who was working on the pool deck at the time other than the pool attendant?

A.    I provide the --

Q.    Excuse me.  The pool supervisor.

A.    I provide the information to them, and then they reach out to the ship for that information.

Q.    How did you provide the information if the information wasn't provided to you?

MR. JARNAGIN:  Objection.  Form.

A.    We -- I got an e-mail from chief officer safety there that -- if we know anything about this.

So at the time, the recollection to recall what happened was -- all I can recall is who was there.  The incident, I could not recall, you know, until they investigated.  And the information I gave was for the two direct supervisor at the pool area.

BY MR. GERSON:

Q.    Were you ever able to identify the specific personnel from -- that were -- the public area attendants that were supposed to be assigned to the area?

A.    No.  No.

Q.    Do you know why the document that I've

Page 107

been asking you about, the public area attendant schedule, do you know why -- or what happened to that schedule?

A.    I don't know.  I cannot say.  The schedule is something that's in the system.  I cannot say what happened to it.  I was not there.  I was there at the time, but at the time that they needed the information, I was not on board.

Q.    Do you know if anyone destroyed the public area attendant schedule that was in effect on the date that Ms. Pell fell?

A.    Not to my knowledge.  The day it happened I was on board, and normally we review the schedule then, so it was live.

Q.    Explain what you mean by that.

A.    The date, December [sic] the 16th, you ask me if anybody -- think of anybody that destroy the schedule.  Not to my knowledge, no.

Q.    Are you aware of who edited the video footage of the incident itself that was preserved in this case?

MR. JARNAGIN:  Objection.  Form.

A.    Video footage, I'm sorry, but I have no access to that.  That's only chief of safety and security.

Page 108

BY MR. GERSON:

Q.    Were you ever informed at any point in time that there was video footage that appears to have been edited or deleted of the actual incident itself as Ms. Pell was exiting the windjammer, approaching the area where she fell?

A.    No, I have no conversation whatsoever with regards to that.

Q.    Is it a coincidence that the video footage in connection with this case, and also the schedule for the people that were assigned to the area where Ms. Pell fell are missing?

MR. JARNAGIN:  Objection.  Form.

A.    I can't say.

BY MR. GERSON:

Q.    Are you aware of the fact that the video footage showing the actual incident itself appears to have been deleted as is the schedule for the people that were supposed to be assigned to monitoring the area as you explained earlier?

MR. JARNAGIN:  Objection.  Form.

A.    I'm not aware of -- no, I'm not aware of any video until you showed it to me a while ago.

BY MR. GERSON:

Q.    I'd like you to take a look at what's been

Page 109

marked as Exhibit 7.  Do you see it?

A.    I can see it, yes.

(Plaintiff's Exhibit 7 was marked for identification.)

BY MR. GERSON:

Q.    Okay.  I'd like you to take a look at this video beginning at 7:48:26, okay?

A.    Okay.

Q.    Did you see how the video goes from 7:48:32 and skips about a minute of footage?  Watch again at 7:48:32, okay?

Did you see that?

A.    Yeah.

Q.    Watch again.  7:48:30 -- 7:48:32 goes to 7:49:42.

Do you see that?

A.    Can you play it again?  Let me confirm 100 percent.  Can you play it again?

Q.    Sure.  Starting at 7:48:27 you see there's a red box, correct?

A.    7:48:27, I can see it, yes.

Q.    Okay.  And I'll represent to you this is another video that was produced by Royal Caribbean in connection with this lawsuit.  This is a different vantage point.  This is actually the deck 9,

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Kelvin Alexander on 01/07/2022**                     Pages 110..113

Page 110

forward-three pool deck view, which is a different vantage point of the video that we looked at a little while ago, okay?

A.    Okay.

Q.    All right.  Beginning at 7:48:27, you see here that there's no one in this area which is the area that we've looked at in other exhibits where Ms. Pell fell, correct?

A.    I presume so.  That's what you're telling me.

Q.    Okay.  I'd like you to assume for purposes of these questions that what I'm telling you is correct, okay?

A.    Okay.  But like I said, first time I'm seeing the video.

Q.    Okay.  So watch at 7:48:27.

A.    Uh-huh.

Q.    And now it's at 7:49:43.  Do you see that there's a man in a green shirt leaning down?

A.    Yeah.

Q.    Do you know what happened to the video footage in the interim between 7:48:27 and 7:49:43?

A.    I have no access to any video footage to see or to view.  That's under the chief officer safety and security responsibilities.

Page 111

Q.    So based on your 30 years of experience working for Royal Caribbean, the only person that would have access to the video footage that we were referring to was the chief officer of safety and chief security officer.  Is that your testimony?

MR. JARNAGIN: Objection.  Form.

A.    That is correct.  It's -- chief security is the sole owner in conjunction with whatever senior officer, like, you know, chief officer safety.

So this footage do not -- we do not have access, nothing to those video footage and -- based on whatever -- you know, whatever is recorded, no.

BY MR. GERSON:

Q.    Did you delete the video footage?

MR. JARNAGIN: Objection.  Form.

A.    I'm sorry.  You break up a little bit.

BY MR. GERSON:

Q.    Did you delete the video footage?

MR. JARNAGIN: Objection.  Form.

A.    Did I delete the video footage?  No.

BY MR. GERSON:

Q.    Do you know who did?

MR. JARNAGIN: Objection.  Form.

A.    I have -- no.

///

Page 112

BY MR. GERSON:

Q.    Now, I'd like to show you another photograph -- or I'd like to refer back to an exhibit.

If we take a look again at Exhibit 4, which -- this isn't the first time you've been looking at Exhibit 4 -- you see -- you see the pool deck here in Exhibit 4 that was taken just -- I believe in the last week.  You see this?

A.    I can see it.

Q.    Okay.  Do you see how the floor surface where the drain is is a different shade of brown from other areas of the floor surface?

A.    Yeah, I can see it.

Q.    Do you know why it is, or what is your understanding of why the floor surface in Exhibit 4 is brown, and then closer to the pool deck it's more of a maroon, and then other portions of the pool deck it seems to be a different color as well?  Do you see all those differences in the shades of Exhibit 4?

A.    I can see it, yes.

Q.    What do you know about changes that were made to the deck of deck 9 on the Enchantment of the Seas?

A.    Well, the time I was there, no changes were made.  To me, the photo look like there

Page 113

was -- maybe previously there were maintenance where they change out the teak.

Q.    So based on the photographs, it does look like the teak has been changed from the initial photographs taken in connection with the investigation, correct?

MR. JARNAGIN: Objection.  Form.

A.    No.  No.  This -- in order to change teak, you need to shut down the whole area, and it takes weeks to do, you know.  So it's not a one-day event.  It's a task.

BY MR. GERSON:

Q.    I understand that.  But what I'm asking you, Mr. Alexander, is:  Do you know when the floor in exhibit -- the floor deck surface as depicted in Exhibit 4 was changed?

MR. JARNAGIN: Objection.  Form.

A.    No.  No.

BY MR. GERSON:

Q.    You left the ship in February, correct, of 2020?

A.    February 3rd.

Q.    And you're not aware of any changes to the floor surface while you were working on the Enchantment of the Seas in 2020, are you?

Page 114

A.    I'm not aware.

Q.    Based on your knowledge and experience working for Royal Caribbean for the last 30 years, doesn't it appear to you that the deck portions of the teak, including the area where this drain is located in Exhibit 4, has been changed at some point?

MR. JARNAGIN: Objection. Form.

A.    No, not to my knowledge.

BY MR. GERSON:

Q.    You just don't know if it has?

A.    Yeah. It's -- I really cannot say yes, I can't say no, but I just -- I cannot recall anything. Not to my knowledge, no.

Q.    But you do notice that the surfaces are different in color, correct?

A.    It's visual, yes.

Q.    Have you seen that -- in your experience working on other Royal Caribbean ships, have you seen changes in the color of teak used on the open decks?

A.    The only changes is if they are doing maintenance on it. I --

Q.    Do you know when --

A.    I've been on ships where they actually close off the whole port side of the pool area and they do piece by piece by the pool. They --

Page 115

Q.    Do --

(Simultaneous speakers.)

A.    -- within operation.

BY MR. GERSON:

Q.    So based on your experience for the last 30 years working for Royal Caribbean, you have seen instances where pieces of the deck surfaces have been changed, correct?

A.    Yes, I've seen that before. Yes.

Q.    And what is your understanding of the maintenance that is required of the deck surfaces on the Enchantment of the Seas?

A.    This one I cannot tell you. I'm not very much experienced on the life span and the whole changing -- changing process. I don't really understand the changing process, like how long they actually do the maintenance on the -- on the -- on the teak. I don't have any experience in that field.

Q.    Did you ever have any conversations with Ms. Pell in connection with this -- with her fall on this particular day?

A.    No.

Q.    Did you ever interview any of the crew members that you were asked to have a meeting with or that you did have a meeting with the following day?

Page 116

A.    No. The only -- I didn't interview anyone. The only thing you had was the chief officer safety and security. Those are the ones who do the interview and investigation.

Q.    You mentioned that a few -- several months ago, you were asked to provide a statement.

Do you remember that?

A.    Yeah, I recall that.

Q.    How was the statement -- the statement that you provided, was that in an e-mail? Was that handwritten? Was it provided on the statement form? What can you tell me about it?

A.    I think it was a e-mail -- e-mail advising what were the -- who were there, who were the pool attendants, who were the supervisors, what were the schedule.

And for me, I just give what I can recall. The only thing I can recall, it was quite some time ago. It's just that -- who was there, the two supervisors, which is the FCS and the -- the -- the head pool attendant.

Q.    Mr. Alexander, you like working for Royal Caribbean, don't you?

A.    I -- I started in 1991, and I'm actually -- I'm still around after 30 years, so I'm

Page 117

proud to be here. It's a great company, and I've grown within. I started out from scratch, and I actually run my own division. And yes, I love my company and working for my company, yes.

Q.    You want to help them if you can, don't you?

A.    Pardon?

Q.    You want to help them out if you can, don't you?

A.    The only way I help them out is to make sure that we maintain our pride, precision, you know, to maintain our policies, enforce our policies, educate our crew member, you know, to make sure everything is good for our guests.

Q.    You want to help out Royal Caribbean if you can, don't you?

MR. JARNAGIN: Objection. Form. Asked and answered.

A.    Depends on the situation. It depends on the situation.

BY MR. GERSON:

Q.    In this particular situation, you understand that -- well, what is your understanding about what happened to Ms. Pell, my client?

A.    I understand that she -- yes, I understand

Page 118

based on our conversation, and I did swear that -- before I started our conversation that whatever comes out would be the truth.

Q.    Are you aware of the fact that Ms. Pell suffered a brain injury requiring two craniotomies as a result of her fall on the deck that you were responsible for?

A.    I was not -- I'm not.

Q.    Were you aware of the fact that Ms. Pell had to be medically disembarked and rushed to a local hospital in Galveston, Texas where she had brain surgery as a result of her fall on this particular ship on this particular day?

