**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Jennifer Pell on 10/01/2021**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT COURT OF FLORIDA

MIAMI DIVISION

--oOo--

JENNIFER PELL,                        )
                                      )
                Plaintiff,            )
vs.                                   )
                                      )   CASE NO.
ROYAL CARIBBEAN CRUISES LTD., a       )   1:20-cv-25271-JEM
Liberian Corporation,                 )
                                      )
                Defendant.            )
                                      )
_____     )

--oOo--

DEPOSITION OF JENNIFER PELL

DATE:                  OCTOBER 1, 2021   (FRIDAY)

TIME:                  10:11 a.m.

LOCATION:              HUSEBY GLOBAL LITIGATION
                       555 Capitol Mall, Suite 550
                       Sacramento, CA 95814

REPORTED BY:           HEATHER M. LOFHOLM, CSR
                       Certified Shorthand Reporter #11570

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Jennifer Pell on 10/01/2021

Pages 2..5

**Page 2**

I N D E X

EXAMINATION BY:                                         PAGE

Michael J. Drahos, Esq.                                    5

Appearance Page                                            3

Exhibit Page                                               4

Certified Questions                                     None

Reporter's Certificate Page                              171

**Page 4**

E X H I B I T S

EXHIBIT NO.                                             PAGE

A      Plaintiff's Answers to Defendant's                5
              Initial Interrogatories

B         2/15/13 Kaiser Medical Record               49

C         4/10/14 Kaiser Medical Record               58

D         5/31/19 Kaiser Medical Record               65

E      Color Copy of Passenger Information            101

F          Copies of Photo Images                     108

G         1/16/20 UTMB Medical Record                 152

                         --o0o--

**Page 3**

A P P E A R A N C E S

For Plaintiff       GERSON & SCHWARTZ, PA
(Remote             Attorneys at Law
Appearance):        1980 Coral Way
                    Miami, Florida 33145

                    PHONE:  (305)371-6000
                    EMAIL: ngerson@gslawusa.com
                    By:  NICHOLAS GERSON, ESQ.

For Defendant:      GRAY ROBINSON
                    Attorneys at Law
                    515 North Flagler Drive
                    West Palm Beach, Florida 33401
                    PHONE:  (561)268-5757
                    EMAIL: michael.drahos@gray-robinson.com

                    By:  MICHAEL J. DRAHOS, ESQ.
                         COOPER JARNAGIN, ESQ. (Remote
                         Appearance)

**Page 5**

BE IT REMEMBERED that on Friday, October 1, 2021, at the hour of 10:11 a.m., of said day, at the offices of Huseby Global Litigation, 555 Capitol Mall, Suite 550, Sacramento, California, before me, HEATHER M. LOFHOLM, a Certified Shorthand Reporter, personally appeared

                    JENNIFER PELL,

called as a witness herein, who having been first administered an oath in accordance with CCP Section 2025, was examined and testified as follows:

         (Defendant's Exhibit A
         was marked for identification.)

              EXAMINATION

BY MR. DRAHOS:

    Q.   Good morning, Ms. Pell.

    A.   Good morning.

    Q.   Can you please state your name for the record.

    A.   Jennifer Mary Pell.

    Q.   Thank you.  And we're here today to take your deposition in the case of Jennifer Pell versus Royal Caribbean Cruise Lines, I had an opportunity to introduce myself a moment ago before we started.  My name is Michael Drahos.  I'm defense counsel for Royal Caribbean Cruises, and I'll be taking the deposition today.

         This is a little bit different in this post-COVID world than the way it's traditionally been done for the

**Page 6**

last hundred years. We have your attorney appearing on the screen here today via Zoom. It's as if he's sitting in the room, and we're going to try to make it as realistic as we possibly can in that regard, so if you at any point in time have any trouble hearing him let me know. I can't see. I've got -- he's parallel to me, so I can't see if he's speaking and not being heard. Otherwise, as we go through the deposition -- have you ever done this before?

A. No.

Q. Okay. So it's a formal question-and-answer session. Everything that's being said now in the room is being recorded by the court reporter, so the way you converse is different than in normal everyday life. In other words, now that every word is being taken down by the court reporter, if we are talking at the same time normally that's no big deal. Today it is, because it's really hard for her to try to get down both people at the same time, so you have to let me ask my full question before you go to answer, and there has to be a little bit of a pause. That's so that you're answering the question that I want you to, and also it makes it a lot easier for her. Okay?

A. I understand that.

Q. So we're all wearing masks in the room. That

**Page 7**

means it's going to be a little bit more difficult for you to understand me than would be normal, so if at any point in time you don't understand a question, either because I mumbled through this mask or I used some kind of legalese that didn't make any sense to you or for whatever reason, just let me know. I'd be happy to rephrase the question or say it again. Okay?

A. Okay.

Q. You can't nod your head. If you do that it won't be taken down on the transcript, so I'll be sitting here and I'll ask you something that calls for a "yes" or "no" and you'll nod your head yes. I'll know what you mean by that, but I'm going to ask you "Is that a yes? Is that a no?" I'm not doing it to be obnoxious. I'm doing it to make sure your answer is being recorded on the transcript.

A. Okay.

Q. Lastly, this is by no means a marathon, so we're going to be here for a while, but if at any point in time you need to take a break -- restroom, phone call, you need to talk to Mr. Pell, whatever -- just let me know, and we'll stop. All right? Otherwise, I just keep powering through to get it over with.

Okay. So I typically like to spend the first part of these depositions getting to know the witness a little bit, so I'm going to start with some background

**Page 8**

questions, if you don't mind. Have you ever gone by any other names in your life, other than Jennifer Pell?

A. Well, my maiden name is Norwood.

Q. Norwood?

A. Yes. I used to go by that before I got married.

Q. Okay. And for what period of time did you go by Jennifer Norwood? Let's start with date of birth. What's your date of birth?

A. June 12th, 1951.

Q. Okay. And when did you change your name to Jennifer Pell?

A. I don't know exactly.

Q. Approximately when?

A. When I got married, I guess.

Q. When did you get married?

A. October 28th, 1972.

Q. All right. And so since October 28, 1972, have you gone by the name Jennifer Pell?

A. Yes.

Q. All right. And what's your current address?

A. We've only been there four years, so I have trouble remembering that new address still. To me it's new.

Q. Okay.

A. Seven -- that's one of the things I don't

**Page 9**

remember well. 7249.

Q. Okay.

A. I think.

Q. 7249?

A. Uh-huh. Oh, Saint John Way.

Q. And where is that?

A. That's in Orangevale.

Q. California, correct?

A. Yes, California.

Q. All right. And approximately how far is that from where we are today?

A. In time?

Q. Yes, ma'am.

A. Forty minutes.

Q. Okay. And we're here today in downtown Sacramento, correct?

A. Yes.

Q. Okay. And you said that you've lived at that address for the last four years?

A. About four years.

Q. Is it a single-family home?

A. Yes.

Q. How many bedrooms?

A. Four.

Q. Is it a two-story or a one-story?

Page 10

A. One story. Everything is all on one floor.

Q. Okay. Who else lives there with you, if anyone?

A. Just my husband.

Q. And what's his name?

A. Ronald Lee Pell.

Q. Has anyone lived in that home there on 7249 Saint John Way, other than Ronald Pell, for more than a week or two?

A. No.

Q. Okay.

A. Oh, yes. My youngest daughter and then my middle daughter have stayed with us at times.

Q. Okay.

A. For different reasons.

Q. I was going to ask. So when you say they've stayed with you for different reasons, for how long of a period of time have they stayed?

A. Well, the youngest one, Mackenzie, longer. That's our youngest daughter. She was back and forth to school, so before she finished school she stayed with us --

Q. All right.

A. -- some.

Q. So since the time period of the incident in this case, June of 2020 -- I'm sorry, January of 2020, has

Page 11

Mackenzie lived in the home for more than a week or so?

A. No.

Q. All right. And how about your other daughter? Since January of 2020?

A. She has maybe. I'm trying to remember.

Q. What's her name?

A. Stephanie.

Q. What's Stephanie's last name?

A. I think she's gone back to her maiden name, Pell.

Q. Stephanie Pell?

A. Stephanie Jean Pell.

Q. And how old is Stephanie Pell?

A. She's maybe 43, I think.

Q. And Mackenzie, how old is she?

A. Twenty-eight.

Q. All right. So since the incident that we're here for on the cruise ship, Mackenzie hasn't lived in the house, but Stephanie has?

A. I think Stephanie has.

Q. Okay. Does Stephanie have any kids?

A. She has one daughter, our granddaughter. She's eight.

Q. And what's your --

A. And she's been there, too.

Q. Okay.

Page 12

A. What did you say?

Q. What's her name, your granddaughter?

A. Heidi.

Q. You think she's lived in the house with you all as well?

A. Yes.

Q. Okay. So anyone else -- other than Stephanie Pell and Heidi, has anyone else lived in the house since January of 2020 up until present day, other than you and your husband?

A. I don't think so.

Q. Okay. Where did you live before this?

A. In Concord, Bay Area.

Q. For how long of a period of time did you live in Concord?

A. Oh, years. Almost 30 years I think we lived in that house.

Q. Okay. And are you from the California area?

A. No.

Q. Where were you born?

A. I was born in Miami Beach, Florida. My parents lived there in Miami.

Q. And so for how long a period of time did you live in the Miami Beach area?

A. The years I can remember until I was about ten.

Page 13

Q. Okay. Where did you go from there?

A. Maybe Jacksonville, Florida.

Q. Where did you go to high school?

A. This is hard. I graduated --

MR. GERSON: Excuse me one second. Is it possible -- I don't know where the microphone is located, but I can hear Michael --

(Discussion was held off the record.)

MR. DRAHOS: Okay. Back on.

Q. So Ms. Pell, when we went off the record the question that I had asked was where you went to high school.

A. I only remember one school, but I was transferred there.

Q. Okay.

A. From another school, and I don't remember that one. I went to Port Huron Northern High School in Michigan -- Port Huron, Michigan.

Q. So, it sounds like, at some point in time you moved from Florida to Michigan?

A. Yes. My dad was a salesman.

Q. I see.

A. So he took different jobs. We moved around.

Q. Okay.

A. Some.

Page 14

Q. Did you ultimately end up getting a high school diploma?

A. Yes.

Q. All right. And did you get it at Port Huron?

A. Yes.

Q. So after high school did you go on to any additional schooling?

A. Oh, yes. I did.

Q. Where did you go from there?

A. I believe in Michigan there was a junior college, but I don't remember a lot about that. I went to it for a short period of time.

Q. Okay. Did you get any type of a degree, an associate's degree?

A. No. I just went to that one a short period of time and then we moved again, I think, and I went -- at one point I think I did most of my college education that I have in -- I think it's called Dixon, Illinois. It was the community college there. I got a degree.

Q. What did you get your degree in?

A. Liberal arts, two-year.

Q. Okay.

A. I forget what they called that.

Q. And what year was that that you obtained that degree in liberal arts?

Page 15

A. Before I got married, I think, yeah.

Q. So if my memory is working today, that means before 1972?

A. I believe so, yeah. I graduated in 1969, so I went to college.

Q. 1969 is when you graduated from high school?

A. Yes.

Q. Okay. So other than Florida and Michigan and now Illinois, did you live anywhere else before you ended up in California?

A. Yes. We came to California from Illinois.

Q. Okay.

A. That's where I met Ron.

Q. All right. So you finished school in Michigan. You went off to college for a little while in Michigan. Then you did your studies (unintelligible) --

A. We went to Wisconsin (unintelligible) --

        (Overlapping voices.
        Reporter admonition.)

BY MR. DRAHOS:

Q. Then you finished your studies in Illinois, and then I have you moving out to California, but you just mentioned that you lived in Wisconsin for a little while. Tell me about that.

A. Nine months in Waukesha.

Page 16

Q. Okay. What were you doing there?

A. My dad had a job there in Waukesha.

Q. All right.

A. With a company, and I remember going to a community college there also with my sister.

Q. Okay.

A. Just to take, like, a course or so ...

Q. All right.

A. And then we moved to Illinois.

Q. And that's where you finished and got your liberal arts degree?

A. Yes.

Q. Okay. What prompted the move to California? Was it your father taking another job?

A. Yeah. I had met Ron, and he was taking another job. He didn't want me to stay.

Q. Who's "he"? Ron?

A. My dad.

Q. Okay. So where specifically did you meet Ron?

A. In Morrison, Illinois.

Q. Okay.

A. Where his family lived.

Q. And so did Ron follow you to California?

A. Yes.

Q. All right. And so what did you do when you got

Page 17

to California?

A. Not too long after we got to California when he got -- well, he got a place when he came out there, and we got married not too long after he got out there.

Q. Okay. So how many kids do you have?

A. In my family?

Q. Yes, ma'am. How much children?

A. Six. Six at that time.

Q. Okay. I already know about the two daughters. That means who am I missing? Mackenzie I know about.

A. My oldest one I had first. She's about 45.

Q. And what's her name?

A. Julie.

Q. Julie?

A. Julie.

Q. What's Julie's last name?

A. Now it's Schultz, Julie Anne Schultz.

Q. Can you spell Schultz for me.

A. S-c-h-u-l-t-z, I think.

Q. I would have never spelled it that way. Okay. And who else? Julie and Mackenzie --

A. Just three children. I've had three.

Q. You've had three children?

A. I've had three girls.

Q. Okay. Stephanie Julie and Mackenzie?

Page 18

A. Julie, Stephanie and Mackenzie. That's the order.

Q. And does Mr. Pell have children from another marriage?

A. No.

Q. All right.

A. Neither of us have ever been married to anyone else, no.

Q. You made mention of six children who were the other three you were referring to?

A. Oh, I thought you were asking about in my immediate family before I got married. Is that what you were talking about?

Q. So I was asking about how many children do you and Mr. Pell have.

A. I'm sorry. I missed that.

Q. That's all right. So you have three daughters?

A. Yes.

Q. And it sounds to me like you spent a majority of your time in the Concord area raising these three kids.

A. Yes.

Q. Is that accurate?

A. Yes.

Q. Okay. So --

A. They were all born in -- I'm sorry. They were

Page 19

all born in Walnut Creek.

Q. Okay.

A. So ...

Q. Are you currently employed?

A. No.

Q. Have you ever held employment?

A. Yes.

Q. When was the last time you were employed?

A. For the school district in Contra Costa County in --

Q. Contra Costa?

A. Well, it's the Bay Area. Contra Costa County -- Concord.

Q. Concord.

A. In that vicinity I worked.

Q. And what did you do for the school district?

A. I did work on call as a teacher's assistant for special education. I did that for five years, I think.

Q. When was the last year that you did that?

A. I did that before I had my last -- probably '92. I'm thinking '93 is when my last daughter was born, so I worked up until -- in fact, I worked part of the pregnancy, too.

Q. Okay.

A. Until I had her.

Page 20

Q. So if you did that for a five-year time period, does that mean you did that from about 1987 to about 1992?

A. Could be. I'm not good with numbers.

Q. All right. And then when your last daughter was born in 1993 were you a stay-at-home mom?

A. Yeah. Yes, I was.

Q. All right. So other than working as an assistant special ed teacher, did you do anything else for a living? Any other employment?

A. Not for a living, no. I volunteered a lot.

Q. Okay. All right. And how about Mr. Pell? Is he employed?

A. He was employed then. He's not employed now.

Q. Is he retired?

A. He's retired.

Q. What did he do for a living?

A. He worked for Chevron Oil Company.

Q. Okay.

A. In the USA, not abroad or anything.

Q. All right. And when did he retire?

A. I do not know exactly, but he's been retired about ten years or so, I think.

Q. Okay. Do you own any other homes, other than the one here in Orangevale?

A. No.

Page 21

Q. Do you own any other properties?

A. No.

Q. Do you have any time shares or --

A. Well, unless you want to count my husband's partner somehow with his brother in owning of an Illinois farm.

Q. How big is the farm?

A. A hundred acres or more.

Q. And when you say he partners with him, does he actually go out there and work the farm?

A. No, he does not work. This is in Illinois. They talk all the time on the phone. We've been out there before. We used to go out there all the time.

Q. When is the last time you were there?

A. It's been a long time.

Q. More than five years?

A. I don't recall that. So much has happened that I don't recall the exact years.

Q. Okay. So did you get a teaching license or certificate?

A. No. To work in that capacity I had to take a test as, I think, many teachers do in order to work as a substitute.

Q. Okay.

A. Kind of. That's kind of what I was like. A

## JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
### Jennifer Pell on 10/01/2021

Pages 22..25

**Page 22**

substitute.

Q.   All right.  So do you hold any particular licenses or certificates of any sort and specialty?

A.   No, I don't think I do.

Q.   Do you have any medical training at all?

A.   No.

Q.   Does your husband have any medical training?

A.   Aside from when he was working for Chevron, he was -- something on the area where he worked as far as somebody -- if they had a problem with breathing or passed out, he had -- CPR maybe.  I'm looking for CPR.

Q.   Okay.  So have you ever been involved in any other litigation before this case?

A.   Not that I recall, no.

Q.   Have you ever filed a Workers' Compensation claim?

A.   No.

Q.   Have you ever filed a Disability claim either with a private insurance company or the United States government?

A.   No.

Q.   Have you ever sought any type of governmental assistance whatsoever?

A.   No.

Q.   Do you have any social media pages or accounts?

**Page 23**

A.   No, I don't have any of those.

Q.   What do you do in your spare time as a hobby?

MR. GERSON:  Form.

THE WITNESS:  Can you hear me?

MR. GERSON:  Yeah.

THE WITNESS:  I'm hearing a lot of static.

MR. DRAHOS:  There's an echo coming back.

MR. GERSON:  Did you hear my objection?

MR. DRAHOS:  Yes, we got it.

Q.   Go ahead, ma'am.  The question was what sort of hobbies do you do?  What do you do in your free time?

A.   In the past I have done some cooking and baking and sewing and crafts.  Housecleaning, of course.

Q.   Okay.

A.   Visitation.  If I know someone that's in the hospital or -- I've visited and really took care of my mother for years, because I was able to.  Nobody else in the family was able to.  She was aging.  She was alone.

Q.   Okay.

A.   So I was with her a lot.  She's now at a nursing home.  She's still living.

Q.   Is she in a nursing home in this area?

A.   No, she's actually in -- what's the -- Orinda.

Q.   How far is that away from here?

A.   An hour and a half.

**Page 24**

Q.   Okay.

A.   Or -- yeah, something like that.

Q.   So do you do anything for recreation?

MR. GERSON:  Object to the form.

THE WITNESS:  Recreation?  Drive places.

BY MR. DRAHOS:

Q.   Okay.

A.   No, I don't necessarily drive places.  Ron and I drive places.  We go to see the grandchildren.  We go to take care of the grandchildren sometimes.

Q.   And which grandchildren are those?  You told me about the one.  I forget her name already.

A.   Heidi.

Q.   Heidi.

A.   She actually comes over frequently.  We have two grandchildren.  I have one grandchild that I don't see very much, because he's seventeen.  Nobody see him very much.  And the two -- we have twins, and they're only two -- between two and three.

Q.   And what are the twins' names?

A.   Savannah and -- there's a girl and a boy.

Q.   Okay.

A.   What's the football player that's so popular?  Brady.

Q.   You know, when I said that I was thinking Tom

**Page 25**

Brady, and then I thought "What are the odds it's going to be Tom Brady?"

A.   I don't think they named him after Tom Brady, but they liked that name.

Q.   All right.  So we have Heidi, Savannah, Brady, and the 17-year-old, what's his name?

A.   Isaiah.

Q.   And you don't see him much?

A.   Not too much.  He works now, and he goes to high school.  He's in his senior year.

Q.   So when you say that Heidi comes over frequently, what do you mean by that?  Every day?

A.   With her mom for visitation usually.  She likes to see her grandma and do crafts and bake.

Q.   So how frequently does she do that?  Is there a routine?

A.   The routine changes.  Weekly.

Q.   So she comes over weekly and she does crafts and baking and things like that with you?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yeah.  That's a yes.  I'm sorry.

Q.   That's okay.  You're doing fine.  And then the twins, Savannah and Brady, how often do you see them?

A.   We usually try about once a week.  They've been

Page 26

sick lately, but we saw them anyway, and then there have been times when they've been sick and we haven't seen them through all this COVID stuff.  It's been sketchy.

Q.   Yeah.  So you go to see Savannah and Brady, or do they come to you?

A.   Both, but not as much coming to see us.  Our place is not as safe where we live and how the property is.

Q.   What do you mean by that?

A.   Whereas their property is enclosed.  They have a backyard enclosed.  We do, too, but there's a lot of cement and there's walls and there's different levels in our backyard, and our front yard is a little hilly.  They run.

Q.   Okay.

A.   And there's just a lot of places to run.

Q.   All right.  So maybe you've never thought about it from this perspective, but is it fair to say that your hobby is being a grandmother?

A.   That is one, yes.

Q.   Okay.  So I want to switch gears a little bit and go through some of your medical history before the subject cruise.  Okay?

A.   Okay.

Q.   So that you're familiar with the time frames I'm

Page 27

talking about, these are all questions that relate to your medical history before you got on the cruise ship that we're here to talk about today.

A.   Okay.

Q.   Okay.  So as I understand it, you take Celexa; is that correct?

A.   Yes.

Q.   Okay.  And you've been on that for a very long time?

A.   I think I have.  I've been on different ones.

Q.   How many years have you been taking that medicine?

A.   Maybe 20 or so or -- different antidepressants.

Q.   Okay.  What others, other than Celexa, have you taken over the last 20 years or so?

A.   Paxil.  I remember Paxil.

Q.   Is there a particular --

A.   I don't think there's been a lot.  That's the only one I remember right now.

Q.   Okay.  Is there a particular physician who monitors that medication for you?

A.   I think it's just been my general MD or whatever you call it.  Primary care doctor.

Q.   Who is your --

A.   And that has changed, of course, over the course

Page 28

of those many years --

Q.   Who is your --

A.   -- as we moved.

Q.   Who is your primary care physician today?

A.   It's hard to say his name.  It starts with a G. It's different.  I'm sorry.  It's not coming to me.

Q.   Is your primary care physician part of the Kaiser Permanente network?

A.   Yes, and he's located in a different place now than he used to be, so I haven't seen him too much -- I haven't seen him maybe at all lately.  I don't recall.

Q.   So there was an issue with the Celexa medication that you're currently taking?

A.   Yes.

Q.   Who would you ask questions of about that?

A.   I ask questions of someone.  I don't remember who.  Oh, I was talking to a -- somebody from the department of psychology, and they told me they cannot do anything about my medication.  The only way they would monitor me is if I needed to speak to them, but the doctor would take care of the medication, the change.

Q.   The department of psychology where?

A.   Roseville, I think.

Q.   Roseville Medical Center?

A.   I think so.

Page 29

Q.   When was this conversation?

A.   Not real long ago.

Q.   In the year 2021?

A.   I had been dealing with the depression for a while.  Maybe 21.

Q.   When you say "maybe 21" you mean maybe in the year 2021?

A.   Yeah, maybe in the year 2020.  Maybe in the year 2021.  I don't recall how long ago that is, but I remember speaking to a woman, and I think she's the one I asked and just -- I spoke to her once or twice, and she -- I asked her about the medication, if I wanted to change it, because it didn't seem to be helping me that much.  I was still depressed and I felt like I needed something else.

Q.   So did you want to change the medication or you wanted to increase it?

A.   One or the other.

Q.   And what was the name of this person that you spoke to?

A.   I don't recall her name.

Q.   Was she a psychiatrist?

A.   I think she was.

Q.   And what prompted this interaction that you had with her?  Was there a formal appointment made?

A.   Yes, there was -- it was an appointment by video

**Page 30**

because of the ongoing pandemic.

Q. So help me identify who this person was. You're telling me --

A. It's on a list, I think, that you have. That's why -- it's not like I can memorize very well.

Q. So --

A. Oh, my doctor's name -- it's coming to me. My primary care's doctor's name is Makieve. Her name -- probably because I didn't talk to her a lot.

MR. DRAHOS: Nick, I'll e-mail this to you if you want, but I'm going to hand her your -- the Plaintiff's Answers to Defendant's Initial Interrogatories.

MR. GERSON: You're going to -- I didn't catch that.

MR. DRAHOS: I'm going to mark the Plaintiff's Answers to Defendant's Initial Interrogatories as Exhibit A to the deposition. Do you need me to e-mail you a copy of that?

MR. GERSON: What's the date of them, just so I can make sure that I've got (unintelligible)?

(Reporter clarification.)

MR. GERSON: I just wanted to know what the date of the -- what the service date is on the interrogatory answers to make sure that (unintelligible).

THE DEPOSITION REPORTER: I'm sorry. We need to

**Page 31**

go off the record for a moment.

(Pause in the proceedings.

Recess was taken.)

MR. DRAHOS: Back on.

Q. Ms. Pell, we're back on the record, and when we left off I was going to hand you what we've marked as composite Exhibit A to this deposition. It's the Plaintiff's Answers to Defendant's Initial Interrogatories dated July 29, 2021. I'm going to hand that to you, and I'm going to ask you if you can please take a moment to review that, and when you're finished I'd like to turn your attention to question number 12.

A. So is this the service list -- what is this service list for here?

Q. Well, that's the service list of the attorneys that received this document.

A. Okay.

Q. But I'm asking you more about the questions themselves. Have you ever seen composite Exhibit A before?

A. This part looks more familiar, yes. I think so.

Q. Okay.

A. Yes.

Q. Early on in the case we had sent these written questions over to your lawyers and asked for you to answer

**Page 32**

those. Did you work with your attorneys to provide answers to those interrogatories?

A. I think so.

Q. All right. And I'm going to turn your attention to interrogatory number 12. It's on page 7.

MR. GERSON: Give me a second, please.

Jennifer, if he's referring to an interrogatory, take a look at it. Read it and then wait for a question, please. Okay. Go ahead.

THE WITNESS: Am I supposed to recognize all these names?

BY MR. DRAHOS:

Q. Have you reviewed interrogatory --

MR. GERSON: Jennifer, wait for a question, and just answer his questions. Okay?

THE WITNESS: Okay.

MR. GERSON: All right.

BY MR. DRAHOS:

Q. Have you reviewed interrogatory number 12, the question?

A. Yes.

Q. Now, interrogatory number 12 is asking you to identify health care providers who rendered treatment to you as a result of this incident, and so what I'd like to ask you, ma'am -- you told me that you had been to the

**Page 33**

department of psychology and you had a discussion about changing your medications. Is the physician who you spoke to or the health care provider you spoke to that you had just referred to identified in interrogatory number 12 in the answers there?

A. Okay. I'm looking. I said I might be able to pick it out.

MR. GERSON: Can you speak up, because now I'm having a hard time hearing you.

THE WITNESS: I remember talking to Tyler Spring. He was in that department, I think.

BY MR. DRAHOS:

Q. In the department of psychology?

A. I think so, yes.

Q. Okay.

A. And I think right after him Dr. May Jung Kim. I think it was her.

Q. Okay.

A. She's a neuropsychologist.

Q. So other than Dr. Kim, have you spoken to any other health care providers about changing your medications for depression?

A. I don't believe I did.

Q. All right. So let me take a step back, okay, because we kind of diverted off course a bit. According

**Page 34**

to your medical records that I've received in the case, you were diagnosed with an anxiety disorder in 2006; is that correct?

A.   I don't remember that date.

Q.   Were you prior to the subject cruise diagnosed with an anxiety disorder?

A.   Well, it had to have been combined with the -- I wasn't specifically taking something for anxiety.

Q.   Okay.  But did a physician at some point in time prior to January of 2020 diagnose you with an anxiety disorder?

A.   I don't remember.

Q.   Have you ever in your lifetime been diagnosed by a health care provider with an anxiety disorder?

A.   I don't recall that.

Q.   Are you saying that you've never been diagnosed with an anxiety disorder or that you don't remember whether you were or you weren't?

A.   I don't remember if I was diagnosed.  I've heard the word.  I feel like I do have anxieties, but I don't remember who I talked to about it, unless it was my regular doctor, my -- this change came about after my accident.

Q.   So --

A.   Because I'm not remembering dates.

**Page 35**

Q.   If your medical records in this case indicated that you were diagnosed with an anxiety disorder in 2006, are you here today to dispute the accuracy of that, or are you saying you just don't remember?

A.   No, I'm saying.

MR. GERSON:  Object to the form.

THE WITNESS:  I just don't remember.

BY MR. DRAHOS:

Q.   Okay.  So additionally your medical records indicate that in the year 2014 you were diagnosed with a major depressive disorder.  Tell me about that.

MR. GERSON:  Object to the form.

THE WITNESS:  2000 when?

BY MR. DRAHOS:

Q.   2014.

A.   I don't recall that time.  I'm trying to think of anything I can correlate to that.  Depressed about something that happened, but I don't remember what it is.

