**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Amanda Campos on 01/12/2022**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 20-CV-25271-MARTINEZ

JENNIFER PELL, A citizen and
resident of California,

    Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES LTD.,
a Liberian Corporation,

    Defendant.

VIDEOTAPED/ZOOM DEPOSITION OF:
CORPORATE REPRESENTATIVE, ROYAL CARIBBEAN CRUISES, LTD.,
AMANDA CAMPOS

Taken on Behalf of the Plaintiff

DATE TAKEN:    Wednesday, January 12, 2022

TIME:    10:44 a.m. - 5:54 p.m.

PLACE:    Miami Beach, Florida

REPORTER:    Lisa Adkins
Notary Public
State of Florida

VIDEOGRAPHER:  Brian Rosenthal

APPEARANCES:

Counsel for Plaintiff:

    NICHOLAS I. GERSON, ESQUIRE
    Gerson & Schwartz, P.A.
    1980 Coral Way
    Miami, Florida 33145
    305.371.6000
    ngerson@gslawusa.com

    Appeared via Zoom video conference


Counsel for Defendant:

    MICHAEL J. DRAHOS, ESQUIRE
    GrayRobinson, P.A.
    515 N. Flagler Drive
    Suite 650
    West Palm Beach, Florida 33401
    561.268.5727
    Michael.drahos@gray-robinson.com

    Appeared via Zoom video conference

INDEX

WITNESS                                                    PAGE

Called by the Plaintiff:

AMANDA CAMPOS

Direct Examination By Mr. Gerson                            6

Stipulations                                             260

Signature Instructions                                   261

Errata Sheet                                             262

Certificate of Reporter Oath                             263

Reporter's Deposition Certificate                        264

EXHIBITS

                                                         PAGE:
Plaintiff's Exhibit No. 1                                  9
    Notice of Deposition

Plaintiff's Exhibit No. 2
    Safety meeting minutes                                 9

Plaintiff's Exhibit No. 3                                 14
    Video

Plaintiff's Exhibit No. 4                                 34
    Defendant's response to Plaintiff's
    First set of interrogatories

Plaintiff's Exhibit No. 5                                 39
    Accident investigation team meeting
    Bates stamp 1805

Plaintiff's Exhibit No. 6                                 65
    Pic of cruise ship deck

Plaintiff's Exhibit No. 7                                 84
    Public Area Attendant Schedule

                      EXHIBIT (CONT)

Plaintiff's Exhibit No. 3A                              90
     Video

Plaintiff's Exhibit No. 8                              122
     Picture of pool with caution tape

Plaintiff's Exhibit No. 9
     (Noting marked or identified)

Plaintiff's Exhibit No. 10                             134
     Photo with lifeguard

Plaintiff's Exhibit No. 11                             152
     Photo of deck and chairs

Plaintiff's Exhibit No. 12                             157
     Photo of deck and chairs

Plaintiff's Exhibit No. 13                             162
     Photo with deck and chairs

Plaintiff's Exhibit No. 14                             187
     Enclosed camera

Plaintiff's Exhibit No. 15                             200
     Photo of sliding glass door open

Plaintiff's Exhibit No. 16
     (Northing marked or identified)

Plaintiff's Exhibit No. 17                             201
     Photo of sliding glass door closed

Plaintiff's Exhibit No. 18                             214
     Spreadsheet

Plaintiff's Exhibit No. 19                             247
     Siebel

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We're now going on the record for the video deposition of Amanda Campos, as corporate representative of Royal Caribbean Cruises, LTD. Taken in the matter of Jennifer Pell versus Royale Caribbean Cruises, LTD.

Today is January 12th, 2022, and the time is 10:54 a.m.

This deposition is being conducted and recorded remotely via Zoom. My name is Brian Rosenthal, I am the videographer. The court reporter is Lisa Adkins both representing Huseby.

Would counsel and all parties present please state their appearances for the record, after which the court reporter please swear in the witness.

MR. GERSON: Nick Gerson on behalf of the Plaintiff Jennifer Pell.

MR. DRAHOS: Michael Drahos on behalf of the Defendant Royal Caribbean, and with me is my colleague Cooper Jarnagin.

THE REPORTER: Thank you. Now I need to do my read-in.

Good morning, everyone. My name is Lisa Adkins, and I'm your court reporter today. I am just going to read into the record the following:

The attorneys participating in this proceeding acknowledge that I am not physically present with the witness and that I will be reporting and administering the oath remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Will counsel please state their name and confirm this agreement on the record starting with counsel for the Plaintiff.

MR. GERSON:  Agreed on behalf of the Plaintiff.

MR. DRAHOS:  And the Defendant agrees.

THE REPORTER:  Thank you.

Ma'am, please raise your right hand.

(Witness sworn.)

THE WITNESS:  ^ I do  ^ Yes, ma'am ^ Yes.

THE REPORTER:  Thank you.

AMANDA CAMPOS,

called as a witness by the Plaintiff, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GERSON:

Q.  **Good morning.**

A.  Good morning.

Q.  **Please state your name for the record.**

A.   Amanda Campos.

Q.   Okay.  Ms. Campos, do you understand you're here for purposes of giving a notice -- for purposes of giving a deposition in a lawsuit that's been filed on behalf of my client Jennifer Pell against Royal Caribbean Cruise Lines, do you not?

A.   I do.

Q.   Okay.  And you understand your answers are binding on the corporation, correct?

A.   Correct.

Q.   Okay.  And you've been provided with a copy of the notice for today?

A.   I have.

Q.   Okay.  And what is the date the notice that you have in your possession?

A.   December 14, 2021.

Q.   Okay.  And what is the title of the notice that you're referring to?

A.   Plaintiff's fourth renotice of taking videotaped deposition.

Q.   Okay.  Have you had a chance to review the notice of taking deposition?

A.   I have.

Q.   And are you prepared to answer the questions and topics that are posed in the notice.

MR. DRAHOS:  Object to the form.  Subject to our be pending objections?

MR. GERSON:  Okay.

A.   I'm prepared subject to the pending objections.

MR. GERSON:  All right.  And I'll just put on the record that pending objections are not a reason for you not to answer the question.  Judge Beccerra procedures, with respect to corporate rep depositions, are stated in her pretrial order but we'll -- or trial order about how to go about it.  So we'll cross that bridge when we get to it, but I just want to put that on the record.

The other thing I want to put on the record is that earlier this morning at approximately -- I can't find the date.  But within a half hour of today's deposition, I received 170 pages of additional documentation Bates stamped -- it begins with Bates stamp 1738 through 1906.  And these are apparently a seven supplemental response for request for production. And, of course, I've had no way to review these in time for -- for today's deposition, and I'm going to -- aside from the notice, which will be attached as Exhibit 1, we'll attach these exhibits -- or this exhibit, this late disclosure of these -- it looks like they're a form of safety meeting minutes or, more precisely, I think

they're called -- let me find them.  The Enchantment accident investigation team meeting minutes.

So haven't had a chance to look at them, and if I need, we may be back here to go over them.  But I'm going to mark them as an Exhibit 2 to the deposition.

(Plaintiff's Exhibit Nos. 1 and 2 are marked for identification.)

MR. DRAHOS:  I'll state on the record that there was a conversation had between you and counsel prior to this deposition where you were directed specifically to the portion of that disclosure that addressed this specific case.

Those 170 pages are largely redacted and duplicative of prior safety committee meeting minutes that have previously been provided to you.

MR. GERSON:  Okay.  Well, I nearly asked about one particular page of the hundreds of pages that were produced and -- just to try to get an idea of what it was that was being provided.  But we can bring that up at another time.

BY MR. GERSON:

Q.  **Ms. Campos, tell me -- or would you tell -- well, would you tell me what's your position of employment is with Royal Caribbean?**

A.  I'm the director of guest claims and

litigation.

Q.   Okay.  And how long have you held that position?

A.   I've held that position for probably about five years or so.

Q.   Okay.  And how long have you been employed with Royal Caribbean altogether?

A.   I've been employed with Royal Caribbean for about 15 years.

Q.   Okay.  And you're also a practicing lawyer, correct?

A.   I am.

Q.   And you went to undergrad at the University of Arizona?

A.   That's correct.

Q.   And law school at the University of Miami?

A.   Correct.

Q.   Okay.  And other than a couple of jobs, you would agree that, for the most part, your legal career has been working as the director of claims for Royal Caribbean?

A.   The majority of my career has been working for Royal Caribbean.  I've had a couple of different titles, but definitely the majority of my career has been working in-house at Royal Caribbean Cruises.

Q. Is this the first time you've given a deposition in a lawsuit that's been filed against Royal Caribbean?

A. No, it is not.

Q. Okay. You've been asked to appear on behalf of the corporation well over 100 times, correct?

A. Probably, yes.

Q. Okay. We've actually met before, correct?

A. That is correct.

Q. And so you understand the rules. I'll be asking you a series of questions. You're required to answer all my questions truthfully. And if you need a break, let me know.

As the director of legal claims, what are your primary duties and responsibilities?

A. So I'm the director of guest claims and litigation. My primary duties and responsibilities are to oversee the guest claims that come in to our department, as well as litigation that is handled by outside attorneys in relation to guest claims.

In addition to that, I serve as the corporate representative for guest-related litigation cases.

Q. Okay. And, tell me, in preparation of your deposition, what did you do?

A. I've reviewed all the discovery in this case

that was produced by Defendant to the Plaintiff. So that would include all -- I mean, it's pretty vast.

I've reviewed all the discovery. I reviewed the complaint. I reviewed the answer to the complaint. I reviewed the interrogatories. The request for production. In addition to that, I reviewed the documents that went with the request for production. And I reviewed depositions of various people that have been deposed in this case.

**Q. Did you review any of the video footage that was produced by Royal Caribbean in this case?**

A. Yes, sorry, I would include that. I'm not going to list -- if you want me to list everything, I will, but that would be responsive to the request for production. So anything that was responsive to the request for production, I have reviewed.

**Q. Okay. So I just want to make sure.**

**You reviewed the photographs that were produced by Royal Caribbean in this case?**

A. I did.

**Q. Okay. And there were, I believe, three videos that were produced by Royal Caribbean in connection with Ms. Pell's fall. You reviewed those as well, correct?**

A. I only reviewed two videos.

**Q. You only reviewed two videos?**

A.   Correct.

Q.   Okay.  The two videos that you reviewed, can you tell describe -- tell me what you recall about them?

A.   There was two videos from two different angles. One was closer up; that was more grainy and the -- that video did not depict the actual incident itself.

And then there was another video that was not as grainy; it was easier to view, in a sense, and that as across the pool.  That's where the camera appeared to be -- that's where the cameras was that was recording the incident, and that one did capture the incident.

Q.   Okay.  And you looked at those videos more than once, have you not?

A.   Yes, during the course of this litigation, I have looked at them more than once, yes.

Q.   Okay.  And then did you also review the photographs that were produced by Royal Caribbean taken as part of the accident investigation?

A.   Yes, I did.

Q.   And, then, do you recall how many photographs, as part of the accident investigation, you reviewed?

A.   I don't recall the specific number.  It was maybe five or seven.

MR. GERSON:  I'd like to -- for the record, I'm going to -- with counsel's stipulation, I'd like to

mark the videos that the witness referred to as Exhibit 2 to the deposition.

The notice -- well, excuse me, Exhibit 3.

The notice is 1.

The belated injury investigation records that were reference as produced this morning as 2.

And then these videos will be composite Exhibit 3.

Are you okay with that, Michael?

MR. DRAHOS:  So -- I mean, I'm okay with the premise, but I need to see what videos you're attaching to make sure they're the correct ones. But we can cross that bridge when we come to it.

(Plaintiff's Exhibit No. 3 is marked for identification.)

MR. GERSON:  Okay.

BY MR. GERSON:

Q.    Ms. Campos, other than reviewing the photographs, the discovery materials, the two different video feeds, one which didn't depict the actual incident, and one video feed that was taken from afar -- and by afar I mean across the pool way, or pool on Deck 9.

What else did you do to prepare for today?

A.    I spoke with different people within our

shoreside team, as well as some of the people that were involved -- or, I guess, I spoke with some people shipboard as well, some crew members.

**Q. Tell me who you spoke to and when you spoke to them?**

A. I spoke with Dinesh, which is, D-i-n-e-s-h. And the last name I'm just going to spell. It's C-h-e-t-t-u-p-o-t-u-l -- who was the guest security supervisor at the time of the incident.

I spoke with him, I believe, back in September or further -- I don't remember exactly when. My deposition was supposed to happen at an earlier date than today -- a couple months ago.

And I believe I also spoke with Kelvin Alexander, a couple months back as well, he was the executive housekeeper.

**Q. And, tell me, why did you speak with Kelvin Alexander?**

MR. DRAHOS: Object to the form. Calls to violate work product. Mental impressions of counsel.

MR. GERSON: (Indiscernible).

MR. DRAHOS: If you can answer without -- mental impressions of counsel, go ahead.

MR. GERSON: Are you instructing your witness

not to answer?

MR. DRAHOS:  If you're asking why she spoke to a specific crew member, eyewitness in the case, that calls for her to reveal my mental impressions or some reason why I might have directed her to do so, then, yes.

But if she's able to answer that question independent of any involvement from me, then she can answer it.

A.  To --

BY MR. GERSON:

Q.  Why --

A.  I spoke with him to get a better understanding of the cleaning procedures done on Deck 9 at the time of the incident.

Q.  And when you spoke to Kelvin Alexander, where did that conversation take place?

A.  I was at my home.  He was -- I don't recall where he was.

Q.  Okay.  And did you send him any documents to review?

A.  I didn't send him anything.  I just got on a phone call.

Q.  What is Royal Caribbean's understanding as far as what Kelvin -- who Kelvin Alexander is and what his

role was with respect to the pool deck on January the 16th, 2020?

A.   Kelvin Alexander was the executive housekeeper -- or is the executive housekeeper.  I don't even recall if he was the executive housekeeper at the time of the incident.  But regardless, I wanted to speak with the executive housekeeper of the Enchantment to understand the cleaning procedures because he would be the one in charge of all of it, essentially.  He does report up, but it's the executive housekeeper that -- that is in charge of the cleaning on board the vessel.

Q.   And, tell me, when you spoke with Kelvin Alexander, was anyone with you at the time?

A.   No one was physically with me, but my attorney was on the phone as well.

Q.   And what is your understanding of what Kelvin Alexander's duties and responsibilities were with respect to the pool deck on Deck 9 as of January the 16th, 2020?

A.   He was in -- he's charge of all the public area -- or of cleaning of the entire ship, overseeing it; that's my understanding.

Specifically with Deck 9, he's the one who -- he would know how many crew members are there to clean it, and when it's cleaned, and the like.  So I wanted to

get a general overview of that.

Again, I spoke with him months ago, so I don't remember the conversation extremely well.  I just remember the overview of him knowing, you know, who would be responsible for cleaning that deck.

Q.    And was Kelvin Alexander able to identify any people on behalf of Royal Caribbean that were responsible for cleaning the deck?

A.    He -- not specific by name, but by title, yes.

Q.    I'm sorry, you were breaking up.

A.    I'm sorry.

He's able to identify them by title, yes.

Q.    And what was the title he was able to identify that meant having?

A.    Well, that there were four pool attendants that are stationed to the deck in the morning; that would be responsible for cleaning that area and that the area -- that's what he had said.

And then there's also the facilities -- that the facilities crew members that are available as well.

Q.    Okay.  The four pool attendants that you're referring, to that Kelvin told you were responsible for cleaning the deck on the day that Ms. Pell was injured, do they have specific job titles?

A.    They are pool attendants and/or public area

attendants.

Q.   Pool attendants and/or public area attendants?

A.   Correct.

Q.   Is a pool attendant and a public area attendant the same job title, or is that a separate job title?

A.   It's the same job.  My understanding now is that it's the same job title.  I was a bit confused about that as well, but it's the same job title.

Q.   Okay.  So you had an opportunity -- did you have an opportunity to read Kelvin Alexander's deposition?

A.   I have not read his deposition.

Q.   Okay.  What is -- you made reference to public area attendants as well, and you made -- first you said that there were four pool attendants and/or public area attendants.

So is it Royal Caribbean's testimony that there were a total of four people that would have been assigned to Deck 9 to monitor the pool deck to make sure that it's dry and that if there was a spilled drink or some other liquid or substance that wasn't supposed to be present on the deck that it would be fixed?

A.   It's Royal -- yes, there were four people in that specific area; not for the entirety of Deck 9, but for that area of the pool deck, yes.

Q.   The pool deck area that you're referring to extends from the bow of the ship to the stern of the ship, more or less, correct?

A.   No, that's not what --

MR. DRAHOS:  Object to the form.

A.   -- I'm referring to.

BY MR. GERSON:

Q.   Okay.  How large of an area do you -- well, do you know how large of an area the pool deck on Deck 9 consists of?

A.   No, I don't know how many -- how large that is in terms of feet.  But on Deck 9 is also the Windjammer.  I wouldn't be including the Windjammer when I say the pool deck area.  That would be from stern to bow, if I included the Windjammer, the pool, and continue to go on.  I'm just talking about the open area where the pools are.

Q.   Okay.  So the open area were the pool deck is located is the area where you have the Jacuzzis, the kid pool, the regular pool; that entire area is the area that you're referring to, that Kelvin Alexander confirmed, they had roughly four people assigned to that particular portion of the deck to monitor it for any wet areas, spilled drinks, or any other risk-creating conditions for passengers or even crew, correct?

A.   So I'm going to refer to what he testified to. I haven't read his deposition.  You might have said there were two other people as well.

Again, my conversation with him was a long time ago.  But I believe that that is correct, yes.  But I won't -- as Royal Caribbean will refer to his expertise from his deposition.  But, yes, there's four pool attendants or public area attendants.  I think that there's facilities cleaners around there as well.  But, again, I'm going to refer to his deposition testimony for the specifics of it.

Q.   Okay.  And so we'll get into that in a bit, but just so I'm clear.

You would defer to what -- anything that Kelvin Alexander said with respect to the staffing and manning levels for observing the opened area on the deck, of Deck 9, excluding the interior portions like the Windjammer Cafe?

A.   Correct.

Q.   Okay.  Other than Kelvin Alexander, who else did you speak with?

A.   I spoke with Dinesh.  We're just talking about crew.  Yes, Dinesh.

Q.   Okay.  And when did you speak to Dinesh?

A.   Months ago as well.

Q. All right. And what is your understanding of who Dinesh is?

A. Dinesh is the guest security supervisor -- was the guest security supervisor at the time of the incident.

Q. Okay. And who else did you speak with?

A. Those are the crew members that I spoke with.

Shoreside I spoke with -- I spoke with other people as well to assist in getting information in preparation of this deposition.

Q. Tell me who you spoke with shoreside, please.

A. I spoke with Anthony Jorajuria. Sorry, I'll spell that. It's, J-o-r-a-j-u-r-i-a.

Q. And what was -- who is Anthony -- well, I think I know who Anthony Jorajuria is -- or however you pronounce his name.

But just tell me, in case I'm mistaken, who is Anthony?

A. He's the project manager refurbishments. So he oversees when a ship is -- when a Royale ship -- I don't know exactly what ships he is assigned to, but one of them is the Enchantment. When it undergoes a refurbishment or a dry-dock.

Q. Okay. And when did you speak with Anthony?

A. I've spoken with him a couple of times over the

course of this litigation, but most recently I spoke with him yesterday.

Q.   And what did you talk about?

A.   Yesterday I spoke to him about -- there were questions surrounding a photograph that was taken showing the deck being different colors.  I spoke with him about that.

Q.   And what information were you provided by Anthony about the reason why there were different colors on the deck?

A.   I just -- before we forget, I also spoke with him about the resurfacing of the deck in 2018 in the past.

Okay, so going back to your other question. What did I speak with him about or -- can you repeat the question?  I'm not quite sure what it was exactly.

Q.   Sure.

You mentioned that you spoke with Anthony about some sort of refurbishing of the deck in 2018.

A.   Yes.

Q.   What portion of the deck was refurbished?

A.   Back in 2018 the entirety of the pool area deck, which we had just talked about -- so where the pool is located was redone into Bolideck Future Teak.

Q.   And when you say that the -- in 2018 there was

refurbishing of the deck in 2018, what portion of the deck was refurbished?

A.   I believe I just stated that.  The pool deck area.

Q.   The entire pool deck area?

A.   What I had referred to before, the area surrounding the pool where --

Q.   Okay.

A.   -- the incident occurred.

Q.   Okay.  Well, the area surrounding the -- and, you know, I apologize.  You know, it seems a redundant question, but the pool deck area is a fairly large area.

Is it your testimony that the entire lower surface on Deck 9 where the pool, the kiddie pool, the Jacuzzis are located, that the entire portion of the pool deck was refurbished?

A.   No, there's a photograph that was produced to you in response to request for production.  I might not be able to describe it as well, but that photograph shows the area that was refurbished.  But it would encompass what you had just said the area surrounding the pools, the Jacuzzi, the kiddy pool.  I don't know how many feet it was.  I don't recall exactly.  I think that was provided to you as well.  But that photograph shows the area that was refurbished.

Q.   Are you familiar with the area where Ms. Pell fell?

A.   Yes, that would have been encompassed in the refurbishment in 2018.

Q.   So in 2018 it's Royal Caribbean's testimony that the are where Ms. Pell fell was also refurbished by -- would that be Bolidt?

A.   Yes, it was -- the decks were redone and Bolideck Future Teak was placed on the decks -- on the deck.  I shouldn't --

Q.   What kind of --

A.   -- say decks.

Q.   Was Future Teak on the deck prior to 2018?

A.   I don't -- it was Bolidt that was on the deck. I don't know specifically.  I did forget.  I did have that information.  But it was a different type of Bolidt that was on it before.

Q.   And do you know why there was any refurbishment done in 2018?

A.   I'm sorry, will you repeat that?

Q.   Sure.

Why -- what is your understanding, in speaking to me, why the deck surface, on the pool deck where Ms. Pell fell, was refurbished in 2018?

A.   I think it was time to do so.  I never really

got specificities as to exactly why it was done, but I think the deck just needed to be resurfaced and that was done.

Q.   Does Royal Caribbean know how often the Bolideck surfaces are you supposed to be resurfaced?

A.   They're not supposed to be resurfaced.  There's no set time or date.  It's not like every five years you need to resurface them.  It's more of an as-needed type of thing.

Q.   And how was the determine made by Royal Caribbean as to when, in fact, the deck surfaces, like the deck used where Ms. Pell fall, is time to be refurbished, or anything else to make some sort of repairs or changes?

A.   It could be a variety of different reasons.  It could be an aesthetic reason that something might be changed because they want to change the look of the whole ship, say, or the whole deck, or it could be due to the deck itself wearing down and not being really as good as it was in the beginning.

But the process comes through from so many different areas.  So, like I said, if it's aesthetic, it could come through new build or from a different department.  If there are issues with the deck, it could come through the ship managers, then it would go through

a different process.  There's really no one-step way.

Different areas of the ship will be looked at by different people and a decision could be made to change the deck.

Q.   How are these decisions made by Royal Caribbean about when it's that time to refurbish the surfaces that were in place on a deck of the Enchantment of the Seas in 2018 when they were changed?

A.   I think that decision was made the year prior. So it's a process that takes a bit of time.  We've got to speak with Bolidt and arrange it all to be done and find a proper time for it to be done, and then get a contract with them.  So the process takes a bit of time.

Q.   Okay.  And is there a policy that you're aware of that Royal Caribbean has with respect to when, in fact, the decks are supposed to be refurbished, or sanded, or changed to improve either the aesthetics or the slip resistance?

A.   No, there's no policy.  It's -- there's no written policy about that.

Q.   Okay.  And you made a reference before about the reasons why the deck surfaces on the -- the Bolideck surfaces on the Enchantment of the Seas were replaced in 2018.  And one of the -- and I'm paraphrasing you.  But I think one of the things that you mentioned was that it

JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022                                    Page 28

might not essentially be performing as well as it should be.

A.   Correct.

Q.   Can you explain what you mean?

A.   If the deck is not performing as it should be. If it's -- if it's worn down. If it, you know, is getting worse for the wear, in a sense. There's a lot of saltwater -- the seawater and stuff like that. So if people are complaining about it, it could be replaced because of that.

Q.   And so what you're saying is that to the marine environment, the number of passengers, and just the other variables that are common to marine -- a marine environment that the deck surfaces on the Enchantment of the Seas, particularly the Bolideck surfaces, can wear down and have less slip-resistant qualities?

A.   That is --

MR. DRAHOS:  Object to the form.

A.   That is a possibility. But when they also wear down, they don't look good anymore. They begin to look discolored. You know, they might have, like, streaks in them like -- it looks like it's dirty when it's not. That's another reason.

So when I say worse for the wear, it just looks like -- it just doesn't look like we want our ship to be

presented.  It just doesn't -- it doesn't look clean when it is.  But it's just -- overtime it begins to look dirty even though it's not, if that makes any sense.  It just esthetically --

Q.   It does.

A.   -- looks displeasing.

Q.   So the deck can accumulate grease and other debris, saltwater, other things that can make the decks look dirty, as you described it, and that can affect the slip-resistant qualities, correct?

MR. DRAHOS:  Object to the form.

A.   Potentially it could.  But it also -- but it also could make it look just not pleasing to guests.

So over the course of time it just doesn't look good anymore as well.  And when it doesn't look good -- we want it to look good.

Q.   I understand.

And so until the deck surface doesn't look good, as you put it, is that kind of when the decision is made by Royal Caribbean to do something about the floor surfaces with respect to refurbishing it, or resanding it, or anything else to try and get back what was lost from the initial installation?

A.   Well, that could be one of the reasons.  But there are -- as I said, it could be a purely overhaul of

the desk itself. It could be something that -- we're informed of a new product by Bolidt that we choose to change the deck to a different product. There could be a variety of different reasons. But what I said was just one of them, and the others that I stated are other ones.

Again, I don't know --

Q. Now --

A. -- specifically why this one was changed in 2018.

Q. **And so who makes the decision ultimately on behalf of Royal Caribbean as far as when to check the -- or when to change the deck surface?**

A. Again, it's not one specific person; it goes through different departments. And I think, in this case, it could have been refurbishment. I think, if I recall -- actually, I'm not quite sure. I don't remember, so I don't want to state it.

It's a variety of different departments that would make the decision altogether.

Q. **As you sit here today, you said that you spoke with Anthony Jorajuria.**

**Do you know when in 2018 the deck surface on the Enchantment of the Seas was refurbished to bring it back to looking esthetically pleasing?**

A.   Again, I stated I wasn't quite sure of the exact reason it was refurbished, but that could have been one of the reasons.  But it was done in December of 2018.

**Q.   So in December of 2018 there was a decision made to change the deck surface -- or refurbish the deck surface on the Enchantment of the Seas.**

**Do you know whether or not the entire surface was resanded or replaced?**

MR. DRAHOS:  Object to the form.

A.   So the decision wasn't made in December 2018; it was done in 200 -- December 2018.

As I testified to you before, the decision would have been made probably the year before.  But you just can't make the decision and do it the next day.  It takes planning.

I forget the last part of -- oh, yes.  And the last part of your question I think we went over before.

There was a photograph that was produced to you in response to request for production that shows exactly which areas around the pool were done.  But it does encompass the pools, the kiddy pools, the Jacuzzis.  I don't know, off the top of my head, exactly how many feet it was, but it is the area surrounding the pool.

BY MR. GERSON:

Q.  Do you know with certainty whether or not the area where Ms. Pell fell was also the area that was refurbished or changes were made in 2018?

A.  Yes, that area is encompassed in the diagram we provided you in response to request for production.

Q.  And in order for the deck surface to be changed, sometimes it's resanded; is that correct?

A.  So, yes.  So with the type of product that's on the deck that's how they do it.  They sand it down and then they pour over the new product.

Q.  Now, Royal Caribbean -- you've told me, as I understand it, that there is no policy with respect to how often to repair or refurbish the deck surface.  From what you're telling me, and correct me if I'm wrong, it's just based on observations that are made by your ship personnel but there's no formal written policy as far as frequency, as far as when that should occur, correct?

MR. DRAHOS:  Object to the form.

A.  Not all of that is correct.  But what part of it, I will say is correct out of all of that, was that there was no written policy.

Q.  Okay.  Tell me what part of it isn't correct.

A.  It's not --

MR. DRAHOS:  Object to the form.

A.   It's not a decision --  well, I can't recall every single thing that you just said.  But the part that stuck out to me was that it's not a decision made by our crew members.  And, again, you just said a lot of different things.

But definitely there's no written policy, and the crew members don't make that decision, and it's not always just pointed out about the crew members.  There might be other reasons.  There's different reasons, again, why it might be done, which I believe I testified to before.

Q.   **It's my understanding in reading -- your familiar with the Defendant's answers to interrogatories that were filed in this case, correct?**

A.   I did review them.

Q.   **Okay.  And one of the questions that was -- excuse me, that was asked was:  How often, or whether or not in the last three years there had been any testing -- safety testing of the floor surface used in the area, or on the pool deck on the Enchantment of the Seas, specifically Deck 9.**

**Do you remember reading that interrogatory answer?**

MR. DRAHOS:  Object to the form.

A.   Was this in the first set of interrogatories?

BY MR. GERSON:

Q.   Give me a second and I can locate it.  Here we go.  I'll show you --

MR. GERSON:  We're onto, Ms. Court Reporter, I think Exhibit 4, would that be correct?

THE REPORTER:  That is correct.

(Plaintiff's Exhibit No. 4 is marked for identification.)

BY MR. GERSON:

Q.   Just, for the record, I will show you what we will -- what has been marked as Exhibit -- well, this is Exhibit -- it says Exhibit 3, but this will actually be Exhibit 4.  They were premarked in attempt to make this a little easier.

But if you take a look at what's on my screen you will see Exhibit 4, even though it's identified as Exhibit 3.  We'll change that when we get it over to the court reporter.

But these are Defendant's supplemental responses to Plaintiff's first set of interrogatories.

A.   Okay.

Q.   Do you see that?

A.   Yes.

Q.   And do you see that on 18, the question is asked of all safely-related inspections or testing

performed on the same floor surface used in the area aboard the subject vessel where the Plaintiff was injured for the five years prior?

A.   Correct.

Q.   And it says that there was none?

A.   Yes, that's what it says.

Q.   Okay.  So Royal Caribbean doesn't have a formal policy in place for testing the floor surface to ensure that it has adequate slip-resistance testing, or at least it didn't in the five years prior to Ms. Pell's fall?

A.   Can you put that question up again?  I'm sorry.

Q.   Sure.

A.   Oh, I have it, actually.

Okay.  Yes, there's no written policy concerning that, correct.

Q.   Why is that?

A.   I don't know.

Q.   Doesn't Royal Caribbean know that the most -- the most frequent types of accidents that occur on its ships are slip and falls that occur on the pool deck like Deck 9?

MR. DRAHOS:  Object to the form

A.   Royal Caribbean is aware that there are slip and falls that happen on pool decks, yes.

BY MR. GERSON:

Q.   Does Royal Caribbean dispute that slip and falls on the pool decks are the most problematic area for slip-and-fall accidents on its ships?

MR. DRAHOS:  Object to the form.

A.   I don't know.  For the purposes of my deposition, I didn't look into which area of the ship in that time frame was the most problematic per year, per ship.  I don't know specifically which area.

BY MR. GERSON:

Q.   Okay.  Are you familiar with something called the Enchantment Accident Investigation Team Meeting Minutes?

A.   I have just become familiar with them recently. I have not reviewed all of them.

Q.   And prior to -- well, generally speaking, do you know what they are?

A.   Yes.

Q.   What are the accident investigation team meeting minutes?

A.   And, again, I just learned of these very recently.

But the accident investigation team meeting minutes are the minutes from a team that is called the accident investigation team; that does, I guess, look

into different crew and passenger accidents that happen on board.  It's a subcommittee of the steering committee and it is basically a group that will look into some of the incidents that happen on board and then discuss them at this steering meeting -- steering committee meeting.

Q.   And are the -- what is the purpose of the accident investigation team meeting minutes?

A.   The minutes themselves is just a recording of their meeting.

Q.   Right.

This is a policy that Royal Caribbean has in place to discuss accidents that happen on its particular ships, correct?

A.   Yes, it's a -- how do I say this properly.  It is a part, in a sense, of the steering committee, which is the meeting minutes -- the safety minute meeting minutes that looks into some of the incidents that occur on board its ships, yes.

Q.   And would you -- the safety meeting minutes would you -- do you dispute that they're important for purposes of evaluating trends and various safety issues with respect to incidents like slip and falls that occur on perhaps the pool deck?

MR. DRAHOS:  Object to the form.

A.   Yes, it's important.

BY MR. GERSON:

Q.   And so when I asked you a little while ago -- I think my question posed to you was:  Isn't the pool deck the most frequent area where slip and falls occur on, at least on the Enchantment of the Seas -- you deny that it's true?

A.   I didn't --

MR. DRAHOS:  Object to the form.

A.   I didn't deny.  I said, I don't know.  That's not a denial.

BY MR. GERSON:

Q.   Okay.

A.   I just -- I don't recall.

Q.   Who --

A.   I don't recall.  If it's in there and that's what it says, then, I'm not going to deny it.  I just don't recall.

Q.   Okay.  Who runs the accident investigation focus team meetings -- the accident investigation team meeting minutes?

A.   Well, there's -- I think there's ten crew members assigned to be part of this team.  You have the document.  If you look at one of them, it will say who was there; not by name but by position.  I don't recall which crew member position runs it.

Again, I just -- I just -- I just became aware --

Q.   Okay.

A.   -- of these minutes recently as well, so I don't know much about them in terms of recalling who ran it or runs it.

Q.   Okay.

A.   It's essentially run, though, by this steering committee, so it's a subsection of that.

Q.   Okay.  And so the minutes themselves would identify who the participants are, who is speaking, and what the topics are, right?

A.   I think that it tells who the participants are by title.  I don't know if it specifically says who is speaking.  Maybe it does at some portions.  And it should say what, I believe, like, the agenda items would be.

Q.   Okay.  Let me show you what we'll mark as Exhibit 5.  And this is a one of the 170-page-plus documents that were just sent to me this morning.  A majority of them are, unfortunately, redacted.

(Plaintiff's Exhibit No. 5 is marked for identification.)

BY MR. GERSON:

Q.   But what I'd like you to take a look at is --

this is what was produced by your lawyers this morning. And if you take a look here -- and if the videographer can zoom-in.

Do you see at the bottom of page 11 of 13 of a meeting minute, which Bates stamped, 1805.

Do you see where it says "items discussed"?

A. Yes.

Q. Okay. And do you see here where it says the -- Pool deck is still the most dangerous area on the ship due to the most accidents occurred on the pool deck"?

A. That's when it says for that meeting, yes.

Q. Okay. And it says this meeting would be held by a senior level officer aboard the Enchantment of the Seas, correct?

A. Correct.

If you go to the top of the page, I believe -- or at the beginning of the meeting minutes for that particular --

Q. Okay, and we'll get to that in a second.

A. Okay.

Q. But it says, "Pool deck still the most dangerous area on the ship due to most accidents occurred on the deck," right?

A. That is what it says, correct.

Q. Do you know whether or not this remark in this

safety meeting minute, which I don't believe is identify as far as when it took place -- do you know if this safety meeting record reference was before the refurbishment that took place in 2018, or after the refurbishment took place?

A.   I think that if you -- if you start -- if you go slowly, there should be a date.  I don't know.  You would have to see if there's a date.  Just go slower, please.

MR. DRAHOS:  There is a date, 1795.

A.   Oh, so Bates stamp --

BY MR. GERSON:

Q.   Like I said, I didn't have a chance to review these because they were just sent to me this morning so -- but counsel is telling me 1795 there is a date.

A.   Yeah.

Q.   So -- okay.  Here is the date, May 22nd, 2018.

A.   So that would have been prior -- that would have been prior the incident that we're here for today.

Q.   Okay.  And in this -- May 22nd, 2018 there are a list of people that are identified but none of them are named by -- or none of them are identified by name just by job title, correct?

A.   Correct.

Q.   Okay.  So at least as of 2018 this safety

record -- and I'm going to go back to the particular

area -- is -- says that:  "Pool deck is still the most

dangerous area on the ship due to most accidents

occurred on the pool deck."

Now that you've seen this portion of the safety

record, you would agree, or do you disagree, that the

pool deck is an area that Royal Caribbean knows is

problematic because there are frequent slip and falls in

that particular area of the ship?

MR. DRAHOS:  Object to the form.

A.   Yes, it would appear for the date of May -- for

May 2018 and I guess whichever ones before it.  I don't

know when it was not the most dangerous area on the

ship, and I don't know when it stopped being it or if it

did.  But for that time period, yes, it appears that it

was.

BY MR. GERSON:

Q.   Okay.  And at least for this particular time

period, the references that are being made seem to

suggest that prior to 2018 that the pool deck was and is

an area that is known by ship officers, the staff

captain, the chief safety officer, the hotel director,

and other department heads as being a problem area for

slip and falls.

Wouldn't that be a fair statement?

MR. DRAHOS:  Object to the form.

A.   I don't think so.  I mean, I think that -- that it was known and said that the pool area is still the most dangerous area on the ship.  But I think that's, A, it is a pool area so, yes, it would be known that pool areas are probably a little bit more dangerous than an area where there's carpeting or no water involved.

But, yes -- I don't know exactly what you asked me anymore because it was a very long question.  If you could repeat it again, I'm sorry.

BY MR. GERSON:

**Q.   I think you answered the question.**

A.   Okay.

**Q.   So with -- given the fact that at least as of 2018 it was acknowledged -- it's acknowledge by ship personnel that the pool deck is a problem area where there are slip and falls, Royal Caribbean does not have a formal policy in place for safety-related testing of those particular -- of these high-traffic areas that are prone to slip and falls such as Deck 9?**

MR. DRAHOS:  Object to the form.

A.   Royal Caribbean does not have a written policy in place.

BY MR. GERSON:

**Q.   Do you know whether or not the manufacturer --**

and by manufacturer I mean Bolidt.

Do you know whether Bolidt has a policy in place, or recommendation as far as how often the floor surfaces on the pool deck that utilized its Bolidt surface are supposed to be refurbished?

A.   I do not know that.

Q.   So Royal Caribbean strictly relies on its own crew members to make visual observations and based on their visual observations, a decision is then made whether or not we need to make the desk look more esthetically pleasing?

MR. DRAHOS:  Object to the form.

A.   No, I never said that.  I said that Royal Caribbean -- different areas of the ship can be refurbished at different times for different reasons.

We have a whole refurbishment team shoreside. The refurbishment team could go on board for a different ship knowing that a refurbishment is coming on, discuss with different crew members, if they want to, what areas of the ship might need to be refurbished.  But they also have, within their own departments -- within the refurbishment department shoreside, discussions about what areas should be refurbished, and that's how it works.  It's not just from crew members saying, This should be done.  That's not how it works at all.

BY MR. GERSON:

Q.   Well, if there's no policy in place to test the slipperiness of the floor surfaces, how does Royal Caribbean decide, other than looking at it superficially to see whether it's dirty, to see, other than esthetically pleasing, whether or not it's safe in wet conditions?

A.   So that could be information that does come from crew members that -- you know, they get emails or information saying, We're having an increase of incidents surrounding the pool.  And then that will be taken into account also when the refurbishment team decides to refurbish it, or if it's a bigger problem than that -- you know, that situation would be remedied immediately.  But that could happen if there is an area on board the ship that's having incidents occurred at a high frequency, then that would be reported back to shoreside.

Q.   And when you say you would rely on the people that are overseeing and managing the pool deck, would one of those people be someone like Kelvin Alexander?

A.   It could be somebody like Kelvin Alexander.  It could be the safety officer.  It could be -- it could be a variety of different people.

Q.   Do Kelvin Alexander and the other variety of

people, the safety officer that you referred to -- does Royal Caribbean have a policy in place that requires their crew members, that are responsible for managing the pool deck, to evaluate or analyze the number of slip and falls that may be ongoing or taking place on a particular deck like Deck 9?

A.   Well, they have their steering committee and those meetings discuss it and then those meeting minutes are looked at shoreside as well.

Q.   So the answer would be yes?

A.   Well, it's not a written policy.  The answer is no in terms of a written policy.  But in terms of what gets relayed, yes.

But I don't know -- I don't even remember if your question was a written policy or just a policy in general.  But there's no written policy.

Q.   My question -- so there's no written policy for how often to replace or refurbish the deck surfaces on the pool deck.  And there's no written policy in place for how often the people like the housekeeping manager, such as Kelvin Alexander and the other people that are running the pool, are supposed to evaluate any sort of slip and fall trends or incidents to ensure that the deck is, in fact, safe and slip resistant for passengers traversing it?

MR. DRAHOS:  Object to the form.

A.    No.  No, I mean, they -- like I said, they have monthly safety steering committees are held and that's discussed within those meetings.

Q.    Okay.  And so those meetings are, essentially, what Royal Caribbean relies on its employees, their department heads to attend.  And part of the reason why they attend those meetings is to discuss potential safety issues, and then decisions are made from there about whether or not we need to fix a condition that may be recurring or problematic such as a slip and fall?

A.    Yes and no.  They discuss it all.  I don't -- and then it's going to be discussed shoreside as well for somethings; maybe not for other things.

Q.    Has Royal Caribbean, to your knowledge, ever done anything to speak with the people from Bolidt with -- as far as what they recommend in terms of how frequently the Bolidt surfaces should be refurbished, resanded, or fixed, changed in someway to make sure that they have adequate slip resistance?

A.    Yeah, Royal Caribbean and Bolidt have talks about how to maintain and how to clean the Bolidt.  And if Royal Caribbean has a problem with the Bolidt, or there's an issue that comes up, they would speak with them.  But -- and if Bolidt had a policy that it should

be done every -- I don't believe that Bolidt does have that policy.  I don't know if they do, but I don't believe they do.  But Royal Caribbean works with Bolidt to ensure that the floor surface is cleaned and maintained properly.

Q.   Between the time that the floor surfaces were changed, as you've testified to in 2018, do you know when the floor surfaces on the Enchantment of the Seas had been changed prior to Ms. Pell's fall?

MR. DRAHOS:  Object to the form.

A.   2018.  Her fall occurred --

BY MR. GERSON:

Q.   So the last --

A.   Her fall occurred in January 2020, and the last time prior to that that they were changed was December 2018.

Q.   And where was the floor surface changed; do you know?

A.   I'm sorry, say that again.

Q.   Do you know when the floor surface was changed?

MR. DRAHOS:  Form.

A.   It was changed in December 2018.

BY MR. GERSON:

Q.   December 2018, okay.  Sorry, I -- maybe I didn't ask the question I intended to ask.

So between 2018 and 2020 the floor surface had not been changed in that interval of time prior to Ms. Pell's fall, correct?

A.   That is correct.

Q.   And why doesn't Royal Caribbean have a written policy for inspecting the deck surfaces on Deck 9 to make sure that it has adequate slip resistance?

MR. DRAHOS:  Object to the form.

A.   I mean, I don't know what you -- there is always -- you know, there's always crew members walking around and if there is an issue that they -- why doesn't it have a policy to use -- I don't really -- I don't know how to respond to this properly.

If you're asking me why does it not have a policy to use testing equipment, I don't know because we don't have a policy concerning that.  But we do have, you know, in general, the understanding that if there's an issue with the flooring, if it's not the proper, you know, traction when crew members are walking over it, or they feel as though, you know, people are slipping at a higher rate, that will be discussed and it will be brought to shoreside's attention.

BY MR. GERSON:

Q.   How many passengers does the Enchantment of the Seas hold; do you know?

A.   I feel like it's like --

Q.   Or --

A.   -- around -- between, like, 25 and 3,500, but I can be completely wrong on that.  So I'm not quite sure, I'm sorry.

Q.   Isn't it closer to more like 4 to 5,000?

A.   I don't know.  I didn't look at that.

Q.   Okay.  And if there's no policy in place to evaluate the safety or slip resistance of the floor surface, how do you -- how does Royal Caribbean ensure that the floor surfaces are, in fact, safe?

A.   Again, I don't -- I didn't -- when you were asking me, I assumed you meant a written policy.  I have gone over, again, I think a couple of times now, that Royal Caribbean has, on board, their monthly safety steering committee meetings that it's discussed and that information gets relayed to shoreside.

We do not have a written policy on having people test the floor with testing equipment.  But we do have general policies of having these meetings held on board to discuss safety issues monthly.

Q.   And then based on what is discussed at those meetings -- if there were of number of slip and falls identified or references to do a need to repair the -- or replace the floor surface, that's essentially how the

process would begin?

A.   Yes, and shoreside would start making arrangements to do whatever was necessary.  Though, in this case, if they need to refurbish the floor or redo the floor -- but, again, that's not going to be something that can be done the day of.  It's going to have to be a process that they would have to get in touch with Bolidt, arrange for it to be done, find a time for it to be done, and like.  But, yeah, shoreside would --

Q.   Do you know --

A.   -- start doing it.

Q.   So does the vessel have to be taken out of service in order to replace the floor surfaces or make changes to the floor surfaces like on Deck 9?

A.   The vessel for -- to put Bolidt on the deck it does not need to be taken out of service; however, the area needs to be taken out of surface, and the pool deck is a pretty busy popular area.  So you wouldn't be able to use the pool deck while it's being done.

I don't know specifically if they're able to do it in sections.  But I believe in 2018 it might have been done while there were people on board.  But, no the --

Q.   Do you know that for a fact?

A.   Yeah, I'm not quite sure if part of it wasn't and part of it was, but I know that you do not -- to do Bolidt you do not -- I don't believe you have to take it out of service.  It's just a question of whether or not it can all be done with passengers on board.  Like, it doesn't need to be --

Q.   Do you know --

A.   -- in dry-dock, is what I'm saying.  If you want -- what I meant was in order to do -- to change the Bolidecking, the ship does not need to be in dry-dock.

**Q.   Would -- do you know whether or not the Bolidt surface that was changed in 2018 was completely ripped up and replaced with different Bolidt, or if it was just resanded back to its prior condition when it was installed?**

A.   No.

So what Bolidt is is that -- all Bolidt -- although it might look like wood, or whatever, it never has to be ripped up.  Bolidt gets sanded down.  So whatever -- so say it was -- and I don't recall.  But say if it was, prior this, a different Future Teak or Select Soft Bolidt, it gets sanded down entirely, and then Bolidt is poured -- new Bolidt is poured onto it. It's not placed onto it.  Bolidt is a material that gets poured on and then sets to dry.

Q.   Okay.  And that's something that occurs in dry-dock?

A.   No, I --

Q.   It doesn't happen in dry-dock?

A.   I just said that Bolidt -- it could.  It could, but it does not need to be in dry-dock to do that.  You do not need to be in dry-dock to pour on Bolidt.  You could, but you don't need --

Q.   Okay.

A.   -- to take a ship out of service to do Bolidt.

Q.   My question -- do you know whether or not the vessel, the Enchantment of the Seas, was placed in dry-dock at any point in time for purposes of resurfacing the -- or refurbishing the Bolideck surface that was used at the time Ms. Pell fell?

A.   I don't understand your question.  I'm sorry.

    MR. DRAHOS:  Object to the form.

A.   Are you asking --

BY MR. GERSON:

Q.   My question was:  Do you know whether or not -- in order to make the changes that you referenced occurred at the end of the 2018 on the Enchantment of the Seas to the Bolidt floor deck, do you know whether or not the vessel was taken out of service at all?

A.   Again, I think I answered this, but I'm not

quite sure.  I don't think it was taken out of service in terms of dry-dock.  I don't know if part of it was done when there were no passengers on board and part of it was done when some passengers were on board.  But in 2018 I -- I don't -- the ship was not in dry-dock when the Bolidt was done.

Q.   Okay.  Do you know how long --

A.   Or I should say, when the resurfacing of the deck happened in 2018 the ship was not in dry-dock.

Q.   Do you know that -- do you know whether or not the plans to refurbish the deck in 2018, if those were all completed as -- as referenced in the emails that you read with -- from Mr. Anthony, I think its, Jorajuria -- do you know if the entire project was completed or only part of the project was completed?

A.   I believe the entire project was completed.

Q.   Do you know how long it took?

A.   I don't know how long it took.  I don't think it takes that long.

Q.   When you say you don't think it takes that long, what is your understanding of -- tell me the basis for that and what you believe the time frame is.

MR. DRAHOS:  Object to the form.

A.   There are -- I think that -- the process of Bolidt, in general, is not a long process; it gets

sanded down and then poured on, so it's not something that takes, you know, months and month.  I think that it would take like a week or something to actually complete, maybe two weeks.

My understanding of it is based on the emails.  So it seems as though, from reading those emails, that it was going at a quick pace.

Q.   And so you mentioned -- going back to the topic.  You mention that you spoke with this Anthony Jorajuria -- and if I'm mispronouncing his name, I apologize.  If that's not his -- what's your understanding of what his name was?

A.   His name is Anthony Jorajuria -- sorry.  Jorajuria.

Q.   Anthony Jorajuria.

Okay.  So you spoke with Anthony and that's how you learned of some of these issues with respect to the floor deck surfaces being refurbished, correct?

A.   Correct, some of it, yes.

Q.   Did you speak with anyone from Bolidt?

A.   No.

Q.   Okay.  And for those jurors that are watching this video.  The lack of -- you do understand, Ms. Campos -- or Royal Caribbean understands that the deck surface, if it doesn't have adequate slip

resistance, can increase the number of slip and falls that occur, correct?

A. Yes, that's a possibility, yes.

Q. I mean, that's -- aside from the aesthetic, I mean, that's part of reason why you would change the deck surface in the first place?

A. Yes, that could be --

MR. DRAHOS: Object to the form.

A. It could be a reason --

BY MR. GERSON:

Q. Do you know --

A. -- for it.

Q. Do you know how many times prior to the end of 2018 the deck surface had been changed on the Enchantment?

A. I do not know how many times prior to 2018 the deck surface had been changed on the Enchantment.

Q. Are you -- is Royal Caribbean unaware of the fact that the deck surfaces on -- or the Bolidt surfaces are supposed to be replaced or refurbished on an annual basis?

MR. DRAHOS: Object to the form.

A. I'm not aware that Bolidt needs to be changed on an -- you're saying that Bolidt needs to be -- or you're asking me if Royal Caribbean is aware that Bolidt

needs to -- can you just say those words specifically again?

BY MR. GERSON:

Q.    Sure.

Is Royal Caribbean aware of the recommendation by Bolidt that the deck surfaces should be refurbished on an annual basis?

MR. DRAHOS:  Object to the form.

A.   I don't understand what you mean by refurbished.  Re-poured?  I don't --

BY MR. GERSON:

Q.    Well, refurbished is another way of saying resanded, repaired.  The same types of things that were done in the end of 2018.

A.    No.

MR. DRAHOS:  Object to the form.

A.    At the end of 2018 the flooring was completely taken out and a new surface was poured; that's not the same thing as resanding.

BY MR. GERSON:

Q.    Are you sure that a new floor surface was replaced or it was just resanded?

A.    My understanding is that there was a new floor surface poured onto it.

Q.    A new floor surface that was poured onto the

existing floor surface?

A.   So the floor surface -- my understanding of Bolidt, again, is that you sand down -- you don't ever rip it out.  There's no ripping Bolidt out under any circumstances whatsoever.  You cannot rip it out.  So if you want to replace the current deck that has Bolidt with new Bolidt, you have to sand it all the way down.

Now, there is other stuff that -- during the course of years it can be sanded to renew it, in a sense, but that's not the same thing that I'm taking about here.  What I'm taking about here -- and I'm sorry if I was unclear in any of this.

But my understanding in 2018 is that the floor surface that was currently there was completely sanded away and a new floor surface was poured on.

Q.   And when was the next time the floor surface on the Enchantment of the Seas was changed?

A.   Since --

MR. DRAHOS:  Object to the form.

A.   Since 2018 it has not been changed.

BY MR. GERSON:

Q.   Are you sure about that?

A.   Yes, I am sure that since 2018 it has not been changed.  And I just want to be careful with the words that you're believing I'm using versus how you define

words.

So going forward, I think we should just be careful about that.  And I'm going to ask you questions when you say things because I think that you're mixing up -- or I'm mixing up and not understanding what you're saying.  So. . .

MR. DRAHOS:  Hence, my objections.

BY MR. GERSON:

Q.   **Okay.  Well, have there been any changes to the floor surface on the Enchantment of the Seas -- and in particular Deck 9, the same deck where Ms. Pell fall -- fell -- since 2018 as you've referenced earlier, until the present day?**

A.   Okay.  So, again, when you say changes.  What I'm thinking is changing completely of the floor surface.  So I'm going to answer this question.

The deck has not been -- there has not been a change to the floor -- to the pool deck of Future Teak that was put on in 2018 in terms of pouring on a new deck since 2018.

BY MR. GERSON:

Q.   **But has the floor been resanded since 2018 to the present?**

A.   Okay, yes, that's a completely different question that you're asking me there and that's, I

think, where you and I are getting -- it's not funny, though, because you're using terms that I don't use in the same way as you.  So if you're trying to --

Q.   Okay, fair enough.

A.   I'm answering the questions in terms of -- when you say refurbished, I'm thinking of it in the terms of how I think of it for Royal Caribbean.

We have a whole refurbishment team that goes on and changes things, takes them off, puts them on, changes the entire thing.

Sanded is completely different than refurbished or changed.

Q.   Well, I don't want to argue with you --

A.   No, no, no --

Q.   -- Amanda.

A.   -- what I'm trying to explain to you --

Q.   That's fine, that's fine.  I'll --

THE REPORTER:  Hey, guys -- hey, hey -- hey, guys, I can only get one person speaking at a time, please.

A.   Mr. Gerson, I think it's very important that you understand that I'm answering these questions thinking you're asking me one thing and apparently you're not, and I don't want that to get lost anywhere here.

So I want to just make sure that you're -- I'm answering the question to what you're asking me, and I don't think that's happening.  So if I want to start again and ask me more specific questions -- because you asked me very broad questions and I'm not -- the words that you're using I guess I'm interpreting as more broad when you're trying to get more specific.

So if you want to ask me anything, I will answer it, obviously, but you need to be -- I'm just a little confused sometimes by your questions and the words you choose to use.  So I do not --

**Q.   Okay, when I say -- when I say change I am -- my idea of change includes sanding because sanding would change the composition and the texture of the floor surface.**

**So using my definition of change.  Have there been any changes to the floor surface on the Enchantment of the Seas since Ms. Pell's fall on January the 16th, 2020 to the present?**

A.   Yes.

MR. DRAHOS:  Wait.  I want to object to the form of that question, as I believe we're going outside the scope now of this witness's testimony.

MR. GERSON:  The witness has answered yes, and she's entitled to answer based on her personal

knowledge.

And, Mr. Drahos, some of the topics in the notice talk about all changes to the floor surface since the date of the incident to the present.

MR. DRAHOS:  She's not a Bolidt --

MR. GERSON:  So --

MR. DRAHOS:  No, we're not here on behalf of Bolidt, and she's not a flooring expert.  So she's going to testify within the limits of what she's capable of --

MR. GERSON:  All right, she doesn't have to be a flooring expert -- she doesn't have to be a flooring --

MR. DRAHOS:  I believe your question --

MR. GERSON:  -- expert, and I'd it if you didn't make speaking objections.  So --

MR. DRAHOS:  Well, you're asking --

MR. GERSON:  -- I'd like to just ask --

MR. DRAHOS:  You're asking me to explain.

MR. GERSON:  Okay.

MR. DRAHOS:  That I think you're going outside of her area of expertise.  She's not -- she's not an expert --

MR. GERSON:  Okay.

MR. DRAHOS:  -- in flooring.

BY MR. GERSON:

Q.   Ms. Campos, tell me what information you know about the sanding that occurred to the floor surface since the date of the incident involving my client on January the 16th to the present.

A.   Okay.  Before I do, I do want to point out that when I answered the floor had not been changed -- my understanding of you asking that question was asking whether or not the floor had been entirely resurfaced again.  To that, the answer is no.

Whether or not the -- there has been a portion of the flooring that was sanded in, I believe, November '21.

Q.   November '21?

A.   Correct.  When the --

Q.   And --

A.   When the ship was in -- after the ship -- or nearing the end of when the ship was in dry-dock.

Q.   Okay, is that when the ship was in dry-dock in Cádiz, Spain?

A.   Correct.

Q.   When was the ship taken out of service for COVID?

A.   It would have been -- I don't know the specific date for the Enchantment, but it would have been

obviously around March 20th, 2019 because that's when all ships stopped sailing -- or 2020.  I'm sorry, 2020.

Q.   And how much of the floor surface was resanded on the Enchantment of the Seas in November of 2021?

A.   I don't know the specific square footage, or amount, or feet that was sanded.  Just a portion of the pool deck was resanded.

Q.   And the portion of the pool deck that was resanded in 2021 included the same portion of the pool deck where Ms. Pell fell, isn't that correct?

A.   I believe that it encompassed that area, yes.

Q.   And have you provided any documentation -- or are you aware of any documentation about the changes that were made to the -- and by changes, the resanding of the floor surface on Deck 9.

Are you aware of any documentation that has been provided to my office with respect to that?

MR. DRAHOS:  Object to the form.

A.   First of all, I don't -- I don't why you keep on saying resanding.  It was just sanded; there was no resanding because that would imply that it had been -- it was sanded.  But, no, there is no documentation concerning that.

BY MR. GERSON:

Q.   How do you know that that took place?

A.   I just found out about that yesterday, and I knew that took place -- or I found out how it took place by speaking with Anthony Jorajuria.

**Q.   And do you know why it is that the floor surface where Ms. Pell fell was sanded if the floor surface hadn't been used for nearly a year's time?**

A.   First, I don't know if the Enchantment hadn't sailed.  But from 2020 -- March 2020 until November 2021 I think it had sailed.  But during the dry-dock in Cádiz, Spain, Deck 9 had areas of it that -- that specific area that got damaged due to the construction that was being done.  So that portion of the floor was sanded because that's where materials were being held, and aluminum was being cut, and the floor got dented and scratched up.  So to make it not dented and scratched up and look better; that area was sanded.

**Q.   So I'd like you to take a look at what we're going to mark as Exhibit --**

MR. GERSON:  Ms. Court Reporter, what exhibit are we on?

THE REPORTER:  Exhibit 6.

MR. GERSON:  Exhibit 6.  Okay, just give me a second here.

(Plaintiff's Exhibit No. 6 is marked for identification.)

BY MR. GERSON:

Q.   Did you review any photographs, Ms. Campos, of the re -- of the sanding -- and as I call them, changes, to the floor surface used in the area of Deck 9 on the Enchantment of the Seas?

A.   I saw a photograph very recently that had, I guess -- I think it was your expert in it, and that's the photograph I think you're referring to.

Q.   Okay.  So I'd like you to take a look at what we'll mark as Exhibit 6.

And do you see here what we have -- you recognize this photograph?

A.   Yes.

Q.   Okay.  And --

A.   Well, no, I hadn't seen this -- this is not the photograph I saw.

Q.   Okay.  Well, I'll represent to you this is a photograph from the inspection that your lawyers were just present, just I believe, in the last ten days or so, maybe a week or so.

And if you take a look at this, you do recognize generally what this shows; do you not?

A.   Yes, this is Deck 9 of the Enchantment of the Seas and specifically this is the area -- not set up the same way.  But it's the area around where the Plaintiff

in this case fell.

Q.   Okay.  And we see in this photograph that we've got different shades of, looks like, browns and tans in the photograph, correct?

A.   Correct.

Q.   Do you know why this particular area, where my cursor is, is shaded a darker -- almost like a -- more of a wood -- dark brown, and then we have another area where this drain is located why it's tan and a different color?

A.   Yes, what I just explained to you.  So when the Bolidt is originally poured, it's more of the tan lighter color.  Overtime it gets darker.  And the area that's the lighter brown had been sanded.

Q.   Is it your understanding that the darker area where my pointer --

MR. GERSON:  Is the videographer able to see this?

THE VIDEOGRAPHER:  Yes, it's on screen.

BY MR. GERSON:

Q.   Okay.  Is it my under -- is it your -- do you know, Ms. Campos, whether or not that this darker shaded area is actually a slip-resistant material that is being applied to the portion of the deck?

MR. DRAHOS:  Object to the form.

A.   I don't know it -- it's the same -- it's the same material throughout the whole deck.  The portion that's lighter had just been sanded down to get rid of all the dents and the damage that had been done to that area during dry-dock.  But nothing --

Q.   **And one of the reasons --**

A.   The darker area -- it just turns dark over time due to the sun.

Q.   **So you don't -- are you -- do you know this for a fact, or you're just assuming that the reason why this portion is a different shade from the rest of the deck surface has nothing to do with what is being applied as an extra coat for slip-resistance protection?**

A.   No, this is going --

MR. DRAHOS:  Object to the form.

THE WITNESS:  Sorry, Mike.

A.   This is going to remain the same, and in a month or so, it will be the same color due to the sun. I know that.  I was told that.  And there's no different material on one versus the other.  They're both Bolidt Future Teak.  One has just been sanded to get rid of the dents and the damage caused.  But, again, in three to four weeks, or a month or so, or maybe a month and a half, they'll be the same color.

BY MR. GERSON:

Q.   And one of the reasons why the floor surface is sanded is because over the course of time, with people walking on this deck surface, and people can be walking barefoot, the area can become -- or the deck surface can become contaminated, dirty, and it can lose some of its slip-resistance qualities, correct?

MR. DRAHOS:  Object to the form.

A.   I'm speaking to why this area here was sanded and the answer is because during dry-dock on November 21st -- November 2021 it got damaged.  So in order to get rid of the damage, it was sanded.  I don't know -- it has nothing to do with anything else besides that.

Q.   What damage are you referring to?

A.   There was damage caused to it during dry-dock. There were materials being held in that location; it got dents and that's -- that's the damage I'm talking about. It did not look good, that specific area, so they sanded it to get rid of all the dents and the dirt -- or it's not dirt, I guess.  The damage that was done to it during dry-dock.

Q.   And have you reviewed any of the documentation about the changes that were made to the particular area of the deck surface that we just looked at in Exhibit 6?

A.   There are no --

MR. DRAHOS:  Object to the form.

A.   There are no documents in relation to it.  It was just done by the ship itself after the ship -- after everything was taken away, after all the work was done, they noticed what it looked like and that there was damage caused to it, and the ship did it itself.

BY MR. GERSON:

**Q.   At the time that these changes were made, that you referred to as we saw in Exhibit 6, Royal Caribbean was aware of the fact that there was a request to inspect the vessel and that a lawsuit was pending by my client in this particular matter, didn't they?**

MR. DRAHOS:  Object to the form.

A.   Correct.

And, again, I'd like to just reiterate that it's sanding done to it; it's not changes.  It's still the same flooring.  The flooring has not --

BY MR. GERSON:

**Q.   I understand --**

A.   But, yes, Royal Caribbean was -- Royal Caribbean in general, yes, was aware of it.  The ship did not correspond with anybody shoreside before it was done and it wasn't -- it wasn't requested to be done. The ship just did it on its own due to the aesthetic look of it, looking bad, so they sanded it on its own.

But they did not reach out to anybody shoreside prior to doing in.

Q.   How extensive was the damage, that you're referring to that took place on the, on Deck 9 causing these changes, which you have represented had nothing to do with the fact that the floor didn't have adequate slip resistance or needed to be changed because of a safety reason?

A.   I don't know --

MR. DRAHOS:  Object to the form.

A.   I don't now the extent of the damages.  My understanding, from what I was told, there were dents and dings.  A large portion of the flooring had plywood on top of it.  This area apparently did not, and there were materials and -- again, I was told that they were cutting aluminum and doing stuff around there that caused the damages.  But I do not have photographs of the damages, again, because the ship just did this without corresponding before to shoreside.  They took it upon themselves to make it look more esthetically pleasing because of the dents and the dings.

BY MR. GERSON:

Q.   Do you know why the changes that were -- that you've referenced having occurred in November of 2021 were never disclosed in this case?

MR. DRAHOS:  Object to the form.

A.  I was just made aware of it yesterday.  I don't think that anybody in this case knew of it until, I guess, maybe you went on and did your vessel inspection.

BY MR. GERSON:

Q.  **Well, what promoted you to assume that there had been any changes in the first place if you're telling me yesterday was the first time you were made aware?**

A.  Yesterday is the first time I saw the picture of your expert on board.  And after seeing it, I could definitely see that there were two different colors, and I reached out to Anthony Jorajuria to try to determine what that was and why that was and what could have caused this to be two different colors.

Q.  **Now, the area where Ms. Pell fell, you would agree that is part of the area that was changed or sanded in 2021, correct?**

MR. DRAHOS:  Object to the form.

A.  It appears --

BY MR. GERSON:

Q.  **November of 2021.**

A.  It appears from looking at that picture and from even that CCTV tape that, yes, it would be encompassed in that area.

Q.   Royal Caribbean was aware of the fact that my expert had intentions of going onto the vessel to inspect the particular area where the sanding took place in 2021, didn't it?

A.   My understanding of that is that you have been -- we have provided you with my dates prior to November 2021 to have your expert come on board.  And, yes, we knew that your expert was coming on board but -- yes, we knew that.  But it's not as though we waited until November 2021 to sand it, and then have your expert come aboard.  We have been offering you many dates prior to that.

And, again, this was not something that was coordinated with shoreside at all in terms of that sanding; it was something the ship did on its own.  So when I asked Anthony Jorajuria about it, he didn't know, and he was the one who had to go out and find from the ship.

Q.   Other than Anthony Jorajuria, who else did you speak with in preparation for today?

A.   I spoke with Rafy Samra.

Q.   Who else?

A.   I spoke with Colleen Dalton.

Q.   What did you speak with Colleen Dalton about?

A.   I spoke with Colleen Dalton about -- I'm sorry,

I'm just trying to find the area.

I spoke -- no, that's not right. There are so many. I'm sorry, just give me a minute. There's 99 I have to look through, so. . .

It was about the accident investigation team meetings. But then specifically we're asking about something else. Like screw observation. I forget what it's called right now. That's what I'm trying to find.

Oh, this is it. I spoke with her about the observation and coaching team reports.

**Q. Okay. And Colleen Dalton is the manager of injury prevention; is that correct, that's her title?**

A. I believe so, yes.

**Q. Is Colleen Dalton the designated person ashore?**

A. I don't know if Colleen Dalton is the designated person ashore.

**Q. Are you familiar with who the designated person ashore is as required under the ISM?**

A. I'm not. I'm not, no. I don't know.

If she said that she was in the deposition you had with her, then I'm sure she is.

**Q. And who other than Colleen Dalton did you discuss your deposition testimony with?**

A. I think I spoke with also Jillian Studders who is the adjuster on this file.

And I might have spoken with Keith Oliver, too, who is also an adjuster who works in my department for guest claims.

Q. What would be the purpose of speaking to Jillian Studders?

A. I think I asked her --

Q. I'm sorry.

A. Yeah. I think I asked her where one of the documents that was produced was obtained from.

Q. And who else did you speak with?

A. Right now, that's all I can remember besides my attorneys.

Q. Okay. Did you speak to any of the public area attendants that were supposed to be monitoring and patrolling the pool deck on the day Ms. Pell fell?

A. I did not.

Q. What did Royal Caribbean do -- and by Royal Caribbean I mean you included since you're speaking on behalf of the corporation.

What did Royal Caribbean do to try to identify who the people -- the public area attendants that were supposed to be assigned patrolling the port and aft side portion of Deck 9 to make sure that there were no spills, wet areas, or other risk-like hazards that make the pool deck such a common and frequent place for

slip-and-fall accidents?

MR. DRAHOS:  Object to the form.

A.  Royal Caribbean reached out to the ship to see if they had the PAA log that would have listed who would have been there on the date of the incident.  I know that the crew members were asked if they recall who was assigned on the date of the incident, as was Kelvin Alexander.  Nobody is able to identify who was there on the date of the incident; that's what has been done to date to try to figure it out.

BY MR. GERSON:

Q.  What is a PAA log?

A.  That's the public area attendant log.  So it would have listed who was assigned there on the date of the incident, and we have not located it.

Q.  Okay.  And so the public area attendant log is a document that is stored electronically and then is provided to the members of the pool staff; that provides them with what their assignments are for a particular day, is that an accurate statement?

A.  I honestly don't know.  If Kelvin Alexander testified in-depth about that, I'll go with whatever he said.  I don't know whether or not it's electronic.  I just -- my knowledge and understanding of it is that it would have the information as to who was assigned to the

pool deck, or that area of the pool deck that day.  I don't know what format it's in. I just know that it has the information of who was assigned there.

Q.    Okay.  To your knowledge, Royal Caribbean has never been able to identify any of the people that were supposed to be patrolling the pool deck, as Kelvin Alexander explained in his deposition, where there are two people that's supposed to be assigned to monitoring the portside and the aft side portion of Deck 9 pool deck; you would agree with that?

A.    Yes, they have not been identified.

Q.    What efforts did Royal Caribbean undertake to try and locate the PAA schedule?

A.    The ship was asked.  The skip looked for it.  I don't know specifically -- I didn't ever inquire as to step-by-step of what they looked or where they looked. But the ship was asked to look for it, and they were not able to locate it.

Q.    What did you -- when you say the ship was asked to look for it, what do you -- what can you tell me about what efforts were undertaken and by whom to identify the public area attendants schedule or the PAA log as you've described it?

A.    The chief officer of safety was contacted from shoreside and specifically asked for that schedule.  He

would have then asked, whoever the executive housekeeper was at the time, or whoever he knew he should be asking, if they had it and the response was, they were not able to locate it.

Q.   And when you say the response was, They were not able to locate it, is this a conversation that you had with Mr. Kelvin Alexander yourself?

A.   It wasn't with Kelvin Alexander; it was with the chief officer of safety.  I didn't have it myself, no.  But it wasn't me who did it; it was somebody who I supervised that did it.

Q.   Okay.  And what was the explanation provided to you, and what is Royal Caribbean's explanation as to what happened to that piece of paper that would identify the specific crew members that were responsible for monitoring the area of the pool deck including the area where Ms. Pell fell on January the 16th, 2020?

A.   They were not able to locate it.

Q.   So Royal Caribbean has no idea, as you sit here today, who, in fact, was supposed to be monitoring Deck 9 on January the 16th, 2020 to ensure that it -- that it was kept in a state and dry condition?

MR. DRAHOS:  Object to the form.

A.   No, we know that it's the pool attendants or public area attendants.  We just don't know their names,

but we know the position.

BY MR. GERSON:

Q.   Well, the cruise line has a manifesto of its crew members, does it not?

A.   There's a manifest of crew members, correct.

Q.   And did Royal Caribbean do anything to look up the manifest for the Enchantment of the Seas to try and locate who potentially could have been assigned to the pool deck on Deck 9 on this particular day?

A.   That is something that I don't know if my lawyers are undertaking to do.  I haven't -- I don't know at this point.  I just know that currently we're not aware of the people names that were on duty that day.

Q.   So we're almost two years to the day that Ms. Pell fell.  This deposition has been noticed on numerous occasions.  And as of January 12th, 2022, Royal Caribbean still has no idea who, in fact, was supposed to be monitoring the pool deck on Deck 9 as required and explained by the housekeeping manager Kelvin Alexander, and then as you have stated earlier?

MR. DRAHOS:  Object to the form.  Asked and answered.

Is that any different than the question you just asked two questions ago?

BY MR. GERSON:

Q.   You can answer the question.

A.   Again, we don't know the specific peoples names, but we do know their job position.  We have not identified the specific people who were on duty that day.

Q.   So then it's possible that if, in fact, there was no schedule, PAA schedule, in place, then crew members that are supposed to have been assigned to the pool deck might not have been aware of their assignments, isn't that a possibility?

MR. DRAHOS:  Object to the form.

A.   No, I would -- I highly doubt that.  That's their job.  Just because we can't locate a piece of paper that was created or -- from 2020, over two years ago -- or almost two years ago.  So because we can't locate a piece of paper from two years ago it does not mean that there was nobody working that day.

BY MR. GERSON:

Q.   Well, you understand, Ms. Campos -- or Royal Caribbean understands that these records are kept electronically, don't you?

A.   Again, I don't know whether or not they're kept electronically.  I've already testified to that.

Q.   Okay.  Well, I'll represent to you that

Mr. Alexander testified in his deposition that the PAA schedule is a document that is kept electronically.  So I'd like you to assume that for purposes of my question.

And if they were kept electronically, why is it that it couldn't be located?

MR. DRAHOS:  Object to the form.

A.   I don't know.  I mean, I haven't delved into that to see how long emails on the ship are kept before -- I don't know how it works on the ship.  I don't know if people deleted them after they read it, or a month later.  I have no clue.  I mean, I don't know if anybody really thought it was -- at the time that they thought they needed to keep it.  I don't know who has the email. I don't know who it comes from.  I don't know how it works right now sitting here today.  So I have no clue.

THE VIDEOGRAPHER:  Counsel, we're --

BY MR. GERSON:

Q.   Do you know whether or not a public area attendant schedule has been produced in companion litigation involving the Adventure of the Seas in another lawsuits, which would be the same class of ship for an incident that occurred prior to the date of incident involving Ms. Pell?

MR. DRAHOS:  Object to the form.

A.   I don't think the Adventure of the Seas is the

same class of ships as the Enchantment of the Seas.

THE VIDEOGRAPHER:  This is the videographer.
I'm sorry for interrupting.  We have about five
minutes left on this media before we need to change.
Thank you.

BY MR. GERSON:

Q.  Okay.

A.  I don't recall -- do you want me to answer the
question?

Q.  Go ahead.  Yes, please.

A.  I don't recall seeing another -- I've never --
how is this.  I don't know if it's paper or electronic
that says that.  I don't know or ever seen one of these
in any other cases.  So if I have, I don't recall.  But
I don't remember really reviewing one of these.  But it
could have been produced, I don't know.

If it was a case that I was involved in and you
want to refresh my memory on it, that's great.  But I
don't recall.

MR. GERSON:  All right, why don't we take a
five-minute break and let the videographer change
out what he needs to change, and then we can resume
once that occurs.

MR. DRAHOS:  Okay.

THE VIDEOGRAPHER:  The time is 12:45 p.m.  and

we are off the record.

(A short recess is taken.)

THE VIDEOGRAPHER:  The time is 12:58 p.m.  This begins Media Unit No. 2, and we are back on the record.

MR. GERSON:  Hold on one sec.

Can you hear me okay?

THE WITNESS:  I can.

MR. GERSON:  Okay.  Because it says my something is muted or whatever, so I just wanted to make sure everyone can hear.

Okay, back on the record.

Okay, Mr. Videographer, are you ready?

THE VIDEOGRAPHER:  We've been back on for about a minute.  Good to go.

MR. GERSON:  Okay.

BY MR. GERSON:

Q.   So, Ms. Campos, I was asking you before about the public area attendants schedule.  And that is a document that is used, as you explained and I believe -- well, as you explained that would set forth who is supposed to be assigned to the pool deck and other open decks on a particular ship such as the Enchantment of the Seas, correct?

A.   Correct.

Q.   And that's the document that is published or put together by, it's my understanding, the executive housekeeper and the hotel director; is that accurate?

A.   If that's what Kelvin Alexander said, then that's accurate, yes.

Q.   Well, let me -- just so I don't misstate anything that was said.

Mr. Alexander testified, from what I recall, that he is part of the -- he's one of the people that put that document.

A.   Okay.

Q.   So I just would like to show you what we will mark as Exhibit --

MR. GERSON:  What exhibit -- are we up to 7?

THE REPORTER:  Yes, sir, 7.

(Plaintiff's Exhibit No. 7 is marked for identification.)

BY MR. GERSON:

Q.   Okay.  And this has a different marking but I'll -- when we're done, I'll make sure it's labeled correctly.

But I'd just like to show you what's has been marked -- it says here Exhibit 3, but this is actually Exhibit 7.

I'd like you to take a look at this.  And this

says, Public Area attendant schedule.  Dated, October 26th, 2019.

This is, essentially, a version of the public area attendants schedule that would have been used on the Enchantment of the Seas, or something similar, would you agree with that?

MR. DRAHOS:  Object to the form.

A.   It looks like the public area attendant schedule for a ship.

BY MR. GERSON:

Q.   Okay.  And I'll represent to you that this is a document that was produced in another lawsuit that involves a -- the Adventure of the Seas, which I do believe is the same class as the Enchantment of the Seas.  If I'm incorrect, feel free to tell me.

But I just want to make sure that generally speaking this would accurately depict what the schedule looks like and what the information includes.

MR. DRAHOS:  Object to the form.  Predicate.

A.   I don't -- the Adventures of the Seas is not the same class of ships.  But I don't know if this is what the one for the Vision of the Seas -- I mean -- sorry.  Because the Enchantment is the vision class. But I don't know if this is what the one for the Enchantment of the Seas would have looked like.  I don't

know.

BY MR. GERSON:

Q.   Well, as far as the format, I mean, you would agree that it would have the identity of the people, what their start times are, what their break times are, and what the different areas of what they're supposed to be monitoring and patrolling, right?

MR. DRAHOS:  Object to the form.

A.   I don't know if --

THE REPORTER:  I'm sorry, I apologize, Mr. Gerson, I did not hear that question.  You broke up on my end.  Would you mind repeating it please.

BY MR. GERSON:

Q.   All I'm asking you, Ms. Campos, is that this is -- this public area attendant schedule, though it might not be an exact replica of the exact form that is used, generally the public area attendant schedule we're looking out would provide the names of the personnel, what their duties and responsibilities are with respect to patrolling, when their break times are, what their schedules are.  And with this document, they would know -- or the crew members would know where they're supposed to be on a particular day, correct?

MR. DRAHOS:  Object to the form.

A.   Again, I don't know if this is the same form

that they would use on the Enchantment of the Seas. But, in general, it would probably contain the names of the people and where they're supposed to be on a particular day.

BY MR. GERSON:

Q.   So you can't rule out the possibility, can you, that -- the fact that there was no public area attendant schedule identified in Royal Caribbean's search for this particular document, you can't rule out the possibility that one was never in place in the first place, can you?

MR. DRAHOS:  Object to the form.

A.   I mean, maybe they just -- yeah, I guess, in general, I can't rule it out, but I would rule out -- I can rule out that there was nobody working there that day.  I mean, maybe they told them verbally.  But it seems as though Kelvin thought that there was one that we're not able to locate and that he said that there was one.  So I probably would rule that out.

BY MR. GERSON:

Q.   Well, how is that through the last -- over a year of litigation that Royal Caribbean has not been able to identify a single person that was responsible for patrolling Deck 9, the pool deck, and doing the continuous monitoring of the port and aft side portions of Deck 9 as Kelvin Alexander said was supposed to

happen?

MR. DRAHOS:  Object to the form.

A.   They've identified the position.  They just haven't identified the person.

BY MR. GERSON:

Q.   Have you reviewed the video footage that was prepared in this case -- or produced in this case?

A.   I have.

Q.   Okay.  And you said you reviewed two videos, correct?

A.   Correct.

Q.   And in the video footage -- and I'll show you. We're going to make them an exhibit to the next -- to the next deposition -- or, excuse me, the next exhibit to the deposition.

MR. GERSON:  This will be -- I guess we're up to Exhibit 8 and --

THE REPORTER:  Nick, I'm sorry.  I thought you marked that as Exhibit 1 at the very beginning of the deposition?  I thought you marked --

MR. GERSON:  No, Exhibit 1 was the notice -- Exhibit 1 was the notice of taking deposition, I thought.  But if we need to go back and read --

MR. DRAHOS:  Exhibit 3 was the videos.

THE REPORTER:  Thank you.

MR. DRAHOS:  And I said at the time I agreed to the premise, but I can't agree that those are the videos until you show them.

BY MR GERSON:

Q.   Okay, so then, for the record, let me show you what we identified earlier as Exhibit 3, and Exhibit 3A. And I'm going to show you each them, okay?

A.   Okay.

Q.   I always have an issue with doing it this way.

All right.  Are you able to see what's been marked as Exhibit 3?

A.   No, I see your desktop.

Q.   Okay, well, that's not what I want you to see.

A.   Now -- yes, now I saw it.  I just saw it very quickly.

Q.   Okay, let me see if I can get you to see what has been marked as Exhibit 3.

A.   Yes.

Q.   Is this one of the videos that you reviewed in preparation of your deposition?

A.   Yes.

Q.   Is this the video footage from across the pool on January 16th, 2020?

A.   Yes.

Q.   Okay.  So we'll mark this as Exhibit 3.

And I'd like you to take a look at -- we're going to --

A. It just went off.

Q. -- mark -- hang on. I'm just identifying that that's the video that you reviewed.

(Plaintiff's Exhibit No. 3A is marked for identification.)

BY MR. GERSON:

Q. And now I'd like you to take a look at Exhibit 3A, which is another video clip.

Do you see this video?

A. Yes.

Q. Okay. Are these the two videos that you reviewed in connection with this incident?

A. Yes.

Q. Okay. Now, in the video footage that you reviewed up until Ms. Pell's fall -- well, let me ask you this: How many times did you review the videos in connection with this case?

A. I don't -- maybe a couple, two, three. I don't know.

Q. Did you review them in preparation for today?

A. Yes, once, twice.

Q. Was anyone present with you when you reviewed the videos?

A.   Well, not physically with me but over Zoom.
Yes, I reviewed them with my attorneys.

Q.   Okay.  In any of the video footage that you reviewed leading up to the fall, were you able to identify any public area attendants patrolling the area where Ms. Pell fell?

MR. DRAHOS:  Object to the form.

A.   I didn't -- I didn't -- I was just looking at the actual incident.  I didn't look to see that.

BY MR. GERSON:

Q.   Okay.  Well, based on your recollection of the video that you did review, do you recall seeing any public area attendants monitoring or patrolling the area where Ms. Pell fell?

A.   I don't recall seeing any.  I don't -- I don't -- no.  It wasn't something that I was specifically looking for, so I don't know.

Q.   Whose -- Royal Caribbean certainly is aware of the fact that the pool deck is a high-traffic area, correct?

MR. DRAHOS:  Object to the form.

A.   There are a lot of people at the pool deck, yes.

BY MR. GERSON:

Q.   Okay.  And why is it for -- and the pool

deck -- aside from once you get into the Windjammer Café.  The pool deck essentially goes, for the most part, from one end on the ship to the another --

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   -- you would agree with that, right?

MR. DRAHOS:  Form.

A.   Well, there's -- there's the open pool deck and then there's the solarium area of the pool as well.  The solarium is part of the pool deck, but it's part of Deck 9.

Q.   If there are no people -- if the cruise ship personnel that are supposed to be monitoring the pool deck for -- or strike that.

You don't disagree, Ms. Campos, do you, that Royal Caribbean had a total of four people, two on the portside and two of the aft side, that were supposed to be monitoring the deck for any spells, wet areas, and any other risk-like conditions that can cause slip and fall, or some other type of harm to a passenger or even crew member, do you?

A.   Yeah, all crew members are supposed to do that wherever they're walking.  But specifically at that area those were the people assigned to be cleaning the pool deck, yes.

Q.   And there's also a policy called the own-the-spill policy, correct?

A.   That is correct.

Q.   What is the own-the-spill policy?

A.   The own-the-spill policy just says that all crew members at any time are responsible for -- if they see something, then they're supposed to make sure that something is remedied immediately.  So if they are walking through and they see debris on the floor, they're supposed to be picking up.  If they're walking somewhere and they see a spill, they're supposed to clean that up.  Every crew member is responsible regardless of what area of the ship they're in.

**Q.   And so that's just a company-wide policy that says no matter who you are, what your position is, if you see a spilled drink, or a glass, or something else on the pool deck and you observe it, you need to own it, so to speak, and either clean it, mark it off, or make arrangements to make sure that no one walks through the area and injuries themselves, correct?**

A.   No, only incorrect in terms of it's not just for the pool deck; it applies to the entire vessel.  You said pool deck.

Q.   I understand.  I understand that.

But the own-the-spill policy is a policy that

every crew member, regardless of your position, is supposed to be familiar with, and is supposed to follow, no matter whether they're on the pool deck, or whether or not they're in a state room hallway?

A.   Correct.

Q.   And that is the only policy that Royal Caribbean has with respect to how to or what -- it's the only written policy in place for maintaining open decks, or inspecting open decks and what you're supposed to do in the event that you identify a spill?

MR. DRAHOS:  Object to the form.

A.   I guess when you put it that way it's not -- with reference to a spill, yes.  That's the policy we talk about in a spill, yes.

BY MR. GERSON:

Q.   And if the employees that are assigned to the pool deck are unaware of their assignment then -- and there were four people supposedly -- there are four people in total assigned, two on the aft side portion of the pool deck, and two people on the portside portion of the pool deck, the policy is no good because there's no one there to enforce it, is there?

MR. DRAHOS:  Object to the form.

A.   That doesn't even really make sense to me.

But, no.  I mean, that policy applies to every

crew member. So there are other crew members there to enforce it in your hypothetical example of nobody being there. Meaning, nobody being the pool attendants.

Own the spill applies to every position not just the pool attendants. There are other positions -- a lot of other positions that are on the pool desk besides the true pool attendants, or the two on each side --

BY MR. GERSON:

Q. Right.

But you don't -- according to Mr. Alexander there were a total of four people. Two actually were supposed to be walking through the area back and forth continuously with a specific assignment of looking out for spills and wet areas in the general area where Ms. Pell fell on January the 16th.

A. That's part of their job duties, yes, but they do have other job duties as well. They're not --

Q. I understand?

A. Own the spill is not there job description or the encompassment of their duties. They have other duties.

Q. So why doesn't Royal Caribbean have more people assigned to the pool deck, other than the two people on the portside, and two people on the aft side to monitor

this area if it's such a problem or high -- or an area where there are so many slip and falls?

MR. DRAHOS:  Object to the form.

A.   Well, there's also the head pool attendant who is responsible for all of it, so he's there as well as. And my understanding is that if there is an influx of people, or there are more people needed that they can assign more public area attendants to be there as needed.  And there's -- other facilities could have somebody there as well, but they do it as needed.  So if they need more than that, they could assign more people.

BY MR. GERSON:

Q.   So if it was, in fact, observed -- you mentioned that the head pool attendant -- well, strike that.

It's my understanding that the housekeeping -- the executive housekeeper, Mr. Alexander, is one of the people that is supposed to make sure that the pool deck personnel, including the public area attendants, are where they're supposed to be based on the public area attendant schedule, correct?

MR. DRAHOS:  Object to the form.

A.   He assists in putting out the schedule.  I don't know if he's the one who's monitoring where they are.  I think that's the head pool attendant.

I didn't understand your question --

Q.   Okay, so --

A.   -- really.

Q.   Well, if there's no one there monitoring the pool deck, such as the public area attendants that are supposed to be assigned there, then that's less crew members to abide by the own-the-spill policy, right?

MR. DRAHOS:  Object to the form.

A.   If they're not there, I guess, yes, but you're -- I don't know why you're saying they're not there just because we can't find the schedule.  That really doesn't correlate to me.

BY MR. GERSON:

Q.   Well, in the video footage that you reviewed, I asked you if recall seeing any public area attendants walking through the specific areas where Ms. Pell and Mr. Pell were walking in the minutes prior to her fall, and I believe you weren't able to identify any.

MR. DRAHOS:  Object to the form.

A.   I think you're mischaracterizing my testimony.

A, I'm pretty sure I said that I wasn't looking for any.

And, B, even if I couldn't find any on the video, that doesn't mean they weren't there.  They have other duties besides walking at the exact location that

Ms. Pell fell.

They're also responsible for the towels and bringing dirty cups, or dirty plates or the like, back to the kitchen and bringing other things out.  So it's not like their only duty is walking up and down the deck and staring at the floor.  They do have other duties as well.

So even if they wouldn't have been on the video for the time frame of the video, that doesn't mean that they weren't there.  They could have been getting new towels, or cleaning up old towels.  There's more than one duty that they have.

So you're the one -- you're making an assumption and that really doesn't hold true.

BY MR. GERSON:

Q.  Well, I understand, and I can certainly appreciate the fact that running and operating a pool deck requires multiple people to do things like get towels and attend to chairs and get people drinks.

Isn't that all the more reason to make sure that you have a sufficient number of people to monitor areas where there are frequent slip and falls in the event that other people have to take care of the towels and to pick up a drink or to do something else?

MR. DRAHOS:  Object to the form.

A.   That's they're job.  That's what they do in addition to it.  We have different people to serve the drinks, but part of their job duties are to do the towels, maintain the pool deck in an orderly manner.

No, I mean -- I think that there were sufficient amount of pool attendants there that day, and they were doing their job.  Just because they weren't on the video doesn't mean that they weren't doing their job.

BY MR. GERSON:

Q.   Okay.  Well, in the video, as you recall that you've reviewed several times, you don't recall seeing any of the public area attendants walking through the areas that Mr. Alexander says they were supposed to be monitoring, did you?

MR. DRAHOS:  Object to the form.  Asked and answered.

A.   Again, you're mischaracterizing my testimony.

I said I did never look for them.  So I don't remember seeing any because I wasn't specifically looking for it.

BY MR. GERSON:

Q.   Well, I'll represent to you that I asked the same question of Mr. Alexander, and he reviewed the video and he wasn't able to identify any of the public

area attendants assigned to the area where he said they were supposed to be patrolling to inspect the floor surface to make sure there were no spills and the area was dry.  And you too didn't identify anyone.

A.   I didn't --

MR. DRAHOS:  Oh, wait.  Object to the form.  Go ahead.  Sorry.

A.    I didn't identify anyone because I wasn't looking for anyone.

And you're also -- the way that you're saying this and asking this question is as though the video encompasses the entire area that they are working, which it does not; it's just a portion of it.  It's a portion of the area that they're working within the video; not the entire area that they work in.

Again -- so if Mr. Kelvin didn't see that -- or Mr. Alexander didn't see them and he didn't -- but that does not mean that they weren't there that day because it wasn't -- the view of the CCTV is not a view of the entire area that pool attendants would be working in.

BY MR. GERSON:

Q.   Well, did you read the testimony of Mr. Alexander where he identified the particular area that the public area attendants were supposed to be patrolling on a continuous basis?

A.   I have not read the testimony of Mr. Alexander. I said that at the beginning of the deposition.  It wasn't --

Q.   Would it have been --

A.   It wasn't transcribed, so I wasn't able to read it.

**Q.   Would it have been unreasonable for Royal Caribbean to assign more personnel to the pool deck since -- as you've explained, that the pool deck often requires multiple people to do many different things that could take a way from monitoring the decks and make sure it's safe?**

MR. DRAHOS:  Object to the form.

A.   I didn't -- I didn't describe it that way.  And if Royal Caribbean needs to assign additional people, they are able to do so.  And that's at the discretion of the executive housekeeper, the hotel director.  They're able to do that.  They did not feel that they needed to do that on this particular day, so nobody extra was assigned.

BY MR. GERSON:

**Q.   Do you expect the executive -- well, let me ask you this:  The executive housekeeper -- what background and training does an executive housekeeper have?**

**And specifically Mr. Alexander.  What**

background and training does he have in how to safely operate a pool on a cruise ship the size of the Enchantment of the Seas?

A.    I don't know his specific --

MR. DRAHOS:  Object to the form.

A.    -- background and training but -- I mean, he has a lot more experience than I do being on cruise ships for as long he has, I'll tell you that much.

I mean, these people who work on cruise ships -- don't underestimate on-the-job-training.  You know, just because maybe he didn't go to an Ivy League school, or a four-year college that doesn't mean that he doesn't have more training than any of us on this video would have.  On-the-job-training on a cruise ship is the most crucial part of the training.

BY MR. GERSON:

Q.    Well, I'm not suggesting anything about Mr. Alexander's education or criticizing the fact that he didn't go to an Ivy League school.  I didn't go to an Ivy School.  I don't know that you went to an Ivy League school and that's, you know, kind of an irrelevant point.

My only point to you, Ms. Campos, on behalf of the Royal Caribbean, is why doesn't Royal Caribbean have someone with specific training and experience operating

a pool deck, like the pool deck on Deck 9, since it's such a high-traffic area frequented by so many of your passengers and where there are so many -- and when it's being referred to in safety records as the most high -- the most area where there are most frequent amount of slip-and-fall accidents?

MR. DRAHOS: Object to the form.

A. We do. We have Kelvin Alexander. Kelvin Alexander who is the executive chief housekeeper on board a cruise ship. It's an officer position; takes a long time to get. He has the experience and that's -- that's -- we do. We have the correct person. I'm not quite sure how you don't think we do. Based on you speaking to him, I have no clue what you're referring to in terms of his experience, or who you believe that we should have.

But Mr. Alexander has the relevant experience needed to become the executive housekeeper, which is not an easy level on a cruise ship to rise to.

BY MR. GERSON:

Q. Mr. Alexander has multiple duties as the executive housekeeper, correct?

A. Correct.

Q. He's in charge of the laundry for all the thousands of passengers and the thousands of crew

members that are aboard the Enchantment of the Seas, correct?

A.   Correct.

Q.   And in addition to those duties and responsibilities, Mr. Alexander is also assigned with the task of making sure that the -- a sufficient number of cruise ship personnel are assigned to the pool deck and actually positioned, and have their assignments so they know what it is that they're supposed to be doing on a daily basis.

MR. DRAHOS:  Object to the form.

A.   Was that a question?  I didn't know that was a question.  I thought it was a statement.

BY MR. GERSON:

Q.   **All I'm saying is, do you disagree with that?**

MR. DRAHOS:  Form.

A.   That's -- he is one of the people who assists in assigning who will be on the pool deck -- which pool attendants or public area attendants will be assigned to the people deck.

BY MR. GERSON:

Q.   **You can't be in two places at the same time, can you?**

MR. DRAHOS:  Is that a real question?

A.   Yeah, I don't know what that is.  No.

BY MR. GERSON:

Q.   Well, is Mr. Alexander -- are you aware -- is Royal Caribbean aware of the fact that even though Mr. Alexander is responsible for the staff assignments and deployment of ship personnel on the pool deck, that he does not -- and he is not commonly located on the pool deck and is located on other portions of the ship doing some of the other duties and responsibilities that he's required of such as laundry, and the towels, and the other laundry-type services?

A.   I think you might have some things confused.  I mean, he's the executive housekeeper, so he's in charge of basically all the -- the house side of things on board.  He has people that work underneath him such as the head pool attendant who would be there.

He's like -- when you asked I guess -- maybe the question -- maybe you want to depose the person in charge of everything, he would be the top.  But there are other people that would be on the pool deck that supervise the pool attendants, which is the head pool attendant.

So, essentially, it's like saying, like, the owner of your firm needs to be in every single deposition or hearing.  No, there's other attorneys.  There's other people assigned to do things.  He has

people under him.  He's just the top of the chain.

So there is a head pool attendant.  He doesn't need to be -- you know, I think Kelvin Alexander spends a lot of his time in his office doing other things, too. He's not the person typically on the ground; that would be the head pool attendant.

Q.   Well, what is the -- so who is -- so if, in fact, there was no schedule in place for the public area attendants, who -- who's ultimately responsible for making sure if, in fact, there was some oversight, and there was no assignment for that particular day, who is responsible to make sure to say, Hey, you know, there's no one on the deck monitoring it for risk-like hazards such as spills, et cetera?

Who is -- what's the -- who is the person that's supposed to fix that?

A.   I believe it would be the head pool attendant who they report to.

Q.   Are you sure about that, or you just believe?

MR. DRAHOS:  Object to the form.

A.   The pool attendant reports to the head pool attendant.  Just like the lifeguards report to the lifeguard supervisor.  Attendants don't report to the executive housekeeper, I'm sure about that.

BY MR. GERSON:

Q.    Would it have been unreasonable to have an assigned or a dedicated pool manager whose only job was supposed to be stationed on the pool deck to make sure that the pool deck and the number of personal that were supposed to be working on the pool deck are there to do their jobs, to make sure that any wet areas are cleaned, any spills are identified, and the own-the-spill policy is adhered to?

MR. DRAHOS:  Object to the form.

A.    I'm -- that's the head pool attendant.

BY MR. GERSON:

Q.    So if there were no people assigned to the pool deck, the public area attendants didn't get the memo, then you're telling me that the head pool attendant is the person that is supposed to have figured that out and say, Hey, there's no one here patrolling the pool deck, and we need to get some people assigned over here so we can make sure that the pool deck is maintained as safely as possible?

A.    They don't -- the pool -- okay.

So the pool attendants don't report to the executive housekeeper directly.  They would report to either the facilities manager or the head pool attendant.

If it's a public area attendant, they wouldn't

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Amanda Campos on 01/12/2022**                    Page 108

report also to the executive housekeeper.  They would report to the facilities manager and, then, I think, there's also like a facilities supervisor.  Those people would be in the area that their employees are in.

The executive housekeeper would not never be the one really patrolling those areas to see.  Each area that requires cleaning would have somebody between the cleaner, or whatever position it is, and the executive housekeeper who would serve as a supervisor.  Those supervisors would report to the executive housekeeper.

**Q.   I guess what procedures does Royal Caribbean have in place to make that its crew members are, in fact, monitoring the pool deck such as the public area attendants?**

A.   I'm mean --

MR. DRAHOS:  Object to the form.

A.    -- that's their job.  If they weren't there the whole day -- the whole morning and night -- like, the whole morning from 8 a.m. when the pool opens until 2 o'clock -- what you would see on that video would not look like that.  There would be chairs with towels all over them and things -- they are there.  They're doing their job.

You would not -- nobody would even -- there would be no service.  I mean, it's impossible.  Guests

would complain if there were no pool attendants there.

But they do have supervisors that would make sure that

they're doing their job.  Again, it's not just pool

attendants, or public area attendant, executive

housekeeper.  There's layers between there.

Q.  Well, if all these people were there, how is it

that Royal Caribbean can't identify any of them?

MR. DRAHOS:  Object to the form.  Asked and

answered.

A.  I don't -- I don't know why.  I don't know what

you mean, why we can't identify.

BY MR. GERSON:

Q.  Royal Caribbean was asked to identify the

public area attendants --

A.  Oh.

Q.  -- that were supposed to be patrolling the

area, as Mr. Alexander said at his deposition.  And that

their primary purpose was to walk up and down the aft

and portside portions of the deck to monitor, to make

sure that were no spills, drinks, wet areas, et cetera.

Why couldn't Royal Caribbean figure out who

those people were?

MR. DRAHOS:  Object to the form.

A.  They were unable to identify who they were

because we don't have the PAA log, which would tell who

was there.  We are able to identify the job title of the them, but not the specific person.

BY MR. GERSON:

Q.  **Is it also the possibility because there were no public area attendants working the area that day --**

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.  **-- at that particular time?**

A.  I mean, you're going -- you can keep on asking me that question a thousand different ways, but I'm not going to agree with you.  And I'm not going to say --

Q.  **Okay.**

A.  -- that there were no public area attendants working there because I don't agree with that.  So we'll agree to disagree --

Q.  **Okay, thank you.**

A.  -- and I'm not going to concede that that's even a possibility.

Q.  **Okay.  I'd like to turn your attention, Ms. Campos, to number 40 of the notice.  And there's been a series -- number of people that have been identified in a witness list.  And I'd like to know who is Shavi Yashwant Veer?**

A.  That's the head pool attendant.  I knew that --

Q.  **Okay.**

A.   -- we had a pool attendant.

Q.   **That's the head pool attendant?**

A.   That is correct.  That is the head pool attendant.

Q.   **Okay.  And who is Milo -- oh, well, he has showed on the -- we know who that is.**

**Give me one second here.**

A.   And just so you know on our responses to the first set of interrogatories we provided you with Shavi Yashwant Veer, that's the pool head attendant.  I knew I wasn't going crazy.  You kept asking me these questions, and I thought I was going crazy.

Yes, head pool attendant.

Q.   **Is Anne Ong?**

A.   Anne Ong is -- she is escalations.  After cruise customer service out of our Manila office.

Q.   **And who is John Dayo III?**

A.   That's her supervisor.

Q.   **And what does Anne Ong know about Ms. Pell's incident?**

A.   I doubt she knows very much.  She was just -- -- there's an entry -- a log entry post-cruise that Ms. Pell's husband called up -- or called in asking some questions maybe about a -- I think it was about a refund or some sort due to the fact that they weren't able

obviously go on the cruise, and she was the one who got that call.

Q.   Royal Caribbean is aware of the fact that people on the pool deck routinely order drinks and have alcohol out there, correct?

MR. DRAHOS:  Object to the form.

A.   Yeah, I guess people drink at the pool.  That's something Royal Caribbean is aware of.

BY MR. GERSON:

Q.   And Royal Caribbean also has unlimited drink packages, do they not?

A.   They do, yes.

Q.   And they have unlimited drink packages on this particular ship on this particular day, correct?

A.   I'm sure they did.  They had both nonalcoholic and alcohol unlimited drink packages, yes.

Q.   Okay.  So Royal Caribbean certainly had notice of the fact that not only is the pool deck on Deck 9 an area where there are frequent slip and falls, but that this is also an area of the ship where people are drinking, and people spill drinks, and people can also come in and out of the pool and track water in various walkway areas where passengers are coming and going from.  You would agree with that, generally, correct?

MR. DRAHOS:  Object to the form.

A.   I would agree that when people come in and out of the pools that water can be tracked behind them, yes. And I would agree that, I guess, people can spill drinks; that's something that can happen, yes.

BY MR. GERSON:

Q.   Now, what are the policies and procedures in place to prevent slip and falls from occurring on Deck 9?  And by Deck 9 I mean the pool deck.

MR. DRAHOS:  Object to the form.

A.   Well, we went over the own the spill, which applies to all the crew members; that if they see something, they should say something.  And there's general cleaning done of the deck every day.  I mean, that would be -- those would be the procedures and the policies.  I don't really know what you mean.  We can't -- it's impossible for Royal Caribbean to prevent every slip and fall that happens because it's just not possible.  So I don't know what you mean in terms -- like, we don't -- I don't know what you mean by what you're asking me.

BY MR. GERSON:

Q.   Do you -- I asked you earlier about, you know, the written policies about the staffing and manning levels and you said there wasn't a written policy, per se, but there was a verbal policy, as Mr. Alexander

explained, about having two people patrolling the walkway area where Ms. Pell fell, and then two people patrolling the opposite side of the ship for similar -- similar observations and things like spills and that nature.

Why isn't there a written policy with respect to how to safely maintain the pool deck aside from the own-the-spill policy?

MR. DRAHOS:  Object to the form.

A.   There's a policy in regards to how to clean the pool deck and like what needs to -- in general the cleaning of it so -- again -- I mean, we don't have a policy titled, how to stop slip and falls.  I don't think that we would -- anybody could really do that.

I'm not -- that's what I mean, I'm not quite sure.  We have policies on making sure that every crew member is aware that if they see anything, it's their responsibility, meaning, like, don't just pass it by and don't think someone else is going to clean it up, and don't think somebody else is going to take care of. You're responsible for taking it -- taking care of it.

And we have pool attendants that are stationed there that are looking at the area and maintaining the area.  In addition to that there are other -- you know, there are waiters around there, like you just said,

serving drinks, so they're responsible as well.  And there are other positions that might be in that area at the same time as well.

So we have crew members in the area that are on the look-out for anything, and we have cleaning procedures on how to maintain Deck 9 pool area as well.

BY MR. GERSON:

Q.   **How does Royal Caribbean make sure that its policies are being enforced and its people are -- that are supposed to be assigned to the area are, in fact, performing their patrols and located where they're assigned?**

MR. DRAHOS:  Object to the form.

A.   They -- I mean, all of these people are professionals on board, and they have supervisors as well, like we were just discussing before.  And in order for a ship to run, everybody has to do their part.  So Royal Caribbean hires people that they believe are responsible people that are there to do a job.

We don't -- I don't really understand what you're saying.  We don't have a videocamera watching all of our employees making sure they're doing what they need to do.  We hire adults who are responsible to do a job, and we believe they do their job.  Now, if they don't do their job and the supervisor knows about it,

then they will be written up, and after a certain amount of times they're not doing their job and they're written up a certain amount of times, they could be terminated. Just like shoreside just for not doing your job.

So it's pretty much the same as you would do at shoreside, in a sense. You know, somebody who is working at a department store wasn't doing their job, their supervisor would know. And essentially if you're not doing your job then you're at the risk of losing your employment.

BY MR. GERSON:

**Q. Does Royal Caribbean have any policies in place that require crew members assigned to the pool deck, like the public area attendants, to sign-in and document the fact that they have signed in to a particular location and signed out so the people managing the pool deck are aware of who was there and when they were there?**

A. I don't believe we have sign-in and sign-outs for pool attendants at the pool.

Again, if the head pool attendant is there and he sees that somebody is not there doing their job, you're going to get written up. These are adults who are taking their job seriously. They're there to do a job. And we believe that, you know, it's -- I'm just

trying to express that we don't -- we don't have to make sure that someone is watching every single crew member all the time to know that they're doing their job.

You know, you're asking me how do we know that people are doing their jobs.  Because it's getting done.  And if things aren't getting done, people will complain about it.  And things won't be the way that they should, and we'd know about.  So that's how we would know.  We would know from two different ways.  We would know that the supervisor would know, and we would also know that if a job doesn't get done on a ship, somebody will notice it, or passengers will complain about it, and Royal Caribbean will then found out about it that way as well.

I can't hear you.

MR. DRAHOS:  You lost the sound, Nick.

No, we lost your sound.

THE VIDEOGRAPHER:  Can you hear us?  Counselor?

Amanda?

MR. DRAHOS:  I can hear you, Brian.  I cannot hear Nick.

THE WITNESS:  I can't hear him.

THE VIDEOGRAPHER:  Okay, let's go off the record for a moment.

Off the record at 1:51 p.m.

(A short recess is taken.)

THE VIDEOGRAPHER: The time is 2:60 p.m., and we are back on the record.

BY MR. GERSON:

Q. Okay, back on the record.

Ms. Campos, you -- or Royal Caribbean is aware that at the time that Ms. Pell was injured on January 16, 2020, the ship was still in port in Galveston, correct?

A. That's correct.

Q. And why was the ship still in port?

A. Because the port was closed, and the ship was unable to leave due to fog.

Q. And because of the fog, that had what effect on the ability of the ship to disembark for its scheduled itinerary?

DR. DRAHOS: Object to the form.

A. I'm not really a navigational expert. I don't know. I think it would affect their ability to navigate safely out of the port; that's what I would think. But, again, I'm not an expert on that. I don't know. But the port was closed so no ships were able to leave.

BY MR. GERSON:

Q. And despite the fact that the ship was unable to leave -- or strike that.

You would agree that the ship was unable to leave for its scheduled departure, correct?

A.   Yes, that is correct.

Q.   And as a result of that -- or the -- part of the reason because of that was because of fog or condensation in the area, correct?

MR. DRAHOS:  Object to the form.

A.   All right, I don't -- I didn't -- no, it was because of fog.

BY MR. GERSON:

Q.   Well, fog insinuates condensation in the air otherwise you don't have the fog, correct?

MR. DRAHOS:  Form.

A.   I don't know.  I don't know how fog is caused exactly, but there was fog.

BY MR. GERSON:

Q.   Okay.  Was the pool deck open?

A.   Yes, it was.

Q.   And are there policies and procedures that are used by Royal Caribbean about whether or not to close the pool deck in the event of fog or other forms of inclement whether?

A.   There's no policies and procedures in terms of fog.  I think that there might be a policy in terms of wind, but nothing in terms of fog.

Q.  What about as far as rain?

A.  No, there's no policies in terms of rain.

Q.  Are there policies and procedures as far as how to safely stowaway deck chairs?

A.  There's a policy in terms of how to stack them, I think, and using a belt of some sort when stacking them.  Yes, there's a policy in terms of that.  It doesn't --

Q.  Is there a policy --

A.  I'm sorry, go ahead.

Q.  No, continue.  I didn't mean to cut off.

A.  No, I don't even know what I was going to say, so you go ahead.

Q.  What are the policies and procedures that are used when the deck chairs are not being used?

MR. DRAHOS:  Object to the form.

A.  I don't know what you mean by that.

BY MR. GERSON:

Q.  Sure.

When deck chairs not being used, are they supposed to be put away?

A.  Not during the --

MR. DRAHOS:  Object to the form.

A.  Not during the day, no.

BY MR. GERSON:

Q.   Okay.  Was the entire portion of the pool opened on this particular day?

A.   The entire pool deck was open, yes.  The pool --

Q.   Were the pools open?

A.   You can see in the video that there's a net around one of the pools.  That one wasn't opened at that time but the other ones were.

Q.   Why was the main -- would you call that the main pool?

A.   There are two pools there, I believe.  And I don't know if you would refer to them -- either of them as the main pool.  But it's the pool that wasn't open at the time.

Q.   Now, in the area close by where -- you're familiar with the general area where Ms. Pell fell, correct?

A.   I am, correct.

Q.   And to the left of the area where Ms. Pell fell there is a -- is it the Jacuzzi or the kiddy pool?

MR. DRAHOS:  Object to the form.

A.   I'm not quite sure.  I think there's a Jacuzzi there.

BY MR. GERSON:

Q.   Okay.  And in front of the Jacuzzi would be the

main pool, correct -- or, excuse, me the kiddy pool?

MR. DRAHOS:  Object to the form.

A.   They're all within the same vicinity.  I don't know what you mean by in front.  Next to the Jacuzzi, or next to one of the Jacuzzis, I don't know.  I mean, there's pools, there's Jacuzzis.

MR. GERSON:  Give me a second to get this one open.

What exhibit are we up to?

THE REPORTER:  This will be Exhibit 8.

MR. GERSON:  Okay.

(Plaintiff's Exhibit No. 8 is marked for identification.)

BY MR. GERSON:

Q.   I'd like you to take a look at what we'll mark as Exhibit 8.  One second.  I apologize.

MR. GERSON:  You said Exhibit 8, right?

THE REPORTER:  Yes, that's correct.

MR. GERSON:  Okay.

BY MR. GERSON:

Q.   Okay.  Take a look at what we've marked as Exhibit 8.

Do you see Exhibit 8?

A.   I do.

Q.   Do you recognize this as a screenshot from the

video that was taken from across the pool produced by Royal Caribbean in this case?

A.   I do.

Q.   Okay.  So where my cursor is over here, this is the Jacuzzi, correct?

A.   Isn't that the kiddy pool?

Q.   Excuse me, I'm asking you.

Is this the kiddy pool, or Jacuzzi?

A.   That's the kiddy pool.

Q.   Okay, and then we have --

A.   It's not really a pool.

Q.   -- these yellow --

A.   I'm sorry.  That's not really like a pool, pool.  It's like a water area, I think.

Q.   Kids can walk in and out of this particular area without having to swim, is that an accurate statement?

A.   Yes.  I believe so, yes.

Q.   And this particular area would be just a matter of feet from the area where Ms. Pell fell, correct?

MR. DRAHOS:  Object to the form.

A.   Everything is a matter of feet from something else.

BY MR. GERSON:

Q.   Well, between -- Ms. Pell fell in between -- or

on the opposite side of these deck chairs that are stacked up in two rows. And on one side of the rows we have the kiddy pool, and then on the second -- behind the second row is the general area where Ms. Pell fell; do you see that?

A. Yeah, like, if you're looking at the lady wearing the black shirt, she is like three chairs a way from where Ms. Pell fell.

Q. Okay. And so this particular circular area -- and I'll show you another photograph.

This is the kiddy pool, which is the kids who, I guess, can't swim can just step into the water and step out without having to actually swim, correct?

A. Correct. I don't know kids who are in there can't swim, in general, but, yes. What you're saying, yes.

Q. Okay. And these yellow barriers around the pool, do you know -- do you know why it is that the pool is closed?

A. I wasn't able to determine specifically why the pool -- that pool was closed at this particular time.

Q. The fact that the pool was closed at this particular time, is that possibly an explanation why there weren't the number of public areas attendants assigned to the pool deck because the -- basically the

main pool was closed?

MR. DRAHOS:  Object to the form.

A.   There were public area attendants assigned to the pool deck.  The pool being closed --

BY MR. GERSON:

Q.   Who are --

A.   -- had nothing -- there were -- there were people assigned to the pool deck, so I'm not quite sure what your question is.

Q.   Well, you've told me that there were people assigned to the pool deck but over the course of the last several hours, you haven't been able to tell me who was.

MR. DRAHOS:  Object to the form.  Argumentative.

BY MR. GERSON:

Q.   You can answer.

MR. DRAHOS:  She's already answered it.

A.   We're not able to identify the --

BY MR. GERSON:

Q.   (Indiscernible) objection.

A.   We're not able to identify the names of the crew members that were assigned at that time.

Q.   Well, how can you make the statement that there were public area attendants assigned to the pool deck if

you've been unable to identify who they are?

MR. DRAHOS: Object to the form. Asked and answered.

A. Just because I can't identify by name who was assigned doesn't mean that there were no public area attendants or pool attendants assigned that day.

BY MR. GERSON:

Q. It doesn't mean that there were either, does it?

MR. DRAHOS: Object to the form.

A. I'm not sure if this is the one we agreed to disagree on. But I'm going to disagree with you. There would have been pool attendants assigned on the date of the incident.

BY MR. GERSON:

Q. I didn't -- what you're really telling me is that there should have been pool attendants assigned. We can agree with that?

MR. DRAHOS: Object to the form.

A. No, there would have been pool attendants assigned.

BY MR. GERSON:

Q. Should there have been pool attendants assigned? Simple question.

MR. DRAHOS: Object to the form.

JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.

**Amanda Campos on 01/12/2022**          Page 127

A.   Yes, there should have been pool attendants assigned.

BY MR. GERSON:

**Q.   If there weren't pool attendants assigned, that would be a violation of Royal Caribbean's procedures for maintaining a safe pool deck, wouldn't it?**

MR. DRAHOS:  Object to the form.

A.   If there were no pool attendants assigned to the pool deck on the day of the incident, that would have been a violation in general of -- I mean, that's their assignment.  That's their job.  There would be no reason for no pool attendants to be assigned.  There are no -- I don't know necessarily if it would be a violation of the remainder of your question.  But it would be a violation in terms of that's their job.  I mean, that's what they're hired to be on ship for.

BY MR. GERSON:

**Q.   And if they weren't assigned and doing their job, that would be a violation?  Simple.**

MR. DRAHOS:  Object to the form.

A.   If they weren't assigned --

BY MR. GERSON:

**Q.   You can answer.**

A.   If they weren't assigned in doing their job, yeah, that would be a violation.

Q.   Now, if we look at the next exhibit to the deposition -- if I can find it.  We're up to Exhibit 9, I believe.  Correct me if I'm wrong.

Going back to the photograph that I just showed you, if I could go to the exhibit.  Sorry, just give me a second here.

Well, you saw the -- you saw the previous exhibit, I believe it was Exhibit 8.  And correct me if I'm wrong, but it was the screenshot with the tape around the pool.

What is your understanding about why the pool was closed?

MR. DRAHOS:  Object to the form.

A.   I think it was a net of some sort.  And, again, I wasn't able to determine why the pool was closed at that time during that day.

BY MR. GERSON:

Q.   So the pool was not fully operational as it would be on a typical sunny day on the Enchantment of the Seas.  You don't disagree with that, do you?

A.   The pool -- I mean, there were other pools. They were all open.  I don't know why this one wasn't open.  I think I recall the lifeguard saying that they opened it later that day.  I just don't know if that's -- somebody could have -- there could have been

an accident in the pool that had to do with, you know, a baby going to -- like some kind of -- it could have been cleaned, it could have been a lot of different reasons. Nobody was able to inform me as to why, but I recall the lifeguard saying that that pool opened later on in the day.

Q.   And where did you get that information from?

A.   From reading his deposition.

Q.   Now, what is Royal Caribbean's position as far as what happened to Ms. Pell?

MR. DRAHOS:  Object to the form.

A.   Ms. Pell was --

BY MR. GERSON:

Q.   There's an objection to the form of question, so let me re-ask the question.

Does Royal Caribbean acknowledge that Ms. Pell slipped and fell on its ship?

A.   Royal Caribbean acknowledges that Ms. Pell fell on its ship.

Q.   And what is Royal Caribbean's explanation as the reason why she fell?

A.   Not quite sure what caused her fall.  But she could have stepped wrong just following -- I don't know. But it doesn't appear as though she slipped and fell.

Royal Caribbean's position with that at the

time --

Q.   And when you say --

A.   Royal Caribbean's position is at the time of the fall, Ms. Pell was not exercising reasonable care under the circumstances, watching where she was going and that caused her to fall on the ship.

Q.   And what is the basis for Royal Caribbean's position that Ms. Pell was not watching where she was going?

A.   Because if she was, I guess, taking reasonable care under the circumstances for her own safety, she most likely would have been able to navigate and probably not have fallen.

Q.   Well, what facts are you able to tell me, or anyone else watching this video, that Royal Caribbean is aware of that Ms. Pell wasn't paying attention to where she was going?

A.   On the video it could be observed that she's holding a bag of something in her hand and eating and not really looking as to where she's going at the time of incident.

Q.   So you're telling me from the video footage that was taken from across the pool diagonally, many, many, many, feet away, that Royal Caribbean is able to -- it's Royal Caribbean's position that she was not

paying attention to where she was going?

A. Correct.

Q. Is that just an assumption, or do you have any concrete facts that support that contention?

A. I mean, from my view of the video from watching it, that's what I saw.

Q. Now, what was done to investigate what happened to Ms. Pell?

MR. DRAHOS: Object to the form.

A. There was a security supervisor, Dinesh, went to the area of the incident, got CCTV, and took photographs.

BY MR. GERSON:

Q. What is Dinesh's position again?

A. He's the security supervisor -- the guest security supervisor.

Q. And Dinesh is a security supervisor.

He's the first person that responded to the fall?

A. No, you were asking me about investigation.

Q. Okay. Who was the first person that responded to the accident scene -- or what is Royal Caribbean's position, as far as who was the first crew member that responded to the accident scene when Ms. Pell fell?

A. That would be June -- and I'll spell the last

name -- S-n-b-a-n-d-a-l. And he's the lifeguard -- or was the lifeguard at the time.

Q. And the lifeguard's primary responsibilities are to oversee the pool to make sure no one drowned and has any sort of accident in the pool itself, correct?

A. Yes. He's a lifeguard, yes.

Q. And the lifeguard wears a red and white uniform, correct?

A. I believe so, yes.

Q. And you know that because in the video footage -- one of the video footages from afar, you're actually able to see June Snbandal respond after Ms. Pell fell, correct?

A. Correct.

Q. Does anyone else arrive at the accident scene before June Snbandal?

A. Crew members, no.

Q. The only person that you see is actually Mr. Pell, correct, and another -- and some other passengers, correct?

A. First it's, I think, two passengers, and then Mr. Pell a little bit later, and then after that, June.

Q. And approximately how much time transpired from the point in which you see Ms. Pell fall, until the first crew member from Royal Caribbean arrived at the

scene?

       MR. DRAHOS:  Object to the form.

   A.  I'm not quite sure.  I didn't time it, but I think it was pretty quick.

BY MR. GERSON:

   Q.  Was it more than a minute?

       MR. DRAHOS:  Object to the form.

   A.  I don't know exactly how long it was.

BY MR. GERSON:

   Q.  And what other crew members other than Mr. Snbandal arrive after him?

       MR. DRAHOS:  Object.

   A.  Another lifeguard comes, I forget his name.  I think it's Mohammed Armen, maybe.  He's another lifeguard that I think was second to the scene.

BY MR. GERSON:

   Q.  What was his name?

   A.  Mohammed Armen, maybe.

   Q.  Mohammed Armen.

       Just as we're going to take a look --

       MR. GERSON:  What exhibit are we on, ma'am?

       THE REPORTER:  This will be Exhibit 10.

       MR. GERSON:  Okay, for the record, Exhibit 10 is going to be -- I'm going to show you Exhibit 10 to the witness.  It says Exhibit 9, but I'll change

the sticker so it actually is going to be Exhibit 10.

(Plaintiff's Exhibit No. 10 is marked for identification.)

BY MR. GERSON:

Q.   But do you recognize this photograph, Ms. Campos?

A.   No.  I recognize -- I mean --

Q.   Okay, well, I'll --

A.   -- I recognize it as the Enchantment of the Seas, but I've never seen it prior to you showing it to me right now.  I believe it's the Enchantment of the Seas.

BY MR. GERSON:

Q.   Okay, I'll represent to you, Ms. Campos, that this photograph is a photograph that was recently taken as part of our vessel inspection of the Enchantment of the Seas this past weekend.  And at the bottom left here we've got the kiddy pool; is that correct?

A.   I really wouldn't call that a pool but, yes.

Q.   Okay, kiddy water area.

And then up in the right-hand corner we've got another pool area, and you see the gentleman in the red pants and the white shirt?

A.   Yes.

Q.   That would be the lifeguard, correct?

A.   That's a lifeguard, correct.

Q.   And so when I was asking you -- and so you would agree this fairly and accurately depicts what the pool deck looks like on a post-COVID-related cruise on the Enchantment of the Seas?

A.   A portion of the pool deck, yeah.  Isn't there another pool on the other side?

Q.   Well, I'm just showing you this photo.  I don't have the capability of making the photo appear larger but, yes, there is a larger portion of the pool deck.

This is just -- I'm just using this as a reference to say -- to show you that this is an example of the lifeguard -- a lifeguard, since you are making reference to lifeguards responding to Ms. Pell's accident scene.

A.   Okay.

Q.   So you made reference that the only crew members that you're aware of that responded to the scene so far -- first of all, what time -- what time did the fall occur?

MR. DRAHOS:  Object to the form.

A.   The specific time is around 2 o'clock, I think. Or if -- maybe 2:48 or 2:47, something like that.

BY MR. GERSON:

Q.   Okay.  And then the first person to respond to the fall are passengers, right?

A.   That's the way --

MR. DRAHOS:  Object to the form.

A.   -- it appears, yes.

BY MR. GERSON:

Q.   And then the passengers go and find Mr. Pell, correct?

MR. DRAHOS:  Object to the form.

Nick, do you want to show you her the video, or have her just test her memory for the next half hour?

MR. GERSON:  I'm going to test her memory.

MR. DRAHOS:  Okay.

MR. GERSON:  I don't need to play the video for her --

MR. DRAHOS:  All right, well, let --

MR. GERSON:  And I'm not misrepresenting anything.

MR. DRAHOS:  Let the record reflect, then, you're not showing the video, and you're just simply testing her memory.

MR. GERSON:  Okay.

A.   I don't think they went to get Mr. Pell.  I think, according to Mr. Pell's testimony, he turned

around and didn't see her there, and he walked back.  He saw somebody on the floor and as he walked closer, as approaching the person on the floor, he realized it was his wife.  Because he was a faster walker than her and was walking pretty far ahead of her.

BY MR. GERSON:

Q.   Okay.

A.   And I don't think the passengers went to get him.

Q.   **Based on your recollection of the video that's where you see a --  you see June Snbandal appear, and then another lifeguard appears after Ms. Pell fell, correct?**

A.   Yes, but I would like to say that I don't know if there's any other passengers that were there at that time as well.  I just -- in terms of asking me who was the first to respond crew-wise, I recall that it was first June, and then the second crew member there would have been Mohammed.  After that, I don't recall who else came and the order of them.  I know at some point the nurse came.

Q.   **Do you recall seeing any of the public area attendants respond to the scene?**

MR. DRAHOS:  Object to the form.

A.   I don't recall.  Again, I recall first the two

people, then Mr. Pell.  There might have been other passengers, but in terms of crew members, June and then Mohammed.

BY MR. GERSON:

Q.   And what happened next?

What did Royal Caribbean do next to investigate?

MR. DRAHOS:  Object to the form.

A.   I don't -- I mean, to investigate -- I've already gone over what was done to investigate.

BY MR. GERSON:

Q.   I haven't gotten there yet, so I don't know what you're saying.

A.   That was the first question you asked me when I started speaking about Dinesh when he -- you asked me about investigation; that was the first question you asked me in this line of questioning.

Q.   Okay.  Was an accident report prepared?

A.   Yes.

Q.   Does -- can Royal Caribbean tell me the circumstances under which it learned of the Plaintiff's fall?

A.   Through the life -- well, I believe the lifeguard said that the bartender told him about the fall, and then he went over to her.

Q.  And what did he do next?

MR. DRAHOS:  Object.

A.  He called for somebody -- somebody called for medical.

Q.  Okay.  And was an investigation completed?

A.  Yes, there was an incident --

**Q.  Were any -- were any of the passengers that were in the area interviewed by Royal Caribbean in connection with this -- with the investigation of the incident?**

A.  No.

**Q.  Does Royal Caribbean have a policy for obtaining witness statements?**

A.  Yes, if there's eyewitness or witnesses to the incident, it's encouraged to get witness statements from them.

**Q.  Were any witness statements taken from any of Royal Caribbean's crew members?**

A.  Witness statements, no.  There were no -- there were no eyewitness crew members.  No, none of the crew members saw the incident occur.

**Q.  Okay.  And what efforts were undertaken to try and interview passengers that were in the area at the time that Ms. Pell fell?**

A.  There were no witnesses identified on her guest

statement to be eyewitnesss to the -- to the events that -- the incident itself.  So there were no known passenger witnesses who actually saw the fall happen, so nobody was interviewed or asked.

Q.   Well, certain --

A.   They wouldn't have been interviewed -- I'm sorry.  Nobody was asked to fill out a witness statement.

Q.   And why is that?

A.   There were no known eyewitnesses passenger-wise to the fall either.

Q.   Well, what effort -- what do you know about what Royal Caribbean did to ask any of the passengers that were in the area at the time of her fall to provide any details about what they observed?

A.   My understanding is that the guests themselves didn't write any names of any witnesses, and there were no -- nobody -- no known witnesses when the investigation was happening.  So there was nobody identified as being an eyewitness to the fall.

Q.   Is Royal Caribbean -- doesn't Royal Caribbean have a policy for personal injury investigations and as part of that policy they're supposed to identify or locate witnesses to see if anyone can provide any information about what they saw, whether or not they saw

the fall, or whether or not they saw some other condition in the area?

A. There was nobody identified. Yes, there is that policy, but there was nobody identified as being an eyewitness to the fall.

Q. Did you -- did Royal Caribbean do anything to find out why it is that none of the crew ship personnel that responded to the accident scene, nor the chief officer of safety who prepared the incident report, made any effort at all to try and identify the passengers or speak to any of the passengers that were nearby at the time when Ms. Pell fell?

MR. DRAHOS: Object to the form.

A. I mean, I think that you covered this in both the depositions of Dinesh and Leszek -- L-e-s-z-e-k. You've discussed this with them, as they were the two people that would have been involved in the investigation. So I think that it's best to rely on their testimony as to their reasoning, which was that there were no witnesses identified by the Plaintiff, or by her husband, and they weren't able to identify any witnesses.

BY MR. GERSON:

Q. Well, certainly there were passengers in the area attending over to Ms. Pell at the time of her fall

when June Snbandal arrived, correct?

A.  Correct, but I think that Mr. Snbandal was probably much more concerned about the Plaintiff herself and how she was doing, rather than thinking to himself at that time --

Q.  I can't hear.

A.  I think that Mr. Snbandal testified -- and I think that he was much more concerned with how she was doing.  He's not -- he's a lifeguard, so I don't think that, at that time, he was thinking to himself that he needs to get the names of the people near there or start asking them if they saw the fall.

Q.  When Ms. Pell fell, she vomited after a few minutes, correct?

A.  That is correct.

Q.  And she was taken to the medical infirmary, was she not?

A.  She was.

Q.  And it was determined that the -- in the medical infirmary that Ms. Pell's fall was not just your ordinary slip and fall on a cruise ship, but that Royal Caribbean was concerned that Ms. Pell sustained a brain injury, isn't that correct?

MR. DRAHOS:  Object to the form.

A.  I don't know if it was determined.  I can

actually say I don't think that the medical facility

determined this is not just your ordinary slip and fall.

But I think that the doctor thought that she could have

a head injury, yes.

BY MR. GERSON:

    Q.    And what did they do as a result of that?

    A.    They contacted the hospital, and she was taken

there.

    Q.    She was taken off of the ship by paramedics to

a hospital in Galveston, Texas, correct?

    A.    Correct, she was taken to a hospital in Texas.

    Q.    And that is -- there's actually a definition

within Royal Caribbean's policies and procedures when

someone is injured in a way -- that suggests she has a

brain injury that is called a traumatic injury and

there's a traumatic injury response, isn't that correct?

       MR. DRAHOS:  Object to the form.

    A.    That is correct, we have a policy about that,

but that is not correct that that was the case here.

This was not deemed a traumatic injury by the doctor.

BY MR. GERSON:

    Q.    Well, it was traumatic enough in the sense that

they felt there was a need to medically disembark

Ms. Pell from the ship to a local hospital where she

eventually had brain surgery, right?

JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.

Amanda Campos on 01/12/2022                    Page 144

MR. DRAHOS:  Object to the form.

Argumentative.

A.   The doctor did not deem this a traumatic injury.

BY MR. GERSON:

**Q.   The doctor on board the ship determined that it was medically necessary to get her off the ship because she had a loss of consciousness and she was exhibiting signs of a brain injury, isn't that correct?**

MR. DRAHOS:  Object to the form.

A.   My understanding is the doctor believed there could be a possibility of her having a brain injury and as such, he thought it would be prudent -- or he thought it would be a good thing for her to go and make sure that everything was okay and go to the hospital.

But, again, he did not -- he did not label this as a traumatic injury.

BY MR. GERSON:

**Q.   Are you telling me that the traumatic injury protocols were not -- are you familiar with the traumatic injury protocol response, which is a policy and procedure for Royal Caribbean?**

A.   I am, but this was not a traumatic injury.  So the traumatic injury policies were not -- were not undertaken because this was not a traumatic injury per

the doctor.

Q.   What is Royal Caribbean's understanding of what a traumatic injury is?

MR. DRAHOS:  Object to the form.

A.   There's a definition of it.  I can look at it. I can't recall -- I can't say it word for word, but there is a definition of traumatic injuries.

I mean, a traumatic injury would be -- an incident is defined as "Any occurrence accidental, which results in death or requires an emergency medical debark or airlift of anyone on board the ship in order for them to receive life-saving support."

BY MR. GERSON:

Q.   Does Royal Caribbean deny that Ms. Pell was medically disembarked from the ship?

A.   She was medically disembarked from the ship, yes.

Q.   So that would warrant the traumatic injury response procedures, isn't that correct?

MR. DRAHOS:  Object to the form.

A.   No, that's not correct because in order to be -- in order to use those procedures, it has to be an order for them to receive life-saving support.  I don't believe that the doctor -- and you would have to ask him but -- believed that she needed life-saving support at

the time she was medically disembarked.

Q. What was the purpose of medically disembarking a passenger on a cruise ship in the absences of a life -- potential life-threatening issue?

MR. DRAHOS: Object to the form. Scope.

A. I mean, again, you would have to speak to the doctor. I think that he more had a concern that she could have -- that she should be seen by, you know, someone besides him and be seen in a hospital. But I don't know if that necessarily means that she has a life -- that she has an injury that is going to need life-saving support.

BY MR. GERSON:

Q. Well, who makes the decision within Royal Caribbean about whether a passenger needs to be medically disembarked for purposes of potential life-threatening injury?

A. That would be the doctor.

Q. And the doctor made that determination in this particular case, didn't he?

MR. DRAHOS: Object to the form. Asked and answered.

A. No, the doctor made the determination -- or he made the determination that she should be medically disembarked. But your -- you keep on -- you're missing

the second part of it, which is the life-saving treatment.  He made the decision --

Q.   Well, he made --

MR. DRAHOS:  Let her finish, please.

BY MR. GERSON:

Q.   All right.

A.   He made the decision that she be medically disembarked but that doesn't necessarily mean it rises to the level of a traumatic injury.  Did not deem this as a traumatic injury.  It was deemed as a moderate injury.

Q.   Now, with that in mind, Royal Caribbean never did anything to go back to try and find out who was on the deck over -- and standing over other locations where Ms. Pell fell to find out what they knew about what happened, did they?

MR. DRAHOS:  Object to the form.

A.   When the investigation -- I mean, no, I don't know what you think they could have done.  I'm not quite sure what you mean by that.

BY MR. GERSON:

Q.   Well, certainly, Ms. Campos -- and I'm not trying to be disrespectful, so please don't take it that way.

But you've given numerous depositions over the

years, we know this.  And Royal Caribbean has a number of ways of tracking down passengers when it wants to.

A.    That's not done on the ship.

MR. DRAHOS:  Object to the form.

A.    That is done -- that is done after the fact in the time of litigation.

I mean, if somebody was identified by somebody or somebody came forward, Royal Caribbean would have been happy to have them fill out a witness statement and give any information they had.  But on the ship, without having names of people, the ship is not able to determine who was next to her, or who was there at the time of the incident passenger-wise.

BY MR. GERSON:

Q.    Ms. Campos, doesn't Royal Caribbean have the technological capability of tracking where their passengers are at all times?

A.    No.

MR. DRAHOS:  Object to the form.

A.    No.

BY MR. GERSON:

Q.    No?

A.    No.

Q.    Are you familiar with something called the sail and sign card?

A.  Yes, but -- I mean, that wouldn't tell you if somebody -- I don't even know what you're saying.

Your -- the question that you just asked me is saying, Does Royal Caribbean have the ability to know where their passengers are at all times.  No, we do not.

If a passenger doesn't use their sign and sail card, we wouldn't know where they were on the ship.  And even if they did use their sign and sail card to purchase a drink at a certain venue and then they left that venue, we would not have the ability to track where they were right after that.  So, no, we don't -- we don't have that ability.

**Q.  Are you aware of any efforts by Royal Caribbean to try and identify any of the people, other than your own crew members and Mr. Pell, to find out what someone may have seen in the area, whether it be the fall itself, or in the events leading up to the fall, or after?**

MR. DRAHOS:  Object to the form.  Asked and answered.

A.  Again, no, they were not -- no witnesses came forward and, no, Royal Caribbean didn't have the name of any of the passengers that were near the incident at the time of the incident.

BY MR. GERSON:

Q. Are you telling me that Royal Caribbean has no way of figuring out who the passengers were hovering over the area at the time of her fall?

A. I mean, in terms of at the time of the incident, no. When the investigation was being --

Q. Does Royal Caribbean --

A. -- done, no.

Q. Now, did you review any of the -- well, tell me what changes and corrective action were undertaken to the area immediately after Ms. Pell's fall?

A. What --

MR. DRAHOS: Object to the form.

A. What changes and corrective actions were done immediately to the area after her fall?

BY MR. GERSON:

Q. Yes.

A. There were no changes.

Again, can you be more specific because I don't know what you mean by changes. Changes means like did we change the area.

Q. Was the area marked off after Ms. Pell fell?

A. There were chairs that were moved after she fell, yes.

Q. And who moved them?

A. I believe a crew member. I don't know who.

Q.   How do you know that?

A.   The video.  I just don't recall who on the video moved those chairs.  I think it --

Q.   And --

A.   -- I don't know for sure.

Q.   And what was the purpose of moving the chairs?

A.   To corner off the area so people wouldn't walk through there.

Q.   And were photographs taken?

A.   Yes, photographs were taken.

Q.   And did you review the photographs that were taken?

A.   Yeah, I did see the photograph -- photographs that were taken.

Q.   And in the photos that were taken, do you know who took them?

A.   Yes, the guest security supervisor took the photographs.

Q.   And who was that?

A.   Dinesh.

Q.   And do you know what kind of camera Dinesh used?

A.   No, I don't.  I don't recall what kind of camera he used.

Q.   How many photos did Dinesh take?

A.   Again, I think it was five or seven.  I don't recall the exact number.

Q.   In the photographs that you reviewed, did you notice the spilled drink under one of the portions of the chairs and a glass that was pulled over another -- or a chair that was pulled over a glass?

MR. DRAHOS:  Object to the form.

A.   No, I saw -- no, I didn't see a glass.  I thought that was a water bottle; is that a glass?  I can't tell.

BY MR. GERSON:

Q.   Let me show you what we'll mark as the next exhibit to the deposition.

MR. GERSON:  What exhibit are we on?

THE REPORTER:  This will be 11.

BY MR. GERSON:

Q.   Okay, this will be 11.

(Plaintiff's Exhibit No. 11 is marked for identification.)

BY MR. GERSON:

Q.   Do you see Exhibit 11, Amanda?

A.   I do.

Q.   Do you see the number 1 with a semi circle around it?

A.   Yes.

Q.   And do you see that there appears to be a liquid substance underneath a portion of the chair?

A.   I don't think that's a liquid substance. That's like a white -- it's white.

Q.   Do you see -- do you see what appears to be a glass in this version of the photo?

A.   I couldn't tell it was a glass.  I thought it was a water bottle.

Q.   You thought it was a water bottle?

A.   I don't know.  Yeah, I can't really tell what it is.

Q.   Okay.  If this, in fact, was a spill in the -- on the floor, where the number 1 is located with the chair pulled over it and the chair pulled over the glass, is this -- if this was a spill, is this something that should have been cleaned up before Ms. Pell fell?

MR. DRAHOS:  Object to the form.

A.   Ms. Pell didn't fall there, though.

BY MR. GERSON:

Q.   Well, how do you know where Ms. Pell fell?

A.   Because you could see it on the video.

Q.   You could see it on the video?

Which video are you referring to?

A.   On my video I'm able to zoom in, and I can see where she fell on my video, and she did not fall there

at all.

Q.   Okay.  Why don't you show me your video that you're referring to.

A.   I have to pull it up.  It might take a bit.

Q.   I have all day.

A.   Okay, so do I.  Happy to do it.

THE VIDEOGRAPHER:  This is the videographer. We're going to need to break shortly for a media change, would now be a good opportunity to do it?

MR. DRAHOS:  Yes.

THE VIDEOGRAPHER:  All right, hearing no objections, the time is 2:58 p.m., and we are off the record.

(A short recess is taken.)

THE VIDEOGRAPHER:  The time is 3:70 p.m. This beginning Media Unit Number 3, and we're back on the record.

THE WITNESS:  Okay, so do you want me to go ahead and share my screen?

MR. GERSON:  Sure.

THE VIDEOGRAPHER:  We are --

(Video is being played).

THE WITNESS:  Okay, so if you want, I can fast-forward it a bit.

BY MR. GERSON:

Q.   We're back on the record.

And, I believe, Amanda, you're showing me the -- one of the videos from afar that you believe shows a different area of where the fall occurred.

Of course, I just want to point out for the record that there are two sets of chairs and this feed is from across the pool diagonally, so you can't actually see the floor surface or anything else because of the interference through -- of the different deck chairs.

But go ahead and show me what it is you want to show me.

A.   Okay.

MR. DRAHOS:  Object to the form of the commentary.

A.   So I think that this is as a result of you -- of me saying that's not where she fell, which, I believe, on my cursor, was one of these two chairs where you were looking at a substance under the chair. Because this is where she ends up sitting.

BY MR. GERSON:

Q.   For the record, you are referring to --

A.   The third --

Q.   -- it looks like from your -- from my cursor, I see one, two, three -- and then your cursor is about at

the fourth chair -- fourth chair from the third line of chairs in this video.

A.   Yes.  Or if you're referring to these two chairs -- I'm not quite sure.  Based on the pictures it look like -- yes, it would be the third row, which would be this row, is where you were pointing at something under the chair so -- and I had responded that that's not where she fell.

Q.   That's not where I was referring to, but go ahead and show me --

A.   Okay.

Q.   -- in the video footage.

A.   Okay.  So -- oh, sorry, that's -- my understanding is that's Ms. Pell's husband.  It's easy to see there's nobody else around at the time.  And here is Ms. Pell.  I'm going to play it right now because the fall is going to occur.

And that's -- so my point was that her fall did not happen there.  Her fall started at the first chair.

Do you want me to stop sharing?

Q.   Sure.

(Witness stops screen share of the video).

BY MR. GERSON:

Q.   In the video footage that you just showed me, you're not able to see the actual location of the floor

where she fell, are you?

A.   No.

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   And you already told me that in the photographs that were taken that the accident scene -- and some of the deck chairs had been removed?

A.   We can't hear you.

Q.   (Counsel ruffles papers).

A.   That's better.

Q.   In your testimony earlier, you were telling me that in the accident scene photographs that several of the deck chairs had been moved to mark off the area and to preserve the incident scene, correct?

MR. DRAHOS:  Object to the form.

A.   I didn't say several.  I think that there were maybe two chairs moved.

BY MR. GERSON:

Q.   Well, do you know how many chairs were moved?

A.   I believe it was two.  But we can look at the video and it's easy to see how many chairs were moved.

Q.   Well, let me ask you this:  I'd like you to take a look at what we'll mark as the -- this is going to be Exhibit 12 to the deposition.

(Plaintiff's Exhibit No. 12 is marked for

identification.)

BY MR. GERSON:

Q. And ask you if you -- this is a little more clear of a picture.

Do you see what's been marked as Exhibit 12?

A. I do.

Q. Do you see what appears to be liquid underneath this section of the chair, and then what appears to be a wineglass opposite that chair?

MR. DRAHOS: Object to the form.

A. I see a substance of some sort under one chair that -- that chair on the third row. And, yes, I see something underneath that other chair, which would have been in the second row.

BY MR. GERSON:

Q. Yes. If this substance -- where my cursor is located with the chair pulled over it -- if that was a spill, is that something that should have been cleaned up by the public area attendants, or anyone else walking through the area?

MR. DRAHOS: Object to the form.

A. I don't know what it is. I can't tell what it is. I mean, I don't know what that is. So I don't know if that is a stain of some sort. I can't tell what it is.

BY MR. GERSON:

Q.   Are you telling me that that substance doesn't look to appear to be like water or some sort of liquid?

MR. DRAHOS:  Object to the form.  Asked and answered.

A.   Again, I don't know what that is.  I can't tell for certain.

BY MR. GERSON:

Q.   So for the members of the jury --

A.   No -- I mean -- yeah, I can't tell for certain. Yeah, I don't know for sure.

Q.   Well, if it was water or some sort of liquid substance, is that something that should be cleaned up by the crew members assigned to the pool deck?

MR. DRAHOS:  Object to the form.

A.   If it was -- if it was water, then it should be -- yeah, I guess it should be addressed.

BY MR. GERSON:

Q.   When you say, it should be addressed, you mean it should be cleaned, right?

A.   Well, water doesn't really --

MR. DRAHOS:  Object to the form.

A.   -- need to be -- water would need to be dried.

BY MR. GERSON:

Q.   Right, excuse me.  It should be -- the area

should have been dried, correct?

MR. DRAHOS:  Object to the form.

A.   Possibly, yes.

BY MR. GERSON:

Q.   And the water that you're looking at in this photograph -- this was taken as part of a Royal Caribbean's investigation into the incident, isn't it?

A.   This photograph was taken 45 minutes after the incident occurred but, yes --

Q.   How do you know that?

A.   That's what Dinesh said.  I believe that he took the pictures at a later time after -- after he met with her in the medical center.  I thought he had said it was around 45 minutes after the incident occurred.

Q.   So what's been marked as Exhibit 12, which is an incident -- part of the accident scene photographs. 45 minutes later you see that there's a water-like substance that consists -- that covers 1, 2, 3, 4 -- at least 5 planks with a chair pulled over it, and then a wineglass on the opposite side of the area where Ms. Pell fell.

You don't despite that, do you?

MR. DRAHOS:  Object to the form.

A.   There's definitely something where your cursor or is now, and there's definitely something -- a

substance of some sort under that chair.  But, again, that's -- neither of those two things are where the incident occurred.

BY MR. GERSON:

**Q.   Well, you don't know exactly where the incident occurred because the only video footage that would actually show us how the fall occurred is missing, isn't it?**

MR. DRAHOS:  Object to the form.

A.   No, I do know exactly where the incident occurred because you can see where it occurred on the CCTV.  I don't know the specific cause of the incident, but I know where it occurred.  You can see it on the video.

**Q.   Did you investigate the incident, Ms. Campos?**

**I'm not trying to be cute, but I'm just asking you:  Did you investigate the incident?**

MR. DRAHOS:  Object to the form.

A.   No, but I have two eyes, and I just watched the incident occur, and I can speak clearly that it did not occur on those two areas that you were just pointing to. You don't have to be an --

BY MR. GERSON:

**Q.   Okay, I'd like --**

A.   -- investigator to do that.

Q.   -- you to take -- I would like you to take a look at Exhibit 13 of the deposition, okay.

(Plaintiff's Exhibit No. 13 is marked for identification.)

BY MR. GERSON:

Q.   Do you see what's been marked as Exhibit 13?

A.   I do.

Q.   Do you see that this is a red circle that has been drawn over the approximate area by -- or this approximate area by Royal Caribbean?

MR. DRAHOS:  Object to the form.  Predicate.

A.   That is a red circle.  That's where she landed. That's not where the incident -- that's not where her fall started.  That's where she fell.

Q.   Well --

A.   The fall did not start there.  I mean, you can see on the video exactly where she started to fall and where she fell.  That would be the area that she fell down at, but that's not where she started to fall.

BY MR. GERSON:

Q.   So are you able to see this photograph that we already referred to as Exhibit 12?

A.   I am.

Q.   Okay.  And now you see this red circle in Exhibit 13 that's precisely the same approximate area

where that spill was, correct?

MR. DRAHOS:  Object to the form.

A.   In that photo, I don't see any substance underneath the chair that that man is sitting on.

**Q.   Well, that's because it's probably already been cleaned.**

MR. DRAHOS:  Object to the form.

A.   The photographs were taken at the same time.

BY MR. GERSON:

**Q.   I mean, these aren't -- I didn't put this circle in this area in Exhibit 13.  These were the photographs that were taken by Royal Caribbean in connection with their investigation of what happened, and Royal Caribbean took it upon themselves to circle this area as the area where the fall occurred.**

A.   I don't know what.

MR. DRAHOS:  Is there a question?  There's no question.

BY MR. GERSON:

**Q.   Well, I lost the video so. . .**

THE VIDEOGRAPHER:  The video is still good on my end, Counselor.  Do you want to get off the record to address the issue, or are you okay?

MR. GERSON:  Give me a moment, please.

BY MR. GERSON:

Q. We take a look again, Ms. Campos, at Exhibit 12. We've got a photograph with a chair pulled over it and a spill underneath it and what appears -- you said it was a water bottle. But this, to me, it's pretty crystal clear that that's a wineglass with the base of the wineglass in the bottom here. But either way, we have liquid.

And then when we look at the other photographs that you say were taken 45 minutes later, or some of the photographs taken 45 minutes later, we now have people seated in the same chairs that weren't seated in the chairs before with a red circle over the exact area from before.

MR. DRAHOS: Object to the form.

A. I didn't -- I said --

MR. DRAHOS: I don't think that's a question.

A. Yeah.

MR. DRAHOS: I don't think it's a question.

A. But I think it also --

BY MR. GERSON:

Q. Do you disagree with that?

A. -- mischaracterizing my testimony.

Q. Do you disagree with the fact that that red circle -- that was taken by Royal Caribbean in connection with their investigation, this red circle

here, is a different area than what has been shown to you in Exhibit 12?  Isn't this generally the same location?

MR. DRAHOS:  Object to the form.

A.   It appears to be the same location, yes.

BY MR. GERSON:

Q.   Now, let's talk about the other CCTV video that was produced in this case.

There was another video that was produced by Royal Caribbean in connection with Ms. Pell's fall, correct?

A.   Correct.

Q.   And, certainly, Ms. Campos, you are well aware of the fact that that video footage is missing, coincidentally, or for whatever reason, the actual moment that Ms. Pell walks out of the Windjammer Café and jumps a minute and 17 seconds and completely misses her fall.

You've seen that video footage, correct?

A.   Yes, I've seen that video footage.

Q.   And what is Royal Caribbean's position as to why the video footage of the actual fall from the best possible angle that would have shown what Ms. Pell fell on -- what happened to it?

A.   The video, when it was reviewed according to

Dinesh, I guess it jumped, or it -- I guess it -- I don't know.  I forget the exact word that he used.  But basically it skipped recording her fall.  It --

Q.   **Royal Caribbean doesn't deny -- sorry, go ahead.**

A.   I guess the camera was faulty at that time and skipped over the incident.

Q.   **When you say that Royal Caribbean's official position is that the video skipped based on what Dinesh told you, what do you mean it skipped?**

MR. DRAHOS:  Object to the form.

A.   It didn't capture the fall itself.  It skipped from before the fall to after the fall.

BY MR. GERSON:

Q.   **The video footage is missing from the precise moment that Ms. Pell walks out of the Windjammer Café and resumes after she's on the ground, isn't that a true statement?**

MR. DRAHOS:  Object to the form.

A.   I don't know if it's the precise moment.  I think it's before then.  At least the one that I'd seen is not like the precise moment.  I don't recall seeing her husband on that video either.

BY MR. GERSON:

Q.   **Okay.**

A.   I don't recall.  But, yes, either way, the video did not record the actual fall.

Q.   **How do you know it didn't the record it and someone didn't delete it?**

MR. DRAHOS:  Object to the form.

A.   I don't know that anybody would even have the capability of deleting it.  I don't know how that would be done.

BY MR. GERSON:

Q.   **Are you telling me that it's not possible that the video could have been deleted?**

A.   I don't see that as a possibility, no.

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   **What did you do -- or what did Royal Caribbean do to try to get to the bottom of how it's just so that a minute -- approximately a minute and 17 seconds -- and those minute and 17 seconds that are missing from the only video that would show what Ms. Pell slipped on, how she slipped, and potentially what she slipped on, is gone?**

MR. DRAHOS:  Object to the form.

A.   First of all, I don't know if the video would have shown all that.  Because if you're looking at that video, I don't think there was anything on the floor at

that time for her to even slip on.

But how do we explain that.  It's -- ideally, we would have that.  I mean, then we would be able to not have this line of questioning and have you make these kind of assumptions.  It was not anything that Royal Caribbean did.  The video skipped over it.  It's not as high quality, as you can see.  It might be an older videocamera and at the time of the incident for some reason, it didn't work.

There's nothing that I could have done to -- we reached out to the shoreside individual who was -- who is, you know, responsible for CCTV, and his response as well is, it must have just skipped.  Some of these video cameras are older and it can happen.

But to insinuate that anybody at Royal Caribbean would have intentionally deleted that I think is not a really proper thing to do because nobody deleted it.

BY MR. GERSON:

Q.   So you think that it's just reasonable for the jury to believe that it's just a coincidence that the video footage that would have shown the actual fall happened to malfunction for the relevant period of time from the moment Ms. Pell walked out of the Windjammer Cafe and just happened to resume after she was on the

ground, is that really what you're suggesting someone should believe?

MR. DRAHOS:  Object to the form.
Argumentative.

A.   Yes, that's not something to believe; that's what happened.  I mean, for you to insinuate that somebody would, first of all, do that, I don't think is a proper thing to insinuate.

And second of all, I don't think that anybody even has the capabilities of deleting portions of that.

And, third, yes, that is what happened.

I mean, I don't know -- the only two people who viewed that video -- it would actually be Dinesh, who you were able to speak with.  He has testified that he did not delete any portion of the video.  He recorded right away in an email that the video skipped.  I don't know what more, you know, Royal Caribbean can say to that except for it's unfortunate that that happened that it skipped.  But with no uncertain -- I mean, there's no -- there's no possibility that somebody would have -- and that somebody would have been Dinesh -- would have deleted a portion of the video showing when she fell.

BY MR. GERSON:

Q.   Has Royal Caribbean ever been sanctioned by a United States district court judge for spoliation of

video evidence in a personal injury litigation
specifically in the last year?

MR. DRAHOS: Object to the form. That area of inquiry is not listed here in this notice. She's not prepared to answer the question --

BY MR. GERSON:

Q. You can answer.

MR. DRAHOS: -- if required too.

BY MR. GERSON:

Q. You can answer.

MR. GERSON: The witness has personal knowledge, she can answer.

MR. DRAHOS: Well, then, she's going to answer it based upon her personal knowledge if she has it; not as a corporate rep because you didn't notice it in this deposition.

A. I don't -- when were we sanctioned and in which case? I don't know what case you're referring to. I really don't.

BY MR. GERSON:

Q. The case involving the baby that fell out of the window. Wasn't Royal Caribbean sanctioned for missing video footage?

MR. DRAHOS: Object to the form.

A. Yeah, that -- that's like -- no. I don't

recall the exact order or what exactly it said, but I don't believe that's the same situation as you have here.

BY MR. GERSON:

Q. **Well, all my question was --**

A. And I'd like to --

Q. **-- Ms. Campos --**

A. -- point out --

Q. **-- and I'm not trying to --**

A. -- that these --

MR. DRAHOS: Let her answer.

A. And I'd like to point out that that case was dismissed on summary judgement, meaning, that the Court found there was not enough to even take it to trial and it was dismissed.

So any alleged wrongdoing in relation to any spoliation, which had nothing -- it's not even close. That video -- Royal Caribbean had the video of the actual incident in that case. It had to do with video from hours before at some point. So I don't think that you can compare the -- that's why I didn't understand what you were saying. But that case was dismissed --

BY MR. GERSON:

Q. **My only question for you -- my only question for you, Ms. Campos, was: Had Royal Caribbean been**

sanctioned within the last year for spoliation of a CCTV video in connection with a personal injury lawsuit?

MR. DRAHOS:  And same objection.  It's outside the area of this deposition.  It wasn't noticed properly.

MR. GERSON:  That's not a basis --

MR. DRAHOS:  She's here as a corporate rep.

MR. GERSON:  That's not a basis to instruct the witness not to answer.

MR. DRAHOS:  You need to -- first of all, calm down.

THE REPORTER:  Hey, guys.  You guys, I can't -- I can't get you guys talking all over each other.  One at a time, please.

MR. GERSON:  I'm just pointing out the obvious.  I mean, you know that, Mr. Drahos.

MR. DRAHOS:  Well, I'm still going to --

MR. GERSON:  The witness has --

MR. DRAHOS:  -- assert my objection --

MR. GERSON:  -- personal knowledge.  She --

MR. DRAHOS:  -- to your questions.

MR. GERSON:  -- can answer.

MR. DRAHOS:  Nick, you've got to let me finish.

Even if your questions are obviously improper, I'm still going to insert an obvious objection,

which is, you didn't properly notice that as an area
of inquiry for this deposition, so she's not
going --

MR. GERSON: It doesn't matter.

MR. DRAHOS: -- to testify as a corporate rep
on that.

It does matter. You have to notice the areas
of inquiry properly.

MR. GERSON: No, the witness can answer based
on personal knowledge. The witness was the
corporate representative who gave testimony in the
case. And it's a simple question and we can move
on.

THE WITNESS: You know what --

MR. GERSON: It's a yes or no. I know the
answer. That's all.

A.   Just so you know -- in pointing that out, I did
give testimony in that case in that area that you're
discussing. I don't recall me ever discussing
spoliation and any sanctions in my deposition in that
case. They did not ask me about that at all.

BY MR. GERSON:

Q.   **Do you deny that Royal Caribbean has ever been
sanctioned for spoliation of video evidence in a
personal injury lawsuit in the last year?**

JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.

Amanda Campos on 01/12/2022                                    Page 174

MR. DRAHOS: Object to the form. Same basis.

A. I'm going to say --

MR. DRAHOS: This isn't for a corporate rep.

A. -- that I don't -- I have not read that order or looked at it. And based on the way that you're saying it and how it's coming, I would need to read that order before I testified anymore about it. I don't believe you're presenting it in the proper context.

BY MR. GERSON:

Q. Okay. Let me show you the video footage again in this case that you say skipped.

This is going to be -- this is part of composite Exhibit 3, the video, I believe.

MR. GERSON: Is that, Ms. Adkins. . .

THE REPORTER: You have exhibit 3 of the video and Exhibit 3A. I don't know which one is which.

MR. GERSON: All right. 3 is the first video from across the pool, and 3A is the video that I am about to show.

BY MR. GERSON:

Q. Okay. Are you able to see the screen?

A. I am.

Q. Okay. This is Jennifer Pell and this is -- we've got a time of 7:48:21; do you see that?

A. The title, yes.

Q.   Okay.  And now this is the other video.

This is 3, and this would be -- you would agree that this advantage point would be the best advantage point of the fall itself, correct?

A.   Correct, but you can't really make out anything in this video due to the poor quality of it.  So I don't believe you would have been able to really determine --

Q.   Well --

A.   But go ahead, yes, it's much closer.

Q.   Ms. Campos, just to comment on some of your video capabilities; that you have acces to and none of us else do, as you were showing us your ability to zoom in the video.  You have the ability to zoom out and make this video clear if you want too, correct?

MR. DRAHOS:  Object to the form.

A.   No, I can show you I cannot.

BY MR. GERSON:

Q.   But you have the capability of making it less grainy --

A.   No.

Q.   -- just as you have the capability of zooming it in, and you can zoom it out with your proprietary software.

A.   No, I --

MR. DRAHOS:  Object to the form.

A.   I do not.  And you're not asking me as a question; you're telling me, and I'm telling you I cannot.

If you want me to pull up --

BY MR. GERSON:

Q.   Okay.

A.   -- this video, I'd be happy to show you that I don't have the ability to get rid of graininess.  This is just --

Q.   Okay.

A.   -- an older videocamera.

Q.   Well, what I'd like to show you is -- I'd like you just to watch the video.  And it's going to -- we're going to start it at 7:48:21, which is about three minutes and eight seconds into the video from stairs one of two that were produced.

And you would agree, in at least this video clip, that there is not the same obstructions that you observed in the first video from across the pool where you told me the fall didn't happen where -- or the fall happened at a different location from what you say, correct?

MR. DRAHOS:  Object to the form.

A.   I don't even know -- no, not correct.

BY MR. GERSON:

Q.   Okay.  You would agree that this video clip that I'm about to show you would be a -- is a better angle of the area where Ms. Pell fell?

MR. DRAHOS:  Object to the form.

A.   I agree that this video is a closer area -- or a closer camera to -- than the one that's across the pool.

BY MR. GERSON:

Q.   This -- what would you describe this camera angle as?

A.   This is an angle, I guess, of the chairs directly -- if this -- if this angle wasn't grainy, it would be a much better vantage point than the one across, yes.

Q.   Okay.  So I'm going to play the video, and I'd like you watch and pay attention to 7:48:30.

(Video is played)

At 7:48:32, the video reassumes at 7:49:47, correct?

MR. DRAHOS:  Object to the form.

A.   That's what it appears to be, yes.

BY MR. GERSON:

Q.   Ms. Pell has already fallen, hasn't she?

A.   Yes.

Q.   Do you see the man in the blue pants and blue

shirt standing?

A.   I do.

Q.   Do you see Mr. Pell in front of the man in the aqua pants hovering over something and that something is Ms. Pell?

Do you see at least what appears to be Mr. Pell hovering over him?

A.   Yes.

Q.   How many deck chairs are you able to see in this video footage where Ms. Pell is leaning over?

A.   About three.  That's the area that she landed in, yes.

Q.   Well, you don't know exactly where she landed because it's missing.

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   Let's look at it again.  7:48:15.

(Video is played).

Do you see the video jumping at 7:48:15 to 7:48:23?

A.   Yes.

Q.   Do you see the video jumping?

A.   I think it did, yes.

Q.   Okay.  You think it did?

A.   I wasn't looking at the exact time.

Q.   7:48:15.  The time --

A.   Mr. Gerson, this video continuously jumps, yes, it skips.  Royal Caribbean is saying that a video is skipping.  Never said anything --

Q.   The time -- the time continues consistently. There's no time jump in the video footage.

Look -- watch again from 7:48:03.

(The video is played.)

The time is consistent with the same time that you would expect seconds to go by, and then at 7:48:33, all of a sudden, we're at 7:49:43.

A.   It skipped to 7:48:32, then 7:48:36.  And then I think there could have been another one, and then it goes to 7:49.

Q.   No, no, no, no, I'm not going to -- let's start it again.

What did you say, 7:48, what, you believe there was a skip?

A.   You saw 7:48 --

MR. DRAHOS:  Object to the form.

A.   -- 32, then you see 7:48:36.

BY MR. GERSON:

Q.   7:48:10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32.  And then all of a sudden, it's 7:49:43.  A whole -- over a

minute.

        MR. DRAHOS:  Object to the form.

BY MR. GERSON:

    Q.   So I don't disagree with you in a sense that the video skips.

        But the reason why the video skips, Ms. Campos, is because that portion of the video is gone.

        MR. DRAHOS:  Object to the form.

BY MR. GERSON:

    Q.   You don't disagree that that portion of the video is gone, do you?

        MR. DRAHOS:  Object to the form.

    A.   That portion of the video was never recorded because it skipped.

BY MR. GERSON:

    Q.   How do you -- tell me what you did -- because this is a very serious issue in the case.

        Tell me what Royal Caribbean did to evaluate or to assess the remarks by Dinesh and the other Royal Caribbean crew members who claim that the video -- they didn't say skipped; they said jumping.  Do you remember seeing that?

    A.   I can use that word instead of skip.  I don't know which word you prefer, jump, skip.  To me, it's the same.

Q.   Well, what are the -- did anyone within Royal Caribbean ever say that the video recorder malfunctioned?

MR. DRAHOS:  Object to the form.

A.   I believe that the safety officer used that word.

BY MR. GERSON:

Q.   And are there policies and procedures that Royal Caribbean has in place that when a CCTV camera malfunctions that there are certain things that they're required to do pursuant to Royal Caribbean's policies?

A.   I really -- I don't know.  I'm not quite sure. It should be probably told to shoreside that there is -- one of the CCTV cameras.

Q.   Isn't there a procedure in place that when a CCTV camera malfunctions that they're supposed to be a notification made and that the repairs are supposed to be made?

A.   I think I just said it should be reported to shoreside, and they should be notified of it.

Q.   And are you -- you are aware of the fact that we asked Royal Caribbean to provide documentation with respect to the so-called malfunction of the videocamera in this case.  You're aware of that, correct?

MR. DRAHOS:  Object to the form.

A.   I'm not -- I don't recall that.

BY MR. GERSON:

Q.   Well, I'll represent to you that we did request evidence from Royal Caribbean to show us whether or not there were any repairs or service requests to either repair or replace the videocamera that has been described as jumping, and no evidence of any repairs have been provided to us.

Can you explain why that is?

A.   I guess it was never repaired.

Q.   And the reason why it was never repaired is because there was no need to repair the videocamera, was there?

MR. DRAHOS:  Object to the form.

Argumentative.

A.   Obviously there is a need if this -- if this camera is -- looks the way that it does in terms of quality.  And obviously it's an older camera that was skipping; it should probably be upgraded or updated somehow.  It was not, but it should be.

BY MR. GERSON:

Q.   Just like there should have been efforts to undertake to identify the witnesses that were hovering over the area where Ms. Pell fell, right?

MR. DRAHOS:  Object to the form.  That's not a

question; that's an argument.

BY MR. GERSON:

Q.   **You can answer.**

A.   It wasn't a question.

Q.   **How does the video make its way, Ms. Campos, from ship to shoreside?**

A.   It stays --

MR. DRAHOS:  Form.

A.   -- in Riskonnect.  So as you can -- as you saw, there's an email that Dinesh said he reviewed the video. One of them skipped, which was recorded on the day of in real time, he had said that.

And that -- my understanding is that the chief officer of safety also reviewed the videos, and he was the one that saved them and uploaded them into Riskonnect.

Q.   **And when there -- when physical copies of CCTV footage is related to an investigation and sent shoreside, it's supposed to be labeled in a certain way, isn't it?**

A.   Not sent shoreside.  It was saved in a database.  It's not mailed.  It's saved in our Riskonnect system.

Q.   **I'm reading to you from documentation that was produced by your lawyers Bates stamped GR197.**

And it says here under close circuit television.  "Physical copies of CCTV footage related to investigation that is sent shoreside must be handled as follows:  Copied to a CD ROM or external drive.  Labeled with Riskonnect personal injury related and investigation or G SIM report number.  Labeled with the ship's name, and labeled with the person's name.

And you dispute --

A.    That's physically --

Q.    -- that procedure?

A.    That's if it's physically sent shoreside for some reason.  This was not physically sent shoreside.  It was saved and placed into Riskonnect where it still is.  There's nothing sent physically.

Q.    When was Royal Caribbean first made aware that the video footage in this particular case from this particular camera, Exhibit 3A, was missing the footage of the actual fall?

A.    At 3:47 the day of the fall.

Q.    And how do you know that?

A.    Because that's when Dinesh sent an email to the state -- to the safety officer saying that the CCTV was reviewed and cannot see the accident as the camera was jumping during that particular frame.  And he wrote --

Q.    How can --

A.   Excuse me, I'm -- and he wrote it on January 16th, 2020, and it was 3:47 p.m., so that's when Royal Caribbean memorialized it.

**Q.   So the initial report from Dinesh was that the videocamera was, as you put it, jumping, right?**

A.   That's how he put it.  He said, "jumping."

**Q.   Can you tell me what -- and the members of the jury that are watching this what jumping means?**

MR. DRAHOS:  Object to the form.

A.   It means what you saw on the video that you just showed.  It jumped from one frame at one time, to another frame at another time.

BY MR. GERSON:

**Q.   Do you mean it's missing?**

MR. DRAHOS:  Object to the form.

A.   Either way you say it, yes.  I mean, I don't know how many times and how many ways you want me to say this.  Yes, the --

**Q.   Well --**

A.   -- incident itself is missing off of that CCTV. I'm not -- I haven't denied that.  I've said it.  I don't know why we're still asking the same questions about it.

Yes, there's no -- there's no video from that angle of the incident itself.

BY MR. GERSON:

Q.   So it's Royal Caribbean's position that the camera malfunctioned, the camera was jumping, or which of the two?

MR. DRAHOS:  Object to the form.

A.   Both.  Jumping would be a malfunction.  The camera is not supposed to jump, hence, the malfunction. I don't know why you're caught up on the semantics of skipping, jumping, or malfunctioning.  They all mean the same thing.

BY MR. GERSON:

Q.   How does a camera jump?

MR. DRAHOS:  Object to the form.

A.   I would not know how a camera jumps.

BY MR. GERSON:

Q.   Well, when you found out Dinesh's explanation that the camera was jumping, did you, on behalf of the corporation, do anything to talk to him to have him explain to you what he meant when he said the camera was jumping?

A.   I understood what he meant.  I mean, I wouldn't need someone to explain it to me.

Q.   The cameras are fixed in the ceilings and on various portions of the ship, aren't they?

A.   Yes.

Q.   Give me a second here.

MR. GERSON:  What exhibit number are we on?

THE REPORTER:  The next one will be Exhibit 14.

(Plaintiff's Exhibit No. 14 is marked for identification.)

BY MR. GERSON:

Q.   Okay, Ms. Campos, I'd like you to take a look at another exhibit to the deposition.  This is Exhibit 14.

Do you see what's been marked as Exhibit 14?

THE REPORTER:  Did we lose him again?

THE WITNESS:  I don't know if that was his question.

A.   I'm not quite sure.  But it is a camera, yes.

BY MR. GERSON:

Q.   You don't dispute that this is a camera?

You don't dispute that that is a camera?

MR. DRAHOS:  Object to the form.

A.   That is a camera.

BY MR. GERSON:

Q.   Okay.  And do you see that there is -- the camera is enclosed in a capsule?

A.   Yes, it has some -- yes.

Q.   How could this camera jump?

MR. DRAHOS:  Object to the form.

A.   Oh my God, are you -- is that a serious question?  Like, I --

BY MR. GERSON:

**Q.   Is that a serious response?  You know, at the same time I'm --**

A.   Mr. Gerson --

**Q.   -- trying --**

MR. DRAHOS:  Yeah, you are.

THE REPORTER:  Hey, guys, I can't -- I can't report this at all.

MR. DRAHOS:  Yes, you are trying to be argumentative, which is why you got the response --

MR. GERSON:  No, I'm just trying to establish that this camera -- I don't understand how a camera could jump when it's enclosed with a plastic casing and it's fixed to a structure on a cruise ship.  How could it jump?

MR. DRAHOS:  That's an arguments, Nick.  That's the epitome of an argument.

MR. GERSON:  I'm asking the witness to explain it to me.

A.   Are you actually thinking -- and I'm hoping that you're just being really rude right now, because I hope that you don't think I'm actually saying that the camera itself jumped.

BY MR. GERSON:

Q.   I guess I don't understand what Royal Caribbean is saying when they say that the camera jumped.

MR. DRAHOS:  Object to the form.  We've repeatedly gone through the semantics of this --

A.   You've never --

MR. DRAHOS:  -- and the different verbiage and everything else.

A.   You've never heard that term "skipped or jumped" when listening to a record, or a mixed tape, or something like that; that it malfunctions somehow and it skips or jumps?  That's a normal term to use with electronics.  Nobody would ever actually think -- and that's why I'm not quite sure if you're being serious or not that the camera --

BY MR. GERSON:

Q.   Well, I --

A.   -- jump.  I mean, that's really --

Q.   Maybe what you're telling me is that the camera was moving and that's what you mean by jumping.  I don't know.  I don't understand the explanation quite frankly and that's part of the problem.  I'm not trying to be rude.  I'm trying to understand --

A.   Okay.

Q.   -- what Royal Caribbean's position is because

this is an important issue in this case.

MR. DRAHOS:  Object to the form.

A.   So if you're being serious and you really don't understand and you actually thought that the camera itself jumped, I can try to explain it better like I just did with using the analogy of a CD player, or any kind of music player when you're listening to a song and it jumps.  Because it's an older technology -- it doesn't actually; it just jumps from one spot to another.  It's due to malfunction of some sort.  But it's a common term that would be used when you're missing a portion, or you skip over a portion of a recording, which is what we have here.

So I'm sorry if you didn't understand me.  If you want me to say it in a different way, but that's the way --

BY MR. GERSON:

Q.   Okay.

A.   -- for me to say it would be that the recording skipped over the portion.  And I don't mean the camera literally skipped, I mean the recording did.

Q.   Okay.  So you're telling me that there was an issue with the data -- the playback data recorder as opposed to the camera itself.

Is that what you're telling me?

MR. DRAHOS:  Object to the form.  Outside the scope.

A.   Again, I don't know exactly -- I don't know the mechanics of why the portion of it is skipped over and why that happened.  Again, I will revert back to that, I believe it's an older camera, as you can see by the quality of it.  But I can definitely say that I never meant that the camera itself jumped.

Q.   Okay.

A.   If you were testing me to be saying that, I apologize, but I did not mean that at all.

**Q.   Okay.  That's -- I'm trying to clarify because there have been a couple of different explanations. Jumping, skipping.  And quite frankly, it's hard to understand of the different verbs and adjectives to describe, you know, what happened here.  You know, what happened.**

**So I'm just trying to get an understanding of, you know, what Royal Caribbean's explanation is.**

MR. DRAHOS:  Object to the form.  Move to strike.  There haven't been different explanations. It's been the same every time.  Different semantics.

MR. GERSON:  Okay, Mike, I appreciate -- just limit the objections to the form of the question.

MR. DRAHOS:  Well, then, limit your commentary,

and I don't have to interfere.

MR. GERSON:  No, I don't need an instruction on how to take a deposition.  I don't -- so just --

MR. DRAHOS:  Well, then, I'll continue to assert the objections that are appropriate in response to your commentary.

MR. GERSON:  Okay.

BY MR. GERSON:

**Q.  Ms. Campos, has Royal Caribbean done anything other than speak to Dinesh to try and get to the bottom of what the precise explanation is, beyond Dinesh's remarks, that the video was jumping at the time that Ms. Pell fell?**

A.  We -- someone within shoreside level security who is in charge of the CCTV cameras on board was contacted, and his response was that -- again, what I said, as a corporate representative that's what I'm supposed to do, get the information that I can.  Is that it is an older camera and it malfunctioned and there's no further explanation than that.

**Q.  Is it that the camera malfunctioned or the data recorder malfunctioned?**

MR. DRAHOS:  Object to the form.

A.  I don't know the difference between the two.  I don't know what you mean by data recorder.  I just know

that the recording of the -- the recording that was taking place malfunctioned.  I don't know any more than that.

BY MR. GERSON:

Q.  **Did Royal Caribbean rule out 100 percent that someone on the ship deleted the video purposely?**

A.  Yes.

Q.  **How so?**

A.  Because Dinesh testified that he didn't delete the video.  He has no reason -- I mean, it's just that -- that question to me is absolutely -- without any doubt in my mind, nobody deleted that video.

Q.  **In any of the other video footage that you've reviewed in connection with your preparation of today's deposition, do you see the video jump the way that it jumped, as you described it, at any other time, in any other video produced in this lawsuit?**

A.  Not in this lawsuit, but I've seen cameras jump before in other cases.  Not the first time I've seen --

Q.  **Well, what --**

A.  -- this happen.

Q.  **What cases?**

A.  I don't recall the case --

MR. DRAHOS:  Object to the form.

A.  I don't recall the cases, but this is not the

first time I've seen a CCTV camera recording do that.

BY MR. GERSON:

Q.   And can you recall when the last -- have you ever given deposition testimony about it before?

A.   No, because nobody else makes a point or issue of it like you do and believes that somebody deleted it. Those people just --

Q.   Well, what other explanation --

A.   Malfunction.

Q.   If you want, it would be understandable or more believable if the references that you're making to these malfunctions were repeated and observed over and over in the video footage.  But you don't disagree with the fact that the only time that this happens is at the precise moment when my client is walking and falls.

MR. DRAHOS:  Object to the form.  Argumentative.  Asked and answered.

At this point you're getting close to harassing with witness.

MR. GERSON:  I'm not harassing anyone.

MR. DRAHOS:  You're getting real close, Nick.  You're walking right up to the line.  I'm not sure there's much more she can add.  She's given you repeat answers over and over and over again.  You're now trying to argue your point rather than get

information.  So, yes, it's becoming harassing.

MR. GERSON:  Who --

MR. DRAHOS:  I'm trying not to -- but you're really making it difficult.

BY MR. GERSON:

Q.   **Who shoreside, Ms. Campos, did you speak with other than Dinesh to try to get to the bottom of this video -- this missing video?**

MR. DRAHOS:  Object to form.  Asked and answered.

A.   It was a person within Global Security, Adam, I don't recall his last name right now.

BY MR. GERSON:

Q.   **When did you speak to this person within Global Security?**

A.   Months ago.  I don't remember when, but months. Closer to the time --

Q.   **Did --**

A.   Closer to the time that my deposition was originally set in this case.

Q.   **And as we sit here today, you don't know who that person is?**

A.   No.

MR. DRAHOS:  Form.  Asked and answered.

BY MR. GERSON:

Q.  How can you find out?

A.  I can find out easily after this deposition.  I just don't recall his last name right this minute.

Q.  Do you recall his first name?

A.  I already said it.  I'm sure the court reporter --

Q.  I must not have --

A.  -- can --

Q.  I must not have heard you.

I must not have heard you, I apologize.  You know I have a hearing issue.  So if I misunder -- if I didn't hear, I apologize.

What was his first name?

A.  Adam.

Q.  Adam.  I did not catch that at all.

So Adam, within the Global Security department shoreside, is the person that you spoke with about this video issue, correct?

A.  Correct.

Q.  Has Royal Caribbean done anything since this lawsuit and being notified about the missing video -- are you aware of any efforts from Royal Caribbean to look into the video recorder or the videocamera to identify any repairs that are needed or any malfunction that may have taken place?

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Amanda Campos on 01/12/2022**

A.   Just that you told me that you asked for any repairs, and you did not get any.  Besides that, I don't know of anything else.

Q.   **So the same videocamera that is missing the video footage due to your position that it was "jumping," is still in place on the Enchantment of the Seas to this day?**

A.   That's my understanding, yes.

MR. DRAHOS:  Nick, when we get to a point that we can take a break, I'd appreciate it.  I need to run to the restroom.

MR. GERSON:  We can take one now, if you guys want.

MR. DRAHOS:  Okay.

MR. GERSON:  I'm trying to speed it along.

THE WITNESS:  When we go off the record, I want to ask a question.

THE VIDEOGRAPHER:  The time is 4:04 p.m., and we are off the record.

(A short recess is taken.)

THE VIDEOGRAPHER:  The time is 4:14 p.m., and we are back on the record.

BY MR. GERSON:

Q.   **Ms. Campos, do you remember when I was asking you questions about the video and there were various red**

boxes in the video footage of the area where Ms. Pell fell?

A.   Yeah.

Q.   What are those red boxes?

A.   I think they are motion boxes.

Q.   And what is the purpose of them; do you know?

A.   Where the camera is picking up motions.

Q.   And why is that -- what's the benefit of that; do you know?

A.   No.

Q.   Like, why is it there?

A.   I'm just trying to find that one tape.  Give me a second.

Q.   Sure.

A.   It's -- 30 cameras run differently than others. Certain cameras, when they sense motion, those go on sometimes.

Q.   What usefulness is that for someone like yourself, or someone investigating an accident -- what's the -- what's the advantage as to having that available; do you know?

A.   I don't believe --

MR. DRAHOS:  Object to the form.

A.   I don't believe there is one.

BY MR. GERSON:

Q.   Okay.  And going back to the exhibit that I showed you with the red circle around it in the area that was -- I don't have the exhibit number.  But if you recall -- do you know who put the red circle in the -- around the floor?

A.   I think Dinesh did, correct?  He -- I think he testified to that.

Q.   Are you aware of any warning signs that were in the immediate area where Ms. Pell fell?

MR. DRAHOS:  Object to the form.

A.   There were -- you mean yellow cone caution signs, or just the general warning signs?  Because on the deck there's warning signs at the doors.

Q.   Well, the warning signs on the doors that you're referring to, those are sliding glass doors, correct?

A.   Yes, them -- yes.  I don't know if all of them are sliding glass doors but some of them are, yes.

Q.   Are these the sliding glass doors that Ms. Pell would have walked through -- at the moment she was going to walk through the sliding glass door any warning sign would disappear because the doors would open, correct?

MR. DRAHOS:  Object to the form.

A.   No, because there's glass on either side of them, so you can see it through the glass on the other

side of it.

BY MR. GERSON:

Q.   Well, assuming you have eyes in the back of your head.  If your walk through the doors toward the pool deck once the doors open, the sign disappears.

You don't disagree with that, do you?

MR. DRAHOS:  Object to the form.

A.   No, I do.  If you have a sliding glass door and on the other side of the sliding glass door is glass -- when it slides, you can see through the glass and you can still see the warning signs.

BY MR. GERSON:

Q.   I'm not sure I follow you, but we can go through this, I suppose.

MR. GERSON:  What exhibit are we on?

THE REPORTER:  Exhibit 15 would be your next exhibit.

(Plaintiff's Exhibit No. 15 is marked for identification.)

BY MR. GERSON:

Q.   All right, Ms. Campos, take a look at what we've marked as Exhibit 16 (sic) to the deposition.

Do you see this?

A.   Oh, okay.  Yes, I see it.

Q.   And at the bottom of this sliding glass door --

these are the sliding glass doors that Ms. Pell would

have been exiting as she entered the Deck 9 pool area

prior to her fall?

A.   I didn't realize those were the doors that she

was exiting, yes.  Then, if those are them --

Q.   Okay.

A.   -- it slid open, yes, she would not be able to

see them.

Q.   At the very bottom here we've got a sign --

signage that says "Automatic door.  Watch your step.

Slippery when wet," correct?

A.   Correct.

Q.   And for someone approaching these doors -- as

soon as the doors open, those signs disappear, don't

they?

MR. DRAHOS:  Object to the form.

A.   The signs, yes, you wouldn't be able to see

them if the door is open when you're approaching.

(Plaintiff's Exhibit No. 17 is marked for

identification.)

BY MR. GERSON:

Q.   Look at Exhibit 17.

This is what someone would see as they approach

the doors, right?

A.   That is correct.

Q.   So those are the only warning signs that Ms. Pell may have seen in the event that she was able to observe them prior the doors opening, correct?

MR. DRAHOS:  Object to the form.

A.   I mean, those are the only warning signs that are placed on those doors.  There's also other warning signs near the pool area and on other doors leading out to the pool area.

MR. GERSON:  For the record, this photograph will be exhibit --

THE REPORTER:  Exhibit 17.

MR. GERSON:  -- composite -- 17A, we'll call it.

BY MR. GERSON:

Q.   Okay.  Now, Ms. Campos, is Ms. Pell the first person that's ever fallen and injured in a slip and fall on the Enchantment of the Seas?

A.   No.

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   Did you conduct a search for the three years prior to Ms. Pell's fall to try to determine the number of times a passenger has reported to the medical infirmary to report the fact that they were injured in a slip and fall on Deck 9 on the Enchantment of the Seas?

A.   Yeah, and I'd just like to clarify your last question.  My answer is -- I couldn't hear, but my answer should have been, she's not the first person to report -- again, you inferred that it was a slip and fall but she -- okay.  She's not the person -- she's not the first person to have fallen on board --

**Q.   Are you --**

A.   -- Deck 9.  But we did do a search, yes.  We did a search, I believe, of all slips, trips, and falls on Deck 9.

**Q.   Are you aware of any documentation produced by Royal Caribbean that states that Ms. Pell didn't slip?**

MR. DRAHOS:  Object to the form.

A.   The only documentation that's in -- I'm not sure if we produced it, or you did -- is from the hospital in Texas where she reported that she tripped and fell.

BY MR. GERSON:

**Q.   In the investigation conducted by Dinesh, in his email, doesn't he state that Ms. Pell slipped and fell?**

MR. DRAHOS:  Object to the form.

A.   Yes, that's based on what he was told by the Plaintiff and/or her husband.

BY MR. GERSON:

Q.   And wouldn't that also been based on his investigation since he's the person that conducted the investigation?

MR. DRAHOS:  Object to the form.

A.   No, it was not based on his investigation.  He was not able to determine the cause from his investigation; that was based on what her husband told him, and the husband didn't witness the incident.

BY MR. GERSON:

Q.   Are you aware of any documentation produced by Royal Caribbean that says that Ms. Pell didn't slip?

MR. DRAHOS:  Object to form.  Asked and answered.

A.   Again, there's a medical record from the hospital in Galveston where she went that states that she had said she tripped and fell.

BY MR. GERSON:

Q.   Are you aware of any documentation from Royal Caribbean that says that Ms. Pell tripped?

A.   I don't know if we produced that, or you produced that medical record.

Q.   Are you aware of any -- all right, I'll ask it another way.

Are you aware of any internal documentation produced by Royal Caribbean that states that Ms. Pell

tripped as opposed to slipped?

MR. DRAHOS: Object to the form.

A. No, the only -- the only internal Royal Caribbean documents reflect what her husband and her said was the cause, which was they had -- I think the husband said that she slipped but, again, he had not -- he did not see the incident.

BY MR. GERSON:

Q. I asked you questions earlier about a -- some ship safety meeting minutes, accident investigation team meetings, that were produced just in the minutes before my client -- before this deposition. Have you read those records?

MR. DRAHOS: Object to the form.

A. I've not reviewed all those records, no.

BY MR. GERSON:

Q. In those safety records it states: "Guest slipped and fell at the pool hurting her back of head and cheek/traumatic."

Did you -- do you dispute the accident investigation team meeting minutes that states that Ms. Pell slipped and fell causing a traumatic injury to head?

MR. DRAHOS: Object to the form.

A. The slip and fall is what they obtained from

Dinesh -- his recounting of what the husband said. And I -- Royal Caribbean is disputing this was deemed a traumatic incident. The person who would deem it traumatic or not would be the doctor, and the doctor did not deem it to be traumatic.

Q.   You're not aware of any internal record from Royal Caribbean that's produced in this case that suggests that Ms. Pell tripped as opposed to slipped, are you?

MR. DRAHOS:  Object to the form.

A.   Again, just what I had just testified to in previous -- couple of questions.

BY MR. GERSON:

Q.   Well, if you're referring to the hospital records, that I think you are referring to, did you note that in the other portions of the record that it also says that she slipped?

MR. DRAHOS:  Object to the form.

A.   I did not note that, no.  I did not see all the records.

BY MR. GERSON:

Q.   Okay.  So you were just shown one portion of a hospital record that make reference to a trip, but you're unaware that other portions of the medical record states that she slipped?

MR. DRAHOS: Object to the form.

A. I'm unaware. I just -- my understanding is the in-take record says that she says she tripped.

BY MR. GERSON:

Q. But all of the documentation produced by Royal Caribbean in this case have all indicated that this was a slip and fall and not a trip and fall, isn't that correct?

MR. DRAHOS: Object to the form. Asked and answered.

A. Again, that's based upon what the husband had said. I think that everybody deposed has said that they were unable to determine the cause of the fall. Nobody had said that they -- the investigation yielded that she slipped.

BY MR. GERSON:

Q. Have you read any of the safety records in this case that makes reference to the drain where the -- close by where the fall occurred and then that drain has propensity to pop up when stepped on?

A. I -- I have not.

Q. Now, I was asking you questions about the number of times passengers have reported a slip and fall, and I'd like to ask you what your understanding is of the total number of slip-and-fall accidents that have

occurred on the Enchantment of the Seas and its sister class ships for the three years prior to Ms. Pell's fall.

MR. DRAHOS:  Object to the form.

A.   So on the vision class, which is where the Enchantment of the Seas is, in the three years prior there were 174 priors that were produced to you.

Q.   And of the --

A.   Between all the ships.

Q.   And of those 174 priors, that is just comprising of how many ships?

A.   I'm not -- I was trying to determine that.  I don't know if that's five ships, or six ships, or four ships.  I'm not quite -- wait.  I think it's four ships, actually.  It could be five.

Q.   The Rhapsody, the Legend, the Vision, the Enchantment, and the Grandeur --

A.   Correct.

Q.   -- is what I have.

A.   So the Slender is not there anymore, yeah.

Q.   So that would be four ships, correct?

A.   No, five.  The Legend, the Grandeur, the Enchantment, the Rhapsody, and the Vision; that's five.

Q.   And of those 174 -- you said 174, correct?

A.   Correct.

Q.   Of the 174, how many of those -- that was over just a three-year span, correct?

A.   That was during a three-year span on five ships, correct.

Q.   And those reports are only reports of passengers who actually reported to the medical infirmary, and an accident report would have been generated, correct?

A.   Correct.

Q.   And how many of those slip and falls occurred on the Enchantment of the Seas?

MR. DRAHOS:  Object to the form.

A.   They're not all slip and falls.  A search was done for slips, trips, and falls, and I don't know exactly how many occurred on the Enchantment.  I didn't count them by ship.

Q.   If I were to tell you they were in the neighborhood of over 50, or approximately 53, would that sound accurate?

MR. DRAHOS:  Object to the form.

A.   I don't know what it should sound like.  But if that's what you're saying, I don't have any reason to not believe that's the case.

BY MR. GERSON:

Q.   Okay.  And isn't it true that of the -- all

of the 53 -- strike that.

You said 173 or 175?  175, I think.

A.   I said 174.

Q.   Excuse me, 174.

Of the 174 prior slip and falls on the class of vessels for the three-year period, those would all be on the same type of floor surface, Bolidt, correct?

A.   Right.

MR. DRAHOS:  Object to the form.

A.   The search that was conducted was the pool deck of the ships for a period of three years; that would include slips, trips, and falls.

BY MR. GERSON:

Q.   How many trips were you able to identify?

A.   I didn't --

MR. DRAHOS:  Object to the form.

A.   I didn't -- I didn't go -- I didn't count them prior to this deposition.

BY MR. GERSON:

Q.   You would agree that predominantly the number of slip and falls are -- excuse me, strike that.

You would agree that, with the exception of maybe a handful at the most, predominantly all of the 170 plus incidents involved slip and falls on the pool deck?

MR. DRAHOS:  Object to the form.

A.   I can agree that all of the these 174 incidents involved a slip, trip, and fall on board the vision class ships.  I didn't analyze them like that.

BY MR. GERSON:

Q.   Well, I'd like you to tell me, if you would -- and if you need that take a few minutes to figure it out -- I'd like you to identify which ones are trips as opposed to slips so we have a firm number.  And we -- and we're both on the same page since you told me that there are some trips as opposed to slips.

MR. DRAHOS:  Object to the form.  I think that's --

BY MR. GERSON:

Q.   I didn't see very many trips.  For the most part it looks like they're all slips.  There may have been one or two, but. . .

A.   I think that would take me more than a couple of minutes.

MR. DRAHOS:  We're not going to do that. That's an unreasonable request to make and it wasn't asked for us to make it in advance of today's deposition.  You can just --

MR. GERSON:  I don't need to --

MR. DRAHOS:  -- as well do the same.

MR. GERSON:  So you're instructing the witness not to answer?  Is that what you're telling me?

MR. DRAHOS:  I'm instructing the witness to follow the notice, which asked us to prepare to answer questions on prior instances that we produced.

MR. GERSON:  Okay.

MR. DRAHOS:  But we were not asked to do that level of exercise because we would have objected to that.

MR. GERSON:  Okay.  I think I'm entitled to know what Royal Caribbean's understanding is of the number of slip and falls that occurred on the class of vessels for the three years prior.

MR. DRAHOS:  Well, why didn't you put that in the notice?

A.   Yeah, you didn't ask for that.  You asked for slips, trips, and falls and that's what was produced to you.  I didn't know that I needed --

BY MR. GERSON:

Q.   Okay, and --

A.   -- to classify them for this deposition.

MR. DRAHOS:  Not only that --

THE REPORTER:  Hey, guys.

MR. DRAHOS:  -- you can just assume --

THE REPORTER: I'm sorry.

MR. DRAHOS: -- like we can. So asking us to do your work is unduly burdensome.

BY MR. GERSON:

Q. **How many slip and falls were you able to identify on the Enchantment of the Seas?**

MR. DRAHOS: Object to the form.

A. I identified there were 174 prior slips, trips, and falls on the vision in the three-year period prior to the incident.

Again, I did not look at them and classify how many from each ship and whether or not they were slip or a trip prior to this deposition.

BY MR. GERSON:

Q. **Is 173 a lot?**

MR. DRAHOS: Object to the form.

A. Well, if you look at it, you have about 2500 passengers for one voyage. One voyage of the Enchantment. That's one voyage. The Enchantment could do five days, seven days. So when you think about how many passengers you have on per year, per year, no. I mean -- and that's just one ship.

So when you're talking 174 people out of millions, no, that would not be considered a lot. It would be a very fractional amount. A tiny, tiny

percentage. Less than --

BY MR. GERSON:

Q. So you're saying --

A. -- 1 percent.

Q. So you're saying -- so Royal Caribbean is saying that this is an acceptable and reasonable number of prior falls based on -- for the reasons you've just explained?

MR. DRAHOS: Object to the form.

A. No, you've actually, literally just asked me the question of whether or not I would say that's a large amount, and my answer to that was, no, I would say that it is not a large amount. Quite the opposite. It's a very small amount considering how many people you have on board these five vessels. We're talking millions and millions of people. But you put those other words into this; not me. I never said that.

MR. GERSON: What exhibit number are we on?

THE REPORTER: This will be Exhibit No. 18.

(Plaintiff's Exhibit No. 18 is marked for identification.)

BY MR. GERSON:

Q. Okay. Are you able to see what's been marked as Exhibit 18, Amanda?

A. Not yet.

Q.   I know it's on here.  On the video it's 17, but it's really 18, and I'll change the numbering.

But do you see this spreadsheet?

A.   I don't see a spreadsheet.

THE VIDEOGRAPHER:  Just to confirm, Counselor, all you have up is your desktop right now.

BY MR. GERSON:

Q.   How about now?

A.   Now I see one.

Q.   Do you recognize this document?

MR. DRAHOS:  Object to the form.

MR. GERSON:  What's wrong with the form of the question?

MR. DRAHOS:  I can't see it, so I don't know how she can possibly recognize that.

MR. GERSON:  She said she could see it.

THE WITNESS:  I can't see it.

MR. DRAHOS:  Yeah, but she can't read that.  No one can read that.

A.   I mean, yeah, sorry, I can see it but I can't --

BY MR. GERSON:

Q.   Well, it was produce by -- this is what was produced to me.

A.   I don't -- I don't have that chart in any

materials that I reviewed.

Q.   You've never seen this chart before?

A.   I might --

MR. DRAHOS:  Is there a Bates number on it?

THE WITNESS:  There's no -- no.

BY MR. GERSON:

Q.   Bates stamped GR784.

A.   Give me a second and let me see if I have it.

I do.  Sorry, hold on.

I have it, but I couldn't read it; it was too small for me to read.

Q.   Okay, well --

A.   I have -- I have another -- the documents for -- you know, all the backup documents that you had requested for this; that's what I reviewed.

Q.   I don't know what you mean the backup documents.

But have you ever seen this document before?

A.   I have.  Sorry, I couldn't -- it's so small there and it's so small, the one that I have, I couldn't tell what it was.

Q.   Okay.  I'll represent to you, Ms. Campos, that this is what was produced to me in response to a court order to identify prior slip and falls on the class of ships for the Enchantment of the Seas.  I think you said

it was the vision class for the prior.

And based on my calculations, I have a total of 53 slip and falls on the Enchantment in the three years prior.

Do you dispute that?

MR. DRAHOS:  Object to the form.

A.   I don't know if you're counting that there's 53 on the Enchantment and of those 53 all of them are slips and falls, or some of those 53 are trip and falls because before you had said that there's 53 --

BY MR. GERSON:

Q.   Okay, well --

A.   -- on the Enchantment.

Q.   Correct.  174 total.  53 on the Enchantment.

A.   So I would think that some of those would be trip and falls, as well as slip and falls.  So I don't know if there's 53 slip and falls.

Q.   Okay.  You would agree that of all of the slip and falls -- that of all the falls that have been identified in this case, they all occurred on Deck 9 on the Grandeur, the Legend, the Vision, or the Rhapsody, or the Enchantment?

A.   Yes.

Q.   And this -- of the 174, they're all on the same type of Bolidt surface, correct?

A.   No --

MR. DRAHOS:  Object to the form.

A.   -- they're not.

BY MR. GERSON:

Q.   Okay.  Are they all on Bolidt surface?

A.   Yes, they would all be on Bolidt surface.  But if you look at any of the ones prior to December 2018, those would be on a different Bolidt surface, on the Enchantment, at least, then the ones that happened after December 2018 on the Enchantment.

Q.   What is the difference between the type of floor surface, as far as Bolidt is concerned -- I mean, more or less it's the same type of -- it's more or less -- if it's not identical, I'm sure it's similar, isn't it?

MR. DRAHOS:  Object to the form.

A.   There was a new Bolidt product that was laid down onto the ship in December 2018.  It was a different flooring --

BY MR. GERSON:

Q.   On which ship?

A.   -- prior to --

Q.   On which ship?

A.   On the -- I'm just talking about the Enchantment right now.  We already went over that.

Q.   And how is the surface different that's on the Bolidt -- that's on the Enchantment now from the surface that is on all of the sister class ships?

MR. DRAHOS:  Object to the form.

A.   I didn't go through that for this deposition. I was not -- I don't believe it's one of my areas to know all of the different floorings on the ships -- on each of these ships.  I just know that prior to December 2018, the Enchantment had a different flooring than after.

BY MR. GERSON:

Q.   What do you know about what the different flooring is since you offered it into today's deposition?

MR. DRAHOS:  Object to the form.

A.   I believe that we went into a long conversation about this at the beginning of the deposition when we talked about -- that the floor was changed in 2018.  The old Bolidt was taken off, and the Bolidt Future Teak system was put in on the Enchantment.

Q.   I think you just agreed with me, actually, that there were changes.  Your definition of changes -- what was determined was that the floor had been resanded, but you didn't agree that it was a change.

A.   No.

MR. DRAHOS:  Object to the form.

A.   Mr. Gerson, you're completely mischaracterizing my deposition.  I said --

BY MR. GERSON:

Q.   Okay.

A.   -- that the changes --

Q.   So what you're telling me --

A.   Let me --

MR. DRAHOS:  Nick, you've got to let her answer.

A.   Let me finish.  Because I need you to understand this, because I don't want you later on saying that I was not saying what was accurate, which I was.

I said it was changed in 2018.  And I said they put on a grand -- they re-poured -- that they poured a new Bolidt onto Deck 9 and put on Bolidt Future Teach system.  You asked me after that, when you did the inspection, was anything changed -- or you asked me specifically after that 2018 was anything changed.  To that I said no.  Because in November of 2021, I did not believe there was change, per my definition of change, it was just sanded.  It was not changed.  It was completely changed in December 2018 to a new Bolidt product.

In November 2021 it was sanded to get rid of the dents. It was, in my opinion, not changed. But I understood that you meant that to mean changed, so I clarified that.

BY MR. GERSON:

Q. Of the -- do you dispute that -- or of the 174 medically documented prior falls, including slip and falls on this class of vessels, do you concede that any are similar?

MR. DRAHOS: Object to the form.

A. I'd have to go through each -- I mean, no, I don't -- I can't answer that question. I don't even know how to go about answering that question.

BY MR. GERSON:

Q. Well, do you have any testimony for me -- to tell me what or why all of -- any of these incidents are not similar in some fashion?

MR. DRAHOS: Object to the form. Not our burden.

MR. GERSON: I'm allowed to ask the witness --

A. I don't -- I don't -- can you repeat the question, please?

BY MR. GERSON:

Q. Sure.

Of the 174 incidents that you know that you

were going to be asked to discuss today, does Royal Caribbean dispute that none of them are similar?

A.    Even though I know that I'm here to discuss them today, I think that it's up to you to ask me about them specifically.

I don't think that necessarily the ones on the other ships are going to be similar, and I don't know if the ones specifically on the Enchantment -- I can say, at least, all of the ones prior to the fall are not going to be similar because it was a different flooring at that time.

If you want to go through the ones after the fall, we can.  But if you expect me to memorize 174 incidents, I just don't have the capability of doing that.  I'm sorry.

Q.    Well, I'd like you -- you've told me that the flooring surface on one ship, the Enchantment of the Seas, is different as of the end of 2018, from the Enchantment of the Seas post 2018.  And I'd like you to tell me what you understand the differences are other than the fact it's potentially a different Bolidt surface?

MR. DRAHOS:  Object to the form.  Outside the scope.

A.    I think that that's enough of a difference for

me to say it's a new flooring.  It replaced an entirely different flooring.  I don't know the specifics of the makeup of it, and I didn't think I needed too for this deposition.

BY MR. GERSON:

Q.    Well, how can you tell me that the prior incidents are not similar based on a difference in the flooring surface, but you have no personal knowledge and no understanding of what those differences are?

MR. DRAHOS:  Object to the form.

Argumentative.  She's not here today as an expert --

MR. GERSON:  It's not argumentative and --

MR. DRAHOS:  No, no --

MR. GERSON:  -- I'd appreciate it if --

MR. DRAHOS:  No, no, no.

MR. GERSON:  -- you'd just object to the form of the question.

MR. DRAHOS:  Let me finish.

She's not here today --

MR. GERSON:  You're not --

MR. DRAHOS:  -- as an expert witness.  She's here today as a corporate representative to answer the 309(b)6 that you identified.

MR. GERSON:  Okay.

MR. DRAHOS:  She's going to answer on behalf of

JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.

Amanda Campos on 01/12/2022                        Page 224

the corporation; that we deem them differently.  If you want to dispute that later through expert testimony, go ahead.  But it's not your place --

MR. GERSON:  I'm not --

MR. DRAHOS:  -- to argue with her now.

MR. GERSON:  I'm entitled to ask the witness a question based on an answer that she provided to me as to why she believed the prior incidents are not similar.

MR. DRAHOS:  And she explained it.

MR. GERSON:  And the answer that she provided -- don't interrupt me, please.

The answer that was provided was that she believed that the floor surface is different from the floor surface that was used because there was some sanding that took place.

So I'd like to know what Royal Caribbean's understanding is of what those differences are and why they make any sort of -- why they matter in the context of these prior incidents.

MR. DRAHOS:  Show me in the notice where you asked for that area of inquiry; that she's supposed to be able to --

MR. GERSON:  I'm not going to argue with you about it.  The notice --

MR. DRAHOS:  But you are.

MR. GERSON:  -- talks about all facts and information of prior incidents.

MR. DRAHOS:  So that doesn't give you --

MR. GERSON:  Question --

THE REPORTER:  Hey, guys, and I'm not going to report you guys talking over each other.

MR. DRAHOS:  She's answered --

BY MR. GERSON:

Q.  **Okay, as you sit here --**

MR. DRAHOS:  -- the question.

BY MR. GERSON:

Q.  **Ms. Campos, as you sit here today, you're not able to tell me how, in fact, the floor surface on the other class of ships that -- other than the Enchantment of the Seas, prior 2018, are different from the Enchantment of the Seas floor surface that existed at the time Ms. Pell fell?**

MR. DRAHOS:  Object to the form.

Show me where it says that in the areas of inquiry that she's supposed to come here today to testify to that.

A.  The only thing I can say for the 100th time is that the floor surface was not sanded a little bit.  And I don't know if you're hearing me, or you don't

understand me.

In 2018 the entire floor was sanded away and an entirely new floor was poured on. It wasn't just a little bit of sanding. There was an entirely new flooring system, a new floor type, put onto the Enchantment of the Seas.

To me -- again, I'm not an expert, my attorney is right. But that is different flooring than the one that was there before. I do not think that, falls on the flooring prior to 2018, would be similar to any falls that occurred after on the brand-new floor; not just sanded. It was a different floor that was placed on the ship in 2018.

BY MR. GERSON:

Q. **I don't believe that's what your testimony was earlier, but that's okay.**

**My question for you is: Do you know --**

A. I'm sorry, Mr. Gerson --

Q. **Here's my next --**

A. -- I have --

Q. **-- question.**

A. -- been -- no, no, no, no. No, let me talk for once. I have gone over this five times, and I don't want you making me out to sound like a liar. I have said this and I know the record will make is clear --

and you must not be hearing me -- that we changed the flooring and that's -- you know what, I'm sorry that you didn't get that before for the five different times that I said it.

But there was a brand-new floor placed on the ship in December 2018, and I think that it's clear in my testimony that that's the case.

Q.   **What did you do to investigate what changes were made to the other flooring surfaces on the another vessels?**

MR. DRAHOS:  Object to the form.

A.   I didn't do any --

MR. DRAHOS:  That's not an area of inquiry either.

A.   That was not part of my notice.

BY MR. GERSON:

Q.   **All right.  So you're telling me that I'm just to accept -- or -- you know, I'm not going to get into an argument with you about it.**

**You don't know what changes were made to the other flooring surfaces on the other vessels prior to 2019?**

MR. DRAHOS:  Object to the form.  Outside the areas of inquiry.

A.   I don't know what flooring was on the other

vessels, and I never said -- I don't know if there were any changes.  I've never testified to any of that for the other vessels.

Q.   How do you know that the same changes to the flooring surface on the prior ships weren't also sanded and changed similar to the ones that you're referring to occurred when the vessel went into dry-dock in 2021 --

A.   I --

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   -- or 2018?

A.   I have not testify to anything with regards to the other ships.  The only flooring I have testified to is the Enchantment.  I do not know, sitting here, whether or not there were any changes to the flooring on any of the other ships, and I have not testified that I have known that.  I've only spoken to the Enchantment of the Seas.  I don't know what flooring is on the other vessels.

Q.   So then how do you know they're different?

MR. DRAHOS:  Object to the form.

A.   I -- they could be; that is what I said.

BY MR. GERSON:

Q.   So you don't know that the flooring surfaces on the other vessels aren't consistent with the flooring

surface on the Enchantment?

A.   I don't know.

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   Okay.

A.   I never said I did know.

Q.   Well, you're -- the only reason I ask is because you told me that they were different and now I'm asking you --

MR. DRAHOS:  No.

BY MR. GERSON:

Q.   -- how they're different, and you're telling me that you're not required to tell me how they are or if they are.

A.   No.

MR. DRAHOS:  No, you asked her the differences of the flooring on the Enchantment and she explained that.  Now, you're following up and trying to change the premise of your question to the entire --

MR. GERSON:  I'm not --

MR. DRAHOS:  -- different class of ships.

BY MR. GERSON:

Q.   Okay, Ms. Campos.  This spreadsheet that was prepared, where did the information come from?

A.   Through Riskonnect.

JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022                              Page 230

Q.   And Riskonnect is what?

A.   Riskonnect is our incident system.  Our claims and incident system that records all of the incidents that occur on the different vessels.

Q.   And in addition to the 154 incidents that were disclosed pursuant to this court's order, were there also complaints from passengers about the slipperiness of the deck surface on the Enchantment of the Seas produced?

A.   Yes, there were complaints produced --

MR. DRAHOS:  Object to the form.

A.   There were complaints produced from Siebel and from Medallia, which are two different systems.  And there were complaints -- the search for that was the same search, which would have been complaints of trips, slips, and falls on the Enchantment of the Seas for the three-year period prior to the incident.

BY MR. GERSON:

Q.   So the complaints were only limited to the Enchantment, and the prior medically documented incidents were for the sister class ships, correct, and the subject ship?

MR. DRAHOS:  Object to the form.

A.   That's what I have -- I can double-check, but that's what I believe it is.  Yes, complaints in people

are all for the Enchantment.

BY MR. GERSON:

Q.   Now --

A.   And same with Medallia.  I don't know what the -- I don't know -- that's what was produced.  I don't know what the request was, but that's what was produced.

**Q.   Now, I believe -- Royal Caribbean's position is that based on the number of passengers that sail on these particular vessels that even the 153 or 100 plus -- let's call it 100-plus incidents that have been disclosed, that Royal Caribbean believes that that is a low number, correct?**

MR. DRAHOS:  Object to the form.  That's already been asked and answered.  We're going --

BY MR. GERSON:

**Q.   You can answer.**

MR. DRAHOS:  -- on six hours of testimony now, and you're asking egregiously --

BY MR. GERSON:

**Q.   You can answer.**

MR. DRAHOS:  -- repetitive questions.

BY MR. GERSON:

**Q.   You can answer.**

A.   If you're looking at percentages in terms of

how many people have been on these ships for those three years, versus how many reports of slips, trips, and falls for those three years -- I mean, factually speaking it's a very, very low percentage.

Q.   Have you ever done anything to evaluate how many of those passengers actually walked through the Deck 9 pool deck area?

MR. DRAHOS:  Object to the form.

A.   Mr. Gerson, all of these slips, trips and falls involved Deck 9 pool deck.  So I don't know what you mean.

BY MR. GERSON:

Q.   I don't think you're understanding me, so I'll re-ask the question.

My question for you, Ms. Campos, was:  You offered me -- or you suggested that there are thousands and thousands of passengers that are aboard these particular vessels during the course of their voyages; do you remember that?

A.   I understand your question now.  As you said earlier --

Q.   Okay, so let me -- let me finish.

MR. DRAHOS:  Wait.

BY MR. GERSON:

Q.   Let me finish asking the question so I just

have a clean record.

Do you have any idea of those thousands and thousands of passengers how many of those passengers actually traversed the pool deck on Deck 9 on the Enchantment of the Seas?

MR. DRAHOS:  Object to form.

A.   No, but as you said before -- like you pointed out, Deck 9 -- the pool decks are high-traffic areas. So most of the passengers do go to the pool deck because that's where the Windjammer is and they are, as you said, high-traffic areas.

Q.   Are you -- so are you telling me that the Windjammer should be part of the scope of inquiry for prior incidents?

MR. DRAHOS:  Object to the form.

A.   No, I'm saying that the Windjammer -- people leave the Windjammer and typically go on the pool deck. Do I have data about it, no.  But the --

BY MR. GERSON:

Q.   Did you --

A.   -- pool deck is an area that most passengers do walk through at some point or another on their cruise. Unless you don't think it is.  I mean, pretty much your whole argument today has been that it is, so I'm not quite sure why you're saying it's different.

Q.   Now, the incidents that have been disclosed on the spreadsheet -- I think it's Exhibit 18, if I'm not mistaken -- those incidents -- those are just passengers that reported to the medical infirmary, correct?

MR. DRAHOS:  Object to the form.  Asked and answered.

A.   Correct, and then the other ones would be the other complaints that we provided you from Siebel and from Medallia.

Q.   And so if someone were to slip and fall and not need to go to the medical infirmary, Royal Caribbean would essentially have no way of knowing what those numbers are, would they?

MR. DRAHOS:  Object to the form.

A.   They would know if the person went to guest services and told them, or if they wrote-in about it after the cruise.  Barring the person telling us themselves, no, we would have no way of knowing.  But if they did go to guest services, or if they did write-in about it after the cruise, we produced those to you.

BY MR. GERSON:

Q.   And as part of the process when a person goes to the medical infirmary, they fill out a passenger injury statement, correct?

A.   That's correct.

Q.   And the passenger injury statements -- those were produced, correct?

A.   Correct.

Q.   And does Royal Caribbean have a policy for reviewing trends with respect to slip and falls on areas of its ships that are problem areas?

A.   Yes, that's done.  We've discussed that already.  In the safety steering committee meetings.

Q.   And how is that information relayed back shoreside?

A.   The information from the safety steering committees will go to shoreside.

Q.   And who from shoreside does it go to?

A.   It goes to different departments.  It depends on what it is.

THE REPORTER:  Hey, Nick --

Q.   The situation --

THE REPORTER:  I'm sorry.  I need to interrupt for a second.  I'm losing power and I don't know why.  And as soon as I lose power, I'm going to be gone.  So if we can go off the record and I can figure out why I'm losing power.

MR. DRAHOS:  Nick, how much more do you have?

THE VIDEOGRAPHER:  Let's go ahead and do that for the court reporter because she may be gone any

second.

THE REPORTER:  Yeah, I only have 4 percent left.

THE VIDEOGRAPHER:  Off the record at 5:01 p.m.

(A short recess is taken.)

THE VIDEOGRAPHER:  The time is 5:03 p.m.  This begins Media Unit Number 4, and we are back on the record.

BY MR. GERSON:

Q.   So back on the record.

Ms. Campos, I'd asked you about the 154 incidents that have been disclosed in this case that required medical attention, and on top of that we've got documented complaints from passengers.

Isn't that notice to Royal Caribbean that there are safety issues on the pool decks of its ships?

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   Let me re-ask the question since there has been an objection.

Based on the number of prior incidents that have been disclosed in this case -- and by prior incidents I mean slip and falls for the three years prior, and the complaints that have been provided both in Siebel and Medallia -- isn't that notice to Royal

Caribbean that they've got a safety issue with respect to how they're maintaining the decks of their pool -- or the pool deck on the Enchantment of the Seas and its sister class ships?

MR. DRAHOS:  Object to the form.

A.   No.  I mean, that doesn't give us notice that the incident involving your -- Ms. Pell was going to happen before it happened.

BY MR. GERSON:

Q.   Well, how many would it take?

A.   If there's many -- there's a vast majority more people -- vast majority that are able to traverse the pool deck without falling than there are that do fall. And obviously Royal Caribbean doesn't want anyone to hurt themselves while on board.  But just because there were 53 people in the three years prior that fell on board Deck 9 of the Enchantment of the Seas, it doesn't necessarily mean that there's an issue with the flooring.

This is a pool deck.  There are people that are getting in and out of the pool.  There's obviously going to be, you know, water around the pool, and you can't prevent all people from slipping and falling if they're not paying attention to where they're walking, and you cannot prevent people from tripping and falling if

they're not paying attention to where they're walking. They have a duty --

Q.   Does Royal Caribbean --

A.   -- under the circumstances just as well as we do.

Q.   Is Royal Caribbean's position that everyone that slips and falls on a pool deck it's their fault?

MR. DRAHOS:  Object to the form.

A.   No, it's not Royal Caribbean's position at all that that's the case, but sometimes it is.  Sometimes it might not be.  But just because there are people that slipped and fall -- fell, it doesn't mean that it is Royal Caribbean's fault and that they could have done anything to have prevented it.

BY MR. GERSON:

Q.   Well, doesn't the fact that there have been well over 100 prior slip and falls on this -- on this portion of the deck that consists of the same manufacturer, doesn't that tell Royal Caribbean they're on notice of a potentially dangerous condition?

MR. DRAHOS:  Object to the form.  That question was just asked three questions ago.  You just changed the words a little bit.

MR. GERSON:  No, it wasn't.  Stop doing what you're doing.

MR. DRAHOS:  No, you stop doing what you're doing, Nick, which is arguing with her and --

MR. GERSON:  You can object --

MR. DRAHOS:  -- re-asking the same exact --

MR. GERSON:  -- to the form of the question.

MR. DRAHOS:  Don't interrupt me.

MR. GERSON:  I didn't --

MR. DRAHOS:  Don't interrupt me.  If you're --

MR. GERSON:  I'd appreciate it if you'd --

MR. DRAHOS:  -- going to sit here and argue with her.

MR. GERSON:  Just object to the form of the question.

MR. DRAHOS:  I've done that already, Nick.  But if you're going to argue with her, I have to step in and protect the witness.

MR. GERSON:  I'm not arguing with her.  I'm asking her questions.

MR. DRAHOS:  You asked her --

THE REPORTER:  You guys, I'm taking a five-minute break.  Sorry, I'm out.

(Both counsel continue to argue)

THE VIDEOGRAPHER:  Folks, folks, hold on, hold on, we're still on the recording over here.  So let me take us off the video recording since we just

lost our court reporter.  Let me do that, is that okay?

MR. GERSON:  Sure.

THE VIDEOGRAPHER:  The time is 5:08 p.m., and we are off the record.

(A short recess is taken.)

THE VIDEOGRAPHER:  The time is 5:36 --

MR. GERSON:  Back on the record.

THE VIDEOGRAPHER:  Just a moment.

The time is 5:12 p.m., and we're back on the record.  Thank you.

You may proceed, counselor.

BY MR. GERSON:

Q.   **Ms. Campos, what is notice of a dangerous condition mean to Royal Caribbean?**

A.   Notice of a dangerous condition would be --

MR. DRAHOS:  Object to the form.

A.   It's hard for me ask -- answer that question because you're asking me does Royal Caribbean, not in a legal sense?

BY MR. GERSON:

Q.   **As far as -- what is Royal Caribbean's understanding of notice of a dangerous condition?**

MR. DRAHOS:  Object to the form.  Calls for a legal conclusion.

A.    Yeah, I don't -- I don't know if -- Royal Caribbean doesn't -- if there is something, say, that's sticking out that could cause somebody to cut themselves, or something like that and they saw it, I think that they would know that that's a dangerous condition that they need to remedy --

Q.    How many --

A.    -- that -- you're asking me.

Q.    **And how many times -- okay.  And how many times would someone need to be cut by that something in order for Royal Caribbean to fix it or correct it?**

MR. DRAHOS:  Object to the form.

A.    Again, it depends on the circumstances surrounding it.  So if you have a very sharp object in the middle of an area that could stab somebody, we would have to change that condition and make sure that it wouldn't happen.

But in the context of what you're talking about in this case, the pool deck, you know, you have to look at each individual incident that happened and see, you know, what's going on.  You could have -- like you said, we could have -- we do have the 53 priors on the Enchantment and some of them could be because someone stubbed their toe.  Some of them could be because a child was running, or somebody else was running.  Some

of them could be because somebody spilled something right in front of somebody and then they slipped on it right a way.  I mean, there's so many different circumstances that can happen that I can't really lump it altogether.  It's based on different circumstances.

Q.  Was the floor surface on the Enchantment of the Seas changed because of a safety issue?

And when I say changed, I mean the changes that were made in 2018.

MR. DRAHOS:  Object to the form.  Asked and answered.

A.  Again, I wasn't able to determine specifically the reason, but I did testify that that could have been one of the reasons, yes.

BY MR. GERSON:

Q.  And do you know what efforts were undertaken to make sure -- well, you said it could be one of the reason.

Do you know if it was one of the reasons?

MR. DRAHOS:  Object to the form.  Asked and answered.

A.  Again, I wasn't able to determine exactly, but I did see that in the Bolidt emails there were people from risk management included in there.  So it could have been one of the reasons why it was changed in

December of 2018.

BY MR. GERSON:

    **Q.   And if it was changed in 2018, why wasn't anything done to test how safe it was after the changes were made?**

    MR. DRAHOS:  Object to the form.

    A.   I never said -- I never said anything -- I mean, wasn't done, tested.  I don't know what you mean by that.

BY MR. GERSON:

    **Q.   Well, in the interrogatories that were served on Royal Caribbean in this case, you were asked whether or not there had been any safety-related testing on the deck surface in the five years prior to Ms. Pell's fall and the answer was none.**

    A.   Well -- but the Future Teak Bolidt that was poured on has certain safety-related -- that's taken into consideration when choosing which material is going to be going on the flooring.  That it needs a certain coefficient of friction.  So there were things done, you know, when it was poured on.  We did a pour-on -- a Bolidt material that didn't meet the safety standards that needed to be there that's different from actual testing.  But the flooring that was placed on there met our needs and met the safety needs that are part of our

needs.

Q.   And how do you know that if there was no formal testing conducted to the floor surface?

MR. DRAHOS:  Object to the form.

A.   That's the product that Bolidt sold to us and it has, within the product, certain specifications, and one of those specifications would be coefficient of friction.

BY MR. GERSON:

Q.   If the floor surfaces were -- if the floor surface was changed in December 2018, then a whole year would have gone by before any other changes were made to that same floor surface, correct?

A.   Correct.  Yes, there weren't any -- the only change that was made, again, to me, was not a change, but was some sanding done in November 2021.  It's still the same flooring that we poured --

Q.   So --

A.   -- December of 2018.

THE REPORTER:  Nick, I'm sorry to have to interrupt again.  I'm going to have to -- I'm losing power and I don't understand why.  If you give me a second, I'm going to call in so at least I can still hear you guys.  Just give me one second.  I apologize.

THE VIDEOGRAPHER:  Let's go off the record.  Is that okay, everyone?

MR. GERSON:  I'm going to --

THE REPORTER:  Well, I've got 1 percent on my battery, so I'm going to lose everybody.

THE VIDEOGRAPHER:  Let's go ahead and go off the record again.

The time is 5:19 p.m., and we're off the record.

(A short recess is taken.)

THE VIDEOGRAPHER:  The time is 5:32 p.m., and we're back on the record.

BY MR. GERSON:

Q.   Since the time that the floor surface was changed in 2018, until January the 20th, 2000 -- January the 16th, 2020, nothing had been done to evaluate whether or not the floor surface at the time Ms. Pell fell met the slip-resistant standards for slip resistance to ensure that it was safe for traversing passengers.  Had Royal Caribbean done that?

MR. DRAHOS:  Object to the form.

A.   There was no testing done on it, that is correct.

BY MR. GERSON:

Q.   And prior to 2018, you don't know when the last

time -- the time -- the last time before 2018 --

December 2018 that the floor surface had been resanded

or changed in any way?

A.   No, I don't know the last time prior to 2018.

Q.   And Royal Caribbean had no policy -- no written

policy as far as the frequency for testing the floors to

ensure that they're safe and had adequate slip

resistance?

MR. DRAHOS:  Object to the form.

A.   There was no written policies in regards to

testing the floor.

BY MR. GERSON:

Q.   And when I was asking you earlier about the

number of passengers that had slipped and fallen on the

Enchantment of the Seas, and I'd given you figures of,

at least, 50 and well over 100 on the -- on all of the

ships -- or the sister class ships, Royal Caribbean's

position is that even that evidence of the medical

reported incidents is not noticed -- or evidenced of

notice of a dangerous condition?

MR. DRAHOS:  Object to the form.  Asked and
answered four times.

A.   Correct, I stand with my previous testimony.

BY MR. GERSON:

Q.   Okay.  I'd like to show you a record, if I

could find it.  Give me a second.  Here we go.

MR. GERSON:  The next exhibit to the deposition is what?

THE REPORTER:  19.

MR. GERSON:  19?

THE REPORTER:  I said 19.

MR. GERSON:  Okay.

(Plaintiff's Exhibit No. 19 is marked for identification.)

BY MR. GERSON:

Q.  Amanda, I'd like you to take a look at what's on the screen, Exhibit 19; do you see this?  Even though it's listed as 13, I'll change it, but it's actually Exhibit 19.  And this is Bates stamped GR793.

A.  Yes.

Q.  What is this?

A.  This is the Siebel.  And Siebel is spelled -- S-i-e-b-e-l.  These are the Seibel complaints that we reproduced to you.

So these would be when somebody would make -- it wouldn't just have to be a complaint.  But when somebody goes to guest services and -- basically that's going to get recorded within the Siebel log.  It would be a complaint, or it could be that they lost their key, or it could be a variety of different things.

JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022                              Page 248

But this is a search done within that database for any slips, trips, and falls on board the Enchantment for the three-year period to the incident.  On --

Q.   And could --

A.   -- slips, trips, and falls on Deck 9.

Q.   And this would be a separate document from the Medallia documents that we were produced, correct?

A.   Correct, and Deck 9 pool deck.  I'm sorry, I just want to be specific.

Q.   Okay.  And there's no one that's -- there no identifying information of the person in Siebel, is there?

A.   I think that there is.  Not on this printout. I think that you could identify the person based on their booking number.

Q.   What were the parameters that were used to identify these separate incidents that -- or complaints that are documented in Siebel?

A.   Again, slips, trips, and falls on the Enchantment for the three-year period prior to the incident on the pool deck.

Q.   Were there any other search criteria that were used?  Wet floor?  Anything like that.  Or is it just. . .

A.   Pool -- I'm not -- I don't think it's -- it's

not -- the way that they do it in Seibel is more -- you know, I think that wet floor was maybe used, too.  I don't know the specific words that they used because they have to do a more broad search to find it all.  But if the pool deck -- what happens is with Siebel is that. . .

Q.   And these are all separate complaints, correct?

A.   Correct.

MR. DRAHOS:  Object to the form.

A.   Well, I think one of them -- one of them is doubled, I saw, in either Medallia or the Siebel.  I don't know which one.  It had the same date.

BY MR. GERSON:

Q.   Okay.  And how many do you -- what was the total number of Siebel complaints that were identified by Royal Caribbean responsive to the inquiry for complaints with respect to Deck 9 on the Enchantment of the Seas for the three years prior?

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   Yeah, for the three years it looks like --

MR. DRAHOS:  Objection.

Q.   Two years prior is what it appears to be.

A.   I'm counting them now.  I didn't count them. You could count them.

BY MR. GERSON:

Q.  Well, I guess what I'm asking is:  Each one a separate incident?

A.  Yes, if it -- for the most part, each one is a separate incident.  Like I testified to before, I saw one that looks like a duplicate.  But that doesn't happen like that.

Q.  Okay.

A.  Like, you'll see --

Q.  And these --

A.  -- that's the same booking number -- I'm trying to explain it.  If it has the same booking number and the same dates, it's the same one.  Some of the entries might be the same one, but I don't think that happened very often.  I think I saw one or two that happened.

Q.  Okay.  And why -- can you just explain to me -- so we've got the prior incidents that have been disclosed, the 174, and those are medically documented incidents.

And then you have the Siebel records, which are just complaints by passengers.

And then you also have another database called Medallia, correct?

A.  Yes, but you might -- most likely there's going to be overlap with the priors and the Siebel.  That's

what you typically see.  So some of these will correspond to the priors.

Q.   Is there a way in the spreadsheet that was produced and in looking at this document to differentiate or distinguish which are overlap and which aren't?

A.   If you -- yeah, I mean, the only way you could do it would be to highlight all the Enchantment ones on the priors and then look at the dates and then you could tell by that.

Q.   In this particular exhibit there's no -- strike that.

This is only for -- this particular document for Siebel is only with respect to the Enchantment of the Seas, correct?

A.   Yes.

Q.   That's why it's all EN, right?

A.   Correct.

Q.   And then how is this different from Siebel -- excuse me, from Medallia?

A.   So Siebel are complaints that are -- their recording is taken on board.  So you have to walk up to guest services.

Medallia is a system that is for post-cruise comments.  So it's an email that somebody would respond

to with feedback about the cruise.  So those are post-cruise.  These are all during the cruise for the most part.

This could have some stuff post-cruise, but Medallia is -- it's like a comment card commenting on the cruise.  Siebel would be --

Q.   And passengers -- sorry.

A.   Siebel will be anybody calling up customer service pre or post.

Medallia is an email comment card system, in a sense.  It was a different system.

Q.   And where is this -- the Siebel documentation, where is that stored?  Electronically?

A.   Yes, in Siebel; that's the name of the program.

Q.   Okay.  And in order to do a search, you just type in a couple of search terms and it pops up?

A.   Yes.  But, again, it's going to be very broad and it has to be narrowed down.  It takes quite a lot of work to go through it because you don't want to miss anything.  So it's more of a broad search, and then you go through them to see -- somethings might pop up that have nothing to do with the slips, trips, and falls, or wet floors --

Q.   The spreadsheet --

A.   -- or the like.

Q.   Sorry.

Okay.  Now, the spreadsheet that you produced that came from Riskonnect, I believe you said; is that accurate?

The spreadsheet that you --

A.   Yes.

Q.   -- produced, was that only produced in response to this lawsuit -- or, excuse me.

Was that only prepared in preparation of this -- of our request for the information?

A.   Yes, that was the response -- the response of documents you wanted to your request for production for interrogatories.

Q.   Is any similar summary of complaints, prior incidents, Siebel complaints, Medallia complaints -- is there any format that is used to provide to shoreside to put them on notice about potential safety issues?

MR. DRAHOS:  Object to the form.

A.   Shoreside gets reports of incidents that happen on board.

BY MR. GERSON:

Q.   And that would be somebody like Colleen?

A.   There's different people that it goes to.  If it's not -- it's just -- yeah, but it's not a report like that.  It's just notifications of some of the

incidents.

Q. I guess what I'm asking is: How does Royal Caribbean, as a company, analyze data such as slip and falls documented in either incident reports, or in the databases, Medallia and Siebel, for purposes of accidents trends, or some sort of safety analysis to figure out how to make a ship safer such as the deck on -- Desk 9 on the Enchantment of the Seas?

MR. DRAHOS: Object to the form.

A. Is that one of my areas? I don't believe it is. It has 99 of them. I don't know if that was one of them.

MR. DRAHOS: Yeah, I don't recall seeing that either. Nick, where is that listed in your notice?

MR. GERSON: No. 15.

THE VIDEOGRAPHER: This is the videographer. Could we have the witness tilt her camera down just a --

MR. GERSON: Here, I'll read it. It's asked for polices and procedures -- "All policies and procedures related to accident investigations for personal injuries, including all internal databases and reports used by the Defendant which are used to document shipboard accidents and injuries which are in effect on the date of the subject incident. And

all documents which refer or relate to them and
effect on the date of the incident."

A.    I think I answered that already.

MR. DRAHOS:  Whether or not there's a policy --
she's indicated in her answer.  Right.  Proceed.

BY MR. GERSON:

Q.    Well, the policy -- I'm not sure I understand
what you're -- first you said that it wasn't a matter of
inquiry.  I believe that it is, and I'm asking you from
a policy -- so is there a policy for evaluating the
databases and reports used by this Defendant to document
accidents, injuries, and complaints?

MR. DRAHOS:  Object to the form.  Asked and
answered.

A.    Well, yeah, the policy is that all -- all
personal injury incidents go into the internal database
at Riskonnect.

BY MR. GERSON:

Q.    And then is there a way that that information
is sent to -- who shoreside evaluates that to make
policy decisions that may make an area like Deck 9
safer?

A.    If there's --

MR. DRAHOS:  Object to the form.

A.    -- anything shoreside, just asks for -- if

there are policies and procedures related to accident investigation, which I would argue are the 7.05 that we went through -- about how to do accident investigations, personal injury that internal databases is where it goes, which is Riskonnect, which I was here prepared to discuss.  That's what documents it.

And I don't know where you're coming up with the rest of it, which I don't believe it's anything close to this area.  I'm not prepared to -- not that I don't -- I'm not saying I'm not going to answer it.  I'm just not prepared to answer the question you're asking me right now.

Q.   Well, you told me that there's a policy and procedure that's in place.  We can -- you agreed with that, correct?

A.   As related, as it says here, to accident investigations for personal injury.  Yes, we went over that.

Q.   And who is responsible for overseeing the policies and procedures?

A.   For accident investigation and personal injuries, safety.

Q.   Who from safety?

A.   The chief safety officer is the one -- I'm sorry?

Q.  Go ahead.

The chief safety officer on the ship?

THE WITNESS:  I might be frozen.

MR. DRAHOS:  Yeah, you were frozen there for a minute.

THE WITNESS:  I was frozen.

A.  Okay, I'm sorry.  Go ahead.

BY MR. GERSON:

Q.  The chief safety officer on the ship?

A.  He's responsible for the accident investigations for personal injuries, yes, and for making sure the policies are adhered to.

Q.  And how does it work when you've got a safety officer that's on board for six months, or nine months and then he's switched to another vessel?

How does the information get passed along from one officer to the next when they're on different contracts that expire and -- you know, how is the information shared from one to the next?

A.  I don't know.

MR. DRAHOS:  Object to the form.

A.  I don't know what you mean.  What information?

BY MR. GERSON:

Q.  Well, you said that there's a policy and procedures related to accident investigations and

internal databases and reports used to document ship

board accidents and injuries.

What is the purpose of that policy?

A.   I think we're talking two different policies.
I'm talking about the policies -- about how to -- how
the accident investigations and personal injury.  Those
polices are in SQM.  All safety officers and all crew
members would have access to those.

Q.   Are you aware of any efforts by Royal Caribbean
to summarize or analyze the number of incidents and
complaints on the pool deck of a Royal Caribbean vessel,
like the Enchantment of the Seas, to make sure that
Royal Caribbean, as a corporation, has a firm
understanding of safety issues on that particular
portion of its ship?

MR. DRAHOS:  Object to the form.  It's been
asked and answered.

A.   Yes, we discussed that.  That's the safety
hearing committee meetings.

BY MR. GERSON:

Q.   The safety security committee meetings.  But
what about shoreside?

A.   I've answered that before and --

MR. DRAHOS:  Object to the form.

A.   -- the information would go shoreside.

BY MR. GERSON:

Q.   And that goes to Colleen; is that correct?

A.   It goes to various people shoreside.  It depends on what information -- or different departments get that information because it doesn't just relate to one thing.

MR. GERSON:  Okay, I have nothing further for you, Amanda.

MR. DRAHOS:  We will read the transcript.

THE VIDEOGRAPHER:  Hearing nothing further, the time is 5:35 p.m.

This concludes the recorded video deposition, and we are off the record.

(This ends the video recording portion of the transcript.)

THE REPORTER:  Nick, are you recording the transcript?

MR. GERSON:  Yes.

THE REPORTER:  Mike, would you like a copy?

MR. DRAHOS:  Yes.

(Thereupon, the deposition concluded at 5:54 p.m.)

STIPULATIONS

IT WAS STIPULATED BETWEEN counsel for the respective parties, with the consent of the witness, that reading and signing of the foregoing deposition by the witness be reserved.

THEREUPON, the deposition of AMANDA CAMPOS, taken at the instance of the Plaintiff, was concluded at 5:54 p.m.

NOTE:  The original and one copy of the foregoing deposition will be held by Nicholas Gerson, Counsel for the Plaintiff.

A copy of the foregoing deposition will be held by Michael Drahos, Counsel for the Defendant.

DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS

The original of the Errata Sheet has been delivered to Michael Drahos, Counsel for Defendant.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL delivered to Nicholas Gerson, Counsel for Plaintiff, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it.  DO NOT make marks or notations on the transcript volume itself.

\*\*\* REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.\*\*\*

ATTACH TO THE DEPOSITION OF AMANDA CAMPOS

    CASE:  Pell vs. Royal Caribbean
   CASE NO.:  20-CV-25271-MARTINEZ

                    ERRATA SHEET

    I, AMANDA CAMPOS, have read the foregoing

deposition given by me on January 12th, 2022, in Miami

Beach, Florida, and the following corrections, if any,

should be made in the transcript:

PAGE    LINE              CORRECTION AND REASON THEREFOR

        Subject to the above corrections, if any, my

testimony reads as given by me in the foregoing

deposition.

        SIGNED at _____ Florida, this

_____ day of _____, 2022.

                    _____

                         AMANDA CAMPOS

CERTIFICATE OF REPORTER OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

        I, the undersigned authority, hereby certify that the witness named herein personally appeared before me via Zoom video conference and was duly sworn on January 12th, 2022.

        WITNESS my hand and official seal this 24th day of January, 2022.

_____

LISA T. ADKINS

NOTARY PUBLIC - STATE OF FLORIDA

MY COMMISSION NO.:  HH 047535

EXPIRES:  November 8th, 2024

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Lisa T. Adkins Notary Public in and for the State of Florida at large, hereby certify that the witness appeared before me via Zoom video conference for the taking of the foregoing deposition, and that I was authorized to and did stenographically and electronically report the deposition, and that the transcript is a true and complete record of my stenographic notes and recordings thereof.

I FURTHER CERTIFY that I am neither an attorney, nor counsel for the parties to this cause, nor a relative or employee of any attorney or party connected with this litigation, nor am I financially interested in the outcome of this action.

DATED THIS 24th day of January, 2022 at Tampa, Hillsborough County, Florida.

_____
LISA T. ADKINS

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Amanda Campos on 01/12/2022**                    Index: 1..16th

---

**Exhibits**

**CamposA 1**
3:14 8:22
88:19,21,
22

**CamposA 2**
3:15 9:5
14:2

**CamposA 3**
3:17 14:3,
8,14
34:12,17
84:23
88:24
89:6,11,
17,25
174:13,15

**CamposA 3A**
4:2 89:6
90:6,10
174:16
184:17

**CamposA 4**
3:18 34:5,
7,13,16

**CamposA 5**
3:20
39:19,22

**CamposA 6**
3:22
65:21,22,
24 66:10
69:24 70:9

**CamposA 7**

3:24
84:16,24

**CamposA 8**
4:3 88:17
122:10,12,
16,17,22,
23 128:8

**CamposA 10**
4:6
133:22,23,
24 134:2,3

**CamposA 11**
4:8
152:18,21

**CamposA 12**
4:9
157:24,25
158:5
160:15
162:22
164:2
165:2

**CamposA 13**
4:11
162:2,3,6,
25 163:11

**CamposA 14**
4:12
187:3,4,9,
10

**CamposA 15**
4:14
200:16,18

**CamposA 17**
4:17

201:19,22
202:11

**CamposA 18**
4:18
214:19,20,
24 234:2

**CamposA 19**
4:20
247:8,12,
14

---

**1**

---

**1** 8:22 9:6
14:4
88:19,21,
22 152:23
153:13
160:18
214:4
245:4

**10** 133:22,
23,24
134:2,3

**100** 11:6
193:5
231:10
238:17
246:16

**100-plus**
231:11

**100th** 225:23

**10:54** 5:8

**11** 40:4
152:15,17,

18,21
179:23

**12** 157:24,
25 158:5
160:15
162:22
164:2
165:2
179:23

**12:45** 82:25

**12:58** 83:3

**12th** 5:7
79:17

**13** 40:4
162:2,3,6,
25 163:11
179:23
247:13

**14** 7:16
179:23
187:3,4,9,
10

**15** 10:9
179:23
200:16,18
254:15

**153** 231:10

**154** 230:5
236:11

**16** 118:8
179:23
200:22

**16th** 17:2,
19 61:18

---

63:5
78:17,21
89:23
95:16
185:2
245:16

**17**  165:17
167:17,18
179:23
201:19,22
202:11
215:1

**170**  8:16
9:13
210:24

**170-page-plus**
39:19

**173**  210:2
213:15

**1738**  8:18

**174**  208:7,
10,24
209:1
210:3,4,5
211:2
213:8,23
217:14,24
221:6,25
222:13
250:18

**175**  210:2

**1795**  41:10,
15

**17A**  202:12

**18**  34:24
179:23
214:19,20,
24 215:2
234:2

**1805**  40:5

**19**  179:23
247:4,5,6,
8,12,14

**1906**  8:18

**1:51**  117:25

———————————

**2**

**2**  9:5,6
14:2,6
83:4
108:20
135:23
160:18

**20**  179:24

**200**  31:12

**2000**  245:15

**2018**  23:12,
19,22,25
24:1 25:4,
5,13,19,24
27:8,24
30:10,23
31:4,5,11,
12 32:3
41:4,17,
20,25
42:12,20
43:15

48:7,11,
16,22,24
49:1 51:22
52:12
53:22
54:5,9,11
56:14,16
57:14,17
58:13,20,
23 59:12,
19,20,22
218:7,10,
18 219:9,
18 220:15,
20,24
222:18,19
225:16
226:2,10,
13 227:6
228:11
242:9
243:1,3
244:11,19
245:15,25
246:1,2,4

**2019**  64:1
85:2
227:22

**2020**  17:2,
19 48:14
49:1 61:19
64:2 65:8
78:17,21
80:15
89:23
118:8
185:2

245:16

**2021**  7:16
64:4,9
65:8 69:10
71:24
72:18,22
73:4,7,10
220:21
221:1
228:7
244:16

**2022**  5:7
79:17

**20th**  64:1
245:15

**21**  63:13,14
179:24

**21st**  69:10

**22**  179:24

**22nd**  41:17,
20

**23**  179:24

**24**  179:24

**25**  50:3
179:24

**2500**  213:17

**26**  179:24

**26th**  85:2

**27**  179:24

**28**  179:24

**29**  179:24

**2:47**  135:24

**2:48**   135:24

**2:58**   154:12

**2:60**   118:2

---
**3**
---

**3**   14:3,8,14
34:12,17
84:23
88:24
89:6,11,
17,25
154:16
160:18
174:13,15,
17 175:2

**3,500**   50:3

**30**   179:24
198:15

**309(b)6**
223:23

**31**   179:24

**32**   179:21,
24

**3:47**   184:19
185:2

**3:70**   154:15

**3A**   89:6
90:6,10
174:16,18
184:17

---
**4**
---

**4**   34:5,7,

13,16 50:6
160:18
236:2,7

**40**   110:20

**45**   160:8,
14,17
164:9,10

**4:04**   197:18

**4:14**   197:21

---
**5**
---

**5**   39:19,22
160:19

**5,000**   50:6

**50**   209:18
246:16

**53**   209:18
210:1
217:3,7,8,
9,10,14,17
237:16
241:22

**5:01**   236:4

**5:03**   236:6

**5:08**   240:4

**5:12**   240:10

**5:19**   245:8

**5:32**   245:11

**5:35**   259:11

**5:36**   240:7

**5:54**   259:21

---
**6**
---

**6**   65:21,22,
24 66:10
69:24 70:9

---
**7**
---

**7**   84:14,15,
16,24

**7.05**   256:2

**7:48**
179:17,19

**7:48:03**
179:7

**7:48:10**
179:23

**7:48:15**
178:17,19
179:1

**7:48:21**
174:24
176:14

**7:48:23**
178:20

**7:48:30**
177:16

**7:48:32**
177:18
179:12

**7:48:33**
179:11

**7:48:36**
179:12,21

**7:49**   179:14

**7:49:43**
179:11,25

**7:49:47**
177:18

---
**8**
---

**8**   88:17
108:19
122:10,12,
16,17,22,
23 128:8

---
**9**
---

**9**   14:23
16:14
17:18,23
19:19,24
20:9,12
21:17
24:14
33:21
35:22
43:20 46:6
49:6 51:15
59:11
64:15
65:10
66:4,23
71:4 75:23
77:9 78:21
79:9,19
87:23,25
92:11
103:1
112:18

113:8
115:6
128:2
133:25
201:2
202:25
203:8,10
217:20
220:17
232:7,10
233:4,8
237:17
248:5,8
249:17
254:8
255:21

**99** 74:3
254:11

———————

**A**
———————

**a.m.** 5:8
108:19

**abide** 97:7

**ability**
118:15,19
149:4,10,
12 175:12,
13 176:8

**aboard** 35:2
40:13
73:11
104:1
232:17

**absences**
146:3

**absolutely**
193:11

**accept**
227:18

**acceptable**
214:6

**acces** 175:11

**access** 258:8

**accident** 9:2
13:18,21
36:12,19,
23,25 37:7
38:18,19
74:5 129:1
131:22,24
132:5,15
135:16
138:18
141:8
157:6,12
160:16
184:23
198:19
205:10,20
209:7
254:21
256:1,3,
16,21
257:10,25
258:6

**accidental**
145:9

**accidents**
35:20 36:4
37:1,12
40:10,22

42:3 76:1
103:6
207:25
254:6,24
255:12
258:2

**account**
45:12

**accumulate**
29:7

**accurate**
76:20
84:3,5
123:16
209:19
220:13
253:4

**accurately**
85:17
135:4

**acknowledge**
6:2 43:15
129:16

**acknowledged**
43:15

**acknowledges**
129:18

**action** 150:9

**actions**
150:13

**actual** 13:6
14:20 91:9
156:25
165:15,22

167:2
168:22
171:19
184:18
243:23

**Adam** 195:11
196:14,15,
16

**add** 194:23

**addition**
11:21 12:6
99:2 104:4
114:24
230:5

**additional**
8:16
101:15

**address**
163:23

**addressed**
9:12
159:17,19

**adequate**
35:9 47:20
49:7 55:25
71:6 246:7

**adhered**
107:8
257:12

**adjectives**
191:15

**adjuster**
74:25 75:2

**Adkins** 5:11,

24 174:14

**administering**
6:4

**adults**
115:23
116:23

**advance**
211:22

**advantage**
175:3
198:20

**Adventure**
81:20,25
85:13

**Adventures**
85:20

**aesthetic**
26:16,22
56:4 70:24

**aesthetics**
27:17

**afar** 14:21,
22 132:11
155:3

**affect** 29:9
118:19

**aft** 75:22
77:9 87:24
92:17
94:19
95:25
109:18

**agenda** 39:16

**agree** 10:19
42:6 72:17
77:10 85:6
86:4 89:2
92:6
110:11,14,
15 112:24
113:1,3
119:1
126:18
135:4
175:2
176:17
177:1,5
210:20,22
211:2
217:18
219:24

**agreed** 6:11
89:1
126:11
219:21
256:14

**agreement**
6:9

**agrees** 6:12

**ahead** 15:24
82:10
100:7
120:10,13
137:5
154:19
155:11
156:10
166:5
175:9
224:3

235:24
245:6
257:1,7

**air** 119:11

**airlift**
145:11

**alcohol**
112:5,16

**Alexander**
15:15,18
16:16,25
17:3,13
18:6 20:21
21:15,20
45:21,22,
25 46:21
76:8,21
77:7 78:7,
8 79:20
81:1 84:4,
8 87:25
95:11
96:17
99:14,24
100:17,23
101:1,25
103:8,9,
17,21
104:5
105:2,4
106:3
109:17
113:25

**Alexander's**
17:17
19:10

102:18

**alleged**
171:16

**allowed**
221:20

**altogether**
10:7 30:20
242:5

**aluminum**
65:14
71:16

**Amanda** 5:4
6:18 7:1
60:15
117:19
152:21
155:2
214:24
247:11
259:8

**amount** 64:6
99:6 103:5
116:1,3
213:25
214:12,13,
14

**analogy**
190:6

**analysis**
254:6

**analyze** 46:4
211:4
254:3
258:10

and/or  18:25
  19:2,15
  203:24

angle  165:23
  177:3,10,
  11,12
  185:25

angles  13:4

Anne
  111:14,15,
  19

annual  56:20
  57:7

answering
  60:5,22
  61:2
  221:13

answers  7:8
  33:13
  194:24

Anthony
  22:12,14,
  15,18,24
  23:9,18
  30:22
  54:13
  55:9,13,
  15,16  65:3
  72:13
  73:16,19

anymore
  28:20
  29:15  43:9
  174:7
  208:20

apologize
  24:11
  55:11
  86:10
  122:16
  191:11
  196:10,12
  244:25

apparently
  8:18  60:23
  71:14

appearances
  5:14

appeared
  13:9

appears
  42:15
  72:20,23
  136:5
  137:12
  153:1,5
  158:7,8
  164:3
  165:5
  177:21
  178:6
  249:23

applied
  67:24
  68:12

applies
  93:22
  94:25  95:4
  113:11

approach
  201:23

approaching
  137:3
  201:13,18

approximate
  162:9,10,
  25

approximately
  8:14
  132:23
  167:17
  209:18

aqua  178:4

area  17:20
  18:17,25
  19:2,4,14,
  15,24,25
  20:1,8,9,
  14,16,18,
  19,20
  21:8,16
  23:22
  24:4,5,6,
  10,12,20,
  21,25  25:1
  31:24
  32:2,4
  33:19  35:1
  36:3,7,9
  38:4  40:9,
  22  42:2,3,
  7,9,13,21,
  23  43:3,4,
  5,7,16
  45:15
  51:18,19
  62:22
  64:11

65:11,16
  66:4,24,25
  67:6,8,13,
  15,23
  68:5,7
  69:4,8,18,
  23  71:14
  72:16,17,
  25  73:3
  74:1
  75:13,21
  76:13,16
  77:1,22
  78:16,25
  81:18
  83:19
  85:1,4,8
  86:15,17
  87:7  91:5,
  13,19
  92:9,23
  93:13,20
  95:13,15
  96:1,8,19,
  20  97:5,15
  99:13
  100:1,3,
  12,14,15,
  20,23,24
  103:2,5
  104:19
  106:8
  107:13,25
  108:4,6,13
  109:4,14,
  17  110:5,
  13  112:19,
  20  114:2,

23,24
115:2,4,6,
10 116:14
119:6
121:15,16,
19 123:14,
16,19,20
124:4,9
125:3,25
126:5
131:11
134:21,23
137:22
139:8,23
140:14
141:2,25
149:16
150:3,10,
14,20,21
151:7
155:4
157:13
158:19,20
159:25
160:20
162:9,10,
18,25
163:11,15
164:12
165:1
170:3
172:4
173:1,18
177:3,5
178:11
182:24
198:1
199:2,9

201:2
202:7,8
224:22
227:13
232:7
233:21
241:15
255:21
256:9

**areas** 20:24
26:22 27:2
31:21
43:6,19
44:14,19,
23 65:10
75:24 86:6
92:18
95:15
97:16
98:22
99:14
107:6
108:6
109:20
112:23
124:24
161:21
173:7
219:6
225:20
227:24
233:8,11
235:5,6
254:10

**argue** 60:13
194:25
224:5,24

239:10,15,
22 256:2

**arguing**
239:2,17

**argument**
183:1
188:19
227:19
233:24

**argumentative**
125:15
144:2
169:4
182:15
188:12
194:17
223:11,12

**arguments**
188:18

**Arizona**
10:14

**Armen**
133:14,18,
19

**arrange**
27:11 51:8

**arrangement**
6:6

**arrangements**
51:3 93:19

**arrive**
132:15
133:11

**arrived**

132:25
142:1

**as-needed**
26:8

**ashore**
74:14,16,
18

**asks** 255:25

**assert**
172:19
192:5

**assess**
180:19

**assign** 96:8,
11 101:8,
15

**assigned**
19:19
20:22
22:21
38:22
75:22
76:7,14,25
77:3,8
79:8 80:9
83:22
92:24
94:16,19
95:24 97:6
100:1
101:20
104:5,7,19
105:25
107:2,12,
17 115:10,

116:13
124:25
125:3,8,
11,23,25
126:5,6,
13,17,21,
24 127:2,
4,8,12,18,
21,24
159:14

**assigning**
104:18

**assignment**
94:17
95:14
106:11
127:11

**assignments**
76:19
80:11
104:8
105:4

**assist** 22:9

**assists**
96:23
104:17

**assume** 72:6
81:3
212:25

**assumed**
50:13

**assuming**
68:10
200:3

**assumption**

98:14
131:3

**assumptions**
168:5

**attach** 8:23

**attached**
8:22

**attaching**
14:12

**attempt**
34:13

**attend** 47:7,
8 98:19

**attendant**
19:4
76:13,16
81:19
85:1,8
86:15,17
87:7 96:4,
14,21,25
105:15,21
106:2,6,
17,21,22
107:10,14,
24,25
109:4
110:24
111:1,2,4,
10,13
116:21

**attendants**
18:15,21,
25 19:1,2,
14,15,16

21:8
75:14,21
77:22
78:24,25
83:19 85:4
91:5,13
95:3,5,7
96:8,19
97:5,15
99:6,13
100:1,20,
24 104:19
105:20
106:9,23
107:13,21
108:14
109:1,4,14
110:5,13
114:22
116:14,20
124:24
125:3,25
126:6,13,
17,20,23
127:1,4,8,
12 137:23
158:19

**attending**
141:25

**attention**
49:22
110:19
130:16
131:1
177:16
236:13
237:24

238:1

**attorney**
17:14
226:7

**attorneys**
6:1 11:20
75:12 91:2
105:24

**Automatic**
201:10

**aware** 27:14
35:24 39:2
56:23,25
57:5
64:13,16
70:10,21
72:2,9
73:1 79:13
80:10
91:18
105:2,3
112:3,8
114:17
116:17
118:6
130:16
135:19
149:13
165:13
181:21,24
184:15
196:22
199:8
203:11
204:10,18,
22,24
206:6

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Amanda Campos on 01/12/2022** Index: baby..blue

258:9

---

**B**

---

**baby** 129:2
170:21

**back** 9:4
15:10,15
23:14,22
29:22
30:25 42:1
45:17
52:14 55:8
83:4,12,14
88:23
95:13 98:3
118:3,5
128:4
137:1
147:13
154:16
155:1
191:5
197:22
199:1
200:3
205:18
235:9
236:7,10
240:8,10
245:12

**background**
101:23
102:1,6

**backup**
216:14,16

**bad** 70:25

**bag** 130:19

**barefoot**
69:4

**barriers**
124:17

**Barring**
234:17

**bartender**
138:24

**base** 164:6

**based** 32:15
44:8 50:22
55:5 61:25
91:11
96:20
103:13
137:10
156:4
166:9
170:14
173:9
174:5
203:23
204:1,5,7
207:11
214:7
217:2
223:7
224:7
231:9
236:21
242:5
248:14

**basically**

37:3
105:13
124:25
166:3
247:22

**basis** 54:21
56:21 57:7
100:25
104:10
130:7
172:6,8
174:1

**Bates** 8:17
40:5 41:11
183:25
216:4,7
247:14

**battery**
245:5

**Beccerra** 8:7

**begin** 28:20
51:1

**beginning**
26:20
40:17
88:19
101:2
154:16
219:17

**begins** 8:17
29:2 83:4
236:7

**behalf** 5:16,
18 6:11
7:5 11:5

18:7 30:12
62:7 75:19
102:23
186:17
223:25

**belated** 14:5

**believable**
194:11

**believed**
144:11
145:25
224:8,14

**believes**
194:6
231:12

**believing**
58:25

**belt** 120:6

**benefit**
198:8

**bigger** 45:13

**binding** 7:9

**bit** 19:7
21:12
27:10,13
43:6
132:22
154:4,24
225:24
226:4
238:23

**black** 124:7

**blue** 177:25

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
Amanda Campos on 01/12/2022          Index: board..called

**board** 17:11 37:2,4,18 44:17 45:16 50:15,21 51:23 52:5 54:3,4 72:11 73:7,8 103:10 105:14 115:15 144:6 145:11 192:15 203:6 211:3 214:15 237:15,17 248:2 251:22 253:20 257:14 258:2

**Bolideck** 23:24 25:9 26:5 27:22 28:15 53:14

**Bolidecking** 52:10

**Bolidt** 25:7, 14,16 27:11 30:2 44:1,2,4 47:16,18, 21,22,23,

25 48:1,3 51:8,16 52:3,11, 13,17,19, 22,23,24 53:5,7,10, 23 54:6,25 55:20 56:19,23, 24,25 57:6 58:3,4,6,7 62:5,8 67:12 68:20 210:7 217:25 218:5,6,8, 12,17 219:2,19 220:17,24 222:21 242:23 243:16,22 244:5

**booking** 248:15 250:11,12

**bottle** 152:9 153:8,9 164:4

**bottom** 40:4 134:18 164:6 167:16 192:10 195:7 200:25

201:9

**bow** 20:2,14

**boxes** 198:1, 4,5

**brain** 142:22 143:15,25 144:9,12

**brand-new** 226:11 227:5

**break** 11:13 82:21 86:5,20 154:8 197:10 239:21

**breaking** 18:10

**Brian** 5:10 117:20

**bridge** 8:11 14:13

**bring** 9:20 30:24

**bringing** 98:3,4

**broad** 61:5,6 249:4 252:17,20

**broke** 86:11

**brought** 49:22

**brown** 67:8,

14

**browns** 67:3

**build** 26:23

**burden** 221:19

**burdensome** 213:3

**busy** 51:19

_____

C
_____

**C-H-E-T-T-U-P-O-T-U-L** 15:8

**Cafe** 21:18 168:25

**Café** 92:2 165:16 166:16

**calculations** 217:2

**call** 16:23 66:3 112:2 121:9 134:20 202:12 231:11 244:23

**called** 6:19 9:1 36:11, 24 74:8 93:1 111:23 139:3 143:15 148:24

250:22

**calling**
252:8

**calls** 15:19
16:4
240:24

**calm** 172:10

**camera** 13:9
151:21,24
166:6
177:6,9
181:9,16
182:17,18
184:17,23
186:3,7,
12,14,17,
19 187:14,
16,17,19,
22,24
188:14,25
189:3,15,
19 190:4,
20,24
191:6,8
192:19,21
194:1
198:7
254:17

**cameras**
13:10
168:14
181:14
186:23
192:15
193:18
198:15,16

**Campos** 5:4
6:18 7:1,2
9:22 14:18
55:24 63:2
66:2 67:22
80:20
83:18
86:14
92:15
102:23
110:20
118:6
134:7,15
147:22
148:15
161:15
164:1
165:13
171:7,25
175:10
180:6
183:5
187:7
192:9
195:6
197:24
200:21
202:15
216:22
225:13
229:23
232:15
236:11
240:14

**capabilities**
169:10
175:11

**capability**
135:10
148:16
167:7
175:18,21
222:14

**capable**
62:10

**capsule**
187:22

**captain**
42:22

**capture**
13:11
166:12

**card** 148:25
149:7,8
252:5,10

**care** 98:23
114:20,21
130:4,11

**career**
10:19,22,
24

**careful**
58:24 59:3

**Caribbean**
5:5,6,19
7:6 9:24
10:7,8,21,
23,25 11:3
12:11,19,
22 13:17
18:7 21:6
26:4,11

27:5,15
29:20
30:12
32:11
35:7,19,24
36:2 37:11
42:7
43:17,22
44:7,14
45:4 46:2
47:6,15,
21,23 48:3
49:5
50:10,15
55:24
56:18,25
57:5 60:7
70:9,20,21
73:1
75:17,18,
20 76:3
77:4,12
78:19
79:6,18
80:21
87:21
91:18
92:16 94:7
95:23
101:8,15
102:24
105:3
108:11
109:7,13,
21 112:3,
8,10,17
113:16
115:8,18

116:12
117:13
118:6
119:20
123:2
129:16,18
130:15,24
132:25
138:6,20
139:8,12
140:13,21
141:6
142:22
144:22
145:14
146:15
147:12
148:1,8,15
149:4,13,
22 150:1,6
162:10
163:12,14
164:24
165:10
166:4
167:15
168:6,16
169:17,24
170:22
171:18,25
173:23
179:3
180:18,20
181:2,9,22
182:4
184:15
185:3
189:2

192:9
193:5
196:20,22
203:12
204:11,19,
25 205:4
206:2,7
207:6
214:5
222:2
231:12
234:11
235:4
236:15
237:1,14
238:3,19
240:15,19
241:2,11
243:12
245:20
246:5
249:16
254:3
258:9,11,
13

**Caribbean's**
16:24
19:17 25:5
78:13 87:8
127:5
129:9,20,
25 130:3,
7,25
131:22
139:18
143:13
145:2
160:7

165:21
166:8
181:11
186:2
189:25
191:19
212:12
224:17
231:8
238:6,9,13
240:22
246:17

**carpeting**
43:7

**case** 9:12
11:25
12:9,11,19
16:3 22:17
30:16
33:14 51:4
67:1 71:25
72:3 82:17
88:7 90:19
123:2
143:19
146:20
165:8
170:18,21
171:12,19,
22 173:12,
18,21
174:11
180:17
181:24
184:16
190:1
193:23

195:20
206:7
207:6,18
209:23
217:20
227:7
236:12,22
238:10
241:19
243:12

**cases** 11:22
82:14
193:19,22,
25

**casing**
188:15

**catch** 196:15

**caught** 186:8

**caused** 68:22
69:15 70:6
71:17
72:15
119:14
129:22
130:6

**causing** 71:4
205:22

**caution**
199:11

**CCTV** 72:24
100:19
131:11
161:12
165:7
168:12

Case 1:20-cv-25271-JB Document 49-1 Entered on FLSD Docket 04/12/2022 Page 277 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: CD..clarify

172:1
181:9,14,
16 183:17
184:2,22
185:20
192:15
194:1

**CD** 184:4
190:6

**ceilings**
186:23

**center**
160:13

**certainty**
32:1

**cetera**
106:14
109:20

**chain** 106:1

**chair** 152:6
153:2,14
155:19
156:1,7,19
158:8,9,
11,12,13,
17 160:19
161:1
163:4
164:2

**chairs** 98:19
108:21
120:4,15,
20 124:1,7
150:22
151:3,6

152:5
155:6,10,
18 156:2,4
157:7,13,
17,19,21
164:11,12
177:11
178:9

**chance** 7:21
9:3 41:13

**change** 26:17
27:4 30:3,
13 31:6
34:17 52:9
56:5 59:18
61:12,13,
14,16
82:4,21,22
133:25
150:20
154:9
215:2
219:24
220:22
229:18
241:16
244:15
247:13

**changed**
26:17
27:8,17
30:9 32:7
47:19
48:7,9,15,
17,20,22
49:2 52:12
56:14,17,

23 58:17,
20,24
60:12 63:7
71:7 72:17
219:18
220:15,19,
20,23,24
221:2,3
227:1
228:6
238:23
242:7,8,25
243:3
244:11
245:15
246:3

**changing**
59:15

**charge** 17:9,
11,20
103:24
105:12,18
192:15

**chart** 215:25
216:2

**check** 30:12

**cheek/
traumatic**
205:19

**chief** 42:22
77:24 78:9
103:9
141:8
183:13
256:24
257:2,9

**child** 241:25

**choose** 30:2
61:11

**choosing**
243:18

**circle**
152:23
162:8,12,
24 163:11,
14 164:12,
24,25
199:2,4

**circuit**
184:1

**circular**
124:9

**circumstances**
58:5
130:5,11
138:21
238:4
241:13
242:4,5

**claim** 180:20

**claims** 9:25
10:20
11:14,16,
18,20 75:3
230:2

**clarified**
221:4

**clarify**
191:12
203:1

class 81:21
82:1
85:14,21,
23 208:2,5
210:5
211:4
212:13
216:24
217:1
219:3
221:8
225:15
229:21
230:21
237:4
246:17

classify
212:22
213:11

clean 17:24
29:1 47:22
93:12,18
114:10,19
233:1

cleaned
17:25 48:4
107:6
129:3
153:16
158:18
159:13,20
163:6

cleaner
108:8

cleaners
21:9

cleaning
16:14
17:8,11,21
18:5,8,17,
23 92:24
98:11
108:7
113:13
114:12
115:5

clear 21:13
158:4
164:5
175:14
226:25
227:6

client 7:5
63:4 70:12
194:15
205:12

clip 90:10
176:18
177:1

close 119:20
121:15
171:17
184:1
194:18,21
207:19
256:9

closed
118:12,22
124:19,21,
22 125:1,4
128:12,15

closer 13:5

50:6 137:2
175:9
177:5,6
195:17,19

clue 81:11,
15 103:14

coaching
74:10

coat 68:13

coefficient
243:20
244:7

coincidence
168:21

coincidentally
165:15

colleague
5:20

Colleen
73:23,24,
25 74:11,
14,15,22
253:22
259:2

college
102:12

color 67:10,
13 68:18,
24

colors 23:6,
9 72:12,15

comment
175:10
252:5,10

commentary
155:15
191:25
192:6

commenting
252:5

comments
251:25

committee
9:14 37:2,
5,15 39:9
46:7 50:16
235:8
258:19,21

committees
47:3
235:12

common 28:13
75:25
190:11

commonly
105:6

companion
81:19

company
254:3

company-wide
93:14

compare
171:21

complain
109:1
117:6,12

Case 1:20-cv-25271-JB   Document 49-1   Entered on FLSD Docket 04/12/2022   Page 279 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022 Index: complaining..continuously

complaining
 28:9

complaint
 12:4
 247:21,24

complaints
 230:7,10,
 12,14,15,
 19,25
 234:8
 236:14,24
 247:18
 248:17
 249:7,15,
 17 250:21
 251:21
 253:14,15
 255:12
 258:11

complete
 55:4

completed
 54:12,14,
 15,16
 139:5

completely
 50:4 52:12
 57:17
 58:14
 59:15,24
 60:11
 165:17
 220:2,24

composite
 14:7
 174:13

202:12

composition
 61:14

comprising
 208:11

concede
 110:17
 221:8

concern
 146:7

concerned
 142:3,8,22
 218:12

concluded
 259:21

concludes
 259:12

conclusion
 240:25

concrete
 131:4

condensation
 119:6,11

condition
 47:10
 52:14
 78:22
 141:2
 238:20
 240:15,16,
 23 241:6,
 16 246:20

conditions
 20:25 45:7

92:19

conduct
 202:21

conducted
 5:9 203:19
 204:2
 210:10
 244:3

cone  199:11

confirm  6:9
 215:5

confirmed
 20:22

confused
 19:7 61:10
 105:11

connection
 12:22
 90:14,19
 139:9
 163:13
 164:25
 165:10
 172:2
 193:14

consciousness
 144:8

consent  6:5

consideration
 243:18

considered
 213:24

consistent
 179:9

228:25

consistently
 179:5

consists
 20:10
 160:18
 238:18

construction
 65:11

contacted
 77:24
 143:7
 192:16

contaminated
 69:5

contention
 131:4

context
 174:8
 224:20
 241:18

continue
 20:15
 120:11
 192:4
 239:22

continues
 179:5

continuous
 87:24
 100:25

continuously
 95:14
 179:2

**contract**
  27:13

**contracts**
  257:18

**conversation**
  9:9 16:17
  18:3 21:4
  78:6
  219:16

**Cooper** 5:20

**coordinated**
  73:14

**Copied** 184:4

**copies**
  183:17
  184:2

**copy** 7:11
  259:19

**corner**
  134:22
  151:7

**corporate**
  5:4 8:8
  11:21
  170:15
  172:7
  173:5,11
  174:3
  192:17
  223:22

**corporation**
  7:9 11:6
  75:19
  186:18

  224:1
  258:13

**correct** 7:9,
  10 10:11,
  15,17
  11:6,8,9
  12:23 13:1
  14:12 19:3
  20:3,25
  21:5,19
  28:3 29:10
  32:7,14,
  18,20,21,
  23 33:14
  34:5,6
  35:4,16
  37:13
  40:14,15,
  24 41:23,
  24 49:3,4
  55:18,19
  56:2
  63:15,21
  64:10
  67:4,5
  69:6 70:14
  72:18
  74:12 79:5
  83:24,25
  86:23
  88:10,11
  91:20
  93:2,3,20
  94:5 96:21
  103:12,22,
  23 104:2,3
  111:3
  112:5,14,

  24 118:9,
  10 119:2,
  3,6,12
  121:17,18
  122:1,18
  123:5,20
  124:13,14
  128:3,8
  131:2
  132:5,8,
  13,14,19,
  20 134:19
  135:1,2
  136:8
  137:13
  142:1,2,
  14,15,23
  143:10,11,
  16,18,19
  144:9
  145:19,21
  157:14
  160:1
  163:1
  165:11,12,
  19 175:4,
  5,14
  176:22,24
  177:19
  181:24
  196:18,19
  199:6,16,
  22 201:11,
  12,25
  202:3
  207:8
  208:18,21,
  24,25

  209:2,4,8,
  9 210:7
  217:14,25
  230:21
  231:13
  234:4,7,
  24,25
  235:2,3
  241:11
  244:13,14
  245:23
  246:23
  248:7,8
  249:7,8
  250:23
  251:15,18
  256:15
  259:2

**corrective**
  150:9,13

**correctly**
  84:21

**correlate**
  97:12

**correspond**
  70:22
  251:2

**counsel** 5:13
  6:5,8,10
  9:9 15:21,
  24 41:15
  81:16
  157:9
  239:22

**counsel's**
  13:25

**counselor**
117:18
163:22
215:5
240:12

**count** 209:16
210:17
249:24,25

**counting**
217:7
249:24

**couple**
10:18,23
15:13,15
22:25
50:14
90:20
191:13
206:12
211:18
252:16

**court** 5:11,
15,24
34:4,18
65:19
169:25
171:13
196:5
216:23
235:25
240:1

**court's**
230:6

**covered**
141:14

**covers**
160:18

**COVID** 63:23

**crazy**
111:11,12

**created**
80:15

**crew** 15:3
16:3 17:24
18:20
20:25
21:23 22:7
33:4,7,8
37:1
38:21,25
44:8,19,24
45:9 46:3
49:10,19
76:6 78:15
79:4,5
80:8 86:22
92:21,22
93:6,12
94:1 95:1
97:6
103:25
108:12
113:11
114:16
115:4
116:13
117:2
125:23
131:23
132:17,25
133:10
135:18

137:18
138:2
139:18,20
141:7
149:15
150:25
159:14
180:20
258:7

**crew-wise**
137:17

**criteria**
248:22

**criticizing**
102:18

**cross** 8:10
14:13

**crucial**
102:15

**cruise** 7:6
79:3 92:12
102:2,7,9,
14 103:10,
19 104:7
111:16
112:1
135:5
142:21
146:3
188:16
233:22
234:17,20
252:1,2,6

**Cruises** 5:5,
6 10:25

**crystal**
164:5

**cups** 98:3

**current** 58:6

**cursor** 67:7
123:4
155:18,24,
25 158:16
160:24

**customer**
111:16
252:8

**cut** 65:14
120:11
241:3,10

**cute** 161:16

**cutting**
71:16

**Cádiz** 63:20
65:10

—————————

D

—————————

**D-I-N-E-S-H**
15:6

**daily** 104:10

**Dalton**
73:23,24,
25 74:11,
14,15,22

**damage** 68:4,
22 69:11,
14,15,17,
20 70:6

71:3

**damaged**
65:11
69:10

**damages**
71:11,17,
18

**dangerous**
40:9,22
42:3,13
43:4,6
238:20
240:14,16,
23 241:5
246:20

**dark** 67:8
68:7

**darker** 67:7,
13,15,22
68:7

**data** 190:23
192:21,25
233:18
254:3

**database**
183:22
248:1
250:22
255:16

**databases**
254:5,22
255:11
256:4
258:1

**date** 7:14

8:15 15:12
26:7 41:7,
8,10,15,17
42:11 62:4
63:4,25
76:5,7,9,
10,14
81:22
126:13
249:12
254:25
255:2

**Dated** 85:1

**dates** 73:6,
11 250:13
251:9

**day** 18:23
31:15 51:6
59:13
75:15
76:20 77:1
79:9,14,15
80:6,18
86:23
87:4,15
99:6
100:18
101:19
106:11
108:18
110:5
112:14
113:13
120:24
121:2
126:6
127:9

128:16,19,
24 129:6
154:5
183:11
184:19
197:7

**Dayo** 111:17

**days** 66:19
213:20

**death** 145:10

**debark**
145:10

**debris** 29:8
93:9

**December**
7:16 31:3,
5,11,12
48:15,22,
24 218:7,
10,18
219:8
220:24
227:6
243:1
244:11,19
246:2

**decide** 45:4

**decides**
45:13

**decision**
27:3,9
29:19
30:11,20
31:5,11,
13,15

33:1,3,7
44:9
146:14
147:2,7

**decisions**
27:5 47:9
255:21

**deck** 14:23
16:14
17:1,18,23
18:5,8,16,
23 19:19,
22,24,25
20:1,9,12,
14,18,23
21:16,17
23:6,10,
12,19,21,
23 24:1,2,
3,5,12,14,
16 25:10,
13,14,23
26:2,11,
12,18,19,
24 27:4,7,
22 28:5,14
29:7,18
30:3,13,23
31:6 32:6,
9,13
33:20,21
35:21,22
37:23 38:3
40:9,10,
21,23
42:2,4,7,
20 43:16,

20 44:4
45:20
46:4,6,18,
19,24 49:6
51:15,16,
18,20
53:23
54:9,11
55:18,25
56:6,14,
17,19 57:6
58:6
59:11,17,
18,20
64:7,8,10,
15 65:10
66:4,23
67:24
68:2,11
69:3,4,24
71:4
75:15,23,
25 77:1,6,
9,10
78:16,21
79:9,19
80:10
83:22
87:23,25
91:19,22
92:1,2,8,
10,11,14,
18,25
93:17,22,
23 94:3,
17,20,21
95:24
96:18 97:5

98:5,18
99:4
101:8,9
103:1
104:7,18,
20 105:5,
7,19
106:13
107:3,4,5,
13,16,18
108:13
109:19
112:4,18
113:7,8,13
114:7,11
115:6
116:13,17
119:17,21
120:4,15,
20 121:3
124:1,25
125:4,8,
11,25
127:6,9
135:5,7,11
147:14
155:9
157:7,13
159:14
178:9
199:13
200:5
201:2
202:25
203:8,10
210:10,25
217:20
220:17

230:8
232:7,10
233:4,8,9,
17,21
237:3,13,
17,20
238:7,18
241:19
243:14
248:5,8,21
249:5,17
254:7
255:21
258:11

**decks** 25:8,
9,12 27:16
29:8 35:25
36:3 83:23
94:8,9
101:11
233:8
236:16
237:2

**dedicated**
107:2

**deem** 144:3
147:9
206:3,5
224:1

**deemed**
143:20
147:10
206:2

**Defendant**
5:19 6:12
12:1

254:23
255:11

**Defendant's**
33:13
34:19

**defer** 21:14

**define** 58:25

**defined**
145:9

**definition**
61:16
143:12
145:5,7
219:22
220:22

**delete** 167:4
169:15
193:9

**deleted**
81:10
167:11
168:16,18
169:22
193:6,12
194:6

**deleting**
167:7
169:10

**delved** 81:7

**denial** 38:10

**denied**
185:21

**dented**
65:14,15

dents 68:4,
22 69:17,
19 71:12,
21 221:2

deny 38:5,
9,16
145:14
166:4
173:23

department
11:19
26:24
42:23
44:22 47:7
75:2 116:7
196:16

departments
30:15,19
44:21
235:14
259:4

departure
119:2

depends
235:14
241:13
259:4

depict 13:6
14:20
85:17

depicts
135:4

deployment
105:5

depose

105:17

deposed 12:9
207:12

deposition
5:3,9 7:4,
20,22
8:16,21
9:5,10
11:2,24
14:2 15:12
19:11,12
21:2,7,10
22:10 36:7
74:20,23
77:7 79:16
81:1
88:14,15,
20,22
89:20
101:2
105:24
109:17
128:2
129:8
152:13
157:24
162:2
170:16
172:4
173:2,20
187:8
192:3
193:15
194:4
195:19
196:2
200:22

205:12
210:18
211:23
212:22
213:13
219:5,14,
17 220:3
223:4
247:2
259:12,21

depositions
8:8 12:8
141:15
147:25

describe
13:3 24:19
101:14
177:9
191:16

description
95:20

designated
74:14,16,
17

desk 30:1
44:10 95:6
254:8

desktop
89:12
215:6

details
140:15

determination
146:19,23,
24

determine
26:10
72:13
124:20
128:15
148:12
175:7
202:22
204:6
207:13
208:12
242:12,22

determined
142:19,25
143:2
144:6
219:23

diagonally
130:23
155:7

diagram 32:4

difference
192:24
218:11
222:25
223:7

differences
222:20
223:9
224:18
229:16

differentiate
251:5

differently
198:15

Case 1:20-cv-25271-JB   Document 49-1   Entered on FLSD Docket 04/12/2022   Page 285 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: difficult..document

224:1

**difficult**
195:4

**Dinesh** 15:6
21:22,23,
24 22:2,3
131:10,17
138:15
141:15
151:20,21,
25 160:11
166:1,9
169:13,21
180:19
183:10
184:21
185:4
192:10
193:9
195:7
199:6
203:19
206:1

**Dinesh's**
131:14
186:16
192:11

**dings** 71:13,
21

**DIRECT** 6:21

**directed**
9:10 16:5

**directly**
107:22
177:12

**director**
9:25 10:20
11:14,16
42:22 84:3
101:17

**dirt** 69:19,
20

**dirty** 28:22
29:3,9
45:5 69:5
98:3

**disagree**
42:6 92:15
104:15
110:15
126:12
128:20
164:21,23
180:4,10
194:13
200:6

**disappear**
199:22
201:14

**disappears**
200:5

**disclosed**
71:25
230:6
231:12
234:1
236:12,22
250:18

**disclosure**
8:24 9:11

**discolored**
28:21

**discovery**
11:25 12:3
14:19

**discretion**
101:16

**discuss**
37:4,12
44:18 46:8
47:8,12
50:21
74:23
222:1,3
256:6

**discussed**
40:6 47:4,
13 49:21
50:16,22
141:16
235:7
258:18

**discussing**
115:16
173:19

**discussions**
44:22

**disembark**
118:15
143:23

**disembarked**
145:15,16
146:1,16,
25 147:8

**disembarking**

146:2

**dismissed**
171:13,15,
22

**displeasing**
29:6

**dispute** 36:2
37:20
184:8
187:16,17
205:20
217:5
221:6
222:2
224:2

**disputing**
206:2

**disrespectful**
147:23

**distinguish**
251:5

**district**
169:25

**doctor**
143:3,20
144:3,6,11
145:1,24
146:7,18,
19,23
206:4

**document**
38:23
76:17 81:2
83:20
84:1,10

85:12
86:21 87:9
116:14
215:10
216:18
248:6
251:4,13
254:24
255:11
258:1

documentation
8:17
64:12,13,
16,22
69:22
181:22
183:24
203:11,14
204:10,18,
24 207:5
252:12

documented
221:7
230:20
236:14
248:18
250:18
254:4

documents
12:7 16:20
39:20 70:2
75:9 205:4
216:13,14,
17 248:7
253:12
255:1
256:6

door   199:21
200:8,9,25
201:10,18

doors
199:13,14,
15,18,19,
22 200:4,5
201:1,4,
13,14,24
202:3,6,7

double-check
230:24

doubled
249:11

doubt   80:13
111:21
193:12

Drahos   5:18
6:12 8:1
9:8 14:10
15:19,23
16:2 20:5
28:18
29:11
31:10
32:19,25
33:24
35:23 36:5
37:24 38:8
41:10
42:10
43:1,21
44:12 47:1
48:10,21
49:8 53:17
54:23

56:8,22
57:8,16
58:19 59:7
61:21
62:2,5,7,
14,17,19,
21,25
64:18
67:25
68:15 69:7
70:1,13
71:10
72:1,19
76:2 78:23
79:22
80:12
81:6,24
82:24
85:7,19
86:8,24
87:11
88:2,24
89:1 91:7,
21 92:4,7
94:11,23
96:3,22
97:8,19
98:25
99:16
100:6
101:13
102:5
103:7
104:11,16,
24 106:20
107:9
108:16
109:8,23

110:6
112:6,25
113:9
114:9
115:13
117:16,20
118:17
119:7,13
120:16,23
121:21
122:2
123:21
125:2,14,
18 126:2,
10,19,25
127:7,20
128:13
129:11
131:9
133:2,7,12
135:22
136:4,9,
14,17,20
137:24
138:8
139:2
141:13
142:24
143:17
144:1,10
145:4,20
146:5,21
147:4,17
148:4,19
149:19
150:12
152:7
153:17

154:10
155:14
157:3,15
158:10,21
159:4,15,
22 160:2,
23 161:9,
18 162:11
163:2,7,17
164:14,16,
18 165:4
166:11,19
167:5,13,
22 169:3
170:3,8,
13,24
171:11
172:3,7,
10,16,17,
19,21,23
173:5
174:1,3
175:15,25
176:23
177:4,20
178:15
179:20
180:2,8,12
181:4,25
182:14,25
183:8
185:9,15
186:5,13
187:18,25
188:8,11,
18 189:4,7
190:2
191:1,20,

25 192:4,
23 193:24
194:16,21
195:3,9,24
197:9,14
198:23
199:10,23
200:7
201:16
202:4,19
203:13,22
204:4,12
205:2,14,
24 206:10,
18 207:1,9
208:4
209:12,20
210:9,16
211:1,12,
20,25
212:3,8,
15,23,25
213:2,7,16
214:9
215:11,14,
18 216:4
217:6
218:2,16
219:4,15
220:1,9
221:10,18
222:23
223:10,13,
15,18,21,
25 224:5,
10,21
225:1,4,8,
11,19

227:11,13,
23 228:9,
21 229:3,
10,16,21
230:11,23
231:14,18,
22 232:8,
23 233:6,
15 234:5,
14 235:23
236:17
237:5
238:8,21
239:1,4,6,
8,10,14,19
240:17,24
241:12
242:10,20
243:6
244:4
245:21
246:9,21
249:9,19,
22 253:18
254:9,13
255:4,13,
24 257:4,
21 258:16,
24 259:9,
20

**drain** 67:9
207:18,19

**drawn** 162:9

**dried** 159:23
160:1

**drink** 19:20
93:16

98:24
112:7,10,
13,16
149:9
152:4

**drinking**
112:21

**drinks** 20:24
98:19 99:3
109:20
112:4,21
113:4
115:1

**drive** 184:4

**drowned**
132:4

**dry** 19:20
52:25
78:22
100:4

**dry-dock**
22:23
52:8,10
53:2,4,6,
7,13 54:2,
5,9 63:18,
19 65:9
68:5 69:9,
15,21
228:7

**due** 26:18
40:10,22
42:3 65:11
68:8,18
70:24

111:25
118:13
175:6
190:10
197:5

**duly** 6:20

**duplicate**
250:6

**duplicative**
9:14

**duties**
11:15,17
17:17
86:19
95:17,18,
21,22
97:25 98:6
99:3
103:21
104:4
105:8

**duty** 79:13
80:5 98:5,
12 238:2

───────────
        **E**
───────────

**earlier** 8:14
15:12
59:12
79:21 89:6
113:22
157:11
205:9
226:16
232:21

246:13

**easier** 13:8
34:14

**easily** 196:2

**easy** 103:19
156:14
157:21

**eating**
130:19

**education**
102:18

**effect**
118:14
254:25
255:2

**effort**
140:12
141:10

**efforts**
77:12,21
139:22
149:13
182:22
196:22
242:16
258:9

**egregiously**
231:19

**electronic**
76:23
82:12

**electronically**
76:17
80:22,24

81:2,4
252:13

**electronics**
189:13

**email** 81:13
169:16
183:10
184:21
203:20
251:25
252:10

**emails** 45:9
54:12
55:5,6
81:8
242:23

**emergency**
145:10

**employed**
10:6,8

**employees**
47:6 94:16
108:4
115:22

**employment**
9:24
116:10

**EN** 251:17

**Enchantment**
9:1 17:7
22:22
27:7,23
28:14
30:24 31:7
33:20

36:12 38:5
40:13 48:8
49:24
53:12,22
56:15,17
58:17
59:10
61:17
63:25 64:4
65:7 66:5,
23 79:7
82:1 83:23
85:5,14,
23,25 87:1
102:3
104:1
128:19
134:10,12,
17 135:6
197:6
202:17,25
208:1,6,
17,23
209:11,15
213:6,19
216:25
217:3,8,
13,14,22
218:9,10,
25 219:2,
9,20
222:8,17,
19 225:15,
17 226:6
228:14,17
229:1,17
230:8,16,
20 231:1

233:5
237:3,17
241:23
242:6
246:15
248:2,20
249:17
251:8,14
254:8
258:12

**enclosed**
187:22
188:15

**encompass**
24:21
31:22

**encompassed**
25:3 32:4
64:11
72:25

**encompasses**
100:12

**encompassment**
95:21

**encouraged**
139:15

**end**  53:22
56:13
57:14,17
63:18
86:12 92:3
163:22
222:18

**ends**  155:20
259:14

**enforce**
94:22 95:2

**enforced**
115:9

**ensure**  35:8
46:23 48:4
50:10
78:21
245:19
246:7

**entered**
201:2

**entire**  17:21
20:20
24:5,13,15
31:8
54:14,16
60:10
93:22
100:12,15,
20 121:1,3
226:2
229:19

**entirety**
19:24
23:22

**entitled**
61:25
212:11
224:6

**entries**
250:13

**entry**  111:22

**environment**
28:12,14

**epitome**
188:19

**equipment**
49:15
50:19

**escalations**
111:15

**essentially**
17:9 28:1
39:8 47:5
50:25 85:3
92:2
105:22
116:8
234:12

**establish**
188:13

**esthetically**
29:4 30:25
44:11 45:6
71:20

**evaluate**
46:4,22
50:9
180:18
232:5
245:16

**evaluates**
255:20

**evaluating**
37:21
255:10

**event**  94:10
98:23
119:21

202:2

**events**  140:1
149:17

**eventually**
143:25

**evidence**
170:1
173:24
182:4,7
246:18

**evidenced**
246:19

**exact**  31:2
86:16
97:25
152:2
164:12
166:2
171:1
178:25
239:4

**EXAMINATION**
6:21

**exception**
210:22

**excluding**
21:17

**excuse**  14:3
33:17
88:14
122:1
123:7
159:25
185:1
210:4,21

**executive**
15:16
17:3,4,5,
7,10 78:1
84:2 96:17
101:17,22,
23,24
103:9,18,
22 105:12
106:24
107:22
108:1,5,8,
10 109:4

**exercise**
212:9

**exercising**
130:4

**exhibit**
8:22,23
9:5,6
14:2,3,8,
14 34:5,7,
11,12,13,
16,17
39:19,22
65:18,19,
21,22,24
66:10
69:24 70:9
84:13,14,
16,23,24
88:13,14,
17,19,21,
22,24
89:6,11,

251:20
253:8

17,25
90:6,10
122:9,10,
12,16,17,
22,23
128:1,2,5,
8 133:21,
22,23,24,
25 134:2,3
152:13,14,
18,21
157:24,25
158:5
160:15
162:2,3,6,
22,25
163:11
164:2
165:2
174:13,15,
16 184:17
187:2,3,4,
8,9,10
199:1,3
200:15,16,
17,18,22
201:19,22
202:10,11
214:18,19,
20,24
234:2
247:2,8,
12,14
251:11

**exhibiting**
144:8

**exhibits**

8:23

**existed**
225:17

**existing**
58:1

**exiting**
201:2,5

**expect**
101:22
179:10
222:13

**experience**
102:7,25
103:11,15,
17

**expert**  62:8,
12,15,23
66:7 72:11
73:2,7,8,
10 118:18,
21 223:11,
21 224:2
226:7

**expertise**
21:6 62:22

**expire**
257:18

**explain**  28:4
60:16
62:19
168:2
182:9
186:19,22
188:20
190:5

250:12,16

**explained**
67:11 77:7
79:20
83:20,21
101:9
114:1
214:8
224:10
229:17

**explanation**
78:12,13
124:23
129:20
186:16
189:21
191:19
192:11,20
194:8

**explanations**
191:13,21

**express**
117:1

**extends**  20:2

**extensive**
71:3

**extent**  71:11

**external**
184:4

**extra**  68:13
101:19

**extremely**
18:3

**eyes**  161:19

200:3

**eyewitness**
16:3
139:14,20
140:20
141:5

**eyewitnesses**
140:10

**eyewitnesss**
140:1

---

**F**

---

**facilities**
18:19,20
21:9 96:9
107:23
108:2,3

**facility**
143:1

**fact** 26:11
27:16
43:14
46:24
50:11
51:25
56:19
68:10
70:10 71:6
73:1 78:20
79:18 80:7
87:7 91:19
96:13
98:17
102:18
105:3

106:8,10
108:13
111:25
112:3,18
115:10
116:15
118:24
124:22
148:5
153:12
164:23
165:14
181:21
194:13
202:24
222:21
225:14
238:16

**facts** 130:14
131:4
225:2

**factually**
232:3

**fair** 42:25
60:4

**fairly** 24:12
135:4

**fall** 12:23
26:12
35:11
46:23
47:11
48:9,11,14
49:3 59:11
61:18
90:17 91:4

92:20
97:17
113:17
129:22
130:4,6
131:19
132:24
135:21
136:2
138:22,25
140:3,11,
14,20
141:1,5,25
142:12,20,
21 143:2
149:16,17
150:3,10,
14 153:18,
25 155:4
156:17,18,
19 161:7
162:14,16,
17,19
163:15
165:10,18,
22 166:3,
12,13
167:2
168:22
175:4
176:20
184:18,19
201:3
202:16,22,
25 203:5
205:25
207:7,13,
19,24

208:3
211:3
222:9,13
234:10
237:13
238:12
243:14

**fallen**
130:13
177:23
202:16
203:6
246:14

**falling**
237:13,23,
25

**falls** 35:21,
25 36:3
37:22 38:4
42:8,24
43:17,20
46:5 50:23
56:1 96:2
98:22
112:19
113:7
114:13
194:15
203:9
209:10,13,
14 210:5,
12,21,24
212:13,18
213:5,9
214:7
216:24
217:3,9,

16,17,19
221:7,8
226:9,11
230:16
232:3,9
235:5
236:23
238:7,17
248:2,5,19
252:22
254:4

**familiar**
25:1 33:13
36:11,14
74:17 94:2
121:16
144:20
148:24

**fashion**
221:17

**fast-forward**
154:24

**faster** 137:4

**fault** 238:7,
13

**faulty** 166:6

**feed** 14:21
155:6

**feedback**
252:1

**feeds** 14:20

**feel** 49:20
50:1 85:15
101:18

**feet** 20:12
24:23
31:24 64:6
123:20,22
130:24

**fell** 25:2,
6,24 32:2
53:15
59:12
64:10 65:5
67:1 72:16
75:15
78:17
79:16
91:6,14
95:16 98:1
114:2
121:16,19
123:20,25
124:4,8
129:17,18,
21,24
131:24
132:13
137:12
139:24
141:12
142:13
147:15
150:21,23
153:16,20,
25 155:17
156:8
157:1
160:21
162:14,18
165:23
169:22

170:21
177:3
182:24
192:13
198:2
199:9
203:17,21
204:16
205:18,22
225:18
237:16
238:12
245:18

**felt** 143:23

**figure** 76:10
109:21
211:7
235:22
254:7

**figured**
107:15

**figures**
246:15

**figuring**
150:2

**file** 74:25

**filed** 7:4
11:2 33:14

**fill** 140:7
148:9
234:23

**find** 8:15
9:1 27:12
51:8 73:17
74:1,8

97:11,23
128:2
136:7
141:7
147:13,15
149:15
196:1,2
198:12
247:1
249:4

**fine** 60:17

**finish** 147:4
172:23
220:11
223:18
232:22,25

**firm** 105:23
211:9
258:13

**five-minute**
82:21
239:21

**fix** 47:10
106:16
241:11

**fixed** 19:22
47:19
186:23
188:16

**floor** 29:21
33:19
35:1,8
44:3 45:3
48:4,6,8,
17,20 49:1

| | | | |
|---|---|---|---|
| 50:9,11, | **flooring** | **footage** | 33:24 |
| 19,25 | 49:18 | 12:10 64:5 | 35:23 36:5 |
| 51:4,5,14, | 57:17 | 88:6,12 | 37:24 38:8 |
| 15 53:23 | 62:8,12, | 89:22 | 42:10 |
| 55:18 | 13,25 | 90:16 91:3 | 43:1,21 |
| 57:21,23, | 63:12 | 97:14 | 44:12 47:1 |
| 25 58:1,2, | 70:17 | 130:22 | 48:10,21 |
| 13,15,16 | 71:13 | 132:11 | 49:8 53:17 |
| 59:10,15, | 218:19 | 156:12,24 | 54:23 |
| 18,22 | 219:9,13 | 161:6 | 56:8,22 |
| 61:14,17 | 222:10,17 | 165:14,19, | 57:8,16 |
| 62:3 63:3, | 223:1,2,8 | 20,22 | 58:19 |
| 7,9 64:3, | 226:5,8,10 | 166:15 | 61:22 |
| 15 65:4,5, | 227:2,9, | 168:22 | 64:18 |
| 12,14 66:4 | 21,25 | 170:23 | 67:25 |
| 69:1 71:6 | 228:5,13, | 174:10 | 68:15 69:7 |
| 93:9 98:6 | 15,18,24, | 178:10 | 70:1,13 |
| 100:2 | 25 229:17 | 179:6 | 71:10 |
| 137:2,3 | 237:19 | 183:18 | 72:1,19 |
| 153:13 | 243:19,24 | 184:2,16, | 76:2 78:23 |
| 155:8 | 244:17 | 17 193:13 | 79:22 |
| 156:25 | | 194:13 | 80:12 |
| 167:25 | **floorings** | 197:5 | 81:6,24 |
| 199:5 | 219:7 | 198:1 | 85:7,19 |
| 210:7 | | | 86:8,16, |
| 218:12 | **floors**  246:6 | **footages** | 24,25 |
| 219:18,23 | 252:23 | 132:11 | 87:11 88:2 |
| 224:14,15 | **focus**  38:19 | **forget**  23:11 | 91:7,21 |
| 225:14,17, | | 25:15 | 92:4,7 |
| 24 226:2, | **fog**  118:13, | 31:17 74:7 | 94:11,23 |
| 3,5,11,12 | 14 119:5, | 133:13 | 96:3,22 |
| 227:5 | 9,11,12, | 166:2 | 97:8,19 |
| 242:6 | 14,15,21, | | 98:25 |
| 244:3,10, | 24,25 | **form**  8:1,24 | 99:16 |
| 13 245:14, | **folks**  239:23 | 15:19 20:5 | 100:6 |
| 17 246:2, | | 28:18 | 101:13 |
| 11 248:23 | **follow**  94:2 | 29:11 | 102:5 |
| 249:2 | 200:13 | 31:10 | 103:7 |
| | 212:4 | 32:19,25 | |

| | | | |
|---|---|---|---|
| 104:11,16 | 152:7 | 200:7 | 243:6 |
| 106:20 | 153:17 | 201:16 | 244:4 |
| 107:9 | 155:14 | 202:4,19 | 245:21 |
| 108:16 | 157:3,15 | 203:13,22 | 246:9,21 |
| 109:8,23 | 158:10,21 | 204:4,12 | 249:9,19 |
| 110:6 | 159:4,15, | 205:2,14, | 253:18 |
| 112:6,25 | 22 160:2, | 24 206:10, | 254:9 |
| 113:9 | 23 161:9, | 18 207:1,9 | 255:13,24 |
| 114:9 | 18 162:11 | 208:4 | 257:21 |
| 115:13 | 163:2,7 | 209:12,20 | 258:16,24 |
| 118:17 | 164:14 | 210:9,16 | |

**formal** 32:16
   35:7 43:18
   244:2

| | | | |
|---|---|---|---|
| 119:7,13 | 165:4 | 211:1,12 | |
| 120:16,23 | 166:11,19 | 213:7,16 | |
| 121:21 | 167:5,13, | 214:9 | |

**format** 77:2
   86:3
   253:16

| | | | |
|---|---|---|---|
| 122:2 | 22 169:3 | 215:11,12 | |
| 123:21 | 170:3,24 | 217:6 | |
| 125:2,14 | 174:1 | 218:2,16 | |

**forms** 119:21

| | | | |
|---|---|---|---|
| 126:2,10, | 175:15,25 | 219:4,15 | |
| 19,25 | 176:23 | 220:1 | |

**forward** 59:2
   148:8
   149:22

| | | | |
|---|---|---|---|
| 127:7,20 | 177:4,20 | 221:10,18 | |
| 128:13 | 178:15 | 222:23 | |
| 129:11,14 | 179:20 | 223:10,16 | |

**found** 65:1,2
   117:13
   171:14
   186:16

| | | | |
|---|---|---|---|
| 131:9 | 180:2,8,12 | 225:19 | |
| 133:2,7 | 181:4,25 | 227:11,23 | |
| 135:22 | 182:14,25 | 228:9,21 | |
| 136:4,9 | 183:8 | 229:3 | |

**four-year**
   102:12

| | | | |
|---|---|---|---|
| 137:24 | 185:9,15 | 230:11,23 | |
| 138:8 | 186:5,13 | 231:14 | |
| 141:13 | 187:18,25 | 232:8 | |

**fourth** 7:19
   156:1

| | | | |
|---|---|---|---|
| 142:24 | 189:4 | 233:6,15 | |
| 143:17 | 190:2 | 234:5,14 | |

**fractional**
   213:25

| | | | |
|---|---|---|---|
| 144:1,10 | 191:1,20, | 236:17 | |
| 145:4,20 | 24 192:23 | 237:5 | |
| 146:5,21 | 193:24 | 238:8,21 | |

**frame** 36:8
   54:22 98:9
   184:24
   185:11,12

| | | | |
|---|---|---|---|
| 147:17 | 194:16 | 239:5,12 | |
| 148:4,19 | 195:9,24 | 240:17,24 | |
| 149:19 | 198:23 | 241:12 | |
| 150:12 | 199:10,23 | 242:10,20 | |

**frankly**
  189:21
  191:14

**free**  85:15

**frequency**
  32:17
  45:17
  246:6

**frequent**
  35:20 38:4
  42:8 75:25
  98:22
  103:5
  112:19

**frequented**
  103:2

**frequently**
  47:18

**friction**
  243:20
  244:8

**front**  121:25
  122:4
  178:3
  242:2

**frozen**
  257:3,4,6

**fully**  128:18

**funny**  60:1

**Future**  23:24
  25:9,13
  52:21
  59:18
  68:21

219:19
220:17
243:16

_____

**G**
_____

**Galveston**
  118:9
  143:10
  204:15

**gave**  173:11

**general**  18:1
  46:16
  49:17
  50:20
  54:25
  70:21
  87:2,13
  95:15
  113:13
  114:11
  121:16
  124:4,15
  127:10
  199:12

**generally**
  36:16
  66:22
  85:16
  86:17
  112:24
  165:2

**generated**
  209:8

**gentleman**
  134:23

**Gerson**  5:16
  6:11,22
  8:3,5
  9:16,21
  13:24
  14:16,17
  15:22,25
  16:11 20:7
  31:25
  34:1,4,9
  36:1,10
  38:1,11
  39:24
  41:12
  42:17
  43:11,24
  45:1
  48:12,23
  49:23
  53:19
  56:10
  57:3,11,20
  58:21
  59:8,21
  60:21
  61:24
  62:6,11,
  15,18,20,
  24 63:1
  64:24
  65:19,22
  66:1
  67:17,20
  68:25
  70:7,18
  71:22
  72:5,21
  76:11 79:2

80:1,19
81:17
82:6,20
83:6,9,16,
17 84:14,
18 85:10
86:2,11,13
87:5,19
88:5,16,21
89:4 90:8
91:10,24
92:5 94:15
95:9 96:12
97:13
98:15
99:10,22
100:21
101:21
102:16
103:20
104:14,21
105:1
106:25
107:11
109:12
110:3,7
112:9
113:5,21
115:7
116:11
118:4,23
119:10,16
120:18,25
121:24
122:7,11,
14,17,19,
20 123:24
125:5,16,

20 126:7,
15,22
127:3,17,
22 128:17
129:13
131:13
133:5,9,
16,21,23
134:5,14
135:25
136:6,13,
15,18,23
137:6
138:4,11
141:23
143:5,21
144:5,18
145:13
146:13
147:5,21
148:14,21
149:25
150:15
152:11,14,
16,20
153:19
154:20,25
155:21
156:23
157:4,18
158:2,15
159:1,8,
18,24
160:4
161:4,23
162:5,20
163:9,19,
24,25

164:20
165:6
166:14,24
167:9,14
168:19
169:23
170:6,9,
11,20
171:4,23
172:6,8,
15,18,20,
22 173:4,
9,15,22
174:9,14,
17,20
175:17
176:5,25
177:8,22
178:16
179:2,22
180:3,9,15
181:7
182:2,21
183:2
185:13
186:1,11,
15 187:2,
6,15,20
188:3,6,
13,20
189:1,16
190:17
191:23
192:2,7,8
193:4
194:2,20
195:2,5,
13,25

197:12,15,
23 198:25
200:2,12,
15,20
201:21
202:9,12,
14,20
203:18,25
204:9,17
205:8,16
206:13,21
207:4,16
209:24
210:13,19
211:5,14,
24 212:1,
7,11,20
213:4,14
214:2,18,
22 215:7,
12,16,22
216:6
217:11
218:4,20
219:11
220:2,4
221:5,14,
20,23
223:5,12,
14,16,20,
24 224:4,
6,11,24
225:2,5,9,
12 226:14,
18 227:16
228:10,23
229:4,11,
20,22

230:18
231:2,16,
20,23
232:9,12,
24 233:19
234:21
236:9,18
237:9
238:15,24
239:3,5,7,
9,12,17
240:3,8,
13,21
242:15
243:2,10
244:9
245:3,13,
24 246:12,
24 247:2,
5,7,10
249:13,20
250:1
253:21
254:15,19
255:6,18
257:8,23
258:20
259:1,7,18

give  34:2
65:22 74:3
111:7
122:7
128:5
148:10
163:24
173:18
187:1
198:12

Case 1:20-cv-25271-JB Document 49-1 Entered on FLSD Docket 04/12/2022 Page 297 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: giving..happening

216:8
225:4
237:6
244:22,24
247:1

**giving** 7:3,4

**glass** 93:16
152:5,6,8,
9 153:6,7,
15 199:15,
18,19,21,
24,25
200:8,9,
10,25
201:1

**Global**
195:11,14
196:16

**God** 188:1

**good** 5:2,23
6:23,24
26:20
28:20
29:15,16,
19 69:18
83:15
94:21
144:14
154:9
163:21

**GR197** 183:25

**GR784** 216:7

**GR793** 247:14

**graininess**
176:8

**grainy** 13:5,
8 175:19
177:12

**grand** 220:16

**Grandeur**
208:17,22
217:21

**grease** 29:7

**great** 82:18

**ground** 106:5
166:17
169:1

**group** 37:3

**guess** 15:2
36:25
42:12 61:6
66:7 69:20
72:4 87:12
88:16
94:12 97:9
105:16
108:11
112:7
113:3
124:12
130:10
159:17
166:1,6
177:11
182:10
189:2
250:2
254:2

**guest** 9:25
11:16,18,

20 15:8
22:3,4
75:3
131:15
139:25
151:17
205:17
234:15,19
247:22
251:23

**guest-related**
11:22

**guests** 29:13
108:25
140:16

**guys** 60:18,
19 172:12,
13 188:9
197:12
212:24
225:6,7
239:20
244:24

————————

**H**

————————

**half** 8:15
68:24
136:11

**hallway** 94:4

**hand** 6:14
130:19

**handful**
210:23

**handled**
11:19

184:3

**hang** 90:4

**happen** 15:12
35:25
37:1,4,12
45:15 53:4
88:1 113:4
140:3
156:19
168:14
176:20
193:21
237:8
241:17
242:4
250:7
253:19

**happened**
54:9 78:14
129:10
131:7
138:5
147:16
163:13
165:24
168:23,25
169:6,11,
18 176:21
191:5,16,
17 218:9
237:8
241:20
250:14,15

**happening**
61:3
140:19

happy 148:9
  154:6
  176:7

harassing
  194:18,20
  195:1

hard 191:14
  240:18

harm 92:20

hazards
  75:24
  106:13

head 31:23
  96:4,14,25
  105:15,20
  106:2,6,
  17,21
  107:10,14,
  23 110:24
  111:2,3,
  10,13
  116:21
  143:4
  200:4
  205:18,23

heads 42:23
  47:7

hear 83:7,
  11 86:11
  117:15,18,
  20,21,22
  142:6
  157:8
  196:12
  203:2
  244:24

heard 189:9
  196:9,10

hearing
  105:24
  154:11
  196:11
  225:25
  227:1
  258:19
  259:10

held 10:2,4
  40:12 47:3
  50:20
  65:13
  69:16

hey 60:18
  106:12
  107:16
  172:12
  188:9
  212:24
  225:6
  235:16

high 45:17
  96:1 103:4
  168:7

high-traffic
  43:19
  91:19
  103:2
  233:8,11

higher 49:21

highlight
  251:8

highly 80:13

hire 115:23

hired 127:16

hires 115:18

hold 49:25
  83:6 98:14
  216:9
  239:23

holding
  130:19

home 16:18

honestly
  76:21

hope 188:24

hoping
  188:22

hospital
  143:7,10,
  11,24
  144:15
  146:9
  203:16
  204:15
  206:14,23

hotel 42:22
  84:3
  101:17

hour 8:15
  136:12

hours 125:12
  171:20
  231:18

house 105:13

housekeeper

15:16
  17:3,4,5,
  7,10 78:1
  84:3 96:17
  101:17,23,
  24 103:9,
  18,22
  105:12
  106:24
  107:22
  108:1,5,9,
  10 109:5

housekeeping
  46:20
  79:20
  96:16

hovering
  150:2
  178:4,7
  182:23

hundreds
  9:17

hurt 237:15

hurting
  205:18

husband
  111:23
  141:21
  156:14
  166:23
  203:24
  204:7,8
  205:4,6
  206:1
  207:11

Huseby 5:12

hypothetical
  95:2

---
**I**
---

idea 9:18
  61:13
  78:19
  79:18
  233:2

ideally
  168:2

identical
  218:14

identification
  9:7 14:15
  34:8 39:23
  65:25
  84:17 90:7
  122:13
  134:4
  152:19
  158:1
  162:4
  187:5
  200:19
  201:20
  214:21
  247:9

identified
  34:16
  41:21,22
  50:24
  77:11 80:5
  87:8 88:3,

4 89:6
100:23
107:7
110:22
139:25
140:20
141:3,4,20
148:7
213:8
217:20
223:23
249:15

identify
  18:6,12,13
  39:11 41:1
  75:20 76:8
  77:5,22
  78:14
  87:22 91:5
  94:10
  97:18
  99:25
  100:4,8
  109:7,11,
  13,24
  110:1
  125:19,22
  126:1,4
  140:23
  141:10,21
  149:14
  182:23
  196:24
  210:14
  211:8
  213:6
  216:24
  248:14,17

identifying
  90:4
  248:11

identity
  86:4

III 111:17

immediately
  45:15 93:8
  150:10,14

imply 64:21

important
  37:20,25
  60:21
  190:1

impossible
  108:25
  113:16

impressions
  15:20,24
  16:4

improper
  172:24

improve
  27:17

in-depth
  76:22

in-house
  10:25

in-take
  207:3

incident
  13:6,11
  14:21 15:9

16:15 17:6
22:5 24:9
41:19 62:4
63:4 76:5,
7,9,15
81:22,23
90:14 91:9
111:20
126:14
127:9
130:21
131:11
139:6,10,
15,21
140:2
141:9
145:9
148:13
149:23,24
150:5
157:14
160:7,9,
14,16
161:3,5,
10,12,15,
17,20
162:13
166:7
168:8
171:19
185:20,25
204:8
205:7
206:3
213:10
230:2,3,17
237:7
241:20

248:3,21
250:3,5
254:4,25
255:2

**incidents**
37:4,17,22
45:11,16
46:23
210:24
211:2
221:16,25
222:14
223:7
224:8,20
225:3
230:3,5,21
231:11
233:14
234:1,3
236:12,21,
23 246:19
248:17
250:17,19
253:15,19
254:1
255:16
258:10

**inclement**
119:22

**include**
12:2,12
210:12

**included**
20:15 64:9
75:18
242:24

**includes**
61:13
85:18

**including**
20:13
78:16
96:19
221:7
254:22

**incorrect**
85:15
93:21

**increase**
45:10 56:1

**independent**
16:8

**Indiscernible**
15:22
125:21

**individual**
168:11
241:20

**inferred**
203:4

**infirmary**
142:16,20
202:24
209:7
234:4,11,
23

**influx**  96:6

**inform**  129:4

**information**
22:9 23:8

25:16
45:8,10
50:17 63:2
76:25 77:3
85:18
129:7
140:25
148:10
192:18
195:1
225:3
229:24
235:9,11
248:11
253:10
255:19
257:16,19,
22 258:25
259:4,5

**informed**
30:2

**initial**
29:23
185:4

**injured**
18:23 35:3
118:7
143:14
202:16,24

**injuries**
93:20
145:7
254:22,24
255:12
256:22
257:11
258:2

**injury**  14:5
74:12
140:22
142:23
143:4,15,
16,20
144:4,9,
12,17,19,
21,23,24,
25 145:3,
8,18
146:11,17
147:9,10,
11 170:1
172:2
173:25
184:5
205:22
234:24
235:1
255:16
256:4,17
258:6

**inquire**
77:15

**inquiry**
170:4
173:2,8
224:22
225:21
227:13,24
233:13
249:16
255:9

**insert**
172:25

| | | | |
|---|---|---|---|
| **insinuate** 168:15 169:6,8 | **intentions** 73:2 | **interval** 49:2 | 21 207:14 256:2,21 |
| **insinuates** 119:11 | **interfere** 192:1 | **interview** 139:23 | **investigations** 140:22 254:21 256:3,17 257:11,25 258:6 |
| **inspect** 70:11 73:3 100:2 | **interference** 155:9 | **interviewed** 139:8 140:4,6 | |
| **inspecting** 49:6 94:9 | **interior** 21:17 | **investigate** 131:7 138:7,9,10 161:15,17 227:8 | **investigator** 161:25 |
| **inspection** 66:18 72:4 134:17 220:19 | **internal** 204:24 205:3 206:6 254:22 255:16 256:4 258:1 | | **involved** 15:2 43:7 82:17 141:17 210:24 211:3 232:10 |
| **inspections** 34:25 | | **investigating** 198:19 | |
| **installation** 29:23 | **interpreting** 61:6 | **investigation** 9:2 13:18, 21 14:5 36:12,19, 23,25 37:7 38:18,19 74:5 131:20 138:16 139:5,9 140:19 141:18 147:18 150:5 160:7 163:13 164:25 183:18 184:3,6 203:19 204:2,3,5, 7 205:10, | **involvement** 16:8 |
| **installed** 52:15 | **interrogatories** 12:5 33:13,25 34:20 111:9 243:11 253:13 | | **involves** 85:13 |
| **instances** 212:5 | | | **involving** 63:4 81:20,23 170:21 237:7 |
| **instruct** 172:8 | **interrogatory** 33:22 | | **irrelevant** 102:21 |
| **instructing** 15:25 212:1,3 | **interrupt** 224:12 235:18 239:6,8 244:21 | | **ISM** 74:18 |
| **instruction** 192:2 | | | **issue** 47:24 49:11,18 89:9 146:4 163:23 180:17 190:1,23 |
| **intended** 48:25 | | | |
| **intentionally** 168:16 | **interrupting** 82:3 | | |

194:5
196:11,18
237:1,18
242:7

**issues** 26:24
37:21 47:9
50:21
55:17
236:16
253:17
258:14

**items** 39:16
40:6

**itinerary**
118:16

**Ivy** 102:11,
19,20

———————
**J**
———————

**J-O-R-A-J-U-R-I-A** 22:13

**Jacuzzi**
24:22
121:20,22,
25 122:4
123:5,8

**Jacuzzis**
20:19
24:15
31:22
122:5,6

**January** 5:7
17:1,18
48:14
61:18 63:5

78:17,21
79:17
89:23
95:16
118:8
185:2
245:15

**Jarnagin**
5:20

**Jennifer**
5:6,17 7:5
174:23

**Jillian**
74:24 75:5

**job** 18:24
19:5,6,7,8
41:23
80:4,14
95:17,18,
20 99:1,3,
7,9 107:2
108:17,23
109:3
110:1
115:19,24,
25 116:2,
4,7,9,22,
24,25
117:3,11
127:11,15,
19,24

**jobs** 10:18
107:6
117:5

**John** 111:17

**Jorajuria**
22:12,15
30:22
54:13
55:10,13,
14,15 65:3
72:13
73:16,19

**judge** 8:7
169:25

**judgement**
171:13

**jump** 179:6
180:24
186:7,12
187:24
188:15,17
189:18
193:15,18

**jumped** 166:1
185:11
188:25
189:3,10
190:5
191:8
193:16

**jumping**
178:19,22
180:21
182:7
184:24
185:5,6,8
186:3,6,9,
17,20
189:20
191:14

192:12
197:6

**jumps** 165:17
179:2
186:14
189:12
190:8,9

**June** 131:25
132:12,16,
22 137:11,
18 138:2
142:1

**jurors** 55:22

**jury** 159:9
168:21
185:8

———————
**K**
———————

**Keith** 75:1

**Kelvin**
15:14,17
16:16,25
17:3,12,16
18:6,22
19:10
20:21
21:14,20
45:21,22,
25 46:21
76:7,21
77:6 78:7,
8 79:20
84:4
87:16,25
100:16

103:8
106:3

**key** 247:24

**kid** 20:19

**kiddie** 24:14

**kiddy** 24:22
31:22
121:20
122:1
123:6,8,9
124:3,11
134:19,21

**kids** 123:15
124:11,14

**kind** 25:11
29:19
102:21
129:2
151:21,23
168:5
190:7

**kitchen** 98:4

**knew** 65:2
72:3 73:8,
9 78:2
110:24
111:10
147:15

**knowing** 18:4
44:18
234:12,18

**knowledge**
47:15 62:1
76:24 77:4

170:12,14
172:20
173:10
223:8

—————————

**L**

—————————

**L-E-S-Z-E-K**
141:15

**label** 144:16

**labeled**
84:20
183:19
184:4,6,7

**lack** 55:23

**lady** 124:6

**laid** 218:17

**landed**
162:12
178:11,13

**large** 20:8,
9,11 24:12
71:13
214:12,13

**largely** 9:13

**larger**
135:10,11

**late** 8:24

**laundry**
103:24
105:9

**laundry-type**
105:10

**law** 10:16

**lawsuit** 7:4
11:2 70:11
85:12
172:2
173:25
193:17,18
196:21
253:8

**lawsuits**
81:21

**lawyer** 10:10

**lawyers** 40:1
66:18
79:11
183:25

**layers** 109:5

**leading** 91:4
149:17
202:7

**League**
102:11,19,
20

**leaning**
178:10

**learned**
36:21
55:17
138:21

**leave**
118:13,22,
25 119:2
233:17

**left** 82:4

121:19
134:18
149:9
236:3

**legal** 10:19
11:14
240:20,25

**Legend**
208:16,22
217:21

**Leszek**
141:15

**level** 40:13
103:19
147:9
192:14
212:9

**levels** 21:16
113:24

**liar** 226:24

**life** 138:23
146:4,10

**life-saving**
145:12,23,
25 146:12
147:1

**life-
threatening**
146:4,17

**lifeguard**
106:23
128:23
129:5
132:1,2,6,
7 133:13,

Case 1:20-cv-25271-JB   Document 49-1   Entered on FLSD Docket 04/12/2022   Page 304 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: lifeguard's..made

15 135:1,
2,14
137:12
138:24
142:9

**lifeguard's**
132:3

**lifeguards**
106:22
135:15

**lighter**
67:13,14
68:3

**limit**
191:24,25

**limited**
230:19

**limits** 62:9

**Lines** 7:6

**liquid** 19:21
153:2,3
158:7
159:3,12
164:7

**Lisa** 5:11,
23

**list** 12:13
41:21
110:22

**listed** 76:4,
14 170:4
247:13
254:14

**listening**
189:10
190:7

**literally**
190:21
214:10

**litigation**
10:1
11:17,19,
22 13:14
23:1 81:20
87:21
148:6
170:1

**local** 143:24

**locate** 34:2
77:13,18
78:4,6,18
79:8
80:14,17
87:17
140:24

**located**
20:19
23:24
24:15 67:9
76:15 81:5
105:6,7
115:11
153:13
158:17

**location**
69:16
97:25
116:16
156:25

165:3,5
176:21

**locations**
147:14

**log** 76:4,
12,13,16
77:23
109:25
111:22
247:23

**long** 10:2,6
21:4 43:9
54:7,17,
18,19,21,
25 81:8
102:8
103:11
133:8
219:16

**look-out**
115:5

**looked**
13:12,15
27:2 46:9
69:24 70:5
77:14,16
85:25
174:5

**lose** 69:5
187:11
235:20
245:5

**losing** 116:9
235:19,22
244:21

**loss** 144:8

**lost** 29:23
60:24
117:16,17
163:20
240:1
247:24

**lot** 28:7
33:4 91:22
95:6 102:7
106:4
129:3
213:15,24
252:18

**low** 231:13
232:4

**lower** 24:13

**lump** 242:4

---

**M**

---

**made** 19:13,
14 26:10
27:3,5,9,
21 29:20
31:6,11,14
32:3,15
33:3 42:19
44:9 47:9
64:14
69:23 70:8
72:2,8
135:18
141:9
146:19,23,
24 147:2,

3,7
181:17,18
184:15
227:9,20
242:9
243:5
244:12,15

**mailed**
183:22

**main** 121:9,
10,13
122:1
125:1

**maintain**
47:22 99:4
114:7
115:6

**maintained**
48:5
107:18

**maintaining**
94:8
114:23
127:6
237:2

**majority**
10:22,24
39:21
237:11,12

**make** 12:17
14:12
19:19
26:13
29:8,13
30:20

31:15 33:7
34:13
44:8,10
47:19 49:7
51:14
53:21 61:1
62:16
65:15
71:20
75:23,24
83:11
84:20
85:16
88:13
93:7,18,19
94:24
96:18
98:20
100:3
101:11
106:12
107:3,6,18
108:12
109:2,19
115:8
117:1
125:24
132:4
144:14
168:4
175:5,13
183:5
206:23
211:21,22
224:19
226:25
241:16
242:17

247:20
254:7
255:20,21
258:12

**makes** 29:3
30:11
146:14
194:5
207:18

**makeup** 223:3

**making** 51:2
98:13
104:6
106:10
114:16
115:22
135:10,14
175:18
194:11
195:4
226:24
257:12

**malfunction**
168:23
181:23
186:6,7
190:10
194:9
196:24

**malfunctioned**
181:3
186:3
192:19,21,
22 193:2

**malfunctioning**
186:9

**malfunctions**
181:10,16
189:11
194:12

**man** 163:4
177:25
178:3

**management**
242:24

**manager**
22:19
46:20
74:11
79:20
107:2,23
108:2

**managers**
26:25

**managing**
45:20 46:3
116:16

**manifest**
79:5,7

**manifesto**
79:3

**Manila**
111:16

**manner** 6:6
99:4

**manning**
21:15
113:23

**manufacturer**
43:25 44:1

238:19

March   64:1
  65:8

marine
  28:11,13

mark   9:5
  14:1  39:18
  65:18
  66:10
  84:13
  89:25  90:4
  93:18
  122:15
  152:12
  157:13,23

marked   9:6
  14:14
  34:7,11
  39:22
  65:24
  84:16,23
  88:19,20
  89:11,17
  90:6
  122:12,21
  134:3
  150:21
  152:18
  157:25
  158:5
  160:15
  162:3,6
  187:4,10
  200:18,22
  201:19
  214:20,23
  247:8

marking
  84:19

material
  52:24
  67:23
  68:2,20
  243:18,22

materials
  14:19
  65:13
  69:16
  71:15
  216:1

matter   5:5
  70:12
  93:15  94:3
  123:19,22
  173:4,7
  224:19
  255:8

meaning   95:3
  114:18
  171:13

means   146:10
  150:19
  185:8,10

meant   18:14
  50:13  52:9
  186:19,21
  191:8
  221:3

mechanics
  191:4

Medallia
  230:13

231:4
234:9
236:25
248:7
249:11
250:23
251:20,24
252:5,10
253:15
254:5

media   82:4
  83:4
  154:8,16
  236:7

medical
  139:4
  142:16,20
  143:1
  145:10
  160:13
  202:23
  204:14,21
  206:24
  209:6
  234:4,11,
  23  236:13
  246:18

medically
  143:23
  144:7
  145:15,16
  146:1,2,
  16,24
  147:7
  221:7
  230:20
  250:18

meet   243:22

meeting   8:25
  9:2,14
  36:12,20,
  23  37:5,7,
  9,16,19
  38:20
  40:5,11,
  12,17
  41:1,3
  46:8
  205:10,21

meetings
  38:19  46:8
  47:4,5,8
  50:16,20,
  23  74:6
  205:11
  235:8
  258:19,21

member   16:3
  38:25
  92:21
  93:12  94:1
  95:1
  114:17
  117:2
  131:23
  132:25
  137:18
  150:25

members   15:3
  17:24
  18:20  22:7
  33:4,7,8
  38:22
  44:8,19,24

45:9 46:3
49:10,19
76:6,18
78:15
79:4,5
80:9 86:22
92:22 93:6
95:1 97:7
104:1
108:12
113:11
115:4
116:13
125:23
132:17
133:10
135:19
138:2
139:18,20,
21 149:15
159:9,14
180:20
185:7
258:8

**memo** 107:13

**memorialized**
185:3

**memorize**
222:13

**memory** 82:18
136:11,13,
22

**mental**
15:20,24
16:4

**mention** 55:9

**mentioned**
23:18
27:25 55:8
96:14

**met** 11:8
160:12
243:24,25
245:18

**Miami** 10:16

**Michael** 5:18
14:9

**middle**
241:15

**Mike** 68:16
191:23
259:19

**millions**
213:24
214:16

**Milo** 111:5

**mind** 86:12
147:12
193:12

**minute** 37:16
40:5 41:1
74:3 83:15
133:6
165:17
167:17,18
180:1
196:3
257:5

**minutes** 8:25
9:2,15

36:13,20,
24 37:7,8,
16,17,19
38:20
39:4,10
40:17 46:8
82:4 97:17
142:14
160:8,14,
17 164:9,
10 176:15
205:10,11,
21 211:7,
19

**mischaracteriz
ing** 97:20
99:18
164:22
220:2

**mispronouncing**
55:10

**misrepresentin
g** 136:18

**misses**
165:17

**missing**
146:25
161:7
165:14
166:15
167:18
170:23
178:14
184:17
185:14,20
190:12

195:8
196:21
197:4

**misstate**
84:6

**mistaken**
22:17
234:3

**misunder**
196:11

**mixed** 189:10

**mixing** 59:4,
5

**moderate**
147:10

**Mohammed**
133:14,18,
19 137:19
138:3

**moment**
117:24
163:24
165:16
166:16,20,
22 168:24
194:15
199:20
240:9

**monitor**
19:19
20:23
95:25
98:21
109:19

**monitoring**
  75:14  77:8
  78:16,20
  79:19  86:7
  87:24
  91:13
  92:13,18
  96:24  97:4
  99:15
  101:11
  106:13
  108:13

**month**  55:2
  68:18,23
  81:10

**monthly**  47:3
  50:15,21

**months**
  15:13,15
  18:2  21:25
  55:2
  195:16
  257:14

**morning**  5:2,
  23  6:23,24
  8:14  14:6
  18:16
  39:20  40:1
  41:14
  108:18,19

**motion**
  198:5,16

**motions**
  198:7

**move**  173:12

  191:20

**moved**
  150:22,24
  151:3
  157:13,17,
  19,21

**moving**  151:6
  189:20

**multiple**
  98:18
  101:10
  103:21

**music**  190:7

**muted**  83:10

─────────────
       **N**
─────────────

**named**  41:22

**names**  78:25
  79:13  80:4
  86:18  87:2
  125:22
  140:17
  142:11
  148:11

**narrowed**
  252:18

**nature**  114:5

**navigate**
  118:19
  130:12

**navigational**
  118:18

**nearby**

  141:11

**nearing**
  63:18

**necessarily**
  127:13
  146:10
  147:8
  222:6
  237:18

**needed**  26:2
  71:7  81:13
  96:7,9,10
  101:18
  103:18
  145:25
  196:24
  212:19
  223:3
  243:23

**neighborhood**
  209:18

**net**  121:6
  128:14

**Nick**  5:16
  88:18
  117:16,21
  136:10
  172:23
  188:18
  194:21
  197:9
  220:9
  235:16,23
  239:2,14
  244:20
  254:14

  259:16

**night**  108:18

**nonalcoholic**
  112:15

**normal**
  189:12

**Nos**  9:6

**note**
  206:15,19

**notice**  7:3,
  12,14,17,
  22,25  8:22
  14:3,4
  62:3
  88:21,22
  110:20
  112:17
  117:12
  152:4
  170:4,15
  173:1,7
  212:4,16
  224:21,25
  227:15
  236:15,25
  237:6
  238:20
  240:14,16,
  23  246:20
  253:17
  254:14

**noticed**  70:5
  79:16
  172:4
  246:19

**notification**
  181:17

**notifications**
  253:25

**notified**
  181:20
  196:21

**November**
  63:13,14
  64:4 65:8
  69:10
  71:24
  72:22
  73:6,10
  220:21
  221:1
  244:16

**number**   13:22
  28:12 46:4
  50:23 56:1
  98:21
  104:6
  107:4
  110:20,21
  124:24
  148:1
  152:2,23
  153:13
  154:16
  184:6
  187:2
  199:3
  202:22
  207:23,25
  210:20
  211:9
  212:13

214:6,18
216:4
231:9,13
236:7,21
246:14
248:15
249:15
250:11,12
258:10

**numbering**
  215:2

**numbers**
  234:13

**numerous**
  79:17
  147:25

**nurse**   137:21

─────────────
        **O**
─────────────

**oath**   6:4

**object**   8:1
  15:19 20:5
  28:18
  29:11
  31:10
  32:19,25
  33:24
  35:23 36:5
  37:24 38:8
  42:10
  43:1,21
  44:12 47:1
  48:10 49:8
  53:17
  54:23

56:8,22
57:8,16
58:19
61:21
64:18
67:25
68:15 69:7
70:1,13
71:10
72:1,19
76:2 78:23
79:22
80:12
81:6,24
85:7,19
86:8,24
87:11 88:2
91:7,21
92:4
94:11,23
96:3,22
97:8,19
98:25
99:16
100:6
101:13
102:5
103:7
104:11
106:20
107:9
108:16
109:8,23
110:6
112:6,25
113:9
114:9
115:13

118:17
119:7
120:16,23
121:21
122:2
123:21
125:2,14
126:2,10,
19,25
127:7,20
128:13
129:11
131:9
133:2,7,12
135:22
136:4,9
137:24
138:8
139:2
141:13
142:24
143:17
144:1,10
145:4,20
146:5,21
147:17
148:4,19
149:19
150:12
152:7
153:17
155:14
157:3,15
158:10,21
159:4,15,
22 160:2,
23 161:9,
18 162:11

| | | | |
|---|---|---|---|
| 163:2,7 | 210:9,16 | **objected** | 75:9 |
| 164:14 | 211:1,12 | 212:9 | 205:25 |
| 165:4 | 213:7,16 | | |
| 166:11,19 | 214:9 | **objection** | **obtaining** |
| 167:5,13, | 215:11 | 125:21 | 139:13 |
| 22 169:3 | 217:6 | 129:14 | |
| 170:3,24 | 218:2,16 | 172:3,19, | **obvious** |
| 174:1 | 219:4,15 | 25 236:20 | 172:15,25 |
| 175:15,25 | 220:1 | 249:22 | |
| 176:23 | 221:10,18 | | **occasions** |
| 177:4,20 | 222:23 | **objections** | 79:17 |
| 178:15 | 223:10,16 | 6:6 8:2,4, | |
| 179:20 | 225:19 | 6 59:7 | **occur**  32:17 |
| 180:2,8,12 | 227:11,23 | 62:16 | 35:20,21 |
| 181:4,25 | 228:9,21 | 154:12 | 37:17,22 |
| 182:14,25 | 229:3 | 191:24 | 38:4 56:2 |
| 185:9,15 | 230:11,23 | 192:5 | 135:21 |
| 186:5,13 | 231:14 | | 139:21 |
| 187:18,25 | 232:8 | **observation** | 156:17 |
| 189:4 | 233:6,15 | 74:7,10 | 161:20,21 |
| 190:2 | 234:5,14 | | 230:4 |
| 191:1,20 | 236:17 | **observations** | |
| 192:23 | 237:5 | 32:15 | **occurred** |
| 193:24 | 238:8,21 | 44:8,9 | 24:9 |
| 194:16 | 239:3,12 | 114:4 | 40:10,23 |
| 195:9 | 240:17,24 | | 42:4 45:16 |
| 198:23 | 241:12,14 | **observe** | 48:11,14 |
| 199:10,23 | 242:10,20 | 93:17 | 53:22 63:3 |
| 200:7 | 243:6 | 202:3 | 71:24 |
| 201:16 | 244:4 | | 81:22 |
| 202:4,19 | 245:21 | **observed** | 155:4 |
| 203:13,22 | 246:9,21 | 96:13 | 160:9,14 |
| 204:4,12 | 249:9,19 | 130:18 | 161:3,6,7, |
| 205:2,14, | 253:18 | 140:15 | 11,13 |
| 24 206:10, | 254:9 | 176:19 | 163:15 |
| 18 207:1,9 | 255:13,24 | 194:12 | 207:19 |
| 208:4 | 257:21 | | 208:1 |
| 209:12,20 | 258:16,24 | **observing** | 209:10,15 |
| | | 21:16 | 212:13 |
| | | | 217:20 |
| | | **obstructions** | 226:11 |
| | | 176:18 | |
| | | | |
| | | **obtained** | |

228:7

occurrence
145:9

occurring
113:7

occurs  53:1
82:23

October  85:2

offered
219:13
232:16

offering
73:11

office  64:17
106:4
111:16

officer
40:13
42:22
45:23  46:1
77:24  78:9
103:10
141:9
181:5
183:14
184:22
256:24
257:2,9,
14,17

officers
42:21
258:7

official
166:8

older  168:8,
14 176:11
182:18
190:8
191:6
192:19

Oliver  75:1

on-the-job-
training
102:10,14

one-step
27:1

Ong  111:14,
15,19

ongoing  46:5

open  20:16,
18 83:22
92:8 94:8,
9 119:17
121:3,5,13
122:8
128:22,23
199:22
200:5
201:7,14,
18

opened  21:16
121:2,7
128:24
129:5

opening
202:3

opens  108:19

operate
102:2

operating
98:17
102:25

operational
128:18

opinion
221:2

opportunity
19:9,10
154:9

opposed
190:24
205:1
206:8
211:9,11

opposite
114:3
124:1
158:9
160:20
214:13

order  8:9,10
32:6 51:14
52:9 53:21
69:11
112:4
115:16
137:20
145:11,21,
22,23
171:1
174:4,7
216:24
230:6
241:10
252:15

orderly  99:4

ordinary
142:21
143:2

originally
67:12
195:20

overhaul
29:25

overlap
250:25
251:5

oversee
11:18
132:4

overseeing
17:21
45:20
256:19

oversees
22:20

oversight
106:10

overtime
29:2 67:13

overview
18:1,4

own-the-spill
93:2,4,5,
25 97:7
107:7
114:8

owner  105:23

**P**

**p.m.** 82:25
83:3
117:25
118:2
154:12,15
185:2
197:18,21
236:4,6
240:4,10
245:8,11
259:11,21

**PAA** 76:4,12
77:13,22
80:8 81:1
109:25

**pace** 55:7

**packages**
112:11,13,
16

**pages** 8:16
9:13,17

**pants** 134:24
177:25
178:4

**paper** 78:14
80:15,17
82:12

**papers** 157:9

**paramedics**
143:9

**parameters**
248:16

**paraphrasing**
27:24

**part** 10:19
13:18,21
31:17,18
32:20,23
33:2 37:15
38:22 47:7
52:1,2
54:2,3,15
56:5 72:17
84:9 92:3,
10 95:17
99:3
102:15
115:17
119:4
134:17
140:23
147:1
160:6,16
174:12
189:22
211:16
227:15
233:13
234:22
243:25
250:4
252:3

**participants**
39:11,13

**participating**
6:1

**parties** 5:13
6:5

**pass** 114:18

**passed**
257:16

**passenger**
37:1 92:20
140:3
146:3,15
149:6
202:23
234:23
235:1

**passenger-wise**
140:10
148:13

**passengers**
20:25
28:12
46:24
49:24 52:5
54:3,4
103:3,25
112:23
117:12
132:20,21
136:2,7
137:8,15
138:2
139:7,23
140:13
141:10,11,
24 148:2,
17 149:5,
23 150:2
207:23
209:6
213:18,21
230:7

231:9
232:6,17
233:3,9,21
234:3
236:14
245:20
246:14
250:21
252:7

**past** 23:13
134:18

**patrolling**
75:15,22
77:6 86:7,
20 87:23
91:5,13
100:2,25
107:16
108:6
109:16
114:1,3

**patrols**
115:11

**pay** 177:16

**paying**
130:16
131:1
237:24
238:1

**Pell** 5:6,17
7:5 18:23
25:1,6,24
26:12 32:2
53:15
59:11
64:10 65:5

72:16
75:15
78:17
79:16
81:23
91:6,14
95:16
97:16,17
98:1 114:2
118:7
121:16,19
123:20,25
124:4,8
129:10,12,
16,18
130:4,8,16
131:8,24
132:13,19,
22,24
136:7,24
137:12
138:1
139:24
141:12,25
142:13,22
143:24
145:14
147:15
149:15
150:21
153:16,18,
20 156:16
160:21
165:16,23
166:16
167:19
168:24
174:23

177:3,23
178:3,5,6,
10 182:24
192:13
198:1
199:9,19
201:1
202:2,15
203:12,20
204:11,19,
25 205:22
206:8
225:18
237:7
245:17

**Pell's**  12:23
35:10 48:9
49:3 61:18
90:17
111:19,23
135:15
136:25
142:20
150:10
156:14
165:10
202:22
208:2
243:14

**pending**  8:2,
4,6 70:11

**people**  12:8
14:25
15:1,2
18:7
19:18,23
20:22 21:3

22:9 27:3
28:9 41:21
45:19,21,
24 46:1,
20,21
47:16
49:20
50:19
51:23
69:2,3
75:21
77:5,8
79:13 80:5
81:10 84:9
86:4 87:3
91:22
92:12,16,
24 94:18,
19,20
95:12,23,
24,25
96:7,11,18
98:18,19,
21,23 99:2
101:10,15
102:9
104:17,20
105:14,19,
25 106:1
107:12,17
108:3
109:6,22
110:21
112:4,7,
20,21
113:1,3
114:1,2
115:9,14,

18,19
116:16
117:5,6
125:8,10
138:1
141:17
142:11
148:11
149:14
151:7
164:10
169:12
194:7
213:23
214:14,16
230:25
232:1
233:16
237:12,16,
20,23,25
238:11
242:23
253:23
259:3

**peoples**  80:3

**percent**
193:5
214:4
236:2
245:4

**percentage**
214:1
232:4

**percentages**
231:25

**performed**

35:1

**performing**
28:1,5
115:11

**period**
42:15,19
168:23
210:6,11
213:9
230:17
248:3,20

**person** 30:14
60:19
74:14,16,
17 87:22
88:4
103:12
105:17
106:5,15
107:15
110:2
131:18,21
132:18
136:1
137:3
195:11,14,
22 196:17
202:16
203:3,5,6
204:2
206:3
234:15,17,
22 248:11,
14

**person's**
184:7

**personal**
61:25
107:4
140:22
170:1,11,
14 172:2,
20 173:10,
25 184:5
223:8
254:22
255:16
256:4,17,
21 257:11
258:6

**personnel**
32:16
43:16
86:18
92:13
96:19
101:8
104:7
105:5
141:7

**phone** 16:23
17:15

**photo** 135:9,
10 153:6
163:3

**photograph**
23:5
24:17,19,
24 31:19
66:6,8,12,
16,18
67:2,4
124:10

128:4
134:6,16
151:13
160:6,8
162:21
164:2
202:9

**photographs**
12:18
13:17,20
14:19 66:2
71:17
131:12
151:9,10,
11,13,18
152:3
157:5,12
160:16
163:8,12
164:8,10

**photos**
151:15,25

**physical**
183:17
184:2

**physically**
6:2 17:14
91:1
184:9,11,
12,14

**pick** 98:24

**picking**
93:10
198:7

**picture**
72:10,23

158:4

**pictures**
156:4
160:12

**piece** 78:14
80:14,17

**place** 16:17
27:7 35:8
37:12
41:2,4,5
43:18,23
44:3 45:2
46:2,5,19
50:8 56:6
64:25 65:2
71:4 72:7
73:3 75:25
80:8 87:10
94:8 106:8
108:12
113:7
116:12
181:9,15
193:2
196:25
197:6
224:3,16
256:14

**places**
104:22

**Plaintiff**
5:17 6:10,
11,19 12:1
35:2 66:25
141:20
142:3

Case 1:20-cv-25271-JB Document 49-1 Entered on FLSD Docket 04/12/2022 Page 315 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: plaintiff's..pool

203:24

**plaintiff's**
7:19 9:6
14:14
34:7,20
39:22
65:24
84:16 90:6
122:12
134:3
138:21
152:18
157:25
162:3
187:4
200:18
201:19
214:20
247:8

**planks**
160:19

**planning**
31:16

**plans** 54:11

**plastic**
188:15

**plates** 98:3

**play** 136:15
156:16
177:15

**playback**
190:23

**played**
154:22
177:17

178:18
179:8

**player**
190:6,7

**pleasing**
29:13
30:25
44:11 45:6
71:21

**plywood**
71:13

**point** 53:13
63:6 79:12
102:22,23
132:24
137:20
155:5
156:18
171:8,12,
20 175:3,4
177:13
194:5,18,
25 197:9
233:22

**pointed** 33:8
233:7

**pointer**
67:16

**pointing**
156:6
161:21
172:15
173:17

**polices**
254:20

258:7

**policies**
50:20
113:6,15,
23 114:16
115:9
116:12
119:19,23
120:2,3,14
143:13
144:24
181:8,11
246:10
254:20
256:1,20
257:12
258:4,5

**policy**
27:14,19,
20 32:12,
16,22 33:6
35:8,15
37:11
43:18,22
44:2 45:2
46:2,11,
12,15,16,
17,19
47:25 48:2
49:6,12,
15,16
50:8,13,18
93:1,2,4,
5,14,25
94:6,8,13,
21,25 97:7
107:7

113:24,25
114:6,8,
10,13
119:24
120:5,7,9
139:12
140:22,23
141:4
143:18
144:21
235:4
246:5,6
255:4,7,
10,15,21
256:13
257:24
258:3

**pool** 13:9
14:22
17:1,18
18:15,21,
25 19:2,4,
15,19,25
20:1,9,14,
15,18,20
21:7
23:22,24
24:3,5,7,
12,14,16,
22 25:23
31:21,24
33:20
35:21,25
36:3 37:23
38:3 40:9,
10,21
42:2,4,7,
20 43:3,5,

16  44:4
45:11,20
46:4,19,22
51:18,20
59:18
64:7,8,9
75:15,25
76:18
77:1,6,9
78:16,24
79:9,19
80:10
83:22
87:23
89:22
91:19,22,
25  92:2,8,
9,10,13,24
93:17,22,
23  94:3,
17,20,21
95:3,5,6,
7,24  96:4,
14,18,25
97:5  98:17
99:4,6
100:20
101:8,9
102:2
103:1
104:7,18
105:5,7,
15,19,20
106:2,6,
17,21
107:2,3,4,
5,10,12,
14,16,18,

20,21,23
108:13,19
109:1,3
110:24
111:1,2,3,
10,13
112:4,7,
18,22
113:8
114:7,11,
22  115:6
116:13,16,
20,21
119:17,21
121:1,3,4,
10,13,20
122:1
123:1,6,8,
9,11,13,14
124:3,11,
18,21,22,
25  125:1,
4,8,11,25
126:6,13,
17,20,23
127:1,4,6,
8,9,12
128:10,11,
15,18,21
129:1,5
130:23
132:4,5
134:19,20,
23  135:5,
7,8,11
155:7
159:14
174:18

176:19
177:7
200:5
201:2
202:7,8
205:18
210:10,24
232:7,10
233:4,8,9,
17,21
236:16
237:2,3,
13,20,21,
22  238:7
241:19
248:8,21,
25  249:5
258:11

**pools**  20:17
24:22
31:22
113:2
121:5,7,11
122:6
128:21

**poor**  175:6

**pop**  207:20
252:21

**pops**  252:16

**popular**
51:19

**port**  75:22
87:24
118:8,11,
12,20,22

**portion**  9:11
20:23
23:21
24:1,15
42:5  63:11
64:6,8,9
65:12
67:24
68:2,11
71:13
75:23  77:9
94:19,20
100:13
121:1
135:7,11
153:2
169:15,22
180:7,10,
13  190:12,
20  191:4
206:22
238:18
258:15
259:14

**portions**
21:17
39:15
87:24
105:7
109:19
152:4
169:10
186:24
206:16,24

**portside**
77:9  92:17
94:20

95:25
109:19

posed  7:25
38:3

position
9:23 10:3,
4 38:24,25
79:1 80:4
88:3 93:15
94:1 95:4
103:10
108:8
129:9,25
130:3,8,25
131:14,23
165:21
166:9
186:2
189:25
197:5
231:8
238:6,9
246:18

positioned
104:8

positions
95:5,6
115:2

possession
7:15

possibility
28:19 56:3
80:11
87:6,9
110:4,18
144:12

167:12
169:20

possibly
124:23
160:3
215:15

post  222:19
252:9

post-covid-
related
135:5

post-cruise
111:22
251:24
252:2,4

potential
47:8
146:4,16
253:17

potentially
29:12 79:8
167:20
222:21
238:20

pour  32:10
53:7

pour-on
243:21

poured
52:23,25
55:1
57:18,24,
25 58:15
67:12
220:16

226:3
243:17,21
244:17

pouring
59:19

power
235:19,20,
22 244:22

practicing
10:10

pre  252:9

precise
166:15,20,
22 192:11
194:14

precisely
8:25
162:25

Predicate
85:19
162:11

predominantly
210:20,23

prefer
180:24

premarked
34:13

premise
14:11 89:2
229:19

preparation
11:23
22:10
73:20

89:20
90:22
193:14
253:9

prepare
14:24
212:4

prepared
7:24 8:4
88:7
138:18
141:9
170:5
229:24
253:9
256:5,9,11

present  5:13
6:2 19:22
59:13,23
61:19 62:4
63:5 66:19
90:24

presented
29:1

presenting
174:8

preserve
157:14

pretrial  8:9

pretty  12:2
51:19
97:21
116:5
133:4
137:5

164:5
233:23

**prevent**
113:7,16
237:23,25

**prevented**
238:14

**prevention**
74:12

**previous**
128:7
206:12
246:23

**previously**
9:15

**primary**
11:15,17
109:18
132:3

**printout**
248:13

**prior** 9:10,
14 25:13
27:9 35:3,
10 36:16
41:18,19
42:20
48:9,15
49:2
52:14,21
56:13,16
71:1 73:6,
11 81:22
97:17
134:11

201:3
202:3,22
208:2,6
210:5,18
212:5,14
213:8,9,13
214:7
216:24
217:1,4
218:7,22
219:8
221:7
222:9
223:6
224:8,20
225:3,16
226:10
227:21
228:5
230:17,20
233:14
236:21,22,
24 237:16
238:17
243:14
245:25
246:4
248:20
249:18,23
250:17
253:14

**priors**
208:7,10
241:22
250:25
251:2,9

**problem**

42:23
43:16
45:13
47:23 96:1
189:22
235:6

**problematic**
36:3,8
42:8 47:11

**procedure**
144:22
181:15
184:10
256:14

**procedures**
8:8 16:14
17:8
108:11
113:6,14
115:6
119:19,23
120:3,14
127:5
143:13
145:19,22
181:8
254:20,21
256:1,20
257:25

**proceed**
240:12
255:5

**proceeding**
6:1

**process**
26:21

27:1,10,13
51:1,7
54:24,25
234:22

**produce**
215:23

**produced**
9:18 12:1,
11,18,22
13:17 14:6
24:17
31:19 40:1
75:9 81:19
82:16
85:12 88:7
123:1
165:8,9
176:16
183:25
193:17
203:11,15
204:10,20,
21,25
205:11
206:7
207:5
208:7
212:6,18
215:24
216:23
230:9,10,
12 231:5,7
234:20
235:2
248:7
251:4
253:2,7

**product**
15:20
30:2,3
32:8,10
218:17
220:25
244:5,6

**production**
8:19 12:6,
7,15,16
24:18
31:20 32:5
253:12

**professionals**
115:15

**program**
252:14

**project**
22:19
54:14,15,
16

**promoted**
72:6

**prone**  43:20

**pronounce**
22:16

**propensity**
207:20

**proper**  27:12
49:18
168:17
169:8
174:8

**properly**

37:14 48:5
49:13
172:5
173:1,8

**proprietary**
175:22

**protect**
239:16

**protection**
68:13

**protocol**
144:21

**protocols**
144:20

**provide**
86:18
140:14,24
181:22
253:16

**provided**
7:11 9:15,
19 23:8
24:24 32:5
64:12,17
73:6 76:18
78:12
111:9
182:8
224:7,12,
13 234:8
236:24

**prudent**
144:13

**public**  17:20
18:25

19:2,4,13,
15 21:8
75:13,21
76:13,16
77:22
78:25
81:18
83:19
85:1,3,8
86:15,17
87:7 91:5,
13 96:8,
19,20
97:5,15
99:13,25
100:24
104:19
106:8
107:13,25
108:13
109:4,14
110:5,13
116:14
124:24
125:3,25
126:5
137:22
158:19

**published**
84:1

**pull**  154:4
176:4

**pulled**
152:5,6
153:14
158:17
160:19

164:2

**purchase**
149:9

**purely**  29:25

**purpose**  37:6
75:4
109:18
146:2
151:6
198:6
258:3

**purposely**
193:6

**purposes**  7:3
36:6 37:21
53:13 81:3
146:16
254:5

**pursuant**
181:11
230:6

**put**  8:5,11,
13 29:19
35:12
51:16
59:19
84:2,10
94:12
120:21
163:10
185:5,6
199:4
212:15
214:16
219:20

Case 1:20-cv-25271-JB   Document 49-1   Entered on FLSD Docket 04/12/2022   Page 320 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: puts..realize

220:16,17
226:5
253:17

**puts** 60:9

**putting**
96:23

---

## Q

**qualities**
28:16
29:10 69:6

**quality**
168:7
175:6
182:18
191:7

**question** 8:7
16:7
23:14,16
24:12
31:18
34:24
35:12 38:3
43:9,12
46:15,17
48:25 52:4
53:11,16,
20 59:16,
25 61:2,22
62:14 63:8
79:24 80:2
81:3 82:9
86:11 97:1
99:24
100:11
104:12,13,

24 105:17
110:10
125:9
126:24
127:14
129:14,15
138:14,16
149:3
163:17,18
164:16,18
170:5
171:5,24
173:12
176:2
183:1,4
187:13
188:2
191:24
193:11
197:17
203:2
214:11
215:13
221:12,13,
22 223:17
224:7
225:5,11
226:17,21
229:19
232:14,15,
20,25
236:19
238:21
239:5,13
240:18
256:11

**questioning**
138:17

168:4

**questions**
7:24
11:11,12
23:5 33:16
59:3 60:5,
22 61:4,5,
10 79:25
111:11,24
172:21,24
185:22
197:25
205:9
206:12
207:22
212:5
231:22
238:22
239:18

**quick** 55:7
133:4

**quickly**
89:15

---

## R

**Rafy** 73:21

**rain** 120:1,
2

**raise** 6:14

**ran** 39:5

**rate** 49:21

**re-ask**
129:15
232:14

236:19

**re-asking**
239:4

**re-poured**
57:10
220:16

**reach** 71:1

**reached**
72:13 76:3
168:11

**read** 5:25
19:10,12
21:2 54:13
81:10
88:23
100:22
101:1,5
174:4,6
205:12
207:17
215:18,19
216:10,11
254:19
259:9

**read-in** 5:22

**reading**
33:12,22
55:6 129:8
183:24

**ready** 83:13

**real** 104:24
183:12
194:21

**realize**

Case 1:20-cv-25271-JB Document 49-1 Entered on FLSD Docket 04/12/2022 Page 321 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: realized..recording

201:4

**realized**
  137:3

**reason** 8:6
  16:5 23:9
  26:16
  28:23 31:2
  47:7 56:5,
  9 68:10
  71:8 98:20
  119:5
  127:12
  129:21
  165:15
  168:9
  180:6
  182:11
  184:12
  193:10
  209:22
  229:7
  242:13,18

**reasonable**
  130:4,10
  168:20
  214:6

**reasoning**
  141:19

**reasons**
  26:15
  27:22
  29:24 30:4
  31:3 33:9
  44:15 68:6
  69:1 129:3
  214:7

242:14,19,
25

**reassumes**
  177:18

**recall** 13:3,
  20,22
  16:18 17:4
  24:23
  30:17 33:1
  38:13,15,
  17,24
  52:20 76:6
  82:8,11,
  14,19 84:8
  91:12,15
  97:15
  99:11,12
  128:23
  129:4
  137:17,19,
  22,25
  145:6
  151:2,23
  152:2
  166:22
  167:1
  171:1
  173:19
  182:1
  193:23,25
  194:3
  195:12
  196:3,4
  199:4
  254:13

**recalling**
  39:5

**receive**
  145:12,23

**received**
  8:16

**recently**
  23:1
  36:14,22
  39:4 66:6
  134:16

**recess** 83:2
  118:1
  154:14
  197:20
  236:5
  240:6
  245:10

**recognize**
  66:12,22
  122:25
  134:6,8,10
  215:10,15

**recollection**
  91:11
  137:10

**recommend**
  47:17

**recommendation**
  44:3 57:5

**record** 5:3,
  14,25 6:9,
  25 8:6,12,
  13 9:8
  13:24
  34:10 41:3
  42:1,6

83:1,5,12
89:5
117:24,25
118:3,5
133:23
136:20
154:13,17
155:1,6,22
163:23
167:2,3
189:10
197:16,19,
22 202:9
204:14,21
206:6,16,
23,24
207:3
226:25
233:1
235:21
236:4,8,10
240:5,8,11
245:1,7,9,
12 246:25
259:13

**recorded** 5:9
  169:15
  180:13
  183:11
  247:23
  259:12

**recorder**
  181:2
  190:23
  192:22,25
  196:23

**recording**

Case 1:20-cv-25271-JB Document 49-1 Entered on FLSD Docket 04/12/2022 Page 322 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: records..relies

13:10 37:8 166:3 190:13,19, 21 193:1 194:1 239:24,25 251:22 259:14,16

**records** 14:5 80:21 103:4 205:13,15, 17 206:15, 20 207:17 230:3 250:20

**recounting** 206:1

**recurring** 47:11

**red** 132:7 134:23 162:8,12, 24 164:12, 23,25 197:25 198:4 199:2,4

**redacted** 9:13 39:21

**redo** 51:4

**redone** 23:24 25:8

**redundant** 24:11

**refer** 21:1, 6,10 121:12 255:1

**reference** 14:6 19:13 27:21 41:3 94:13 135:13,15, 18 206:23 207:18

**referenced** 53:21 54:12 59:12 71:24

**references** 42:19 50:24 194:11

**referred** 14:1 24:6 46:1 70:9 103:4 162:22

**referring** 7:18 18:22 20:1,6,21 66:8 69:14 71:4 103:14 153:23 154:3 155:22 156:3,9 170:18

199:15 206:14,15 228:6

**reflect** 136:20 205:4

**refresh** 82:18

**refund** 111:24

**refurbish** 27:6 31:6 32:13 45:13 46:18 51:4 54:11

**refurbished** 23:21 24:2,16, 20,25 25:6,24 26:13 27:16 30:24 31:2 32:3 44:5, 15,20,23 47:18 55:18 56:20 57:6,10,12 60:6,11

**refurbishing** 23:19 24:1 29:21 53:14

**refurbishment** 22:23 25:4,18 30:16 41:4,5 44:16,17, 18,22 45:12 60:8

**refurbishments** 22:19

**regular** 20:20

**reiterate** 70:15

**relate** 255:1 259:5

**related** 183:18 184:2,5 254:21 256:1,16 257:25

**relation** 11:20 70:2 171:16

**relayed** 46:13 50:17 235:9

**relevant** 103:17 168:23

**relies** 44:7 47:6

rely 45:19
  141:18

remain 68:17

remainder
  127:14

remark 40:25

remarks
  180:19
  192:12

remedied
  45:14 93:8

remedy 241:6

remember
  15:11
  18:3,4
  30:18
  33:22
  46:14
  75:11
  82:15
  99:20
  180:21
  195:16
  197:24
  232:19

remotely
  5:10 6:4

removed
  157:7

renew 58:9

renotice
  7:19

rep 8:8
  170:15

172:7
173:5
174:3

repair 32:13
  50:24
  182:6,12

repaired
  57:13
  182:10,11

repairs
  26:14
  181:17
  182:5,7
  196:24
  197:2

repeat 23:15
  25:20
  43:10
  194:24
  221:21

repeated
  194:12

repeatedly
  189:5

repeating
  86:12

repetitive
  231:22

replace
  46:18
  50:25
  51:14 58:6
  182:6

replaced

27:23 28:9
31:9 52:13
56:20
57:22
223:1

replica
  86:16

report 17:9
  106:18,22,
  23 107:21,
  22 108:1,
  2,10
  138:18
  141:9
  184:6
  185:4
  188:10
  202:24
  203:4
  209:7
  225:7
  253:24

reported
  45:17
  181:19
  202:23
  203:16
  207:23
  209:6
  234:4
  246:19

reporter
  5:11,15,
  21,24
  6:13,17
  34:4,6,18
  60:18

65:19,21
84:15
86:10
88:18,25
122:10,18
133:22
152:15
172:12
174:15
187:3,11
188:9
196:6
200:16
202:11
212:24
213:1
214:19
225:6
235:16,18,
25 236:2
239:20
240:1
244:20
245:4
247:4,6
259:16,19

reporting
  6:3,7

reports
  74:10
  106:21
  209:5
  232:2
  253:19
  254:4,23
  255:11
  258:1

represent
  66:17
  80:25
  85:11
  99:23
  134:15
  182:3
  216:22

representative
  5:4 11:22
  173:11
  192:17
  223:22

represented
  71:5

representing
  5:12

reproduced
  247:19

request   8:19
  12:5,7,14,
  16 24:18
  31:20 32:5
  70:10
  182:3
  211:21
  231:6
  253:10,12

requested
  70:23
  216:15

requests
  182:5

require
  116:13

required
  11:11
  74:18
  79:19
  105:9
  170:8
  181:11
  229:13
  236:13

requires
  46:2 98:18
  101:10
  108:7
  145:10

resanded
  31:9 32:7
  47:19
  52:14
  57:13,22
  59:22
  64:3,7,9
  219:23
  246:2

resanding
  29:22
  57:19
  64:14,20,
  21

resistance
  27:18
  47:20 49:7
  50:9 56:1
  71:7
  245:19
  246:8

resistant

46:24

respect   8:8
  17:1,18
  21:15
  27:15
  29:21
  32:12
  37:22
  55:17
  64:17
  86:19 94:7
  114:6
  181:23
  235:5
  237:1
  249:17
  251:14

respond
  49:13
  132:12
  136:1
  137:17,23
  251:25

responded
  131:18,21,
  24 135:19
  141:8
  156:7

responding
  135:15

response
  8:19 24:18
  31:20 32:5
  78:3,5
  143:16
  144:21

145:19
  168:12
  188:4,12
  192:6,16
  216:23
  253:7,11

responses
  34:20
  111:8

responsibiliti
es   11:15,17
  17:17
  86:19
  104:5
  105:8
  132:3

responsibility
  114:18

responsible
  18:5,8,17,
  22 46:3
  78:15
  87:22
  93:6,12
  96:5 98:2
  105:4
  106:9,12
  114:21
  115:1,19,
  23 168:12
  256:19
  257:10

responsive
  12:14,15
  249:16

rest   68:11

256:8

**restroom**
197:11

**result** 119:4
143:6
155:16

**results**
145:10

**resume** 82:22
168:25

**resumes**
166:17

**resurface**
26:8

**resurfaced**
26:2,5,6
63:9

**resurfacing**
23:12
53:14 54:8

**reveal** 16:4

**revert** 191:5

**review** 7:21
8:20 12:10
13:16
16:21
33:15
41:13 66:2
90:18,22
91:12
150:8
151:11

**reviewed**
11:25

12:3,4,5,
6,8,16,18,
23,24,25
13:2,21
36:15
69:22
88:6,9
89:19
90:5,14,
17,24
91:2,4
97:14
99:12,24
152:3
165:25
183:10,14
184:23
193:14
205:15
216:1,15

**reviewing**
14:18
82:15
235:5

**Rhapsody**
208:16,23
217:21

**rid** 68:3,21
69:11,19
176:8
221:1

**right-hand**
134:22

**rip** 58:4,5

**ripped**
52:12,19

**ripping** 58:4

**rise** 103:19

**rises** 147:8

**risk** 116:9
242:24

**risk-creating**
20:24

**risk-like**
75:24
92:19
106:13

**Riskonnect**
183:9,16,
23 184:5,
13 229:25
230:1,2
253:3
255:17
256:5

**role** 17:1

**ROM** 184:4

**room** 94:4

**Rosenthal**
5:10

**roughly**
20:22

**routinely**
112:4

**row** 124:4
156:5,6
158:12,14

**rows** 124:2

**Royal** 5:4,19
7:5 9:24
10:7,8,20,
23,25 11:2
12:11,19,
22 13:17
16:24 18:7
19:17,23
21:6 25:5
26:4,10
27:5,15
29:20
30:12
32:11
35:7,19,24
36:2 37:11
42:7
43:17,22
44:7,13
45:3 46:2
47:6,15,
21,23 48:3
49:5
50:10,15
55:24
56:18,25
57:5 60:7
70:9,20
73:1
75:17,20
76:3 77:4,
12 78:13,
19 79:6,17
80:20
87:8,21
91:18
92:16 94:6
95:23

101:7,15
102:24
105:3
108:11
109:7,13,
21 112:3,
8,10,17
113:16
115:8,18
116:12
117:13
118:6
119:20
123:2
127:5
129:9,16,
18,20,25
130:3,7,
15,24,25
131:22
132:25
138:6,20
139:8,12,
18 140:13,
21 141:6
142:21
143:13
144:22
145:2,14
146:14
147:12
148:1,8,15
149:4,13,
22 150:1,6
160:6
162:10
163:12,14
164:24

165:10,21
166:4,8
167:15
168:6,15
169:17,24
170:22
171:18,25
173:23
179:3
180:18,19
181:1,9,
11,22
182:4
184:15
185:3
186:2
189:2,25
191:19
192:9
193:5
196:20,22
203:12
204:11,18,
25 205:3
206:2,7
207:5
212:12
214:5
222:1
224:17
231:8,12
234:11
235:4
236:15,25
237:14
238:3,6,9,
13,19
240:15,19,

22 241:1,
11 243:12
245:20
246:5,17
249:16
254:2
258:9,11,
13

**Royale** 5:6
22:20

**rude** 188:23
189:23

**ruffles**
157:9

**rule** 87:6,
9,13,14,18
193:5

**rules** 11:10

**run** 39:8
115:17
197:11
198:15

**running**
46:22
98:17
241:25

**runs** 38:18,
25 39:6

———————

S

———————

**S-I-E-B-E-L**
247:18

**S-N-B-A-N-D-A-
L** 132:1

**safe** 45:6
46:24
50:11
101:12
127:6
243:4
245:19
246:7

**safely** 102:1
107:18
114:7
118:20
120:4

**safely-related**
34:25

**safer** 254:7
255:22

**safety** 8:25
9:14 33:19
37:16,19,
21 41:1,3,
25 42:5,22
45:23 46:1
47:3,9
50:9,15,21
71:8 77:24
78:9 103:4
130:11
141:9
181:5
183:14
184:22
205:10,17
207:17
235:8,11
236:16
237:1

242:7
243:22,25
253:17
254:6
256:22,23,
24 257:2,
9,13
258:7,14,
18,21

**safety-related**
43:18
243:13,17

**sail** 148:24
149:6,8
231:9

**sailed** 65:8,
9

**sailing** 64:2

**saltwater**
28:8 29:8

**Samra** 73:21

**sanctioned**
169:24
170:17,22
172:1
173:24

**sanctions**
173:20

**sand** 32:9
58:3,7
73:10

**sanded** 27:17
52:19,22
55:1 58:9,

14 60:11
63:12
64:6,20,22
65:5,13,16
67:14
68:3,21
69:2,8,11,
18 70:25
72:18
220:23
221:1
225:24
226:2,12
228:5

**sanding**
61:13 63:3
66:3 70:16
73:3,15
224:16
226:4
244:16

**saved**
183:15,21,
22 184:13

**scene**
131:22,24
132:15
133:1,15
135:16,19
137:23
141:8
157:6,12,
14 160:16

**schedule**
77:13,22,
25 80:8
81:2,19

83:19
85:1,4,9,
17 86:15,
17 87:8
96:21,23
97:11
106:8

**scheduled**
118:15
119:2

**schedules**
86:21

**school** 10:16
102:12,19,
20,21

**scope** 61:23
146:5
191:2
222:24
233:13

**scratched**
65:15

**screen** 34:15
67:19
154:19
156:22
174:21
247:12

**screenshot**
122:25
128:9

**screw** 74:7

**search** 87:8
202:21
203:8,9

209:13
210:10
230:14,15
248:1,22
249:4
252:15,16,
20

**Seas** 27:7,
23 28:15
30:24 31:7
33:20 38:5
40:14 48:8
49:25
53:12,23
58:17
59:10
61:18 64:4
66:5,24
79:7
81:20,25
82:1 83:24
85:5,13,
15,20,22,
25 87:1
102:3
104:1
128:20
134:11,13,
18 135:6
197:7
202:17,25
208:1,6
209:11
213:6
216:25
222:18,19
225:16,17
226:6

228:18
230:8,16
233:5
237:3,17
242:7
246:15
249:18
251:15
254:8
258:12

**seated**
164:11

**seawater**
28:8

**sec** 83:6

**seconds**
165:17
167:17,18
176:15
179:10

**section**
158:8

**sections**
51:22

**security**
15:8 22:3,
4 131:10,
15,16,17
151:17
192:14
195:11,15
196:16
258:21

**sees** 116:22

**Seibel**

247:18
249:1

**Select** 52:22

**semantics**
186:8
189:5
191:22

**semi** 152:23

**send** 16:20,
22

**senior** 40:13

**sense** 13:8
28:7 29:3
37:15
58:10
94:24
116:6
143:22
180:4
198:16
240:20
252:11

**separate**
19:5
248:6,17
249:7
250:3,5

**September**
15:10

**series** 11:11
110:21

**serve** 11:21
99:2 108:9

**served**

243:11

**service**
51:14,17
52:4
53:10,24
54:1 63:22
108:25
111:16
182:5
252:9

**services**
105:10
234:16,19
247:22
251:23

**serving**
115:1

**set** 26:7
33:25
34:20
66:24
83:21
111:9
195:20

**sets** 52:25
155:6

**shade** 68:11

**shaded** 67:7,
22

**shades** 67:3

**share** 154:19
156:22

**shared**
257:19

**sharing**
156:20

**sharp** 241:14

**Shavi** 110:23
111:9

**ship** 17:21
20:2,3
22:20
26:18,25
27:2 28:25
32:16
36:7,9
40:9,22
42:3,9,14,
21 43:4,15
44:14,18,
20 45:16
52:10
53:10
54:5,9
63:17,18,
19,22
70:3,6,21,
24 71:18
73:15,18
76:3
77:14,17,
19 81:8,9,
21 83:23
85:9 92:3,
12 93:13
102:2,14
103:10,19
104:7
105:5,7
112:14,20
114:3

115:17
117:11
118:8,11,
12,15,24
119:1
127:16
129:17,19
130:6
141:7
142:21
143:9,24
144:6,7
145:11,15,
16 146:3
148:3,10,
11 149:7
183:6
186:24
188:16
193:6
205:10
209:16
213:12,22
218:18,21,
23 222:17
226:13
227:6
230:22
254:7
257:2,9
258:1,15

**ship's** 184:7

**shipboard**
15:3
254:24

**ships** 22:21
35:21 36:4

37:13,18
64:2 82:1
85:21
102:8,10
118:22
208:2,9,
11,13,14,
21 209:4
210:11
211:4
216:25
219:3,7,8
222:7
225:15
228:5,13,
16 229:21
230:21
232:1
235:6
236:16
237:4
246:17

**shirt** 124:7
134:24
178:1

**shoreside**
15:1 22:8,
11 44:16,
22 45:18
46:9 47:13
50:17
51:2,9
70:22
71:1,19
73:14
77:25
116:4,6

168:11
181:13,20
183:6,19,
21 184:3,
11,12
192:14
195:6
196:17
235:10,12,
13 253:16,
19 255:20,
25 258:22,
25 259:3

**shoreside's**
49:22

**short** 83:2
118:1
154:14
197:20
236:5
240:6
245:10

**shortly**
154:8

**show** 34:3,
10 39:18
84:12,22
88:12
89:3,5,7
124:10
133:24
135:13
136:10
152:12
154:2
155:11,12
156:10

161:7
167:19
174:10,19
175:16
176:7,12
177:2
182:4
224:21
225:20
246:25

**showed** 111:6
128:4
156:24
185:11
199:2

**showing** 23:6
134:11
135:9
136:21
155:2
169:22
175:12

**shown** 165:1,
23 167:24
168:22
206:22

**shows** 24:20,
25 31:20
66:22
155:4

**sic** 200:22

**side** 75:22
77:9 87:24
92:17
94:19
95:8,25

105:13
114:3
124:1,2
135:8
160:20
199:24
200:1,9

**Siebel**
230:12
234:8
236:25
247:17,23
248:11,18
249:5,11,
15 250:20,
25 251:14,
19,21
252:6,8,
12,14
253:15
254:5

**sign**  148:25
149:6,8
199:21
200:5
201:9

**sign-in**
116:14,19

**sign-outs**
116:19

**signage**
201:10

**signed**
116:15,16

**signs**  144:9
199:8,12,

13,14
200:11
201:14,17
202:1,5,7

**SIM**  184:6

**similar**  85:5
114:3,4
218:14
221:9,17
222:2,7,10
223:7
224:9
226:10
228:6
253:14

**simple**
126:24
127:19
173:12

**simply**
136:21

**single**  33:2
87:22
105:23
117:2

**sir**  84:15

**sister**  208:1
219:3
230:21
237:4
246:17

**sit**  30:21
78:19
195:21
225:10,13

239:10

**sitting**
81:15
155:20
163:4
228:14

**situation**
45:14
171:2
235:17

**size**  102:2

**skip**  77:14
179:18
180:23,24
190:12

**skipped**
166:3,7,9,
10,12
168:6,13
169:16,19
174:11
179:12
180:14,21
183:11
189:9
190:20,21
191:4

**skipping**
179:4
182:19
186:9
191:14

**skips**  179:3
180:5,6
189:12

**Slender**
208:20

**slid**  201:7

**slides**
200:10

**sliding**
199:15,18,
19,21
200:8,9,25
201:1

**slip**  27:18
35:21,24
36:2 37:22
38:4 42:8,
24 43:17,
20 46:4,
23,24
47:11,20
49:7 50:9,
23 55:25
56:1 71:7
92:19 96:2
98:22
112:19
113:7,17
114:13
142:21
143:2
168:1
202:16,25
203:4,12
204:11
205:25
207:7,23
209:10,13
210:5,21,
24 211:3

212:13
213:5,12
216:24
217:3,16,
17,18
221:7
234:10
235:5
236:23
238:17
245:18
246:7
254:3

**slip-and-fall**
36:4 76:1
103:6
207:25

**slip-resistance**
35:9 68:13
69:6

**slip-resistant**
28:16
29:10
67:23
245:18

**slipped**
129:17,24
167:19,20
203:20
205:1,6,
18,22
206:8,17,
25 207:15
238:12
242:2
246:14

**slipperiness**
45:3 230:7

**Slippery**
201:11

**slipping**
49:20
237:23

**slips** 203:9
209:14
210:12
211:9,11,
16 212:18
213:8
217:8
230:16
232:2,9
238:7
248:2,5,19
252:22

**slower** 41:8

**slowly** 41:7

**small** 214:14
216:11,19,
20

**Snbandal**
132:12,16
133:11
137:11
142:1,2,7

**so-called**
181:23

**Soft** 52:22

**software**
175:23

**solarium**
92:9,10

**sold** 244:5

**somethings**
47:14
252:21

**someway**
47:19

**song** 190:7

**sort** 23:19
26:13
46:22
111:25
120:6
128:14
132:5
158:11,24
159:3,12
161:1
190:10
224:19
254:6

**sound**
117:16,17
209:19,21
226:24

**Spain** 63:20
65:10

**span** 209:2,
3

**speak** 15:17
17:6
21:21,24
22:6,24
23:15

27:11
47:16,24
55:20
73:20,24
75:10,13
93:18
141:11
146:6
161:20
169:14
192:10
195:6,14

**speaking**
25:22
36:16
39:11,15
60:19
62:16 65:3
69:8 75:4,
18 85:17
103:14
138:15
232:4

**specific**
9:12 13:22
16:3 18:9,
24 19:24
30:14
61:4,7
63:24 64:5
65:11
69:18
78:15
80:3,5
95:14
97:16
102:4,25

110:2
135:23
150:18
161:12
248:9
249:3

**specifically**
9:11 17:23
25:15 30:9
33:21 36:9
39:14
51:21 57:1
66:24 74:6
77:15,25
91:17
92:23
99:20
101:25
124:20
170:2
220:20
222:5,8
242:12

**specifications**
244:6,7

**specificities**
26:1

**specifics**
21:11
223:2

**speed** 197:15

**spell** 15:7
22:13
131:25

**spelled**
247:17

**spells** 92:18

**spends** 106:3

**spill** 93:11
94:10,13,
14 95:4,20
112:21
113:3,10
153:12,15
158:18
163:1
164:3

**spilled**
19:20
20:24
93:16
152:4
242:1

**spills** 75:24
95:15
100:3
106:14
107:7
109:20
114:4

**spoke** 14:25
15:2,4,6,
10,14
16:2,13,16
17:12 18:2
21:22
22:7,8,11,
12 23:1,4,
6,11,18
30:21
55:9,16
73:21,23,

25 74:2,9,
24 196:17

**spoken** 22:25
75:1
228:17

**spoliation**
169:25
171:17
172:1
173:20,24

**spot** 190:9

**spreadsheet**
215:3,4
229:23
234:2
251:3
252:24
253:2,5

**SQM** 258:7

**square** 64:5

**stab** 241:15

**stack** 120:5

**stacked**
124:2

**stacking**
120:6

**staff** 42:21
76:18
105:4

**staffing**
21:15
113:23

**stain** 158:24

**stairs**
176:15

**stamp** 8:18
41:11

**stamped** 8:17
40:5
183:25
216:7
247:14

**stand** 246:23

**standards**
243:22
245:18

**standing**
147:14
178:1

**staring** 98:6

**start** 41:6
51:2,12
61:3 86:5
142:11
162:16
176:14
179:15

**started**
138:15
156:19
162:14,17,
19

**starting** 6:9

**state** 5:14
6:8,25 9:8
30:18
78:22 94:4

| | | | |
|---|---|---|---|
| 184:22 | step | strike  92:14 | 179:11,25 |
| 203:20 | 124:12,13 | 96:14 | |
| | 201:10 | 118:25 | **sufficient** |
| **stated**  8:9 | 239:15 | 191:21 | 98:21 99:6 |
| 24:3 30:5 | | 210:1,21 | 104:6 |
| 31:1 79:21 | **step-by-step** | 251:11 | |
| | 77:16 | | **suggest** |
| **statement** | | **structure** | 42:20 |
| 42:25 | **stepped** | 188:16 | |
| 76:20 | 129:23 | | **suggested** |
| 104:13 | 207:20 | **stubbed** | 232:16 |
| 123:17 | | 241:24 | |
| 125:24 | **stern**  20:2, | | **suggesting** |
| 140:1,8 | 14 | **stuck**  33:3 | 102:17 |
| 148:9 | | | 169:1 |
| 166:18 | **sticker** | **Studders** | |
| 234:24 | 134:1 | 74:24 75:5 | **suggests** |
| | | | 143:14 |
| **statements** | **sticking** | **stuff**  28:8 | 206:8 |
| 139:13,15, | 241:3 | 58:8 71:16 | |
| 17,19 | | 252:4 | **summarize** |
| 235:1 | **stipulation** | | 258:10 |
| | 13:25 | **subcommittee** | |
| **states** | | 37:2 | **summary** |
| 169:25 | **stop**  114:13 | | 171:13 |
| 203:12 | 156:20 | **subject**  8:1, | 253:14 |
| 204:15,25 | 238:24 | 4 35:2 | |
| 205:17,21 | 239:1 | 230:22 | **sun**  68:8,18 |
| 206:25 | | 254:25 | |
| | **stopped** | | **sunny**  128:19 |
| **stationed** | 42:14 64:2 | **subsection** | |
| 18:16 | | 39:9 | **superficially** |
| 107:3 | **stops**  156:22 | | 45:4 |
| 114:22 | | **substance** | |
| | **store**  116:7 | 19:21 | **supervise** |
| **stays**  183:7 | | 153:2,3 | 105:20 |
| | **stored**  76:17 | 155:19 | |
| **steering** | 252:13 | 158:11,16 | **supervised** |
| 37:2,5,15 | | 159:2,13 | 78:11 |
| 39:8 46:7 | **stowaway** | 160:18 | |
| 47:3 50:16 | 120:4 | 161:1 | **supervisor** |
| 235:8,11 | | 163:3 | 15:9 22:3, |
| | **streaks** | | 4 106:23 |
| **strictly** | 28:21 | **sudden** | 108:3,9 |
| 44:7 | | | 111:18 |
| | | | 115:25 |

| | | | |
|---|---|---|---|
| 116:8 | 96:18,20 | 58:1,2,14, | 56:19 57:6 |
| 117:10 | 97:6 99:14 | 15,16 | 227:9,21 |
| 131:10,15, | 100:2,24 | 59:10,16 | 228:24 |
| 16,17 | 104:9 | 61:15,17 | 244:10 |
| 151:17 | 106:16 | 62:3 63:3 | |
| | 107:3,5,15 | 64:3,15 | **surgery** |
| **supervisors** | 109:16 | 65:5,6 | 143:25 |
| 108:10 | 115:10 | 66:4 68:12 | **surrounding** |
| 109:2 | 120:21 | 69:1,3,4, | 23:5 24:7, |
| 115:15 | 140:23 | 24 100:3 | 10,21 |
| **supplemental** | 181:16,17 | 155:8 | 31:24 |
| 8:19 34:19 | 183:19 | 210:7 | 45:11 |
| | 186:7 | 217:25 | 241:14 |
| **support** | 192:18 | 218:5,6,8, | |
| 131:4 | 224:22 | 12 219:1,2 | **sustained** |
| 145:12,23, | 225:21 | 222:17,22 | 142:22 |
| 25 146:12 | | 223:8 | **swear**  5:15 |
| **suppose** | **supposedly** | 224:14,15 | **swim**  123:16 |
| 200:14 | 94:18 | 225:14,17, | 124:12,13, |
| **supposed** | **surface** | 24 228:5 | 15 |
| 15:12 | 24:14 | 229:1 | **switched** |
| 19:21 | 25:23 | 230:8 | 257:15 |
| 26:5,6 | 29:18 | 242:6 | |
| 27:16 44:5 | 30:13,23 | 243:14 | **sworn**  6:15, |
| 46:22 | 31:6,7,8 | 244:3,11, | 20 |
| 56:20 | 32:6,13 | 13 245:14, | **system** |
| 75:14,22 | 33:19 | 17 246:2 | 183:23 |
| 77:6,8 | 35:1,8 | | 219:20 |
| 78:20 | 44:5 48:4, | **surfaces** | 220:18 |
| 79:18 80:9 | 17,20 49:1 | 26:5,11 | 226:5 |
| 83:22 | 50:10,25 | 27:6,22,23 | 230:2,3 |
| 86:6,23 | 51:18 | 28:14,15 | 251:24 |
| 87:3,25 | 52:12 | 29:21 44:4 | 252:10,11 |
| 92:13,17, | 53:14 | 45:3 46:18 | |
| 22 93:7, | 55:25 | 47:18 | **systems** |
| 10,11 | 56:6,14,17 | 48:6,8 | 230:13 |
| 94:2,9 | 57:18,21, | 49:6 50:11 | |
| 95:13 | 24,25 | 51:14,15 | |
| | | 55:18 | |

| | | | |
|---|---|---|---|
| **T** | talks  47:21 225:2 | 32:14 41:15  72:8 | 25  120:2, 5,7  127:15 |
| takes  27:10, 13  31:16 54:19,20 55:2  60:9 103:10 252:18 | tan  67:9,12 | 107:14 126:16 | 137:16 138:2 |
| | tans  67:3 | 130:22 144:19 | 150:4 182:17 |
| | tape  72:24 128:9 189:10 198:12 | 150:1 157:11 159:2 | 231:25 252:16 |
| | | 167:10 176:2 | **test**  45:2 |
| **taking**  7:19, 22  46:5 58:10,11 88:22 114:21 116:24 130:10 193:2 239:20 | task  104:6 | 189:19 190:22,25 | 50:19 136:11,13 |
| | Teach  220:17 | 212:2 220:7 | 243:4 |
| | Teak  23:24 25:9,13 52:21 59:18 68:21 219:19 243:16 | 227:17 229:12 233:12 234:17 | **tested**  243:8 |
| | | | **testified** 6:20  21:1 31:13 33:10  48:7 76:22 80:24  81:1 84:8  142:7 169:14 174:7 193:9 199:7 206:11 228:2,13, 16  250:5 |
| **talk**  23:3 62:3  94:14 165:7 186:18 226:22 | team  9:2 15:1 36:12,19, 23,24,25 37:7 38:19,22 44:16,17 45:12  60:8 74:5,10 205:10,21 | tells  39:13 | |
| | | ten  38:21 66:19 | |
| **talked**  23:23 219:18 | | term  189:9, 12  190:11 | |
| **talking** 20:16 21:22 69:17 172:13 213:23 214:15 218:24 225:7 241:18 258:4,5 | | terminated 116:3 | |
| | technological 148:16 | terms  20:12 39:5  46:12 47:17  54:2 59:19 60:2,5,6 73:14 93:21 103:15 113:18 119:23,24, | **testify**  62:9 173:5 225:22 228:12 242:13 |
| | technology 190:8 | | |
| | television 184:2 | | **testimony** 19:17 21:10 24:13  25:5 |
| | telling | | |

61:23
74:23
97:20
99:18
100:22
101:1
136:25
141:19
157:11
164:22
173:11,18
194:4
221:15
224:3
226:15
227:7
231:18
246:23

**testing**
33:18,19
34:25
35:8,9
43:18
49:15
50:19
136:22
191:10
243:13,24
244:3
245:22
246:6,11

**Texas**
143:10,11
203:16

**texture**
61:14

**thing** 8:13
26:9 33:2
57:19
58:10
60:10,23
144:14
168:17
169:8
186:10
225:23
259:6

**things** 27:25
29:8 33:5
47:14
57:13 59:4
60:9 98:4,
18 101:10
105:11,13,
25 106:4
108:22
114:4
117:6,7
161:2
181:10
243:20
247:25

**thinking**
59:15
60:6,23
142:4,10
188:22

**thought**
81:12
87:16
88:18,20,
23 104:13
111:12

143:3
144:13
152:9
153:7,9
160:13
190:4

**thousand**
110:10

**thousands**
103:25
232:16,17
233:2,3

**three-year**
209:2,3
210:6
213:9
230:17
248:3,20

**tilt** 254:17

**time** 5:7
8:20 9:20
11:1 15:9
16:14
17:5,13
21:4 22:4
25:25
26:7,12
27:6,10,
12,13
29:14 36:8
42:15,18
48:6,15
49:2 51:9
53:13,15
54:22
58:16

60:19 65:6
68:7 69:2
70:8 72:8,
10 78:2
81:12
82:25 83:3
89:1 93:6
98:9
103:11
104:22
106:4
110:8
115:3
117:3
118:2,7
121:8,14
124:21,23
125:23
128:16
130:1,3,20
132:2,23
133:3
135:20,23
137:16
139:24
140:14
141:12,25
142:5,10
146:1
148:6,13
149:24
150:3,4
154:12,15
156:15
160:12
163:8
166:6
168:1,8,23

172:14
174:24
178:25
179:1,5,6,
9 183:12
185:11,12
188:5
191:22
192:12
193:16,19
194:1,14
195:17,19
197:18,21
222:11
225:18,23
236:6
240:4,7,10
245:8,11,
14,17
246:1,4
259:11

**times**  11:6
22:25
44:15
50:14
56:13,16
86:5,20
90:18
99:12
116:2,3
148:17
149:5
185:17
202:23
207:23
226:23
227:3
241:9

246:22

**tiny**  213:25

**title**  7:17
18:9,12,13
19:5,7,8
39:14
41:23
74:12
110:1
174:25

**titled**
114:13

**titles**  10:23
18:24

**today**  5:7,24
7:12 14:24
15:13
30:21
41:19
73:20
78:20
81:15
90:22
195:21
222:1,4
223:11,19,
22 225:13,
21 233:24

**today's**
8:15,21
193:14
211:22
219:13

**toe**  241:24

**told**  18:22

32:11
68:19
71:12,15
87:15
125:10
138:24
157:5
166:10
176:20
181:13
197:1
203:23
204:7
211:10
222:16
229:8
234:16
256:13

**top**  31:23
40:16
71:14
105:18
106:1
236:13

**topic**  55:9

**topics**  7:25
39:12 62:2

**total**  19:18
92:16
94:19
95:12
207:25
217:2,14
249:15

**touch**  51:8

**towels**  98:2,

11,19,23
99:4 105:9
108:21

**track**  112:22
149:10

**tracked**
113:2

**tracking**
148:2,16

**traction**
49:19

**training**
101:24
102:1,6,
13,15,25

**transcribed**
101:5

**transcript**
259:9,15,
17

**transpired**
132:23

**traumatic**
143:15,16,
20,22
144:3,17,
19,21,23,
24,25
145:3,7,8,
18 147:9,
10 205:22
206:3,4,5

**traverse**
237:12

**traversed**
  233:4

**traversing**
  46:25
  245:19

**treatment**
  147:2

**trends** 37:21
  46:23
  235:5
  254:6

**trial** 8:9
  171:14

**trip** 206:23
  207:7
  211:3
  213:13
  217:9,16

**tripped**
  203:16
  204:16,19
  205:1
  206:8
  207:3

**tripping**
  237:25

**trips** 203:9
  209:14
  210:12,14
  211:8,11,
  15 212:18
  213:8
  230:15
  232:2,9
  248:2,5,19

  252:22

**true** 38:6
  95:7 98:14
  166:17
  209:25

**truthfully**
  11:12

**turn** 110:19

**turned**
  136:25

**turns** 68:7

**type** 25:16
  26:8 32:8
  92:20
  210:7
  217:25
  218:11,13
  226:5
  252:16

**types** 35:20
  57:13

**typical**
  128:19

**typically**
  106:5
  233:17
  251:1

———————

    U

———————

**ultimately**
  30:11
  106:9

**unable**
  109:24

  118:13,24
  119:1
  126:1
  207:13

**unaware**
  56:18
  94:17
  206:24
  207:2

**uncertain**
  169:19

**unclear**
  58:12

**underestimate**
  102:10

**undergoes**
  22:22

**undergrad**
  10:13

**underneath**
  105:14
  153:2
  158:7,13
  163:4
  164:3

**understand**
  7:2,8
  11:10 17:7
  29:17
  32:12
  53:16
  55:23 57:9
  60:22
  70:19
  80:20

  93:24
  95:19 97:1
  98:16
  115:20
  171:21
  188:14
  189:2,21,
  23 190:4,
  14 191:15
  220:12
  222:20
  226:1
  232:20
  244:22
  255:7

**understandable**
  194:10

**understanding**
  16:13,24
  17:16,22
  19:6 22:1
  25:22
  33:12
  49:17
  54:21
  55:5,12
  57:23
  58:2,13
  59:5 63:8
  67:15
  71:12 73:5
  76:24 84:2
  96:6,16
  128:11
  140:16
  144:11
  145:2

Case 1:20-cv-25271-JB Document 49-1 Entered on FLSD Docket 04/12/2022 Page 339 of 342
JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.
Amanda Campos on 01/12/2022          Index: understands..video

156:14
183:13
191:18
197:8
207:2,24
212:12
223:9
224:18
232:13
240:23
258:14

**understands**
55:24
80:21

**understood**
186:21
221:3

**undertake**
77:12
182:23

**undertaken**
77:21
139:22
144:25
150:9
242:16

**undertaking**
79:11

**unduly**  213:3

**unfortunate**
169:18

**uniform**
132:8

**Unit**  83:4
154:16

236:7

**United**
169:25

**University**
10:13,16

**unlimited**
112:10,13,
16

**unreasonable**
101:7
107:1
211:21

**updated**
182:19

**upgraded**
182:19

**uploaded**
183:15

**usefulness**
198:18

**utilized**
44:4

────────────

V

────────────

**vantage**
177:13

**variables**
28:13

**variety**
26:15
30:4,19
45:24,25
247:25

**vast**  12:2
237:11,12

**Veer**  110:23
111:10

**venue**  149:9,
10

**verbal**
113:25

**verbally**
87:15

**verbiage**
189:7

**verbs**  191:15

**version**  85:3
153:6

**versus**  5:6
58:25
68:20
232:2

**vessel**  17:11
35:2
51:13,16
53:12,24
70:11 72:4
73:2 93:22
134:17
228:7
257:15
258:11

**vessels**
210:6
212:14
214:15
221:8

227:10,21
228:1,3,
19,25
230:4
231:10
232:18

**vicinity**
122:3

**video**  5:3
12:10
13:6,7
14:20,21
55:23
88:6,12
89:22
90:5,10,
11,16
91:3,12
97:14,24
98:8,9
99:8,11,25
100:11,14
102:13
108:20
121:6
123:1
130:15,18,
22 131:5
132:10,11
136:10,15,
21 137:10
151:2,3
153:21,22,
23,24,25
154:2,22
156:2,12,
22,24

157:21
161:6,14
162:17
163:20,21
165:7,9,
14,19,20,
22,25
166:9,15,
23 167:2,
11,19,23,
25 168:6,
13,22
169:13,15,
16,22
170:1,23
171:18,19
172:2
173:24
174:10,13,
15,17,18
175:1,6,
11,13,14
176:7,13,
15,17,19
177:1,5,
15,17,18
178:10,18,
19,22
179:2,3,6,
8 180:5,6,
7,11,13,20
181:2
183:5,10
184:16
185:10,24
192:12
193:6,10,
12,13,15,

17 194:13
195:8
196:18,21,
23 197:5,
25 198:1
215:1
239:25
259:12,14

**videocamera**
115:21
168:8
176:11
181:23
182:6,12
185:5
196:23
197:4

**videos**
12:21,24,
25 13:2,4,
12 14:1,7,
11 88:9,24
89:3,19
90:13,18,
25 155:3
183:14

**view** 13:8
100:19
131:5

**viewed**
169:13

**violate**
15:20

**violation**
127:5,10,
14,15,19,

25

**vision**
85:22,23
208:5,16,
23 211:3
213:9
217:1,21

**visual** 44:8,
9

**vomited**
142:13

**voyage**
213:18,19

**voyages**
232:18

---

**W**

---

**wait** 61:21
100:6
208:14
232:23

**waited** 73:9

**waiters**
114:25

**waive** 6:6

**walk** 109:18
123:15
151:7
199:21
200:4
233:22
251:22

**walked**
137:1,2

168:24
199:20
232:6

**walker** 137:4

**walking**
49:10,19
69:3 92:23
93:9,10
95:13
97:16,17,
25 98:5
99:13
137:5
158:19
194:15,22
237:24
238:1

**walks** 93:19
165:16
166:16

**walkway**
112:23
114:2

**wanted** 17:6,
25 83:10
253:12

**warning**
199:8,12,
13,14,21
200:11
202:1,5,6

**warrant**
145:18

**watch** 176:13
177:16

**JENNIFER PELL vs ROYAL CARIBBEAN CRUISES LTD.**
**Amanda Campos on 01/12/2022**          Index: watched..wrong

179:7
201:10

**watched**
161:19

**watching**
55:22
115:21
117:2
130:5,8,15
131:5
185:8

**water** 43:7
112:22
113:2
123:14
124:12
134:21
152:9
153:8,9
159:3,12,
16,21,23
160:5
164:4
237:22

**water-like**
160:17

**ways** 110:10
117:9
148:2
185:17

**wear** 28:7,
15,19,24

**wearing**
26:19
124:7

**wears** 132:7

**week** 55:3
66:20

**weekend**
134:18

**weeks** 55:4
68:23

**wet** 20:23
45:6 75:24
92:18
95:15
107:6
109:20
201:11
248:23
249:2
252:23

**whatsoever**
58:5

**whichever**
42:12

**white** 132:7
134:24
153:4

**wife** 137:4

**wind** 119:25

**Windjammer**
20:12,13,
15 21:18
92:1
165:16
166:16
168:24
233:10,13,

16,17

**window**
170:22

**wineglass**
158:9
160:20
164:5,6

**witness's**
61:23

**witnesses**
139:14,25
140:3,17,
18,24
141:20,22
149:21
182:23

**wood** 52:18
67:8

**word** 145:6
166:2
180:23,24
181:6

**words** 57:1
58:24 59:1
61:5,11
214:17
238:23
249:3

**work** 15:20
70:4
100:15
102:9
105:14
168:9
213:3

252:19
257:13

**working**
10:20,22,
25 80:18
87:14
100:12,14,
20 107:5
110:5,14
116:7

**works** 44:24,
25 48:3
75:2 81:9,
15

**worn** 28:6

**worse** 28:7,
24

**write** 140:17

**write-in**
234:19

**written**
27:20
32:16,22
33:6 35:15
43:22
46:11,12,
15,16,17,
19 49:5
50:13,18
94:8
113:23,24
114:6
116:1,2,23
246:5,10

**wrong** 32:14

50:4
128:3,9
129:23
215:12

**wrongdoing**
171:16

**wrote** 184:24
185:1

**wrote-in**
234:16

─────────────
**Y**
─────────────

**Yashwant**
110:23
111:10

**year** 27:9
31:14 36:8
87:21
170:2
172:1
173:25
213:21
244:11

**year's** 65:6

**years** 10:5,9
26:7 33:18
35:3,10
58:9 79:15
80:15,16,
17 148:1
202:21
208:2,6
210:11
212:14
217:3

232:2,3
236:23
237:16
243:14
249:18,21,
23

**yellow**
123:12
124:17
199:11

**yesterday**
23:2,4
65:1 72:2,
8,10

**yielded**
207:14

─────────────
**Z**
─────────────

**zoom** 5:10
91:1
153:24
175:12,13,
22

**zoom-in** 40:3

**zooming**
175:21