*Frank A. Fore, P.E., CXLT*
*Professional Engineer*

# AMENDED ENGINEERING REPORT

*Name of Injured:*
Jennifer Pell

*Type of Incident:*
Slip and Fall on Wet Synthetic Exterior Deck

*Date of Incident*:
January 16, 2020

*Where Incident Occurred:*
Deck 9 Main Pool Amidships Port Side
RCCL *M/S Enchantment of the Seas*

*Place and Date of Vessel Inspection*:
Cape Canaveral, FL; January 2, 2022

*Investigation Conducted by:*
Frank A. Fore, P.E., CXLT

*Report Requested by:*
Philip M. Gerson, Esq.

*Report Submitted:*
April 1, 2022

## TABLE OF CONTENTS

QUALIFICATIONS ........................................................................................................................3

EXECUTIVE SUMMARY ............................................................................................................4

    Summary of the Facts of the Incident ......................................................................................4

    Background of Slip & Falls on Exterior Deck Surfaces ..........................................................5

    History of Slip & Falls Synthetic Pool Deck Surfaces ...........................................................6

LITERATURE REVIEW ...............................................................................................................7

    ADA Background .....................................................................................................................7

    Dangers of Walkway Surfaces with Insufficient Slip Resistance .........................................10

    Marine Environment Slip Resistance ....................................................................................11

    Sustainable Slip Resistance ...................................................................................................12

    Slip Resistance Testing .........................................................................................................13

    Warnings Help Prevent Slips ................................................................................................13

MATERIALS REVIEWED ..........................................................................................................14

SAFETY CODES, REGULATIONS, STANDARDS, GUIDELINES, &
RECOMMENDATIONS ..............................................................................................................16

*ENCHANTMENT OF THE SEAS* VESSEL STATISTICS & INSPECTION ......................20

    Vessel Statistics ....................................................................................................................20

    Refurbishment (2005, 2012) .................................................................................................20

    Vessel Inspection, Layout, & Observations (01/02/2022) ....................................................20

    Slip Resistance Testing .........................................................................................................25

    Effects of Seawater and Other Contaminants .......................................................................26

PLAINTIFF CHARACTERISTICS .............................................................................................27

    Plaintiff Characteristics ........................................................................................................27

    Vision ....................................................................................................................................28

    Shoes .....................................................................................................................................28

CONCLUSIONS ...........................................................................................................................28

REFERENCES ..............................................................................................................................30

    Codes, Standards, Guidelines, and Recommendations .........................................................30

    Scientific Literature ..............................................................................................................31

## QUALIFICATIONS

I am a Professional Engineer. I hold a Bachelor of Science in Mechanical Engineering (with honors) from the Georgia Institute of Technology.  From 1985 until 1991 I was an engineer at Pratt & Whitney with a focus on failure analysis of aircraft component materials.  Since then, I have owned and operated my own engineering consulting firm in Jupiter, Florida.  I am a licensed General Contractor in the State of Florida.  I have designed, constructed, and maintained flooring.  In the past, I have been licensed by the U.S. Coast Guard as a Master of Vessels.

I have worked as a forensic accident investigator since the time I was employed at Pratt & Whitney.  There, I was directly responsible for determining the causes of Class-A military aircraft mishaps.  Since leaving Pratt, I have investigated and analyzed numerous mishaps, including slips and falls on cruise ships (at the request of both plaintiffs and defendants).

Assessing the risks and causes of slips, trips, and falls involves several disciplines, including engineering, biomechanics, human factors, ergonomics, epidemiology, and tribology (the study of the interaction of sliding surfaces).  As a professional engineer, I have received training and have practical experience in applying these disciplines.

As both an engineer and general contractor, it is necessary to be aware of, and to take into account, relevant scientific and technical literature and mandatory and voluntary safety standards, guidelines, and recommendations pertinent to particular construction and maintenance applications and potential safety hazards.  Such scientific/technical literature and consensus safety standards frequently identify dangerous conditions and specify what most practitioners do, or *do not* do, to avoid them.

I applied the same overall methodology to the present case that I was taught to follow in evaluating military aviation mishaps at Pratt & Whitney. This process involves hypothesizing plausible explanations for conditions or events presented by the human-equipment interface in question and then taking into account relevant literature and performance standards, evaluating the known physical evidence, visiting accident scenes, interviewing available witnesses, if any, to see if hypotheses can be proven (or disproven), and conclusions can be reached, to a reasonable degree of probability.  Certainty is not required.  For example, while at Pratt & Whitney, whole fleets of military aircraft were grounded based upon a determination of *probable* causes of mishaps.

I have been allowed to present expert testimony using the same methodology I employed in the present case.  See *Holderbaum v. Carnival Corp.*, 2015 WL 5006061, at pp. 3-10 (S.D. Fla., Aug. 23, 2015)(rejecting Daubert challenge to most of my expected testimony); *Benner v. NCL (Bahamas) Ltd.*, Case. No. 15-20585 (S.D. Fla., Apr. 4, 2016)("It is clear that Fore engaged in an adequate scientific investigation of the incident itself, further supported by relevant scientific literature and vessel regulations."); *Galarza v. Carnival Corp.*, Case No. 15-24380 (S.D. Fla., Aug. 8, 2016)("Fore's testimony is admissible"

regarding slip resistance); and *Holley v. Carnival Corp.*, Case No. 20-cv-20495, (S.D. Fla., Nov. 18, 2021)(" Mr. Fore may opine as to whether Defendant violated Defendant's own safety standards and industry standards").

## EXECUTIVE SUMMARY

### Summary of the Facts of the Incident

On January 16, 2020, the plaintiff in this case, Jennifer Pell, was walking on the exterior walkway adjacent to the main pool on Deck 9 of the RCCL *Enchantment of the Seas*. At the time, weather conditions included a persistent heavy fog that limited visibility and dampened the deck walking surface. Suddenly and without warning, Ms. Pell stepped on a slippery area, slipped, and fell. While falling to the ground, Ms. Pell struck her head on a metal chair, and as a result of that impact, she suffered a traumatic head injury requiring surgery.

RCCL's pools and hot tub spas are filled with seawater. The deck area where Ms. Pell slipped and fell surrounds a pool filled with seawater. Therefore, as dripping swimmers walked on the subject deck, salt would accumulate on the walking surface. The flooring near the pools on the vessel is also subject to constant contamination by sunscreens and oils – transferred and deposited there by bathers who continually traverse the flooring around the pools. It is reasonable to believe that the passengers using the pool on the *Enchantment of The Seas* would also use sunscreens and oils, with the obvious result that the water passengers would drip on the deck would also contain these sunscreens and oils.

In the main pool area, RCCL had installed an all-synthetic flooring. The synthetic flooring that RCCL chose for the Deck 9 pool area is a product called *Future Teak* manufactured by the Bolidt Cruise Control Corporation.

The slip-resistance of the synthetic flooring, *when wet*, was dependent on the surface roughness of the floor after installation. At the time Ms. Pell slipped and fell, the deck was wet and slippery due to the ambient persistent fog, and she could not see the floor condition because of the fog. Further, there is evidence that the floor becomes less slip-resistance with wear and requires periodic sanding to maintain adequate slip-resistance.

Antoine Dons, General Manager of Bolidt, acknowledged that *Future Teak*, when first installed, has little to no "undulation" and that "inherently our products are self-leveling." He also explained that "the final mechanical sanding of the top surface gives it roughness; i.e., the wood grain effect, which is also the [surface] roughness that you are referring to. And that is done with the same grit of sandpaper that is specified for this system."

In scientific studies it has been shown that rougher floor surfaces typically have a higher coefficient of friction (COF). However "rougher" flooring can store lubricants in the valleys between the "asperities" (i.e., tiny peaks) in the flooring, thus acting as reservoirs for the contaminants.