A.    That information, yes, was on a communicated e-mail.

Q.    Is it your fault that the crew members that were supposed to be assigned to the area weren't doing their job at the time prior to Ms. Pell's fall?

MR. JARNAGIN:  Objection.  Form.

A.    No.

BY MR. GERSON:

Q.    Whose fault is it?

A.    I cannot really pinpoint to say -- blame anyone right now because I was not there on the scene and --

Page 119

Q.    If, in fact, there were no crew members monitoring the area where Ms. Pell fell, and there was a spill right in the walkway where she was walking, that would be a violation of Royal Caribbean's policies for making sure that the area was kept in a safe condition, wouldn't it be?

MR. JARNAGIN:  Objection.  Form.

A.    Yes.  And -- and we have the head pool attendant there who is monitoring the area.  And if that wasn't kept up to standard, I actually --

THE REPORTER:  I'm sorry, Mr. Alexander.
Can you please slow down?  I can't understand you.

THE WITNESS:  Okay.  Yes.

A.    If the -- the PAA is not in his area, it's the head pool attendant responsibility to make sure that all the PAA are in the area.

BY MR. GERSON:

Q.    So if the PAA wasn't in the area where Ms. Pell fell, that would be a violation of the policies and procedures for ensuring that the pool deck in the area that we've been referring to over and over again where Ms. Pell fell was kept in a safe condition?

A.    Well, as I mentioned before, he will not

Page 120

be specifically standby in that area because it's just one isolated area.  He have to move forward and aft as well.

So we will not find him based in one area. He's constantly moving within couple of minutes of time.  And he could have something else he was doing like picking up extra plates and dropping them to the pantry.  That would cause a little more time to pass in the area.

Q.    Did you ever read the accident report or the incident report in connection with Ms. Pell's fall?

A.    Yes, I think I -- yeah, I recall that.

Q.    When did you review the accident report?

A.    I can't recall when, but it had to be sometime around the same time.  I can't remember.  I can't remember.  Sorry.  I can't remember.  But it had to be same time around last year when -- February before I signed off.

Q.    Who showed you -- how did you access the accident report?

A.    It's a -- it's a report that actually comes from the chief officer safety.

Q.    When you reviewed it -- was anyone with you when you reviewed it?

Page 121

A.    I cannot recall.

Q.    What do you recall about your review of the accident report prior to you signing off the ship?

A.    Well, I understand that the guest had disembarked -- based on the slip and the fall that she had, she had disembarked the vessel.

Q.    How were you able to access the accident report?  Did you just go into the electronic file and look at it, or did you have to ask someone to provide you with a copy?

A.    Normally when the chief officer safety do the investigation, they send it out to us, so that's how we get access to it.

Q.    Okay.  So you were sent a copy of the accident report and then you reviewed it, and then after you reviewed it, you signed off the ship?

A.    That's correct, yeah.

Q.    Do you recall the references to the video footage in the accident report?

A.    Sorry.  Can you repeat?

Q.    Do you recall any references to the video footage in the accident report that you reviewed prepared by the chief officer of safety prior to disembarking the ship in February of 2020?

A.    No.  No.  The video -- nothing -- no such

**Page 122**

video was, you know, shared with us.

Q.    In the accident report that you reviewed, it makes reference to the fact that Ms. Pell was injured as a result of the slip and fall, correct?

MR. JARNAGIN: Objection. Form.

A.    Well, I couldn't -- I just saw the -- the scene.  I didn't see the accident.

BY MR. GERSON:

Q.    Say that again.

A.    I can visual -- what you show me in the video, I can see the area where the accident took place, but I did not actually visual see the camera, it was the guest who actually fall.

Q.    Did you read any of the other statements of the crew members in the accident report that you reviewed?

A.    No.  No.

MR. JARNAGIN: Objection. Form.

BY MR. GERSON:

Q.    Why did you review the accident report?

A.    It's part of our -- our process that they have on board.

Q.    Did you review the accident report prior to disembarking the ship so your memory was refreshed when you give deposition -- when you were asked to

**Page 123**

give deposition testimony in this case?

MR. JARNAGIN: Objection. Form.

A.    No.

MR. GERSON: All right.  I have nothing further for you at this time, Mr. Alexander.  I don't know if your counsel has any questions for you.

MR. JARNAGIN: I do not.  And we will read the transcript.

THE VIDEOGRAPHER: The time on the monitor is 2:19 P.M.  This concludes this deposition.

THE REPORTER: Does anybody want the transcript or not at this time?

MR. GERSON: Yes.

MR. JARNAGIN: We'll take a copy if he's ordering it.

(Witness excused.)

(Deposition was concluded at 2:19 P.M.)

**Page 124**

C E R T I F I C A T E   O F   O A T H

STATE OF FLORIDA          }
COUNTY OF PALM BEACH      }


I, the undersigned authority and Notary Public in the State of Florida, certify that KELVIN ALEXANDER personally (audiovisually) appeared before me and was duly sworn on January 7th, 2022.

_____
PAULA BEKKER-MURPHY
NOTARY PUBLIC, STATE OF FLORIDA
My Commission Expires: 8/22/2023
Commission No: GG906794

**Page 125**

C E R T I F I C A T E

I, PAULA BEKKER-MURPHY, Court Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that I was authorized to and did report the deposition in stenotype of KELVIN ALEXANDER; and that a review of the transcript was requested; and that the foregoing pages are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not an attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

DATED this 7th day of January, 2022.

_____
PAULA BEKKER-MURPHY
Court Reporter

**Page 126**

DEPOSITION ERRATA SHEET

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20___.

_____
KELVIN ALEXANDER

**Page 127**

DEPOSITION ERRATA SHEET

Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
SIGNATURE:_____DATE:_____
KELVIN ALEXANDER

**Page 128**

DEPOSITION ERRATA SHEET

Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
Page No.____Line No._____Change to: _____
_____
Reason for change: _____
SIGNATURE:_____DATE:_____
KELVIN ALEXANDER

---

**1**

**1** 4:9 25:8
26:3,8,16,
19 27:7,
14,22,25
44:14
68:8,14
69:22
76:12,13
78:6 80:6
82:2 85:23

**10** 78:20

**100** 109:17

**109** 3:21

**11** 8:7,15,
16 9:7
37:15

**11:22** 4:15

**12** 20:16
61:18

**12th** 8:25
9:1

**15** 13:24

**16** 11:22
12:7,10,11
59:9,19
66:15
72:2,4
101:4

**16th** 10:17,
22 11:11,
14,17
12:13 24:4

29:5 40:3,
8 41:1
43:8 48:3
54:20 58:7
62:20,23
65:19 66:4
68:4
100:15
107:16

**17:00** 40:15
47:2 49:1

**19** 57:12

**1991** 9:20
10:7
116:24

**1:31** 99:24
100:1

**1:46** 100:3,
6

**1A** 3:15
67:1,5,6,9
70:17
74:18,21
77:16
85:11
86:24 87:2

---

**2**

**2** 3:16
26:4,9,16,
20 27:7,
14,22,25
38:13,15
39:1,5,6,
8,19 40:1

44:15
69:4,7,11
78:6

**2020** 10:18,
22 11:11
12:13 24:4
29:5 40:3
48:4,16
62:20 66:4
68:4
113:21,25
121:24

**2022** 4:14

**21st** 49:1

**25** 3:18

**26th** 51:25

**2:19**
123:11,19

---

**3**

**3** 3:17
51:11,12,
14,19,21,
22 52:19
53:3

**30** 8:18,19
13:25
49:16
83:20
111:1
114:3
115:6
116:25

**30-year**

13:20

**39** 3:16
102:8

**3rd** 11:16
15:14
113:22

---

**4**

**4** 3:18
25:12,16,
17,19,21
30:1,22
31:16
34:15 39:5
44:14
46:25
70:17
76:4,5,7,
16 77:2
78:6,8,14
79:1,16
112:4,6,7,
15,19
113:16
114:6

**4-point-
something-
something-
something**
19:3

**43** 101:25
102:1

**47** 96:14

---
**5**
---

**5**  3:5,19
61:17
88:11,13,
16 102:14

**51**  3:17

---
**6**
---

**6**  3:20
91:22,24
92:2

**6-**  102:24

**64**  72:4

**67**  3:15

**6:00**  22:25

**6th**  48:16

---
**7**
---

**7**  3:21
109:1,3

**700**  102:24

**7:40:44**
96:13

**7:44**  97:8

**7:44:58**  94:5

**7:46:30**
93:17

**7:47:20**
94:4,5

**7:47:42**  97:8

**7:48:26**
109:7

**7:48:27**
109:19,21
110:5,16,
22

**7:48:30**
109:14

**7:48:32**
109:10,11,
14

**7:49:42**
109:15

**7:49:43**
110:18,22

**7th**  4:14

---
**8**
---

**88**  3:19

---
**9**
---

**9**  20:17,19,
20 21:3,7
22:15
25:22
31:17,22
32:19
34:15 52:5
53:13
54:19
57:22
58:6,14,23
59:12,24
60:13,21

61:16,20
62:14
67:17 68:2
70:8 72:22
83:23
84:23
85:23
102:6
109:25
112:22

**91**  3:20

---
**A**
---

**A.M.**  4:15

**aboard**  59:19

**Absolutely**
40:12

**accept**  68:1

**access**  16:9
50:23
54:17,23,
25 55:1,3
92:15
107:24
110:23
111:3,11
120:20
121:7,13

**accessed**
105:9

**accessing**
55:15

**accident**
16:15

36:6,9
48:7
100:15,22
120:10,14,
21 121:3,
7,15,19,22
122:2,7,
11,15,20,
23

**accidents**
32:2,8,18

**accommodation**
7:19,24

**accurate**
23:11 29:2
87:16

**accurately**
25:24

**action**  35:12
87:8

**actively**
86:22

**activities**
33:24

**actual**  23:8
50:13
108:4,17

**add**  65:16

**additional**
40:18
47:5,6
60:17,24
63:2,24
64:12,13

65:20
99:16,19

**address**
40:19 90:3

**addressed**
38:2 42:16
47:6

**admin**  10:1,
10

**Adventure**
5:20,23
6:22 8:23,
24 9:3,11
10:14,21
12:4,5
14:6

**advising**
116:13

**affirmed**  5:3

**aft**  30:3
61:16
96:16
97:23,24
120:2

**afternoon**
14:12

**agree**  27:13
28:25
31:24,25
55:11 77:1
82:16,17
100:25

**ahead**  25:2
72:15

77:19 80:3

**alerting**
75:11

**Alexander**
3:4 4:11
5:2,9,10
6:1,25
10:3 14:2
37:13 46:1
67:22
69:21
76:23 77:1
78:25
81:9,18
82:17 91:8
94:21 97:1
100:9
113:14
116:22
119:11
123:6