Q.   So using the time frame that you had told me about earlier, that you had been on Celexa for 20 years or so, since that time frame up until the present moment has that Celexa prescription ever been changed at all, either reduced or increased?

MR. GERSON:  Object to the form.

THE WITNESS:  I can't -- I think it was reduced

**Page 36**

and then upped, as far as I can remember.

BY MR. DRAHOS:

Q.   So have you ever been under the care of a psychologist or a psychiatrist at any point in time in your life?

A.   Yes.  A long time ago I think I saw someone.

Q.   When you say "a long time ago," what do you mean by that?

A.   In Walnut Creek.  I think I remember seeing someone in Walnut Creek, but I don't remember the name.

Q.   Was this a psychologist or a psychiatrist?

A.   I don't know.

Q.   Who was the person who wrote the very first prescription of Celexa for you?

A.   I think my doctor I had in Contra Costa County in the hospital where I got my care in Contra Costa County in the Bay Area, in Walnut Creek, I think.

Q.   And that would have been over 20 years ago?

A.   Probably, yeah.  I have been taking it for a while.

Q.   So if I'm understanding your testimony correctly then, you're telling me that you've been under this medication for over 20 years, but you don't remember any particular depressive disorder being diagnosed in 2014?  Is that what you're saying?

**Page 37**

MR. GERSON:  Object to the form.

THE WITNESS:  I don't remember a diagnosis, no.

BY MR. DRAHOS:

Q.   Is there a doctor who you can tell me who you recall treating you specifically for your depressive symptoms?

A.   I can't think of anybody really.

Q.   Other than this psychologist in Walnut Creek that you told me about, have you been under the care of any other psychologists, psychiatrists, or mental health counselors prior to January of 2020?

A.   I don't recall.

Q.   Does that mean that you haven't or you just don't remember one way or another?

MR. GERSON:  Object to the form.  The witness answered she doesn't recall.

MR. DRAHOS:  Form is fine.

THE WITNESS:  I don't really remember.

BY MR. DRAHOS:

Q.   Okay.  And I'm trying to understand what that means.  Does that mean you don't remember because it didn't happen?  In other words, you didn't have any other psychologist or psychiatrist that has ever treated you, or you just don't know whether they have or they haven't?

A.   I don't think I have had any.

Page 38

Q. Do you currently have Medicare coverage?

A. I believe so.

Q. Do you have any other supplemental insurance other than Medicare?

A. No.

Q. For how long of a period of time have you had Medicare coverage?

A. Five years or -- since I'm 65, or is it 62?  I don't know.

Q. Prior to becoming Medicare eligible did you have private insurance?

A. Kaiser.

Q. When you say "Kaiser," what do you mean by that?

A. Kaiser Permanente coverage, they call it, don't they?

Q. I wouldn't know, ma'am.  That's why I'm here to ask you.

A. Okay.

Q. So --

A. Yeah, it's one of the services in this area.

Q. What do you mean by that?

A. One of the health care services --

Q. Okay.

A. -- foundations or whatever.

Q. But when you'd go to Kaiser Permanente to receive

Page 39

medical care before you were Medicare eligible how did you pay for that treatment?

MR. GERSON:  Object to the form.

THE WITNESS:  Co-pay.

BY MR. DRAHOS:

Q. Through what insurance?

A. I don't remember the name of that.

Q. Is there a history of depression in your family?

A. You could say that.

Q. You have a brother and a sister?

A. That's where there's six kids in my family, siblings.

Q. Do you have both a brother and a sister who have been diagnosed with depression?

A. Yes.

Q. And was your father also diagnosed with depression during his life?

A. I believe he was.

Q. And did he commit suicide in 2007?

A. Yes, he did.

MR. GERSON:  Object to the form.

BY MR. DRAHOS:

Q. So to try to make this a little bit easier I'm going to hand you back composite Exhibit A, please.  No, you can have it.  It's for you.  This time --

Page 40

MR. GERSON:  I didn't hear that, Counsel.  What was that?

MR. DRAHOS:  I'm handing her Exhibit A.

MR. GERSON:  The interrogatory answers?

MR. DRAHOS:  Yes.

MR. GERSON:  Okay.

BY MR. DRAHOS:

Q. If you can turn your attention, ma'am, to interrogatory number 13, please.  Let me know when you've had a chance to review 13.

A. Yeah, I've read number 13.  There's an answer here.

MR. GERSON:  Jennifer, just wait for a question.  Okay?

THE WITNESS:  Okay.

BY MR. DRAHOS:

Q. Interrogatory number 13 asks for you to identify the names, addresses, telephone numbers of all physicians, medical facilities or other health care providers who have diagnosed, examined or treated you in the past ten years, and as it relates to each one of them, what they diagnosed or treated you for and what examinations they conducted as well as whatever the condition was that prompted the treatment, your answer to that question was "Kaiser Permanente."  Do you see that there?

Page 41

A. Yes.

Q. All right.  Would you agree with me -- well, first of all, is it your testimony here in this case that you have not received medical treatment anywhere else in the last ten years, other than at Kaiser Permanente?

A. Except for the accident.

Q. Okay.

A. You know that, right?

Q. Other than the accident that we're here for today, have you received treatment anywhere else?  Any medical treatment anywhere else in the last ten years, other than at Kaiser Permanente?

A. No.

Q. Were you diagnosed with a peripheral venous insufficiency in 2007?

MR. GERSON:  Object to the form.

THE WITNESS:  What is that?

BY MR. DRAHOS:

Q. Have you ever heard of that condition before?

A. Say it again.

Q. Peripheral venous insufficiency.

MR. GERSON:  I'm having a hard time hearing you, Mike.  Can you say that again.

THE WITNESS:  Peripheral?

///

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Jennifer Pell on 10/01/2021

Pages 42..45

Page 42

BY MR. DRAHOS:

Q.   Peripheral venous insufficiency.

A.   Peripheral venous --

Q.   Yes, ma'am.

A.   -- insufficiency?

Q.   Insufficiency.

A.   Have I been diagnosed with that?

Q.   Yes.

A.   I guess I'm not familiar with the terms here, what you're saying.

Q.   Has a doctor ever diagnosed you with a condition wherein it was told to you that your peripheral vascular system, the veins and arteries in your body, do not pump the blood through your arteries and veins as they should?

A.   No, I've never been --

MR. GERSON:  Object to the form.

BY MR. DRAHOS:

Q.   Were you diagnosed with osteoarthritis of the knee in 2009?

A.   I remember that.

Q.   And who treated you for that?

A.   I don't remember that.

Q.   Were you diagnosed with obstructive sleep apnea in 2011?

A.   I don't remember the year.

Page 43

Q.   Have you been diagnosed with obstructive sleep apnea?

A.   I have, yes.

Q.   And were you diagnosed with that prior to the subject cruise?

A.   Yes.

Q.   And do you continue to receive treatment for obstructive sleep apnea up until the present day?

A.   No, I don't.

Q.   Why have you stopped receiving treatment?

A.   I was having a lot of problems with the whole mechanism, the whole thing, leaking and a lot of problems, and I just -- I just wasn't doing well with it.

Q.   When did you stop?

A.   I don't recall.

Q.   Before or after January of 2020?

A.   Before.

Q.   Have you spoken to any doctors in the last two years about your decision to stop receiving treatment for sleep apnea?

A.   I think somebody mentioned to me, actually, about that, a nurse, maybe a surgical nurse when I was having surgery at the center out here, the Kaiser for --

Q.   Surgery for what?

A.   Surgery for -- it would have been maybe my last

Page 44

surgery for -- the abdominal surgery.  They were fixing something.  I had -- I can't remember the terms.

Q.   You had a revision surgery for a colostomy bag?

A.   Not that one.  The one after that.  You probably have ...

Q.   Okay.

A.   Let me think for a minute.  I had herniated areas in -- along the incision, and I thought they called them that.  It was skin or flesh.  I'm trying to think of the right words.

Q.   So is that --

A.   It had, like, lumps that were hard and sore, and they had -- I guess I had a lot of scar tissue.  That's what I was trying to think of, scar tissue in there, and there was a lot, and they had to do surgery for that.

Q.   So --

A.   And he was trying to advise me to -- I should use that that I had at home, but he was not a doctor.

Q.   So your primary care physician who you're treating with today has not --

A.   I don't remember.

Q.   Let me ask the question.

A.   Yeah.

Q.   Has not spoken with you about your decision to stop receiving treatment for sleep apnea?

Page 45

A.   Not that I can recall, no.

Q.   And you have done that without consulting with a physician?

A.   Yeah.

Q.   Were you diagnosed with type 2 diabetes in 2013?

A.   I remember being diagnosed.  They were watching me, and I don't remember what year, though.

Q.   Were you diagnosed with type 2 diabetes prior to the cruise in January of 2020?

A.   Oh, yes.

Q.   When you say, "They were watching me," who's "they"?

A.   My tests that they were taking and the doctor at the time probably.

Q.   What was the name of the doctor who was treating you for that?

A.   That's what I don't recall.

Q.   Do you know what diabetic neuropathy is?

A.   Yes.

Q.   What is diabetic neuropathy?

MR. GERSON:  Object to the form.

THE WITNESS:  It has to do with your extremities, your toes, feet, and there's -- there can be numbness and stinging.  I think it's less blood flow or something.  The blood flow is obstructed or something.

**Page 46**

BY MR. DRAHOS:

Q.   And would you agree --

A.   And nerves.

Q.   Would you agree that you were diagnosed with diabetic neuropathy prior to the subject cruise in January of 2020?

A.   No.

Q.   Were you diagnosed with diabetic neuropathy in the year 2018?

A.   I don't recall.

MR. GERSON:  Object to the form.  I didn't hear that last part, Mike.  What did you say?

MR. DRAHOS:  If she was diagnosed with diabetic neuropathy in November of 2018.

MR. GERSON:  Object to the form.

BY MR. DRAHOS:

Q.   So is it your testimony today, Ms. Pell, that you were not diagnosed with diabetic neuropathy until after the cruise in January of 2020?

A.   No, I don't recall that either.

Q.   Okay.  So --

A.   I mean, I know what it is.

Q.   You know what it is, but did the doctor (unintelligible) --

A.   (Unintelligible.)

**Page 47**

(Overlapping voices.
Reporter admonition.)

BY MR. DRAHOS:

Q.   How is it that you know what it is?

A.   It's on TV a lot.

Q.   And is it your testimony here today that a doctor has never told you that you have diabetic neuropathy?

A.   Yes.  I mean, I've never been told that I can recall.

Q.   So if I was to represent to you here today that you were diagnosed with that in November of 2018, that's the first you're hearing of it?

MR. GERSON:  Object to the form.

You can answer, Jennifer, if you know.

THE WITNESS:  I don't know what to say.  It's just -- if I did I don't remember it.  It's not like I'm treating that, other than my type 2 diabetes.  I'm not taking anything for that.  Is there anything that they prescribed for that?  Because I don't know of anything to do.  I'm not in treatment.

BY MR. DRAHOS:

Q.   So you described it as the extremities, your legs and toes and feet feeling numb and tingling.

A.   Yeah, I think it's your -- is it your hands, too?

Q.   Unfortunately I can't answer any questions.

**Page 48**

A.   Yeah.  It's just the legs, I think.

Q.   So do you feel those sensations in your legs, numbness and tingling?

A.   A tiny bit.

MR. GERSON:  Object to the form.

BY MR. DRAHOS:

Q.   And for how long of a period of time have you felt that sensation?

A.   Not long.

Q.   Prior to the subject cruise?

MR. GERSON:  Object to the form.

THE WITNESS:  I don't remember.

BY MR. DRAHOS:

Q.   So Ms. Pell, I'm going to hand you what we're going to mark as Exhibit B to the deposition.

A.   Okay.

Q.   And this is a --

MR. GERSON:  Can I see whatever it is you're --

MR. DRAHOS:  I'm sending it to you right now --

MR. GERSON:  -- going to show the witness before you show it to her.

MR. DRAHOS:  I'm sending it, which is the reason for the delay.  Give me one second while that goes through the internet.

///

**Page 49**

(Defendant's Exhibit B was marked for identification.)

MR. DRAHOS:  I'm marking this as Exhibit B.  Nick, can you confirm receipt for me, please.

MR. GERSON:  What are you marking?

MR. DRAHOS:  I'm marking an office note dated February 15, 2013.  It's a four-page document written by Dr. Yarlagadda, Y-a-r-l-a-g-a-d-d-a.

THE WITNESS:  I do remember that.

MR. GERSON:  Jennifer, wait for a question.  Okay?

THE WITNESS:  Okay.

MR. GERSON:  I'd like to see a copy of the document.

MR. DRAHOS:  I e-mailed it to you.

MR. GERSON:  Okay.

THE WITNESS:  I need my reading glasses.

MR. GERSON:  Jennifer, just wait for a question.  Okay?

THE WITNESS:  Okay.

BY MR. DRAHOS:

Q.   So Ms. Pell, when I was marking this exhibit and handing it to you you had said to me that you remembered this particular visit.  What is it about this particular visit that you remember?

**Page 50**

A.   Just the doctor's name.

Q.   Okay.  Who was Dr. Yarlagadda to you?

A.   I don't remember her, just the name.

Q.   Do you know what myofascial pain syndrome is?

MR. GERSON:  Object to the form.

THE WITNESS:  No.

BY MR. DRAHOS:

Q.   According to this record, Dr. Yarlagadda had diagnosed you with myofascial pain syndrome during this particular visit.  Do you recall what it was that you were suffering from that prompted that diagnosis?

MR. GERSON:  Object to the form.

THE WITNESS:  No.

BY MR. DRAHOS:

Q.   According to the record that's marked there as composite Exhibit B, you were asked a health questionnaire during this particular visit, and I'd like to turn your attention to the bottom of the document, please, ma'am.

A.   Okay.

Q.   On February 15th, 2013, were you asked the question of whether or not you had little interest or pleasure in doing things, and did you respond "Several days"?

A.   I think so.

Q.   And --

**Page 51**

A.   I believe so.  Yeah.

Q.   On February 15th, 2013, did you complete the health questionnaire wherein you were asked whether you were feeling down, depressed or hopeless, and did you answer "Several days"?

A.   Yes.

MR. GERSON:  Object to the form.

BY MR. DRAHOS:

Q.   Were you also asked the question whether or not you were having trouble falling or staying asleep or sleeping too much, and did you answer "More than half the days"?

MR. GERSON:  Object to the form.

THE WITNESS:  Probably.

MR. GERSON:  Counsel, are you referring to -- what page of the document are you referring to?

MR. DRAHOS:  The bottom of page 1.

Q.   Were you also asked the question on February 15th, 2013, whether or not you were feeling tired or having very little energy, and did you answer "Nearly every day"?

MR. GERSON:  Object to the form.  Counsel, you're making a reference to a record of February 2013?

MR. DRAHOS:  Yes.  I think I made that clear now more than once.

**Page 52**

MR. GERSON:  I know, but the record that you sent me is dated January 16th, 2020.

MR. DRAHOS:  Hold on a second.  I just resent it.

MR. GERSON:  I haven't gotten it yet.

MR. DRAHOS:  I'm waiting for confirmation before I ask the next question.

MR. GERSON:  Okay.  So just as a matter of clarification, you previously referenced Exhibit B, which was the medical record from January 16th, 2020, but --

MR. DRAHOS:  No, that's the one that was sent to you.  She's got the right one in front of her, so she has the record that's got the sticker on it that's dated February 15th, 2013.

MR. GERSON:  Okay.  And I'm just pointing out that previously I had asked you for a copy of Exhibit B, and it was a different record than you were showing the witness.  I'm not saying you did it intentionally.  I just want to make sure that the record is clear that what you sent me and what you're showing the witness were two different documents.

MR. DRAHOS:  All right, Nick.  You now have the record dated February 15th, 2013, in front of you?

MR. GERSON:  I do.

MR. DRAHOS:  Thank you.

MR. GERSON:  I just want to be able to follow

**Page 53**

along, and I wasn't able to.

MR. DRAHOS:  All right.  Then I'll go back over it again.

Q.   Ms. Pell, on February 15th, 2013, did you answer a patient health questionnaire wherein you stated that for several days you felt little interest or pleasure in doing things?

A.   I may have.  This does look familiar.

Q.   And did you also answer a question as to whether or not you were feeling down, depressed or hopeless for several days?

A.   I probably did.

Q.   And on February 15th, 2013, were you having trouble falling or staying asleep or sleeping too much more than half the days?

A.   It's kind of vague, but --

MR. GERSON:  Object to the form.

THE WITNESS:  -- I think it's -- this may be the doctor that okayed my medication or something, I think.

BY MR. DRAHOS:

Q.   On February 15, 2013, did you indicate that nearly every day you feel tired or have little energy?

A.   I don't remember, but I ...

Q.   Do you have any reason to dispute the record as you see it here today?

**Page 54**

A.  No.

Q.  On February 15, 2013, did you indicate that nearly every day you feel bad about yourself or that you are a failure and let you and your family down?

A.  Yeah.

Q.  And I'm --

A.  I've admitted that before, I think.

Q.  Okay.  And on February 15th, 2013, did you indicate that nearly every day you have trouble concentrating on things, such as reading the newspaper or watching television?

MR. GERSON:  Object to the form.

Take a look at the record and answer the question if you recall, Jennifer.

THE WITNESS:  I don't really recall that well, but ...

BY MR. DRAHOS:

Q.  Do you have any reason to dispute the accuracy of defendant's composite Exhibit B?

A.  No.

MR. GERSON:  What page are you referring to, Counsel?

MR. DRAHOS:  Page 2.

THE WITNESS:  We're on page 2?

///

**Page 55**

BY MR. DRAHOS:

Q.  And on February 15th, 2013, did you indicate that it's somewhat difficult -- that these problems that we've discussed, trouble concentrating, little interest in doing things, trouble falling asleep or sleeping too much, did you indicate on February 15th, 2013, that these problems have made it somewhat difficult for you to do your work or take care of things at home?

MR. GERSON:  Object to the form.  Counsel, can you tell me where exactly on page 2 you're referencing.

MR. DRAHOS:  It's question number ten.

Q.  Take your time before you answer.

A.  Yeah.  I think I probably did say that at the time where I said all this other stuff.

Q.  And if you'll turn your attention a few lines down in that document under the section there that says "HPI."  Do you see that?

A.  Yes.

Q.  On February 15th, 2013, were you suffering from stuttered speech?

A.  I don't remember that.

Q.  Can you turn your attention, ma'am -- well, are you saying that didn't happen, that that's inaccurate, or that you just don't remember?

A.  I don't remember where -- it says it's one

**Page 56**

episode, so I don't remember.  Maybe that's why.

Q.  Can you turn your attention to the last page of composite Exhibit B, please, the very last page.  Do you see there under the section "Major Depression, Recurrent"?  It says "Note: needs follow up appointment with her psychiatrist."  Do you see that there?

A.  Yes.

MR. GERSON:  I don't.  You said the last page?

MR. DRAHOS:  Last page, "Major Depression," in all caps, "Recurrent."

MR. GERSON:  I've only got a five-page document.  I'm not trying to be difficult.  I'm just trying to follow along.  The last page is blank.  I'm looking for where you're referencing.  I just want to be able to -- okay.  Page 4?  All right.  Go ahead.

BY MR. DRAHOS:

Q.  Who is the psychiatrist that's being referred to there?

A.  That I don't remember.

Q.  Did you have a psychiatrist who was treating you for major depression in February 2013?

A.  I don't think so.

Q.  So was the recommendation being made to you to go get a psychiatrist or to return to a psychiatrist?

A.  It may have been suggested, but I don't recall.

**Page 57**

Q.  And if it was suggested, did you ultimately follow that suggestion and retain a psychiatrist?

A.  I don't think so.

Q.  If you'll turn your attention, please, to page 3 of Exhibit B, please, ma'am.  The very bottom of page 3 --

A.  Where are the pages anyway?  One, two ...

Q.  On the very bottom of page 3 in all caps it says "Assessment/Plan."  Do you see that there?

A.  Yes.

Q.  And it says "Dysarthria."  Do you see that?  So the question, ma'am, was do you see that there?

A.  Oh, yes.

Q.  Okay.

A.  I do see that.  I'm sorry.

Q.  So were you diagnosed with dysarthria on February 15th of 2013?

A.  I don't remember about that.

Q.  And you see there it says "Plan," and it says "CT"?

A.  Uh-huh.

Q.  Did you have a CAT scan taken of your brain in 2013 due to these conditions that you presented with to the doctor?

A.  I don't remember that either.  Sorry.

Q.  I'm going to hand you what we're going to mark as

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Jennifer Pell on 10/01/2021
Pages 58..61

Page 58

Exhibit C to the deposition.

(Defendant's Exhibit C was marked for identification.)

BY MR. DRAHOS:

Q. Exhibit C, which is en route to your attorney, is a five-page document that's dated April 10, 2014. You are welcome to take a look at that, and I'll ask you questions after I get confirmation that your lawyer has received it.

MR. DRAHOS: Nick, do you have it? Nick, are you there?

MR. GERSON: I'm here.

MR. DRAHOS: Do you have Exhibit C?

MR. GERSON: I do.

BY MR. DRAHOS:

Q. Okay. Ma'am, if you can turn your attention to the bottom of page 1 of Exhibit C, and I'd like to ask you can you please read to yourself the questions and answers that are there and confirm for me that, as you sit here today, you have no reason to dispute the accuracy of those answers that were provided by you, just according to the document.

A. These were provided by me?

Q. Yes, ma'am.

A. On a health questionnaire?

Page 59

Q. Yes.

A. I don't recall that. About depression and everything?

MR. GERSON: Jennifer, just wait for a question, and answer. Okay?

THE WITNESS: I'm trying to understand the question.

BY MR. DRAHOS:

Q. What I'd like to know is in reviewing Exhibit C, particularly this patient health questionnaire, in reviewing that are you able to dispute -- is it your position that the answers that were given there are not accurate?

MR. GERSON: Object to the form.

THE WITNESS: I don't know, because I'm not remembering them very well.

BY MR. DRAHOS:

Q. And if you'll turn your attention to page 4, please, down towards the bottom do you see there it says "Major Depression, Recurrent" in all caps?

A. Yes.

Q. And do you see where it says "Plan"?

A. Yes.

Q. That particular drug, citalopram, that's Celexa, correct?

Page 60

A. Yes.

Q. And the amount that was prescribed was 40 milligrams, correct?

A. Yes.

Q. And that's the same amount of Celexa that you're taking today, 40 milligrams, correct?

A. I don't recall.

Q. Are you taking more than 40 milligrams?

A. I think no.

MR. GERSON: Jennifer, just wait for a question, and answer the question the best you can.

BY MR. DRAHOS:

Q. So the answer is no, you're not taking more than 40 milligrams of Celexa?

A. No.

Q. Have you prior to the subject cruise required treatment on your eyes?

A. No.

Q. Do you know --

A. Just a check.

Q. Do you know what a detached retina is?

A. Oh, yes. I have had treatment on one eye for that. The left eye, I think.

Q. You were diagnosed with a detached retina in 2014, correct?

Page 61

A. That could be the date. I'm not sure. I was, though.

Q. Okay. You were certainly diagnosed with a detached left retina prior to the subject cruise, agreed?

A. Yes, agreed.

Q. And that detached retina ultimately required surgery, did it not?

A. Yes, I had surgery.

Q. And following that surgery you were diagnosed with scar tissue in that retina, agreed?

A. I don't remember that.

Q. Who was the doctor who was treating you for this condition?

A. I don't remember his name. I'm sorry.

Q. Who is Dr. Ethan Kutzscher, K-u-t-z-s-c-h-e-r?

A. Is he a retinologist?

Q. He's the doctor, at least according to the records, who did the surgery.

A. That could be him.

Q. When is the last time you've seen him?

A. Oh, I haven't seen him for a long time.

Q. When is the last time anyone has evaluated you for the detached retina condition that you had?

A. I don't know, but I get my checks at the right times, because I check on that because I have the

## JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
### Jennifer Pell on 10/01/2021
**Pages 62..65**

Page 62

diabetes.

Q.   Where do you get your eyes checked?

A.   Well, now out here.  It's in Roseville, I think, near that one Kaiser.

Q.   You need to be a little bit more specific.

A.   Yeah.  I'm sorry.  I'm not the one driving.  Usually my husband takes me.  You could ask him.  He probably knows.

Q.   So you get your --

A.   He's taken me.

Q.   -- eyes checked somewhere outside the Kaiser Permanente network?

A.   No.

Q.   Is it part of the Kaiser Permanente network?

A.   Yes.

Q.   What's the name of the doctor who checks your eyes for you?

A.   I used to know, but since we've moved there's new doctors now.  It used to be, I think, Dr. -- I think his name was Dr. Lowe, but I'm not sure.  I used to help a friend with her doctor visits that was older than me, and it could have been her doctor, but I think we both -- I'm not sure right now.

Q.   Dr. Lowe, L-o --

MR. GERSON:  Counsel, I've got to take a

Page 63

two-minute break, if that's okay, when you're done with this question.

MR. DRAHOS:  Let me wrap this up real quick.

THE WITNESS:  But I can scratch that really, because I think it was her doctor.

BY MR. DRAHOS:

Q.   Okay.  What I'm trying to figure out is who is your current eye doctor?

A.   I don't know.  I think I see different ones when I go in there.  I might have a couple.  I might have a regular doctor.  Ophthalmologist, do they call it?  And I don't think -- I don't know if there's a retinal doctor or not.  That's a specialist.

Q.   Okay.  What's the name of the ophthalmologist that you see?

A.   I don't know.  I don't remember.

Q.   What's the name of the retinal doctor?

A.   I don't remember.

Q.   And who does your regular vision checks?

A.   I think different ones.  Since we've been here -- maybe the four years we've been here I could have been every year, every two years, but I have had those --

Q.   And you're wearing --

A.   -- checks.

Q.   -- eyeglasses here?

Page 64

A.   These are just -- what do they call them -- reading glasses, magnifiers just for reading.

Q.   So other than for reading, do you require these glasses?

A.   No.

MR. DRAHOS:  Okay.  Let's go off the record for a minute.

MR. GERSON:  All right.

(Recess was taken.)

BY MR. DRAHOS:

Q.   So Ms. Pell, in the year 2018 you suffered a perforated diverticulitis?

A.   That sounds about right.

Q.   And that required an acute surgery that resulted in a colostomy bag?

A.   Yes.

Q.   And you had that colostomy bag until approximately January of 2019?

A.   The next year, I think.  It was like five months or something.

Q.   Okay.  And in 2018 were you also diagnosed with atherosclerosis of the aorta?

A.   What is that?

Q.   Were you told there was a build-up of plaque in your aorta?

Page 65

A.   No.

Q.   Were you told your aortic valve or your -- the aorta in your body was stenosed?

A.   No, I never was told that.

Q.   So is that the first you're hearing of that today when I'm telling you this?

A.   Well, it's not true.  I don't remember hearing that.

Q.   Okay.  Were you also diagnosed with bilateral TMJ?

A.   No.

Q.   Do you suffer from TMJ?

A.   No.  A long time ago I might have.  I mean, years and years ago I remember something about that, but it went away.

Q.   So you were not receiving any treatment for TMJ?

A.   No, and I didn't ever.

(Defendant's Exhibit D was marked for identification.)

BY MR. DRAHOS:

Q.   Ma'am, I'm handing you what I'm going to mark as composite Exhibit D to the deposition.  This is a medical record dated May 31st of 2019 that is five pages in total.  Take a look at that, and I'm going to ask some questions after your attorney confirms receipt.

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Jennifer Pell on 10/01/2021                               Pages 66..69

Page 66

MR. GERSON:  Which exhibit is this?

MR. DRAHOS:  D.

MR. GERSON:  D like David?

MR. DRAHOS:  Yeah.  Do you have it?

MR. GERSON:  I see it now.

BY MR. DRAHOS:

Q.   So Ms. Pell, did you suffer a fall at home in May of 2019?

A.   I don't remember that --

Q.   If you can turn your --

A.   -- at home.

Q.   -- attention to the last sentence of composite Exhibit D dated May 31st, 2019.  It reads "Patient coming in as she had a fall four days back.  Slipped at home.  Now nose with bruise and upper and lower lip cuts.  Feel ok otherwise."  Do you see that there?

A.   Yeah.

Q.   Does this refresh your recollection regarding a fall that occurred in your home in May of 2019?

A.   No.

Q.   Do you recall having a fall incident in your home in 2019?  Never mind the month.  A fall in 2019 wherein you subsequently came in and received treatment for it?

A.   No.

Q.   Are you saying that you never fell in May of

Page 67

2019, or you just don't remember?

A.   I didn't fall in the home, and I don't remember that.  No.

Q.   So in looking at Defendant's Exhibit D and reading this note by the doctor wherein it states that you came in reporting of a fall, do you have an explanation for how this record came to be?  Are you saying the doctor fabricated it?