Further, Luis Portillo, an employee of Bolidt, acknowledged that in November 2018, that Bolidt was "hired to sand the future teak around the main pool deck, this project has been booked due to the current state of the future teak it is ***quite slippery since it lost its original grain***." (emphasis added)

On January 2, 2022, I inspected the *Enchantment of The Seas* for the purposes of the present case. In the area where the plaintiff fell, the flooring had obviously been cleaned, ***sanded***, and was in the process of being resealed by RCCL prior to my arrival slip-resistance testing.

RCCL now claims that the areas changed prior to my arrival were only damaged, or stained, areas. The area I inspected had been sanded so it was impossible for me to inspect the unsanded "stained" areas, but typically, decks become "stained" because containments remain present for prolonged periods of time. Further, the area I inspected does not appear to be included in the area referred to by Bolidt in their scope of work. The *Enchantment of The Seas* was taken out of service just six weeks after the subject incident, so it was likely that had the deck not been sanded prior to my arrival, the deck would have been in substantially the same condition as it was on the day of the subject incident.

Finally, I reviewed numerous prior Guest Injury Statements, RCCL Steering Committee Minutes, Siebel databases, and Medallia databases that indicate that slips and falls on decks around the pools were very common historical occurrences.

## Background of Slip & Falls on Exterior Deck Surfaces

Falls in the United States account for approximately 9 million annual visits to emergency rooms. (2011 National Safety Council *Injury Facts*) Falls are the second leading cause of unintentional deaths, resulting in more than 25,000 fatalities in 2009 alone (NSC, "Slips, Trips, and Falls," 2013).

Many, if not most, same-level slips and falls are the result of defects in the floor surface and/or faulty housekeeping (Liberty Mutual Ins. Co., 2009, at 2). "Defective floors" include floor surfaces that lack adequate slip-resistance, especially when contaminated (*id*). "Faulty housekeeping" relates in part to allowing contaminants, such as water and oils, to build up on the floor (*id*).

Additional risk factors for slips and falls on floor surfaces include abrupt transitions from relatively *slip-resistant* dry areas to relatively *un-slip-resistant* wet areas (*id*).

Falls aboard cruise ships are the leading cause of traumatic injury to passengers (CDC, *Health Information for International Travel 2014*, at 497).

It should be noted that RCCL requires its crew to wear slip-resistant footwear while walking and working in guest common and other vessel areas (but does not warn passengers to do so).

Recognition of such slip and fall risk factors, and their fixes, by prominent safety organizations such as the International Maritime Organization (IMO), the U.S. Coast Guard, the U.S. Access Board, the American Society for Testing and Materials (ASTM), and major cruise lines including RCCL and Carnival, has led to the formulation and promulgation of walkway safety standards and guidelines which apply to the marine environment.

For example, American Society for Testing and Materials (ASTM) Standard F1166-07, entitled "Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities," generally "requires a coefficient of friction of **0.6 or greater** *measured when wet* for walkways, passageways, decks, ramps and stair treads."

RCCL internally specifies that flooring have *a minimum* coefficient of friction of **0.6** or higher, *measured when wet*. RCCL sees such "high traffic areas" aboard its ships as potential hot spots for contaminated flooring (*i.e.,* a slip hazard). As an indication of industry standards, Carnival has similar standards that also mandate a minimum of **0.6 or greater** *measured when wet* for walkways, passageways, decks.

## History of Slip & Falls Synthetic Pool Deck Surfaces

Prior to becoming involved in the present case, I have had occasions to assess the wet slip resistance of interior and exterior floor surfaces on several RCCL vessels. I have also performed such assessments on several Carnival vessels using a similar synthetic deck material. This includes the exterior waterpark deck of the *M/S Carnival Sunshine* and two prior occasions on exterior poolside decks on the *M/S Carnival Victory*.

Specifically, on Monday, January 16, 2017, I went aboard the Carnival *Victory* in another passenger slip case *(Padula v. Carnival)* to photograph and test the slip-resistance of natural teak and synthetic flooring on the exterior decks near a pool and the waterslide.

On that occasion, I used an XL Tribometer to test the slip-resistance of both natural teak and synthetic decking on the vessel (in the general vicinity of the waterslide and a pool).

On April 17, 2017, in the *Padula v. Carnival* case, I rendered a report of my findings on the *M/S Carnival Victory*, and the reducing effect that ***salt water and oils*** from the pools and waterslide would have on the slip resistance of nearby flooring (in comparison with fresh water).

RCCL's pools and hot tub spas are filled with seawater. The deck area where Ms. Pell slipped and fell surrounds a pool filled with seawater. Therefore, as dripping swimmers walked on the subject deck, salt would accumulate on the walking surface. Seawater by itself is a superior lubricant, especially compared to fresh water (which is a good lubricant). Sea water will reduce friction seen under fresh water lubrication **by up to nearly half** (Chen, 2012a; Chen, 2012b; Ding, 2010; Lancaster, 1972).

Water-in-oil emulsions have the same lubricating effect as pure oils (Benner, 2006).  The deeper the liquid on the floor, the slipperier it will be (Dee 2016; Chen, 2014; Li, 2004).

In summary, my tests and relevant scientific literature demonstrate that suffusions of liquid, particularly seawater, or water containing oil (*e.g*., body oils, suntan lotion, *etc*.), independently or in combination, in comparison to fresh water alone, will reduce the wet slip resistance of surface materials to dangerous levels below generally-accepted minimum safety standards for flooring and thus be capable of causing an individual to slip and fall.

As an indication of industry standards, the Standard Club's Guide to P&I Cover, 2nd ed. 2001 (issued to club members such as Carnival), states:

> "*Floor covers.  Slips and falls can occur because of <u>water on the decks</u>.*"
> \*\*\*
> "*It is important to be aware that passengers on board a ship are not familiar with typical ship arrangements and typical ship problems*."
> \*\*\*
> "<u>*Passengers frequently slip on wet teak decks*</u>..."  (my emphasis)

RCCL's failure to remediate these conditions at the location of the subject incident on the *Enchantment of The Seas*, more likely than not, were substantial contributing causes of Ms. Pell's slip and fall incident in the present case.


# LITERATURE REVIEW

## ADA Background

The Department of Justice published revised regulations for Title III of the Americans with Disabilities Act of 1990 "**ADA**" in the Federal Register on September 15, 2010.  These regulations adopted revised, enforceable accessibility standards called the ***2010 ADA Standards for Accessible Design***.  These Standards for Accessible Design provide minimum architectural design standards for ***public accommodations*** and commercial facilities (Title III regulations at 28 CFR part 36, subpart D & 2004 ADAAG at 36 CFR part 1191, appendices B and D).


Further, the Architectural and Transportation Barriers Compliance Board (Access Board), proposed accessibility guidelines for the construction and alteration of passenger vessels to ensure that the vessels are readily accessible to and usable by passengers with disabilities. The guidelines are known as the *Proposed Passenger Vessels Accessibility Guidelines* (**PVAG**).

For forty years, Americans have heard phrases like "accessibility" and "accessible." RCCL, through their website provides the *Accessible Seas Brochure*.  This brochure uses these words throughout, and features the *Symphony of the Seas* on the cover and states:

*ACCESSIBILITY FOR ALL- Royal Caribbean believes the best vacations come without limitations. We are committed to providing the most **accessible** cruise vacation experience for our guests. That's why we outfit our ships with a wide variety of features and programming designed to give **access** to all. Rest assured, wherever our ships can go, you can too.* (emphasis added)

Further, most passengers on cruise ships worldwide are from the United States. In fact, as shown in **Table 1**, more than half of all worldwide passengers are from the United States.

| COUNTRY | PASSENGERS | PERCENT |
|---|---|---|
| United States | 11.9 | 51.9% |
| China | 2.4 | 10.5% |
| Germany | 2.19 | 9.6% |
| United Kingdom | 1.93 | 8.4% |
| Australia | 1.34 | 5.8% |
| Canada | 0.92 | 4.0% |
| Italy | 0.77 | 3.4% |
| Spain | 0.51 | 2.2% |
| France | 0.5 | 2.2% |
| Brazil | 0.45 | 2.0% |
| TOTAL | 22.91 | 100.0% |

**Table 1**- Where are Passengers Coming From? (passengers in millions) (Kennedy, 2018)

As will be shown *infra,* the U.S. Access Board, Proposed Passenger Vessel Accessibility Guidelines (PVAGs) provides floor ***slip-resistance requirements***. Again, the general slip risk factors in question, and the fixes necessary to reduce or eliminate them, have been well known for years and have been well-publicized.