**ambiguous**
95:7

**amount**  69:25
102:19,25

**answers**  7:7

**apologize**
96:24

**appeared**
87:15

**appears**  40:2
68:17
76:16
77:21
108:3,17

**applicable**
35:17

**applied**  9:19

**applies**
18:17

**apply**  17:18

**approach**
83:11

**approaching**
108:5

**approval**
24:25

**approve**  25:2

**approximately**
11:21 12:2
44:17

**area**  3:17
7:19 16:18
19:10
20:15,20
21:12
23:5,20
24:19
26:8,9,16
27:5,7,8,
14,21,24,
25 28:4,
15,25
29:1,7,10,
11,14,23
31:4,8
33:22,23
34:13,19
36:7,12
37:16

42:3,21
43:21
44:5,13,
14,24,25
45:15,19
47:22 48:8
52:19 53:6
54:4 56:12
57:6,11,21
58:17
60:9,18,20
61:19,21,
22,24,25
62:1,3,5,
8,9,16
64:11,16
65:9 67:10
69:23
70:6,8,19
71:7 74:25
75:1,3,6,
11 80:18,
21,25
81:10,11
82:1,10,23
84:10,22
85:10,11,
22,25
86:8,23
87:1,10,
15,19
88:1,24
91:9,10,17
93:18,22
94:7,12
95:22
96:5,10,17
97:3,6,7,

14,18,20,
22 98:9,
12,14,15,
20 99:5,7,
8,18
100:19,21,
24 101:6,
20,23
102:1,5,8,
9,12,13,
16,18,20
103:2
104:3,10,
20 105:7,
8,10
106:18,22,
23 107:1,
10 108:6,
11,20
110:6,7
113:9
114:5,24
118:17
119:2,5,9,
15,17,19,
22 120:1,
2,4,9
122:11

**areas**  7:22,
23 18:11
24:23
28:16
46:19
54:16
60:14
102:12,15
103:1
112:12

**arrange**  56:1

**arrangement**
10:25
36:12,15
37:1,8,16,
20,23,24
38:3,7
40:13,25
45:9,14
46:5,14,15
47:1

**Asia**  12:14

**aspect**  42:14

**assign**  52:3

**assigned**
19:15,21
20:5,10,
11,24
21:2,7
24:1 30:3
31:9
50:14,17,
22 54:7,16
57:16,21
58:5,14,23
60:1 61:3,
9 63:18
98:12 99:7
102:6,16,
22 104:3,
9,10,20
105:6
106:22
108:11,19
118:17

**assignment**

23:1 27:6
99:5

**assignments**
22:23 38:3

**assistance**
64:14
84:15
96:17,21

**assistant**
10:1

**assume**  6:17
69:20
78:25
79:5,9
91:8
110:11

**assumption**
79:15
91:15

**attend**  18:8
31:1 55:17
71:25
84:15

**attendance**
54:8

**attendant**
3:17 9:25
19:13,17
22:1,25
23:6,19,21
24:13,16,
19 29:11
38:1 42:22
43:13,14
44:5,13,24

45:15,19
47:2,22
49:8 50:18
52:20 53:6
56:1,18
60:18
61:13
65:16
84:10
94:12
95:22
96:10,20
97:6,18
98:9
103:24
104:16
105:10
106:4
107:1,10
116:21
119:9,16

**attendants**
17:24
19:14
22:19,21,
22 25:3,4
27:8,15
28:25
29:2,14
30:2 31:8
34:14
35:24
36:12
37:17
42:6,10,
24,25
43:1,6,21
47:13 48:7

49:6,10
55:19,22
56:2,12,
19,22
58:25
60:20
62:17
69:24
70:7,20
93:22
97:3,20
99:5,7
100:17
101:21
102:1,6,8,
16,25
103:23
105:7
106:22
116:15

**attended**
71:16,19
72:1

**attending**
97:11 98:3

**attention**
35:2 59:3
80:20
81:16 88:4

**audio** 27:11,
12 91:1

**audiovisual**
71:23

**avoid** 35:21
36:9 86:4
100:22

**avoided**
72:19

**aware** 32:25
42:2
59:11,23
66:13,19
71:12 75:5
84:21
87:7,8
91:4 101:9
107:19
108:16,22
113:23
114:1
118:4,9

**awareness**
48:6 57:3
101:7

———————

**B**

———————

**back** 10:17
23:22
29:25
41:10
44:15,21
45:7 48:20
49:20
51:17 71:2
74:14 80:1
86:21
97:24
100:6
112:3

**background**
9:10,15
64:3 87:14

**bag** 75:21

**ball** 42:3

**bartender**
93:15,17,
23 94:6

**based** 34:17,
20 35:5,10
41:10,22
48:5 54:15
57:23
58:24
60:7,22
61:5 62:21
70:13,14,
16,17
78:19
79:25
80:17,18
82:10,22
87:14
91:15 93:8
95:20 96:2
97:1,10
99:12,13,
14 100:14
101:6
111:1,11
113:3
114:2
115:5
118:1
120:4
121:5

**basis** 23:9
42:16
43:22

**bathroom**
35:7

**begin** 23:21

**beginning**
4:9 97:8
109:7
110:5

**behalf** 4:19,
21

**behavior**
73:7

**Bekker-murphy**
4:4

**benefit**
51:10

**beverages**
9:23

**big** 102:10,
23

**bit** 10:4
46:2
111:16

**blame** 118:23

**block** 74:3
80:25
82:23
85:24
91:17

**blocked**
80:18,19,
21 81:11
88:24

**blocking**

88:19 90:15 91:9

**blue** 75:15, 21,22

**board** 6:21 24:9 52:8 54:23 55:1 107:8,13 122:22

**body** 94:19

**box** 109:20

**brain** 118:5, 11

**break** 17:8 23:22 27:23 35:8 96:7 99:22 111:16

**briefing** 16:22 22:24 40:18 42:13,17 47:5 54:1 61:13 73:6 100:17

**Brilliance** 13:16

**bring** 24:25

**broom** 18:1 29:23 30:24

**brought** 35:2

**brown** 112:11,16

**bucket** 18:1, 8 29:17

**busy** 60:24 61:22,24, 25 99:19

**bypass** 70:14

———————

**C**

———————

**call** 27:25 28:6 83:13 84:6,15

**called** 18:14,25 23:3 37:1, 7 83:12

**Calls** 52:21 76:18 89:19 90:17

**camera** 97:12 98:22 122:12

**candid** 6:8

**capacity** 60:8,23 99:18

**care** 81:16 83:1 99:3

**careful** 63:13 73:8

**Caribbean**

4:12 5:12 6:20 8:5, 6,11,14, 18,20 12:19,25 13:21 19:9 32:17 33:13 37:14 49:15 52:2 53:8 54:12 67:23 72:20 73:3 83:4,19,20 84:19 87:8 96:6 109:23 111:2 114:3,18 115:6 116:23 117:15

**Caribbean's** 34:13 39:9 84:20 119:4

**carry** 88:5 100:17

**case** 18:7 59:6 63:4 95:21 107:21 108:10 123:1

**catch** 80:12

**causing**

71:13

**caution** 72:13 74:25 75:1,5,10

**Cavalier** 14:21 15:5,7

**center** 72:16

**certainty** 78:18

**chain** 3:16

**chair** 34:3 68:18 73:10 76:15 77:12,17 81:25 82:7 86:3,16,18 88:18 89:10 90:6,9 95:5

**chairs** 64:21 67:10 68:10 73:14,20, 23 74:2,5 77:2,19,20 79:21 80:17,23 88:19 89:15,16 90:6,11,14 91:8,16

**change** 52:9
113:2,8

**changed**
113:4,16
114:6
115:8

**changing**
115:15,16

**charge** 7:18,
21

**checking**
21:10 22:5

**chemical**
87:24

**chief** 47:24
92:16
106:12
107:24
110:24
111:4,7,9
116:2
120:23
121:11,23

**circle** 68:9
69:3,4,10
82:2,18

**clarity** 93:8

**class** 12:19,
21,25
13:2,6,7,
8,9,12
102:4

**classes**
13:22,23

**clean** 18:2
21:11
29:13
30:25 48:9
57:13
64:23 83:5
84:18
85:12
86:10
87:24
96:17,21

**cleaned** 57:9
70:9 71:1
81:3,13
82:14,19
84:16
85:1,21

**cleaning**
19:18
24:12,15
38:2 43:12
49:7,10
50:15,19
55:2,25
56:3 57:17
58:21
65:12

**cleanliness**
19:7 21:13
22:3 31:4,
14 36:7
64:9 65:8
99:2

**clear** 103:13

**clearer**
88:9,17

**client**
117:24

**close** 76:25
77:15
78:5,21
93:15
94:9,17
95:11
114:24

**closed**
87:15,19
88:1

**closer** 80:4,
6 112:16

**clothes**
95:12

**coincidence**
108:9

**color** 68:24
95:12
112:18
114:15,19

**comfort**
64:16

**commit** 34:5,
9,10

**common** 32:9,
11 33:22
41:24 59:7

**communicate**
55:21
56:17

**communicated**
105:3

118:15

**communication**
48:13

**company**
9:13,14,24
10:8 49:16
72:24
117:1,4

**computer**
55:11

**concluded**
123:19

**concludes**
123:11

**condition**
17:19
18:3,18
19:23 44:7
60:4,15
79:20
92:11
119:6,24

**conditions**
19:12
70:19

**conducted**
35:6

**cone** 86:1,
2,19 87:10

**cones** 75:2,
11

**configuration**
25:25
73:13

76:16

**confirm** 54:2
109:17

**conjunction**
24:13
43:12
57:18
111:8

**connect** 22:8

**connection**
17:3 35:24
36:12
39:10
43:6,17
45:20
47:14,20
56:22
67:23
71:17
74:22
77:4,10
78:15 79:3
89:17
92:12
108:10
109:24
113:5
115:20
120:11

**consecutive**
11:22,24
12:8

**consequences**
6:6 34:20

**consideration**
35:11

65:17
101:14

**consist**
13:11

**constant**
34:18 99:1

**constantly**
21:12 22:4
120:5

**continue**
94:2

**continued**
100:4

**continuing**
73:5

**continuous**
17:23 21:9
33:24
72:24

**continuously**
11:9,12
26:25
28:22
29:6,7
30:7 31:6
60:2

**contract**
10:24
11:1,5

**contracts**
10:24
66:22

**contribute**
87:25

**convenience**
74:13

**conversation**
108:7
118:1,2

**conversations**
115:19

**Cooper** 4:21

**cooperate**
106:2

**copy** 15:22
24:3 104:8
121:10,14
123:16

**corner** 75:22

**correct** 5:24
7:15,16
8:2,13,15,
21 9:2,5
11:2,3,6,
7,20
12:20,22,
23 14:22
15:1,2,5,6
16:1,4,8
20:6,8,21,
22,25
21:3,4,20,
21 23:15
24:17
26:25
27:1,17
28:18,20
29:3,7,16
31:6,7,11,