A.   No, that --

MR. GERSON:  Object to the form.

THE WITNESS:  There might have been a fall, but not in my home.  I mean, I've had a couple of falls.

BY MR. DRAHOS:

Q.   Tell me about that.  How many have you had?

A.   There was one I remember at the Safeway parking lot in town that we go to.

Q.   Okay.

A.   And after we moved -- I guess that would be around this date -- I had one.

Q.   Tell me about that one.

A.   I was out by myself shopping, or attempting to shop, and there was this really high step that I went up over, and I fell.

Q.   So where were you shopping?

A.   It was pretty close to home.  I haven't been very

Page 68

far away from this new place we haven't been at very long.  It was at a shopping center.  It was in front of a Ross store, I believe.  I went up the wrong way to the store.  I had parked in a place and come across.  I went up a place where there was just -- it was like this.  I didn't realize there was a really high curb.

Q.   So you misjudged the --

A.   I misjudged --

Q.   -- the curb?

A.   -- height of the curb.

Q.   And that caused you to fall?

A.   Yeah.

Q.   And you suffered injury to your nose and your lips?

A.   I think I scratched my nose and -- yeah.  I had some contusions or whatever you call them, cuts, one or two.

Q.   So you fell forward (unintelligible) --

A.   Yes, and my hand (unintelligible) --

(Overlapping voices.
Reporter admonition.)

BY MR. DRAHOS:

Q.   So I want to go back over it.  You misjudged the height of this curb, and you fell forward?

A.   Yes.

Page 69

Q.   And when you fell forward you landed on your hands?

A.   I must have sort of landed on my face, too.

Q.   Okay.

A.   Because I remember scraping right here.

Q.   When you say "right here" you're touching your nose and your mouth?

A.   Nose and mouth, lips, and I know I was worried about a tooth a little bit, too.

Q.   And so this is the incident then that is being referred to --

A.   Yeah, I don't know why --

Q.   Let me finish the question.  This is the incident that is being referred to in this May 31st, 2019, medical report, correct?

A.   Yes.

Q.   Okay.

A.   I think so.

Q.   And you had told me about another fall that occurred at Safeway.

A.   Yeah.  At Safeway I got out of my vehicle.  I had parked in this spot before near a narrow curbed -- surrounded with curb, cart return, and it was empty.  Sometimes it has carts in it.

Q.   Okay.  And what caused you to fall?

# JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
## Jennifer Pell on 10/01/2021
**Pages 70..73**

---

**Page 70**

A. Well, that one happened rather fast, too. I believe I slipped on the curb and fell into the hole and didn't hit my head, hit my face again. My poor face.

Q. And when was this incident?

A. I don't recall that. It was before this accident that we're here for, yes.

Q. Before the subject cruise?

A. Yeah. I don't know how long before.

Q. So both instances involve you misjudging a curb; would you agree?

A. Yes.

Q. In the first instance that you told me about outside the Ross store did you see the curb before you fell?

A. Yes.

MR. GERSON: Object to the form.

BY MR. DRAHOS:

Q. In the Safeway incident that you told me about did you see the curb before you fell?

A. I knew it was there somewhere.

Q. You just misjudged it?

A. Yeah. Yes rather.

Q. The instance that happened outside the Ross store, do you agree if you misjudged the curb you're responsible for that fall?

---

**Page 71**

MR. GERSON: Object to the form.

THE WITNESS: Yes.

BY MR. DRAHOS:

Q. And in the instance at Safeway when you misjudged that curb --

A. Well, let me go back a minute. I feel that it was too high.

Q. Okay.

A. Once I looked at it and realized how high it was I felt like it was too high. I mean, I don't know why they had such a high curb there.

Q. And this was a curb located where on the property?

A. Somewhere in front of the store, not the door. There was lower curb in front of the door. That's where I should have gone down to.

Q. All right. Ultimately, though, you saw this area and just simply didn't judge it correctly, correct?

A. Correct.

MR. GERSON: Object to the form.

BY MR. DRAHOS:

Q. And then this instance at Safeway, do you agree that if you saw that curb and misjudged it you're responsible for that fall as well?

MR. GERSON: Object to the form.

---

**Page 72**

THE WITNESS: No.

BY MR. DRAHOS:

Q. Why not?

A. I feel it was a hazardous step. Those things, they had several of them in the parking lot, and I knew they were there, but I didn't realize how hazardous they were.

Q. So if you knew they were there, both the curb at the Ross store and the curb at the Safeway, was it your responsibility to navigate around those areas to avoid an injury?

MR. GERSON: Object to the form.

THE WITNESS: If there was access I feel like you should -- it was a parking spot.

BY MR. DRAHOS:

Q. Okay. But that doesn't really answer my question. If you saw the area before the fall --

A. Yeah.

Q. -- don't you agree if you felt it was dangerous that it's your responsibility to avoid that area?

A. I don't know if I felt it was dangerous at that point in time. It's just after the incident I began to look at those places differently. They're, like, too close to the parking, and they're like a hole, and there's a curb, a big curb. I believe that was a big curb, too.

---

**Page 73**

Q. So if you felt the area was dangerous at Safeway did you file a lawsuit against anyone for the injury?

A. I think we did. I don't recall much about it.

Q. You filed a lawsuit against Safeway?

A. I think we did, yes. I reported it, and people helped me.

Q. Did you receive a settlement as a result of the incident?

A. I believe we did, but I don't remember what that was.

MR. GERSON: Object to the form.

BY MR. DRAHOS:

Q. What was the name of the attorney who represented you?

A. I don't remember that either. I'm sorry.

Q. What year was this incident?

A. I don't remember the exact year. 2000-something. Well, it has something maybe to do with this. No.

Q. Where was the lawsuit filed?

A. Where?

Q. Yes, ma'am.

A. I don't know that fact.

Q. The incident that occurred --

A. Well, Contra Costa County. Is that what you --

Q. Can you say that again for me.

---

Page 74

A.   Contra Costa County, Concord.

Q.   Did you give a deposition in that case?

A.   I don't remember a deposition.

Q.   The incident that occurred outside the Ross store that you told me about, did you also file a claim against that property owner?

A.   No.

Q.   Why not?

A.   I just -- it was more minor, the scraping of my nose and a little swelling around the lips.

Q.   So --

A.   Other than that, I just chalked it up to my mistake going that way.  I still felt it was hazardous, though, to have a curb that huge out there.  I believe it had yellow on it, too, the yellow rubber, but I'm not sure.  Maybe that was over at the door.

Q.   And that incident occurred because you didn't lift your foot high enough?

A.   Yeah.  I mean, yes.

Q.   So this incident that occurred on May 31st -- that occurred in May of 2019 that we just talked about, this fall incident, did you suffer an injury to your head as a result?

A.   I don't -- no.

Q.   You don't know or no?

Page 75

A.   No.

Q.   Why was an MRI done on your brain on November 19th, 2019?

A.   That's a different date.

Q.   I understand that, ma'am, but why was it done?

A.   What was done?

Q.   An MRI of your brain.

MR. GERSON:  Is that a question?

MR. DRAHOS:  Yes.

THE WITNESS:  What's the question?

BY MR. DRAHOS:

Q.   The question is why was it done?

A.   Why was --

MR. GERSON:  Answer if you know the answer.

THE WITNESS:  That's a different time, it sounds like.  I'd have to know the time -- that's a different one than what you just last asked me, I think.

BY MR. DRAHOS:

Q.   The question is --

MR. GERSON:  Jennifer, just to make this easier, if you don't understand the question, then just tell Mr. Drahos you don't understand.

THE WITNESS:  I don't understand.

BY MR. DRAHOS:

Q.   Okay.  Do you know why an MRI was done on your

Page 76

brain on November 19th of 2019?

MR. GERSON:  Object to the form.

THE WITNESS:  No.

BY MR. DRAHOS:

Q.   Did you speak to any doctors about the findings of that MRI?

A.   I don't recall.

Q.   If you trip and fall over an object that you could have avoided, do you agree that you're responsible for what happens as a result?

A.   Not always.

Q.   Okay.  Explain to me why.

A.   Well, like I tried to explain to you before, I felt like this curb was really high.

Q.   Okay.  The curb was really high, but if I understand your testimony correctly, you could have avoided that area altogether, correct?

MR. GERSON:  Object to the form.  That's not what she said.

Go ahead.

THE WITNESS:  Would you repeat it again now?

BY MR. DRAHOS:

Q.   Sure.

A.   I'm getting garbled up a little bit.

Q.   All right.  Well, take your time and make sure

Page 77

that you understand the question I'm asking.  So the curb that you tripped over that you're claiming was too high, would you agree that you could have avoided that curb altogether?

MR. GERSON:  Object to the form.

THE WITNESS:  I was going to a store, and there was no reason for me to think that I couldn't approach the store from where I was going.  I did say that I could have gone another way, but I didn't know the store that well.  I didn't even know the shopping center that well and -- anywhere out there, the parking lot, and I thought that I was being as careful as I could.

MR. GERSON:  Jennifer, just answer the question.

BY MR. DRAHOS:

Q.   Do you agree that when you're navigating through areas, whatever areas those may be, it's your responsibility to be as careful as you can be?

A.   Yes.

Q.   And do you agree that you are as careful as can be when navigating around an area?  You should be able to safely get from where you're going to where you want to go, correct?

MR. GERSON:  Object to the form.

THE WITNESS:  I don't know.

///

**Page 78**

BY MR. DRAHOS:

Q. Do you think you could have done anything differently to avoid the incident that occurred outside of this Ross store?

MR. GERSON: Object to the form.

THE WITNESS: In getting to know a place everybody goes back to what happened and why it happened and where it happened.

BY MR. DRAHOS:

Q. Okay. So now in thinking back on the incident and now having known that place, do you think there's something you could have done differently to have avoided that incident?

A. Well, I told you that already.

Q. What could you have done --

A. Go closer to the store, but I didn't think of that when I was going there.

Q. So when you say "closer to the store," what do you mean? Do you mean avoiding the curb altogether?

A. Yeah.

Q. And the incident at Safeway, do you think there's something you could have done differently to have avoided that incident?

MR. GERSON: Object to the form.

THE WITNESS: It was a parking place, and I was,

**Page 79**

you know, getting a parking place, and I didn't think of it being hazardous.

BY MR. DRAHOS:

Q. So does that mean no, you couldn't have done anything to avoid that incident?

A. Well, I think I had already chosen that parking place, and maybe there were no others. I don't remember exactly. It was close to the store.

Q. So does that mean you could not have done anything differently in that incident to have avoided that from happening?

MR. GERSON: Object to the form.

THE WITNESS: I don't know.

BY MR. DRAHOS:

Q. Have you been admitted to any -- strike that.

Other than these two incidents that we've talked about, the one at Safeway and the one outside the Ross store, have there been any other incidents in your life where you've tripped and fallen?

A. Not that I can recall. They've been -- I mean, everybody does that, don't they?

Q. How many times have you tripped and fallen in your life?

A. Not a lot.

Q. How many times more than the two times we've

**Page 80**

talked about?

A. I don't know. I wasn't hurt.

Q. Okay. But have there been instances where you have tripped and fallen beyond the two that we've talked about?

A. I can't think of any.

Q. How about slipped and fallen? Have you had -- prior to the subject cruise ever had any instances where you slipped and fell?

A. Probably on ice somewhere where I lived, on ice when I was younger.

Q. How many times?

A. I don't recall that.

Q. More than once?

A. I don't think so.

Q. So have you been admitted to the hospital for medical care in the last ten years anywhere else, other than Kaiser Permanente?

A. No.

Q. Have you gone to an emergency room for medical treatment for any reason in the last ten years, other than to Kaiser Permanente?

A. Oh, when we were in Texas and this incident happened, of course, there's that --

Q. Yes. Understood, ma'am. Other than Texas?

**Page 81**

A. -- other than that.

Q. Have you been to the emergency room for any reason anywhere else, other than at Kaiser Permanente?

A. I can't --

MR. GERSON: Object to the form.

THE WITNESS: I can't recall anyplace, no.

BY MR. DRAHOS:

Q. Prior to the subject cruise have you had a CT of your head anywhere else other than at Kaiser Permanente?

A. No.

Q. Prior to the subject cruise have you had an MRI on your brain anywhere else other than at Kaiser Permanente?

A. No.

Q. Prior to the subject cruise have you ever had the need to undergo any type of physical therapy?

A. Yes, I think I did after the Safeway, for my face.

Q. Physical therapy for your face?

A. Yeah, it was the -- I don't know what it was called.

Q. Where was that therapy done?

A. Walnut Creek, at Kaiser Walnut Creek.

Q. At Kaiser Permanente?

A. Yes.

## JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
### Jennifer Pell on 10/01/2021
**Pages 82..85**

Page 82

Q.   Prior to the subject cruise have you ever had the need to undergo speech therapy for any reason?

A.   Not that I can recall.

Q.   Prior to the subject cruise have you ever had the need to undergo occupational therapy for any reason?

A.   I don't think so, no.

Q.   What pharmacy do you use to fill prescriptions?

A.   I think it's called Eureka pharmacy, Roseville.

Q.   Is that E-u-r-e-k-a?

A.   Sounds right.

Q.   And where was that located?

A.   I think it's in Roseville.

Q.   And how long has that been your pharmacy?

A.   Pretty much the whole time we've been here.

Q.   Four years?

A.   About four years, yes.

Q.   Where did you go prior to Eureka pharmacy?

A.   Walnut Creek.  We lived in the Bay Area, in Concord.

Q.   And when you say "Walnut Creek," what was the name of the pharmacy?

A.   There's two pharmacies there we used.  We used one -- I don't recall the names of them exactly.

Q.   But both pharmacies were located in Walnut Creek?

A.   Yes.  One was downtown, and one was a little

Page 83

further out from the big downtown area of Walnut Creek.

Q.   Ma'am, can you turn your attention back to Defendant's Exhibit A.  That's the answers to interrogatories, and specifically I'd like to ask you about interrogatory number 5.

A.   On page 4?

Q.   Yes.  Take your time, and take a look at that and tell me when you've finished reading it.

MR. GERSON:  Which interrogatory answer are you asking her to review?

MR. DRAHOS:  Number 5.

THE WITNESS:  And so on answering it now, no.

MR. GERSON:  Jennifer, wait for a question first.  Look at the interrogatory he's referring to.  Wait for a question, and then answer to the best of your ability.  Okay?

THE WITNESS:  Okay.  I thought he was asking a question.

BY MR. DRAHOS:

Q.   So have you had a chance to review the answer to interrogatory number 5?

A.   Yes.

Q.   Is there something that's incorrect about that answer?

A.   Well, because I take medications where I'm not

Page 84

supposed to drink I wouldn't be drinking, no.

Q.   Okay.

A.   I don't remember drinking, no.

Q.   So in accordance -- according to your response to interrogatory number 5, within 24 hours of the incident you had taken 40 milligrams of pravastatin -- I'll spell it later -- 500 milligrams of Metformin and 40 milligrams of citalopram, which is that Celexa we've talked about, correct?

A.   Within how many hours?

Q.   Within 24 hours of the incident.

A.   I don't remember that, because I was injured.

Q.   Were you taking these medications onboard the ship?

A.   Yes.

Q.   Were you taking any other medications, other than these three?

A.   No.

Q.   Are you sure of that?

A.   I mean, these are prescription.

Q.   Understood.  What I mean to make sure is, as you sit here today, with all the opportunity you need to think about it, is this your answer, that these were the three medications that you took on the ship?

A.   Yes.

Page 85

Q.   Okay.  Did you bring any medical devices on the ship?

A.   No.

Q.   Had you ever been on a cruise before the subject cruise that we're here to talk about today?

A.   Yes, two or three others.  This might be number four.  We went on a Mexican cruise, and we went on one to Alaska, and then we also went on a Caribbean.

Q.   And which cruise lines did you sail for those three cruises?

A.   Did I what?

Q.   Which cruise lines did you sail on?

A.   Different ones, I think.  The first one might have been Royal.

Q.   And when you say "the first one" you're talking about the Mexican cruise?

A.   Yeah, I -- I'm not sure about the names.

Q.   When you say "the names" --

A.   The names of the cruise line.

Q.   Do you recall the name of the ship?

A.   No.

Q.   Is the same true for the Alaska cruise?  You don't recall the name of the ship or the cruise line?

A.   No.

Q.   And how about the Caribbean cruise?  Do you

Page 86

recall --

A. Same. I think that they might have been two different cruise lines. I think we've only cruised Royal Caribbean and maybe Princess. I know I'm not supposed to guess, but I just don't recall. I'm trying to be truthful.

Q. So prior to the subject cruise is it your testimony that you had been on a Royal Caribbean vessel before?

A. I believe so.

Q. And in that experience or those experiences did you ever have any negative experience?

A. Yes, I think so.

MR. GERSON: Object to the form.

THE WITNESS: Not an accident, but the way things were handled. Is that what you mean?

BY MR. DRAHOS:

Q. Sure.

A. Yeah.

Q. So what I'd like to know is you told me you've been on three cruises before the subject cruise, correct?

A. Correct.

Q. And at least one of those instances involved a Royal Caribbean cruise?

A. I think so.

Page 87

Q. Okay. And as you sit here, do you have a criticism of how that particular cruise went?

A. I cannot remember a specific one.

Q. Do you have a particular criticism of any experience that you had at any particular time on a cruise vessel before the subject cruise?

MR. GERSON: Object to the form.

THE WITNESS: I can't remember.

BY MR. DRAHOS:

Q. Okay. In any of those prior instances, those prior cruises that you were on, did you ever require medical care during the cruise?

A. No.

Q. So this particular incident was the first and only time that you'd ever been in a cruise ship medical center?

A. Yes. Well, I don't even remember the medical center. On the cruise ship, you mean?

Q. Yes, ma'am.

A. I don't even remember that.

Q. Okay. But prior to the subject cruise you'd never been in a cruise ship medical center?

A. No.

Q. So the subject cruise began on January 15th of 2020, correct?

Page 88

A. Sounds about right.

Q. Okay. And this was the Enchantment of the Seas?

A. That sounds familiar.

Q. And the ship originated out of Galveston, correct?

A. Yes.

Q. Who booked that cruise?

A. Who what?

Q. Who booked it?

A. My husband.

Q. Was there any particular reason why your husband booked this particular cruise?

A. We wanted to go on a cruise with his brothers and sister and her friend. They had never been on a cruise before, none of them.

Q. So brother and sister and friend?

A. Friend and cousin.

Q. What are their names?

A. There's another Ron Pell. That's his cousin. There's a Roger Pell.

Q. So Roger Pell?

A. His brother.

Q. He went on this cruise?

A. Yes.

Q. And then you said "sister." Is that

Page 89

sister-in-law, or is that a separate sibling?

A. She's my sister-in-law. She's Ron's sister, Beth.

Q. What's Beth's last name?

A. Williams, I believe.

Q. And then you said there was a cousin?

A. Well, he's another Ron Pell. Did you get that already?

Q. Okay. So I got that one. Who else?

A. And Steve Pell, his other brother.

Q. Okay.

A. Is that, like, five?

Q. So I have Roger Pell. I have Steve Pell. I have Beth Williams, and then I have Ron Pell. Any other family --

A. And then Beth's friend came, Jeane -- I can't remember her last name at this moment. I'm sorry.

Q. So Roger Pell, is he married?

A. No.

Q. Did he come on the cruise by himself?

A. Yes.

Q. Beth Williams, is she married?

A. No.

Q. Did she come on the cruise herself?

A. She came with her friend Jeane.

Page 90

Q.   Her friend.  Okay.  And Steve Pell, did he come on the cruise alone?

A.   Oh, yes.  He didn't have a significant other or whatever.

Q.   And Ron Pell, is he married?

A.   That's my Ron.

Q.   No, no.

A.   Yes, we're married.

Q.   You said there was a cousin Ron Pell.

A.   Oh, no.  He's not married.

Q.   Did he come on the cruise alone?

A.   Yes.

Q.   So this is the extent of the group of people that went on this trip?

A.   Uh-huh.

Q.   In your group?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.  Sorry.

Q.   It's all right.  Do you know whether or not your husband Ron did any research about this cruise prior to booking it?

A.   Probably a little.  I don't know.

Q.   You don't know what research, if any (unintelligible) --

Page 91

A.   I don't (unintelligible) --
                    (Overlapping voices.
                     Reporter admonition.)
BY MR. DRAHOS:

Q.   You don't know what research, if any, he did?

A.   He probably did some research.  I don't remember what.

Q.   Okay.  Did you bring a cane onboard the ship?

A.   No.

Q.   A wheelchair?

A.   No.

Q.   A scooter of any sort?

A.   Meaning like one of those?

Q.   Yeah, a mobile scooter.

A.   No.  You mean one of those walkers?  No.

Q.   Okay.  Did you require at that particular time any type of assistive device in order to walk?

A.   I think I did.

Q.   What did you require?

A.   I think I used a walker and a wheelchair at times when I was recovering and a cane.

Q.   Why did you not bring the cane onboard the ship?

A.   No, I mean after the incident.

Q.   Okay.  My question was different.

A.   I'm sorry.  I misunderstood you then.

Page 92

Q.   At the time of the subject cruise when you boarded the vessel on January 15th of 2020 did you require any type of assistive device to walk?

A.   No, I didn't require anything.

Q.   Did you use any?

A.   I've used something before, but not right before.

Q.   What did you use before?

A.   Those things I mentioned.  I had those things, I think, from the other surgeries.

Q.   Okay.

A.   To help me.

Q.   So before the subject cruise you had used a walker to walk?

A.   But not right before the cruise or anything.

Q.   We're going to get that in a second.

A.   Okay.

Q.   So what was the reason for using the walker prior to the subject cruise?

A.   After my abdominal surgeries.

Q.   And how about the wheelchair?

A.   Same.

Q.   So the walker, the cane and the wheelchair were after the abdominal surgeries?

A.   Yeah.  The cane was kind of, like, at the end of my recovery.

Page 93

Q.   So did you undergo physical therapy after the abdominal surgeries?

A.   I don't recall that.  I don't think -- yes, I did.  Someone came to the house, I think, to help me.

Q.   And who was this person?

A.   I don't remember her name.  Maybe she's on the list.  It was a physical therapist.

Q.   A physical therapist came to your house to render therapy to you after the --

A.   To help me get going and exercising and get my movement more -- better.

Q.   Okay.  And for how long a period of time did you receive this therapy?

A.   This is from not this incident.

Q.   I understand.

A.   Okay.

Q.   You're telling me you had surgery on your stomach.  You had abdominal surgeries?

A.   Yes.

Q.   You told me the last one you had received was to clear out adhesions and scars in the area, right?

A.   Yes.

Q.   Okay.  So when those surgeries were completed it's my understanding that you underwent physical therapy to help you walk.

**Page 94**

A.   I'm not sure where -- I think the physical therapy was before while I was recovering from the other surgery, because there were -- there was time in between the last one -- there was time in between each three surgeries just because of the nature of the surgery.

Q.   All right.  So let's take it step by step so that I walk out of here with a clear understanding.

A.   Okay.

Q.   Okay?  So I'm going to label these as three different surgeries.  The first was the surgery that resulted in the colostomy bag.  Okay?

A.   Yes.

Q.   The second was to reverse that surgery --

A.   Yes.

Q.   -- to take the colostomy bag away?

A.   Yes.

Q.   And the third was to remove the scar tissue that had formed in the area, correct?

A.   Yes.

Q.   So after the surgery was performed that resulted in the colostomy bag, did you have to undergo any physical therapy to help you walk?

A.   That might have been -- I remember somebody coming to the house, and that was the worst, the first one.  That was the worst one for me.

**Page 95**

Q.   And what entity was this person affiliated with?

A.   She was a home health care nurse or a physical therapist from Kaiser.

Q.   From Kaiser?

A.   I think so.

Q.   And for how long of a period of time did you receive physical therapy from this person?

A.   A few weeks.  I just don't recall how much.

Q.   How often, meaning how many days a week for a few weeks?

A.   I think maybe a couple days a week.  Yes, I think so.

Q.   So after this surgery that resulted in the colostomy bag did you require the use of a wheelchair to get around?

A.   Some places, yes.  I remember I had to go to a lot of doctor appointments.

Q.   Did you have a wheelchair at home?

A.   No, I don't think so.  We might have had one that Ron rented, but we didn't really use it, because I was using -- I wanted to be -- stand up and move more.  No, I don't remember -- in fact, we ended up having to pay for it and didn't really need it.  We turned it back in.

Q.   All right.

A.   Because I had my -- what do you call -- the push

**Page 96**

things that have either two or four wheels on them?  Walker.

Q.   You had a walker?

A.   I had a walker that I used.

Q.   For how long of a period of time did you use that walker?

A.   I think I used it several times throughout the surgeries and recovery.

Q.   Okay.  So for each one of these surgeries, the surgery that resulted in the colostomy bag, the surgery to reverse that colostomy bag, and the surgery to revise those scars, in each one of those instances after those surgeries you required the use of a walker?

A.   I guess I don't really remember which ones I used it for.  Mainly the first one.

Q.   Okay.

A.   I may have used just the cane because of -- I already know through my other surgeries I had when I had my children -- I had C-sections for all three of them, that each time they do that the incision area has probably got the most pain the first time, and the next times it's not as bad.  I think that's what I found out, so I didn't have to use as much.

Q.   All right.  Let me focus on this particular time period.

**Page 97**

A.   But I don't remember.

Q.   All right.  So we talked about the first surgery, again, the one that resulted in the colostomy bag.  After that you had home health physical therapy, correct?

A.   I think so, yes.

Q.   A couple days a week for several weeks, correct?

A.   (Nodding head.)

Q.   Yes?

A.   Yes.

Q.   And during that time period you required the use of a walker, correct?

A.   Yes, I think I did.

Q.   All right.  After the revision -- the reverse surgery to reverse the colostomy bag, after that surgery did you require home health physical therapy?

A.   I don't think so.  I don't remember.

Q.   And following that surgery did you require the use of a walker?

MR. GERSON:  Form.

THE WITNESS:  I think so.

BY MR. DRAHOS:

Q.   For how long of a period of time?

A.   Not as long.

Q.   Approximately how long?

A.   Maybe a couple weeks.

Page 98

Q.   Did you undergo any type of assessment or testing by a professional to determine whether or not you were capable of walking without that walker?

A.   No.

Q.   So what was going on with your body?  How were you feeling that led to this decision to do the scar revision surgery?

A.   I think I had pain, unexplainable pain and hardness that you could feel through the skin near the -- maybe kind of protrusion a little bit.

Q.   Okay.

A.   Right along the scar line.

Q.   And that pain was significant enough to prompt you to go to a doctor to be seen for it?

A.   Yes.

Q.   And it was significant enough to warrant that doctor doing a revision surgery?

A.   The --- yes.

Q.   And was that done by robot, by hand?  What kind of surgery was it?  Do you know?

MR. GERSON:  Form.

THE WITNESS:  I don't know.

BY MR. DRAHOS:

Q.   Okay.  And so following this revision surgery to clean these scars did you require home health physical

Page 99

therapy?

A.   I don't remember that.

Q.   Following this scar revision surgery did you require the use of a wheelchair to get around?

A.   I don't think so.  Well, except for walking distances to the doctor.  If I was going in to the doctor I think I used -- from the parking lot to the doctor.

Q.   You used the wheelchair?

A.   Yes, but we didn't have our own.

Q.   Following this scar revision surgery did you also require the use of a walker?

A.   I think so.

Q.   For what purposes -- what reasons would you use the walker for?

A.   Support.

Q.   Okay.

A.   Because of pain.

Q.   You had told me about the specific example of using the wheelchair from the car to the doctor's office.

A.   Yes.

Q.   Can you also give me a specific example of something that would warrant you using the walker.

A.   Well, I tried to do as much walking to the doctor as I had to and could, so I think at times I didn't use the wheelchair.  I used the walker.  I took my walker with

Page 100

us.

Q.   So when you went to the supermarket to go grocery shopping --

A.   I don't remember doing that.

Q.   Okay.

A.   My husband did a lot of the grocery shopping.

Q.   Why is that?

A.   I don't know.  Trying to help out.

Q.   Okay.  So before the subject cruise your husband would help out by doing grocery shopping?

A.   Well, he still does.

Q.   Okay.  But he was doing it before the cruise as well?

A.   Yes.

Q.   So after this revision of the scars, surgery, did anyone do any type of an assessment on you to determine whether or not you required any kind of assistive devices to continue walking?

A.   No.

Q.   For how long of a period of time, if at all, did you use a cane following the scar revision surgery?

A.   I don't remember.

Q.   Did you use a cane?

A.   Yes.

THE DEPOSITION REPORTER:  Can we pause for a

Page 101

moment?

MR. DRAHOS:

(Discussion was held off the record.

Lunch recess was taken.)