As shown in **Table 2**, Carnival Cruise Line (which includes Princess Cruises), Royal Caribbean Cruise Line, and Norwegian Cruise Line made up over **76%** of the market share of the cruise industry ***worldwide*** in 2017. Therefore, the practices of these three companies reasonably constitute ***industry standard***.

| CRUISE LINE | PERCENT |
|---|---|
| Carnival | 44.1% |
| RCCL | 23.9% |
| NCL | 8.8% |
| Total | 76.8% |

**Table 2**- Market Share of the Cruise Industry Worldwide in 2017 (Statista 2020)
"Cruise Market Watch- Market Share" (Cruise Market Watch Retrieved 4 November 2018)

Again, as an indicator of *industry standards*, Carnival, Princess, Royal Caribbean, and Norwegian all have begun incorporating aspects of the ADA guidelines aboard their vessels.  Further, on July 23, 2015, the United States and Carnival entered into a widely published ***Settlement Agreement*** resolving an investigation into numerous complaints conducted by the United States under Title III of the Americans with Disabilities Act.  The Agreement acknowledged:

> *The Company* [Carnival] *is a public accommodation because it is a private entity that owns, leases (or leases to), or operates a place of public accommodation, i.e., cruise ships operating in United States' waters or those of its territories. 42 U.S.C. §§ 12181(6), (7) and 28 C.F.R. § 36.104.  Accordingly, **the Company is subject to the requirements of Title III of the ADA**, 42 U.S.C. §§ 12181-12189, and its implementing regulations at 28 C.F.R. Part 36.* (emphasis added)

Carnival Corporation agreed to designate an ADA Compliance Officer to be responsible for compliance across the three brands.  Carnival also agreed to appoint an ADA Responsibility Officer for Carnival and for Holland America Group (which includes Holland America Line and Princess Cruises) who has responsibility and authority to resolve ADA complaints for the respective brands.  In addition, Carnival agreed that each covered sailing will have designated ADA Shipboard Officers available to address ADA issues that arise at sea.

Again, as an indicator of ***industry standards***, according to Attachment A of the Settlement, Carnival Corporation owns and operates Carnival Cruise Line, Princess Cruises, and the Holland America Line (the "Covered Brands").  Collectively, these brands own, lease, or operate 55 cruise ships and have 7 ships currently in the design and construction phase.  These 62 ships are covered under the terms of this Agreement.

Further, Carnival Corporation agreed to hire ADA auditors to conduct surveys and audit each ship for compliance with the ADA Standards for Accessible Design in areas open to the public and in designated accessible cabins and suites.  The ADA auditors were to develop a plan to remediate barriers to access on each ship in conjunction with the Company's dry dock schedule, conduct on-site inspections to verify ADA compliance, and file a report annually with the Department of Justice.

As a result of the Agreement, Carnival Corporation created a new company "Brand Standards and Implementation Policies" to ensure **ADA compliance**.

The Agreement required, "The Company shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the ADA."

The agreement also required that, "The Company shall remove architectural barriers in existing facilities, including communication barriers that are structural in nature, where such removal is readily achievable, i.e., easily accomplishable and able to be carried out

without much difficulty or expense" (42 U.S.C. § 12182(b)(2)(A)(iv) and 28 C.F.R. § 36.304).

The location of the incident in the present case exhibits the previously mentioned risk factors, specifically that the walkway floor was not adequately slip resistant and there were no warning signs alerting passengers of the impending change in deck slip-resistance.

These conditions were created by the cruise line itself, and deviate from generally-accepted, if not mandatory, safety regulations, standards and guidelines pertaining to _accessible_ walkways for passengers.

### Dangers of Walkway Surfaces with Insufficient Slip Resistance

In general, slip and fall accidents on level walking surfaces are believed to be the result of a loss of traction between the shoe and the contact surface. (Lockhart, 2000, at 1) Foot slips on floors are due to insufficient friction between the sole and the floor (Chang, 2004, at 548).

"Friction" is the force that resists relative movement of two surfaces in contact with one another (Pazos, 2003). "Static friction" describes the resisting force at the instant that relative motion begins; and "dynamic friction" describes the resisting force when movement has already begun (_id_).

The **"Coefficient of Friction" (COF)** between two surfaces is the ratio of the force required to initiate or sustain movement of one surface over the other to the total force pressing the two surfaces together:

$$\text{COF} = \text{horizontal force/vertical force}$$

COF ranges from 0 to 1.0, and the higher the number the greater the slip resistance. A COF of 0.5 exists if it were to take exactly 5 pounds of horizontal force to slide a 10-pound weight across a level floor (5/10 = 0.5). If there were less traction so that it took only 4 pounds to cause the weight to slide, then the COF would be 0.4. Ice may have a COF of less than 0.20 while dry, whereas clean asphalt may have a COF of 0.8, or more.

A foreign substance on a walking surface can increase the danger of walking on that surface by acting as a lubricant and decreasing the slip resistance between the shoe and the surface to an unsafe level. According to the ASTM International:

> The presence of foreign materials on walkway surfaces often causes people to slip. Most foreign materials, if present on a walkway, will lower slip resistance. A foreign material in contact with a shoe and a walkway presents two additional surfaces: the top of the foreign material mating with the bottom of the shoe sole, and the bottom of the foreign material mating with the walkway surface. Obviously, keeping the walkway surface clean of foreign materials is the best method to eliminate this potential hazard (ASTM Int'l F 802-83, 1983, Section 4.1).

Water, acting as a lubricant between the shoe and the floor, can reduce the slip resistance. Templer (1992) reports that only selected combinations of wet shoes and wet surfaces result in a slip resistance value (COF) greater than 0.4 (Templer, 1992, 51-53).  According to Templer, many surfaces (*e.g.*, linoleum, concrete, granolithic, clay tiles and terrazzo), which are normally slip resistant when dry, lose slip resistance when wet and exhibit "coefficient of friction" values between 0.2 to less than 0.4 (*id.*, Table 3.5, 52).

In other words, a person stepping onto a surface covered with a layer of water may experience only half, or less, of the slip resistance that surface would have provided had it been dry.

In human ambulation, every heel contact with a floor surface results in some "slip." Recovering from slip events (*i.e.*, avoiding a fall) becomes more challenging as *slip distance* and *peak forward sliding velocity* increase.  (Cham, 2002, at 575)  Slip distances and sliding velocities greater than 10-15 cm. and 0.5 m/s respectively usually result in falls (*id*).   However, falls can also result from slip distances and sliding velocities below those levels (*id*).

"Required coefficient of friction" (**RCOF**) is the measured ratio of the horizontal foot force to the vertical foot force and represents the minimum coefficient of friction that must be available at the shoe-floor interface to prevent slipping (Burnfield, 2006, at 983; Bunterngchit, 2000, at 230).

"Surface changes" describe transitions from one type of flooring material to another as one walks through an area (Zurich, 2011, at 3).  This is a critical safety issue when the adjoining surfaces have widely different slip resistance, such as dry teak to wet synthetic flooring (*id*.; Bunterngchit, 2000, at 230).  Surface changes like these may create a higher RCOF requirement and exposure for a slip and fall incident, especially if the  pedestrian who is walking on a slip-resistant surface is unaware that an adjoining surface is relatively less slip-resistant (particularly when wet) (*id*).

Chang, *et. al*. explained in 2004:

> *The control of slipping events requires the establishment of a friction standard for the floor/shoe combination and the use of materials that meet this standard.*

**<u>Marine Environment Slip Resistance</u>**

Environmental conditions aboard vessels operating in a marine environment present walkway and slip resistance challenges that differ somewhat from those in a comparable shore side venue (Pazos, 2003).