18 39:18,
21 40:7,8
41:2 45:1,
9,16 47:10
50:8 51:7
52:6,20
53:3,9,10,
15 54:20,
22 55:6,7,
11 58:8,
10,15,23
62:7,17,18
65:14,15,
23 66:2,
15,17,23,
25 67:18
70:22
74:19,20
77:5,15
78:10
79:10 81:1
82:19
84:5,6
85:13
86:8,13,17
87:2 88:20
89:11,13,
18 90:7,16
93:12,19
94:8 95:2,
5 97:21
105:10,17
109:20
110:8,13
111:7
113:6,20
114:15
115:8

correctly
20:23

counsel 4:16
123:7

couple 6:1
17:14
44:18,22,
23 120:5

court 4:4,17
7:6

cover 54:5
61:18
71:13
99:14
102:11

covered
24:23

covering
77:12 89:4
102:11

covers 24:22

craniotomies
118:5

created
24:14

creates
24:11

creating
70:21

crew 9:24
23:25

121:17
122:4

30:20
34:5,6,9,
14,17,19
84:2,4,20
85:19 86:6
93:10,14,
22 102:12
115:23
117:13
118:16
119:1
122:15

CROSS 3:3

cruise 9:19
23:9 25:4
26:15,22
28:14
30:16 52:9
53:23 64:2
83:16
92:23 93:6

Cruises 4:13

cups 21:10
22:16
44:19
98:18

current 9:10

cursor 26:9
92:20 97:7

cursor-wise
94:18

cut 41:15

cute 94:22

—————————
          D
—————————

daily 23:9,
23 27:5
42:16 73:6

data 55:4

date 4:13
11:19
56:20
76:17
107:10,16

day 19:24,
25 23:2
24:22,23
25:5 29:4
36:2 40:6
42:8 49:1
53:18,21
54:8 56:13
58:14
61:4,10
63:19
79:17,22
102:7
105:9
107:12
115:21,25
118:13

deals 83:4,8

debris 81:14
82:9,23
85:1 87:22

December
107:16

decide 74:8

decision
58:22
65:11

deck 10:10
17:19
18:11,17,
22 19:10,
11,15,21
20:5,11,
12,16,17,
19,20
21:2,3,7
22:15 24:2
25:22 27:3
28:2,15
31:9,10,
17,18,19,
21,22,23
32:8,19,22
33:2
34:15,25
35:17 38:5
40:7,17
41:15,21
42:10,11,
23 43:6
44:5 47:4,
13,14,21
48:2
49:18,24
50:14,17,
22 52:5
53:13
54:19
56:15,24
57:9,16,22
58:5,6,14,
23 59:12,

24 60:2,
13,14,21
61:3,10,
16,17,18,
19 62:14
63:5,18,25
64:4,10
65:3,11,
13,20 66:3
67:17
68:2,3
70:8 72:8,
22 73:14,
23,24
74:5,6
77:2,11,
17,19,20
78:20
79:20,21
83:22
84:23
85:23 86:8
91:16
92:10 95:5
99:6
101:10,12,
20 102:6,
9,13,17,
21,22,23,
25 106:3
109:25
110:1
112:6,16,
17,22
113:15
114:4
115:7,11
118:6

119:22

**decks** 20:13,
25 53:14
72:22
114:19

**declared** 6:5

**defendant**
4:22

**defining**
81:21

**delete**
111:14,18,
20

**deleted**
108:4,18

**demographic**
60:22

**depends**
117:19

**depict** 25:24

**depicted**
26:16
27:7,22,24
30:22 95:8
113:15

**deposition**
4:3,10
5:15 15:8,
16 25:7
38:12
39:15 45:1
88:11
100:3
122:25

123:1,12,
19

**describe**
27:21

**description**
3:14 64:7

**desktop**
16:7,12

**destroy**
107:17

**destroyed**
107:9

**determination**
57:20 59:1

**determine**
47:21
54:11
55:16
105:16

**determined**
6:7

**determines**
57:15

**dictate**
53:12

**difference**
84:9

**differences**
112:19

**difficult**
30:15

**direct** 3:3
5:5 15:4

50:19
106:18

**directly**
14:3

**director**
14:3,4,10,
14 15:4
39:20
40:11
41:9,19
71:22

**disappointed**
47:12

**disembarked**
118:10
121:5,6

**disembarking**
121:24
122:24

**disposed**
87:23

**dispute** 90:5

**distance**
95:13

**division**
117:3

**divisional**
71:22

**document**
23:8 51:23
52:12,15,
18 53:11
54:25
106:25

documentation
  52:2

documents
  15:16
  39:14

drain  71:10,
  11,13
  76:13
  77:13,18,
  25  78:4,7,
  13,14,22
  79:1,16,
  17,21
  80:11
  112:11
  114:5

drinks  94:7

drive  64:15

drop  44:21

dropping
  120:7

drownings
  50:6

dry  16:19
  17:19,23
  18:3,17
  19:23
  31:10
  41:15,21
  42:7,11,23
  44:7  46:19
  48:9  60:3,
  15  64:24
  69:24

due  33:14,

19

duly  5:3

dustpan  18:1
  29:18,23
  30:24

duties  27:6
  50:11

duty  23:23

─────────
    E
─────────

e-mail  3:16
  15:17,19,
  22 16:10,
  13,22
  17:2,6,10,
  12,15
  39:15,17,
  20 40:2,4,
  5,10,24
  41:4,7,8,
  22,25 43:7
  45:7,8,11,
  12,22
  46:7,13,
  16,20,21,
  22,24
  48:12,19,
  20 54:13
  56:11
  100:14
  106:12
  116:10,13
  118:15

earlier
  26:21

38:16
39:13
59:14  76:4
108:20

easy  62:15

edited
  107:19
  108:4

educate
  117:13

education
  73:5

educational
  9:10,15

effect
  107:10

electronic
  55:16
  121:8

electronically
  55:5

elementary
  9:17

employed
  8:19

employee
  35:6 73:5
  86:19

employees
  73:4

employment
  10:25

Enchantment

10:17,21
11:6,10,15
12:5,6,12,
22,24
13:1,15
14:6,19,
23,25
19:15,21
20:3,18
24:2
25:20,22,
25 41:1
52:5,20
53:7 55:1
59:5,20,25
65:4,13,21
66:14,21,
23 67:17,
20 68:3
71:17,20
72:1,22
76:8
104:6,24
105:20
112:22
113:25
115:12

encounter
  32:12 83:9

end  40:21
  47:8

enforce
  117:12

enjoy  74:2,
  13

ensure  19:9

24:21 42:3
48:8 56:15
60:3,14
64:15

**ensuring**
40:19 47:7
64:10,11
79:19
92:10
119:21

**enter**  81:11

**entire**  31:23
60:13
66:22

**entirety**
101:1

**entitled**
34:11

**environment**
17:23 19:6

**equipment**
17:25 88:4

**equipments**
65:7

**error**  33:10,
14,19,25
34:5,9,10

**errors**  34:11

**estimate**
11:9

**evaluate**
62:20
65:19 66:1

**evening**
40:15 47:3
48:3,15

**event**  83:21
85:18,20
86:7 98:8,
13 113:10

**eventually**
33:25

**evidence**
95:20

**exact**  70:18
98:7

**EXAMINATION**
5:5

**examined**  5:3

**Excel**  55:9

**excuse**  10:21
34:8 39:5,
25 70:17
78:12
106:6

**excused**
123:18

**executive**
6:21 7:15,
17 8:4,6,
16,17 9:8,
11 10:2,
11,13,16
20:3 29:10
30:19
33:12
34:25

37:14
39:20,23,
25 40:10
49:14 59:8
79:19
83:18 92:9

**exercise**
35:12

**exhibit**
3:14,15,
16,17,18,
19,20,21
25:7,8,12,
16,17,19,
21 30:1,22
31:16
34:15
38:11,13,
15 39:1,5,
6,8,19
40:1 44:14
45:1 46:25
51:11,12,
14,19,21,
22 52:19
53:3 55:9
67:1,4,6,9
70:17
74:17,21
76:3,4,5,
7,16 77:2,
16 78:6,8,
14 79:1,16
85:11,23
86:24 87:2
88:11,13,
16 91:22,

24 92:2
109:1,3
112:3,4,6,
7,15,19
113:15,16
114:6

**exhibits**
3:23 110:7

**exiting**
108:5

**expect**  43:20
44:3,12,23
69:23 70:6
97:2,13

**expectation**
40:15 47:3
48:1,5
56:14 66:3
97:5

**experience**
87:15
111:1
114:2,17
115:5,18

**experienced**
115:14

**explain**  5:25
6:9 35:20
53:25
76:15
100:18
107:15

**explained**
25:3
108:20

**explanation**
79:18

**extends**
68:19

**extra** 120:7

**eye** 28:16

---

**F**

---

**face** 43:15
56:6,9

**faces** 49:13
94:17

**facility**
19:18
24:12,15
38:1 43:12
49:7
50:15,19
55:2,25
56:3 57:17
65:13

**fact** 47:12
68:2 69:22
82:18 83:3
84:21
91:10
108:16
118:4,9
119:1
122:3

**factors**
87:25

**fairly** 25:24

**fall** 32:15

33:6,10,
13,19,21
34:1,2
35:24
36:13
42:10,23
43:17,20
45:20
46:17
48:4,17
59:4,7,12,
20 66:14,
21 67:24
71:14
74:23
77:11
78:15
79:3,18
89:18
96:12
100:23
103:5
115:20
118:6,12,
18 120:12
121:5
122:4,13

**falling**
87:11

**falls** 32:18,
19 33:1
59:2,24
62:22 63:5
72:8,10,
12,21 73:4
100:25
101:10

**familiar**
17:17
20:17
23:3,14
36:25 37:7
50:25 84:5

**fault**
118:16,22

**FCS** 19:18
104:16
116:20

**February**
11:16
15:14
113:20,22
120:18
121:24

**federal**
36:24

**feet** 102:24

**fell** 43:22
45:23
47:22
53:21 54:8
61:25 62:5
63:19
75:3,7
76:17
79:23
97:21 99:8
105:17
107:11
108:6,12
110:8
119:2,20,
23

**fellow** 86:19

**field** 115:18

**figure** 54:18
102:3,4
104:3,18
105:6
106:3

**figures**
102:4

**figuring**
49:9

**file** 55:3
121:8

**filed** 5:12

**files** 38:18,
21 55:5

**finalize**
24:24

**find** 28:20
35:3 48:10
49:17
50:21
57:11
61:22
104:15
120:4

**fines** 6:7

**finish** 23:23
74:13

**fits** 25:1
38:9

**five-minute**
99:21

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Kelvin Alexander on 01/07/2022** Index: floor..gave

floor 21:11
30:25
68:21 70:8
81:19
112:10,12,
15 113:14,
15,24

floors 19:11

Florida 4:5

focus 42:18
50:10
61:20
101:7

focused
61:21

food 9:23
80:13,14
81:4,14
82:9,23,25
85:1

footage
16:24
43:16
47:20
92:12,24
93:3,5,7
95:2,5,9
96:11,13
97:1,12
98:7,22
107:20,23
108:3,9,17
109:10
110:22,23
111:3,10,
11,14,18,