BY MR. DRAHOS:

Q.   Okay.  So we're back on the record, Ms. Pell.

A.   Okay.

Q.   I'm going to show you what we're marking as composite Exhibit E to this deposition.

(Defendant's Exhibit E

was marked for identification.)

BY MR. DRAHOS:

Q.   I just forwarded a copy to your lawyer, and I'm going to hand that to you and ask you to take a look at that, and I'm going to ask some questions.

MR. DRAHOS:  Nick, do you have Exhibit E?

MR. GERSON:  I do.

BY MR. DRAHOS:

Q.   Okay.  So Ms. Pell, if you'll turn your attention to page 3, please.  Now, this was a cruise that was scheduled to begin on January the 15th, 2020, out of Galveston, correct?

A.   I'm not sure about the dates.

Q.   All right.  But the cruise originated out of Galveston?

## JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Jennifer Pell on 10/01/2021                                      Pages 102..105

Page 102

A.   Yes.

Q.   And if the itinerary, according to Royal Caribbean's records, was that this cruise was supposed to begin on January 15th of 2020, you would have no reason to dispute that, as you sit here, agreed?

A.   Yes.

Q.   Okay.  So if you'll look there at the third page it indicates that you boarded the vessel at 7:18 p.m.  Do you see that there?

A.   In the morning -- no, that's not.

Q.   It says 7:18 p.m.  Is that what time you got on the ship?

A.   I didn't remember that.

Q.   Were you late to this cruise?

A.   No.  No, we were not.

Q.   Okay.  Was there any particular reason why you would have boarded it at 7:18 p.m.?

A.   Maybe it had something to do with our luggage.  I don't know.

Q.   When did you arrive from California to Texas?

A.   I'm not recalling that either.

Q.   How did you get from California to Texas?  Did you fly?

A.   I believe so.  Yes, I think we must have, because I think we had a return ticket which we couldn't use,

Page 103

because the doctors didn't want me to fly because of my head injury.

Q.   Okay.

A.   And because of the pressurized cabin or something.

Q.   All right.  So you would have flown from California to Texas?

A.   I think so, yeah.

Q.   Do you know what day it was that you arrived to Texas?  Was it the same day as the cruise, or did you arrive earlier?

A.   I don't remember now.  Ron would remember something like that.  Sorry.

Q.   And did you meet all of your group in Texas, or did you all originate in California together?

A.   No, we didn't originate in California.

Q.   So you met --

A.   We met in Texas, I think.

Q.   Okay.

A.   I don't remember that.

Q.   So let me go back and ask the other question to make sure that you answered it and that I understood your question.  Did you bring a cane onto the ship?

A.   No.

Q.   Did you bring --

Page 104

A.   I didn't need one at that time.

Q.   Did you bring a walker onto the ship?

A.   No, I did not.

Q.   When was the last time that you had attempted to use the cane to walk prior to the cruise in January of 2020?

A.   Quite a bit of time.

Q.   What does that mean?

A.   Months.

Q.   Months?

A.   Months maybe.  I don't know.  My recollection of time isn't -- I'm not real good.  Too many things have happened.

Q.   So what did you do when you first got on the ship on January the 15th?

A.   I'm not recalling that either.  I remember something about the luggage.  They couldn't find some of our luggage.  We had to wait for that for a while, so I don't know if we sat around and waited for that or what.  I don't remember that.

Q.   Okay.

A.   I just remember something about the luggage.

Q.   What was the weather like that day?

A.   I think it was foggy, overcast, I'd call it.

Q.   All right.  So when you got on the ship it was

Page 105

foggy?

A.   I think so.

Q.   All right.  And most people on the first day of the cruise, when they get on the ship they kind of explore the ship itself.  Did you do that?

A.   I don't remember that.

Q.   Okay.

A.   I remember waiting around by the room.

Q.   So can you tell me one way or another whether or not on January 15th of 2020 you went up to Deck 9 of the Enchantment of the Seas?

A.   I don't think so.

Q.   You don't think you went on the top deck at all on January 15th?

A.   I don't think so.

Q.   How sure are you of that?

A.   I'm not real sure.  Some things I remember.  Some things I don't.

Q.   So you could have gone onto Deck 9 on January 15th?  You just don't remember?

A.   I don't remember.

Q.   Did you have any trouble at all on January 15th navigating around the ship?

A.   No.

MR. GERSON:  Object to the form.

Page 106

BY MR. DRAHOS:

Q.   Did you make any complaints at all on January 15th about any aspect of the cruise?

A.   No.  Just that we couldn't leave.

Q.   Why not?

A.   Because of the fog, and I remember some kind of accident in the harbor --

Q.   An accident involving --

A.   -- they were talking about.

Q.   Explain to me what your understanding is of the accident that went on in the harbor.

A.   Somebody hit somebody.

Q.   Another boat hit another boat?

A.   I think so.

Q.   Is that why the ship didn't leave the port on January 15th, because there had been an accident?

A.   I think so, and the fog.  They didn't want to travel in that fog.

Q.   Would you agree --

A.   I mean, that's coming back to me now.  I don't know why I remember -- I guess that's the way memory is sometimes.  You remember some things and not others.

Q.   So I want to ask you something in general.  When you're walking outside of your home do you pay attention to warning signs?

Page 107

MR. GERSON:  Object to the form.

THE WITNESS:  I don't have any warning signs out of --

BY MR. DRAHOS:

Q.   That wasn't my question.

MR. GERSON:  Jennifer, just answer the question.

BY MR. DRAHOS:

Q.   When you're outside your home -- I don't care where you are -- do you pay attention to warning signs?

A.   Oh, I see what you're saying now.  Yes.

Q.   Would you agree with me that it's your responsibility when you're out and about to be mindful of warning signs and to follow those warnings?

A.   When you see them, yes.

MR. GERSON:  Object to the form.

BY MR. DRAHOS:

Q.   Did you see warning signs on the Enchantment of the Seas prior to the subject incident?

A.   No.

MR. GERSON:  Object to the form.

BY MR. DRAHOS:

Q.   Is it your testimony here today before the members of the jury under oath that at no point in time prior to January 16th, 2020, did you notice a warning sign on the Enchantment of the Seas?

Page 108

A.   No.

MR. GERSON:  Object to the form.

THE WITNESS:  I don't remember.

BY MR. DRAHOS:

Q.   Okay.  So that's a little bit of a different answer, so let me make sure I understand what you're saying.  Are you saying you don't remember seeing warning signs because you can't remember, or you don't remember because they weren't there?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  I remember nothing about that -- about signs, warning signs.

BY MR. DRAHOS:

Q.   What does that mean?  Does that mean you're saying there were no warning signs or you just don't remember if you saw any?

MR. GERSON:  Object to the form.

THE WITNESS:  I don't remember.

(Defendant's Exhibit F was marked for identification.)

BY MR. DRAHOS:

Q.   Okay.  I want to hand you what we're going to mark as Exhibit F to this deposition.

MR. GERSON:  Hold on a second.

MR. DRAHOS:  I e-mailed it to you.

Page 109

MR. GERSON:  All right.  And Jennifer, look at whatever he's about to hand you and wait for a question.  Okay?

BY MR. DRAHOS:

Q.   Exhibit F is one, two, three --

MR. GERSON:  Hold on.

MR. DRAHOS:  I'm just stating it for the record.

MR. GERSON:  I'm sorry.

MR. DRAHOS:  Exhibit F is a five-page document.  I've e-mailed it to you.  I'll wait for your confirmation that you've received it before I --

MR. GERSON:  It just came in.  Relax.

MR. DRAHOS:  I'm relaxed.

MR. GERSON:  Okay.

BY MR. DRAHOS:

Q.   Okay.  Here you go, Ms. Pell.

MR. GERSON:  I was just pointing out that I hadn't received it yet.  So for the record, Exhibit F is a total of five photographs, correct?

MR. DRAHOS:  Five pages.

MR. GERSON:  Okay.  Five pages.

THE WITNESS:  I'm not familiar with these.

MR. GERSON:  Jennifer, wait for a question.  Okay?

THE WITNESS:  Okay.  I'm sorry.

## JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
### Jennifer Pell on 10/01/2021                    Pages 110..113

**Page 110**

BY MR. DRAHOS:

Q.   So in looking through composite Exhibit F are you able to identify what those are depicted in those photographs?

MR. GERSON:  Object to the form.  And for the record, you're referring to a five-page document with different photographs, but you're not being clear which one you're asking her about.

MR. DRAHOS:  All I've done -- now you need to calm down.  All I've asked her to do was look at and tell me if she's able to identify what they are.  That's all.

MR. GERSON:  Object to the form of the question.

THE WITNESS:  I'm not familiar with these.

BY MR. DRAHOS:

Q.   Okay.  What is it that's depicted there in the first page of composite Exhibit F?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  It looks like doors.

BY MR. DRAHOS:

Q.   Okay.  And is there anything on those doors?  Are there words or signs or anything on there that you notice?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  I don't remember those.

BY MR. DRAHOS:

Q.   That's not the question.

**Page 111**

A.   Oh.

Q.   The question is do you notice (unintelligible) --

A.   I notice (unintelligible).

(Overlapping voices.

Reporter admonition.)

BY MR. DRAHOS:

Q.   Do you notice words on that door?

A.   I see them in the pictures.

MR. GERSON:  Object to the form of the question.

BY MR. DRAHOS:

Q.   How about the second page?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  I see them in the picture.  I don't remember them.

BY MR. DRAHOS:

Q.   And how about the third page?  Do you recognize what's depicted in the third page?

MR. GERSON:  Object to the form of the question.  I'm not sure what the question is, but I'm objecting to the form anyway.

THE WITNESS:  Same as the first.  My answer is the same as the first page.

BY MR. DRAHOS:

Q.   Okay.

A.   I'm not familiar with those doors.

**Page 112**

Q.   All right.  How about those signs on the doors themselves?  What do those appear to be to you?

MR. GERSON:  Object to the form of the question.  Which -- you're referring to an exhibit, which is five pages, and now I don't know which exhibit --

MR. DRAHOS:  We're going page by page, but I'll represent the Bates number on the bottom to make it even more clear.

Q.   Do you see --

MR. GERSON:  Great.

BY MR. DRAHOS:

Q.   -- Ms. Pell, on the third page -- wait a minute.  I got lost.  On the second page of composite exhibit -- what are we on?  The second page on composite Exhibit F, which is Bates-stamped GR 240, do you see a warning sign there?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  Which page are we on?  I see all the pictures.

BY MR. DRAHOS:

Q.   Second page, and it's got a Bates stamp on the lower right-hand corner there, GR 240.  Do you see what appears to be a warning sign on that door?

A.   In the picture, yes.

Q.   Okay.  And what is it telling you?

**Page 113**

MR. GERSON:  Object to the form of the question.

THE WITNESS:  Well, it's obvious.  I can read it.

BY MR. DRAHOS:

Q.   Okay.  What is it telling you?  What's obvious about it?

A.   I don't think they were obvious when I was there.

Q.   Okay.

MR. GERSON:  Jennifer, just answer the question.

BY MR. DRAHOS:

Q.   I'm asking you to look at what's depicted there, and tell me what is obvious about what you see.

A.   Well, they're obvious in the picture here, yes.  I can read it.

Q.   What is it that's obvious about it, ma'am?

A.   It says "No food or glass in the pool."  We weren't in the pool.

Q.   And what about --

A.   Not that I -- "Surfaces may be slippery when wet" is what it reads.

Q.   Did you understand what -- do you understand what that means?

A.   Of course, yes.

Q.   All right.  How about the next page, which is Bates-stamped GR 240?  Do you see the warning sign on that door?

Page 114

MR. GERSON:  Object to the form of the question.

THE WITNESS:  "Keep an eye on your kids."

BY MR. DRAHOS:

Q.   How about the sign just below there?

A.   "Watch your step.  Deck slippery when wet."  I'm just reading.

Q.   Okay.  And do you understand what that means, as you sit here today?

A.   Yes.

Q.   Okay.  And how about the next page?

A.   "Keep an eye on your kids."

Q.   The next page is GR 241.  What is that?

A.   That's the last page.  That's a really big sign.  "Pool Rules."  We weren't near the pool.

MR. GERSON:  Hold on a second.  GR 241 on the copy I have is page 3.

MR. DRAHOS:  It is page 3 on mine also.

MR. GERSON:  Can you double-check, Jennifer, that we're all looking at the same page, because I'm not there.

THE WITNESS:  I may be on the wrong page at times.  They're not --

BY MR. DRAHOS:

Q.   Let's make sure.  Do you see in the lower right-hand corner it says GR 241?

A.   The lower right-hand corner.  That's the last

Page 115

page?

Q.   Let me see what you have there, because it may have been in a different order.

A.   Put together -- yeah, here's 241.

Q.   It's in different order.  Let's put it in the same order.

MR. GERSON:  For the record, this is Nick Gerson, that the witness -- the exhibit shown to the witness is different in apparently order, the copy that I have."

MR. DRAHOS:  That's pretty clear.  That's why I'm changing it so that it's in the same order, and it's why it has Bates numbers --

MR. GERSON:  Okay.

MR. DRAHOS:  -- in the lower right-hand corner.

Q.   Okay, ma'am.  Do you see what's depicted there in GR 241?

A.   A sign for the pool.

Q.   Okay.  And do you agree that if you're in or around that area you have a responsibility to follow the instructions that are on that sign?

A.   Yes.

Q.   And if you go to the next page, please, ma'am, which would be GR 247.

A.   This one?

Q.   Yes, ma'am.  Do you see those pictures there?

Page 116

A.   Yes.

Q.   Would you agree that these are also warning signs?

A.   Yes, they look like warning signs.

Q.   And do those warning signs appear to be open and obvious to you?

A.   In the picture.

Q.   Okay.  Do you think you could walk through that door without noticing those warning signs?

MR. GERSON:  Object to the form.

THE WITNESS:  Perhaps.

MR. GERSON:  (Unintelligible.)

THE DEPOSITION REPORTER:  I'm sorry, Mr. Gerson?

THE WITNESS:  Well, the door was the --

(Overlapping voices.

Reporter admonition.)

MR. GERSON:  Foundation.

BY MR. DRAHOS:

Q.   So ma'am, in looking at GR 247 is it your testimony that you could walk through that door without noticing those signs that are on there?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  If they're open.

BY MR. DRAHOS:

Q.   What do you mean by that?

Page 117

A.   Well, the door is closed.

Q.   What are --

A.   I don't even know where that door is.

Q.   What do those warning signs --

MR. GERSON:  Jennifer, just listen to the question, and answer the question.  Okay?

THE WITNESS:  Okay.

BY MR. DRAHOS:

Q.   What do those warning signs say?

A.   They're warning signs, "No food or glass in the pool."

Q.   How about just below that?

A.   "Watch your step.  Deck slippery when wet."

Q.   How about on the other side of the door?

A.   And automatic door.

Q.   What about the other side of the door?  There's a pink sticker there do you see it?

A.   "Surfaces may be slippery when wet."

Q.   And how about just below that?

A.   Same strip as on the other side.

Q.   Okay.  Are those warnings clear to you?

A.   Yes.

MR. GERSON:  Object to the form of the question.

BY MR. DRAHOS:

Q.   Are they in any way confusing, or do you not

Page 118

understand what they're trying to convey?

A. No. Wait a minute. What was the question again? Do I not understand in any way what?

Q. Do you understand what they're attempting to convey in those warning signs?

A. Yes.

MR. GERSON: Object to the form of the question.

BY MR. DRAHOS:

Q. And would you have -- would you agree with me that you have an obligation to follow those warning signs?

MR. GERSON: Object to the form of the question.

THE WITNESS: I was.

BY MR. DRAHOS:

Q. Okay. So then you agree?

A. I was trying -- yeah, I agree.

MR. GERSON: Jennifer, just listen to the question, and answer the question.

BY MR. DRAHOS:

Q. Do you need a warning sign to tell you that a floor could be slippery when it's wet?

MR. GERSON: Form.

BY MR. DRAHOS:

Q. Is that --

(Reporter clarification.

Overlapping voices.)

Page 119

THE WITNESS: I don't need it, but I think others -- I mean, a reminder is good.

BY MR. DRAHOS:

Q. Is it common sense to you that a floor can be slippery when wet?

A. Yes.

Q. Would you agree that you should avoid walking on flooring that has puddles?

MR. GERSON: Form.

THE WITNESS: I didn't see puddles when I was walking.

BY MR. DRAHOS:

Q. Okay.

A. But I slipped in something.

Q. We're going to get there, ma'am. I promise you. Do you agree that you should exercise caution when walking on floors that are wet?

A. I agree.

MR. GERSON: Form.

BY MR. DRAHOS:

Q. What is your typical habit in terms of where you focus your eyes while walking?

MR. GERSON: Form.

BY MR. DRAHOS:

Q. Do you look straight ahead? Do you look down at

Page 120

the ground in front of you?

A. I look everywhere.

MR. GERSON: Form.

BY MR. DRAHOS:

Q. Okay. What do you mean by you look everywhere?

A. What's close to me, around me.

Q. What's close to you how? What do you mean?

MR. GERSON: Form.

THE WITNESS: Where I'm walking. I don't know how to answer that.

BY MR. DRAHOS:

Q. How far ahead do you look? How many steps ahead of your point of travel do you look when you're looking at the area around you?

MR. GERSON: Form.

THE WITNESS: Not too far, because I don't go that fast.

BY MR. DRAHOS:

Q. Approximately how many feet?

MR. GERSON: Object to the form.

THE WITNESS: But yet I see what's there in front of me, so I -- I'm not a good guess of yards. I don't know. How many feet? I don't know. It's hard to say when you're walking.

///

Page 121

BY MR. DRAHOS:

Q. Okay.

A. You're changing that view all the time.

Q. If you're not watching where you're going are you being careful?

A. I was being careful.

Q. I'm asking you in general.

A. In general?

Q. If you're not watching where you're going --

MR. GERSON: Object to the form.

BY MR. DRAHOS:

Q. -- are you being careful?

A. Well, that goes without saying.

Q. So then you would agree that in order to be careful you should watch where you're walking?

A. Right.

MR. GERSON: Object to the form.

BY MR. DRAHOS:

Q. Do you remember anything specifically about what you did on January the 15th while on the ship?

A. I mentioned to you about the luggage, but I don't know what day that was.

Q. That's all right?

A. That's when we first got there, I think.

Q. So you said you recall there being an issue with

Page 122

luggage.  Is there anything else that you recall about your experience on the ship on January the 15th?

A.  No, I don't recall anything really.  Eating.

Q.  Where did you eat?

A.  I don't know the name or -- you know, I wasn't familiar with the ship, so ...

Q.  Did you eat at a buffet or a sit-down dinner on that first night?

A.  I don't remember.

Q.  What time did you go to bed?

A.  I don't remember that.

Q.  What time do you typically go to bed?

A.  Between 9:00 and 10:00 or thereabouts.

Q.  Did you stay up later than you typically stayed up on this first night of the cruise?

A.  I don't remember that either.

Q.  All right.  So let me take you to the second day now.  This is day two, January 16th.  The ship is still in port, correct?

A.  I think so.

Q.  Do you know what time you got up that morning?

A.  No.

Q.  Do you know what activities you participated in on the ship that day?

A.  I think I remember playing some bingo.  That

Page 123

might have been in the morning.

Q.  All right.  Did you have breakfast?

A.  I believe so.

Q.  What did you have for --

MR. GERSON:  (Unintelligible.)

BY MR. DRAHOS:

Q.  -- breakfast?

A.  I don't remember.

(Reporter clarification.)

BY MR. DRAHOS:

Q.  Where did you eat breakfast?

A.  I don't remember.

Q.  Okay.  What time did you play bingo?

A.  I don't remember that either.

Q.  By the way, on January 15th, that first night of the cruise, did you witness anyone trip, slip or fall?

MR. GERSON:  Form.

THE WITNESS:  Not that I recall.

BY MR. DRAHOS:

Q.  Did you witness anyone on the ship having any trouble navigating around the vessel?

MR. GERSON:  Form.

THE WITNESS:  I don't remember being around the vessel much.

///

Page 124

BY MR. DRAHOS:

Q.  Okay.  So that would mean then that you don't remember seeing anyone having any trouble walking around it?

A.  No.

Q.  All right.  So do you recall what you were wearing on January 16th?

A.  You mean when the incident happened?

Q.  Yes, ma'am.

A.  I was wearing this sweater.

Q.  Okay.

A.  And some pants, some jeans.

Q.  What kind of footwear were you wearing?

A.  I don't remember that fact for some reason.  I think I was wearing a covered shoe.  I have cold feet.

Q.  Can you describe the shoe beyond that with any other detail?

A.  No.  I had several pairs of shoes with me.

Q.  Did you have lunch that day?

A.  Yes.

Q.  Do you recall what you had for lunch?

A.  No.  It was buffet style, though.  I do remember the lunch.

Q.  So how often, if at all, did you monitor your blood sugar back in January of 2020?

Page 125

A.  You mean while I was on the ship?

Q.  No, just -- in January of 2020 how often, if at all, were you monitoring your blood sugar?

A.  I don't remember that.

Q.  You would agree that you were actually prescribed a device that was responsible for monitoring your blood sugar?

A.  Yes.  There was something wrong with it, I think.

Q.  So does that mean that in January of 2020 you were not monitoring your blood sugar?

A.  Maybe, yeah.

MR. GERSON:  Form.

BY MR. DRAHOS:

Q.  Can you recall exactly how long it would have been that you would have actually used that device that monitored your blood sugar?

A.  What's the question again?  Do I remember --

MR. DRAHOS:  Do you have it there?

THE WITNESS:  -- how long?

(The record was read back.)

THE WITNESS:  No.

BY MR. DRAHOS:

Q.  You would agree, though, that you certainly did not bring that device onto the ship?

A.  No, I don't think I did.

Page 126

Q.   What are the effects that occur to your body when your blood sugar is elevated?

A.   I really don't know.  I haven't had that many.  I don't think I've had any that I can recall particularly.  Low, maybe low.

Q.   Do you know why it was that your doctors prescribed this device to monitor your blood pressure?

A.   To keep my blood levels more level.

Q.   Did they explain to you why it was that that was important?

A.   Yes.

Q.   What did they tell you?

A.   I think you're supposed to take it often.

Q.   Why?  Why is that something that they wanted you to do?

A.   Because it can, like, cause you to be sick.

Q.   Are there certain foods that you can eat that can cause your blood sugar to spike?

A.   I believe there are.

Q.   What kind of foods are those?

A.   Sugary foods and pastas and breads and stuff like that.

Q.   So this incident occurred on Deck 9 of the vessel, correct?

A.   Yes.

Page 127

Q.   Tell me what happened.

MR. GERSON:  Object to the form.

THE WITNESS:  I was coming out onto that deck and following Ron.  He knew where we were going to meet our friends and family.  When I came around the corner I slipped on something and very quickly went down, hit my head.

BY MR. DRAHOS:

Q.   So when you said you were coming out onto that deck, where were you coming from?

A.   We were coming from -- I guess it's like a lobby area in between the dining area and the outer deck at Deck 9.  There's bathrooms and whatnot in there.

Q.   How many times had you been in that area -- that particular area of Deck 9 prior to this incident?

A.   I don't remember.

Q.   More than once?

A.   In that inner area maybe more than once.

Q.   How about the particular area --

A.   Where the bathrooms are.  I don't remember being on that deck except for that day.

Q.   So let me make sure I understand your testimony.  Are you saying that you were not on the port side of Deck 9 prior to the subject incident?

MR. GERSON:  Object to the form of the question.

Page 128

THE WITNESS:  I don't think so.

BY MR. DRAHOS:

Q.   So that --

A.   I don't remember.  I don't remember.

Q.   So --

A.   Which one is it?  I don't remember.

Q.   So you could have been?  You don't remember?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  Yeah.

BY MR. DRAHOS:

Q.   What time of the day was this?

A.   When the incident happened?

Q.   Yes, ma'am.

A.   I think it was in the afternoon.

Q.   What time in the afternoon?

A.   Like after lunch sometime.  I don't -- I'm not recollecting the time exactly.

Q.   So who did you eat lunch with?

A.   The group, the girls -- I believe I sat with the girls and Ron sat with the boys, the guys.

Q.   And you had told me, though, that you were following Ron to meet up with friends and family.

A.   Yeah.

Q.   At some point --

A.   Checks -- how do you say -- comes over and talks

Page 129

to me or wants me to follow him, yeah.

Q.   So at some point in time after the lunch did you separate from the rest of the group?

A.   We must have.

Q.   Where did the rest of the group go?

A.   Out on Deck 9 somewhere.

Q.   And where did you go?

A.   I think I might have stopped off at the bathroom.  Ron leaded for me and we came out there together.

Q.   All right.

A.   Because he knew where they were going to be, I guess.

Q.   So the entire group ate lunch.  You don't recall where, but you think it was a buffet; is that correct?

A.   Yes, I think it was a buffet.

Q.   All right.  The rest of the group left out to go onto Deck 9, correct?

A.   (Nodding head.)

Q.   Is that a yes?

A.   Yes.

Q.   And you went to go to the bathroom?

A.   I believe so.  I'm always going to the bathroom.

Q.   All right.  And so you didn't know where they were going on Deck 9, but Ron did?

A.   So I was following -- yeah.

Page 130

MR. GERSON: Object to the form of the question.

Mike, can you slow down, because I'm having a hard time hearing the deck words you're using.

BY MR. DRAHOS:

Q. What was the plan when you guys got together? What were you planning to do?

A. It seems like there was a plan to just meet up and talk about a plan, I guess. That's all I remember about that.

Q. So you were planning to meet somewhere on Deck 9 to talk about what you were going to do the rest of the day?

A. I think so, yeah. I think people were kind of doing their own thing.

Q. When you were following Ron were you following in his path?

A. Yes.

Q. Meaning --

MR. GERSON: Form.

BY MR. DRAHOS:

Q. -- you walked in the same path Ron did?

A. Yes.

MR. GERSON: Object to the form of the question.

BY MR. DRAHOS:

Q. Did you see Ron trip or slip prior to this

Page 131

incident?

A. No, no.

Q. Where were your eyes focused just prior to your fall?

A. I don't know that.

Q. Where should your eyes have been focused?

A. In front of me.

Q. In front of you where?

A. I saw the chairs that were there. I wanted to avoid those, and there was a pathway, and I could see Ron.

Q. Does Ron walk faster than you?

A. A little.

Q. Does that require you to pick up your pace in order to keep up with him?

A. I don't, though.

Q. How far ahead --

A. He takes bigger strides.

Q. How far ahead of you was Ron from you at the time you fell?

MR. GERSON: Object to the form of the question.

THE WITNESS: Not very far.

BY MR. DRAHOS:

Q. How many feet?

A. I could still see him. I don't know how many feet.

Page 132

Q. So is it your testimony that --

A. Six or seven. I don't know.

Q. Six or seven feet?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And so it's your testimony that prior to the fall you saw lounge chairs?

A. Yeah. There were rows of them.

Q. Okay. And you wanted to avoid them?

A. Yeah.

MR. GERSON: Object to the form of the question.

BY MR. DRAHOS:

Q. Why?

A. As to not trip on them.

Q. Was there --

A. It kind of looked hazardous a little bit.

Q. How?

A. Just the fact that there were a bunch of chairs there and we were expected to walk through lines of chairs.

Q. You were walking through the path that Ron set for you?

A. Yes, yes.

MR. GERSON: Object to the form of the question.

Page 133

BY MR. DRAHOS:

Q. So whatever direction Ron was going in, you were going to follow, correct?

A. Yes.

Q. Okay. And so as you approached these, as you've called them, bunch of chairs, they looked hazardous to you?

A. In that there were a lot of them.

Q. Anything else about them, other than that there was a lot of them?

MR. GERSON: Form.

THE WITNESS: No.

BY MR. DRAHOS:

Q. And it's your testimony that you wanted to avoid them?

A. Yes.

Q. Why?

A. I saw them.

Q. Why did you want to avoid them?

A. Because I didn't want to trip on them.

MR. GERSON: I'm having a hard time hearing.

THE WITNESS: And I didn't trip on them.

BY MR. DRAHOS:

Q. So you wanted to avoid them?

A. I fell into them.

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Jennifer Pell on 10/01/2021                                    Pages 134..137

Page 134

Q.   You wanted to avoid them because you didn't want to trip over them?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  Yeah.  There was not a real clear path, so I was looking at the chairs, yes.

BY MR. DRAHOS:

Q.   Did you tell Ron at any point in time to slow down?

A.   No.

Q.   Did you at any point in time tell him that you didn't like the path that he was taking that you were following?

A.   No.

Q.   Do you feel that the path he took was dangerous?

A.   No, not particularly.

Q.   Do you feel that the path that Ron took put you at a heightened risk?

A.   No.

Q.   So would you agree that if you tripped over those chairs and fell you're responsible for what happened?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  I would have had to see them, yes. I saw them and was being careful of them.