Thus, the American Society for Testing and Materials (ASTM) Standard F1166-07, entitled "Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities," generally "requires **a _coefficient of friction of 0.6 or greater measured when wet_** for walkways, passageways, **_decks_**, ramps, and stair treads" (emphasis added).

Even RCCL, through their own internal Safety Standards, requires that flooring shall have a minimum **_SCOFw_** (Static Coefficient of Friction (**_wet_**)) of **_0.6._**

Further, the **_deeper the liquid_** on the floor, the **_lower the COF_** will be (Dee 2016; Chen, 2014; Li, 2004). Pazos posits that hydroplaning can occur when a person moves fast on a walkway where the amount of standing water is significant (Pazos, 2003, at 3). Photographs of the deck surfaces in the area where Ms. Pell fell show significant puddling of water.

**_Seawater by itself is a superior lubricant_**. It can reduce the slip resistance of materials seen under fresh water lubrication **_by up to nearly half_** (Chen, 2012a; Chen, 2012b; Ding, 2010; Lancaster, 1972). RCCL's pools and hot tub spas are filled with seawater. The deck area where Ms. Pell slipped and fell surrounds a pool filled with seawater. Therefore, as dripping swimmers walked on the subject deck, salt would accumulate on the walking surface.

A rougher floor surface may lead to a higher coefficient of friction (COF) (Chang, 2004). However "rougher" flooring can store lubricants in the valleys between the "asperities" (*i.e.*, tiny peaks) in the flooring, thus acting as reservoirs for the contaminants (Chen, 2014; Mohamed, 2012).

Mohamed, *et. al.* (2012) concluded that wetting flooring materials (*e.g.,* wood and polymers) with water and/or oils causes drastic decreases of friction coefficient. The **_lubricating effect of water-in-oil emulsions is like oil alone_** (Benner, 2006). Clearly the use of sunscreens and oils would be common in this area. While the *Enchantment of The Seas* was not in service during my inspection, I have personally witnessed passengers applying sunscreens on other RCCL vessels.

## Sustainable Slip Resistance

Aggravating the problem, the walkway surface can become less slip resistant with use (Strautins, 2008a, 2008b). This can occur rapidly, such that some relatively new products can become hazardous within a short period of time (*id*). The loss of slip resistance with use may be attributed to a range of complex interacting factors including the installation process, surface treatments, maintenance and wear (Strautins, 2007, at 1).

Sustainable Slip Resistance (SSR) testing can identify flooring that is susceptible to loss of its slip resistance from wear and inappropriate maintenance (Sotter, 2010). The SSR test procedure consists of an initial slip resistance test, followed by 5,000 cycles of mechanical abrasion, followed by another slip resistance test (Sotter 2010, at 3, Strautins 2007, 2008a). The greatest loss of slip resistance typically occurs after the first 50 cycles (Strautins 2008a, at 3). Five hundred cycles has been found in the laboratory to be roughly equivalent to 6-12 months of wear in customer areas in a McDonald's restaurant.

**Slip Resistance Testing**

Where, as here, there is an allegation that a particular slip and fall was caused by <u>wet walking surface conditions</u>, proper assessment of the walking surface itself must be carried out under both dry *and we*t conditions (DiPilla, 2002).  This requires special test equipment capable of making wet coefficient of friction measurements (*id*).

Some types of testing devices, such as "drag" or "pull" meters, are unsuitable for this purpose because they tend to adhere or "stick" to the wet surface being tested (Zurich, 2012, at 2).  This phenomenon, called "**sticktion**," requires more than usual force to pull a drag-type meter from the stationary position (*id*).  This can result in higher-than-accurate wet coefficient measurements, that approach if not exceed the dry measurements (*id*).

On the other hand, certain *articulated* testing devices, such as the Brungraber Mark II and the English XL tribometers, replicate a human foot-strike on a flat surface and thereby avoid the "sticktion" problem (Zurich, 2012).  These articulated devices have been validated by scientific studies as a reliable means for measuring the slip indices of dry *and wet* surfaces (Zurich, 2012; Kim, 2012; Excel Tribometers, 2012; Burnfield, 2006; Grieser, 2002).

American National Standard Institute's Technical Report ANSI/ASSE TR-A1264.3, "Using Variable Angle Tribometers (VAT) for Measurement of the Slip Resistance of Walkway Surfaces" demonstrated that the VIT is a reliable method for testing the slip resistance of walking surfaces.

Tribometers in general, and the specific VIT I used, have also been demonstrated to be valid in accordance with American National Standard Institute's ANSI/ASTM F2508, "Standard Practice for the Validation and Calibration of Walkway Tribometers Using Reference Surfaces."

**Warnings Help Prevent Slips**

Many researchers have observed that when individuals expect a walking surface to be slippery, e.g., ice, they tend to shorten their step length in order to reduce forward foot velocity at foot touchdown (Lockhart, 2010, at 3).  In general, reducing the step length reduces the RCOF for a given walking surface (Bunterngchit, 2000, at 230).

Thus, when forewarned, a pedestrian can be more vigilant and walk in a safer manner.  But a warning should not be depended upon in place of good design or adequate maintenance (Sotter, 2010).  People should not be expected to reliably use safety equipment (e.g., slip resistant footwear) or exercise special caution ("Slippery [or wet] floor" sign) (*id*).

As discussed *supra*, there were inadequate warning signs posted at the entrance to the main pool to alert passengers of the significant dangers presented by the walkway surrounding the main pool, even though this route was designated an "*accessible*" route by RCCL.

## <u>MATERIALS REVIEWED</u>

I reviewed and/or am familiar with the following information:

1. Amended Complaint;
2. Answers & Affirmative Defense;
3. Answers to Plaintiff's First Set of Interrogatories;
4. Chettupotula D 1-OCR;
5. Chettupotula D 2-OCR;
6. Chettupotula D 3-OCR;
7. Chettupotula D 4-OCR;
8. Def's 1st Supp Resp to Plf's 1st RFP (168 pgs);
9. Def's 2nd Supp Resp to RFP - Bolidt BCC 17-02-24;
10. Def's 2nd Supp Resp to RFP - Medallia;
11. Def's 2nd Supp Resp to RFP - Personnel Files (500 pgs);
12. Def's 2nd Supp Resp to RFP - Prior Incidents;
13. Def's 2nd Supp Resp to RFP - Siebel Remarks;
14. Def's 2nd Supp Resp to RFP - Steering Committee Minutes (381 pgs);
15. Def's 2nd Supp Resp to Plaintiff's 1st Set of Interrogatories;
16. Def's 6th Supp Document Production - GR1188-1726 (539 pgs);
17. Def's 6th Supp Resp to Request for Production;
18. Def's Ans to Plf's Interr - Docs Provided GR000232-268;
19. Def's Answers to Plaintiff's First Set of Rogs;
20. Def's Fourth Supp Resp to Plf's 1st RFP;
21. Def's Interratories to Plf;
22. Def's Resp to RFP - Docs Produced;
23. Def's Resp to RFP;
24. Def's Response to Plaintiff's 2nd Set of Rogs;
25. Def's 1st Supplemental Response to Pl's 1st RFP;
26. Dinesh Chettupotula Deposition (10-17-21);
27. Email from Dinesh Chettupotula - GR1187;
28. 5th Supp Resp to Plaintiff's 1st RFP;
29. Pics Provided with Def's Ans to Rogs GR 70-77;
30. Jennifer Pell CCTV Stairs 1 of 2.mov;
31. Jennifer Pell CCTV Stairs 2 of 2.mov;
32. Jennifer Pell CCTV_44004195v1.mov;
33. Leszek Rusz - Photos (8);
34. Leszek Rusz 1 - OCR;
35. Leszek Rusz Deposition (12-20-21);
36. Leszek Rusz 2 - OCR;
37. Leszek Rusz 3 - OCR;
38. Leszek Rusz 4 - OCR;
39. Leszek Rusz 5 - OCR;