20 121:19,
22

form 14:5
18:19
22:18
27:18
28:19
31:12 32:4
33:3,16
34:16
35:18
37:9,18
39:22 41:3
43:23 44:8
45:2 47:16
49:2 50:2,
9 51:3
52:7,14,21
53:8 54:21
55:12 57:1
58:9,16
59:13,18
60:5 62:2,
24 63:20
65:22
66:5,16
68:20
69:5,16
70:1,11,23
72:23 74:7
75:13
76:18
77:23
79:4,11,24
81:20
82:12,20
84:24
85:14

87:3,18
88:21
89:5,12,19
90:8,17
91:12
92:14
93:13
94:15 96:1
99:9 101:2
104:22
105:11,18
106:11
107:22
108:13,21
111:6,15,
19,23
113:7,17
114:7
116:11
117:17
118:19
119:7
122:5,18
123:2

format 53:4
55:8,10

forward
28:2,7,10
62:11
94:13
96:16
97:23
120:2

forward-three
110:1

found 48:14,
15,18

four-month
12:9

fourth 11:5

Francois
14:20,21
15:5,12,
18,20
16:10
17:7,11
40:2,10,
12,21,24
43:7
45:12,22
46:6,16
48:12
100:12

Francois's
54:13

free 31:10

front 15:25
16:3,8
36:24
73:10,11

full 60:23
99:18

future 35:21

_____

G

_____

Galveston
5:22,23
118:11

garbage
30:25

gave 106:17

gazing   72:16

generally
11:8  25:25

generated
55:10

Gerson   3:5
4:19  5:6
6:24  10:12
13:5,10
14:7  18:23
20:9  22:20
24:10
25:14
27:20
28:23
30:12
31:15
32:6,21
33:7,17
34:22
35:22
36:18,22
37:5,12,21
38:19,22,
24  39:3,24
41:5  44:2,
11  45:6,13
46:8  47:18
49:4,22
50:3,12
51:5,16
52:11,17,
23  54:24
55:14  57:7
58:3,11,18
59:15,17,
22  60:10

62:4  63:3,
22  65:1,24
66:8,18
67:3  69:1,
8,19  70:3,
15  71:4
73:2,21
74:15
75:18
76:20  78:2
79:7,12
80:2
81:17,23
82:15  83:2
84:3,17
85:3,17
87:6  88:6,
15  89:1,7,
14,22
90:13,19,
21  91:2,14
92:1,8,18
93:16
94:1,20
95:19  96:4
99:21
100:8
101:8
105:1,14,
21  106:19
108:1,15,
24  109:5
111:13,17,
21  112:1
113:12,19
114:9
115:4
117:21

118:21
119:18
122:8,19
123:4,15

give   16:20,
22  22:25
103:13
116:17
122:25
123:1

giving   5:11

glass   44:20
69:3,6,15
70:7,12,14
77:15
80:11
85:5,6
89:11,16
90:6  98:5

glasses
98:18

good   5:7
99:14
117:14

Gotcha   7:13

governing
53:11

great   117:1

green   94:23
110:19

greeting
22:5

ground   6:1
80:5

grounds   63:6

Group   6:21

grown   117:2

guest   16:16,
23  22:5,6,
8  36:10
41:23
45:23
46:17
60:7,22
61:23
74:1,8
86:4  90:24
121:4
122:13

guests   21:10
63:11
64:16
72:25  73:7
99:18
117:14

guys   16:18
22:9  46:18
58:21

——————
**H**
——————

half   96:3,
14  98:2

hand   6:4
93:12

handful
93:11

handwritten
116:11

handy  85:19

happen  32:11
  35:4  41:25

happened
  42:2  62:13
  80:20
  100:13
  103:14
  106:15
  107:2,6,12
  110:21
  117:24

harm  95:24

hat  95:2

hazard  28:17
  64:22  81:2

hazard-like
  22:16

hazards
  27:10,16
  31:11

head  19:13,
  14,17
  22:1,25
  24:13,15
  38:1
  43:13,14
  49:7  50:18
  56:1,3,17,
  18  58:20,
  25  65:12,
  15  103:23
  104:16
  116:21
  119:8,16

hear  27:12
  91:19,20
  100:9,10
  104:13

height  78:20

held  56:13,
  20

high  9:18
  61:20,21
  70:8  71:9
  85:21

highlight
  47:4

highlighted
  40:17

history
  59:24

Hold  38:24

home  5:21

hospital
  118:11

hotel  10:9
  14:3,4,10,
  14  15:4
  39:20
  40:11
  41:9,19
  71:22

hours  24:22
  49:1

housekeeper
  6:21  7:15,
  17  8:5,7,
  16,17  9:8,

11  10:2,
  11,14,16
  20:3  29:10
  30:19
  33:12
  34:25
  37:14
  39:23
  49:15  59:9
  79:19
  83:18  92:9

housekeeping
  7:18,21
  9:25  10:1,
  10

human  33:10,
  14,19,25
  34:5,9,10,
  11

─────────
      I
─────────

idea  96:23

identification
  25:13  39:2
  51:15  67:2
  88:14
  91:25
  109:4

identified
  29:11
  70:7,9
  84:10

identify
  68:22
  69:24

83:22
  84:13,14
  85:15,20
  86:7,13
  87:5
  106:20

immediately
  18:8  29:13
  31:2  81:3,
  13  82:14,
  19  83:6,11
  86:14

importance
  41:13,20
  42:6,11,22
  100:18

important
  6:13  7:1
  27:2
  100:20

impossible
  34:3

improper
  74:5,8

incarceration
  6:7

incident
  11:17,19
  16:21,23,
  25  17:4
  42:17
  47:15,20
  48:6,23,24
  49:11
  56:23  57:4

66:7 77:5
92:13
98:13
101:6
106:16
107:20
108:4,17
120:11

**incidents**
66:10,13,
20

**including**
6:7 52:5
114:5

**Incorrect**
78:11

**increase**
62:14,20
63:6,9,15,
16,21,23
65:11 66:2
101:16,19

**increasing**
101:11

**individual**
95:13

**individually**
103:25

**individuals**
58:13
103:25

**information**
49:21
103:14,15,
17,24

104:7,11,
15,20,23
105:2,19,
23 106:7,
8,9,10,17
107:8
118:14

**informed**
108:2

**informing**
35:8

**initial**
113:4

**injured** 15:1
16:17 40:6
48:11,16
53:18,21
58:15
61:11
122:4

**injury** 118:5

**inquiry**
106:2

**inside** 103:1

**inspect**
43:22

**inspecting**
53:13

**inspection**
34:24
35:16

**inspections**
29:21

**instances**
115:7

**integrity**
64:23

**interim**
110:22

**internal**
60:18,25
99:20
101:23
102:12

**internally**
60:25

**interruption**
71:23

**interval**
96:6,11
97:8

**interview**
115:23
116:1,4

**interviewed**
103:4

**introduce**
4:16

**investigated**
106:17

**investigation**
35:3,5,6,
14 67:24
89:17
103:5
113:6
116:4

121:12

**involvement**
63:17

**involving**
11:19
39:10

**isolated**
120:2

**issue** 64:17

**issues** 22:6
37:25
50:5,7
65:6 71:13

---

**J**

---

**jacuzzi**
20:21
78:10

**January** 4:13
10:17,22
11:10,14,
17 12:12
24:4 29:4,
5 40:3,8
41:1 43:7
48:3,16
49:1 54:19
58:6
62:19,23
65:19 66:4
68:3
100:15

**Jarnagin**
4:21 14:5
18:19 20:7

22:18
27:18
28:19
31:12
32:4,20
33:3,16
34:16
35:18
37:2,9,18
38:17,20
39:22 41:3
43:23 44:8
45:2,10
47:16
49:2,19
50:2,9
51:3 52:7,
14,21
54:21
55:12 57:1
58:9,16
59:13 60:5
62:2,24
63:20
65:22
66:5,16
68:20
69:5,16
70:1,11,23
72:23 74:7
75:13
76:18
77:23
79:4,11,24
81:20
82:12,20
84:12,24
85:14

87:3,18
88:21
89:5,12,19
90:8,17
91:12
92:14
93:13
94:15 96:1
99:9 101:2
104:22
105:11,18
106:11
107:22
108:13,21
111:6,15,
19,23
113:7,17
114:7
117:17
118:19
119:7
122:5,18
123:2,8,16

**Jennifer**
 4:12 5:12

**job** 9:10,20
 22:14
 37:10
 47:23,24
 50:16
 58:20 97:3
 118:18

**joined** 9:13

**judge** 7:12

**jurors** 51:10

**jury** 7:11

23:17
36:24,25
37:7

---

**K**

---

**keeping**
 42:11,22

**Kelvin** 3:4
 4:11 5:2,9
 6:19 22:13
 36:23
 41:12
 46:17 51:1
 56:21 58:4

**kids** 28:3,
 9,10 30:3,
 21 63:12
 73:1
 78:11,12
 94:14

**kind** 68:9
 76:25
 80:13,20
 81:10
 82:10

**kit** 83:14
 84:7 86:20

**knowledge**
 71:15
 78:16
 83:18
 107:12,18
 114:2,8,13

---

**L**

---

**land** 30:16

**laptop** 15:25
 16:3,6

**large** 4:5
 57:21 82:1
 99:7

**largest**
 31:23

**laundry**
 7:19,24
 8:1,2

**lawsuit** 5:11
 39:10
 109:24

**lawyers** 39:9

**lay** 23:20
 90:11

**layout** 90:11

**leading**
 96:12

**leaning**
 110:19

**learned** 35:1

**leave** 21:11
 98:12,20

**left** 21:19
 72:16 78:9
 113:20

**lesser** 45:4

**level** 58:24

lied   6:8

life   115:14

lifeguard
  49:23 50:4
  84:11,13

liquid   80:15

listening
  18:5

live   107:14

local   118:10

located
  20:21 21:2
  31:17,22
  80:25
  91:10
  114:5

locating
  91:3

location
  42:20
  70:12,13
  74:9 84:8

long   8:4
  10:20
  14:12 25:1
  43:14 45:5
  49:12
  84:18
  102:23
  115:16

long-term
  101:14

looked   55:8
  77:11

78:15
79:17 94:5
110:2,7

lost   27:11,
  12 90:25

lot   42:13

lounge   74:2

love   117:3

—————————

M

—————————

made   39:15
  59:23
  71:12
  84:21
  87:13
  101:9,17
  106:2
  112:22,25

main   31:19
  61:19
  64:15 71:8
  77:9 86:9

maintain
  17:22
  18:10,21
  19:6 31:14
  36:7 42:3
  48:9 57:6
  64:9,22
  65:8
  100:20
  117:11,12

maintained
  19:23 55:5
  60:3 64:17

79:20
92:11
100:24
101:3

maintaining
  17:18
  18:17 31:4
  100:19

maintenance
  22:3
  64:17,19
  113:1
  114:21
  115:11,17

make   16:17
  18:2 19:22
  21:9 31:10
  34:1,11
  36:6,8
  42:1,18
  44:6
  46:18,24
  48:8 50:5
  54:2,4,6
  57:5,12
  58:21
  64:18,20,
  21 65:5,10
  69:6
  70:20,25
  72:15 73:3
  75:24 79:5
  84:9
  86:10,16
  87:23
  93:9,15
  94:10,16,