BY MR. DRAHOS:

Q.   And just like the two examples we talked about at

Page 135

Safeway and at the Ross stores, if you see something that could potentially be a risk you should avoid it, correct?

MR. GERSON:  Form.

THE WITNESS:  I didn't see the step as being hazardous, no, and the place where I parked at that time.

BY MR. DRAHOS:

Q.   Was there anything prior to the fall that prevented you from going in a different direction than the direction you went in?

A.   Too much chairs and people.

Q.   Okay.  Could you have gone a different way than the way you went?

MR. GERSON:  Form.

THE WITNESS:  No.

BY MR. DRAHOS:

Q.   You could not have gone a different way?

A.   I might have gotten lost.

Q.   Are you stating here that in order for you to go in the direction you were going in, the only way to go was to follow Ron's path?

A.   The way I saw it, yeah.  There were people coming and going, and he was taking the clear path.

Q.   Did you see the leg of the chair in front of you just before you fell?

A.   No.

Page 136

Q.   You did not?

A.   No.  Well, I mean, I know that they were there.

Q.   You knew that the leg of the chair was there, correct?

A.   I knew that the chairs were there.

MR. GERSON:  Form.

THE WITNESS:  I fell into the chairs.

BY MR. DRAHOS:

Q.   I understand, but as you were approaching the chairs you knew that they had legs to them, right?

A.   Yes.

Q.   And you knew where they were, correct?

A.   Yes, and I didn't see any leg, no.  There was no leg.

Q.   Were your eyes focused on the leg of the chair at the time you fell?

A.   I think so.  I think I was looking down.

Q.   You think you were looking down?

A.   (Nodding head.)

Q.   Yes?

A.   Yes.

Q.   And would you agree that looking down in the direction of the leg of those chairs would have been the safest way to navigate through that area?

MR. GERSON:  Object to the form of the question.

Page 137

THE WITNESS:  That's the only way there was is through the chairs.

BY MR. DRAHOS:

Q.   And as you were approaching that area and walking through those chairs and recognizing that you had to avoid them, wouldn't you agree that the safest way to navigate through that area would have been to look down at the leg of those chairs as you were approaching them?

A.   Yes, I believe I did.

MR. GERSON:  Object to the form of the question.

BY MR. DRAHOS:

Q.   And if you didn't, would you agree you weren't being careful?

MR. GERSON:  Form.

THE WITNESS:  I don't think it was that I wasn't careful that it happened, no.  I wouldn't agree to that.

BY MR. DRAHOS:

Q.   Have you ever told anyone that you fell because you tripped on the chair?

A.   I don't remember that.  I don't remember that.

Q.   As you sit here today, do you think you fell because you tripped over the leg of the chair?

MR. GERSON:  Form.

THE WITNESS:  I may not have realized at that time that that's what happened or that that didn't happen.

Page 138

BY MR. DRAHOS:

Q.   As you sit here today, have you come to the realization that you fell because you tripped over the leg of the chair?

A.   No.

MR. GERSON:  Object to the form of the question.

BY MR. DRAHOS:

Q.   So is it your statement here under oath that you did not fall because you tripped on the chair?

A.   I did not fall because I tripped, no.  I felt my feet go out -- slip out underneath me, and I fell sideways or forward into the chairs.  I wasn't that close to the chairs.  It was a big enough area to get through the chairs, I thought.

Q.   So you thought the chairs were situated far enough apart to be able to walk through them?

A.   Yes.

MR. GERSON:  Object to the form of the question. That's not what she said.

BY MR. DRAHOS:

Q.   So it's your testimony that you felt your feet slip underneath you?

A.   Yes.

Q.   Do you know what caused your feet to slip underneath you?

Page 139

A.   Something slippery.

Q.   What specifically?

A.   I don't know.

Q.   Did you see anything on the floor just prior to falling?

A.   No, I didn't see anything.  Otherwise, it wouldn't have happened.

Q.   Did you see anything on the floor after you fell?

A.   I should have been looking at the floor, but I don't think I was.

Q.   And so did you see anything on the floor after you fell?

A.   That would be a no.

MR. GERSON:  Form.

BY MR. DRAHOS:

Q.   Did you notice anything on your clothing or on your shoes after the fall?

MR. GERSON:  Form.

THE WITNESS:  As I sat there a while I think I felt wet is all I remember.

BY MR. DRAHOS:

Q.   Wet where?

A.   Where I was sitting or laying.

Q.   Where on your body?

A.   On my pants, on my legs.

Page 140

Q.   On your pant legs?

A.   Yeah, my back side maybe.

MR. GERSON:  For the record, the witness is referring to her right top portion of her thigh.

MR. DRAHOS:  I was going to ask that question, Nick.  Thank you.

Q.   So where specifically on your pant legs do you claim you felt wet?

A.   As I was sitting there I don't really remember what my position was.

Q.   So does that mean you don't remember where specifically on your pant legs you were wet?

A.   I just felt wet.

Q.   Okay.  But this is the one and only time I get to ask you these questions.

A.   I'm sorry.

Q.   My question is are you able to tell me where specifically you felt wet on your pants?

A.   No, I'm not able to tell you that.

Q.   Do you know where that wetness came from?

A.   Pardon me?

Q.   The wetness that you felt on your legs, do you know where it came from, the source?

A.   I figured it was the floor.

Q.   Do you know that for sure?

Page 141

A.   No.  What do you mean?

MR. DRAHOS:  What was the answer?

(The record was read back.)

BY MR. DRAHOS:

Q.   Do you know for sure that the wetness you felt on your legs came from the floor?

A.   It must have.

Q.   Are you guessing?

MR. GERSON:  Form.

THE WITNESS:  It did.

BY MR. DRAHOS:

Q.   How do you know that?

A.   It was pretty wet.

Q.   Okay.  If you didn't see anything on the floor before and you didn't see anything on the floor after, how do you know that the wetness on your legs came from the floor?

A.   Because I (inaudible).

(Reporter clarification.)

THE WITNESS:  Because I felt it, and it was where I was on the floor.

BY MR. DRAHOS:

Q.   So you felt it while you were sitting on the chair, correct?

MR. GERSON:  No.  Don't put words in her mouth,

## JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
### Jennifer Pell on 10/01/2021
**Pages 142..145**

Page 142

Michael.  That's not what she said.

MR. DRAHOS:  It's a follow-up question, Nick.

MR. GERSON:  I'd appreciate it if you --

MR. DRAHOS:  Just object to the form.  Object to the form, and if you don't like the way I ask it the question will get thrown it later.

MR. GERSON:  She just said it, and you're twisting her words.

BY MR. DRAHOS:

Q.  You felt the wetness while you were sitting on the chair, correct?

MR. GERSON:  Form.

THE WITNESS:  Also, yes, but it didn't come from the chair.

BY MR. DRAHOS:

Q.  Did you tell anybody that you felt wet on your pants?

A.  I don't recall.

Q.  Are there any pictures of your pants that are wet?

A.  I don't think so.

Q.  Did you take any pictures of the floor?

A.  (Shaking head.)

Q.  Is that a no?

A.  No, I didn't take any pictures.

Page 143

Q.  Did anyone else make any statements on the scene that they had noticed that your pants were wet?

A.  Not that I recall.  I didn't talk to people.  I didn't hear anything anybody was saying.

Q.  So does that then mean -- let me just ask the question.  Did you hear anyone on the scene say anything as to what they thought caused you to fall?

A.  No.

Q.  Did you hear anyone say that they saw you fall?

A.  No.

Q.  Did your husband see you fall?

A.  No.

Q.  Why not?

A.  Well, he kept going, I guess.  He didn't know I fell.  I guess he didn't hear me or ...

Q.  He was ahead and he continued walking?

A.  Correct.

Q.  Did you lose consciousness at any point in time following the fall?

A.  I may have, because I don't remember a lot.

Q.  On Deck 9 immediately following the fall did you lose consciousness at any point?

A.  I don't think so, but I might -- I was in and out of bewilderment, not registering much.

Q.  Did you experience any seizures while on Deck 9?

Page 144

A.  No.  I don't remember a seizure, but apparently I had one.

Q.  What makes you say that?

A.  It was -- I had to ask some questions just because of my curious nature, because I don't remember anything.

Q.  Okay.

A.  In the hospital I had.

Q.  In the hospital you had a seizure?

A.  The first hospital, yes.

Q.  Okay.  But the question that I had was -- or that I had asked you was on Deck 9 did you have any seizures?

A.  No.

Q.  And you said, "I had to ask because of my curious nature."  Who did you ask?

A.  My husband.  He was with me when I had that one.

Q.  When did you ask him?

A.  I don't know.  A while back.

Q.  When is it that he told you you had a seizure?

A.  I think he offered, actually.

Q.  Your husband --

A.  I don't know at what point he did it, but he probably didn't want to scare me too much, so he didn't tell me very much.  He waited for me to ask things.

Q.  When is it that your -- when specifically did

Page 145

your husband tell you you had had this seizure?

A.  I don't recall that specifically.

Q.  Let me make sure that I ask that question clearly.  When your husband told you that you had a seizure, what point in time did he tell you the seizure was?

A.  Oh, in the hospital while I was waiting to be seen.

Q.  In what hospital?

A.  The one in Texas there in Galveston, right nearby.

Q.  So your husband told you that while you were waiting to be seen at the hospital in Texas you had a seizure?

A.  Yes.

Q.  Did he tell any of your health care providers that?

A.  Oh, yes.  He had to get somebody right away, because there was just me and him, I guess.

Q.  How long were you on -- strike that.  Did you require assistance to get up from the floor after you fell?

A.  Yes.

Q.  Who helped you up?

A.  All I remember is Ron being there, and I don't

Page 146

remember.  There might have been someone else.  Maybe a pool -- somebody that was out -- a lifeguard person or something.

Q.   How long were you on the floor for before someone helped you up?

A.   Seems like a long time.  I don't know.  My guess of time is not real good.

Q.   And when you were helped up where were you taken?

A.   They helped me up into a chair.

Q.   A lounge chair?

A.   Yeah, back -- right back somewhere of where I fell.

Q.   And how long were you in that chair for before medical attention arrived?

A.   I don't remember.

Q.   Did you vomit?

A.   Seems like for a while.  I vaguely remember that.

Q.   How long were you sitting in the chair for before you vomited?

A.   I don't know.  I think maybe right away.

Q.   How many times did you vomit while up on Deck 9?

A.   I don't remember that.

Q.   Did you request medical attention?  Did you request medical attention?

A.   You mean like somebody helping me?

Page 147

Q.   Yes.

A.   I don't remember that.

Q.   Did someone from the ship's medical staff arrive on scene?

A.   I think so, but I don't remember.

Q.   Do you know how it came to be that that person learned of your circumstance?

A.   No.  Maybe somebody told.

Q.   Do you recall the interaction between yourself and this medical staff member?

A.   No.

Q.   Did anyone from the ship's security staff come and question you about what happened while you were on Deck 9?

A.   I don't remember anybody doing that.

Q.   And you were taken from Deck 9 down to the ship's medical center?

A.   I don't even remember that.

Q.   Do you recall being in the ship's medical center?

A.   Vaguely.

Q.   All right.

A.   I don't remember talking to people --

Q.   So --

A.   -- people talking to me.

Q.   If, according to the notes that were written by

Page 148

the ship's nurse, you specifically denied losing consciousness at any point in time, as you sit here today, are you in any position to agree or disagree with the accuracy of that note?

A.   I think that's accurate.

Q.   Okay.  And did you also tell the ship's physician that you did not lose consciousness at any point in time?

A.   I don't remember that.

Q.   If, according to the ship's doctor, it's written in his note that you told him that, that you did not lose consciousness at any point in time, are you in a position here today to say whether or not that note is accurate or inaccurate?

A.   It's probably that part is accurate.

Q.   Do you know that your blood sugar was 212 when taken to the ship's medical center?

A.   No.

MR. GERSON:  Form.

BY MR. DRAHOS:

Q.   Is that abnormally high for you?

A.   A little bit.

MR. GERSON:  Form.

BY MR. DRAHOS:

Q.   Would you agree it's higher than it should be?

A.   Probably.

Page 149

MR. GERSON:  Form.

BY MR. DRAHOS:

Q.   Did anyone from the ship's security staff come and interview you about what had happened while you were in the ship's medical center?

A.   I don't remember that.

Q.   Do you remember giving a statement to anyone affiliated with Royal Caribbean about what had happened?

A.   No.

Q.   Did you fill out an injury statement?

A.   (Shaking head.)

Q.   Is that a no?

A.   No.  I don't remember.

Q.   Can you turn your attention back to composite Exhibit E for me, please.

MR. GERSON:  Did you say E?

MR. DRAHOS:  E like echo.

MR. GERSON:  Okay.  Thank you.

BY MR. DRAHOS:

Q.   If, according to the ship's records, you were taken off of the vessel at 3:39 p.m., do you have any reason to dispute the accuracy of that?

A.   No, I just don't remember when.

Q.   Would you agree that you were taken off of the ship conscious and alert?

**Page 150**

MR. GERSON:  Form.

THE WITNESS:  I don't remember.  Would I agree?  No.

BY MR. DRAHOS:

Q.  Do you think you lost consciousness at some point in time while you were on the ship?

A.  No.

Q.  And are you saying you weren't alert at the time you were taken off?

A.  I wasn't as alert as before the fall.

Q.  Did you know where you were?

A.  I don't think I even know where I was.

MR. GERSON:  Form.

BY MR. DRAHOS:

Q.  And you were taken by ambulance to UTMB hospital, correct?

A.  Yes.  I don't remember that even.

Q.  Were you conscious?

A.  I was conscious, I think, but I was maybe sleepy and maybe had eyes closed.

Q.  So was it -- sorry.

A.  I didn't know what was going on.

Q.  So is it your testimony that you were not alert during the transport?

A.  I wasn't as alert, no.

**Page 151**

Q.  When you arrived to UTMB were you conscious?

A.  I don't remember that either.

Q.  Were you alert?

A.  I don't remember.

MR. GERSON:  Form.

BY MR. DRAHOS:

Q.  Were you capable of speaking?

A.  I don't remember that either.

Q.  Does that mean you weren't able to or you just don't remember one way or another?

A.  Ask me that again.

Q.  Sure.  I asked you if you were alert at the time you arrived to UTMB.  You said, "I don't remember," so I'm trying to understand what that means.  Are you saying you weren't alert or you're saying you don't remember whether you were alert or not?

A.  I don't think I was alert, I guess.  It kind of has complication, that question.

Q.  When you arrived to UTMB were you capable of speaking?

A.  I don't remember.

Q.  So is it fair to say that your memory of what was going on during this particular time period is not all that reliable?

A.  It's not that good.

**Page 152**

MR. GERSON:  Object to the form.

MR. DRAHOS:  What am I on?  G maybe?

THE DEPOSITION REPORTER:  I can't tell if I'm not marking.

MR. DRAHOS:  What was that one?  That's F, so I'm on G.

THE WITNESS:  The pictures?

MR. DRAHOS:  This next one is going to be --

MR. GERSON:  Hold on a second.  Are you referring to a different exhibit now?

MR. DRAHOS:  I'm about ready to put a sticker on an exhibit, and I needed to know where I was at.  I haven't given her anything yet.

MR. GERSON:  Okay.

(Defendant's Exhibit G was marked for identification.)

BY MR. DRAHOS:

Q.  Ma'am, do you remember about a half-hour ago I had asked you whether or not you had ever told anyone that you fell because you tripped over the chair?  Do you remember that line of questioning?

A.  Yes, I remember the line.

Q.  And I had asked you whether or not you had ever told anybody that before, and you told me you didn't remember.

**Page 153**

A.  I don't remember.

Q.  Okay.  So is it possible, as you sit here today, that you did tell somebody that?

MR. GERSON:  Object to the form of the question.

THE WITNESS:  I don't know.

BY MR. DRAHOS:

Q.  Do you think -- strike that.

I'm going to hand you what we're going to mark as Exhibit G.  This is a one-page document from UTMB dated January 16th, 2020, and I'd like you to turn your attention to a note written by Nurse Scarlett Butler at 4:04 p.m.

MR. GERSON:  Can I see a copy of that.

MR. DRAHOS:  It's been e-mailed to you.

MR. GERSON:  Okay.  And for the record, this is one page out of how many pages of documents?

MR. DRAHOS:  I don't know the number of documents, but it's an exhibit that I'm using in this deposition.

MR. GERSON:  Okay.  I'd just like to point out for the record that this is --

MR. DRAHOS:  I don't think you need to point that out right now.

MR. GERSON:  -- one of a thousand pages.

MR. DRAHOS:  Okay.  Well, you can make that

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Jennifer Pell on 10/01/2021                              Pages 154..157

Page 154

argument later.  Do you have it?  Nick, do you have it?

MR. GERSON:  I'm looking right here.  This is page -- page 16, it says.

MR. DRAHOS:  Yes, Exhibit G.

Q.   Ms. Pell, do you see the note written by Scarlett Butler at 4:04 wherein it states "Jennifer Pell is a 68 year old female presents by EMS from mechanical fall. Patient reports she tripped on chair and fell, landing on face."  Do you see that there?

A.   Yes.

MR. GERSON:  Object to the form of the question.

BY MR. DRAHOS:

Q.   As you sit here today, given that your memory is not that good as relates to what you said on that particular day, are you in a position to dispute Nurse Butler's report that you told her that?

A.   I don't remember that.

Q.   You don't remember saying it?

A.   I don't remember any of this.

Q.   So it's possible then, you would agree, that on January 16th, 2020 --

MR. GERSON:  Object to the --

(Overlapping voices.)

MR. DRAHOS:  Let me finish the question.

Q.   That on January 16th, 2020, at 4:04 p.m. you told

Page 155

Scarlett Butler that you tripped on a chair and fell, landing on your face?

A.   I think I --

MR. GERSON:  Object to the form of the question.

THE WITNESS:  I think I used a wrong description, wrong words.

BY MR. DRAHOS:

Q.   Okay.

A.   But I don't remember it at all.

Q.   After you got off the Enchantment of the Seas did you have any further discussions with anyone at Royal Caribbean?

A.   I don't -- no, I didn't, not that I can recall.

Q.   According to the records we've received in the case, you received medical treatment at UTMB from January 16th of 2020 until January 29th of 2020?

A.   If that's in the record that sounds like that might be.

Q.   And following your treatment at UT --

A.   Is it about --

MR. GERSON:  Hold on a second.

MR. DRAHOS:  I'm sorry?

MR. GERSON:  I'm not sure what's going on.  Is there a question or answer or both?

///

Page 156

BY MR. DRAHOS:

Q.   So the dates were January 16th of 2020 through January 29th of 2020.

A.   Sounds about right.

Q.   Okay.  And from the point of discharge at UTMB on January 29th you were taken to PAM Clear Lake Rehab?

A.   That sounds about right, too.

Q.   Okay.  And you received treatment at PAM Clear Lake Rehab from January 29th of 2020 through February 12th of 2020?

A.   That sounds right, too.

Q.   Okay.  And when you were discharged from PAM Clear Lake Rehab did you go directly home to California?

A.   Yes.

Q.   All right.  And you told me earlier that the doctors didn't want you to fly home; is that right?

A.   Right.

Q.   How did you get home?

A.   So I had to have a walker.

Q.   Okay.

A.   So Ron went and bought me a walker.

Q.   But what -- what mode of transportation --

A.   Oh, car.

(Overlapping voices.
Reporter admonition.)

Page 157

BY MR. DRAHOS:

Q.   What mode of transportation did you take to get home?  You said car?

A.   Yes, rented car.

Q.   By the way, your group of friends and family members who were on this cruise with you, did they at any point in time come over to the scene of where this incident occurred while you were still there at the scene?

A.   Only one I remember seeing is -- it's because I have spent a length of time with her while I was injured there -- my sister-in-law's friend Jeane.

Q.   Jeane is the only one you remember being on scene there with you?

A.   Yes.  She stayed with me while Ron and Beth went up to our room to pack all our stuff up, because I was going to the hospital.

Q.   And what about when you were in the medical center?  Do you recall anyone from your group being in the medical center with you?

A.   No, I don't remember that unless -- well, I don't remember.

Q.   And how about when you got off the ship?  Did anyone from your group get off the ship as well and accompany you to UTMB, or did they stay on the cruise?

A.   They stayed on the ship.

Page 158

Q.   All of them?

A.   Yes.

Q.   So when you left PAM Clear Lake Rehab did you go straight to California, or did you stop anywhere along the way?

A.   Well, to eat and stay it took several days.

Q.   I understand.  What I meant was did you seek any medical care at any point in time from the time you left PAM Clear Lake Rehab until the time you arrived home in California?

A.   No, no medical care.

Q.   And did you go directly to your house?

A.   I believe so.  We'd been away for a month, it seems like.

Q.   Okay.  Did you receive any further inpatient rehab in California on your return home, meaning did you check yourself into any facilities for further care?

A.   I think I was told to go see the doctor.

Q.   Told to go see what doctor?

A.   I don't remember that.

Q.   Okay.

A.   I don't know how soon we did that.  We just went home.

Q.   You went home.  Do you recall what day it was that you arrived home?

Page 159

A.   No.  Seems like we were three or four days driving.

Q.   And how soon after you arrived home did you go see your first health care provider?

A.   I don't recall that either.

Q.   Who was --

A.   There were so many visits.

Q.   Who was the --

A.   It was the first type of doctor.

Q.   Who was the first person that you saw?

A.   Maybe my primary care doctor, maybe -- I saw a doctor -- a neurologist, I believe, a man.

Q.   Would that have been Dr. Ansari, A-n-s-a-r-i?

A.   I believe so.

Q.   He was the first person that you saw?

A.   I'm not sure.

Q.   Was this --

A.   We were told to go see him.

Q.   Okay.  Was this an appointment that was made, or did you appear for treatment unannounced?

A.   I think it was an appointment that might have even been called for as follow-up.  I don't remember that part.

Q.   And is Dr. Ansari affiliated with Kaiser Permanente as well?

Page 160

A.   Yes.

Q.   And to make this as simple as I can, when you returned home to California did you receive any medical care for your condition anywhere else other than at Kaiser Permanente?

A.   No.

Q.   Was all of the treatment that you received upon your return home to California on an outpatient basis?

A.   Yes.

Q.   Do you know why it was you went to see Dr. May Jung Kim in November of 2020?

A.   It was about -- I was advised by one of my sisters that I should go see someone to change the medication, that I was becoming more depressed, and so I think that's why I went.

Q.   Okay.

A.   My doctor may have advised that also.

Q.   So --

A.   She said it was up to me.

Q.   Who is "she"?

A.   My doctor.  She was female, my primary care doctor.

Q.   What was your understanding of what the purpose was for you to see Dr. Kim?

A.   Actually, I think she was after I talked to a man

Page 161

who was -- I have that list.  She was the second person I saw in the psychology part of what I was doing with my medication and my depression.

Q.   So you understand that Dr. Kim is a neuropsychologist, correct?

A.   Right.  I read that.  I just saw that again when I was looking for her name.

Q.   All right.

A.   I don't know where -- oh, here.

Q.   So --

A.   This is the list.

Q.   Are you aware of what Dr. Kim's findings were following her assessment of you?

A.   Not really aware.

Q.   Have you ever read the report that Dr. Kim wrote regarding her assessment of you?

A.   I probably did a while ago.

Q.   Are you aware of the fact that Dr. Kim concluded that you appeared to have made a, quote, "substantial gain in cognitive functioning as most of the cognitive domains were largely within normal limits"?  Are you aware that was Dr. Kim's finding?

A.   Not really.

Q.   Are you aware that Dr. --

A.   She didn't want to see me unless I wanted to see

Page 162

her.

Q.   Are you aware that Dr. Kim concluded that your memory was an area of strength for you?

A.   No, I don't remember --

MR. GERSON:  Form.

THE WITNESS:  -- her saying that.

BY MR. DRAHOS:

Q.   And are you aware that it was Dr. Kim's conclusion -- and I'll quote directly -- "Fortunately I do not discern evidence of a neurodegenerative disease," end quote?  Were you aware that that was Dr. Kim's conclusion following her assessment of you?

A.   Probably, yeah.

Q.   Were you happy to hear that?

A.   Yeah, I was happy to hear that she felt like I was doing okay.  We didn't get into a lot of stuff or anything, so I -- and it was a ways away from that other thing you had me read with my primary care doctor back in -- I get confused with all the doctors that I've had.

Q.   So it was your testimony a moment ago that Dr. Kim was willing to see you if you wanted to see her?

A.   Yes.

Q.   Did you ever see her again after this assessment?

A.   No.

Q.   Why not?

Page 163

A.   I was just probably tired of talking to people and doctors.  I wanted to just see how I could do on my own.

Q.   Have you had any further neuropsychological testing done after this test with Dr. Kim?

A.   I don't think so.

Q.   Why not?

A.   Well, I think I'm getting better.  There are still some issues I'm not sure about.

Q.   Like what?

A.   Feelings in my head.

Q.   What kind of feelings?

A.   Aches and some headaches.

Q.   Have you been to see anyone specifically for those aches and headaches?

A.   No, not yet.

Q.   Why not?

A.   They've been mild, and I've been able to relieve them just by paying attention to my body.

Q.   Other than these aches and headaches in your head, are there any other issues that you're not sure about?

MR. GERSON:  Form.

THE WITNESS:  I'm not sure how things are going to heal on my head, and I have different sensations.  In

Page 164

the beginning I had some sharp pains that I couldn't explain, which is probably why I saw more doctors earlier.

BY MR. DRAHOS:

Q.   So these sharp pains, have they gone away?

A.   For the most part, I think.  Every once in a while the places where I had incisions to the skull and everything are, like, sore and ache.

Q.   When you say, "every once in a while," when is the last time you felt this sensation?

A.   At night mainly when I'm trying to sleep, because I'm laying on -- pressure to -- any pressure to my head, sometimes I have to take this off.

Q.   That's a headband?

A.   Yeah.

Q.   You've been wearing that headband the entirety of the day today, have you not?

A.   Not the entirety.  On the way over here -- I didn't want to get any headaches, so I didn't wear it for a while.

Q.   But would you agree that from the time of this deposition until the present moment you've been wearing that headband?

A.   I think I have.  I've been mostly trying to focus on other things, questions and whatnot.

Q.   So any other feelings in the head that we haven't

Page 165

talked about yet?

MR. GERSON:  Form.

THE WITNESS:  I don't think so.

BY MR. DRAHOS:

Q.   And would you agree that none of these feelings have been of such a degree that you've gone to specifically seek treatment for them?

A.   No.  They have been not as great as they were before.

Q.   Are there any other issues that you're not sure about?

A.   Well, sometimes focusing on different things is hard.

Q.   Can you give me an example?

A.   And sometimes I find myself, like, zoning out. Well, when we're driving in the car I am not paying attention to that, I guess, because I'm not driving.

Q.   Do you still drive?

A.   A little.

Q.   When you say "a little," when is the last time you drove a car?

A.   Maybe a couple weeks ago.

Q.   Where did you go?

A.   Someplace -- I can't remember specifically. Maybe the dollar store or something like that, someplace

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Jennifer Pell on 10/01/2021                              Pages 166..169

**Page 166**

real close to where I live.

Q.   Did you go alone?

A.   I think so.

Q.   So no one has -- there hasn't been a medical provider who has --

A.   Told me I can't --

Q.   -- told you you can't drive?

A.   (Shaking head.)

Q.   Are there any other -- strike that.
     Are there any physical limitations that you experience today that you're attributing to this incident?

A.   The slower moving around, because I'm dizzy and -- not real dizzy, but I'm not walking -- I tend to sway from side to side, so I think my balance is off.

Q.   Have you sought any treatment for that?

A.   I did some physical therapy, I think, to help for a few weeks or several months back.

Q.   Where did you go?

A.   To Kaiser again.

Q.   And this was specifically to help you with this swaying?

A.   With balance.  Balance mainly.

Q.   And did you improve?

A.   I think that I did, but it seems like I've gone back for some reason.

**Page 167**

Q.   Do you have any pending appointments to return?

A.   No.

Q.   Why not?

A.   I've been thinking I might go.

Q.   But the situation has not reached a degree to which you felt you had to go there?

A.   Yeah.  I'm just cautious.

Q.   Any other physical limitations?

A.   I don't think so.

Q.   Is there anything else about this case, now having spent the entire day together, a question I've asked or something that's on your mind that you think it would be important for me to know when I'm evaluating this case and reporting to my client?

A.   Well, because I didn't see the warnings maybe they're not where they should be if they're important at all, and I guess they are to some people particularly, but I felt like I was being cautious and thinking about what I was doing and alert and everything, and I still feel that the whole situation out there was kind of hazardous with all the people and all the chairs, and the fact that there is at times water on the deck, I'm wondering if they should have somebody out there mopping up more or something, since it was water back there that I slipped on or whatever it was.