40. Marjun Sabandal Deposition (10-21-21);
41. Pics Attached to NOS Answers to Rogs (37);
42. Pic of Friend Showing Heavy Fog (1);
43. Plf's Ans to Def's Rogs;
44. Plf's Resp to Def's RFP;
45. RCCL Document Production in Response to 2nd RFP;
46. RCCL 4th Supp Doc Prod to Pl's 1st R4P GR001081-1106;
47. RCCL Response to Pl's Second R4P;
48. RCCL 3rd Supp Response to Plf's 1st RFP;
49. RCCL 3rd Supp Resp to Plf's 1st RFP;
50. RCCL 3rd Supp Resp to Plf's 1st RFP - Deck Logs;
51. Resp to 1, 2, 3 and 4 (2,618 pgs);
52. Resp to 10 and 12;
53. Resp to 13;
54. Resp to 18;
55. Reviewed Medical Docs;
56. 2nd Supp Resp to Plaintiff's 1st RFP;
57. Supplemental Response to Plaintiff's Rogs;
58. Deposition of Jennifer Pell (10-01-21);
59. Deposition of Ronald Pell (10-01-21);
60. Deposition of Yashoda Nandan (10-21-21)
61. RCCL Document Production - Supplemental Response to Third Request for Production-GR001911-1961;
62. RCCL Seventh Supplemental Response to Pl's First Request for Production;
63. RCCL Supplemental Response to Pl's Third Request for Production Nos. 7 and 10;
64. Document 1417_001;
65. Document 1418_001;
66. Document 1420_001;
67. Document 2099_001;
68. Document 2100_001;
69. RCCL's *Work Safe Live Well Topic*;
70. RCCL's QT-G-003 *Safety Quick Trainer Own The Spill Response Kit & Required Team Training*;
71. RCCL's *Own the Spill* – Safety and Injury Prevention SQM, Chapter 5.05;
72. RCCL *Accessible Seas* brochure;
73. RCCL's Website *Questions related to Accessibility & Disability*;
74. RCCL *Enchantment of The Seas* Accessible Cruising Deck Plan;
75. Results of my vessel inspection of the RCCL *Enchantment of The Seas* on January 2, 2022;
76. Results of my vessel inspection of the Carnival *Victory* on January 16, 2017;
77. Deposition of Antoine Dons, General manager of Bolidt (and exhibits) taken in *Padula v. Carnival*;
78. Deposition of Konrad Pankiewicz (Carnival *Victory* Pool & Deck Supervisor) taken in *Padula v. Carnival*;

79. Settlement Agreement Between the United States of America and Carnival Corporation (DJ No. 202-17M-206);
80. Amendments to the Settlement Agreement;
81. RCCL's internal Safety Standards and Training Materials;
82. Codes, Standards, Guidelines, and Recommendations on page 30, *infra;*
83. References listed on pages 31-33, *infra.*

## SAFETY CODES, REGULATIONS, STANDARDS, GUIDELINES, & RECOMMENDATIONS

**International Maritime Organization,** *International Safety Management (ISM) Code***,** (adopted in 1998 under authority of the international **Safety of Life at Sea (SOLAS) Treaty** and legally binding on vessel operators), provides:

> 1.2.1.  The objectives of the Code are to ensure safety at sea, prevention of ***human injury*** or loss of life,…
>
> 1.2.2   Safety management objectives of the Company should, *inter alia*:
> .1 provide for safe practices in ship operation…
> .2 establish safeguards against ***all identified risks***.
>
> 1.2.3   The safety management system should ensure:
>
> .2   *that* ***applicable codes, guidelines, and standards*** *recommended by the [International Maritime] Organization, Administrations, classification societies, and maritime industry organizations are taken into account*. (my emphasis)

**International Maritime Organization,** *SOLAS, Part C, Regulation 13* **("Means of Escape")** (also legally binding) provides:

> 1.1   safe escape routes shall be provided;
> 1.2   *escape routes shall be maintained in a safe condition,* ***clear of obstacles***. (my emphasis)

**International Maritime Organization, "***Recommendation on the Design and Operation of Passenger Ships to Respond to Elderly and Disabled Persons' Needs***," *MSC/Circ. 735* (24 June 1996)**, states:

> Decks and floors should be level and have a ***slip-resistant*** surface. (my emphasis)

**U.S. Access Board,** *Proposed Passenger Vessel Accessibility Guidelines***, §V302.1 ("Deck Surfaces"), provides:**

> Deck surfaces shall be stable, firm, *and* ***slip resistant***….(my emphasis)

**ASTM F-1166-07,** *"Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities,"* states:

§11.12.1.1. Walkways, passageways, decks, and all other walking surfaces shall have a non-skid surface sufficient to provide a coefficient of friction (COF) of **_0.6_** *or higher measured when the surface is **_wet_**.* (my emphasis)

**The Standard Club's** *Guide to P&I Cover*, **2nd ed. 2001** (issued to club members such as Carnival), states:

"*Floor covers.* **_Slips and falls can occur because of water on the decks_**."
***
"*It is important to be aware that passengers on board a ship are **_not familiar_** with typical ship arrangements and typical ship problems.*"
***
"**_Passengers frequently slip on wet teak decks_**..." (my emphasis)

**Royal Caribbean Cruises Work Safe Live Well Topic**, states:

January 2019 Slip, Trip and Falls
PST004
Slip and trip injuries are preventable.
Causes of accident and incidents are 90% unsafe acts and 10% unsafe conditions*
 *National Safety Council
Empowering crewmembers to be cautious and proactive can minimize injuries.
Revision Date:  07/01/2017
Printed:  02/18/19

**Royal Caribbean Cruises Shipboard Safety Steering Committee Meeting Minutes**

Risk Management
On Deck
Safety Quick Trainer
Own The Spill Response Kit And Required Team Training
QT-G-003
Revision Date:  07/01/2017
Printed:  11/25/20

**Preventing Slips**

**_Slips and falls can be prevented by cleaning and maintenance of walking surfaces_** and awareness or behavior. (emphasis added)

**Clean Up Spills**

Our *Own the Spill SQM* policy is designed to heighten the awareness and to clean up spills for the safety of both crew and guest as you notice them.

### Guidance And Training

***All Officers, Staff and Crew must be willing to assist and take responsibility in the ship's cleanliness efforts, no matter what department they work in***, this includes: (emphasis added)

1. ***Stand by the area of water*** or liquid spilled while a co-worker obtains a warning sign and cleaning equipment to clean up and DRY the spill and/or remove the excess water. (emphasis added)
2. ***Advise guests*** and/or crew of the spill areas. (emphasis added)
3. ***Quickly place the warning sign near the area of the spill. Once the warning sign is placed, ensure pedestrian traffic is alerted to the spill and directed to avoid walking in the spill area***. (emphasis added)
4. ***Quickly clean and DRY the spill area***. (emphasis added)
5. Remove the warning sign and returning the area to normal operation.
6. Report malfunctioning equipment that may lead to standing water or liquids spills or locations with conditions of liquids or standing water may become present Ensure guests avoid the area of the equipment.
7. Pick up trash and properly dispose while walking about the ship.
8. Take ownership over the proper disposal of own garbage.
9. Assist other departments in keeping their respective areas clean.

### Practical Training

**Where is the Nearest Own the Spill Response Station to Your Work Area?**
1. Twice a week take your team to the ***Own the Spill*** Response Stations in their work areas.
2. Show them the *Own the Spill* Response Stations and point out each piece of equipment and explain their use.
3. After showing the team the *Own the Spill* Response Stations, conduct TWO (2) drills in their work areas.
4. Collect all CM signatures of those who attended the training. Conduct make up training for those who were not present signatures for training.
5. Sub-Division Managers should attended two (2) drills per month for quality control.

**Own *the Spill* – Safety and Injury Prevention SQM, Chapter 5.05**, states:

The *Own the Spill* program helps to promote a pride in overall cleanliness of the ship; is a shared responsibility with all employees across every department and reinforced by all supervisors. The program is to help reduce exposure to injuries resulting from slips and falls, by emphasizing the need to quickly respond to spills of liquids in guest and crew areas, in particular our restaurants, bars, public spaces and by managing excess water on open decks.