17,19
95:13,17,
18 98:25
99:1
100:16
117:10,13
119:16

makes   46:14
  61:9 122:3

making   22:8
  42:6 57:19
  119:5

man   94:23
  110:19

manage   64:4

managing
  65:3

manner   92:11

manpower
  60:6,8,16,
  17,20
  62:14,21
  63:2,7,10,
  14,24
  65:11,20
  66:2
  99:11,15,
  16,19
  101:12,16,
  20 103:3,
  22

mark   25:7
  38:11
  88:10

marked   3:13

19:5 25:12
38:13
39:1,5
51:11,14
67:1 74:17
82:1,17
88:13
91:24
109:1,3

maroon
112:17

matter  4:11
55:15
85:4,12

meaning
33:21

means  6:4

meant  53:24

Media  4:9

medical  59:3

medically
118:10

meet  40:13,
14 42:21
47:1

meeting
35:14,19,
23 36:1,3,
4 42:1,5
43:2,6,11
48:25
49:5,11
53:22
54:9,12

55:17,20,
22,24
56:1,13,
19,21
57:2,3
71:21,23
73:6
115:24,25

meetings
42:9
71:16,19,
24,25 72:6

member
34:17,19
85:19
93:11,14,
23 117:13

members
23:17,25
30:20
34:5,6,9,
14 36:25
37:6 84:2,
4,20 86:6
115:24
118:16
119:1
122:15

memory
122:24

mention
82:22
102:20

mentioned
7:14 9:7
11:4,5

22:17
26:21
29:15
58:20
61:14
62:13
74:21
99:12,17
103:21
116:5
119:25

mess  9:24

message
42:18

met  42:25

mid-ship
62:10
97:24

middle  78:7

mind  8:8
46:6

minute
109:10

minutes
44:18,22,
24 85:7,8
86:21
96:3,14
97:10,15
98:2,7
120:5

minutes'
85:2

Mischaracteriz
es  59:14

missing
108:12

mistaken
48:21

mistakes
34:1

mitigate
86:25

mitigated
101:1

monitor  4:14
18:11
20:25
22:15
26:8,15
44:6 58:6
60:2,8,13,
20 87:5
97:23
99:24
100:6
123:11

monitoring
19:10 22:4
26:24
27:4,9,16
28:15 29:6
34:14,23
47:14,22
49:24
53:14 54:3
56:24
61:10
70:20 85:9

86:23
93:22
94:12
95:22
97:20
102:9
108:19
119:2,9

**month**  40:21
47:9 72:4,
5

**months**  9:4
11:1,9,12,
13,22,23
12:7,9,10,
12 17:14
59:10,11,
19 66:15
72:2,4
101:4
116:5

**months'**
10:24
11:24

**mop**  18:1,7
29:15,17,
20,22
85:19
86:13,14,
15

**mopping**
87:10

**morning**  5:7
15:13
22:24 29:4
40:18

42:13,16,
19 47:5
61:13

**move**  30:8,9
74:9 94:19
120:2

**movements**
95:11

**moving**  28:22
120:5

——————

**N**
——————

**names**  43:5

**nature**  34:20
35:10

**needed**  7:12
54:11
55:17,22
64:13
99:17
103:14
107:7

**Nick**  4:19
38:17

**night**  19:25
42:19
48:18,20

**normal**  16:20
81:12
98:24

**Notary**  4:4

**notice**  24:9
114:14

**noticed**
85:10

**notified**
15:8 84:21
100:11,12

**November**
8:25 9:1

**number**  19:1,
4,20 20:16
27:14 32:2
57:15,20
59:2
61:16,17,
18,20
62:21
68:14
69:4,10,
11,22
72:21
76:12,13
78:20 82:2
86:7,24
99:5
102:13

**numbers**
26:3,4
102:2

——————

**O**
——————

**object**  59:17
69:10,12

**Objection**
14:5 18:19
20:7 22:18
27:18

28:19
31:12
32:4,20
33:3,16
34:16
35:18
37:2,9,18
39:22 41:3
43:23 44:8
45:2,10
47:16
49:2,19
50:2,9
51:3 52:7,
14,21
54:21
55:12 57:1
58:9,16
59:13 60:5
62:2,24
63:20
65:22
66:5,16
68:20
69:5,16
70:1,11,23
72:23 74:7
75:13
76:18
77:23
79:4,11,24
81:20
82:12,20
84:12,24
85:14
87:3,18
88:21
89:5,12,19

90:8,17
91:12
92:14
93:13
94:15 96:1
99:9 101:2
104:22
105:11,18
106:11
107:22
108:13,21
111:6,15,
19,23
113:7,17
114:7
117:17
118:19
119:7
122:5,18
123:2

**objects**
73:10

**observed**
35:21

**occupation**
6:19

**occur**  32:8
72:21

**occurred**
62:22
66:20
79:18

**October**
11:15
51:25

**offhand**
18:15 19:4

**officer**
47:24
92:17
106:12
110:24
111:4,5,9
116:2
120:23
121:11,23

**one-day**
113:10

**open**  20:13
31:23
83:22 86:8
114:19

**operation**
7:19,20,24
22:2 25:1
42:14 65:6
115:3

**operations**
8:3

**opinion**
101:11

**opposed**
32:19
79:22

**opposite**
28:2,9,10
77:19 89:9

**order**  54:4
113:8

**ordering**
123:17

**organization**
83:7

**original**
74:14

**originally**
8:9

**outer**  18:22
102:13

**overseeing**
19:8

**oversees**
22:2

**owner**  111:8

---

**P**

---

**P.M.**  99:24
100:1,3,6
123:11,19

**PA**  40:19
41:13,20

**PAA**  23:4,5,
13,14,18
24:3,11,
14,19 25:3
38:8 47:7
48:6
50:23,25
51:6,8
53:20
54:17 55:9
60:25
102:25

119:15,17,
19

**PAAS**  50:18,
22

**pantry**  44:21
98:19
120:8

**Pardon**  16:5
17:8 53:19
117:7

**part**  12:24
27:5,6
31:13
35:12
46:21 59:1
64:7 68:18
81:19
90:11
97:22
103:4
122:21

**partially**
77:18

**particles**
80:16

**partly**  99:4

**party**  74:9

**PAS**  40:14

**pass**  70:24
98:25
120:8

**passenger**
28:17
95:1,4

**passengers** 70:21

**past** 13:25 59:19 76:9 101:4

**pathway** 74:3

**Paula** 4:4

**Pell** 4:12 5:13 11:19 15:1 39:10 40:6 43:22 47:22 48:10,16 53:18,21 54:8 58:15 61:11,25 62:5 63:19 70:22 75:3,7 76:17 79:23 87:11 88:20 90:15 91:10 95:25 97:21 99:8 100:13 105:17 107:11 108:5,12 110:8 115:20 117:24 118:4,9 119:2,20, 23 122:3

**Pell's** 35:24 36:13 42:10,23 43:17,20 45:20 47:14,20 48:4 49:11 56:22 59:4 66:14,21 67:24 74:23 77:4,11 78:15 79:3,17 89:17 92:13 103:5 118:18 120:11

**penalty** 6:5

**people** 21:24 22:14 33:6,10 38:4 50:5 54:7,16 57:15,20 58:5,7,8, 12,22 60:11,12 61:3,9 62:6,8 71:13 102:22 108:11,18

**percent** 109:18

**period** 11:1 44:4 101:13

**periodic** 43:22 98:25

**perjury** 6:5

**person** 15:5 65:10 92:10 95:13 97:18 104:21 111:2

**personnel** 18:10 19:9,20 20:5,10,24 21:1,6,22 23:9 26:6, 7,8,12,15, 22 28:14 29:6 30:20 50:13 52:3 53:12 60:1 63:18 84:20 85:9 86:22,25 92:23 93:6 104:9 106:21

**persons** 21:6

**pertaining** 104:15

**photo** 69:17 71:6

75:14,22 78:1,19,20 80:1 85:25 88:12,24 90:4 92:3 112:25

**photograph** 3:15,18,19 25:20,21 26:17 27:8,22 30:1 67:17,22 68:12 69:2 70:16,18 74:17,22 75:9 76:8 77:4,10 79:2,16,22 80:23 88:8 112:3

**photographs** 17:3 113:3,5

**physically** 63:12

**pick** 98:18

**picking** 44:19 120:7

**picture** 71:2 88:17 103:13

**piece** 114:25

**pieces** 115:7

**pinpoint**
  118:23

**place**  28:21
  30:5,7
  32:1 54:3
  64:11 66:7
  73:20
  98:11
  122:12

**placing**
  87:10

**plaintiff**
  3:13 4:20

**plaintiff's**
  25:8,12,16
  38:13 39:1
  51:14 67:1
  88:13
  91:24
  109:3

**planks**  89:3,
  8,10

**plates**  21:10
  120:7

**play**
  109:17,18

**played**  92:7

**playing**
  93:25

**point**  30:8
  62:19
  105:5
  108:2
  109:25

110:2
114:6

**policies**
  17:18 18:9
  34:13,24
  117:12
  119:5,21

**policy**
  18:12,14,
  16,24 19:5
  35:15,16
  83:4,7,10,
  12 84:5

**politely**
  63:13 73:8

**pool**  16:16,
  18,21
  17:19,23,
  24 18:2,
  10,17,21,
  22 19:5,6,
  7,10,11,
  13,14,15,
  17,21
  20:5,11,
  12,15,20,
  25 21:2,14
  22:1,2,3,
  19,21,22,
  25 23:6,20
  24:2,13,15
  25:3 27:3,
  4,8,15
  28:2,3,9,
  11 30:2,3,
  21 31:9,
  17,21,22

32:8,22
33:1,22
34:24
35:17,24
36:7,8,12
37:25
38:1,5
40:7,14,
17,25
42:3,5,7,
10,12,14,
21,23,24,
25 43:1,6,
13,14,21
44:5,13,24
47:2,4,13,
14,21
48:2,25
49:6,7,18,
24 50:6,7,
14,17,18,
22 54:7,19
55:19
56:1,2,15,
17,18,19,
22,24
57:9,16,21
58:5,23,25
59:12,24
60:2,7,13,
23 61:3,
10,13,19
63:5,9,18,
25 64:4,
10,16,21,
23 65:3,6,
8,11,16,20
66:3 67:10

68:2 72:8,
18,25
73:9,10,
23,25
74:3,5
78:11,12
79:20
92:10
94:14
98:15
99:6,14
100:17,19,
20,24
101:6,10,
12,20,23
102:6,12
103:1,23
104:16
106:3,4,6,
18 110:1
112:6,16,
17 114:24,
25 116:14,
21 119:8,
16,21

**port**  5:21
  17:24
  21:8,15,
  18,25
  26:1,23
  28:1,5,7,
  10,14 29:6
  30:3,7,21
  58:7 60:12
  94:13
  98:16 99:1
  114:24