**Page 168**

Q.   What was the weather like that particular day while you were out there on Deck 9?

A.   It was foggy.

Q.   Were you able to see?

A.   A ways in front of me, yeah.  It wasn't -- I mean, it wasn't too foggy, but it was foggy, so there was, like, moisture out there, I guess, in the air.

Q.   Was it foggy to such a degree, though, that you were not capable of seeing what was in front of you?

A.   No.

     MR. GERSON:  Form.

BY MR. DRAHOS:

Q.   You could see what was in front of you?

A.   (Nodding head.)

Q.   Yes?

A.   Yes, I could see what was in front of me.

     MR. DRAHOS:  All right.  Thank you.  Those are all the questions that I have.

     THE WITNESS:  Okay.  Thank you, too.

     THE DEPOSITION REPORTER:  Mr. Gerson, do you have any questions?

     MR. GERSON:  No.

     THE DEPOSITION REPORTER:  Would you like to order the transcript?

     MR. GERSON:  We'll read.

**Page 169**

     THE DEPOSITION REPORTER:  Would you like to purchase a copy of the transcript?

     MR. GERSON:  I'm not ordering it.

     (Discussion was held off the record.)

     MR. GERSON:  E-Tran only, please.

     (The deposition of Jennifer Pell
          concluded at 2:55 p.m.)

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Jennifer Pell on 10/01/2021                                    **Pages 170..172**

**Page 170**

--oOo--

I do solemnly declare under penalty of perjury, under the laws of the State of California, that the foregoing is my deposition under oath; that these are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this _____ day of _____, 20_____.

_____
JENNIFER PELL

**Page 171**

CERTIFICATE OF REPORTER

I, HEATHER M. LOFHOLM, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition, JENNIFER PELL, was by me duly administered an oath in accordance with CCP Section 2025 to tell the truth, the whole truth and nothing but the truth in the within-entitled cause; that the testimony of said witness was taken down in shorthand by me, a Certified Shorthand Reporter and disinterested person, at the time and place herein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the outcome of this cause, and that I am not related to any of the parties thereto.

I hereto declare under penalty of perjury that the foregoing is true and correct.  I have hereunto set my hand on October 16, 2021.

_____
Heather M. Lofholm, CSR No. 11570

**Page 172**

CHANGES AND SIGNATURE
WITNESS NAME: Jennifer Pell, 10/01/2021
PAGE    LINE    CHANGE            REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I, Jennifer Pell, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted above.

_____
Jennifer Pell

Sworn to and Subscribed before me
_____, Notary Public.
This_____day of _____, 20____.
My Commission Expires:

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
*Jennifer Pell on 10/01/2021*                          **Index: 1..2020**

|  |  |  |  |
|---|---|---|---|
| **Exhibits** | **1** | 107:24<br>122:18<br>124:7<br>153:10<br>154:21,25<br>155:16<br>156:2 | **2007**  39:19<br>  41:15 |
| **PellJ A**  4:4<br>  5:10 30:17<br>  31:7,19<br>  39:24 40:3<br>  83:3 | **1**  5:1 51:17<br>  58:17<br><br>**10**  58:6<br><br>**10:00**  122:13 | | **2009**  42:19<br><br>**2011**  42:24<br><br>**2013**  45:5<br>  49:7 50:20<br>  51:2,19,23<br>  52:13,22<br>  53:4,13,21<br>  54:2,8<br>  55:2,6,19<br>  56:21<br>  57:16,22 |
| **PellJ B**  4:5<br>  48:15<br>  49:1,3<br>  50:16<br>  52:8,15<br>  54:19 56:3<br>  57:5 | **10:11**  5:2<br><br>**12**  31:12<br>  32:5,19,22<br>  33:4<br><br>**12th**  8:9<br>  156:9 | **17-year-old**<br>  25:6<br><br>**1951**  8:9<br><br>**1969**  15:4,6<br><br>**1972**  8:16,<br>  17 15:3 | |
| **PellJ C**  4:6<br>  58:1,2,5,<br>  13,17 59:9<br><br>**PellJ D**  4:7<br>  65:18,22<br>  66:13 67:4 | **13**  40:9,10,<br>  11,17<br><br>**15**  49:7<br>  53:21 54:2<br><br>**15th**  50:20<br>  51:2,19<br>  52:13,22<br>  53:4,13<br>  54:8 55:2,<br>  6,19 57:16<br>  87:24 92:2<br>  101:21<br>  102:4<br>  104:15<br>  105:10,14,<br>  20,22<br>  106:3,16<br>  121:20<br>  122:2<br>  123:15 | **1987**  20:2<br><br>**1992**  20:2<br><br>**1993**  20:5<br><br>**19th**  75:3<br>  76:1 | **2014**  35:10,<br>  15 36:24<br>  58:6 60:25<br><br>**2018**  46:9,<br>  14 47:11<br>  64:11,21<br><br>**2019**  64:18<br>  65:23<br>  66:8,13,<br>  19,22 67:1<br>  69:14<br>  74:21 75:3<br>  76:1 |
| **PellJ E**  4:8<br>  101:9,10,<br>  16 149:15<br><br>**PellJ F**  4:9<br>  108:19,23<br>  109:5,9,18<br>  110:2,16<br>  112:14<br><br>**PellJ G**  4:10<br>  152:15<br>  153:9<br>  154:4 | | **2**<br><br>**2**  45:5,8<br>  47:17<br>  54:23,24<br>  55:10<br><br>**20**  27:13,15<br>  35:20<br>  36:18,23<br><br>**2000**  35:13<br><br>**2000-something**<br>  73:17<br><br>**2006**  34:2<br>  35:2 | **2020**  10:25<br>  11:4 12:9<br>  29:8 34:10<br>  37:11<br>  43:16 45:9<br>  46:6,19<br>  52:2,9<br>  87:25 92:2<br>  101:21<br>  102:4 |
| | **16**  154:3<br><br>**16th**  52:2,9 | | |

104:6
105:10
107:24
124:25
125:2,9
153:10
154:21,25
155:16
156:2,3,9,
10 160:11

**2021** 5:1
29:3,7,9
31:9

**2025** 5:8

**21** 29:5,6

**212** 148:15

**24** 84:5,11

**240** 112:15,
22 113:24

**241** 114:12,
15,24
115:4,16

**247** 115:23
116:19

**28** 8:17

**28th** 8:16

**29** 31:9

**29th** 155:16
156:3,6,9

**2:55** 169:7

---

**3**

**3** 57:4,5,7
101:20
114:16,17

**30** 12:16

**31st** 65:23
66:13
69:14
74:20

**3:39** 149:21

---

**4**

**4** 56:15
59:18 83:6

**40** 60:3,6,
8,14 84:6,
7

**43** 11:13

**45** 17:11

**4:04** 153:12
154:6,25

---

**5**

**5** 83:5,11,
21 84:5

**500** 84:7

**550** 5:3

**555** 5:3

---

**6**

**62** 38:8

**65** 38:8

**68** 154:7

---

**7**

**7** 32:5

**7249** 9:1,4
10:7

**7:18** 102:8,
11,17

---

**9**

**9** 105:10,19
126:23
127:13,15,
24 129:6,
17,24
130:10
143:21,25
144:12
146:21
147:14,16
168:2

**92** 19:20

**93** 19:21

**9:00** 122:13

---

**A**

**A-N-S-A-R-I**
159:13

**a.m.** 5:2

**abdominal**
44:1
92:19,23
93:2,18

**ability**
83:15

**abnormally**
148:20

**abroad** 20:19

**access** 72:13

**accident**
34:23
41:6,9
70:5 86:15
106:7,8,
11,16

**accompany**
157:24

**accordance**
5:8 84:4

**accounts**
22:25

**accuracy**
35:3 54:18
58:20
148:4
149:22

**accurate**
18:22
59:13
148:5,12,
14

ache 164:7

aches 163:13,15, 20

acres 21:8

activities 122:23

acute 64:14

additional 14:7

additionally 35:9

address 8:20,22 9:19

addresses 40:18

adhesions 93:21

administered 5:8

admitted 54:7 79:15 80:16

admonition 15:19 47:2 68:21 91:3 111:5 116:16 156:25

advise 44:17

advised 160:12,17

affiliated 95:1 149:8 159:24

afternoon 128:14,15

aging 23:18

agree 41:2 46:2,4 70:10,24 71:22 72:19 76:9 77:3,15,19 106:19 107:11 115:18 116:2 118:9,14, 15 119:7, 16,18 121:14 125:5,23 134:19 136:22 137:6,12, 16 148:3, 24 149:24 150:2 154:20 164:20 165:5

agreed 61:4, 5,10 102:5

ahead 23:10 32:9 56:15 76:20 119:25

120:12 131:16,18 143:16

air 168:7

Alaska 85:8, 22

alert 149:25 150:8,10, 23,25 151:3,12, 15,16,17 167:19

altogether 76:17 77:4 78:19

ambulance 150:15

amount 60:2, 5

Anne 17:17

Ansari 159:13,24

answering 6:21 83:12

answers 30:12,16, 24 31:8 32:2 33:5 40:4 58:18,21 59:12 83:3

antidepressant s 27:13

anxieties

34:20

anxiety 34:2,6,8, 10,14,17 35:2

anyplace 81:6

aorta 64:22, 25 65:3

aortic 65:2

apnea 42:23 43:2,8,20 44:25

apparently 115:9 144:1

appeared 5:5 161:19

appearing 6:1

appears 112:23

appointment 29:24,25 56:5 159:19,21

appointments 95:17 167:1

approach 77:7

approached 133:5

approaching
  136:9
  137:4,8

approximately
  8:13 9:10
  64:18
  97:24
  120:19

April  58:6

area  12:13,
  18,24
  18:20
  19:12 22:9
  23:22
  36:17
  38:20
  71:17
  72:17,20
  73:1 76:17
  77:20
  82:18 83:1
  93:21
  94:18
  96:20
  115:19
  120:14
  127:12,14,
  15,18,19
  136:24
  137:4,7
  138:13
  162:3

areas  44:7
  72:10
  77:16

argument

154:1

arrive
  102:20
  103:11
  147:3

arrived
  103:9
  146:14
  151:1,13,
  19 158:9,
  25 159:3

arteries
  42:13,14

arts  14:21,
  25 16:11

asks  40:17

asleep  51:10
  53:14 55:5

aspect  106:3

assessment
  98:1
  100:16
  161:13,16
  162:12,23

Assessment/
plan  57:8

assistance
  22:23
  145:21

assistant
  19:17 20:7

assistive
  91:17 92:3
  100:17

associate's
  14:14

ate  129:13

atherosclerosi
s  64:22

attempted
  104:4

attempting
  67:21
  118:4

attention
  31:12 32:4
  40:8 50:18
  55:15,22
  56:2 57:4
  58:16
  59:18
  66:12 83:2
  101:19
  106:24
  107:9
  146:14,23,
  24 149:14
  153:11
  163:19
  165:17

attorney  6:1
  58:5 65:25
  73:13

attorneys
  31:15 32:1

attributing
  166:11

automatic
  117:15

avoid  72:10,
  20 78:3
  79:5 119:7
  131:10
  132:10
  133:14,19,
  24 134:1
  135:2
  137:5

avoided
  76:9,17
  77:3
  78:12,22
  79:10

avoiding
  78:19

aware
  161:12,14,
  18,21,24
  162:2,8,11

B

back  10:19
  11:9 13:9
  23:7 31:4,
  5 33:24
  39:24 53:2
  66:14
  68:23 71:6
  78:7,10
  83:2 95:23
  101:6
  103:21
  106:20
  124:25
  125:20

140:2
141:3
144:18
146:11
149:14
162:18
166:17,25
167:24

**background**
7:25

**backyard**
26:11,13

**bad** 54:3
96:22

**bag** 44:3
64:15,17
94:11,15,
21 95:14
96:10,11
97:3,14

**bake** 25:14

**baking** 23:12
25:19

**balance**
166:14,22

**basis** 160:8

**Bates** 112:7,
21 115:12

**Bates-stamped**
112:15
113:24

**bathroom**
129:8,21,
22

**bathrooms**
127:13,20

**Bay** 12:13
19:12
36:17
82:18

**Beach** 12:21,
24

**bed** 122:10,
12

**bedrooms**
9:23

**began** 72:22
87:24

**begin** 101:21
102:4

**beginning**
164:1

**Beth** 89:3,
14,22
157:14

**Beth's** 89:4,
16

**bewilderment**
143:24

**big** 6:17
21:7 72:25
83:1
114:13
138:13

**bigger**
131:17

**bilateral**

65:9

**bingo** 122:25
123:13

**birth** 8:7,8

**bit** 5:24
6:20 7:1,
25 26:21
33:25
39:23 48:4
62:5 69:9
76:24
98:10
104:7
108:5
132:17
148:21

**blank** 56:13

**blood** 42:14
45:24,25
124:25
125:3,6,
10,16
126:2,7,8,
18 148:15

**boarded** 92:2
102:8,17

**boat** 106:13

**body** 42:13
65:3 98:5
126:1
139:24
163:19

**booked** 88:7,
9,12

**booking**
90:22

**born** 12:20,
21 18:25
19:1,21
20:5

**bottom** 50:18
51:17
57:5,7
58:17
59:19
112:7

**bought**
156:21

**boy** 24:21

**boys** 128:20

**Brady** 24:24
25:1,2,3,
5,24 26:4

**brain** 57:21
75:2,7
76:1 81:12

**breads**
126:21

**break** 7:19
63:1

**breakfast**
123:2,7,11

**breathing**
22:10

**bring** 85:1
91:8,22
103:23,25
104:2

125:24

brother 21:5
39:10,13
88:16,22
89:10

brothers
88:13

bruise 66:15

buffet 122:7
124:22
129:14,15

build-up
64:24

bunch 132:19
133:6

Butler
153:11
154:6
155:1

Butler's
154:16

─────────
C
─────────

C-SECTIONS
96:19

cabin 103:4

California
5:4 9:8,9
12:18
15:10,11,
22 16:13,
23 17:1,2
102:20,22
103:7,15,

16 156:13
158:4,10,
16 160:3,8

call 7:19
19:17
27:23
38:14
63:11 64:1
68:16
95:25
104:24

called 5:7
14:18,23
44:8 81:21
82:8 133:6
159:22

calls 7:11

calm 110:10

cane 91:8,
21,22
92:22,24
96:17
100:21,23
103:23
104:5

capable 98:3
151:7,19
168:9

capacity
21:21

Capitol 5:3

caps 56:10
57:7 59:20

car 99:19

156:23
157:3,4
165:16,21

care 23:16
24:10
27:23
28:4,7,21
32:23
33:3,21
34:14
36:3,16
37:9 38:22
39:1 40:19
44:19 55:8
80:17
87:12 95:2
107:8
145:16
158:8,11,
17 159:4,
11 160:4,
21 162:18

care's 30:8

careful
77:12,17,
19 121:5,
6,12,15
134:23
137:13,16

Caribbean
5:20,22
85:8,25
86:4,8,24
149:8
155:12

Caribbean's

102:3

cart 69:23

carts 69:24

case 5:19
10:25
22:13
31:24 34:1
35:1 41:3
74:2
155:15
167:10,14

CAT 57:21

catch 30:13

caused 68:11
69:25
138:24
143:7

caution
119:16

cautious
167:7,18

CCP 5:8

Celexa 27:5,
14 28:12
35:20,22
36:14
59:24
60:5,14
84:8

cement 26:12

center 28:24
43:23 68:2
77:10
87:16,18,

22 147:17,
19 148:16
149:5
157:18,19

**certificate**
21:20

**certificates**
22:3

**Certified**
5:5

**chair** 135:23
136:3,15
137:19,22
138:4,9
141:24
142:11,14
146:9,10,
13,18
152:20
154:8
155:1

**chairs** 131:9
132:8,19,
21 133:6
134:5,20
135:10
136:5,7,
10,23
137:2,5,8
138:12,13,
14,15
167:21

**chalked**
74:12

**chance** 40:10

83:20

**change** 8:10
28:21
29:12,15
34:22
160:13

**changed**
27:25
35:22

**changing**
33:2,21
115:11
121:3

**check** 60:20
61:25
158:17

**checked**
62:2,11

**checks** 61:24
62:16
63:19,24
128:25

**Chevron**
20:17 22:8

**children**
17:7,22,23
18:3,9,14
96:19

**chosen** 79:6

**circumstance**
147:7

**citalopram**
59:24 84:8

**claim** 22:16,
18 74:5
140:8

**claiming**
77:2

**clarification**
30:21 52:8
118:24
123:9
141:19

**clean** 98:25

**clear** 51:24
52:18
93:21 94:7
110:7
112:8
115:10
117:21
134:4
135:22
156:6,8,13
158:3,9

**client**
167:14

**close** 67:25
72:24 79:8
120:6,7
138:12
166:1

**closed** 117:1
150:20

**closer**
78:16,18

**clothing**
139:16

**Co-pay** 39:4

**cognitive**
161:20

**cold** 124:15

**college**
14:10,17,
19 15:5,15
16:5

**colostomy**
44:3
64:15,17
94:11,15,
21 95:14
96:10,11
97:3,14

**combined**
34:7

**commit** 39:19

**common** 119:4

**community**
14:19 16:5

**company** 16:4
20:17
22:19

**Compensation**
22:15

**complaints**
106:2

**complete**
51:2

**completed**
93:23

**complication**

151:18

**composite**
31:7,19
39:24
50:16
54:19 56:3
65:22
66:12
101:9
110:2,16
112:13,14
149:14

**concentrating**
54:10 55:4

**concluded**
161:18
162:2
169:7

**conclusion**
162:9,11

**Concord**
12:13,15
18:20
19:13,14
74:1 82:19

**condition**
40:23
41:19
42:11
61:13,23
160:4

**conditions**
57:22

**conducted**
40:22

**confirm** 49:4
58:19

**confirmation**
52:5 58:8
109:10

**confirms**
65:25

**confused**
162:19

**confusing**
117:25

**conscious**
149:25
150:18,19
151:1

**consciousness**
143:18,22
148:2,7,11
150:5

**consulting**
45:2

**continue**
43:7
100:18

**continued**
143:16

**Contra** 19:9,
11,12
36:15,16
73:24 74:1

**contusions**
68:16

**conversation**
29:1

**converse**
6:14

**convey**
118:1,5

**cooking**
23:12

**copy** 30:18
49:13
52:15
101:13
114:16
115:9
153:13
169:2

**corner**
112:22
114:24,25
115:14
127:5

**correct** 9:8,
16 27:6
34:3 59:25
60:3,6,25
69:15
71:18,19
76:17
77:22 84:9
86:21,22
87:25 88:5
94:18
97:4,6,11
101:22
109:19
122:19
126:24
129:14,17

133:3
135:2
136:4,12
141:24
142:11
143:17
150:16
161:5

**correctly**
36:21
71:18
76:16

**correlate**
35:17

**Costa** 19:9,
11,12
36:15,16
73:24 74:1

**counsel** 5:22
40:1
51:15,22
54:22 55:9
62:25

**counselors**
37:11

**count** 21:4

**County** 19:9,
12 36:15,
16 73:24
74:1

**couple** 63:10
67:12
95:11
97:6,25
165:22

**court** 6:13, 16

**cousin** 88:17,19 89:6 90:9

**coverage** 38:1,7,14

**covered** 124:15

**COVID** 26:3

**CPR** 22:11

**crafts** 23:13 25:14,18

**Creek** 19:1 36:9,10,17 37:8 81:23 82:18,20, 24 83:1

**criticism** 87:2,4

**cruise** 5:20 11:17 26:23 27:2 34:5 43:5 45:9 46:5, 19 48:10 60:16 61:4 70:7 80:8 81:8,11,15 82:1,4 85:4,5,7, 9,12,16, 19,22,23, 25 86:3,7, 21,24

87:2,5,6, 12,15,18, 21,22,24 88:7,12, 13,14,23 89:20,24 90:2,11,21 92:1,12, 14,18 100:9,12 101:20,24 102:3,14 103:10 104:5 105:4 106:3 122:15 123:16 157:6,24

**cruised** 86:3

**cruises** 5:22 85:10 86:21 87:11

**CT** 57:19 81:8

**curb** 68:6, 9,10,24 69:23 70:2,9,13, 19,24 71:5,11, 12,15,23 72:8,9,25 74:14 76:14,15 77:1,3

78:19

**curbed** 69:22

**curious** 144:5,14

**current** 8:20 63:8

**cuts** 66:15 68:16

———————

**D**

———————

**dad** 13:21 16:2,18

**dangerous** 72:19,21 73:1 134:14

**date** 8:7,8 30:19,22, 23 34:4 61:1 67:19 75:4

**dated** 31:9 49:6 52:2, 12,22 58:6 65:23 66:13 153:9

**dates** 34:25 101:23 156:2

**daughter** 10:11,12, 19 11:3,21 19:21 20:4

**daughters** 17:9 18:17

**David** 66:3

**day** 5:2 12:9 25:12 43:8 51:21 53:22 54:3,9 103:9,10 104:23 105:3 121:22 122:17,18, 24 124:19 127:21 128:11 130:12 154:15 158:24 164:16 167:11 168:1

**days** 50:23 51:5,12 53:6,11,15 66:14 95:9,11 97:6 158:6 159:1

**deal** 6:17

**dealing** 29:4

**decision** 43:19 44:24 98:6

**deck** 105:10,13,

19 114:5
117:13
126:23
127:3,10,
12,13,15,
21,24
129:6,17,
24 130:3,
10 143:21,
25 144:12
146:21
147:14,16
167:22
168:2

**defendant's**
5:10
30:12,16
31:8 49:1
54:19 58:2
65:18 67:4
83:3
101:10
108:19
152:15

**defense** 5:22

**degree**
14:13,14,
19,20,25
16:11
165:6
167:5
168:8

**delay** 48:23

**denied** 148:1

**department**
28:18,22

33:1,11,13

**depicted**
110:3,15
111:17
113:10
115:15

**deposition**
5:19,23
6:8 30:17,
25 31:7
48:15 58:1
65:22
74:2,3
100:25
101:9
108:23
116:13
152:3
153:19
164:21
168:20,23
169:1,6

**depositions**
7:24

**depressed**
29:14
35:17 51:4
53:10
160:14

**depression**
29:4 33:22
39:8,14,17
56:4,9,21
59:2,20
161:3

**depressive**

35:11
36:24 37:5

**describe**
124:16

**description**
155:5

**detached**
60:21,24
61:4,6,23

**detail**
124:17

**determine**
98:2
100:16

**device** 91:17
92:3
125:6,15,
24 126:7

**devices** 85:1
100:17

**diabetes**
45:5,8
47:17 62:1

**diabetic**
45:18,20
46:5,8,13,
18 47:7

**diagnose**
34:10

**diagnosed**
34:2,5,13,
16,19
35:2,10
36:24

39:14,16
40:20,21
41:14
42:7,11,
18,23
43:1,4
45:5,6,8
46:4,8,13,
18 47:11
50:9 57:15
60:24
61:3,9
64:21 65:9

**diagnosis**
37:2 50:11

**differently**
72:23
78:3,12,22
79:10

**difficult**
7:1 55:3,7
56:12

**dining**
127:12

**dinner** 122:7

**diploma** 14:2

**direction**
133:2
135:8,9,19
136:23

**directly**
156:13
158:12
162:9

**Disability**

22:18

**disagree**
148:3

**discern**
162:10

**discharge**
156:5

**discharged**
156:12

**discussed**
55:4

**discussion**
13:8 33:1
101:3
169:4

**discussions**
155:11

**disease**
162:10

**disorder**
34:2,6,11,
14,17
35:2,11
36:24

**dispute**   35:3
53:24
54:18
58:20
59:11
102:5
149:22
154:15

**distances**
99:6

**district**
19:9,16

**diverted**
33:25

**diverticulitis**
64:12

**Dixon**   14:18

**dizzy**
166:12,13

**doctor**   27:23
28:20
34:22
36:15 37:4
42:11
44:18
45:13,15
46:23 47:6
53:19
57:23
61:12,17
62:16,21,
22 63:5,8,
11,12,17
67:5,7
95:17
98:14,17
99:6,7,23
148:9
158:18,19
159:9,11,
12 160:17,
21,22
162:18

**doctor's**
30:7,8
50:1 99:19

**doctors**
43:18
62:19 76:5
103:1
126:6
156:16
162:19
163:2
164:2

**document**
31:16
49:7,14
50:18
51:16
55:16
56:11
58:6,22
109:9
110:6
153:9

**documents**
52:20
153:16,18

**dollar**
165:25

**domains**
161:20

**door**   71:14,
15 74:16
111:7
112:23
113:25
116:9,14,
20 117:1,
3,14,15,16

**doors**

110:18,20
111:25
112:1

**double-check**
114:18

**downtown**
9:15 82:25
83:1

**Drahos**   5:13,
22 13:9
15:20
23:7,9
24:6
30:10,15
31:4
32:12,18
33:12
35:8,14
36:2 37:3,
17,19
39:5,22
40:3,5,7,
16 41:18
42:1,17
46:1,13,16
47:3,21
48:6,13,
19,22
49:3,6,15,
21 50:7,14
51:8,17,24
52:3,5,10,
21,24
53:2,20
54:17,23
55:1,11
56:9,16

58:4,10,
13,15
59:8,17
60:12
63:3,6
64:6,10
65:20
66:2,4,6
67:13
68:22
70:17
71:3,21
72:2,15
73:12
75:9,11,
18,22,24
76:4,22
77:14
78:1,9
79:3,14
81:7
83:11,19
86:17 87:9
91:4 97:21
98:23
101:2,5,
12,16,18
106:1
107:4,7,
16,21
108:4,13,
21,25
109:4,7,9,
13,15,20
110:1,9,
14,19,24
111:6,10,
15,23

112:6,11,
20 113:3,9
114:3,17,
22 115:10,
14 116:18,
24 117:8,
24 118:8,
13,18,22
119:3,12,
20,24
120:4,11,
18 121:1,
11,18
123:6,10,
19 124:1
125:13,18,
22 127:8
128:2,10
130:4,20,
24 131:22
132:13
133:1,13,
23 134:6,
24 135:6,
15 136:8
137:3,11,
17 138:1,
7,20
139:15,21
140:5
141:2,4,
11,22
142:2,4,9,
15 148:19,
23 149:2,
17,19
150:4,14
151:6

152:2,5,8,
11,17
153:6,14,
17,22,25
154:4,12,
24 155:7,
22 156:1
157:1
162:7
164:3
165:4
168:12,17

**drink**   84:1

**drinking**
84:1,3

**drive**   24:5,
8,9 165:18
166:7

**driving**   62:6
159:2
165:16,17

**drove**   165:21

**drug**   59:24

**due**   57:22

**dysarthria**
57:10,15

———————

E

———————

**e-mail**
30:10,17

**e-mailed**
49:15
108:25
109:10

153:14

**E-TRAN**   169:5

**E-U-R-E-K-A**
82:9

**earlier**
35:20
103:11
156:15
164:2

**Early**   31:24

**easier**   6:22
39:23
75:20

**eat**   122:4,7
123:11
126:17
128:18
158:6

**Eating**   122:3

**echo**   23:7
149:17

**ed**   20:8

**education**
14:17
19:18

**effects**
126:1

**elevated**
126:2

**eligible**
38:10 39:1

**emergency**
80:20 81:2

employed
  19:4,8
  20:12,13

employment
  19:6 20:9

empty  69:23

EMS  154:7

en  58:5

Enchantment
  88:2
  105:11
  107:17,25
  155:10

enclosed
  26:10,11

end  14:1
  92:24
  162:10

ended  15:9
  95:22

energy  51:20
  53:22

entire
  129:13
  167:11

entirety
  164:15,17

entity  95:1

episode  56:1

Ethan  61:15

Eureka  82:8,
  17

evaluated
  61:22

evaluating
  167:13

everyday
  6:14

evidence
  162:10

exact  21:18
  73:17

EXAMINATION
  5:12

examinations
  40:22

examined  5:9
  40:20

examples
  134:25

Excuse  13:5

exercise
  119:16

exercising
  93:10

exhibit  5:10
  30:17
  31:7,19
  39:24 40:3
  48:15
  49:1,3,22
  50:16
  52:8,15
  54:19 56:3
  57:5 58:1,
  2,5,13,17