In general, slips and trips occur due to a loss of traction between the shoe and the walking surface or an inadvertent contact with a fixed or moveable object, which may lead to a fall.  A variety of situations that may cause slips, trips and falls include but not limited to:

- ***Wet*** or greasy ***floor*** - Uneven walking surfaces (emphasis added)
- Missing or uneven floor tiles – Damaged or irregular steps: no handrails
- Clutter – Electrical cords or cables
- Metal surfaces – dock plates – Weather hazards – rain, sleet, ice, snow, frost
- Loose flooring, carpeting or mats – ***Transition from one floor type to another*** (emphasis added)
- Sloped walking surfaces – ***Shoes with wet***, muddy, greasy or ***oily soles*** (emphasis added)
- Open desk or file cabinet drawers - Ramps and gangways ***without skid-resistant surfaces*** (emphasis added)

***The* above *items can be controlled or eliminated by practicing the procedures and guidelines* in the *Own the Spill SQM* policy (See Attached). (emphasis added)**

In addition to the *Own the Spill* policy, the following will help you create a safer environmental for both crew and guest.

**1) Create Good Floor Cleaning Practices**

Good floor cleaning is critical. When cleaning the various types of flooring around the ship, it is imperative to ensure that the proper chemical is used for the type of flooring and to minimize the amount of water used in the process.

Proper floor cleaning is a routine and ongoing procedure that is performed as a part of each crewmembers daily performance. ***When you see liquid that has been spilled, immediately clean the up the area. Do not walk by the spill***. If you see a fellow crewmember spill a liquid, stop him/her and immediately clean up the spill. ***In common areas, it may be necessary to assign a specific person to clean up the area***. (emphasis added)

**2) Reduce Wet or Slippery Surfaces**

Walking surfaces account for a significant portion of injuries to our guests and crew. The most frequently reported types of surfaces where these injuries occur include
- Food preparation areas
- ***Common areas*** such as restrooms and ***walkways*** (emphasis added)
- ***Changes in flooring types*** (emphasis added)

***Traction on outdoor surfaces*** such as pool areas can quickly [sic]. Those conditions can then affect indoor surfaces as moisture tracked in by pedestrian traffic.
- ***Keep walking areas clean*** and in good repair condition. (emphasis added)
- When snow and ice are present, remove or treat these elements. In some extreme cases, it may be necessary to suspend use of the area.
- ***Use adhesive striping material or anti-skid paint whenever possible***. (emphasis added)

### *ENCHANTMENT OF THE SEAS* VESSEL STATISTICS & INSPECTION

**Vessel Statistics**

| | |
|---|---|
| Name | *Enchantment of the Seas* |
| Owner | Royal Caribbean Cruises Ltd. |
| Operator | Royal Caribbean International |
| Port of registry | Nassau, Bahamas |
| Ordered | 3 August 1994 |
| Builder | Kvaerner Masa Yards Helsinki New Shipyard, Helsinki, Finland |
| Yard number | 493 |
| Laid down | 25 October 1995 |
| Launched | 20 November 1996 |
| Completed | 3 July 1997 |
| Maiden voyage | 13 July 1997 |
| In service | 1997-Present |
| Type | Cruise Ship |
| Class | *Vision* |
| Tonnage | 82,910 GT |
| Length | 988.71 Feet |
| Decks | 11 Passenger Decks |
| Capacity | 2,446 Passengers |
| Identification | |
|     Call sign: | C6FZ7 |
|     IMO number: | 9111802 |
|     MMSI number: | 311733000 |

**Refurbishment (2005, 2012)**

In 2005, the Enchantment of the Seas was overhauled. Part of overhaul included stretching the vessel by cutting it in two amidship and adding a 73-foot long section. The Enchantment of the Seas entered dry dock at Keppel Verolme shipyards in Rotterdam on 15 May 2005. The mid-body extension section was built at Aker Finnyards.

The ship resumed service on 7 July 2005, less than two months after entering dry dock. The new section added included 151 new passenger cabins.

In December 2012, Enchantment of the Seas went into drydock in Freeport, Bahamas for a further refurbishment.

**Vessel Inspection, Layout, & Observations (01/02/2022)**

On, January 2, 2022, I conducted an on-site inspection of the scene of the incident on the RCCL *M/S Enchantment of the Seas*. At the time of my inspection, the vessel was tied up to the dock at the Cruise Terminal in Cape Canaveral, Florida. Counsel for defendant was present.

We were escorted from the pier up a gangway to a lower deck, from which we took an elevator to Deck 9.  On this deck, RCCL had installed two main pools.  These pools were surround by decks that were covered with the synthetic *Future Teak* (see **Fig. 1**).

**Fig. 1**



To get from the Windjammer restaurant area to the pool areas, passengers had to transit aft (see **Fig. 2**).  The red line indicates the route Ms. Pell intended to take, and the "X" marks the area where she slipped and fell on the port side of the vessel.

**Fig. 2**



21 *of* 33

Ms. Pell slipped and fell approximately in the center of **Fig. 3**.

**Fig. 3**



In the area where the Ms. Pell slipped and fell, the flooring had obviously been cleaned, **_sanded_**, and was in the process of being resealed by RCCL prior to my arrival and subsequent slip-resistance testing (see **Fig. 3**, **Fig. 4**, **Fig. 5**, and **Fig. 6**).

**Fig. 4**



The darker area on the left had been sealed (see **Fig. 5**). The lighter area on the right was unsealed.

**Fig. 5**



Close examination of the deck surface reveled fresh sanding (see **Fig. 6**).

**Fig. 6**



I inspected, photographed, and tested the synthetic decking using the English XL tribometer. I specifically tested the area where Ms. Pell slipped and fell (see **Fig. 7**).

**Fig. 7**



To exit the forward restaurant area going aft to the pool areas, passengers had to pass through sliding glass weather doors (see **Fig. 8**). These were the doors Ms. Pell used.

**Fig. 8**



As can be seen in **Fig. 8**, decals were placed on the lower half of the sliding doors cautioning passengers to "*WATCH YOUR STEP DECK SLIPPERY WHEN WET*." However, as can also be seen in **Fig. 8**, these doors opened automatically when passengers approached them.

When the doors are in the open position, the doors are drawn into pockets and the decals on the doors cannot be seen.  No other signs warned passengers about the **_slippery_** deck that RCCL themselves acknowledge is "*SLIPPERY WHEN WET*" (see **Fig. 9**)

**Fig. 9**



## Slip Resistance Testing

I was interested in measuring and comparing the dry *and wet* slip indices of the deck surface where Ms. Pell fell.  To do so, I used a currently-calibrated English XL Sequencer Model Tribometer, also referred to as the Variable Incident Tribometer (VIT).  I am an experienced operator of the VIT.  To demonstrate competency in the use of the VIT, I was required to accurately perform slip testing as part of the certification process by the manufacturer.  I used this equipment to measure the dry *and wet* slip indices of the **walkway surface** in the area where Ms. Pell slipped and fell.

Prior to arriving at the pier, I conditioned the test foot per the User's Guide using a sanding disk supplied by the manufacturer.  I used manufacturer supplied neolite test feet for all slip testing.  I installed the first foot and then adjusted the tightness of the test foot ankle joint per the User's Guide.  To verify the VIT Tribometer was functioning properly, I performed preliminary slip tests on a calibration tile that was provided and calibrated by the manufacturer.

I then measured the walkway slip resistance, while dry and *wet* with water, of three areas on the deck surface.  I tested each area in four orthogonal directions, in accordance with the standard ANSI/ASSE TR-A1264.3 (2008) for a total of twelve tests.  (See **Addendum A** for test results).

The average values for each area were:     **Dry**- 0.79, 0.78, & 0.65   ave: **0.74**
The average values for each area were:     **Wet**- 0.78, 0.72, & 0.66   ave: **0.72**

The deck, ***when freshly sanded***, uniformly meets, the **0.6** minimum coefficient of friction (COF) specified by the previously mentioned Codes, Standards, Guidelines, and Recommendations

Antoine Dons, General Manager of Bolidt, acknowledged that *Future Teak*, when first installed, has little to no "undulation" and that "inherently our products are self-leveling." He also explained that "the final mechanical sanding of the top surface gives it roughness; i.e., the wood grain effect, which is also the [surface] roughness that you are referring to.· And that is done with the same grit of sandpaper that is specified for this system."  Mr. Dons admits that sanding the deck increases surface roughness and that promotes slip resistance.