**portion**
  68:19
  77:12,18
  82:1

**portions**
  112:17
  114:4

**posed**  86:25

**position**
  7:14 23:7

**positioned**
  56:23

**positions**
  21:5,23
  28:25

**possibilities**
  74:11

**possibility**
  44:9,10
  63:8 82:9
  96:15
  97:10
  98:1,3

**possibly**
  66:2 96:19

**post**  25:2

**posted**  24:6,
  8

**potential**
  27:9 50:7
  63:17 87:1
  100:22

**potentially**
  60:1 63:6

102:7

**power**  57:23
  58:24 60:6
  99:13

**precision**
  117:11

**predict**
  43:25

**preparation**
  15:15
  39:14

**prepared**
  121:23

**present**
  35:11
  54:12
  55:17,23
  56:12 72:7

**presently**
  5:20 6:20

**preserve**
  87:16

**preserved**
  107:20

**presume**
  87:20
  110:9

**presuming**
  82:25

**prevent**  73:4

**preventable**
  72:10

**prevented**

72:12

**previous**
  55:9 62:22
  79:2

**previously**
  113:1

**pride**  117:11

**primary**  31:9

**prior**  11:10
  12:11 42:9
  59:3
  62:19,22
  65:18
  66:3,12,15
  87:10
  118:18
  121:3,23
  122:23

**priority**
  86:9

**proactive**
  57:5

**procedure**
  35:15
  98:11

**procedures**
  17:18,21,
  22 18:9
  34:13,24
  86:24
  119:21

**Proceed**
  72:13

**process**

62:15 88:5
  115:15,16
  122:21

**produced**
  39:9 67:23
  109:23

**properly**
  87:24
  100:25
  101:3

**proud**  117:1

**provide**
  103:7,13,
  16,17,24
  104:6
  106:5,7,9
  116:6
  121:9

**provided**
  24:3
  105:22
  106:10
  116:10,11

**provision**
  10:9

**public**  3:17
  4:4 7:19,
  21,23
  23:5,19,20
  24:19
  28:24
  29:1,11,14
  31:8 34:13
  37:16
  45:15,19

52:19 53:6
55:4 56:11
60:18,20
62:16
69:23
70:6,19
84:10
93:21
94:12
95:22
96:10
97:3,6,18,
20 98:9
99:5,7
101:20
102:1,5,8,
12,16
105:7,9
106:21
107:1,9

**pull** 53:17
86:16

**pulled** 80:24
81:25
88:18
89:15,16
90:6,7,9
91:16

**purpose**
31:8,10
100:21

**purposes**
5:11 69:21
78:24
79:8,9
91:7
110:11

**put** 12:7
44:15
51:17
63:10,14
74:13
86:1,2,3,
18 87:7
101:7

---

**Q**

---

**Quantum**
12:14,16,
17,18

**question**
6:12,15
14:11,13
26:13,14
37:3 53:19
54:10
69:21
71:18
78:25 79:9
91:7 93:1,
4

**questions**
6:2,3 7:7
110:12
123:7

---

**R**

---

**raise** 48:6
57:3 101:7

**range** 94:17
99:14

**reach** 64:13

100:16
103:14
104:5,14,
15,17
106:8

**read** 40:9
45:9,21
48:18
120:10
122:14
123:9

**ready** 18:8

**reason** 56:21
57:2 80:23
81:10

**reasonable**
69:25

**reasons**
100:21

**recall** 16:14
18:15
36:4,11
40:4 41:4,
7 43:3,5,
11 48:19,
25 56:4,5,
6,8,10
102:3
103:18,19
105:22,25
106:14,15,
16 114:12
116:8,17,
18 120:13,
15 121:1,
2,18,21

**recently**
76:9

**recess** 100:1

**recognize**
25:17,21
40:23
67:16

**recollection**
18:21
32:24 36:2
39:17
59:21
62:25 72:7
81:4 101:4
103:10
106:14

**record** 5:8
7:7 40:9
99:25
100:7

**recorded**
111:12

**recording**
92:7 93:25

**RECROSS** 3:3

**rectified**
64:19

**red** 109:20

**REDIRECT** 3:3

**reduce** 72:21

**reduced**
101:1

**refer** 27:24

112:3

**reference**
  39:15
  46:14,25
  87:13
  122:3

**references**
  121:18,21

**referencing**
  85:23

**referred**
  17:7  21:23
  24:1  26:6,
  22  54:13
  58:7  87:9
  94:13

**referring**
  17:11
  24:20  29:1
  35:16
  45:15
  46:20  48:3
  52:18
  81:24,25
  88:9  111:4
  119:22

**refreshed**
  122:24

**refreshes**
  39:16

**regularly**
  41:14,20
  60:3

**rejoin**  8:22

**rejoined**
  8:24

**remember**
  13:17
  19:1,4
  43:15
  49:13
  77:14
  116:7
  120:16,17

**remind**  16:18

**reminders**
  42:15

**reminding**
  72:25

**remove**  74:12

**repeat**  13:3
  34:8  36:20
  53:19
  54:10
  71:18
  73:16  96:8
  104:13
  121:20

**reply**  41:10
  48:20

**report**  14:1,
  2,3,14,18
  15:4
  36:11,15
  37:1,8,16,
  19,23,24
  38:3,7
  40:13,25
  45:9,14,

21,22,23
46:5,6,9,
14,15  47:1
58:24
64:18
120:10,11,
14,21,22
121:3,8,
15,19,22
122:2,15,
20,23

**reported**
  32:15
  62:21

**reporter**
  4:4,17
  6:23  7:6
  10:3  13:3,
  8  24:7
  36:17,20
  46:1  57:25
  73:16  81:7
  119:11
  123:13

**reports**
  37:25

**represent**
  25:19  39:8
  67:21  76:7
  109:22

**representation**
  68:1

**request**
  60:19
  63:18
  101:17

**required**  6:2
  59:3
  115:11

**requires**
  6:12

**requiring**
  118:5

**resources**
  60:25

**respect**
  24:18  64:4
  65:3

**response**
  6:13  54:13
  76:22
  91:18

**responsibiliti
es**  110:25

**responsibility**
  64:12
  92:16,17
  119:16

**responsible**
  19:8  79:19
  83:21
  92:10  99:4
  118:7

**rest**  40:19
  47:7

**result**  35:14
  118:6,12
  122:4

**Retained**
  3:23

**review** 15:16 16:24 17:2,6,10 40:25 43:16 45:19 47:19,23 52:15 53:20,22 61:8 107:13 120:14 121:2 122:20,23

**reviewed** 15:19 16:14 39:14,17 45:18 59:2 92:12 120:24,25 121:15,16, 22 122:2, 16

**reviewing** 36:11

**Rhapsody** 13:16

**right-hand** 71:9 75:15,16, 17

**risk** 70:21 86:25 95:24

**risk-creating**

27:16 70:19

**role** 24:18, 21

**root** 35:3

**rope** 81:5

**roped** 80:18 96:17

**rotation** 40:20 47:8 56:16

**roughly** 20:4 59:9 97:9

**rounds** 70:24

**routine** 98:24

**Royal** 4:12 5:12 6:20 8:5,6,14, 18,20 12:19,25 13:21 19:9 32:17 33:12 34:12 37:14 39:9 49:15 52:2 53:8 54:12 67:23 72:20 73:3 83:4,18,20 84:19,20 87:8 96:6 109:23 111:2

114:3,18 115:6 116:22 117:15 119:4

**rules** 6:1,10

**run** 63:13 72:19 92:4 117:3

**running** 33:24 63:11,12

**runs** 65:6

**rushed** 118:10

_____

**S**

_____

**S-A-N-J-E-Y** 14:17

**safe** 13:19 79:20 92:11 119:6,23

**safety** 18:22 19:5,6 27:2,9 42:14,15 47:24 64:10,16 65:8 71:16,19, 21,22,24, 25 72:6,25 73:6 92:17 106:13

107:24 110:24 111:4,9 116:3 120:23 121:11,23

**sanitizing** 88:4

**Sanjey** 14:15,16, 17

**scenario** 89:25

**scene** 75:8 87:16 88:22 89:25 103:23 118:25 122:7

**schedule** 3:17 23:4, 14,18,19, 24 24:4,5, 7,11,14, 19,21,25 25:4,5 38:8,9 45:15,19, 24,25 50:23,25 51:6,8 52:9,20,25 53:1,2,4, 5,6,16,18, 20,22,23

54:15,18
55:9,16,18
61:5,6,7,8
64:10
99:12
103:21,22,
25 104:9,
19 105:10,
12 107:2,
3,4,10,13,
18 108:10,
18 116:16

**schedules**
55:4

**school** 9:18

**scoop** 87:22

**scoopers**
29:19

**scratch**
117:2

**screen** 25:9,
15 26:4
38:18,21
44:15
91:6,22

**Seas** 5:21,
23 6:22
8:23,24
9:4,11
10:14,17,
22 11:6,10
12:4,12,
17,18,22,
24 13:1,
15,16,17

14:19 15:1
19:16,22
20:3,18
24:2
25:20,22
26:1 41:1
52:6 53:7
59:25
65:4,21
66:14,21
67:18,20
68:3
71:17,20
72:1,22
76:9
112:23
113:25
115:12

**seated** 95:4

**seconds**
85:12

**secure** 82:10

**security**
47:25
92:17
107:25
110:25
111:5,7
116:3

**seeking**
96:21

**semicircle**
68:9,15

**send** 41:8,
25 56:11

121:12

**senior** 111:8

**sense** 62:16
94:22

**series** 6:2
63:5

**set** 40:15
47:3 48:2
53:23
55:24
64:10 66:2
77:3,6
97:5

**setting**
64:20

**setup** 73:12,
19,22
74:5,8
76:15
77:2,7,8
79:21

**shade** 112:11

**shades**
112:19

**share** 91:6

**shared** 122:1

**shift** 19:25
42:19

**shifts** 53:14

**ship** 9:20
12:19
18:10
19:20 23:9

26:1,7,15,
22 28:14
30:16
31:18,20
32:17
33:5,9
49:21
52:25
53:2,12
61:1
83:10,16,
19 86:22,
25 92:23
93:6 99:8,
20 101:22
102:4,10,
11,15
103:1,15
104:5,23
106:8
113:20
118:13
121:3,16,
24 122:24

**ships** 13:24
53:8 84:8
114:18,23

**shirt** 94:24
110:19

**show** 25:6
38:10
46:10
51:9,11
88:7 91:5
105:13
112:2
122:10

showed  44:6,
  14,25
  46:22
  74:17
  76:24
  108:23
  120:20

showing  30:1
  108:17

shown  85:25
  93:4

shows  88:17

shut  113:9

sic  5:11
  11:16  25:8
  47:24
  48:16  49:1
  57:12  62:9
  107:16

side  17:24
  21:8,9,15,
  16,17,18,
  19,25
  26:23,24
  28:1,5,7,
  10,15  29:7
  30:3,7,21
  42:22
  58:7,8
  60:12  71:9
  75:15,17
  77:8,9,19
  89:10
  90:23
  93:24
  94:13