59:9
65:18,22
66:1,13
67:4 83:3
101:9,10,
16 108:19,
23 109:5,
9,18
110:2,16
112:4,5,
13,14
115:8
149:15
152:10,12,
15 153:9,
18 154:4

expected
  132:20

experience
  86:11,12
  87:5 122:2
  143:25
  166:11

experiences
  86:11

explain
  76:12,13
  106:10
  126:9
  164:2

explanation
  67:6

explore
  105:4

extent  90:13

extremities
  45:22
  47:22

eye  60:22,
  23 63:8
  114:2,11

eyeglasses
  63:25

eyes  60:17
  62:2,11,17
  119:22
  131:3,6
  136:15
  150:20


          F


fabricated
  67:8

face  69:3
  70:3
  81:18,19
  154:9
  155:2

facilities
  40:19
  158:17

fact  19:22
  73:22
  95:22
  124:14
  132:19
  161:18
  167:21

failure  54:4

fair  26:18
  151:22

fall  66:7,
  14,19,21,
  22 67:2,6,
  11 68:11
  69:19,25
  70:25
  71:24
  72:17
  74:22 76:8
  123:16
  131:4
  132:7
  135:7
  138:9,10
  139:17
  143:7,9,
  11,19,21
  150:10
  154:7

fallen
  79:19,22
  80:4,7

falling
  51:10
  53:14 55:5
  139:5

falls  67:12

familiar
  26:25
  31:21 42:9
  53:8 88:3
  109:22
  110:13
  111:25

122:6

family  16:22
  17:6 18:12
  23:18
  39:8,11
  54:4 89:15
  127:5
  128:22
  157:5

farm  21:6,
  7,10

fast  70:1
  120:17

faster
  131:11

father  16:14
  39:16

February
  49:7 50:20
  51:2,19,23
  52:13,22
  53:4,13,21
  54:2,8
  55:2,6,19
  56:21
  57:16
  156:9

feel  34:20
  48:2 53:22
  54:3 66:15
  71:6 72:4,
  13 98:9
  134:14,16
  167:19

feeling

47:23
  51:4,19
  53:10 98:6

feelings
  163:11,12
  164:25
  165:5

feet  45:23
  47:23
  120:19,23
  124:15
  131:23,25
  132:3
  138:11,21,
  24

fell  66:25
  67:23
  68:18,24
  69:1 70:2,
  14,19 80:9
  131:19
  133:25
  134:20
  135:24
  136:7,16
  137:18,21
  138:3,11
  139:8,12
  143:15
  145:22
  146:12
  152:20
  154:8
  155:1

felt  29:14
  48:8 53:6
  71:10

72:19,21
  73:1 74:13
  76:14
  138:10,21
  139:20
  140:8,13,
  18,22
  141:5,20,
  23 142:10,
  16 162:15
  164:9
  167:6,18

female  154:7
  160:21

figure  63:7

figured
  140:24

file  73:2
  74:5

filed  22:15,
  18 73:4,19

fill  82:7
  149:10

find  104:17
  165:15

finding
  161:22

findings
  76:5
  161:12

fine  25:23
  37:17

finish  69:13
  154:24

finished
  10:20
  15:14,21
  16:10
  31:11 83:8

five-page
  56:11 58:6
  109:9
  110:6

five-year
  20:1

fixing  44:1

flesh  44:9

floor  10:1
  118:20
  119:4
  139:4,8,9,
  11 140:24
  141:6,14,
  15,17,21
  142:22
  145:22
  146:4

flooring
  119:8

floors
  119:17

Florida
  12:21
  13:2,20
  15:8

flow  45:24,
  25

flown  103:6

fly  102:23
  103:1
  156:16

focus  96:24
  119:22
  164:23

focused
  131:3,6
  136:15

focusing
  165:12

fog  106:6,
  17,18

foggy  104:24
  105:1
  168:3,6,8

follow  16:23
  52:25
  56:5,12
  57:2
  107:13
  115:19
  118:10
  129:1
  133:3
  135:20

follow-up
  142:2
  159:22

food  113:15
  117:10

foods
  126:17,20,
  21

foot  74:18

football
  24:23

footwear
  124:13

forget  14:23
  24:12

form  23:3
  24:4 35:6,
  12,24
  37:1,15,17
  39:3,21
  41:16
  42:16
  45:21
  46:11,15
  47:13
  48:5,11
  50:5,12
  51:7,13,22
  53:17
  54:12 55:9
  59:14
  67:10
  70:16
  71:1,20,25
  72:12
  73:11
  76:2,18
  77:5,23
  78:5,24
  79:12 81:5
  86:14 87:7
  97:19
  98:21
  105:25
  107:1,15,

20 108:2,
10,17
110:5,12,
17,22
111:9,12,
18,20
112:3,17
113:1
114:1
116:10,22
117:23
118:7,11,
21 119:9,
19,23
120:3,8,
15,20
121:10,17
123:17,22
125:12
127:2,25
128:8
130:1,19,
23 131:20
132:12,25
133:11
134:3,21
135:3,13
136:6,25
137:10,14,
23 138:6,
18 139:14,
18 141:9
142:4,5,12
148:18,22
149:1
150:1,13
151:5
152:1

153:4
154:11
155:4
162:5
163:23
165:2
168:11

**formal** 6:11
29:24

**formed** 94:18

**Fortunately**
162:9

**Forty** 9:14

**forward**
68:18,24
69:1
138:12

**forwarded**
101:13

**found** 96:22

**Foundation**
116:17

**foundations**
38:24

**four-page**
49:7

**frame** 35:19,
21

**frames** 26:25

**free** 23:11

**frequently**
24:15
25:11,15

**Friday** 5:1

**friend** 62:21
88:14,16,
17 89:16,
25 90:1
157:11

**friends**
127:5
128:22
157:5

**front** 26:13
52:11,22
68:2
71:14,15
120:1,21
131:7,8
135:23
168:5,9,
13,16

**full** 6:19

**functioning**
161:20

———————

**G**

———————

**gain** 161:19

**Galveston**
88:4
101:22,25
145:10

**garbled**
76:24

**gears** 26:21

**general**
27:22

106:23
121:7,8

**Gerson** 13:5
23:3,5,8
24:4
30:13,19,
22 32:6,
14,17 33:8
35:6,12,24
37:1,15
39:3,21
40:1,4,6,
13 41:16,
22 42:16
45:21
46:11,15
47:13
48:5,11,
18,20
49:5,10,
13,16,18
50:5,12
51:7,13,
15,22
52:1,4,7,
14,23,25
53:17
54:12,21
55:9 56:8,
11 58:12,
14 59:4,14
60:10
62:25 64:8
66:1,3,5
67:10
70:16
71:1,20,25
72:12

73:11
75:8,14,20
76:2,18
77:5,13,23
78:5,24
79:12 81:5
83:9,13
86:14 87:7
97:19
98:21
101:17
105:25
107:1,6,
15,20
108:2,10,
17,24
109:1,6,8,
12,14,17,
21,23
110:5,12,
17,22
111:9,12,
18 112:3,
10,17
113:1,8
114:1,15,
18 115:7,
13 116:10,
12,13,17,
22 117:5,
23 118:7,
11,16,21
119:9,19,
23 120:3,
8,15,20
121:10,17
123:5,17,
22 125:12

127:2,25
128:8
130:1,19,
23 131:20
132:12,25
133:11,21
134:3,21
135:3,13
136:6,25
137:10,14,
23 138:6,
18 139:14,
18 140:3
141:9,25
142:3,7,12
148:18,22
149:1,16,
18 150:1,
13 151:5
152:1,9,14
153:4,13,
15,20,24
154:2,11,
22 155:4,
21,23
162:5
163:23
165:2
168:11,20,
22,25
169:3,5

**girl**   24:21

**girls**   17:24
128:19,20

**give**   32:6
48:23 74:2
99:21

165:14

**giving**   149:7

**glass**   113:15
117:10

**glasses**
49:17
64:2,4

**Global**   5:3

**good**   5:14,
15 20:3
104:12
119:2
120:22
146:7
151:25
154:14

**government**
22:20

**governmental**
22:22

**GR**   112:15,
22 113:24
114:12,15,
24 115:16,
23 116:19

**graduated**
13:4 15:4,
6

**grandchild**
24:16

**grandchildren**
24:9,10,
11,16

**granddaughter**
11:21 12:2

**grandma**
25:14

**grandmother**
26:19

**great**   112:10
165:8

**grocery**
100:2,6,10

**ground**   120:1

**group**   90:13,
16 103:14
128:19
129:3,5,
13,16
157:5,18,
23

**guess**   8:14
42:9 44:13
67:18 86:5
96:14
106:21
120:22
127:11
129:12
130:8
143:14,15
145:19
146:6
151:17
165:17
167:17
168:7

**guessing**

141:8

**guys**   128:20
130:5

---

**H**

---

**habit**   119:21

**half**   23:25
51:11
53:15

**half-hour**
152:18

**hand**   30:11
31:6,9
39:24
48:14
57:25
68:19
98:19
101:14
108:22
109:2
153:8

**handing**   40:3
49:23
65:21

**handled**
86:16

**hands**   47:24
69:2

**happen**   37:22
55:23
137:25

**happened**
21:17

35:18 70:1,23 78:7,8 80:24 104:13 124:8 127:1 128:12 134:20 137:16,25 139:7 147:13 149:4,8

**happening** 79:11

**happy** 7:6 162:14,15

**harbor** 106:7,11

**hard** 6:18 13:4 28:5 33:9 41:22 44:12 120:23 130:3 133:21 165:13

**hardness** 98:9

**hazardous** 72:4,6 74:13 79:2 132:17 133:6 135:5 167:20

**head** 7:9,12 70:3 74:22 81:9 97:7 103:2 127:7 129:18 136:19 142:23 149:11 163:11,21, 25 164:11, 25 166:8 168:14

**headaches** 163:13,15, 20 164:18

**headband** 164:13,15, 22

**heal** 163:25

**health** 32:23 33:3,21 34:14 37:10 38:22 40:19 50:16 51:3 53:5 58:25 59:10 95:2 97:4,15 98:25 145:16 159:4

**hear** 13:7 23:4,8 40:1 46:11

143:4,6,9, 15 162:14, 15

**heard** 6:7 34:19 41:19

**hearing** 6:5 23:6 33:9 41:22 47:12 65:5,7 130:3 133:21

**HEATHER** 5:4

**Heidi** 12:3,8 24:13,14 25:5,11

**height** 68:10,24

**heightened** 134:17

**held** 13:8 19:6 101:3 169:4

**helped** 73:6 145:24 146:5,8,9

**helping** 29:13 146:25

**herniated** 44:7

**high** 13:3, 11,17

14:1,6 15:6 25:9 67:22 68:6 71:7,9,10, 11 74:18 76:14,15 77:2 148:20

**higher** 148:24

**hilly** 26:13

**history** 26:22 27:2 39:8

**hit** 70:3 106:12,13 127:6

**hobbies** 23:11

**hobby** 23:2 26:19

**hold** 22:2 52:3 108:24 109:6 114:15 152:9 155:21

**hole** 70:2 72:24

**home** 9:21 10:6 11:1 23:21,22 44:18 55:8 66:7,11,

14,19,21
67:2,12,25
95:2,18
97:4,15
98:25
106:24
107:8
156:13,16,
18 157:3
158:9,16,
23,24,25
159:3
160:3,8

homes   20:23

hopeless
  51:4 53:10

hospital
  23:16
  36:16
  80:16
  144:8,9,10
  145:7,9,13
  150:15
  157:16

hour   5:2
  23:25

hours   84:5,
  10,11

house   11:18
  12:4,8,17
  93:4,8
  94:24
  158:12

Housecleaning
  23:13

HPI   55:17

huge   74:14

hundred   6:1
  21:8

Huron   13:17,
  18 14:4

hurt   80:2

husband   10:3
  12:10 22:7
  62:7
  88:10,11
  90:21
  100:6,9
  143:11
  144:16,21
  145:1,4,12

husband's
  21:4

Huseby   5:3

─────────
      I
─────────

ice   80:10

identification
  5:11 49:2
  58:3 65:19
  101:11
  108:20
  152:16

identified
  33:4

identify
  30:2 32:23
  40:17
  110:3,11

Illinois
  14:18
  15:9,11,21
  16:9,20
  21:5,11

immediately
  143:21

important
  126:10
  167:13,16

improve
  166:23

inaccurate
  55:23
  148:13

inaudible
  141:18

incident
  10:24
  11:16
  32:24
  66:21
  69:10,13
  70:4,18
  72:22
  73:8,16,23
  74:4,17,
  20,22
  78:3,10,
  13,21,23
  79:5,10
  80:23
  84:5,11
  87:14
  91:23
  93:14

107:18
124:8
126:23
127:15,24
128:12
131:1
157:8
166:11

incidents
  79:16,18

incision
  44:8 96:20

incisions
  164:6

incorrect
  83:23

increase
  29:16

increased
  35:23

Initial
  30:12,16
  31:8

injured
  84:12
  157:10

injury   68:13
  72:11 73:2
  74:22
  103:2
  149:10

inpatient
  158:15

instance

70:12,23
71:4,22

**instances**
70:9 80:3,
8 86:23
87:10
96:12

**instructions**
115:20

**insufficiency**
41:15,21
42:2,5,6

**insurance**
22:19
38:3,11
39:6

**intentionally**
52:17

**interaction**
29:23
147:9

**interest**
50:21 53:6
55:4

**internet**
48:24

**interrogatorie
s** 30:12,16
31:8 32:2
83:4

**interrogatory**
30:23
32:5,7,13,
19,22 33:4
40:4,9,17

83:5,9,14,
21 84:5

**interview**
149:4

**introduce**
5:20

**involve** 70:9

**involved**
22:12
86:23

**involving**
106:8

**Isaiah** 25:7

**issue** 28:12
121:25

**issues**
163:9,21
165:10

**itinerary**
102:2

———————

J

———————

**Jacksonville**
13:2

**January**
10:25 11:4
12:9 34:10
37:11
43:16 45:9
46:5,19
52:2,9
64:18
87:24 92:2
101:21

102:4
104:5,15
105:10,14,
20,22
106:3,16
107:24
121:20
122:2,18
123:15
124:7,25
125:2,9
153:10
154:21,25
155:16
156:2,3,6,
9

**Jean** 11:11

**Jeane** 89:16,
25 157:11,
12

**jeans** 124:12

**Jennifer**
5:6,17,19
8:2,7,11,
18 32:7,14
40:13
47:14
49:10,18
54:14 59:4
60:10
75:20
77:13
83:13
107:6
109:1,23
113:8
114:18

117:5
118:16
154:6
169:6

**job** 16:2,
14,16

**jobs** 13:23

**John** 9:5
10:7

**judge** 71:18

**Julie** 17:13,
14,15,17,
21,25 18:1

**Julie's**
17:16

**July** 31:9

**June** 8:9
10:25

**Jung** 33:16
160:11

**junior** 14:10

**jury** 107:23

———————

K

———————

**K-U-T-Z-S-C-H-
E-R** 61:15

**Kaiser** 28:7
38:12,13,
14,25
40:24
41:5,12
43:23
62:4,11,14

80:18,22
81:3,9,12,
23,24
95:3,4
159:24
160:4
166:19

kids 11:20
17:5 18:20
39:11
114:2,11

Kim 33:16,
20 160:11,
24 161:4,
15,18
162:2,21
163:5

Kim's
161:12,22
162:8,11

kind 7:4
21:25
33:25
53:16
92:24
98:10,19
100:17
105:4
106:6
124:13
126:20
130:13
132:17
151:17
163:12
167:20

knee 42:19

knew 70:20
72:5,8
127:4
129:11
136:3,5,
10,12

Kutzscher
61:15

——————

L

L-O 62:24

label 94:9

Lake 156:6,
9,13
158:3,9

landed 69:1,
3

landing
154:8
155:2

largely
161:21

Lastly 7:17

late 102:14

lawsuit
73:2,4,19

lawyer 58:8
101:13

lawyers
31:25

laying

139:23
164:11

leaded 129:9

leaking
43:12

learned
147:7

leave 106:4,
15

led 98:6

Lee 10:5

left 31:6
60:23 61:4
129:16
158:3,8

leg 135:23
136:3,13,
14,15,23
137:7,22
138:3

legalese 7:4

legs 47:22
48:1,2
136:10
139:25
140:1,7,
12,22
141:6,16

length
157:10

level 126:8

levels 26:12
126:8

liberal
14:21,25
16:11

license
21:19

licenses
22:3

life 6:14
8:2 36:5
39:17
79:18,23

lifeguard
146:2

lifetime
34:13

lift 74:18

likes 25:13

limitations
166:10
167:8

limits
161:21

lines 5:20
55:15
85:9,12
86:3
132:20

lip 66:15

lips 68:14
69:8 74:10

list 30:4
31:13,14,
15 93:7

161:1,11

**listen** 117:5
  118:16

**litigation**
  5:3 22:13

**live** 12:12,
  14,23 15:9
  26:7 166:1

**lived** 9:18
  10:6 11:1,
  17 12:4,8,
  16,22
  15:23
  16:22
  80:10
  82:18

**lives** 10:2

**living** 20:8,
  10,16
  23:21

**lobby** 127:11

**located** 13:6
  28:9 71:12
  82:11,24

**LOFHOLM** 5:4

**long** 10:16
  12:14,23
  17:2,4
  21:15 27:8
  29:2,9
  36:6,7
  38:6 48:7,
  9 61:21
  65:13 68:1

70:8 82:13
93:12 95:6
96:5
97:22,23,
24 100:20
125:14,19
145:20
146:4,6,
13,18

**longer** 10:18

**looked** 71:9
  132:17
  133:6

**lose**
  143:18,22
  148:7,10

**losing** 148:1

**lost** 112:13
  135:17
  150:5

**lot** 6:22
  14:11
  20:10
  23:6,20
  26:11,16
  27:18 30:9
  43:11,12
  44:13,15
  47:5 67:16
  72:5 77:11
  79:24
  95:17 99:7
  100:6
  133:8,10
  143:20
  162:16

**lounge** 132:8
  146:10

**low** 126:5

**Lowe** 62:20,
  24

**lower** 66:15
  71:15
  112:22
  114:23,25
  115:14

**luggage**
  102:18
  104:17,18,
  22 121:21
  122:1

**lumps** 44:12

**lunch** 101:4
  124:19,21,
  23 128:16,
  18 129:2,
  13

———————

**M**

———————

**Mackenzie**
  10:18
  11:1,14,17
  17:10,21,
  25 18:1

**made** 18:9
  29:24
  51:24 55:7
  56:23
  159:19
  161:19

**magnifiers**
  64:2

**maiden** 8:3
  11:9

**major** 35:11
  56:4,9,21
  59:20

**majority**
  18:19

**make** 6:3
  7:5,15
  30:20,24
  39:23
  52:18
  75:20
  76:25
  84:21
  103:22
  106:2
  108:6
  112:7
  114:23
  127:22
  143:1
  145:3
  153:25
  160:2

**makes** 6:22
  144:3

**Makieve** 30:8

**making** 51:23

**Mall** 5:3

**man** 159:12
  160:25

marathon
  7:17

mark   30:15
  48:15
  57:25
  65:21
  108:23
  153:8

marked   5:11
  31:6 49:2
  50:15 58:3
  65:19
  101:11
  108:20
  152:16

marking
  49:3,5,6,
  22 101:8
  152:4

marriage
  18:4

married   8:5,
  14,15 15:1
  17:4 18:7,
  12 89:18,
  22 90:5,8,
  10

Mary   5:17

mask   7:4

masks   6:25

matter   52:7

MD   27:22

meaning
  91:13 95:9

130:18
158:16

means   7:1,17
  15:2 17:10
  37:21
  113:21
  114:7
  151:14

meant   158:7

mechanical
  154:7

mechanism
  43:12

media   22:25

medical
  22:5,7
  26:22 27:2
  28:24 34:1
  35:1,9
  39:1 40:19
  41:4,11
  52:9 65:22
  69:14
  80:17,20
  85:1
  87:12,15,
  17,22
  146:14,23,
  24 147:3,
  10,17,19
  148:16
  149:5
  155:15
  157:17,19
  158:8,11
  160:3

166:4

Medicare
  38:1,4,7,
  10 39:1

medication
  27:21
  28:12,19,
  21 29:12,
  15 36:23
  53:19
  160:14
  161:3

medications
  33:2,22
  83:25
  84:13,16,
  24

medicine
  27:12

meet   16:19
  127:4
  128:22
  130:7,10

meet all
  103:14

member
  147:10

members
  107:23
  157:6

memorize
  30:5

memory   15:2
  106:21

151:22
154:13
162:3

mental   37:10

mention   18:9

mentioned
  15:23
  43:21 92:8
  121:21

met   15:13
  16:15
  103:17,18

Metformin
  84:7

Mexican
  85:7,16

Miami   12:21,
  22,24

Michael   5:21
  13:7 142:1

Michigan
  13:18,20
  14:10
  15:8,14,15

microphone
  13:6

middle   10:11

Mike   41:23
  46:12
  130:2

mild   163:18

milligrams
  60:3,6,8,

14 84:6,7

mind   8:1
  66:22
  167:12

mindful
  107:12

mine   114:17

minor   74:9

minute   44:7
  64:7 71:6
  112:12
  118:2

minutes   9:14

misjudged
  68:7,8,23
  70:21,24
  71:4,23

misjudging
  70:9

missed   18:16

missing
  17:10

mistake
  74:13

misunderstood
  91:25

mobile   91:14

mode   156:22
  157:2

moisture
  168:7

mom   20:5

25:13

moment   5:21
  31:1,10
  35:21
  89:17
  101:1
  162:20
  164:21

monitor
  28:20
  124:24
  126:7

monitored
  125:16

monitoring
  125:3,6,10

monitors
  27:21

month   66:22
  158:13

months   15:25
  64:19
  104:9,10,
  11 166:17

mopping
  167:23

morning
  5:14,15
  102:10
  122:21
  123:1

Morrison
  16:20

mother   23:17

mouth   69:7,8
  141:25

move   16:13
  95:21

moved   13:20,
  23 14:16
  16:9 28:3
  62:18
  67:18

movement
  93:11

moving   15:22
  166:12

MRI   75:2,7,
  25 76:6
  81:11

mumbled   7:4

myofascial
  50:4,9

————————

N

————————

named   25:3

names   8:2
  24:20
  32:11
  40:18
  82:23
  85:17,18,
  19 88:18

narrow   69:22

nature   94:5
  144:5,15

navigate

72:10
  136:24
  137:6

navigating
  77:15,20
  105:23
  123:21

nearby
  145:11

necessarily
  24:8

needed   28:20
  29:14
  152:12

negative
  86:12

nerves   46:3

network   28:8
  62:12,14

neurodegenerat
ive   162:10

neurologist
  159:12

neuropathy
  45:18,20
  46:5,8,14,
  18 47:7

neuropsycholog
ical   163:4

neuropsycholog
ist   33:19
  161:5

newspaper
  54:10

**Nick** 30:10 49:4 52:21 58:10 101:16 115:7 140:6 142:2 154:1

**night** 122:8, 15 123:15 164:10

**nod** 7:9,12

**nodding** 97:7 129:18 136:19 168:14

**normal** 6:14 7:2 161:21

**Northern** 13:17

**Norwood** 8:3, 4,7

**nose** 66:15 68:13,15 69:7,8 74:10

**note** 49:6 56:5 67:5 148:4,10, 12 153:11 154:5

**notes** 147:25

**notice** 107:24

110:21 111:2,3,7 139:16

**noticed** 143:2

**noticing** 116:9,21

**November** 46:14 47:11 75:3 76:1 160:11

**numb** 47:23

**number** 31:12 32:5,19,22 33:4 40:9, 11,17 55:11 83:5,11,21 84:5 85:6 112:7 153:17

**numbers** 20:3 40:18 115:12

**numbness** 45:23 48:3

**nurse** 43:22 95:2 148:1 153:11 154:15

**nursing** 23:20,22

— — — — — — —
O
— — — — — — —

**oath** 5:8 107:23 138:8

**object** 24:4 35:6,12,24 37:1,15 39:3,21 41:16 42:16 45:21 46:11,15 47:13 48:5,11 50:5,12 51:7,13,22 53:17 54:12 55:9 59:14 67:10 70:16 71:1,20,25 72:12 73:11 76:2,8,18 77:5,23 78:5,24 79:12 81:5 86:14 87:7 105:25 107:1,15, 20 108:2, 10,17 110:5,12, 17,22 111:9,12,

18 112:3, 17 113:1 114:1 116:10,22 117:23 118:7,11 120:20 121:10,17 127:2,25 128:8 130:1,23 131:20 132:12,25 134:3,21 136:25 137:10 138:6,18 142:4 152:1 153:4 154:11,22 155:4

**objecting** 111:19

**objection** 23:8

**obligation** 118:10

**obnoxious** 7:14

**obstructed** 45:25

**obstructive** 42:23 43:1,8

**obtained**
14:24

**obvious**
113:2,4,6,
11,12,14
116:6

**occupational**
82:5

**occur**  126:1

**occurred**
66:19
69:20
73:23
74:4,17,
20,21 78:3
126:23
157:8

**October**  5:1
8:16,17

**odds**  25:1

**offered**
144:20

**office**  49:6
99:19

**offices**  5:2

**oil**  20:17

**okayed**  53:19

**older**  62:21

**oldest**  17:11

**onboard**
84:13
91:8,22

**one-page**
153:9

**one-story**
9:25

**ongoing**  30:1

**open**  116:5,
23

**ophthalmologis
t**  63:11,14

**opportunity**
5:20 84:22

**Orangevale**
9:7 20:24

**order**  18:2
21:22
91:17
115:3,5,6,
9,11
121:14
131:14
135:18
168:23

**ordering**
169:3

**originate**
103:15,16

**originated**
88:4
101:24

**Orinda**  23:23

**osteoarthritis**
42:18

**outer**  127:12

**outpatient**
160:8

**overcast**
104:24

**overlapping**
15:18 47:1
68:20 91:2
111:4
116:15
118:25
154:23
156:24

**owner**  74:6

**owning**  21:5

───────────

**P**

───────────

**p.m.**  102:8,
11,17
149:21
153:12
154:25
169:7

**pace**  131:13

**pack**  157:15

**pages**  22:25
57:6 65:23
109:20,21
112:5
153:16,24

**pain**  50:4,9
96:21
98:8,13
99:17

**pains**  164:1,

4

**pairs**  124:18

**PAM**  156:6,
8,12
158:3,9

**pandemic**
30:1

**pant**  140:1,
7,12

**pants**  124:12
139:25
140:18
142:17,19
143:2

**parallel**  6:6

**Pardon**
140:21

**parents**
12:21

**parked**  68:4
69:22
135:5

**parking**
67:15
72:5,14,24
77:11
78:25
79:1,6
99:7

**part**  7:24
19:22 28:7
31:21
46:12
62:14

148:14
159:23
161:2
164:5

**participated**
122:23

**partner**   21:5

**partners**
21:9

**passed**   22:10

**past**   23:12
40:20

**pastas**
126:21

**path**
130:16,21
132:22
134:5,11,
14,16
135:20,22

**pathway**
131:10

**patient**   53:5
59:10
66:13
154:8

**pause**   6:21
31:2
100:25

**Paxil**   27:16

**pay**   39:2
95:22
106:24
107:9

**paying**
163:19
165:16

**Pell**   5:6,
14,17,19
7:20  8:2,
11,18
10:5,7
11:9,10,
11,12  12:8
13:10
18:3,15
20:11  31:5
46:17
48:14
49:22  53:4
64:11  66:7
88:19,20,
21  89:7,
10,13,14,
18  90:1,5,
9  101:6,19
109:16
112:12
154:5,6
169:6

**pending**
167:1

**people**   6:18
73:5  90:13
105:3
130:13
135:10,21
143:3
147:22,24
163:1
167:17,21

**perforated**
64:12

**performed**
94:20

**period**   8:6
10:17,24
12:14,23
14:12,15
20:1  38:6
48:7  93:12
95:6  96:5,
25  97:10,
22  100:20
151:23

**peripheral**
41:14,21,
24  42:2,3,
12

**Permanente**
28:8
38:14,25
40:25
41:5,12
62:12,14
80:18,22
81:3,9,13,
24  159:25
160:5

**person**   29:18
30:2  36:13
93:5  95:1,
7  146:2
147:6
159:10,15
161:1

**personally**

5:5

**perspective**
26:18

**pharmacies**
82:22,24

**pharmacy**
82:7,8,13,
17,21

**phone**   7:19
21:12

**photographs**
109:19
110:4,7

**physical**
81:16,19
93:1,7,8,
24  94:1,21
95:2,7
97:4,15
98:25
166:10,16
167:8

**physician**
27:20
28:4,7
33:2  34:9
44:19  45:3
148:6

**physicians**
40:18

**pick**   33:7
131:13

**picture**
111:13

112:24
113:12
116:7

**pictures**
111:8
112:19
115:25
142:19,22,
25 152:7

**pink** 117:17

**place** 17:3
26:7 28:9
68:1,4,5
78:6,11,25
79:1,7
135:5

**places** 24:5,
8,9 26:16
72:23
95:16
164:6

**Plaintiff's**
30:11,15
31:8

**plan** 57:18
59:22
130:5,7,8

**planning**
130:6,10

**plaque** 64:24

**play** 123:13

**player** 24:23

**playing**
122:25

**pleasure**
50:22 53:6

**point** 6:5
7:2,18
13:19
14:17 34:9
36:4 72:22
107:23
120:13
128:24
129:2
134:7,10
143:18,22
144:22
145:5
148:2,7,11
150:5
153:20,22
156:5
157:7
158:8