Further, Luis Portillo, and employee of Bolidt, acknowledged that in November 2018, that RCCL hired Bolidt "to sand the future teak around the main pool deck, this project has been booked due to the current state of the future teak it is ***quite slippery since it lost its original grain***." (emphasis added)

Apparently, the Future Teak in this area was installed in 2017 and according to Mr. Portillo of Bolidt, by 2018 the deck was already ***quite slippery*** because of wear.  Records indicate that the deck was sanded in 2018, but since Ms. Pell fell a year later, it is reasonable to assume that the deck was again in need of sanding.  This is reinforced by the fact that RCCL had actually again sanded the deck after Ms. Pell fell.


**Effects of Seawater and Other Contaminants**

RCCL's pools and hot tub spas are filled with seawater.  The deck area where Ms. Pell slipped and fell surrounds a pool filled with seawater.  Therefore, as dripping swimmers walked on the subject deck, salt would accumulate on the walking surface.

Konrad Pankiewicz, who was Pool & Deck Supervisor on a *different* cruise ship pool, the Carnival *Victory*, testified in his deposition in the *Padula* case, at pp. 32-34, 45-49, that the flooring near the waterslide and pools on the vessel is subject to constant contamination *by seawater and oils* – transferred and deposited there by bathers who continually traverse the flooring around the pools and waterslide (Bradford, 2014).  It is reasonable to believe that the passengers using the waterworks on the *Enchantment of The Seas* would also use sunscreens and oils, with the obvious result that the water passengers would drip on the deck would also contain these sunscreens and oils.

Studies have shown that the presence of oils in the water (fresh or salt) on the flooring surfaces in question would be capable of degrading the wet slip resistance of those materials to unacceptable, dangerous levels (Mohamed, 2012; Benner, 2006).

Further, the deeper the liquid on the floor, the lower the COF will be (Dee, 2016; Chen, 2014; Li, 2004). Thus, a suffusion of liquid on the flooring surfaces in question (as opposed to the small amount of fresh water I used in my testing) would independently be capable of degrading the wet slip resistance of the flooring to unacceptable, dangerous levels (*id*).

Studies have demonstrated that seawater by itself is a superior lubricant which can reduce the *wet* coefficient of friction of a broad range of materials **by up to nearly half** of the friction values seen with fresh water lubrication (Chen, 2012a; Chen, 2012b; Ding, 2010; Lancaster, 1972). RCCL's pools and hot tub spas are filled with seawater. The deck area where Ms. Pell slipped and fell surrounds a pool filled with seawater. Therefore, as dripping swimmers walked on the subject deck, salt would accumulate on the walking surface.

Therefore, the presence *of salt water* (rather than fresh water) on the flooring surfaces in question would independently be capable of degrading the wet slip resistance of those materials to unacceptable, dangerous levels that (1) would violate the referenced safety codes, regulations, standards, guidelines, and recommendations, and (2) would be fully capable of causing one to slip (and fall) (*id*).

More to the point, Mr. Dons acknowledged that Future Teak when contaminated, that "If that contamination itself is slippery, then that would be correct to assume [that the slip resistance of the deck would be expected to diminish]. He also acknowledged that Bolidt tells customers that they need to keep the floor clean to maintain the slip-resistant properties.

In summary, *suffusions* of *oil-infused seawater* (or sea water alone) transferred to the flooring by bathers from the nearby saltwater pool would independently or in combination reduce the slip resistance of the synthetic flooring to dangerous levels that violate the previously mentioned safety standards and would be fully capable of causing an individual to slip.

# PLAINTIFF CHARACTERISTICS

## Plaintiff Characteristics

Ms. Pell, at the time of the fall, was 68 years old, stood 5'10" in height and weighed approximately 200 pounds. She had not consumed alcohol on the day of the fall.

<u>**Vision**</u>

My understanding is that she had good vision and only needed corrective lenses for reading.

<u>**Shoes**</u>

My understanding is that Ms. Pell was wearing rubber sole open toed shoes at the time of the incident.

## **CONCLUSIONS**

1.  My tests and relevant scientific literature, taken together, demonstrate that liquid suffusions, and/or seawater, and/or oil, independently or in combination, would take the wet slip resistance of the flooring in question down to dangerous levels.

2.  These lower slip-resistance levels would violate the previously mentioned safety standards that have been published worldwide for decades and that I have personally previously provided RCCL.

3.  These lower slip-resistance levels would be fully capable of causing an individual to slip and fall.

4.  These conditions existed on the walking surface where Ms. Pell slipped and fell when she walked onto the walkway.

5.  RCCL's choice of flooring, and the conditions of the flooring in question, were substantial contributing causes of Ms. Pell's slip and fall on the RCCL Enchantment of The Seas on January 16, 2020.

6.  RCCL's failure to place adequate warning signs at the entrance to the main pool area to alert passengers of the significant dangers presented by the walkway surrounding the main pool, even though this route was designated an "***accessible***" route by RCCL, was a substantial contributing cause of Ms. Pell's slip and fall.

7.  RCCL's failure to post an attendant/security guard at the entranceway to the main pool area to warn passengers that the deck was slippery when wet and to watch their step (as I have observed RCCL attendants do during other site inspections), was also a substantial contributing cause of Ms. Pell's slip and fall.

8.  Numerous prior Guest Injury Statements, RCCL Steering Committee Minutes, Siebel databases, and Medallia databases indicate that slips and falls on decks around the pools were very common historical occurrences.

9.  Antoine Dons, General Manager of Bolidt, acknowledged that Future Teak, when first installed, has little to no "undulation" and that "inherently our products are self-leveling." He also explained that "the final mechanical sanding of the top surface gives it roughness; i.e., the wood grain effect,

which is also the [surface] roughness ...” Mr. Dons admits that sanding the deck increases surface roughness and that promotes slip resistance.

10. Mr. Dons also acknowledged that when contaminated, the slip resistance of Future Teak the deck would be expected to diminish. He also acknowledged that Bolidt tells customers that they need to keep the floor clean to maintain the slip-resistant properties.

11. Luis Portillo, an employee of Bolidt, acknowledged that in November 2018, that RCCL hired Bolidt “to sand the future teak around the main pool deck... due to the current state of the future teak it is ***quite slippery since it lost its original grain.***”

12. The Future Teak in this area was installed in 2017 and according to Mr. Portillo of Bolidt, by 2018 the deck was already quite slippery because of wear. Records indicate that the deck was sanded in 2018, but since Ms. Pell fell a year later, it is reasonable to assume that the deck was again in need of sanding. This is reinforced by the fact that RCCL had actually again sanded the deck after Ms. Pell fell.

13. Prior to the subject incident, RCCL had the feasible means to mitigate the dangerous conditions in question on the RCCL Enchantment of the Seas (but neglected to do so) by simply sanding the walkway as was done before and after Ms. Pell slipped and fell.

I anticipate testifying at trial regarding my qualifications, the referenced scientific/technical literature, regulations and standards, documents, observations, photographs, testing, methodologies, exhibits, findings, conclusions, and opinions referred to in this report. I will also testify to any and all matters disclosed in any expert disclosure, and/or supplemental report, and/or or in any deposition I might give. I also expect to offer rebuttal testimony to any comparable expert evidence offered by the defendant.

I reserve the right to amend or edit this report based on any new information that might be provided as discovery is ongoing.

Respectfully submitted,

_____          4/1/22

Frank A. Fore, P.E., CXLT          Date
PE 0042561

# REFERENCES

## Codes, Standards, Guidelines, and Recommendations

ANSI 1264.2-2006, *Standard for the Provision of Slip Resistance on Walking/Working Surfaces* (2006)

ANSI/ASSE TR-A1264.3 "Using Variable Angle Tribometers (VAT) for Measurement of the Slip Resistance of Walkway Surfaces" Des Plaines, IL: American Society of Safety Engineers (2008).