98:16 99:1
  114:24

sign  11:1,
  15  75:1

signed
  11:14,18
  15:13
  120:19
  121:16

signing
  121:3

signs  74:25
  75:6,11

similar
  81:15

simultaneous
  30:11  64:8
  84:1  95:15
  115:2

single  95:21

sir  14:11
  27:13

sit  36:23
  65:18
  78:23

sitting
  73:11

situated
  70:14
  83:16  84:7

situation
  117:19,20,
  22

size  99:13

skips  109:10

slip  16:16
  32:14,18
  33:1,6,10,
  13,19,21
  34:2 36:10
  46:17
  59:2,7
  62:21
  63:5,9,21
  72:8,10,
  12,21 73:4
  100:22,25
  101:6,10
  121:5
  122:4

slip-and-fall
  32:2,7
  66:13,20

slipped
  41:23
  45:23

slippery
  19:11

slips  63:24

slow  46:2
  119:12

slower  10:5

slowly  7:2
  72:18

smoothly
  65:6

solarium

20:14
  61:15
  102:13

sole  111:8

sort  75:2

source
  60:17,24
  99:19

space  74:14

span  12:3
  44:4
  115:14

speak  6:14
  7:1 10:4
  95:16

speakers
  30:11  64:8
  84:1 95:15
  115:2

speaking
  95:17

special
  81:15,16
  83:1 87:21
  88:3,4

specialist
  19:18
  24:12,15
  38:2 43:13
  49:7 50:20
  55:2,25
  56:4 57:17
  58:21
  65:13

specialists
  50:15

specific
  37:10  45:3
  46:25
  58:17  65:2
  102:2,3
  106:21

specifically
  43:5  120:1

specifics
  37:11

speculation
  52:22
  76:19
  89:20
  90:18

spill  18:7
  29:24  31:1
  57:13
  69:22,24
  70:25
  77:21
  80:10,13,
  15,20,25
  81:1,12,
  13,19
  82:11,13,
  18,21
  83:3,5,9,
  13,22
  84:5,7,10,
  18,22,25
  85:1,10,20
  86:5,8,13,
  20  87:1,

20,24
88:1,18,24
89:2,4,9,
16  90:7,10
91:9
96:18,22
98:4,11
119:3

spilled
  68:18
  69:22
  75:12  85:5
  95:23

spills  22:16
  49:24
  57:8,10,11
  83:4,8
  99:2

spoke  15:12

spoken  15:7

spot  80:5
  98:23

spotless
  64:24

spreadsheet
  55:10

squeegee
  41:14,20

staircase
  67:12,14,
  15  76:25
  78:5,21
  80:24

stand  86:20

standard
  61:7
  73:19,22
  119:10

standby
  120:1

standing
  28:21

starboard
  17:24
  21:9,17,
  19,25
  26:23  29:7
  58:8  60:12
  98:16  99:1

start  14:8
  23:22

started  9:22
  10:7
  116:24
  117:2
  118:2

starting
  94:5
  109:19

state  4:5
  5:7

stated  21:7

statement
  21:3  23:11
  29:2  66:24
  87:17
  103:8,13
  116:6,9,11

statements
  122:14

station
  29:22

stationed
  14:9  21:24
  22:15
  23:10
  28:14,21
  30:5,6
  38:4  54:19

Stay  80:7

stenographical
ly  4:3

stepping
  86:4

steps  86:17

stockkeeper
  10:9

stockkeepers
  9:25

stop  63:12
  73:8

straight
  72:15

stress
  41:13,19
  42:6,11,22
  46:18
  56:14

stressed
  36:5

strike  10:14

14:24
17:16
101:18

stuff 44:20

style 53:5

suffered
118:5

sufficient
60:8,16
74:1

sun 74:10

supervision
34:18
50:19

supervisor
10:1,10
35:9
106:6,18

supervisors
116:15,20

supposed
18:10
20:4,11
21:2,6,24
22:10
23:10
26:8,15,24
27:9,15
28:13
29:5,12,
20,23
30:2,4,20,
23 31:5
38:4 49:24
50:4,14

52:4 53:13
54:18
56:24
57:8,16
58:22
70:20
73:13,23
84:4 85:20
97:19
104:10,19
105:8,16
106:22
108:19
118:17

surface
60:14
75:12 85:5
112:10,12,
15 113:15,
24

surfaces
19:22
28:16
114:14
115:7,11

surgery
118:12

swear 4:17
118:1

swore 6:4

sworn 5:3

system 107:5

─────────────
            T
─────────────

table 21:11

takes 113:9

taking 75:10

talk 30:13,
14 49:17

talking 22:6
45:24

task 113:11

teak 113:2,
4,8 114:5,
19 115:18

team 16:22
35:20
41:13,20
54:2

telling
23:13
36:24
37:6,15
41:19
48:15
56:12
60:11
78:13
79:10 82:6
98:9
110:9,12

tells 23:9

tend 98:10,
12

tenure 13:21

testified
5:4

testimony
15:9 20:2

59:8,14
111:5
123:1

Texas 5:22,
23 118:11

thing 32:12
38:7 41:24
59:7
69:13,14
116:2,18

things 70:18
86:7,12
87:9

threaten 6:9

time 4:14
12:3 15:4,
8,11 20:12
23:21,22
29:21
43:14
44:12 45:5
48:19,23,
24 49:12,
18 54:22
56:20
62:19
64:17
69:25
72:13,18
74:2 75:6,
8 84:14
85:2 92:6
96:6,11
97:8 98:7,
21,22,23
99:23

100:5
101:15
104:4
105:5,17
106:4,14
107:7
108:3
110:14
112:5,24
116:18
118:18
120:6,8,
16,18
123:5,10,
14

**timely** 57:9

**times** 16:19
18:3 46:19
48:9 52:13
64:24

**title** 18:25
22:14
50:16

**Tobago** 8:10,
12 9:19

**today** 5:21
6:10 14:14
36:24
50:21
65:18
78:24
100:15

**today's** 4:13
15:16

**told** 20:24

33:18 58:4
61:14
66:12
95:10

**tomorrow**
40:15 47:2

**tone** 40:15
47:3 56:14
66:3

**tools** 85:19

**top** 31:18,
19 40:22
42:2 90:14

**total** 19:20
21:1

**totally** 77:6

**traffic** 62:3
70:8 71:9
85:22

**trained** 86:6
97:4

**training**
16:20 64:3
65:2,5
87:14

**transcript**
123:9,14

**travel** 104:7

**tray** 93:18
94:7

**treatment**
87:21

**Trinidad**

8:10,12
9:18

**trip** 34:2
63:9 64:22

**trips** 100:23

**trolley**
75:16

**true** 98:9

**truth** 6:6
95:16,17
118:3

**truthfully**
6:3

**two-minute**
44:4

**types** 70:18

**typical**
10:25

———————

**U**

———————

**UE** 9:19

**Uh-huh**
110:17

**ultimately**
58:21

**unaware**
48:24

**underneath**
68:18
80:24
89:10

**understand**

5:10 6:15
8:1 30:15
46:3,11,12
53:24 58:1
73:17 80:9
81:8
113:13
115:16
117:23,25
119:13
121:4

**understanding**
30:18 36:3
41:18
51:22 67:8
78:1 80:22
81:9 83:21
91:15
101:5
112:15
115:10
117:23

**understood**
6:17 20:23
22:12

**unpredictable**
57:10

**unreasonable**
99:6

**upcoming**
40:20 47:8
56:16

**upper** 75:14,
17

**utility**
9:23,24

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Kelvin Alexander on 01/07/2022**          Index: vacation..water

10:7

**V**

**vacation**
11:13,24

**vantage**
109:25
110:2

**verbal**  6:13
76:22
91:18

**verbally**
56:18

**version**  88:8

**versus**  4:12

**vessel**  14:8
31:23
62:23
65:21  72:3
121:6

**vessels**
12:13,25
13:11,14,
20

**video**  3:20,
21  16:24
43:16,19,
24  47:20,
23  92:3,4,
5,7,12,19,
22,23
93:3,5
94:3,5
95:2,5,8

96:11,13
97:1
107:19,23
108:3,9,
16,23
109:7,9,23
110:2,15,
21,23
111:3,11,
14,18,20
121:18,21,
25  122:1,
11

**video-recorded**
4:10

**videoed**  7:10

**view**  110:1,
24

**vigilant**
57:5

**violate**
34:19

**violation**
34:12,21,
23  35:1,
10,15
119:4,20

**vision**  13:2,
6,7,8,9,
12,15
40:20  47:8
56:15
69:18
94:9,10

**vision-class**

13:20

**visual**  34:4
62:9  95:10
96:2  97:12
114:16
122:10,12

**voice**  90:3

**vomit**  81:5,
14,18
82:7,8,10
88:2

**voyage**  40:19
47:7  51:24
53:16,17

**W**

**walk**  9:6,9
21:9,12
30:7  62:9
72:18  94:7
95:22
96:10
97:6,17,23

**walked**  93:23

**walking**
17:25  22:5
30:23,24
31:6  34:2
43:21
44:13
58:17
72:14,17
73:9  91:11
93:11,17
97:14

119:3

**walks**  44:24

**walkway**
19:22
26:9,16
29:7  34:15
44:5  60:14
68:19
69:23  71:8
74:1  75:12
77:8,9
78:7  88:19
89:3  90:15
93:18
95:23
119:3

**walkways**
26:25
28:15

**wanted**  50:21
62:14

**warning**
75:2,5
86:1,2

**warrant**
63:17,24
101:11

**watch**  43:19
109:10,14
110:16

**watching**
51:10  94:2

**water**  62:6
85:5

**waved** 93:18

**week** 112:8

**weekend** 76:9

**weeks** 11:16, 18 52:10 113:10

**wet** 18:11 19:11 22:16 27:16 28:16 29:10 86:8

**whatsoever** 108:7

**white** 68:21 69:12,13, 14 80:5 95:2

**wild** 73:7

**windjammer** 62:10,11 108:5

**wine** 85:6

**work** 6:20 8:17 9:23 10:8,23 11:12,23 12:3,13 13:24 23:16,21 99:1

**worked** 8:14 9:7 12:2, 15 13:19,

22 49:16 72:2 83:19

**working** 10:20 11:9,21 12:11 13:21 14:19,23, 25 20:12 23:23 24:22 40:16 47:4 49:17 52:4 66:23 98:20 103:24 105:8,13, 16 106:3 111:2 113:24 114:3,18 115:6 116:22 117:4

**works** 60:25

**Wow** 8:19

**written** 18:12

**wrong** 21:1

**wrote** 40:2, 10

— Y —

**year** 59:3 62:22

103:9,12 120:18

**years** 8:7, 15,16,18, 19 9:7 12:3,4,15 13:25 37:15 49:16 83:20 101:11 111:1 114:3 115:6 116:25

**years'** 101:13,15

**yesterday** 36:6 48:7 57:4 100:15

— Z —

**zoom** 71:2,6 75:14,16, 20 80:4