**pointing**
52:14
109:17

**pool**
113:15,16
114:14
115:17
117:11
146:2

**poor** 70:3

**popular**
24:23

**port** 13:17,
18 14:4
106:15

122:19
127:23

**portion**
140:4

**position**
59:12
140:10
148:3,11
154:15

**possibly** 6:4

**post-covid**
5:24

**potentially**
135:2

**powering**
7:21

**pravastatin**
84:6

**pregnancy**
19:23

**prescribed**
47:19 60:2
125:5
126:7

**prescription**
35:22
36:14
84:20

**prescriptions**
82:7

**present** 12:9
35:21 43:8
164:21

**presented**
57:22

**presents**
154:7

**pressure**
126:7
164:11

**pressurized**
103:4

**pretty** 67:25
82:14
115:10
141:13

**prevented**
135:8

**previously**
52:8,15

**primary**
27:23
28:4,7
30:8 44:19
159:11
160:21
162:18

**Princess**
86:4

**prior** 34:5,
10 37:11
38:10 43:4
45:8 46:5
48:10
60:16 61:4
80:8 81:8,
11,15
82:1,4,17

86:7
87:10,11,
21 90:21
92:17
104:5
107:18,24
127:15,24
130:25
131:3
132:7
135:7
139:4

**private**
22:19
38:11

**problem**
22:10

**problems**
43:11,12
55:3,6

**proceedings**
31:2

**professional**
98:2

**promise**
119:15

**prompt**   98:13

**prompted**
16:13
29:23
40:23
50:11

**properties**
21:1

**property**
26:7,10
71:13 74:6

**protrusion**
98:10

**provide**   32:1

**provided**
58:21,23

**provider**
33:3 34:14
159:4
166:5

**providers**
32:23
33:21
40:19
145:16

**psychiatrist**
29:21
36:4,11
37:23
56:6,17,
20,24 57:2

**psychiatrists**
37:10

**psychologist**
36:4,11
37:8,23

**psychologists**
37:10

**psychology**
28:18,22
33:1,13
161:2

**puddles**
119:8,10

**pump**   42:13

**purchase**
169:2

**purpose**
160:23

**purposes**
99:13

**push**   95:25

**put**   115:4,5
134:16
141:25
152:11

---

Q

---

**question**
6:19,21
7:3,6
13:11
23:10
31:12
32:8,14,20
40:13,24
44:22
49:10,18
50:21
51:9,18
52:6 53:9
54:13
55:11
57:11
59:4,7
60:10,11
63:2 69:13

72:17
75:8,10,
12,19,21
77:1,13
83:13,15,
18 91:24
103:21,23
107:5,6
108:10
109:2,23
110:12,17,
22,25
111:2,9,
12,18,19
112:3,17
113:1,8
114:1
116:22
117:6,23
118:2,7,
11,17
125:17
127:25
128:8
130:1,23
131:20
132:12,25
134:3,21
136:25
137:10
138:6,18
140:5,17
142:2,6
143:6
144:11
145:3
147:13
151:18

153:4
154:11,24
155:4,24
167:11

**question-and-answer** 6:11

**questioning**
152:21

**questionnaire**
50:16 51:3
53:5 58:25
59:10

**questions**
8:1 27:1
28:15,16
31:18,25
32:15
47:25
58:8,18
65:24
101:15
140:15
144:4
164:24
168:18,21

**quick** 63:3

**quickly**
127:6

**quote** 161:19
162:9,11

_____

**R**
_____

**raising**
18:20

**reached**
167:5

**read** 32:8
40:11
58:18
113:2,13
125:20
141:3
161:6,15
162:18
168:25

**reading**
49:17
54:10
64:2,3
67:5 83:8
114:6

**reads** 66:13
113:19

**ready** 152:11

**real** 29:2
63:3
104:12
105:17
134:4
146:7
166:1,13

**realistic**
6:4

**realization**
138:3

**realize** 68:6
72:6

**realized**
71:9

137:24

**reason** 7:5
48:22
53:24
54:18
58:20 77:7
80:21 81:3
82:2,5
88:11
92:17
102:4,16
124:14
149:22
166:25

**reasons**
10:14,16
99:13

**recall**
21:17,18
22:14
28:11
29:9,20
34:15
35:16
37:5,12,16
43:15
45:1,17
46:10,20
47:9 50:10
54:14,15
56:25 59:2
60:7 66:21
70:5 73:3
76:7 79:20
80:13 81:6
82:3,23
85:20,23

86:1,5
93:3 95:8
121:25
122:1,3
123:18
124:6,21
125:14
126:4
129:13
142:18
143:3
145:2
147:9,19
155:13
157:18
158:24
159:5

**recalling**
102:21
104:16

**receipt** 49:4
65:25

**receive**
38:25 43:7
73:7 93:13
95:7
158:15
160:3

**received**
31:16 34:1
41:4,10
58:9 66:23
93:20
109:11,18
155:14,15
156:8
160:7

**receiving**
43:10,19
44:25
65:16

**recess** 31:3
64:9 101:4

**recognize**
32:10
111:16

**recognizing**
137:5

**recollecting**
128:17

**recollection**
66:18
104:11

**recommendation**
56:23

**record** 5:16
13:8,10
31:1,5
50:8,15
51:23
52:1,9,12,
16,18,22
53:24
54:13 64:6
65:23 67:7
101:3,6
109:7,18
110:6
115:7
125:20
140:3
141:3

153:15,21
155:17
169:4

**recorded**
6:13 7:15

**records** 34:1
35:1,9
61:18
102:3
149:20
155:14

**recovering**
91:21 94:2

**recovery**
92:25 96:8

**recreation**
24:3,5

**Recurrent**
56:4,10
59:20

**reduced**
35:23,25

**reference**
51:23

**referenced**
52:8

**referencing**
55:10
56:14

**referred**
33:4 56:17
69:11,14

**referring**
18:10 32:7

51:15,16
54:21
83:14
110:6
112:4
140:4
152:9

**refresh**
66:18

**regard** 6:4

**registering**
143:24

**regular**
34:22
63:11,19

**rehab** 156:6,
9,13
158:3,9,16

**relate** 27:1

**relates**
40:21
154:14

**Relax** 109:12

**relaxed**
109:13

**reliable**
151:24

**relieve**
163:18

**remember** 9:1
11:5 12:25
13:13,16
14:11 16:4
27:16,19

28:16 29:9
33:10
34:4,12,
17,19,21
35:4,7,18
36:1,9,10,
23 37:2,
14,18,21
39:7
42:20,22,
25 44:2,21
45:6,7
47:16
48:12
49:9,25
50:3 53:23
55:21,24,
25 56:1,19
57:17,24
61:11,14
63:16,18
65:7,14
66:9 67:1,
2,15 69:5
73:9,15,17
74:3 79:7
84:3,12
87:3,8,17,
20 89:17
91:6 93:6
94:23
95:16,22
96:14
97:1,16
99:2
100:4,22
102:13
103:12,20

104:16,20,
22 105:6,
8,17,20,21
106:6,21,
22 108:3,
7,8,11,16,
18 110:23
111:14
121:19
122:9,11,
16,25
123:8,12,
14,23
124:3,14,
22 125:4,
17 127:16,
20 128:4,
6,7 130:8
137:20
139:20
140:9,11
143:20
144:1,5
145:25
146:1,15,
17,22
147:2,5,
15,18,22
148:8
149:6,7,
13,23
150:2,17
151:2,4,8,
10,13,15,
21 152:18,
21,22,25
153:1
154:17,18,

19 155:9
157:9,12,
20,21
158:20
159:22
162:4
165:24

**remembered**
5:1 49:23

**remembering**
8:22 34:25
59:16

**reminder**
119:2

**remove** 94:17

**render** 93:8

**rendered**
32:23

**rented** 95:20
157:4

**repeat** 76:21

**rephrase** 7:6

**report** 69:15
154:16
161:15

**reported**
73:5

**reporter** 5:5
6:13,16
15:19
30:21,25
47:2 68:21
91:3
100:25

111:5
116:13,16
118:24
123:9
141:19
152:3
156:25
168:20,23
169:1

**reporting**
67:6
167:14

**reports**
154:8

**represent**
47:10
112:7

**represented**
73:13

**request**
146:23,24

**require** 64:3
87:11
91:16,19
92:2,4
95:14
97:15,17
98:25
99:4,11
131:13
145:21

**required**
60:16 61:6
64:14
96:13

97:10
100:17

**research**
90:21,24
91:5,6

**resent** 52:3

**respond**
50:22

**response**
84:4

**responsibility**
72:10,20
77:17
107:12
115:19

**responsible**
70:25
71:24 76:9
125:6
134:20

**rest** 129:3,
5,16
130:11

**restroom**
7:19

**result** 32:24
73:7 74:23
76:10

**resulted**
64:14
94:11,20
95:13
96:10 97:3

**retain** 57:2

**retina** 60:21,24 61:4,6,10, 23

**retinal** 63:12,17

**retinologist** 61:16

**retire** 20:20

**retired** 20:14,15, 21

**return** 56:24 69:23 102:25 158:16 160:8 167:1

**returned** 160:3

**reverse** 94:13 96:11 97:13,14

**review** 31:11 40:10 83:10,20

**reviewed** 32:13,19

**reviewing** 59:9,11

**revise** 96:11

**revision** 44:3 97:13

98:7,17,24 99:3,10 100:15,21

**right-hand** 112:22 114:24,25 115:14

**risk** 134:17 135:2

**robot** 98:19

**Roger** 88:20, 21 89:13, 18

**Ron** 15:13 16:15,17, 19,23 24:8 88:19 89:7,14 90:5,6,9, 21 95:20 103:12 127:4 128:20,22 129:9,24 130:15,21, 25 131:10, 11,18 132:22 133:2 134:7,16 145:25 156:21 157:14

**Ron's** 89:2 135:20

**Ronald** 10:5, 7

**room** 6:3, 12,25 80:20 81:2 105:8 157:15

**Roseville** 28:23,24 62:3 82:8, 12

**Ross** 68:2 70:13,23 72:9 74:4 78:4 79:17 135:1

**route** 58:5

**routine** 25:16,17

**rows** 132:9

**Royal** 5:19, 22 85:14 86:3,8,24 102:2 149:8 155:11

**rubber** 74:15

**Rules** 114:14

**run** 26:14, 16

— S —

**S-C-H-U-L-T-Z** 17:19

**Sacramento** 5:4 9:16

**safe** 26:7

**safely** 77:21

**safest** 136:24 137:6

**Safeway** 67:15 69:20,21 70:18 71:4,22 72:9 73:1, 4 78:21 79:17 81:17 135:1

**sail** 85:9, 12

**Saint** 9:5 10:7

**salesman** 13:21

**sat** 104:19 128:19,20 139:19

**Savannah** 24:21 25:5,24 26:4

**scan** 57:21

**scar** 44:13, 14 61:10 94:17

98:6,12
99:3,10
100:21

**scare**   144:23

**Scarlett**
153:11
154:5
155:1

**scars**   93:21
96:12
98:25
100:15

**scene**   143:1,
6   147:4
157:7,8,12

**scheduled**
101:21

**school**   10:20
13:3,12,
13,16,17
14:1,6
15:6,14
19:9,16
25:10

**schooling**
14:7

**Schultz**
17:17,18

**scooter**
91:12,14

**scraping**
69:5   74:9

**scratch**   63:4

**scratched**
68:15

**screen**   6:2

**Seas**   88:2
105:11
107:18,25
155:10

**section**   5:8
55:16   56:4

**security**
147:12
149:3

**seek**   158:7
165:7

**seizure**
144:1,9,19
145:1,5,14

**seizures**
143:25
144:12

**sending**
48:19,22

**senior**   25:10

**sensation**
48:8   164:9

**sensations**
48:2
163:25

**sense**   7:5
119:4

**sentence**
66:12

**separate**

89:1   129:3

**service**
30:23
31:13,14,
15

**services**
38:20,22

**session**   6:12

**set**   132:22

**settlement**
73:7

**seventeen**
24:17

**sewing**   23:13

**shaking**
142:23
149:11
166:8

**shares**   21:3

**sharp**   164:1,
4

**ship**   11:17
27:2
84:14,24
85:2,20,23
87:15,18,
22   88:4
91:8,22
102:12
103:23
104:2,14,
25   105:4,
5,23
106:15

121:20
122:2,6,
18,24
123:20
125:1,24
149:25
150:6
157:22,23,
25

**ship's**
147:3,12,
16,19
148:1,6,9,
16   149:3,
5,20

**shoe**
124:15,16

**shoes**   124:18
139:17

**shop**   67:22

**shopping**
67:21,24
68:2   77:10
100:3,6,10

**short**   14:12,
15

**Shorthand**
5:5

**show**   48:20,
21   101:8

**showing**
52:16,19

**shown**   115:8

**sibling**   89:1

siblings 39:12

sick 26:1,2 126:16

side 117:14,16, 20 127:23 140:2 166:14

sideways 138:11

sign 107:24 112:15,23 113:24 114:4,13 115:17,20 118:19

significant 90:3 98:13,16

signs 106:25 107:2,9, 13,17 108:8,12, 15 110:21 112:1 116:3,4,5, 9,21 117:4,9,10 118:5,10

simple 160:2

simply 71:18

single-family 9:21

sister 16:5 39:10,13 88:14,16, 25 89:2

sister-in-law 89:1,2

sister-in-law's 157:11

sisters 160:13

sit 58:19 84:22 87:1 102:5 114:8 137:21 138:2 148:2 153:2 154:13

sit-down 122:7

sitting 6:2 7:10 139:23 140:9 141:23 142:10 146:18

situated 138:15

situation 167:5,20

sketchy 26:3

skin 44:9 98:9

skull 164:6

sleep 42:23 43:1,8,20 44:25 164:10

sleeping 51:11 53:14 55:5

sleepy 150:19

slip 123:16 130:25 138:11,22, 24

slipped 66:14 70:2 80:7,9 119:14 127:6 167:24

slippery 113:18 114:5 117:13,18 118:20 119:5 139:1

slow 130:2 134:7

slower 166:12

social 22:25

someplace 165:24,25

sore 44:12 164:7

sort 22:3 23:10 69:3 91:12

sought 22:22 166:15

sounds 13:19 18:19 64:13 75:15 82:10 88:1,3 155:17 156:4,7,11

source 140:23

spare 23:2

speak 28:20 33:8 76:5

speaking 6:7 29:10 151:7,20

special 19:18 20:8

specialist 63:13

specialty 22:3

specific 62:5 87:3 99:18,21

specifically 16:19 34:8

37:5 83:4 121:19 139:2 140:7,12, 18 144:25 145:2 148:1 163:14 165:7,24 166:20

**speech** 55:20 82:2

**spell** 17:18 84:6

**spelled** 17:20

**spend** 7:23

**spent** 18:19 157:10 167:11

**spike** 126:18

**spoke** 29:11, 19 33:2,3

**spoken** 33:20 43:18 44:24

**spot** 69:22 72:14

**Spring** 33:10

**staff** 147:3, 10,12 149:3

**stamp** 112:21

**stand** 95:21

**start** 7:25 8:7

**started** 5:21

**starts** 28:5

**state** 5:16

**stated** 53:5

**statement** 138:8 149:7,10

**statements** 143:1

**states** 22:19 67:5 154:6

**static** 23:6

**stating** 109:7 135:18

**stay** 16:16 122:14 157:24 158:6

**stay-at-home** 20:5

**stayed** 10:12,16, 17,20 122:14 157:14,25

**staying** 51:10 53:14

**stenosed** 65:3

**step** 33:24 67:22 72:4 94:6 114:5 117:13 135:4

**Stephanie** 11:7,10, 11,12,18, 19,20 12:7 17:25 18:1

**Stephanie's** 11:8

**steps** 120:12

**Steve** 89:10, 13 90:1

**sticker** 52:12 117:17 152:11

**stinging** 45:24

**stomach** 93:18

**stop** 7:21 43:14,19 44:25 158:4

**stopped** 43:10 129:8

**store** 68:3 70:13,24

71:14 72:9 74:4 77:6, 8,9 78:4, 16,18 79:8,18 165:25

**stores** 135:1

**story** 10:1

**straight** 119:25 158:4

**strength** 162:3

**strides** 131:17

**strike** 79:15 145:20 153:7 166:9

**strip** 117:20

**studies** 15:16,21

**stuff** 26:3 55:14 126:21 157:15 162:16

**stuttered** 55:20

**style** 124:22

**subject** 26:22 34:5 43:5 46:5 48:10

60:16 61:4 70:7 80:8 81:8,11,15 82:1,4 85:4 86:7, 21 87:6, 21,24 92:1,12,18 100:9 107:18 127:24

**subsequently** 66:23

**substantial** 161:19

**substitute** 21:23 22:1

**suffer** 65:12 66:7 74:22

**suffered** 64:11 68:13

**suffering** 50:11 55:19

**sugar** 124:25 125:3,7, 10,16 126:2,18 148:15

**Sugary** 126:21

**suggested** 56:25 57:1

**suggestion** 57:2

**suicide** 39:19

**Suite** 5:3

**supermarket** 100:2

**supplemental** 38:3

**Support** 99:15

**supposed** 32:10 84:1 86:4 102:3 126:13

**Surfaces** 113:18 117:18

**surgeries** 92:9,19,23 93:2,18,23 94:5,10 96:8,9,13, 18

**surgery** 43:23,24, 25 44:1,3, 15 61:7,8, 9,18 64:14 93:17 94:3,5,10, 13,20 95:13 96:10,11 97:2,14,17

98:7,17, 20,24 99:3,10 100:15,21

**surgical** 43:22

**surrounded** 69:23

**sway** 166:14

**swaying** 166:21

**sweater** 124:10

**swelling** 74:10

**switch** 26:21

**symptoms** 37:6

**syndrome** 50:4,9

**system** 42:13

---

**T**

---

**takes** 62:7 131:17

**taking** 5:23 16:14,15 27:11 28:13 34:8 36:19 45:13 47:18 60:6,8,13

84:13,16 134:11 135:22

**talk** 7:20 21:12 27:3 30:9 85:5 130:8,11 143:3

**talked** 34:21 74:21 79:16 80:1,4 84:8 97:2 134:25 160:25 165:1

**talking** 6:16 18:13 27:1 28:17 33:10 85:15 106:9 147:22,24 163:1

**talks** 128:25

**teacher** 20:8

**teacher's** 19:17

**teachers** 21:22

**teaching** 21:19

**telephone** 40:18

television
  54:11

telling  30:3
  36:22 65:6
  93:17
  112:25
  113:4

ten  12:25
  20:22
  40:20
  41:5,11
  55:11
  80:17,21

tend  166:13

terms  42:9
  44:2
  119:21

test  21:22
  163:5

testified
  5:9

testimony
  36:21 41:3
  46:17 47:6
  76:16 86:8
  107:22
  116:20
  127:22
  132:1,7
  133:14
  138:21
  150:23
  162:20

testing  98:1
  163:5

tests  45:13

Texas  80:23,
  25 102:20,
  22 103:7,
  10,14,18
  145:10,13

therapist
  93:7,8
  95:3

therapy
  81:16,19,
  22 82:2,5
  93:1,9,13,
  24 94:2,22
  95:7 97:4,
  15 99:1
  166:16

thereabouts
  122:13

thigh  140:4

thing  43:12
  130:14
  162:18

things  8:25
  25:19
  50:22 53:7
  54:10
  55:5,8
  72:4 86:15
  92:8 96:1
  104:12
  105:17,18
  106:22
  144:24
  163:24

164:24
165:12

thinking
  19:21
  24:25
  78:10
  167:4,18

thought
  18:11 25:1
  26:17 44:8
  77:11
  83:17
  138:14,15
  143:7

thousand
  153:24

thrown  142:6

ticket
  102:25

time  6:5,
  16,19 7:3,
  18 8:6
  9:12
  10:17,24
  12:14,23
  13:19
  14:12,16
  17:8 18:20
  19:8 20:1
  21:3,12,
  13,14,15
  23:2,11
  26:25 27:9
  33:9 34:9
  35:16,19,
  21 36:4,6,

7 38:6
39:25
41:22
45:14 48:7
55:12,14
61:20,21,
22 65:13
72:22
75:15,16
76:25
82:14 83:7
87:5,15
91:16 92:1
93:12
94:3,4
95:6 96:5,
20,21,24
97:10,22
100:20
102:11
104:1,4,7,
12 107:23
121:3
122:10,12,
21 123:13
128:11,15,
17 129:2
130:3
131:18
133:21
134:7,10
135:5
136:16
137:25
140:14
143:18
145:5
146:6,7

148:2,7,11
150:6,8
151:12,23
157:7,10
158:8,9
164:9,20
165:20

times  10:12
26:2 61:25
79:22,25
80:12
91:20
96:7,21
99:24
114:21
127:14
146:21
167:22

tingling
47:23 48:3

tiny  48:4

tired  51:19
53:22
163:1

tissue
44:13,14
61:10
94:17

TMJ  65:10,
12,16

today  5:18,
23 6:2,17
9:11,15
15:2 27:3
28:4 35:3
41:10

44:20
46:17
47:6,10
53:25
58:20 60:6
65:5 84:22
85:5
107:22
114:8
137:21
138:2
148:2,12
153:2
154:13
164:16
166:11

toes  45:23
47:23

told  24:11
28:18
32:25
35:19 37:9
42:12
47:7,8
64:24
65:2,4
69:19
70:12,18
74:5 78:14
86:20
93:20
99:18
128:21
137:18
144:19
145:4,12
147:8

148:10
152:19,24
154:16,25
156:15
158:18,19
159:18
166:6,7

Tom  24:25
25:2,3

tooth  69:9

top  105:13
140:4

total  65:23
109:19

touching
69:6

town  67:16

traditionally
5:25

training
22:5,7

transcript
7:10,15
168:24
169:2

transferred
13:13

transport
150:24

transportation
156:22
157:2

travel

106:18
120:13

treated
37:23
40:20,22
42:21

treating
37:5 44:20
45:15
47:17
56:20
61:12

treatment
32:23 39:2
40:24
41:4,10,11
43:7,10,19
44:25
47:20
60:17,22
65:16
66:23
80:21
155:15,19
156:8
159:20
160:7
165:7
166:15

trip  76:8
90:14
123:16
130:25
132:15
133:20,22
134:2

tripped  77:2
  79:19,22
  80:4
  134:19
  137:19,22
  138:3,9,10
  152:20
  154:8
  155:1

trouble  6:5
  8:22 51:10
  53:14 54:9
  55:4,5
  105:22
  123:21
  124:3

true  65:7
  85:22

truthful
  86:6

turn  31:11
  32:4 40:8
  50:17
  55:15,22
  56:2 57:4
  58:16
  59:18
  66:10 83:2
  101:19
  149:14
  153:10

turned  95:23

TV  47:5

Twenty-eight
  11:15

twins  24:18
  25:24

twins'  24:20

twisting
  142:8

two-minute
  63:1

two-story
  9:25

two-year
  14:21

Tyler  33:10

type  14:13
  22:22
  45:5,8
  47:17
  81:16
  91:17 92:3
  98:1
  100:16
  159:9

typical
  119:21

typically
  7:23
  122:12,14

---

**U**

Uh-huh  9:5
  25:20
  57:20
  90:15,17
  132:4

ultimately
  14:1 57:1
  61:6 71:17

unannounced
  159:20

undergo
  81:16
  82:2,5
  93:1 94:21
  98:1

underneath
  138:11,22,
  25

understand
  6:24 7:2,3
  27:5 37:20
  59:6 75:5,
  21,22,23
  76:16 77:1
  93:15
  108:6
  113:20
  114:7
  118:1,3,4
  127:22
  136:9
  151:14
  158:7
  161:4

understanding
  36:21
  93:24 94:7
  106:10
  160:23

understood
  80:25

84:21
  103:22

underwent
  93:24

unexplainable
  98:8

unintelligible
  15:16,17
  30:20,24
  46:24,25
  68:18,19
  90:25 91:1
  111:2,3
  116:12
  123:5

United  22:19

upped  36:1

upper  66:15

USA  20:19

UT  155:19

UTMB  150:15
  151:1,13,
  19 153:9
  155:15
  156:5
  157:24

---

**V**

vague  53:16

vaguely
  146:17
  147:20

valve  65:2

**vascular**
  42:12

**vehicle**
  69:21

**veins** 42:13,
  14

**venous**
  41:14,21
  42:2,3

**versus** 5:19

**vessel** 86:8
  87:6 92:2
  102:8
  123:21,24
  126:24
  149:21

**vicinity**
  19:15

**video** 29:25

**view** 121:3

**vision** 63:19

**visit** 49:24,
  25 50:10,
  17

**visitation**
  23:15
  25:13

**visited**
  23:16

**visits** 62:21
  159:7

**voices** 15:18
  47:1 68:20

91:2 111:4
116:15
118:25
154:23
156:24

**volunteered**
  20:10

**vomit**
  146:16,21

**vomited**
  146:19

---

**W**

---

**wait** 32:8,
  14 40:13
  49:10,18
  59:4 60:10
  83:13,14
  104:18
  109:2,10,
  23 112:12
  118:2

**waited**
  104:19
  144:24

**waiting** 52:5
  105:8
  145:7,13

**walk** 91:17
  92:3,13
  93:25
  94:7,22
  104:5
  116:8,20
  131:11

132:20
138:16

**walked**
  130:21

**walker** 91:20
  92:13,17,
  22 96:2,3,
  4,6,13
  97:11,18
  98:3
  99:11,14,
  22,25
  104:2
  156:19,21

**walkers**
  91:15

**walking** 98:3
  99:5,23
  100:18
  106:24
  119:7,11,
  16,22
  120:9,24
  121:15
  124:3
  132:22
  137:4
  143:16
  166:13

**walls** 26:12

**Walnut** 19:1
  36:9,10,17
  37:8 81:23
  82:18,20,
  24 83:1

**wanted**
  29:12,16
  30:22
  88:13
  95:21
  126:14
  131:9
  132:10
  133:14,24
  134:1
  161:25
  162:21
  163:2

**warning**
  106:25
  107:2,9,
  13,17,24
  108:7,12,
  15 112:15,
  23 113:24
  116:2,4,5,
  9 117:4,9,
  10 118:5,
  10,19

**warnings**
  107:13
  117:21
  167:15

**warrant**
  98:16
  99:22

**watch** 114:5
  117:13
  121:15

**watching**
  45:6,11

54:11
121:4,9

**water**
167:22,24

**Waukesha**
15:25 16:2

**ways** 162:17
168:5

**wear** 164:18

**wearing** 6:25
63:23
124:7,10,
13,15
164:15,21

**weather**
104:23
168:1

**week** 10:8
11:1 25:25
95:9,11
97:6

**weekly**
25:17,18

**weeks** 95:8,
10 97:6,25
165:22
166:17

**wet** 113:18
114:5
117:13,18
118:20
119:5,17
139:20,22
140:8,12,

13,18
141:13
142:16,20
143:2

**wetness**
140:20,22
141:5,16
142:10

**whatnot**
127:13
164:24

**whatsoever**
22:23

**wheelchair**
91:10,20
92:20,22
95:14,18
99:4,8,19,
25

**wheels** 96:1

**Williams**
89:5,14,22

**Wisconsin**
15:17,23

**woman** 29:10

**wondering**
167:22

**word** 6:15
34:20

**words** 6:15
37:22
44:10
110:21
111:7

130:3
141:25
142:8
155:6

**work** 19:17
21:10,11,
21,22 32:1
55:7

**worked**
19:15,22
20:17 22:9

**Workers'**
22:15

**working** 15:2
20:7 22:8

**works** 25:9

**world** 5:25

**worried** 69:8

**worst** 94:24,
25

**wrap** 63:3

**written**
31:24 49:7
147:25
148:9
153:11
154:5

**wrong** 68:3
114:20
125:8
155:5,6

**wrote** 36:13
161:15

---

**Y**

---

**Y-A-R-L-A-G-A-
D-D-A** 49:8

**yard** 26:13

**yards** 120:22

**Yarlagadda**
49:8 50:2,
8

**year** 14:24
19:19
25:10
29:3,7,8
35:10
42:25 45:7
46:9 63:22
64:11,19
73:16,17
154:7

**years** 6:1
8:21 9:19,
20 12:16,
25 19:18
20:22
21:16,18
23:17
27:11,15
28:1 35:20
36:18,23
38:8 40:20
41:5,11
43:19
63:21,22
65:13,14
80:17,21
82:15,16

**yellow**  74:15

**younger**
  80:11

**youngest**
  10:11,18,
  19

---

### Z

---

**zoning**
  165:15

**Zoom**  6:2