AS 3661.1, *Slip Resistance of Pedestrian Surfaces* (1993)

AS 4586, *Slip Resistance Classification of New Pedestrian Surfaces Using British Pendulum Tester* (2004)

AS 4663, *Slip Resistance Measurement of Existing Pedestrian Surfaces* (2013)

ASTM F 802-83, *Standard Guide for Selection of Certain Walkway Surfaces When Considering Footwear Traction,* West Conshohocken, PA: ASTM International (1983)

ASTM F1637-95, *Standard Practice for Safe Walking Surfaces*, West Conshohocken, PA: ASTM International (1995)

ASTM F 1166-07, *Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities*, West Conshohocken, PA: ASTM Intern. (2007)

Carnival Corp., *Safety Standard 003 (Rev 1) Guest Common Area Flooring Materials* (October 2012)

Carnival, *2-Minute Trainer ("Own the Spill")*

Carnival, *2-Minute Trainer ("Spills and Wet Floors")*

International Maritime Organization, *SOLAS, Part C, Regulation 13 ("Means of Escape")*

International Maritime Organization (IMO), *Recommendation on the Design and Operation of Passenger Ships to Respond to Elderly and Disabled Persons' Needs*, MSC/Circ. 735 (June 24, 1996)

International Maritime Organization, *International Safety Management (ISM) Code* (2002)

The Standard Club, Guide to P&I Cover, 2d ed. (2001)

U.S. Access Board, Proposed Passenger Vessel Accessibility Guidelines (PVAG)

**Scientific Literature**

Benner, *et. al.,* "Lubricating Properties of Water in Oil Emulsions," *Journal of Tribology*, (April, 2006) Vol. 128, 296-311

Bradford, "What Bathers Put Into A Pool: A Critical Review of Body Fluids and A Body Fluid Analog," *Int. J. of Aquatic Research and Education* (2014) Vol. 8, No. 2: 168-181

Buckley, Surface Effects of Adhesion, Tribology Series 5 (Elsevier 1981)

Bunterngchit, *et. al.,* "Age Related Effects of Transitional Floor Surfaces and Obstruction of View on Gait Characteristics Related to Slips and Falls," *Int. J. Indust. Ergonomics 25* (2000) 223-232

Burnfield, *et. al.,* "Prediction of Slips: An Evaluation of Utilized Coefficient of Friction and Available Slip Resistance," *Ergonomics,* (August, 2006) Vol. 45, No. 10: 982-995

CDC, *Health Information for International Travel* (2014)

Cham, *et. al.,* "Lower Extremity Corrective Reactions To Slip Events," *J. of Biomech.* 34 (2001) 1439-1445

Cham, *et. al.*, "Heel Contact Dynamics During Slip Events On Level and Inclined Surfaces," *Safety Science* 40 (2002) 559-76

Chang, *et. al.*, "Floor Slipperiness Measurement: Friction Coefficient, Roughness of Floors, and Subjective Perception Under Spillage Conditions," *Safety Science* 42 (2004) 547-65

Chang, *et. al.,* "The Role of Surface Roughness in the Measurement of Slipperiness," *Ergonomics*, (2010) Vol. 44, Issue 13

Chen, "Microstructure of PTFE-Based Polymer Blends and Their Tribological Behaviors Under Aqueous Environment," *Tribol. Lett.* (2012a) 45: 387-395

Chen, et. al., "Comparative Investigation on the Tribological Behaviors of CF/PEEK Composites Under Seawater Lubrication," Tribology Int. (2012b) Vol. 52: 170-177

Chen, "The Slip-Resistance Effect of Tread Grooves and Floor Roughness of Different Liquid Thickness," (Springer, 2014) 443-438

CNA Insurance Co., "Slip, Trip and Fall Accident Control" (2010)

Dee, *et. al*., "Development of a Slip Hazard: Partially Wetted Floors and Film Formation," *SAE Materials Performance and Characteristics*, (2016) Vol. 5, No. 1: 272-287

Dickinson, *et. al.*, Selling The Seas, 2nd ed. (Wiley, 2008)

Ding, *et. al.,* "Friction and Wear Performance of an Aluminum Alloy in Synthetic Seawater," J. of Engineering Tribology, (2010), Vol. 225, 43-49

DiPilla, "State of the Art in Slip-Resistance Measurement," *Professional Safety* (June, 2002) 37-42

El-Sherbiny, et. al., "Friction Coefficient of Rubber Materials Sliding Against Flooring Materials, ARPN J. of Engr. And Applied Sciences, (2012a) Vol. 7, No. 1: 12126

El-Sherbiny, *et. al*., "Prevention of Slip Accidents by Using Floor Mats," *Kautschuk, Gummi, Kunststoffe* (2012b), Vol. 65: 39-44

Excel Tribometers, "Report of ASTM F2508 Validation of the English XL VIT" (Variable Incidence Tribometer) (June 19, 2012)

Grieser, *et. al*., "Slip Resistance: Field Measurements Using Two Modern Slip Meters," *Professional Safety* (June, 2002) 43-48

Kennedy, S., "2019 Cruise Trends & Industry Outlook," Cruise Lines International Association (CLIA), 2018

Kim, "Comparison of Three Different Slip Meters Under Various Contaminated Conditions," *Saf. Health Work* (March 2012) 3(1): 22-30

Lancaster, "Lubrication of Carbon-Fibre-Reinforced Polymers; Part I – Water and Aqueous Solutions," *Wear* (Elsevier, 1972) 315-333

Li, *et. al*., "Floor Slipperiness Measurement: Friction Coefficient, Roughness of Floors, and Subjective Perception Under Spillage Conditions," *Safety Science* (2004) Vol. 42: 547-565

Liberty Mutual Ins. Co., "Preventing Slips and Falls," Dec. 2009

Liu, *et. al*., "Aging Effect on Foot Dynamics During Unexpected Slips," *Clin. Res. Foot Ankle* (2013) 1:2

Lockhart, *et. al.,* "Prediction of Falls Using a Robust Definition of Slip Distance and Adjusted Required Coefficient of Friction," IEA Proceedings (2000)

Lockhart, *et. al.*, "Effects of Aging on the Biomechanics of Slips and Falls," *Hum. Factors* (Winter, 2010) 47(4): 708-729

Mohamed, *et. al.*, "Friction Coefficient Displayed By Rubber Sliding Against Flooring Materials," *Int. J. of Engrng. and Technology,* (Dec., 2012) Vol. 12, No. 6: 144-149

National Safety Council, "Slips, Trip, and Falls" (2013)

Pazos, "Slip-and-Fall in the Marine Environment," *Occupational Health and Safety* (Mar. 1, 2003)

Sotter, Stop Slip and Fall Accidents, (Sotter Engr. Corp. 2009)

Sotter, "Identification of Flooring Having Sustainable Wet Slip Resistance," (Sotter Engr. Corp. 2010)

Sotter, "How To Buy Flooring Having Sustainable Wet Slip Resistance," *Occ. Health & Safety* (Oct. 1, 2010)

Statista Research Department, "Share of the Cruise Industry Worldwide in 2017, by Company," 2020

Strautins, "Enhanced Test Method for Assessing Sustainable Slip Resistance," Int. Conf. on Slips, Trips, and Falls (2007)

Strautins, "Sustainable Slip Resistance: an Opportunity for Innovation," (Qualicer, Castellon, Spain 2008a)

Strautins, "What Your Mother Didn't Tell You About Slip Resistance," *Tile Today,* vol. 62 (2008b)

Templer, The Staircase: Studies of Hazards, Falls and Safer Design, Vol. 2. Cambridge, MA: MIT Press (1992)

Zurich Services Corp., "Slips, Trips, and Falls for Retail," (2011)

Zurich Services Corp., "A Comparison of Two Slip Meters," *Risktopic 4-3.010* (October, 2012)